1  LYSAGHT LAW GROUP
2  Brian C. Lysaght (Bar. No. 61965)
   lysaghtlaw@hotmail.com
3  12021 Wilshire Boulevard
4  Los Angeles, California 90025
   Telephone: (310) 567-1111
5  Facsimile: (310) 472-0243
6  (Additional counsel listed below)
   *Attorneys for Plaintiffs*
7

```
                    FILED
           CLERK U.S. DISTRICT COURT

               NOV - 8 2011

       CENTRAL DISTRICT OF CALIFORNIA
       BY _____ DEPUTY
```

8         **UNITED STATES DISTRICT COURT**
          **CENTRAL DISTRICT OF CALIFORNIA**
9

10 | THE WESTERN AND SOUTHERN LIFE
11 | INSURANCE COMPANY, WESTERN-
   | SOUTHERN LIFE ASSURANCE COMPANY,
12 | COLUMBUS LIFE INSURANCE COMPANY,
13 | INTEGRITY LIFE INSURANCE COMPANY,
   | and FORT WASHINGTON INVESTMENT
14 | ADVISORS, INC.
15 |                          Plaintiffs,
16 |              - v -
   | COUNTRYWIDE FINANCIAL CORP.,
17 | COUNTRYWIDE HOME LOANS, INC.,
18 | COUNTRYWIDE CAPITAL MARKETS, LLC,
   | COUNTRYWIDE SECURITIES CORP.,
19 | CWALT, INC., CWABS, INC., CWMBS, INC.,
20 | CWHEQ, INC., BANK OF AMERICA CORP.,
   | BANK OF AMERICA, N.A., BAC HOME
21 | LOANS SERVICING, LP, NB HOLDINGS
22 | CORP., ANGELO MOZILO, DAVID SAMBOL,
   | ERIC SIERACKI, RANJIT KRIPALANI,
23 | STANFORD KURLAND, DAVID A.
24 | SPECTOR, N. JOSHUA ADLER, and
   | JENNIFER SANDEFUR,
25
26 |                          Defendants.
27

Case No. 2:11-cv-07166

Judge Pfaelzer

**AMENDED COMPLAINT**

Amended Complaint

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ........................................................................... 1

PARTIES............................................................................................... 6

    I.    Plaintiffs ................................................................... 6

    II.   Countrywide Defendants.......................................... 6

    III.  Officer Defendants ................................................... 8

    IV.  Bank of America Defendants .................................. 12

    V.   Relevant Non-Parties.............................................. 13

JURISDICTION AND VENUE ..................................................... 15

SUBSTANTIVE ALLEGATIONS ................................................. 16

    I.    RESIDENTIAL MORTGAGE-BACKED SECURITIES....... 16

    II.   THE SECURITIZATION PROCESS ..................................... 17

    III.  COUNTRYWIDE'S QUEST FOR MARKET DOMINANCE................................................................ 19

    IV.  WESTERN & SOUTHERN'S PURCHASES OF CERTIFICATES ................................................................ 23

    V.   COUNTRYWIDE'S ABANDONMENT OF ITS UNDERWRITING GUIDELINES ........................................ 23

         A.   Countrywide Falsely Touted Its Underwriting Standards ......................................................... 23

B.   Publicly Available Information Demonstrates That Countrywide Defrauded Investors by Systemically Ignoring Underwriting Standards ................................... 27

C.   Widespread Defaults and Downgrades Confirm That Countrywide Abandoned Its Underwriting Standards... 34

D.   Loan File Reviews By Countrywide's Insurers and Others Reveal A Total Disregard For Underwriting Standards ......................................................... 35

E.   Countrywide and Bank of America Have Paid Billions to Resolve Claims That They Securitized Loans While Ignoring Underwriting Standards ................................... 38

F.   The HUD Audit ................................................. 40

G.   Countrywide and Bank of America Conspired with Certificate Underwriters ........................................ 40

VI.   COUNTRYWIDE ROUTINELY FORGED OR FALSIFIED LOAN DOCUMENTS ............................................ 43

A.   The Audrey Sweet Mortgage Loan ............................... 45

B.   The Girgis Mortgage Loan ........................................ 46

C.   The Dana Miller Mortgage Loan ................................. 47

D.   Other Acts of Forgery and Falsification ....................... 49

E.   Predatory Lending Practices ..................................... 51

F.   Cheating Borrowers After Default .............................. 58

VII.   COUNTRYWIDE FAILED PROPERLY TO ASSIGN MORTGAGES AND FAILED TO DELIVER LOAN FILES TO THE TRUSTS .................................................... 60

A.   Countrywide Representations ..................................... 62

B.   Contrary to Its Representations, Countrywide Did Not Properly Assign Large Numbers of Mortgages, and Failed Properly to Transfer Loan Files ........................... 65

C.   Countrywide's Attempts to Cover Up Transfer and Assignment Failures........................................ 69

D.   Acts of Perjury, Forgery, and "Robo-Signing" In Ohio Foreclosures ................................................. 73

E.   Defendants' False Statements Regarding MERS .......... 76

VIII.   COUNTRYWIDE MANIPULATED THE APPRAISAL PROCESS................................................................. 76

IX.   COUNTRYWIDE MANIPULATED THE RATINGS PROCESS................................................................. 81

X.   COUNTRYWIDE RECEIVED MORTGAGE INSURANCE KICKBACKS ............................................................. 83

XI.   COUNTRYWIDE ENGAGED IN BANK FRAUD ............... 89

XII.   WESTERN & SOUTHERN'S DETRIMENTAL RELIANCE AND DAMAGES....................................................... 90

XIII.   LIABILITY OF SPONSOR, DEPOSITORS, AND UNDERWRITERS AS SELLERS OF SECURITIES OR SALE PARTICIPANTS ....................................................... 91

XIV.   DEFENDANTS' LIABILITY AS CONTROL PERSONS..... 93

XV.   BANK OF AMERICA'S LIABILITY AS SUCCESSOR IN INTEREST BY DE FACTO MERGER ................................ 103

XVI.   WESTERN & SOUTHERN DID NOT KNOW AND COULD NOT HAVE KNOWN OF ITS CLAIMS PRIOR TO APRIL 2009 ....................................................................... 116

FIRST CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.41) ........................................................................ 123

SECOND CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.44(B)(4)) .................................................................... 124

THIRD CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.44(J)) ..................................................................... 125

FOURTH CAUSE OF ACTION (Violation of Ohio Securities Act, ORC § 1707.44(G)) .................................................................... 126

FIFTH CAUSE OF ACTION (Rescission pursuant to Ohio Securities Act, ORC § 1707.43) ............................................................... 126

SIXTH CAUSE OF ACTION (Violation of Ohio Corrupt Activities Act, ORC § 2923.31-2923.36) ......................................................... 127

SEVENTH CAUSE OF ACTION (Ohio Negligent Misrepresentation) ... 129

EIGHTH CAUSE OF ACTION (Violation of Section 10(b) of the 1934 Act and Rule 10b-5) ......................................................... 131

NINTH CAUSE OF ACTION (Violation of Section 20(a) of the 1934 Act) ........................................................................... 134

TENTH CAUSE OF ACTION (Violation of Section 11 of the 1933 Act ) ............................................................................ 135

ELEVENTH CAUSE OF ACTION (Violation of Section 12(a)(2) of the 1933 Act) ......................................................................... 138

TWELFTH CAUSE OF ACTION (Violation of Section 15 of the 1933 Act) ............................................................................... 139

THIRTEENTH CAUSE OF ACTION (Successor and Vicarious Liability) ........................................................................... 141

FOURTEENTH CAUSE OF ACTION (Ohio Common Law Fraud)........ 141

SEVENTEENTH CAUSE OF ACTION (Civil Conspiracy).....................142

PRAYER FOR RELIEF ...............................................................143

JURY TRIAL DEMANDED.....................................................144

1    Plaintiffs The Western and Southern Life Insurance Company,

2    Western-Southern Life Assurance Company, Columbus Life Insurance

3    Company, Integrity Life Insurance Company, and Fort Washington

4    Investment Advisors, Inc. (collectively, "Western & Southern") by and

5    through their attorneys, bring this action against Countrywide Financial

6    Corporation ("Countrywide Financial"), Countrywide Home Loans, Inc.

7    ("Countrywide Home Loans"), Countrywide Capital Markets, LLC

8    ("Countrywide Capital Markets"), (successor to Countrywide Capital

9    Markets, Inc.) Countrywide Securities Corporation ("Countrywide

10   Securities"), and CWALT, Inc. ("CWALT"), CWABS, Inc. ("CWABS"),

11   CWHEQ, Inc. ("CWHEQ"), and CWMBS, Inc. ("CWMBS") (all

12   collectively, "Countrywide" or the "Countrywide Defendants"); Angelo

13   Mozilo, David Sambol, Eric Sieracki, Ranjit Kripalani, Stanford Kurland,

14   David A. Spector, N. Joshua Adler, and Jennifer Sandefur (the "Officer

15   Defendants"); and Bank of America Corporation ("Bank of America"), Bank

16   of America, N.A., BAC Home Loans Servicing, LP ("BAC Servicing"), and

17   NB Holdings Corporation (collectively, the "Bank of America Defendants"),

18   and allege as follows:

19                          **NATURE OF ACTION**

20        1.    This action arises out of the sale to Western & Southern of

21   certain residential mortgage-backed securities (the "Certificates").  The

22   Certificates were sold pursuant to offering materials (as more fully described

23   below) that contained untrue statements and omissions of material facts in

24   violation of Sections 1707.41, 1707.43, 1707.44 and 2923.32 of the Ohio

25   Revised Code, the federal securities laws, and common law prohibitions

26   against fraud and negligent misrepresentation.

27

2.      Four of the five Western & Southern plaintiffs are mutual insurance companies based in Cincinnati, Ohio.  Like other mutual insurance companies, they are owned by their policyholders and are subject to state insurance regulations including capital requirements that effectively limit the types of investments they can hold.  Accordingly, Western & Southern generally only purchased from Countrywide senior "Class A" Certificates rated triple-A or the equivalent, seeking a stable stream of interest income.  These investments were managed by a relatively small staff of portfolio managers and accountants located in Ohio.

3.      From 2000-2003, Countrywide rose to prominence as a mortgage lender originating hundreds of billions of dollars worth of loans annually and securitizing them for sale to investors.  Business expanded so rapidly that Countrywide's founder and CEO, Defendant Angelo Mozilo, stated publicly that by 2006 Countrywide would be the Nation's "dominant" home-mortgage lender.  By 2004, however, it became apparent that Countrywide would be unable to reach its lofty goals if it limited itself to lending to borrowers who qualified under prudent loan underwriting standards.

4.      In order to fuel Countrywide's growth and amass vast riches for themselves, Mozilo, the other Officer Defendants and certain unnamed co-conspirators described herein embarked on a massive fraud that is largely responsible for the Nation's enduring financial crisis and for the financial ruin of countless individuals.

5.      Mozilo and his lieutenants directed Countrywide's principal loan originator, Countrywide Home Loans, to approve any loan that could be offloaded onto investors such as Western & Southern, without regard to whether the loan complied with Countrywide's already lax underwriting

standards.  As Countrywide's CFO, Defendant David Sambol, stated in a February 13, 2005 email, "we should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."

6.     Countrywide Home Loans' underwriters or third party mortgage brokers that had been tapped to fill the Countrywide pipeline canvassed the market for borrowers most vulnerable to slick sales practices and the illusion that achieving home ownership was as easy as agreeing to a mortgage loan that they did not understand.

7.     It was often obvious that borrowers targeted by Countrywide could not repay the loans Countrywide sought to extend to them.  In those cases, Countrywide employees many times forged documents to create the appearance that the borrower qualified for the loan.  Countrywide employees who observed fraudulent underwriting practices and reported them were summarily fired.

8.     Countrywide, the Officer Defendants, and others participating in the scheme (as described herein) never intended to allow the most toxic loans originated by Countrywide Home Loans to remain on Countrywide's balance sheet.  Instead, these mortgage loans were sold to investors such as Western & Southern.

9.     In marketing the Certificates to Western & Southern, Countrywide and the Certificate underwriters represented that the loans underlying the securities were underwritten in accordance with prudent standards that ensured only qualified borrowers were granted loans, that borrowers could repay the underlying loans, and that mortgaged properties provided adequate collateral for corresponding loans.  Countrywide further represented that the underlying mortgage loans had been validly assigned to

the Trusts that issued the Certificates, and that the Trusts, acting through loan servicers or the trustees, would have the ability to foreclose in the event of borrower default.

10.     The loans backing the Certificates deviated dramatically from what was represented to Western & Southern.  To generate an ever-growing volume of loans to securitize and sell to investors, Countrywide abandoned all semblance of underwriting guidelines, regularly originating or purchasing loans issued to borrowers regardless of ability to repay or collateral value. Moreover, Defendants did not properly assign many of the mortgages underlying the Certificates, nor did they properly transfer notes and loan files to the relevant Trusts.

11.     Virtually all of the Certificates acquired by Western & Southern were triple-A rated at the time of purchase.  Now most are "junk" bonds that do not qualify for any investment grade rating.  They are "junk."  In ten of the 32 securitizations in this action, well over 20% of the underlying loans have defaulted, been foreclosed upon or are seriously delinquent.  In seven securitizations, over 30% of the loans have defaulted, been foreclosed upon or are seriously delinquent.  Under the Ohio Securities Act, the Ohio Corrupt Activities Act, the federal securities laws and common law, Western & Southern is entitled to rescind its purchase of these securities and to obtain damages for the full amount of its losses.

12.     The Certificates are complex structured financial investments backed by thousands of mortgage loans.  They are difficult to accurately analyze and value.  From its purchase of its Certificates through today, Western & Southern has diligently analyzed expected cash flows for valuation, regulatory and accounting purposes.  As set forth herein, through at least June 2009, Western & Southern's analytical efforts were

continuously frustrated by the provision of false and fraudulent loan tape data by the Countrywide Defendants and their successors.  As a regulated, "buy and hold" investor in triple-A certificates, Western & Southern was more concerned about possible impairment of the cash flows due under the Certificates than fluctuations in market price.   As such, and as set forth more fully below, Western & Southern did not know and could not have known of its claims prior to June 2009.

13.    The allegations set forth in this Amended Complaint are the result of an exhaustive investigation by counsel for Western & Southern including a review of documents in Western & Southern's files, public filings relating to the Certificates and Countrywide's financial operations, testimony from numerous former Countrywide employees and other publicly available reports concerning Countrywide's misconduct.

14.    Counsel for Western & Southern has also engaged in a number of interviews of witnesses or their attorneys, including of Countrywide borrowers who were similarly victims of Countrywide's fraudulent schemes and individuals familiar with Countrywide's securitization practices. Western & Southern engaged in discussions with counsel for other parties who have sued Countrywide including parties that have conducted their own reviews of Countrywide loan files described below to the extent that such parties were able to share non-confidential information concerning the methodologies employed and their findings.  Western & Southern also conducted its own review of Countrywide loan or foreclosure files and internal Countrywide documents made public in connection with investigations by federal law enforcement or regulatory agencies.

**PARTIES**

**I.    Plaintiffs**

15.    Plaintiff The Western and Southern Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life insurance and annuity products.

16.    Plaintiff Western-Southern Life Assurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life insurance and annuity products.

17.    Plaintiff Columbus Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life, accident and health insurance and annuity products.

18.    Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws of, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio.  It sells life, accident and health insurance and annuity products.

19.    Fort Washington Investment Advisors, Inc. is a registered investment advisor formed under the laws of the State of Ohio, with its principal place of business in Cincinnati, Ohio.  Fort Washington Investment Advisors is bringing this action on behalf of Fort Washington Active Fixed Income LLC, a Delaware limited liability company with its principal place of business in Cincinnati, Ohio.

**II.    Countrywide Defendants**

20.    Defendant Countrywide Financial is a corporation organized under the laws of the State of Delaware with its principal executive offices at

4500 Park Granada, Calabasas, California.  Pursuant to a merger completed on July 1, 2008, Countrywide Financial was merged into and is now part of Defendant Bank of America.

21.    Defendant Countrywide Home Loans, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of New York with its principal place of business at 4500 Park Granada, Calabasas, California.  Countrywide Home Loans is now part of Defendant Bank of America and operates under the trade name "Bank of America Home Loans."

22.    Defendant Countrywide Capital Markets, a wholly-owned subsidiary of Countrywide Financial, is a corporation organized under the laws of the State of California with its principal place of business at 4500 Park Granada, Calabasas, California.  Countrywide Capital Markets (now part of Bank of America) operates through its two main wholly-owned subsidiaries, Defendant Countrywide Securities Corporation and Countrywide Servicing Exchange.

23.    Defendant Countrywide Securities is a corporation organized under the laws of the State of Delaware with its principal place of business at 4500 Park Granada, Calabasas, California.  Countrywide Securities is now part of Defendant Bank of America.

24.    Defendant CWALT is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.  CWALT was the Depositor for certain of the Offerings in which Western & Southern invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Western & Southern.

25.     Defendant CWABS is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.  CWABS was the Depositor for certain of the Offerings in which Western & Southern invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Western & Southern.

26.     Defendant CWHEQ is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.  CWHEQ was the Depositor for certain of the Offerings in which Western & Southern invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Western & Southern.

27.     Defendant CWMBS is a Delaware corporation and a limited purpose subsidiary of Countrywide Financial Corporation with its principal place of business at 4500 Park Granada, Calabasas, California.  CWMBS was the Depositor for certain of the Offerings in which Western & Southern invested, the Registrant for certain Registration Statements filed with the SEC, and an issuer of certain mortgage-backed Certificates purchased by Western & Southern.

## III.    Officer Defendants

28.     Defendant Angelo Mozilo co-founded Countrywide and served on its Board of Directors from 1969 to July 1, 2008.  Mozilo also served as Countrywide Financial's Chairman starting in March 1999 and in various other executive positions since Countrywide Financial's inception, including President from March 2000 through December 2003, and Chief Executive

1   Officer from February 1998 to July 1, 2008.  He was a member of

2   Countrywide Financial's Executive Strategy Committee, which was

3   responsible for establishing and evaluating Countrywide's overall strategic

4   direction and governing its annual planning process.  Mozilo also served on

5   Countrywide Financial's Credit Committee and Finance Committee and, as

6   CEO and Chairman of the Board, directly oversaw the Ethics and Asset

7   Liability Committees.  Mozilo resigned from all of the above positions on

8   July l, 2008.  Mozilo resides in Thousand Oaks, California.

9          29.    Defendant David Sambol joined Countrywide Financial in

10  1985.  Sambol held numerous key executive positions at Countrywide.

11  From 1994 to 2003, Sambol was a Managing Director and served as

12  Countrywide Financial's Senior Managing Director and Chief of Production

13  for its loan sector.  From 2004 to 2006, Sambol was President and COO of

14  Countrywide Home Loans, where he led all operations and had oversight

15  responsibility for the company.

16         30.    From 2004 to 2006, Sambol served as Countrywide Financial's

17  Executive Managing Director for Business Segment Operations, heading up

18  all revenue-generating operations at Countrywide Financial, as well as the

19  corporate operational and support units comprised of Administration,

20  Marketing and Corporate Communications, and Enterprise Operations and

21  Technology.  From September 2006 through his retirement in mid-2008,

22  Sambol was Countrywide Financial's President and Chief Operating Officer.

23  Beginning in 2007, Sambol was CEO of Countrywide Home Loans and a

24  member of Countrywide Financial's Board of Directors.  Beginning in 2007,

25  Sambol also was CEO and President of CWHEQ and a member of its Board

26  of Directors.  Sambol resides in Hidden Hills, California.

27

31.     During his tenure at Countrywide, Sambol was also a member of several Countrywide Financial committees, including the Executive Strategy Committee, the Asset/Liability Committee, the Finance Committee, the Audit and Ethics Committee, and the Committee to Set Loan Loss Allowance.

32.     Defendant Eric Sieracki served as Countrywide Financial's Executive Managing Director and Chief Financial Officer from April 2005 through the 2008 merger with Bank of America.  Prior to his appointment as CFO, Sieracki occupied other high-level positions in various Countrywide entities, including with CWALT, CWABS, CWHEQ, and CWMBS. Sieracki signed the Registration Statements for the following securitizations: CWALT 2005-46CB, CWALT 2005-47CB, CWALT 2005-49CB, CWALT 2005-54CB, CWALT 2006-14CB, CWALT 2006-14CB, CWALT 2006-7CB, CWALT 2007-15CB, CWALT 2007-16CB, CWALT 2007-17CB, CWALT 2007-21CB, CWALT 2007-5CB, CWHL 2005-24, CWHL 2005-25, CWHL 2006-21, CWHL 2007-14, CWHL 2007-15, CWHL 2007-5, CWL 2006-S8, CWL 2006-S9, CWL 2007-11, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.  Sieracki resides in Lake Sherwood, California.

33.     Defendant Ranjit Kripalani joined Countrywide Financial and its subsidiary Countrywide Securities in 1998, as Countrywide Financial's Executive Vice President, and Countrywide Securities' National Sales Manager.  He occupied numerous high-level positions across various Countrywide entities, including CWALT, CWABS, CWHEQ and CWMBS. Kripalani signed the Registration Statements for the following securitizations:  CWALT 2007-15CB, CWALT 2007-16CB, CWALT 2007-17CB, CWALT 2007-21CB, CWHL 2007-14, CWHL 2007-15, and CWL 2007-11.  Kripalani resides in Manhattan Beach, California.

34.     Defendant Stanford Kurland was President and COO of Countrywide Financial from 1988 until September 7, 2006.  He served in numerous high-level positions across Countrywide.  At all relevant times up to his September 2006 departure, Kurland was also the CEO, President and Chairman of the Board of CWABS.  He was also Chairman of the Board, President, and CEO of CWALT, CWABS, CWHEQ, and CWMBS. Kurland signed the registration statements for the following securitizations: CWALT 2005-10CB, CWALT 2005-13CB, CWALT 2005-20CB, CWALT 2005-26CB, CWALT 2005-28CB, CWALT 2005-30CB, CWALT 2005-46CB, CWALT 2005-47CB, CWALT 2005-49CB, CWALT 2005-54CB, CWALT 2005-J1, CWALT 2006-14CB, CWALT 2006-14CB, CWALT 2006-7CB, CWALT 2007-5CB, CWHL 2005-24, CWHL 2005-25, CWHL 2005-J2, CWHL 2006-21, CWHL 2007-5, CWL 2006-S8, CWL 2006-S9, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.  Kurland resides in Hidden Hills, California and is employed by PennyMac, a mortgage company in Calabasas, California, that invests in distressed mortgages.

35.     Defendant David A. Spector joined Countrywide in 1990 and served as its Executive Vice President of Secondary Markets.  He was promoted to Managing Director in 2001 and served as Senior Managing Director of Secondary Marketing at Countrywide Financial from 2004 to 2006.  He was also a member of the Board of Directors for CWALT, CWABS, CWHEQ, and CWMBS.  Spector signed the Registration Statements for the following securitizations:  CWALT 2005-10CB, CWALT 2005-13CB, CWALT 2005-20CB, CWALT 2005-26CB, CWALT 2005-28CB, CWALT 2005-30CB, CWALT 2005-46CB, CWALT 2005-47CB, CWALT 2005-49CB, CWALT 2005-54CB, CWALT 2005-J1, CWALT 2006-14CB, CWALT 2006-14CB, CWALT 2006-7CB, CWALT 2007-5CB,

CWHL 2005-24, CWHL 2005-25, CWHL 2005-J2, CWHL 2006-21, CWHL 2007-5, CWL 2006-S8, CWL 2006-S9, CWL 2007-4, CWL 2007-S1, and CWL 2007-S2.  Spector resides in Martinez, California.  Like Kurland, Spector is now employed by PennyMac.

36.    Defendant N. Joshua Adler served as President, CEO, and was a member of the Board of Directors for CWALT, CWABS, CWMBS, and CWHEQ.  Adler signed the Registration Statements for the following securitizations:  CWALT 2007-15CB, CWALT 2007-16CB, CWALT 2007-17CB, CWALT 2007-21CB, CWHL 2007-14, CWHL 2007-15, and CWL 2007-11.  Adler resides in Calabasas, California.

37.    Defendant Jennifer Sandefur joined Countrywide Financial in 1994 as Vice President and Assistant Treasurer and was shortly promoted to Treasurer of Countrywide Home Loans.  She served as Senior Managing Director and Treasurer of Countrywide Financial at the time of her departure in 2008.  She also held high-level positions with CWALT, CWABS, CWHEQ, and CWMBS.  Sandefur signed the Registration Statement for the following securitizations:  CWALT 2007-15CB, CWALT 2007-16CB, CWALT 2007-17CB, CWALT 2007-21CB, CWHL 2007-14, CWHL 2007-15, and CWL 2007-11.  Sandefur resides in Somis, California.

## IV.    Bank of America Defendants

38.    Defendant Bank of America Corporation is a Delaware corporation with its principal executive offices at 100 North Tryon Street, Charlotte, North Carolina.  Defendants Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, and Countrywide Securities all became part of Bank of America following the merger of Countrywide Financial into Bank of America on July 1, 2008.

39.     Defendant Bank of America, N.A. is a federally chartered bank
regulated by the Office of the Comptroller of the Currency, Department of
the Treasury (the "OCC").  Bank of America, N.A. is sued in its capacity as
successor to Countrywide Bank, FSB.  In February of 2009 Countrywide
Bank, FSB, filed an application to become a National Association, and in
April of 2009, Countrywide Bank, NA was merged into Bank of America,
N.A.  All allegations in this Amended Complaint made against Countrywide
Bank are asserted against Bank of America, N.A. as successor to
Countrywide Bank, FSB and/or Countrywide Bank, N.A. ("Countrywide
Bank").

40.     Defendant BAC Servicing is a limited partnership and
subsidiary of Bank of America with its principal executive offices at 4500
Park Granada, Calabasas, CA.  BAC Servicing is identified in mortgage
contracts and other legal documents as "BAC Home Loans Servicing, LP
FKA Countrywide Home Loans Servicing, LP," as it was formerly known as
Countrywide Home Loans Servicing, LP, the Countrywide subsidiary
responsible for servicing Countrywide mortgage loans.

41.     Defendant NB Holdings Corporation is a Delaware corporation.
NB Holdings Corporation is one of the shell entities used to effectuate the
Bank of America-Countrywide merger, and is a successor to Defendant
Countrywide Home Loans.  On July 3, 2008, Countrywide Home Loans
completed the sale of substantially all of its assets to NB Holdings
Corporation, a wholly-owned subsidiary of Bank of America.

## V.     The Non-Party Trusts

42.     The Certificates for each securitization relevant to this action
were issued by a trust.  The issuing trusts (collectively, the "Trusts") are
identified in Exhibit A along with other details regarding Western &

Southern's purchases.  The Trusts are common-law trusts formed under the laws of the State of New York.

43.     The Trusts are managed by a trustee.  The trustee for all Certificates purchased by Western & Southern is The Bank of New York Mellon ("BNY"), a New York banking corporation.  The 32 securitization Trusts involved in this complaint are: Alternative Loan Trust 2005-10CB ("CWALT 2005-10CB"), Alternative Loan Trust 2005-13CB ("CWALT 2005-13CB"), Alternative Loan Trust 2005-20CB ("CWALT 2005-20CB"), Alternative Loan Trust 2005-26CB ("CWALT 2005-26CB"), Alternative Loan Trust 2005-28CB ("CWALT 2005-28CB"), Alternative Loan Trust 2005-30CB ("CWALT 2005-30CB"), Alternative Loan Trust 2005-46CB ("CWALT 2005-46CB"), Alternative Loan Trust 2005-47CB ("CWALT 2005-47CB"), Alternative Loan Trust 2005-49CB ("CWALT 2005-49CB"), Alternative Loan Trust 2005-54CB ("CWALT 2005-54CB"), Alternative Loan Trust 2005-J1 ("CWALT 2005-J1"), Alternative Loan Trust 2006-7CB ("CWALT 2006-7CB"), Alternative Loan Trust 2006-14CB ("CWALT 2006-14CB"), Alternative Loan Trust 2006-39CB ("CWALT 2006-39CB"), Alternative Loan Trust 2007-5CB ("CWALT 2007-5CB"), Alternative Loan Trust 2007-15CB ("CWALT 2007-15CB"), Alternative Loan Trust 2007-16CB ("CWALT 2007-16CB"), Alternative Loan Trust 2007-17CB ("CWALT 2007-17CB"), Alternative Loan Trust 2007-21CB ("CWALT 2007-21CB"), CHL Mortgage Pass-Through Trust 2005-24 ("CWHL 2005-24"), CHL Mortgage Pass-Through Trust 2005-25 ("CWHL 2005-25"), CHL Mortgage Pass-Through Trust 2005-J2 ("CWHL 2005-J2"), CHL Mortgage Pass-Through Trust 2006-21 ("CWHL 2006-21"), CHL Mortgage Pass-Through Trust 2007-5 ("CWHL 2007-5"), CHL Mortgage Pass-Through Trust 2007-14 ("CWHL 2007-14"), CHL Mortgage Pass-Through

1   Trust 2007-15 ("CWHL 2007-15"), CWHEQ Home Equity Loan Trust
2   2006-S8 ("CWL 2006-S8"), CWHEQ Home Equity Loan Trust 2006-S9
3   ("CWL 2006-S9"), CWABS Asset-Backed Certificates Trust 2007-4 ("CWL
4   2007-4"), CWABS Asset-Backed Certificates Trust 2007-11 ("CWL 2007-
5   11"), CWHEQ Home Equity Loan Trust 2007-S1 ("CWL 2007-S1"), and
6   CWHEQ Home Equity Loan Trust 2006-S2 ("CWL 2007-S2").

7       44.    At all relevant times, Defendants committed the acts, caused or
8   directed others to commit the acts, or permitted others to commit the acts
9   alleged in this Complaint.  Any allegations about acts of corporate
10  Defendants means that those acts were committed through their officers,
11  directors, employees, agents, and/or representatives while those individuals
12  were acting within the actual or implied scope of their authority.

13                      **JURISDICTION AND VENUE**

14      45.    This action was filed in the Southern District of Ohio and
15  subsequently transferred to the Central District of California for pretrial
16  purposes only by order of the Judicial Panel for Multidistrict Litigation.  The
17  Honorable S. Arthur Spiegel of the Southern District of Ohio denied
18  Defendants' motion to transfer the trial of this action to the Central District
19  of California.

20      46.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  The
21  federal claims asserted herein arise under Section 10(b) of the Securities and
22  Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b-5 promulgated
23  thereunder, 17 C.F.R. § 240.l0b-5; Section 20(a) of the 1934 Act, 15 U.S.C.
24  § 78t(a); 28 U.S.C. § 1337; and Section 27 of the 1934 Act, 15.U.S.C.
25  §78aa.  The federal claims asserted herein also arise under Sections 11,
26  12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2),

1    and 770; Section 22 of the 1933 Act, 15 U.S.C. § 77v; and 28 U.S.C. §
2    1337.

3          47.    This Court has supplemental jurisdiction over Western &
4    Southern's state-law claims pursuant to 28 U.S.C. § 1367.

5          48.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)
6    and Section 27 of the 1934 Act, 15 U.S.C. § 78aa.

7                         **SUBSTANTIVE ALLEGATIONS**

8    **I.    RESIDENTIAL MORTGAGE-BACKED SECURITIES**

9          49.    In the 1980s and 1990s, mortgage originators followed a
10   traditional business model whereby they either held to maturity the loans
11   they had provided to borrowers, or sold the loans to certain government-
12   sponsored entities, mainly the Federal National Mortgage Association
13   ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie
14   Mac").

15         50.    Loans held by originators were typically conservative, first-lien
16   loans to prime borrowers. Originators would profit if a borrower made
17   timely interest and principal payments, but would lose if the borrower
18   defaulted and the property value was less than the loan balance. As a result,
19   originators had good reason to carefully establish the creditworthiness of
20   each borrower and the true value of each underlying property before issuing
21   a mortgage loan.

22         51.    Loans sold to Fannie Mae and Freddie Mac could not exceed
23   certain maximum amounts, and had to meet specific guidelines on
24   documentation, loan servicing and the like. These so-called "conforming"
25   loans are the loans with the historically lowest rates of delinquency and
26   default. Mortgage loans that exceed agency maximums or otherwise do not
27   meet the agency guidelines are known as "non-conforming" loans.

52.     In the 1980s and 1990s, Fannie Mae and Freddie Mac sold securities – known as residential mortgage-backed securities (or "RMBS") – backed by loans purchased from mortgage originators.  These early mortgage-backed securities were considered very low-risk investments, because the underlying loans conformed to strict regulatory guidelines, and because Fannie Mae and Freddie Mac guaranteed timely payments of principal and interest.  Indeed, because the agencies' guarantees were implicitly, if not explicitly, backed by the federal government, investors regarded RMBS issued by Fannie Mae and Freddie Mac as virtually risk-free.

53.     In the early 2000s, the demand for securities backed by mortgage loans increased.  Private financial institutions stepped in by originating and then securitizing an ever-growing number of non-conforming loans, such as jumbo loans in excess of agency maximum amounts, loans based on reduced documentation, loans issued to less creditworthy borrowers, and loans with adjustable interest rates.  By 2001, private financial institutions had issued $240 billion in face amount of RMBS.  By 2006, that amount had increased four-fold to over $1 trillion.

54.     During this period, Countrywide dramatically increased its underwriting and issuance of mortgage-backed securities to take advantage of the exploding market and earn substantial revenues by aggressively marketing the securities to investors such as Western & Southern.

## II.     THE SECURITIZATION PROCESS

55.     The process whereby residential mortgage-backed securities are created and sold is known as mortgage securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together,

with securities constituting interests in the cash flow from the mortgage pools then sold to investors.

56. The first step is the origination or purchase of mortgage loans by a "sponsor" (or "seller"), and the sale of a pool of such loans by the sponsor to a "depositor," typically a special-purpose affiliate of the sponsor.

57. The depositor then deposits the pool of loans into a trust under a trust agreement that establishes various classes, or "tranches," of interests in payments made by borrowers on the loans. The trust issues certificates representing interests in these tranches; the certificates are sold to an underwriter (often an affiliate of the sponsor and the depositor); and the underwriter seeks to re-sell the certificates at a profit to investors.

58. Each tranche has a different level of purported risk and reward, and, often, a different rating by a nationally recognized credit-rating agency, such as Standard & Poor's or Moody's. The most senior tranches generally receive the highest ratings, AAA or AA. Junior tranches offer higher potential returns but are exposed to more risk and have lower credit ratings. Senior tranches are generally entitled to payment in full ahead of junior tranches, and losses on are generally allocated first to junior tranches. This division of cash flows and losses is referred to as the flow of funds or "waterfall."

59. The sponsor and underwriter work with one or more of the credit-rating agencies to ensure that each certificate tranche receives the highest possible rating in order to facilitate the underwriter's marketing and re-sale to investors.

60. Because cash flow from loans in the mortgage pool is the sole source of funds to re-pay holders of a mortgage-backed security, the credit quality of the securities turns on the credit quality of the underlying

mortgage pool, which often includes thousands of loans.  Detailed information about loan credit quality is contained in loan files developed and maintained by the mortgage originators.  For residential mortgage loans, each loan file should normally contain documents such as the borrower's loan application; verification of income, assets, and employment; credit reports; and an appraisal of the mortgaged property that secures the loan and provides the basis for other measures of credit quality, such as loan-to-value ratio and occupancy status.  The loan file should also include notes by the person who granted the loan application describing the loan's compliance with underwriting guidelines, and documenting any factors that justified any departure from those standards.

61.    RMBS investors do not have access to the loan files.  Instead, the sponsor, the depositor, and the underwriter are responsible for gathering and verifying information about the documentation and credit quality of loans that are deposited into a mortgage-backed security trust, and then presenting that information to potential investors in registration statements, prospectuses, prospectus supplements, data compilations, and loan tapes (collectively, "Offering Materials").  This verification and disclosure process is a critical safeguard for investors, and a fundamental legal obligation of the sponsor, the depositor, and the underwriter.

## III.    COUNTRYWIDE'S QUEST FOR MARKET DOMINANCE

62.    Prior to 2000, Countrywide originated mainly conforming mortgage loans that could be sold to Fannie Mae and Freddie Mac.  Beginning in 2000, Countrywide entered the so called "subprime" mortgage market in earnest, originating loans that did not comply with Fannie Mae and Freddie Mac guidelines.

63.     Over the next few years, Countrywide was able to increase its market share of both conforming loans and non-conforming loans.  In 2001, 2002 and 2003, approximately half of Countrywide's originations were non-conforming, sub-prime loans.

64.     In 2004, demand for mortgage loans decreased and virtually every other originator besides Countrywide originated fewer loans than in prior years.  Countrywide to the contrary increased its loan origination by systemically abandoning its underwriting standards.  Countrywide's 2004 market share increased subprime loans to 72% of Countrywide's mortgage portfolio.  Countrywide maintained its sub-prime originations at similar levels throughout 2005 and 2006.

65.     As part of its quest for larger and larger loan volume, Countrywide began a race to the bottom of underwriting standards.  A component of this effort was a "matching strategy" whereby Countrywide would match any loan program offered by a competitor, regardless of the risk involved.  This strategy required Countrywide's wholesale disregard of its own underwriting guidelines in favor of blindly approving nearly any kind of loan.

66.     An integral part of Countrywide's matching strategy was a practice of granting "exceptions" to its underwriting guidelines.  Prior to Countrywide's efforts to increase market share , exceptions were typically only granted where sufficient compensating factors offset the underwriting criterion that a given loan had failed.  Countrywide, however, began to employ exceptions to gain approval for loans that did not have such compensating factors and that did not otherwise pass muster under the underwriting guidelines.

67.     As Countrywide's loan volume increased, so did the personnel authorized to grant exceptions.  And if a first-level underwriter refused to grant an exception, a salesperson could simply go to that underwriter's superior – and on – to find someone who would.  Countrywide also employed a computer system known as the Exception Processing System. That system would approve nearly any borrower, though at an increased cost to the borrower (and eventually the market) depending on the increased risk. Because that system was known within Countrywide to approve almost any borrower, it was nicknamed the "Price Any Loan" system.

68.     Countrywide typically made four attempts at approving a loan. In the last attempt, the loan was referred to Countrywide's Secondary Markets Structured Lending Desk.  At that desk, the sole criterion for determining whether Countrywide would approve a loan was whether the loan could be sold into the secondary market.  This practice guaranteed Countrywide the largest volume of loan originations possible without regard for its underwriting guidelines.

69.     To increase loan volume, Countrywide engaged in a regular practice of predatory lending executed by its internal and independent brokers.  Those brokers were given scripts and taught high pressure sales tactics to trick, or sometimes downright lie to, borrowers in order to lull them into accepting a Countrywide loan or refinancing.  Those brokers were paid on commissions that increased depending on the loan.  A conforming, low-dollar loan would earn some of the lowest commissions, while loans that had high pre-payment penalties or that reset to high interest rates received much higher commissions.  In fact, the higher the loan reset rate, the higher the commission the broker was paid.  Such loans were often

confusing and complex, and the brokers themselves sometimes did not understand how they worked.

70.     Countrywide hid these practices from the market by, among other things, classifying a larger and larger number of loans as prime that were in fact generally considered to be subprime.  Countrywide also regularly touted its strict underwriting guidelines and its claim that it could find the best loan for any borrower – claims only now known to be patently untrue.

71.     Countrywide hid its practices from the market in part so that its directors, officers and executives could enrich themselves through sales of massive amounts of stock.  Between 2004 and the end of 2007, insiders sold more than $850 million of Countrywide stock, and Mozilo himself sold about $474 million worth of shares during that period.  Those sales were made at inflated prices, because the Defendants systematically hid the origination, securitization and servicing fraud in which Countrywide was engaged.

72.     In October 2006, Countrywide authorized a share repurchase program up to a limit of $2.5 billion.  The market took the program to be a signal that Countrywide's board thought its shares were undervalued.  From November 2006 to February 2007, Countrywide's share price thus rose over $6.50 per share to hit an all-time high of $45.03 in February 2007.  In effect, Countrywide's board supported its stock prices through the repurchase program while it and other insiders dumped their Countrywide shares on the market.

73.     However, Countrywide could not hide its difficulties forever. By the middle of 2007, Countrywide's stock price began to suffer significantly and rumors began to circle about problems with Countrywide's

1   liquidity.  On August 16, 2007, Countrywide had to draw down its full credit
2   facility of $11.5 billion to stay afloat, and on August 22, 2007, Bank of
3   America purchased $2 billion worth of nonvoting, convertible preferred
4   stock equal to approximately a 17% share of Countrywide.

5   74.    Finally, with Countrywide about to fail, in January 2008, Bank
6   of America announced that it would purchase all of Countrywide for a little
7   over $4 billion.  Through a series of transactions since that announcement,
8   Bank of America is now running what used to be Countrywide's mortgage
9   origination and servicing businesses.

10  **IV.    WESTERN & SOUTHERN'S PURCHASES OF**
11  **CERTIFICATES**

12  75.    Western & Southern purchased $447 million of Countrywide
13  Certificates from June 21, 2005 through March 25, 2008.  These purchases
14  are each listed individually in Exhibit A to this Amended Complaint.

15  **V.    COUNTRYWIDE'S ABANDONMENT OF ITS**
16  **UNDERWRITING GUIDELINES**

17  76.    The fundamental basis upon which residential mortgage-backed
18  securities are valued is the borrowers' ability to repay the underlying loans
19  and the adequacy of the collateral for those loans.  If the borrowers cannot
20  pay, and the collateral is insufficient, the investors incur losses.  For these
21  reasons, the underwriting standards and practices of the mortgage originators
22  that issued the loans backing the Certificates, and the representations in the
23  Offering Materials regarding those standards, are critically important to the
24  value of the securities and to investors' decisions to purchase.

25  **A.    Countrywide Falsely Touted Its Underwriting Standards**

26  77.    Countrywide represented in the Offering Materials that the
27  loans underlying each securitization were underwritten in accordance with

1   meaningful underwriting standards designed properly to qualify borrowers

2   and ensure the sufficiency of loan collateral.  For example, in the Offering

3   Materials for CWALT 2007-16CB, Countrywide told investors:

4   > All of the mortgage loans in the issuing entity will have been

5   > originated or acquired by Countrywide Home Loans in

6   > accordance with its credit, appraisal and underwriting process

7   > . . . .  Countrywide Home Loans' underwriting standards are

8   > applied by or on behalf of Countrywide Home Loans to

9   > evaluate the prospective borrower's credit standing and

10  > repayment ability and the value and adequacy of the mortgaged

11  > property as collateral.

12  CWALT 2007-16CB Prospectus Supplement dated June 28, 2007 at S-41.

13  The Offering Materials for each of the securitizations at issue here had

14  similar representations.  *See* Ex. B.

15  78.     The Offering Materials represented that only borrowers who

16  had the means to repay had received loans.  For example, the Offering

17  Materials for CWALT 2007-16CB stated:

18  > Under [Countrywide's underwriting] standards, a prospective

19  > borrower must generally demonstrate that the ratio of the

20  > borrower's monthly housing expenses (including principal and

21  > interest on the proposed mortgage loan and, as applicable, the

22  > related monthly portion of property taxes, hazard insurance and

23  > mortgage insurance) to the borrower's monthly gross income

24  > and the ratio of total monthly debt to the monthly gross income

25  > (the "debt - to – income" ratios) are within acceptable limits.

26  CWALT 2007-16CB Pro. Supp. S-42.  The Offering Materials for each of

27  the securitizations at issue here had similar representations.  *See* Ex. B.

79.    The Offering Materials asserted that all loans were issued in substantial compliance with underwriting standards, and that any deviation from specific criteria was justified by sufficient positive compensating factors and made on a limited case-by-case basis.  For example, the Offering Materials for CWALT 2007-16CB told investors: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower."  CWALT 2007-16CB Pro. Supp. S-42.  The Offering Materials for each of the securitizations at issue here had similar representations.  *See* Ex. B.

80.    The Offering Materials told investors that the loans underlying the certificates had not been adversely selected, that is that Countrywide did not intentionally select poor loans for securitization that it did not want on its balance sheet.  For example, the Offering Materials for CWALT 2007-16CB provided:

> Countrywide Home Loans will represent and warrant to the depositor in the pooling and servicing agreement that the mortgage loans were selected from among the outstanding one- to four-family mortgage loans in Countrywide Home Loans' portfolio as to which the representations and warranties set forth in the pooling and servicing agreement can be made and that the selection was not made in a manner intended to affect the interests of the certificateholders adversely.

CWALT 2007-16CB Pro. Supp. S-35.  The Offering Materials for each of the securitizations at issue here had similar representations.  *See* Ex. B.

81.    In addition, Countrywide falsely represented the rigor of its underwriting to Western & Southern portfolio managers during marketing "road shows," industry gatherings, and telephone conversations between

2002-2008.  For example, in 2006, Western & Southern portfolio managers attended the American Securitization Forum ("ASF"), an industry event at which Countrywide regularly marketed its products.  In breakout sessions with Western & Southern, Countrywide assured Western & Southern portfolio managers that Countrywide had controls and processes in place to ensure that underwriting standards were followed and that the loans underlying Countrywide securitizations complied with represented standards for such criteria as owner occupancy, appraisal practices, and loan to value ratios.

82.	Countrywide represented to Western & Southern that before securitizing a pool of loans, Countrywide would conduct a sampling process to identify and remove from the pool any loan approved in violation of Countrywide's underwriting guidelines.

83.	Countrywide made similar statements to Western & Southern during road shows, due diligence meetings, internet-based presentations and in telephone conversations with Western & Southern portfolio managers from 2002-2008.  Countrywide also sent Western & Southern presentations touting its due diligence and risk management procedures, and presentations concerning the sensitivity of securitization certificates to variation in several statistical metrics relating to the underlying loans.  Countrywide knew that Western & Southern would use the statistical metrics to develop a proprietary model used to perform loan-level analysis to determine the likelihood that Western & Southern would receive the cash flows due under its Countrywide Certificates.

84.	These representations were false.  As set forth below in this Section V, and in Sections III and VI, the mortgage loans underlying the Certificates did not comply with the underwriting standards the Offering

Materials described because those standards were systemically ignored.  In originating or acquiring the loans, Countrywide regularly ignored borrowers' repayment ability, the adequacy of the collateral securing the loans and the ability to efficiently realize on mortgaged property when loans defaulted. Countrywide also failed to inform investors that it was systematically abusing the "exceptions" process in order to further circumvent its purported underwriting standards.

> **B.    Publicly Available Information Demonstrates That Countrywide Defrauded Investors by Systemically Abandoning Underwriting Standards**

85.    The SEC has released documents showing that Countrywide adopted a "matching" strategy whereby it would provide any mortgage product feature offered by a competitor.  By mixing and matching the worst features of mortgage products from different competitors, Countrywide's composite product offering pushed the outer limit of already lax underwriting practices.

86.    This "matching" strategy could only be implemented through abandonment of Countrywide's supposed credit-risk-reducing underwriting procedures.  To get around requirements of such procedures, Countrywide set up a system whereby any loan could be approved by way of underwriting "exceptions," and coached borrowers on how to apply for loan products that required little or no income or asset verification.  Internal documents show that "exceptions" were involved in upwards of a third of all loans, and were based purely on the desire to increase loan volume (and profits) and not on "compensating factors" as represented in the Offering Materials. Countrywide deliberately offloaded the worst of these loans to securitizations sold to investors such as Western & Southern.

87.     On August 2, 2005, Officer Defendant Sambol discussed Countrywide's strategy of "cherry picking" loans so that Countrywide would retain less risky loans while the most toxic loans were offloaded on investors.  As Sambol wrote to Mozilo, "we need to analyze the securitization implications on what remains if [Countrywide Bank] is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans."

88.     Mozilo responded that Countrywide should funnel the more toxic loans to investors through securitizations.  According to Mozilo:

> [T]here is a price we will pay no matter what we do.  The
> difference being that by placing less attractive loans in the
> secondary market we know exactly the economic price we will
> pay when the sales settle.  By placing, even at 50%, into
> [Countrywide] Bank we have no idea what economic and
> reputational losses we will suffer not to say anything about
> restrictions placed upon us by regulators.

89.     Countrywide's Chief Risk Officer John McMurray specifically raised concerns about the risks presented by Countrywide's practice of "cherry picking" toxic loans for inclusion in securitizations.  As McMurray later testified:

> Countrywide's bank tended to - on - on some of the key
> products, tended to select the best loans out of the ones that
> were originated,' by best - I'm talking about from a credit risk
> standpoint, so let me clarify that.  So as - as those loans are
> drawn out of the population, what's left to put into the
> securities were not - are not as good as what you started out

with, and then that can have an adverse effect on securities performance.

90.    That Countrywide was "cherry-picking" the loans it would keep for itself was also confirmed by Clifford Rossi, a Countrywide Risk Officer, who testified that the practice of the "bank was to originate and to cherry pick the better quality assets."  This highly material information was never disclosed to investors.

91.    Countrywide intentionally deviated from its underwriting guidelines.  Chief Risk Officer McMurray testified that his credit risk department "would reject proposals for new products but the people in sales nevertheless used the exceptions procedure to achieve the same result."  He was "surprised, angry, and disappointed" when he found out Countrywide had advertising fliers promoting loans that had low credit-score requirements, only required a stated (undocumented) income, and provided 100% financing even though his credit risk department had previously rejected those flyers.

92.    McMurray also testified that he spoke with others in Countrywide, including Sambol, about Countrywide underwriting loans that were prohibited by its underwriting guidelines.  Indeed, in a May 22, 2005 email, McMurray complained to Sambol that "exceptions are generally done at terms more aggressive than our guidelines . . . .  Given the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."

93.    Sambol embraced Countrywide's abandonment of underwriting guidelines, stating in a February 13, 2005 email that "we should be willing

to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."

94.    Countrywide business units heeded the call, placing "virtually any loan" that Countrywide thought it could offload on Western & Southern and other investors who were assured by public disclosures that Countrywide followed its underwriting guidelines.

95.    In 2006, Countrywide internal reviews concluded that one third of all Countrywide loans violated its underwriting guidelines.  Frank Aguilera, a Countrywide Managing Director responsible for risk management, reported the "particularly alarming" result that 23% of the subprime loans, which were often included as prime or Alt-A loans in Countrywide's securitizations, were generated as exceptions, even taking into account "all guidelines, published and not published, approved and not yet approved."  The exception rate for "80/20" products (which were particularly risky because they required 100% financing) was even higher. Aguilera wrote at the time: "[t]he results speak towards our inability to adequately impose and monitor controls on production operations."  Another internal review conducted around the same time concluded that "approximately 40% of the Bank's reduced documentation loans . . . could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more."

96.    An internal Countrywide document described the objectives of Countrywide's Exception Processing System to include "[a]pprov[ing] virtually every borrower and loan profile," with "pricing add on" (*i.e.,* additional fees) if necessary to offset the risk.  The objectives also included providing "[p]rocess and price exceptions on standard products for high risk borrowers."

97.    A pay-option ARM is a type of loan in which the borrower can make a payment even less than that required to payoff accruing interest.  If the borrower does this too many times, the amount of principal owed is recalculated, resulting in a sudden increase in the minimum payments.  In a June 1, 2006 email regarding Pay-Option ARMs, Mozilo warned Sambol and other Countrywide executives that borrowers "are going to experience a payment shock which is going to be difficult if not impossible for them to manage."  In a September 26, 2006 email, Mozilo admitted that with respect to pay-option ARMs "we are flying blind on how these loans will perform" in a stressed environment.  Mozilo's "flying blind" admission extended well beyond pay option ARMs.  As Chief Risk Officer McMurray later testified, "I do think you could generalize [this] observation to a much broader set of loans than just pay option."

98.    During a March 12, 2007 meeting of Countrywide's credit risk committee, the risk management department reported that 12% of loans reviewed internally were rated "severely unsatisfactory" or "high risk" because the loans had loan-to-value ratios, debt-to-income ratios or borrower credit scores outside of Countrywide's already liberal underwriting guidelines.

99.    In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide admitted: "Specifically looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully indexed rate."  Countrywide also admitted that "almost 25% of the borrowers would not have qualified for any other [Countrywide] product."

100.    According to the SEC, on May 29, 2007 Sambol and Sieracki attended a Credit Risk Committee Meeting at which they were informed that

"loans continue[d] to be originated outside guidelines," primarily via the Secondary Structured Lending Desk without "formal guidance or governance surrounding" the approvals.  These observations at the May 2007 Credit Risk Committee meeting concerned a period in which a large majority of the loans underlying the Certificates were originated.

101.   In November 2007, Countrywide prepared a "lessons learned" analysis.  This included observations from interviews of Countrywide's employees and culminated in an internal presentation.  In this analysis, Countrywide repeatedly admitted that it was singularly focused on market share and its "matching" strategy:

- ***"We were driven by market share, and wouldn't say 'no' (to guideline expansion)."***

- "Competitiveness and aggressiveness are great, and part of our DNA.  However, it can lead to arrogance and lack of friends.  There are times when our strengths can turn into our weaknesses."

- "The strategies that could have avoided the situation were not very appealing at the time.  Do not produce risky loans in the first place: This strategy would have hurt our production franchise and reduced earnings."

- ***"Market share, size and dominance were driving themes. . . .  [that] [c]reated huge upside in good times, but challenges in today's environment.  Net/net it was probably worth it."***

(Emphasis added).

102.   Countrywide also fully recognized that the "matching" strategy led to product development far outpacing its risk-assessment procedures and misaligned the incentives of its employees:

- ***"With riskier products, you need to be exquisite in off-loading the risk.  This puts significant pressure on risk management.  Our systems never caught up with the risks, or with the pace of change."***

- "Risk indicators and internal control systems may not have gotten enough attention in the institutional risk and Board committees."

- ***"Not enough people had an incentive to manage risk."***

- "Decentralized and local decision making were another characteristic of our model. . . . The downside was fewer risk controls and less focus on risk, as the local decision makers were not directly measured on risk."

- "Our wide guidelines were not supported by the proper infrastructure (credit, risk management)."

- "[W]e did not put meaningful boundaries around the [broad product] strategy, even when our instincts might have suggested that we do so, and we allowed the model to outrun its critical support infrastructure in investment and credit risk management. . . . Our risk management systems were not able to provide enough counterbalance . . . ."

- ***"The focus of production was volume and margin, not credit risk.  There was also massive emphasis on share."***

(Emphasis added).

103.   Countrywide's internal analysis of underwriting failures is directly relevant to the Western & Southern Certificates because the analysis admits systemic breakdown during the very time period when loans underlying the Certificates were originated, and when many of the Certificates were issued.

**C.     Widespread Defaults and Downgrades Confirm That Countrywide Abandoned Its Underwriting Standards**

104.   Even though the Certificates were supposed to be long-term, stable investments, just years after their issuance high percentages of the underlying mortgage loans have defaulted, been foreclosed upon, or are delinquent, resulting in massive losses to the Certificate holders, including Western & Southern.  For instance, seven of the Offerings which Western & Southern purchased have loan pools with 30% of their Mortgage Loans in either default or delinquency.  Many have even higher than 30% default rates - for instance over 61% of the Mortgage Loans in the current pool are in default or are delinquent for CWL 2007-11.  Likewise, over 50% of the Mortgage Loans in the current pool are delinquent for CWL 2007-04.  These statistics are more fully set forth in Exhibit C.

105.     Thirty-three of Western & Southern's thirty-six tranches were rated triple-A or the equivalent.  The ratings for each tranche are more fully set forth in Exhibit D.  According to the Standard & Poor's website, "An obligation rated 'AAA' has the highest rating assigned by Standard & Poor's.  The obligor's capacity to meet its financial commitment on the obligation is extremely strong."  Moody's similarly describes its highest rating, Aaa, as meaning that the investment is "judged to be of the highest quality, with minimal credit risk."  Historically, a AAA rated security had an expected loss rate of less than .05%.

106.   The poor performance of the loan pools and the rapid drop in credit ratings of the Certificates have, according to recent data, caused an approximately 31.1% decline in the market values of the Certificates.

**D.     Loan File Reviews By Countrywide's Insurers and Others Reveal A Total Disregard For Underwriting Standards**

107.   Third parties with access to the complete loan files for certain Countrywide securitizations have performed additional analysis of the mortgage loans underlying Countrywide's offerings.  These include, among other monoline insurers, MBIA Insurance Corporation ("MBIA") and Syncora Insurance Company ("Syncora").  Their analyses provide strong evidence that essential characteristics of the loans underlying the Certificates were severely misrepresented, and that the problems in Countrywide's underwriting practices were systemic.

108.   The MBIA analysis included at least four of the same offerings in which Western & Southern invested:  CWL 2006-S8, CWL 2006-S9, CWL 2007-S1 and CWL 2007-S2.

109.   In its review of approximately 19,000 Countrywide loan files, MBIA found that 91% of the defaulted or delinquent loans in those securitizations contained material deviations from Countrywide's underwriting guidelines.  According to the MBIA report, loan applications frequently "(i) lack key documentation, such as verification of borrower assets or income; (ii) include an invalid or incomplete appraisal; (iii) demonstrate fraud by the borrower on the face of the application; or (iv) reflect that any of borrower income, FICO score, debt, DTI [debt-to-income,] or CLTV [combined loan-to-value] ratios, fails to meet stated Countrywide guidelines (without any permissible exception)."

110.   Syncora conducted a similar analysis of defaulted Countrywide loans to determine whether the loans had been originated in accordance with Countrywide representations.  Syncora found that 75% of the loans it reviewed "were underwritten in violation of Countrywide's own lending guidelines, lack any compensating factors that could justify their increased risk, and should never have been made."  The Syncora's review covered 2004 to 2007, a time period in which a large majority of the loans underlying the Certificates were originated.

111.   The Illinois Attorney General reviewed the sales of loans to Countrywide by an Illinois mortgage broker and found that documentation for vast the majority of the loans included inflated incomes, almost all without the borrowers' knowledge.  This study covered the time period of 2004 to 2007, again the same time period during which Countrywide was generating loans underlying the Certificates.  Likewise, a review of 100 stated-income loans by the Mortgage Asset Research Institute revealed that 60% of the income amounts were inflated by more than 50% and that 90% of the loans had inflated income figures of at least 5%.  This review also covers the time period of 2004 to 2007.

112.   Ambac Assurance Corporation, another insurer of Countrywide securitizations, reviewed 6,533 files of defaulted loans.  Of those, over 97% had one or more defects in underwriting, including misrepresentations of borrowers' income, assets, or employment; owner occupancy; appraisals; or other aspects of Countrywide's underwriting guidelines.

113.   Mortgage Guaranty Insurance Corporation ("MGIC") recently disclosed its audit of Countrywide loans in an arbitration demand relating to its insurance policies on Countrywide loans.  MGIC has declined coverage for these loans because of loan fraud.  In the demand, MGIC seeks to rescind

or otherwise deny coverage for approximately 1,400 Countrywide insurance claims.

114.   In its loan files audit, MGIC found pervasive fraud.  As the chart below demonstrates, the differences between the truth and what Countrywide claimed are dramatic.

|  | Countrywide Representation | Reality |
|---|---|---|
| **Position** | Account Executive | Janitor |
| **Income** | $13,494.03/month | $3,901.58/month |
| **DTI Ratio** | 37.91% | 134.05% |
| **Other** | Made $30,000 downpayment. | Made no down payment. |
|  | Had $45,000 in Wells Fargo bank account. | No such account existed. |
|  | Property to be primary residence. | Property intended as investment. |
|  |  |  |
| **Position** | Auto body shop employee | Part-time housekeeper |
| **Income** | $6,833/month | Approx. $1,300/month |
| **DTI Ratio** | 39% | 205.47% |
| **Other** | Property to be primary residence. | Property was purchased for sister. |
|  |  |  |
| **Position** | Dairy foreman | Milker |
| **Income** | $10,500/month | $1,100/month |
| **DTI Ratio** | 43.26% | 403.40% |

| Other | Property to be primary residence. | Property was purchased for son. |
|---|---|---|
| | | |
| **Position** | Sales executive | None |
| **Income** | $8,700/month | None |
| **DTI Ratio** | 35.17% | Infinitely high |
| **Other** | Property to be primary residence. | Property to be rented to daughter. |
| | No other mortgages held at time of loan. | Two undisclosed mortgages on other property. |
| | | |
| **Position** | Owner of production company | None |
| **Income** | $17,661/month | None |
| **DTI Ratio** | 16.55% | Infinitely high |
| **Other** | Made $70,000 down payment on property and Had $79,458 Washington Mutual bank account. | Made no down payment and no such account existed. |

E.   **Countrywide and Bank of America Have Paid Billions to Resolve Claims That They Securitized Loans While Ignoring Underwriting Standards**

115.   In January 2011, the Congressional Financial Crisis Inquiry Commission ("FCIC") made public a review of Countrywide loans by Fannie Mae and Freddie Mac that had uncovered billions of dollars of Countrywide loans that failed to comply with applicable underwriting

guidelines.  According to the FCIC, Countrywide was forced by Freddie Mac to repurchase $1.9 billion of loans that did not comply with applicable underwriting guidelines in 2009 and 2010.  Countrywide was forced to repurchase over $6 billion of loans it sold to Fannie Mae.

116.   The FCIC Report states that Fannie Mae identified Countrywide as one of the top originators of fraudulent mortgage loans. According to the FCIC:

> Fannie Mae's detection of fraud increased steadily during the housing bubble and accelerated in late 2006, according to William Brewster, the current director of the company's mortgage fraud program.  He said that, seeing evidence of fraud, Fannie demanded that lenders such as Bank of America, Countrywide, Citigroup, and JP Morgan Chase repurchase about $550 million in mortgages in 2008 and $650 million in 2009.  "Lax or practically non-existent government oversight created what criminologists have labeled 'crime-facilitative environments,' where crime could thrive," said Henry N. Pontell, a professor of criminology at the University of California, Irvine, in testimony to the Commission.

117.   The director of Fannie Mae's mortgage fraud program, William Brewster, testified that Countrywide was one of the top five loan originators found by Fannie Mae to be fraudulent.

118.   On June 28, 2011, Bank of America announced an $8.5 billion proposed settlement of so called "put back" claims and servicing problems with BNY as trustee for 530 Countrywide-sponsored securitizations.

### F.     The HUD Audit

119.    On September 30, 2011, the Inspector General for the Department of Housing and Urban Development ("HUD") issued an audit report of loans originated by Countrywide.  The HUD found that Countrywide did not comply with regulations applicable to underwriting FHA-insured loans in Ohio and five other states.

120.    According to the HUD Inspector General, for many of those loans:

> Countrywide did not properly verify, analyze, or support
> borrowers' employment and income, source of funds to close,
> liabilities and credit information . . . .  This noncompliance
> occurred because Countrywide's underwriters did not exercise
> due diligence in underwriting the loans.  As a result of the
> improperly underwritten loans, HUD paid more than $1 million
> in claims and incurred losses totaling more the $720,000 on the
> sales of associated properties for the seven loans.

HUD Audit Report on Countrywide, September 30, 2011, at 2.

121.    As a result, the HUD Inspector General recommended action against Countrywide and Bank of America for falsely certifying Countrywide performed due diligence on the loans when it had not.

### G.     Countrywide and Bank of America Conspired with Certificate Underwriters

122.    Countrywide often tapped Wall Street financial institutions to underwrite its fraudulent securitizations.  These financial institutions were fully aware that the loans underlying Countrywide's MBS were misrepresented in the Offering Materials, but they sold the Certificates to investors such as Western & Southern anyway.  Countrywide paid these

1   financial institutions many millions of dollars in underwriting and other fees

2   and benefited from such institutions' access to a broad base of institutional

3   investors.

4       123.   For example, Western & Southern acquired CWALT 2005-

5   54CB, CWALT 20067CB, and CWALT 2007-17CB Certificates from

6   Credit Suisse First Boston LLC (since renamed Credit Suisse Securities

7   LLC) ("Credit Suisse Securities") and CWALT 2006-14CB and CWALT

8   2007-21CB Certificates from Deutsche Bank Securities Inc. ("Deutsche

9   Bank").  The January 2011 FCIC report stated that Credit Suisse and

10   Deutsche Bank routinely waived mortgage loans into securitizations while

11   knowing that the loans did not comply with applicable underwriting

12   guidelines.

13       124.   Moreover as underwriters, Credit Suisse Securities and

14   Deutsche Bank had a duty to perform due diligence on the securitizations

15   they underwrote.  Frequently, they relied on outside firms to conduct

16   reviews of underlying mortgage loans.  One of the largest third party due

17   diligence firms is Clayton Holdings ("Clayton").  As the FCIC report found:

18   "Because of the volume of loans examined by Clayton during the housing

19   boom, the firm had a unique inside view of the underwriting standards that

20   originators were actually applying – and that securitizers were willing to

21   accept."

22       125.   For each loan pool it was hired to review, Clayton checked for:

23   (1) adherence to seller-credit underwriting guidelines and client-risk

24   tolerances; (2) compliance with federal, state and local regulatory laws; and

25   (3) the integrity of electronic loan data provided by the seller to the

26   prospective buyer.  Contract underwriters reviewed the loan files, compared

27   tape data with hard copy or scanned file data to verify loan information,

identified discrepancies in key data points, and graded loans based on seller guidelines and client tolerances.

126.   Clayton generated regular reports for the underwriter, the sponsor and the originator that summarized Clayton's review findings, including summaries of the loan files that were outside the relevant underwriting standards.  Once Clayton identified such problems, the originator had the right to cure the deficiencies.  If additional information was provided by an originator, Clayton re-graded the loan.  Once this process was complete, Clayton provided the relevant underwriters, sponsors or originators with final reports.

127.   Clayton gave loans one of three grades – Grade 3 loans "failed to meet guidelines and were not approved," while Grade 1 loans "met guidelines."  Tellingly, only 54% of the nearly one million loans reviewed by Clayton "met guidelines."

128.   Recently released internal Clayton documents show that a startlingly high percentage of defective loans reviewed by Clayton were included by Credit Suisse Securities in loan pools underlying the Certificates sold to Western & Southern and others.  According to Clayton, 32% of the 56,300 loans that it reviewed for Credit Suisse Securities from the first quarter of 2006 through the second quarter of 2007 failed to conform to Credit Suisse Securities' stated underwriting standards.

129.   Credit Suisse Securities not only continued to work with problematic originators such as Countrywide, but also failed to conduct any investigation of its own, ignoring the red flags raised by Clayton's results.  According to Clayton, of the 32% of loans identified as non-compliant, Credit Suisse Securities "waived in" a third of them (or 11% of the total

group), including loans in securitizations purchased by investors such as Western & Southern.

130.   Clayton's reports also reveal that from January 2006 to June 2007, 35% of the mortgages Deutsche Bank submitted to Clayton for review were rejected as outside underwriting guidelines.  Some 50% of such loans were subsequently "waived in" by Deutsche Bank.  Of the nine banks that FCIC investigated, Deutsche Bank was second both in the number of loans rejected by Clayton and in the number of loans it subsequently waived in.

## VI.    COUNTRYWIDE ROUTINELY FORGED OR FALSIFIED LOAN DOCUMENTS

131.   Countrywide not only defrauded investors such as Western & Southern, it defrauded countless borrowers (and other third parties) as well.

132.   Eileen Foster, former head of Countrywide's mortgage fraud investigations unit, has provided extensive information about acts of forgery that she uncovered while at Countrywide.  *See* Ex. I (Occupational Safety and Health Administration ("OSHA") Order dated September 13, 2011).

133.   For example, without knowledge of employees in the Boston region, she had bins of documents headed for shredding set aside for her investigators to review.  They discovered that Countrywide employees regularly doctored loan applications by using "white-out" or tape to change important information on loan applications and appraisals.  The alterations were made for the sole purpose of allowing unqualified borrowers to qualify for loans.

134.   In her FCIC testimony on July 30, 2010, Foster stated that salespeople who needed to appraise a property at an excessive value simply took an appraisal from another property with the desired value and pasted the new address onto the old appraisal.

135.   According to Foster, salespeople also had blank account statements from a number of major banks that they would use to create forged document statements to support fake reports of borrowers' assets.

136.   One Countrywide office had two fax machines, one used to fax false and fraudulent documents to the other in order to make it appear that the forged documents were sent by borrowers.

137.   Foster testified that Countrywide was not concerned with fraud prevention, but instead, focused exclusively on loan production.  Foster was not allowed to investigate certain business units and branches, and other times would need the approval of the local salespeople to even visit a branch.

138.   Bank of America fired Foster after it assumed control of Countrywide.  The Department of Labor subsequently ruled that she was improperly terminated, awarded her nearly a million dollar judgment, and ordered Bank of America to reinstate her.  *See* Ex. I.

139.   The Department of Labor found that Foster discovered numerous instances of "loan document forgery and alteration, manipulation of borrower's assets and income, manipulation of the company's automated underwriting system, the destruction of valid client documents, and evidence that blank templates of bank statements from several different financial institutions were emailed back and forth among loan officers in various branches for use in forging proof of borrower income and assets."  Ex. I at 2.

140.   According to the Department of Labor, Foster "was particularly concerned that [Countrywide] was engaged in the systematic cover-up of various types of fraud through terminating, harassing, and otherwise trying to silence employees who reported the underlying fraud and misconduct."  Ex. I at 2.

141.   One of Foster's duties was to prepare Suspicious Activities Reports ("SARs") for submission to federal authorities.  Foster attempted to improve Countrywide's SAR reporting in order to ensure that the numerous instances of fraud within Countrywide were reported properly.  As she told the FCIC during her interview, Countrywide "grossly underfiled" SARs. Countrywide and Bank of America resisted her efforts and attempted to "hide widespread bank, mail, and wire fraud" within Countrywide.  Ex. I at 2.

142.   Foster stated during her FCIC testimony that in January or February 2008 she discussed Countrywide's woefully deficient federal controls with federal banking regulators.

143.   Ultimately, Bank of America fired Foster for her repeated acts of whistle blowing.

144.   Foster's testimony of widespread forgeries committed by Countrywide or its third party affiliated mortgage brokers is confirmed by the many examples of forgeries Western & Southern has discovered in the course of its investigation.  Below are three examples of their forgeries:

### A.     The Audrey Sweet Mortgage Loan

145.   Audrey Sweet purchased a home in Maple Heights, Ohio around August 2005 and obtained a Countrywide loan to finance the purchase price.  On July 25, 2007, Sweet submitted testimony to the Joint Economic Committee of Congress about the falsification of documents used to obtain her loan and other predatory lending practices she experienced at the hands of Countrywide.

146.   Shortly after obtaining her mortgage, Sweet received a letter from Countrywide informing her that her mortgage payment was going to increase from $1,055.61 to $1,713.88 to account for a rate increase and

1  Countrywide's payment of her back taxes.  Sweet could not afford the

2  increase.

3      147.   Sweet testified that after her loan closed, she discovered that

4  Countrywide increased the monthly income she provided the Countrywide

5  representative without her knowledge and also falsely overstated her assets.

6  As Sweet testified:

7      [M]y gross monthly income was recorded as $726 dollars more

8      than it actually was.  Secondly, I have two sets of loan

9      documents, one that was created 10 days before we closed and

10      one that was created the day of closing.  The closing day

11      documents list my assets as $9,400 in my Charter One Bank

12      Account.  I have never had $9,400 in the bank.  Indeed, coming

13      up on payday, I am fortunate to have $94 left.  The final item I

14      noticed was that the tax amount listed on the appraisal report

15      was $1981.34, which comes to about $165 per month but

16      Countrywide listed $100 as the tax amount.

17      148.   Sweet testified that, unbeknownst to her, the Countrywide

18  representative forged the documentation necessary for her to qualify for the

19  loan by overstating her income and assets, including falsified bank account

20  holdings and understated property taxes.

21      **B.**   **The Girgis Mortgage Loan**

22      149.   In late 2006, Ohio residents Dr. Joseph and Nermine Girgis

23  purchased a Florida vacation condominium.  To finance this purchase, the

24  Girgises obtained two mortgages from Countrywide in the amounts of $1

25  million and $147,500.  In April 2007, the couple purchased a second unit at

26  the same address for over $1 million.  To finance this second purchase, they

27  also obtained two mortgages from Countrywide in the amounts of $920,000

and $115,000.  *See Girgis v. Countrywide Home Loans, Inc.*, No. 10-cv-590-JG, 2010 U.S. Dist. LEXIS 114842, at *2 (N.D. Ohio Oct. 28, 2010) (findings of fact).

150.   In a subsequent dispute with Countrywide, Dr. Girgis testified by affidavit that the first loan was supported by a forged loan document, and the second loan was fraudulently notarized and witnessed.  J. Girgis Aff. ¶¶ 1, 3, 7-13, *Girgis v. Countrywide Home Loans, Inc.*, No. 10-cv-590-JG, Docket Entry No. 39-1 filed October 19, 2010.

151.   Girgis further stated in his affidavit that his income from a lease was necessary to qualify for the second loan, as he was a weak credit, initially rejected by Countrywide's Loan Underwriting Expert System (CLUES) given his 74% debt-to-income-ratio.  He also stated that the signature on that lease was "witnessed" by Grace Torres and Maria Diaz, notwithstanding that Dr. Girgis had never met with nor spoken to either person.  Each mortgage on the second condominium was notarized by Denise Colado and witnessed by Elizabeth Smart, again notwithstanding that Dr. Girgis had never met with nor spoken to either person.

152.   During the course of its investigation, Western & Southern spoke with the Girgis's attorney in their lawsuit against Countrywide.  Their attorney confirmed the accuracy of the statements Dr. Girgis made in his affidavit.

## C.   The Dana Miller Mortgage Loan

153.   Ohio resident Dana Miller obtained an ARM mortgage from Avizen Solutions in June 2004, and sometime thereafter Countrywide purchased Avizen Solutions.  Miller Aff. ¶ 10, *Miller v. Countrywide Home Loans*, No. 09-cv-00674-EAS-TP, Docket Entry 52 (S.D. Ohio Feb. 18,

2011).[1]  In a subsequent dispute, Miller testified that Countrywide barraged him with phone calls urging him to refinance his loan because "interest rates were going to 7% or more in the immediate future."

154.   Miller also testified that beginning in March 2006, Tiffany L. Smith, an account executive at Countrywide, began calling him and reiterating that he needed to refinance immediately to avoid rising interest rates.  Miller was eventually convinced to refinance his loan for a new Countrywide loan that cost him over $11,000 in fees.

155.   Smith told Miller that in order to qualify for the refinancing, he would have to claim an income of $7,000 per month.  When Miller told Smith that he had never made that much money, she responded that "it does not matter what you make; this is what I need to put down for you to qualify you for the loan."

156.   Smith also told Miller that an appraisal would have to come in at $345,000 to qualify for the loan.  When Miller told Smith that his house was not even worth $300,000, she told him he did not "know what property in your area is worth."  Miller also testified that an appraisal by Landsafe Appraisal over-valued Miller's property "to enable the consummation of a fraudulent loan."  On the basis of that "appraisal" and his stated income, Miller was approved for the loan to his detriment and for the benefit of Countrywide and Smith.  On August 28, 2008, a foreclosure action was filed against Miller, and he later lost his home.

157.   During the course of its investigation, Western & Southern spoke with Miller.  He confirmed the truth of the facts contained in that affidavit.

---

[1] The affidavit was stricken from the docket on procedural grounds.

1

## D.      Other Acts of Forgery and Falsification

2      158.    Maria Santana, a school teacher and resident of New Haven,

3  Connecticut, told her story in testimony before the Connecticut General

4  Assembly.  Santana purchased a condominium in 2006 with a Countrywide

5  mortgage loan and second lien home equity loan.  The Countrywide

6  representative that handled her application falsified her income by inflating

7  it 300% without her knowledge.  The Countrywide representative provided a

8  false savings account on the application to create the illusion that Santana

9  had a higher net worth.  As Santana testified:

10          I was unable to go over any of the paperwork with the people

11          from Countrywide because they did not show up to the closing.

12          At the time I signed the mortgage documents I did not realize

13          that my income had been falsely inflated on the application.  I

14          told Countrywide my true income but it was tripled on the

15          application.  The application also shows a fake savings account

16          that I did not put on the application.  I could not afford the

17          payments and the Wall Street trust that now owns my loan filed

18          a foreclosure against me last January.  At the time of the

19          foreclosure, the monthly payments on my two loans were

20          nearly 100% of my monthly income.

21      159.    Julie Santoboni, who took out a Countrywide mortgage on her

22  family's home in Washington, D.C., was interviewed on National Public

23  Radio.  She reported that when she and her husband reached out to

24  Countrywide to refinance their home's adjustable-rate loan, a Countrywide

25  loan officer pressured her to lie about her income to obtain a more attractive

26  loan, since she had taken off two years of work to spend time with her

27  children.  The loan officer said that he could increase her husband's listed

income and that the underwriters would not question the income because her husband's job title included the word "manager."

160.   Santoboni said that the Countrywide loan officer wanted her to write a letter stating she made $60,000 during each of the past two years and have her accountant sign it, even though she had no income.  The loan officer continued to give her a "hard sell," pressuring her to lie about her income in order to obtain a more favorable interest rate.  Santoboni followed up with Countrywide to complain about the incident, but received no response as of the time of the interview.  She also filed a complaint with the Federal Office of Thrift Supervision about the wrongdoing.

161.   A Countrywide borrower named Bruce Rose described obtaining a mortgage loan from Countrywide that stated his monthly income as $12,166, as he realized only later, when his annual income at the time was only around $16,000.

162.    One borrower told NBC News that her Countrywide loan officer told her to claim she made more than twice her actual income in order to gain approval for her loan.

163.   According to Mark Zachary, a former Regional Vice President of Countrywide, a Countrywide customer stated in a September 19, 2006 email:

> I was told that my loan had been turned over to Countrywide's internal fraud department for review because a loan officer increased my income figures without authorization in order to get me approved for the stated-income loan.  I was told by several people at Countrywide that this was done just to get me qualified and that nobody would check on it.

164.   These are not isolated acts of forgery and perjury.  Numerous former Countrywide employees have attested to the fraud regularly committed at Countrywide.

165.   An employee of Countrywide Home Loans alleged that "loan officers were falsifying and fabricating information on the borrower loan applications" and providing Borrower Authorization and Certification forms "which contained forged or false borrower signatures."  Compl. ¶ 6, *Manegdeg v. Countrywide Home Loans, Inc.*, No. BC391220 (filed May 20, 2008, Cal. Sup. Ct., Los Angeles County).

166.   A Countrywide employee has alleged the she witnessed "incidents of fraud, including, but not limited to, changing the loan applicant's salary, so the applicant would qualify for a loan and signing the applicant's name to loan documents."  Compl. ¶ 18, *Brunelli v. Countrywide Financial*, No. 34-2009-40957 (filed April 13, 2009, Cal. Sup. Ct., Sacramento County).

167.   The testimony of numerous Countrywide victims and former employees makes clear that Countrywide employees systematically engaged in acts of forgery in Ohio and elsewhere with effects in Ohio on investors like Western & Southern.

### E.   Predatory Lending Practices

168.   While Countrywide claimed that its mission was to find "the best loan possible" for each individual buyer, the opposite was true. Countrywide regularly steered borrowers to loans with onerous terms that were more profitable for Countrywide.  As reported by the *New York Times* in August 2007:

[P]otential borrowers were often led to high-cost and
sometimes unfavorable loans that resulted in richer

> commissions for Countrywide's smooth-talking sales force,
> outsized fees to company affiliates providing services on the
> loans, and a roaring stock price that made Countrywide
> executives among the highest paid in America.
>
> Countrywide's entire operation, from its computer system to its
> incentive pay structure and financing arrangements, is intended
> to wring maximum profits out of the mortgage lending boom no
> matter what it costs borrowers, according to interviews with
> former employees and brokers who worked in different units of
> the company and internal documents they provided.  One
> document, for instance, shows that until last September the
> computer system in the company's subprime unit excluded
> borrowers' cash reserves, which had the effect of steering them
> away from lower-cost loans to those that were more expensive
> to homeowners and more profitable to Countrywide.

Gretchen Morgenson, *Inside the Countrywide Lending Spree*, N.Y. TIMES, Aug. 26, 2007.

169.   Countrywide employees encouraged the third party mortgage brokers to do the same.  For example, as reported by the *New York Times* in August 2007:

> While mortgage brokers' commissions would vary on loans that
> reset after a short period with a low teaser rate, the higher the
> rate at reset, the greater the commission earned, these people
> said. . . .
>
> CONSIDER an example provided by a former mortgage broker.
> Say that a borrower was persuaded to take on a $1 million
> adjustable-rate loan that required the person to pay only a tiny

1   fraction of the real interest rate and no principal during the first

2   year — a loan known in the trade as a pay option adjustable-

3   rate mortgage.  If the loan carried a three-year prepayment

4   penalty requiring the borrower to pay six months' worth of

5   interest at the much higher reset rate of 3 percentage points over

6   the prevailing market rate, Countrywide would pay the broker a

7   $30,000 commission. . . .

8   The company's incentive system also encouraged brokers and

9   sales representatives to move borrowers into the subprime

10   category, even if their financial position meant that they

11   belonged higher up the loan spectrum.

12 *Id.*

13   170.   These predatory lending practices were not limited to

14 Countrywide brokers but included a network of third party entities such as

15 Mid Atlantic Capital, One Source Mortgage and other non-party mortgage

16 brokers.  At its peak, this Countrywide network included over 30,000

17 mortgage brokers.  Countrywide's wholesale lending channel underwrote

18 loans originated by these brokers and other financial intermediaries.

19   171.   In fact, Countrywide had so many independent brokers that it

20 did not provide them with IRS Form 1099s, which businesses normally must

21 file for independent contractors who meet certain earnings criteria.

22 According to the New York Times, one independent broker, surprised she

23 did not receive one after her first year working for Countrywide – even

24 though she received one from every other entity for which she did work –

25 called Countrywide to inquire.  She was told by a Countrywide

26 representative, "We're too big.  There's too many.  We can't do it."

27

172.   In order for third party brokers to submit loan files to Countrywide, the brokers first had to submit an application to Countrywide and then enter into a Wholesale Broker Agreement.  Once that agreement was finalized, Countrywide went on to inculcate the broker into its way of doing business.

173.   Third party brokers were given a standardized Countrywide script for calls to potential customers.  The script instructed the brokers to begin their sales pitch with the (now proven false) claim that they would find the best loan possible for the borrowers.  In reality, the brokers' real intent was to attempt to sell borrowers the loan that would earn the brokers the highest commission and Countrywide the highest profit.

174.   Countrywide's incentive structure was an integral part of its scheme to originate the highest number of short-term profitable loans possible.  Countrywide offered inflated commissions on non-conforming loans, including loans that would fetch a higher price in the securitization market, such as loans with prepayment penalties likely to generate a stream of income over time.  It did not matter to the third party brokers or Countrywide that such loans cost borrowers more in fees and interest payments than other products for which the borrowers were qualified.  All that mattered was closing the loans and booking commissions, fees and profits in the aftermarket.

175.   Many of the loans sold by internal and third party brokers were highly complex, involving features like pay options and negative amortization.  The brokers sold those loans without considering whether they were suitable for borrowers, and indeed, many brokers did not understand or were not given enough information to be able to explain many features of the loans.

176.   After qualifying to submit loans to Countrywide, third party brokers were given access to the Countrywide Loan Expert Underwriting Systems (also known as CLUES), a computerized approval system used by Countrywide's internal brokers.

177.   As the *New York Times* uncovered, the CLUES system steered borrowers into higher cost sub-prime loans even when they qualified for lower cost prime loans.  The system did so by excluding important borrower information, such as cash reserves, from its calculations.  CLUES was designed to provide third party and internal brokers with approvals from Countrywide in a matter of minutes, a feature used by brokers to exert maximum pressure in pushing borrowers into unsuitable loans.

178.   Countrywide's goal was thus two-fold:  to originate as many loans as possible while pushing as many borrowers as possible into loans with the greatest profit for Countrywide, and then to sell off the bottom of the barrel to mortgage-backed securities investors like Western & Southern.

179.   The Countrywide network of internal and third party brokers all acted together with the same purpose.  The Defendants' success depended on all participants, incentivized by commissions, increased salary, and, in the case of Mozilo and other Officer Defendants, multi-million dollar bonuses, having the single goal of originating the most profitable loans.

180.   Additional Countrywide loans were obtained from its Correspondent Lending Channel.  In that program, Countrywide provided lines of credit to mortgage originators and other financial institutions including commercial banks, savings and loans and credit unions.  After purchasing the loans from correspondent lenders, Countrywide securitized them and sold them off to investors like Western & Southern.  Vast amounts of the loans originated through the correspondent channel were, however,

fraudulently originated and Countrywide's securitization of them offloaded that risk onto investors.

181.   During the relevant period, correspondent loans made up between 42% and 47% of Countrywide's total mortgage production. *See* 2007 Countrywide 10-K at 6.  In 2007, the Correspondent Lending Channel was comprised of approximately 1,760 lenders. *Id.* at 5.

182.   The correspondent lenders were fully integrated with Countrywide.   They had access to the CLUES program, and Countrywide also provided them with a program called Platinum Lender Access.  That program permitted lenders to register and underwrite loans, order products like flood insurance and manage their loan pipelines.  Countrywide's Loan Origination and Underwriting system ("CLOUT") was also a part of the Platinum system.  CLOUT provided correspondents every possible Countrywide loan option available, including the terms and documentation requirements of each.  All these programs integrated the correspondent lenders with Countrywide and enabled them to churn out even more loans at great speed.

183.   Countrywide also provided correspondents with credit applications, loan contracts and other necessary forms to enable the correspondents to initiate and close loans quickly.  It also authorized correspondents to accept applications on its behalf and quickly provided financing rate quotes and other applicable Countrywide terms.  Finally, Countrywide itself funded the loans before or shortly after they were consummated with funds from Countrywide.

184.   Countrywide claims that it carefully vetted its correspondent lenders and the loans they originated to assure investors that those loans were underwritten in accordance with Countrywide's own guidelines.  For

example, Countrywide claimed its correspondent lenders were "subject to initial and ongoing credit evaluation and monitoring." *See* 2007 Countrywide 10-K at 5.  Countrywide also claimed that "[a]ll of the mortgage loans in the issuing entity will have been originated *or acquired* by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards." *See, e.g.*, CWALT 2007-17CB Prospectus Supplement at S-36.

185.   Given the wholesale abandonment of its underwriting guidelines with respect to the loans it originated and purchased, as described above, the correspondent loans that Countrywide securitized were fraudulently originated and contained defects at alarmingly high rates.  A substantial portion of the fraudulent loans securitized by Countrywide came from correspondents since they originated nearly half of all Countrywide loans.  Moreover, the correspondent lenders had little motivation to ensure that the loans they sold to Countrywide were properly underwritten since they would bear no risk of loss from non-performing loans.  The correspondent lenders would offload that risk to Countrywide who, in turn, would securitize the loans and offload that risk to investors like Western & Southern.

186.   Among the correspondent lenders that originated loans for Countrywide were People's Choice Mortgage, Summit Mortgage LLC, Loans for Residential Homes Mortgage Corporation, Sprint Funding Corporation, Ameribanq Mortgage Group LLC and E-Loan, Inc.  These and other correspondent lenders regularly sold Countrywide fraudulent loans.

187.   For example, between November 2003 and August 2005, a group perpetrating a mortgage fraud scheme obtained 136 fraudulent loans from People's Choice Mortgage and other loan originators, totaling

$16,613,850.  Countrywide funded certain of those fraudulent loans through its correspondent arrangement with People's Choice Mortgage.  At least one member of the group has since pleaded guilty to participating in a mortgage fraud scheme in obtaining those loans, including to charges of wire fraud, conspiracy to commit wire fraud and money laundering.

188.   Given the diligence of its correspondent lenders that Countrywide claimed to have performed in its SEC filings, Countrywide knew of the fraudulent and defective origination practices by the correspondent lenders.

**F.   Cheating Borrowers After Default**

189.   Countrywide and Bank of America cheated borrowers after default.

190.   When a Countrywide borrower defaults, BAC Servicing is permitted to take action to preserve the value of the mortgaged property. For example, BAC Servicing may order a property inspection for the purpose of verifying the occupancy status of defaulting borrowers' home. When homes are in the foreclosure process, BAC Servicing may provide maintenance services such as lawn mowing and security.

191.   BAC Servicing uses Bank of America affiliated entities, including LandSafe Default, Inc. (also known as LandSafe National Default, "LandSafe"), and ReconTrust Company, N.A. ("ReconTrust"), to hire third party vendors to perform default-related services.  BAC Servicing in turn charges the defaulting borrowers.  Notwithstanding that mortgage loan documents require BAC Servicing to charge more than actual cost, it routinely marked up its servicing charges by up to 100%.

192.   When a defaulting borrower's home is foreclosed upon and sold, BAC Servicing deducts these fees (which defaulting borrowers are in

no position to pay themselves) from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and the foreclosed property.

193.   Defendant Sambol touted this profiteering from default-related services during an October 2007 earnings call:

> Now, we are frequently asked what the impact of our servicing costs and earnings will be from increased delinquencies and [loss] mitigation efforts, and what happens to costs.  And what we point out is, as I will now, is that increased operating expenses in times like this tend to be fully offset by increases in ancillary income in our servicing operation, greater fee income from items like late charges, and importantly from in-sourced vendor functions that represent part of our diversification strategy, a counter-cyclical diversification strategy such as our businesses involved in foreclosure trustee and default title services and property inspection services.

194.   On June 7, 2010, the Federal Trade Commission ("FTC") commenced a lawsuit against Countrywide Home Loans and BAC Servicing for gouging borrowers for default-related services.  Countrywide Home Loans and BAC Servicing eventually paid $108 million to settle the charges.

195.   The FTC has found that Countrywide and BAC Servicing committed numerous frauds in bankruptcy proceedings.  According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans.  Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts."

196.   Countrywide, BAC Servicing and Bank of America run an insurance scam involving property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happens, BAC Servicing replaces the policies with policies underwritten by Balboa Insurance, which until very recently was an affiliate of Bank of America.  Balboa Insurance charges outrageous rates for these so called "forced-placed" policies, typically several times the premium under the original policy.

## VII.   COUNTRYWIDE FAILED PROPERLY TO ASSIGN MORTGAGES AND FAILED TO DELIVER LOAN FILES TO THE TRUSTS

197.   A fundamental step in the mortgage securitization process is the transfer to a mortgage-backed security trust of good title to mortgage loans underlying the security.  This is necessary in order for the trust to be entitled to enforce the mortgage loans in case of default.

198.   Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

199.   The rules for these transfers are governed by the law of the state in which the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law).

200.   Generally, state laws and PSAs require the promissory note and security instrument to be transferred by endorsement, in the same way that a check can be transferred by endorsement, or by sale.  In addition, state laws generally require that the trustee have physical possession of the original,

manually signed note in order for the loan to be enforceable by the trustee against the borrower in case of default.

201.   In order to preserve the bankruptcy-remote status of the issuing trusts in mortgage-backed securities transactions, the notes and security instruments are generally not transferred directly from the mortgage loan originator to the trust.  Rather, the notes and security instruments are initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities.  After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization.  Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

202.   PSAs generally require the transfers of mortgage loans to the trust to be completed within a strict time limit after formation of the trust in order to ensure that the trust is properly formed.

203.   Applicable state trust law generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, endorsement, physical delivery and other requirements of the PSA with respect to the transfers of notes and mortgages results in void transfers and lack of good title.

204.   Attorneys General from all 50 states are currently investigating the misdeeds of Countrywide, Bank of America, BAC Servicing and others who have attempted to cover up the widespread failure properly to assign mortgage loans to securitization trusts foreclosing on homes without proper documentation.  Upon information and belief, the Attorneys General have uncovered significant evidence of wrongdoing by Countrywide, Bank of

America, and BAC Servicing, independent of the evidence described herein, that would be obtained during discovery in this action.

### A.    Countrywide Representations

205.   The Offering Materials represented that each mortgage represented a valid lien such that the issuing trust could foreclose upon the mortgage in the event of a borrower's default.  For example, the Offering Materials for CWALT 2007-16CB represented that "each loan is secured by a valid lien on, or a perfected security interest with respect to, the Property." CWALT 2007-16CB Prospectus Supplement at 26.  The same or substantially identical representations appeared in the Offering Materials relating to each of the other securitizations that are subject to this action. *See* Exhibit E.

206.   Defendants represented in the Offering Materials associated with each securitization that the underlying mortgages and notes would be properly assigned to the trusts and that the loan files would similarly be delivered to the trusts.  For example, the CWALT 2007-16CB Offering Materials represented:

> [O]n the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan and all right, title and interest in and to all other assets included in Alternative Loan Trust 2007-16CB, including all principal and interest received on or with respect to the mortgage loans, but not any principal and interest due on or before the cut-off date.
>
> In connection with the transfer and assignment of a mortgage loan, the depositor will deliver or cause to be

delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things,

- the original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost;

- the original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;

- an assignment in recordable form of the mortgage or a copy of such assignment;

- the original or a copy of the title policy with respect to the related mortgaged property; and

- if applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor).

CWALT 2007-16CB Prospectus Supplement at S-39-S-40.  The same or substantially identical representations appeared in the Offering Materials relating to each of the other securitizations in this action.  *See* Exhibit E.

207.   The Offering Materials further assured investors that transfers of mortgage loans through the Mortgage Electronic Registration System ("MERS") were sufficient to ensure that the mortgage loans could be

1   foreclosed upon in the event of a borrower's default.  For example, the
2   CWALT 2007-16CB Offering Materials state:

3       For any mortgage held through the MERS® System, the
4       mortgage is recorded in the name of Mortgage Electronic
5       Registration Systems, Inc., or MERS, as nominee for the owner
6       of the mortgage loan, and subsequent assignments of the
7       mortgage were, or in the future may be, at the discretion of the
8       master servicer, registered electronically through the MERS®
9       System. For each of these mortgage loans, MERS serves as
10      mortgagee of record on the mortgage solely as a nominee in an
11      administrative capacity on behalf of the trustee, and does not
12      have any interest in the mortgage loan.

13  CWALT 2007-16CB Prospectus Supplement at S-41.  The same or
14  substantially identical representations appeared in the Offering Materials
15  relating to each of the other securitizations subject to this action.  *See*
16  Exhibit E.

17      208.   These disclosures led investors to conclude that Defendants had
18  taken all steps necessary to ensure the trusts could negotiate loan
19  modifications with proper authority and, when necessary, foreclose upon any
20  defaulted mortgage loan.  Since the loans underlying the certificates were
21  supposedly secured, the representations concerning the loan collateral were
22  obviously material to investors such as Western & Southern.  In many
23  instances, however, the collateral did not properly secure the underlying
24  loans and could not be efficiently realized because Defendants either lost,
25  failed to timely create, or failed to timely deliver the paperwork necessary to
26  prove title to the mortgages and the notes under state law.

27

**B.      Contrary to Its Representations, Countrywide Did Not Properly Assign Large Numbers of Mortgages, and Failed Properly to Transfer Loan Files**

209.   In their zeal to offload toxic loans to investors such as Western & Southern, Countrywide did not come close to complying with the strict rules governing assignment of mortgages, and transfer of promissory notes and loan files.  Countrywide lost much of the paperwork relating to the loans underlying their securitizations, or made no attempt to assign mortgages and deliver the original mortgage notes to the issuing trusts as required under state law.  They have engaged in a cover up of their failure validly to assign mortgage notes by filing false documentation in courts nationwide and forging assignment documents.  The cover-up made possible and facilitated the execution of additional securitizations which damaged investors such as Western & Southern.

210.   The Federal Reserve System, the OCC and the OTS recently issued a report finding that Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for mortgage-backed securities transactions.  In the *Interagency Review of Foreclosure Policies and Practices* released April 2011, the agencies reported that their extensive examinations of mortgage loan servicers including Bank of America, Wells Fargo, JPMorgan Chase Bank (including as successor to WaMu), and Citibank (including CitiMortgage) "showed that servicers possessed original notes and mortgages."  As a result, contrary to the Defendants' assertions in the Offering Materials, the mortgage note or file for each underlying loan was not transferred properly and none of the trusts has the right to foreclose on any of the affected underlying loans.

211.   In *Kemp v. Countrywide Home Loans, Inc.*, Bankr. No. 08-18700 (D.N.J.), a Bank of America employee testified that the failure to deliver mortgage loan files to the securitization trust that purportedly own the loans is standard practice.  Bank of America, as successor to Countrywide, sought to prove that the BNY, as trustee for an issuing trust that purportedly held the mortgage in question was entitled to enforce the mortgage.  Bank of America presented testimony by Linda DeMartini, who had been employed by Bank of America or Countrywide for almost ten years as of August 2009, and was then a supervisor and operational team leader for the litigation management at Countrywide.  She testified that Countrywide originated the mortgage in 2006 and transferred it to the BNY as trustee for the issuing trust, but that Countrywide retained the original note in its own possession.

212.   Even though DeMartini was presented by Bank of America as a witness in an attempt to prove that the loan documents had been validly transferred to the issuing trust, her testimony proved that the loan documents were never validly transferred.  She testified that an allonge to the promissory note, which purported to transfer the note to the trust by endorsement, was created only in preparation for the litigation in 2009, long after the purported transfer of the note to the trust in 2006, and was never delivered to the trustee.

213.   DeMartini testified that the original note was retained by Countrywide and was never delivered to the trustee.  Most significantly, she testified on direct examination that not delivering the original note to the trustee was standard business practice:

Q. Ms. DeMartini, is it generally the custom to – for your investor [*i.e.*, the issuing trust] to hold the documents?

1    A.  No.  They would stay with us as the servicer.

2    Q.  And are documents ever transferred to the investor?

3    A.  If we service-release them they would be transferred to

4    whomever we're service-releasing them to.

5    Q.  So I believe you testified Countrywide was the originator of

6    this loan?

7    A. Yes.

8    Q.  So Countrywide had possession of the documents from the

9    outset?

10    A. Yes.

11    Q.  And subsequently did Countrywide transfer these

12    documents by assignment or an allonge?

13    A. Yes.

14    Q.  And –

15    A. Well, transferred the rights, yes, transferred the ownership,

16    not the physical documents.

17    Q. So the physical documents were retained within the

18    corporate entity Countrywide or Bank of America?

19    A.  Correct.

20    Q.  Okay.  And would you say that this is standard operating

21    procedure in the mortgage banking business?

22    A.  Yes.  It would be normal – the normal course of business as

23    the reason that we are the servicer, as we're the ones that are

24    doing all the servicing, and that would include retaining the

25    documents.

26    214.   In response to questioning by the Bankruptcy Judge, DeMartini

27    again testified that "I do know that it is our normal course of action with the

Amended Complaint - 67

loans that we service that we are the ones that retain the – that we retain those documents." In response to the Court's question whether the documents are "ever moved to follow the transfer of ownership," DeMartini testified that "it is not customary for them to move."

215. At a subsequent hearing in September 2009, Bank of America, N.A.'s counsel stated:

> [A]lthough . . . the UCC and the Master Servicing Agreement apparently requires that, procedure seems to indicate that they don't physically move documents from place to place because of the fear of loss and the trouble involved and the people handling them. They basically execute the necessary documents and retain them as long as servicing's retained. The documents only leave when servicing is released.

216. In November 2010, the Bankruptcy Court for the District of New Jersey Chief Bankruptcy Judge Judith H. Wizmur held in November 2010 that the BNY, as trustee for an issuing trust, could not enforce a mortgage loan for two reasons:

> First, under New Jersey's Uniform Commercial Code ("UCC") provisions, the fact that the owner of the note, the Bank of New York, never had possession of the note, is fatal to its enforcement. Second, upon the sale of the note and mortgage to the Bank of New York, the fact that the note was not properly indorsed to the new owner also defeats the enforceability of the note.

*Kemp v. Countrywide Home Loans, Inc.*, No. 08-18700-JHW, Slip Op., at *10-11 (Bankr. D.N.J. Nov. 16, 2010). The Court further held that Bank of America, N.A. also could not enforce the mortgage loan, because as an agent

1   for the owner of the note, Bank of America, N.A. had no more authority to

2   enforce the note than its principal, the BNY.  *Id.* at *21.

3       217.   As DeMartini testified, parties to mortgage-backed

4   securitizations routinely fail to transfer the original mortgage loan

5   documents to the issuing trusts for MBS transactions.  The servicer typically

6   retains the original documents itself because it is easier than complying with

7   state laws regarding assignment.  Thus, Defendants failed validly to transfer

8   the promissory notes and security instruments for many of the mortgage

9   loans underlying the Certificates to the issuing trusts.

10       **C.**    **Countrywide's Attempts to Cover Up Transfer and**

11          **Assignment Failures**

12       218.   BAC Servicing is the primary servicer for all 32 offerings at

13   issue in this action.

14       219.   Bank of America and BAC Servicing employ an army of so-

15   called "robo-signers" who execute tens of thousands of foreclosure affidavits

16   a month, all necessarily false because they are allegedly based on their own

17   personal knowledge, and many of them are without proper documentation

18   including evidence of possession of the underlying mortgage note.  The

19   "robo-signers" sometimes attempt to execute assignments retroactive to the

20   closing date of the relevant securitization in an attempt to circumvent state

21   laws governing assignment.  Such purportedly retroactive assignments are

22   invalid.

23       220.   The Office of the Comptroller of the Currency (the "OCC")

24   issued a Consent Order dated April 13, 2011 finding that Bank of America,

25   including in its role as successor to Countrywide, tried to cover up that

26   issuing trusts do not have legal title sufficient to foreclose upon underlying

27   mortgage loans by engaging in fraudulent or improper foreclosure practices.

221.   The United States Department of Housing and Urban Development ("HUD") attempted to investigate Defendants' faulty handling of assignments to Countrywide Mortgage-Backed Trusts.  However, Defendants stonewalled the investigation.  According to a declaration filed by a HUD auditor, William W. Nixon, in a lawsuit filed in Maricopa County, Arizona, Bank of America "significantly hindered" HUD's investigation into Defendants' faulty assignment practices.  Bank of America refused to allow HUD auditors to perform a "walkthrough" of Bank of America's document repositories and refused to comply with subpoenas.

222.   Despite Defendants' attempts to obstruct HUD's investigation, HUD reportedly discovered that one Bank of America employee executed 75,000 foreclosure documents in a two-year period.  Another reportedly executed 47,000.  Obviously, no effort was made to determine the accuracy of the assertions contained in such documents.  Defendants were engaged in an effort to cover up the fact that they systemically failed properly to assign mortgages to issuing trusts, including the trusts that issued the Certificates.

223.   In states providing for non-judicial foreclosures, Bank of America utilizes its affiliate ReconTrust Company, N.A. ("ReconTrust") to exert pressure on homeowners in an attempt to cover-up Defendants' failure properly to assign mortgages.  On August 4, 2011, the Attorney General for the State of Washington filed an action against ReconTrust after conducting an extensive investigation and finding that ReconTrust forced people from their homes without adequate documentation.

224.   As a direct result of this misconduct, in September 2010 Bank of America and its affiliates had to suspend foreclosures in 23 states to allow the company to undertake a review of internal procedures while publicly acknowledging that tens of thousands of foreclosure proceedings were

improperly filed.  On October 9, 2010, Bank of America and its affiliates' documentation failures and lack of internal controls forced them to suspend foreclosures nationwide.

225.   Astonishingly, a July 19, 2011 Associated Press report confirms that Defendants continue to "robo-sign" documents and file false foreclosure documents in an ongoing effort to cover up their epic failure to deliver notes and security instruments and deliver loan files as promised in the Offering Materials.  The Associated Press interviewed officials with intimate knowledge of mortgage recording in counties across the country.  They confirmed that Defendants and other banks were still committing foreclosure fraud and "robo-signing."  As one official stated, "It is still an epidemic." Recent reports further suggest that the "robo-signing" conspiracy began as early as 2003 unbeknownst to investors.

226.   On August 4, 2011, the New York State Attorney General filed fraud claims against BNY, the trustee for the Certificates and other securitizations created and serviced by Bank of America, N.A. and its affiliates.  The fraud claim concerns BNY and Defendants' attempt to orchestrate a collusive settlement to brush Defendants' mortgage-backed securities misconduct under the rug.  The New York Attorney General's claims followed an extensive investigation of Bank of America's foreclosure practices which found that, as Western & Southern discovered with respect to the Certificates, Bank of America and its affiliates made absolutely no attempt to transfer title to the issuing trusts.

227.   The New York Attorney General found that Bank of America's and its affiliates' blatant disregard for the rules governing assignment has caused, and is continuing to cause, serious harm to investors such as Western & Southern.  As the Attorney General stated in his petition in *In the*

*Matter of the Application of Bank of New York Mellon* (as Trustee under various Pooling and Servicing Agreements and Indenture Trustee under various Indentures) et al., Index No. 651786/2011 (N.Y. Supr., New York County):

> [Assignment] provisions are central to any mortgage securitization, but they are now vitally important to trust investors in light of the housing market collapse.  Any action to foreclose requires proof of ownership of the mortgage.  This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership.  Moreover, complete mortgage files give borrowers assurance that their properties are properly foreclosed upon.  The failure to properly transfer possession of complete mortgage files has hindered numerous foreclosure proceedings and resulted in fraudulent activities including, for example, "robo-signing."

228.   The Attorney General's petition reported that an extensive review of foreclosure proceedings commenced by Bank of America and its affiliates found widespread misconduct.  For example, Bank of America and BNY admitted in *Bank of New York v. Kirkland*, Index No. 07-16839 (N.Y. Supr., Westchester County) that an action to foreclose on a mortgage had been commenced despite the fact that the promissory note had not been assigned to the trust that purportedly owned the note.  Similarly, in *Bank of New York v. Gioio*, Index No. 08-9865 (N.Y. Supr., Westchester County), Bank of America and BNY admitted that a note assignment had been executed two days prior to commencement of the action, contrary to requirements of state law.

1
2

### D. Acts of Perjury, Forgery, and "Robo-Signing" In Ohio Foreclosures

3   229.   Western & Southern reviewed files from hundreds of

4   foreclosure proceedings filed in the State of Ohio by Countrywide or Bank

5   of America as successor to Countrywide.  The results of this investigation

6   demonstrate that Bank of America has committed numerous acts of perjury,

7   forgery falsification and "robo-signing" in the state of Ohio.

8   230.   One of Bank of America's "robo-signers" is Renee Hertzler.

9   She testified in *Starr v. Bank of America Corp.*, No. 09-41903-JBR (Bankr.

10  D. Mass. Feb. 19, 2010) that she executed 8,000 foreclosure documents a

11  month admittedly without making any attempt to read them or ensure the

12  accuracy of statements in them.  Indeed, when asked if she read the

13  documents she "robo-signed" she stated:  "I typically don't read them

14  because of the volume that we sign."  She often represented that she was an

15  employee of the trustee overseeing the securitization at issue or other entities

16  when she was not.  This was pure fiction designed to cover-up Defendants'

17  massive failure to assign mortgage notes.

18  231.   Hertzler and Bank of America committed perjury and forgery in

19  *Countrywide Home Loans Servicing v. Elizabeth Bowers*, No. A 0902481

20  (Hamilton County).  In that case, Bank of America submitted an assignment

21  that purported to transfer a mortgage from American Home Mortgage to

22  Countrywide.  Hertzler signed the assignment on behalf of MERS, claiming

23  to be a vice president.  She is not an employee of MERS and never has been.

24  232.   BAC Servicing conspired with the Ohio law firm of Lerner,

25  Sampson & Rothfuss of Cincinnati in several foreclosure cases.  Shellie Hill,

26  a deed paralegal at Lerner Sampson & Rothfuss, admitted during deposition

27  testimony on September 20, 2010 that she regularly fabricated mortgage

assignments by falsely signing as a vice president of MERS.  *The Bank of New York v. James M. Unger, et al.*, 09-CV-711343 (Cuyahoga County, Ohio).  She admitted that she never worked for MERS and had no direction from MERS to sign on its behalf.

233.    Bank of America filed falsified assignments executed by Shellie Hill in many foreclosure proceedings in Ohio.  For example, in *Countrywide Home Loans v. Eric J. Engel*, No. A 0900184 (Hamilton County, Jan. 8, 2009), Bank of America submitted a mortgage assignment dated two days before the foreclosure proceeding was filed.  The assignment purported to transfer a mortgage home from Americas Wholesale Lender to Countrywide.  Hill signed the assignment as a vice president of MERS.  She is not an employee of MERS and never has been.

234.    Bank of America and Hill have submitted similarly falsified documents in many other proceedings.  *See Countrywide Home Loans Servicing v. Sherri Noyes*, No. A 0902462, Hamilton County; *BAC Home Loans Servicing v. Eric J. Engel*, No. A 0902467, Hamilton County; *BAC Home Loans Servicing v. John Klumpp*, No. A 0902467, Hamilton County; *Countrywide Home Loans v. Donald Lay*, No. 08-9777, Montgomery County; *Countrywide Home Loans v. Zella C. Ward*, No. 08-9768, Montgomery County; *Countrywide Homes Loans, Inc. v. Brenda L. Boyd*, No. 08-9779, Montgomery County; *Countrywide Home Loans v. Otha T. Lewis III*, No. 08-9876, Montgomery County; *Countrywide Home Loans v. Ronald H. Jones*, No. 08-10318, Montgomery County; *Countrywide Home Loans Servicing v. Rodney A. Fuller*, No. 08-10484, Montgomery County; *Countrywide Home Loans Servicing v. Chaunda McCray*, No. 08-10611, Montgomery County; *Countrywide Home Loans v. Kendra J. Cron*, No. 08-0690, Montgomery County.

235.   Keri Selman is an assistant vice president of BAC Servicing based in Texas.  Selman regularly claims in documents filed in foreclosure proceedings that she is an employee of entities other than Bank of America when she is not.  A New York court recently identified Selman as "a milliner's delight by virtue of the number of hats she wears" and refused to foreclose upon a home based on an assignment and affidavit signed by her. *Bank of N.Y. v. Myers*, 2009 N.Y. Slip Op 50159(U) (King County Feb. 3, 2009).

236.   Selman and Bank of America committed perjury and submitted a falsified Assignment of Note and Mortgage in *Countrywide Bank, FSB v. Wells*, No. A0800892 (Hamilton County, Jan. 25, 2008).  The assignment in that case, dated three days before the foreclosure proceeding, purported to transfer a note and mortgage from America's Wholesale Lender to Countrywide.  Keri Selman signed the assignment as a vice president of MERS.  She is not an employee of MERS and never has been.

237.   An especially notorious Bank of America "robo-signer" is Kimberly Dawson, a vice president at the bank.  Renee Hertzler admitted during her deposition in *Starr v. Bank of America Corp*. that Dawson regularly signs on behalf of MERS without authorization from MERS to do so.

238.   In *Countrywide Home Loans v. William D, Angi et al.*, Case No. 08-3180 (April 4, 2008), Bank of America submitted an assignment in a foreclosure proceeding that purported to transfer a mortgage from American Home Mortgage to Countrywide.  Dawson signed the assignment on behalf of MERS as nominee for American Home Mortgage, claiming to be a vice president of MERS.  She is not an employee of MERS and never has been.

239.   Western & Southern identified numerous other instances of suspected robo-signers who submitted perjured affidavits to Ohio courts on behalf of Defendants.

240.   The simple fact is that the original mortgage note and loan file should have been physically delivered to the Trusts.  They often were not.

**E.     Defendants' False Statements Regarding MERS**

241.   Defendants' representations in the Offering Materials that MERS ensured that each Trust could foreclose upon the underlying collateral were false.  As multiple courts have held, because the actual mortgage note is typically not transferred to MERS, MERS is a nullity.  In February 2011, MERS instructed its lender members to stop foreclosing in the name of MERS in light of the overwhelming authority that beneficial ownership of an underlying mortgage cannot be transferred to MERS.

242.   Defendants' representations in the Offering Materials that MERS would be the "beneficial owner" of each mortgage were false.  As MERS Recommended Foreclosure Procedure 8 provides, "MERS does not create or transfer beneficial interests in mortgage loans or create electronic assignments of the mortgage."

**VIII.  COUNTRYWIDE MANIPULATED THE APPRAISAL PROCESS**

243.   The Offering Materials uniformly represent that Defendants required and relied upon independent, industry-standard appraisals to value homes pledged pursuant to the mortgages underlying the Certificates.  For example, the Prospectus Supplement for CWALT 2007-16CB told investors:

> Countrywide Home Loans obtains appraisals from independent
> appraisers or appraisal services for properties that are to secure
> mortgage loans. The appraisers inspect and appraise the

proposed mortgaged property and verify that the property is in acceptable condition.  Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home.  All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

CWALT 2007-16CB Prospectus Supplement S-43.  The Prospectus Supplement for the other securitizations at issue had the same or similar representations.  *See* Exhibit F.

244.   Defendants' representations regarding the appraisal process for properties securing mortgage loans underlying the Certificates were false in at least three respects.  First, the appraisers were not independent of Countrywide Home Loans and other loan originators, all of which regularly pressured appraisers to value mortgaged properties at pre-determined, inflated and false values.  Second, sales managers employed by the originators had authority to override and inflate appraiser final valuations and they regularly exercised that authority.  Third, the appraisals did not conform to Fannie Mae or Freddie Mac standards due to, among other things, the appraisers' lack of independence and originators' override authority.

245.   Countrywide Home Loans regularly engaged appraisers affiliated with Countrywide, including appraisers that were owned or controlled by Countrywide, either directly or indirectly through intermediate subsidiaries or otherwise subject to Countrywide's influence.  This created a conflict of interest.  As originator and securitizer of the loans, Countrywide

had an incentive to inflate the value of properties because doing so would result in lower LTV ratios.  A lower LTV ratio would allow a loan to be approved when it otherwise would not be, and would appear less risky to Western & Southern and other investors.  But loans based on inflated appraisals are more likely to default and less likely to produce sufficient assets to repay the lien holder in foreclosure.

246.   The appraisals in practice were not intended to determine the adequacy of the collateral in the event of a default, but rather to ensure that a large volume of mortgages were rapidly originated, underwritten and securitized with no regard to the value of the collateral.

247.   According to Capitol West Appraisals, LLC, a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, and is a "review appraiser" for Wells Fargo, Washington Mutual and other lenders, Countrywide Financial and Countrywide Home Loans engaged in a pattern and practice of pressuring even non-affiliated real estate appraisers to increase appraisal values artificially for properties underlying mortgages Countrywide Home Loans originated.  Capitol West stated that Countrywide Home Loans officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions.  When Capitol West refused to vary the appraisal values from what it independently determined was appropriate, Countrywide Home Loans retaliated.

248.   According to Capitol West, from at least 2004, and likely before, and continuing through at least 2007 when the Mortgage Loans at issue here were being originated and securitized into the Certificates, Countrywide Home Loans maintained a database titled the "Field Review List" containing the names of appraisers whose reports Countrywide Home Loans would not accept without a report from a second appraiser.  Capitol

West was placed on the Field Review List after refusing to buckle under the pressure to inflate the value of the properties.  No mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which Countrywide Home Loans would be the lender, because neither the broker nor the borrower wanted to pay to have two appraisals done.  Instead, the broker would simply retain another appraiser who was not on the Field Review List.

249.   According to Capitol West, Countrywide Home Loans created certain procedures to further enforce its blacklisting of uncooperative appraisers like Capitol West.  Specifically, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide's computer systems automatically flagged the underlying property for a "field review" of the appraisal by LandSafe, Inc., a wholly owned subsidiary of Countrywide Financial.  LandSafe would then issue another appraisal for the subject property that, without exception, would be designed to "shoot holes" in the appraisal performed by the blacklisted appraiser such that the mortgage transaction could not close based on that appraisal.  Indeed, according to Capitol West, in every instance, LandSafe would find defects in the appraisal from the blacklisted appraiser, even if another, non-blacklisted appraiser had arrived at the same value for the underlying property and the non-blacklisted appraiser's appraisal was accepted.  According to Capitol West, this is exactly what happened with respect to an appraisal it submitted after it was placed on the Field Review List.

250.   Because Countrywide was one of the nation's largest mortgage lenders, a substantial portion of any mortgage broker's loans was submitted to it.  Because a broker could not rule out that Countrywide would be the ultimate lender, and because mortgage brokers knew that a field review

would be required if a blacklisted appraiser were chosen, with the likely result that a mortgage would not be issued with that appraisal, and that its mortgage applicant would have to incur the cost of retaining another appraiser, the broker had a strong incentive to refrain from using a blacklisted appraiser.  By these means, Countrywide systematically and deliberately enlisted appraisers in its scheme to inflate appraisals and issue low quality, extremely risky loans.

251.   A former Countrywide employee, Mari Eisenman, after a few months on the job in or around October 2004 suspected that Countrywide employees were engaged in numerous illegal practices including "securing multiple property appraisals when the original property appraisals failed to qualify the individual for a loan." *Inside Countrywide, a 'counseling meeting' then termination*, iWatch News, October 18, 2011.

252.   Eisenman forced an investigation of the illegal practices by Countrywide's fraud unit.  That investigation substantiated her allegations and, as a result, a branch manager and a number of loans officers were fired or forced to resign.  *Id.*  After the investigation was complete, Eisenman was terminated – she believes because she forced Countrywide to investigate and expose its fraudulent practices.  *Id.*

253.   Mark Zachary, a former Regional Vice President of Countrywide, claims he was fired for airing his concerns about Countrywide's underwriting practices.  In September 2006, he had informed Countrywide executives that there was a problem with appraisals performed on KB Home properties being purchased with mortgage loans originated by Countrywide.  According to Zachary, Countrywide executives knew that appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all closing costs.  According to

Zachary, this practice resulted in borrowers being "duped" as to the true values of their homes.  This also made loans more risky because when values were falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily incorrect.

254.   Zachary brought his concerns to executives of the Countrywide/KB Homes joint venture, as well as Countrywide executives in Houston, the Employee Relations Department and senior risk management executives.  According to Zachary, Countrywide performed an audit in January 2007, and the findings of the audit corroborated his story; and the findings were brought to the attention of Countrywide executives.

255.   In her FCIC testimony, Eileen Foster stated that she uncovered Countrywide's systemic practice of fraudulent appraisals of second lien home equity loans.  Countrywide utilized an automated system.  According to Foster, if the automated program did not value the property at a level sufficient to approve the loan, Countrywide loan officers would enter a different property address until they found one that appraised at the level required.

## IX.   COUNTRYWIDE MANIPULATED THE RATINGS PROCESS

256.   Each tranche of the Certificates received a credit rating indicating the tranche's risk profile.  The initial ratings given to the Certificates were generally AAA, the highest available investment rating.  The ratings were material to reasonable investors, including Western & Southern, because they provided assurances that investors would receive the expected interest and principal payments.  The Certificates would have been unmarketable to investors like Western & Southern and would not have been issued but for the existence of favorable ratings.

257.   The Offering Materials represented that the rating agencies conducted an analysis designed to assess the likelihood of delinquencies and defaults in the underlying mortgage pools and issued ratings accordingly. For example, the Offering Materials for CSAB 2006-3 stated:

> It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a "Rating Agency") specified in the related prospectus supplement.  The rating would be based on, among other things, the adequacy of the value of the Trust Fund Assets and any credit enhancement with respect to the class and will reflect the Rating Agency's assessment solely of the likelihood that holders of a class of securities of the class will receive payments to which the securityholders are entitled under the related Agreement.

CWALT 2007-16CB Prospectus at 109-10.  The Offering Materials relating to Defendants' other offerings that are part of this action provide identical or substantially similar disclosures.  *See* Exhibit G.  Each Prospectus Supplement also provides the ratings for each class of Certificate issued, based on ratings analyses done by two or three ratings agencies.

258.   These representations were false or misleading.  The ratings given to the Certificates by the major credit rating agencies were based on the loan profiles fed to the agencies by Defendants.  But as described upon above and below, most (if not all) of the key components of that data were false because Defendants failed to adhere to disclosed underwriting standards, failed to assign title to the underlying mortgages properly, and

manipulated the appraisal of properties underlying the mortgage pools. As such, Defendants essentially pre-determined the ratings by "feeding garbage" into the ratings system. This rendered misleading Defendants' representations concerning the ratings and their significance, because Defendants failed to disclose that ratings were based on unreliable information provided by Defendants themselves, and therefore did not reflect the true credit risks associated with the Certificates.

259. Countrywide's practice of feeding misinformation to ratings agencies is highlighted by David Winston's lawsuit against Countrywide for wrongful discharge. Winston recently won a $3.8 million jury verdict. He proved that he was discharged from his position at Countrywide for refusing to lie to the ratings agencies that were rating a Countrywide bond offering. As the *New York Times* reported on February 19, 2011:

> Mr. Winston's story provides a glimpse into how business was done at Countrywide at the height of the subprime craziness — and how assiduously Angelo R. Mozilo, the company's fallen leader, worked to quash dissent in the ranks. Mr. Winston had the audacity to question Countrywide practices. Mr. Mozilo was not pleased and, before long, Mr. Winston was marginalized and later dismissed.

## X.   COUNTRYWIDE RECEIVED MORTGAGE INSURANCE KICKBACKS

260. The Offering Materials represented that BAC Servicing would maintain mortgage insurance for the loans in each offering with an LTV ratio over a specified percentage. The originator often purchased the policy, passing the cost onto individual buyers. For example, the Offering Materials for CWHL 2007-15 provided:

> Generally, each mortgage loan with a Loan-to-Value Ratio at origination of greater than 80% will be covered by a primary mortgage guaranty insurance policy issued by a mortgage insurance company acceptable to Fannie Mae or Freddie Mac. The policy provides coverage in an amount equal to a specified percentage times the sum of the remaining principal balance of the related mortgage loan, the accrued interest thereon and the related foreclosure expenses.
>
> . . .
>
> The primary mortgage guaranty insurance policy will be maintained for the life of the lender acquired mortgage insurance mortgage loans, unless otherwise provided in the mortgage note or prohibited by law.

CWHL 2007-15 Prospectus Supplement at S-37.  The Offering Materials for 26 of the securitizations at issue in this action contained substantially similar disclosures.  *See* Exhibit H.

261.   Sometimes the trust – as opposed to the lender – was required to purchase mortgage insurance.  For example, the Offering Materials for CWL 2007-11 provided:

> It is expected that the Mortgage Loans generally will not carry borrower-paid mortgage insurance.  The Trust Fund will acquire a mortgage insurance policy (the "Mortgage Insurance Policy") from Mortgage Guaranty Insurance Corporation (the "Mortgage Insurer").  The policy is expected to cover approximately 31.71% and 23.73% of the Mortgage Loans with Loan-to-Value Ratios at origination in excess of 80% in the Statistical Calculation Pool in respect of Loan Group 1 and

1  Loan Group 2, respectively (in each case by principal balance)
2  (each such insured Mortgage Loan, a "Covered Mortgage
3  Loan").  The Mortgage Insurance Policy will only cover losses
4  pursuant to the formula described in the policy down to
5  approximately 60% of the value of the related Mortgaged
6  Property.  The premium payable on the Mortgage Insurance
7  Policy to the extent applicable to the Covered Mortgage Loans
8  (the "Mortgage Insurance Premium") will be paid monthly by
9  the Co-Trustee with funds withdrawn from the Distribution
10  Account as provided in the Pooling and Servicing Agreement
11  and the Mortgage Insurance Policy.
12  CWL 2007-11 Prospectus Supplement at S-47.

13      262.   These statements were materially false and misleading because
14  Countrywide did not disclose in the Offering Materials that it would not
15  allow any insurer to provide mortgage insurance unless that insurer agreed to
16  pay kickbacks that are illegal under the Real Estate Settlement Procedures
17  Act of 1974 ("RESPA").

18      263.   Countrywide utilized its captive insurer, Balboa Reinsurance
19  Company, in order to circumvent the prohibition against kickbacks in
20  RESPA.

21      264.   In addition to MGIC, Countrywide used Genworth Mortgage
22  Insurance Corporation, Radian Guaranty Inc., United Guaranty Residential
23  Insurance Company, Triad Guaranty Insurance Company and Republic
24  Mortgage Insurance (collectively, the "PMI Insurers") as mortgage insurers
25  in connection with mortgage loans it originated and serviced including the
26  bulk of the mortgage loans underlying the offerings subject to this action.

27

265.   At all relevant times, each of the PMI Insurers was authorized to do business in Ohio.

266.   Whether paid for by the borrowers or the trusts, many of the properties covered by the mortgage insurance policies are located in Ohio. For example, CWHL 2007-15 included 59 loans originated in Ohio with $6.8 million of principal balance.  The CWHL 2007-15 Prospectus Supplement disclosed that the weighted average LTV of these loans was 87.5%.  Because the average LTV for the Ohio loans was over 80%, most, if not all, of the Ohio loans required mortgage insurance.

267.   Similarly, CWL 2007-11 included 29 loans with a principal loan balance of $3.5 million were originated in Ohio.  The CWL 2007-11 Prospectus Supplement disclosed that the weighted average LTV of these loans was 84.8%.  Because the average LTV for the Ohio loans was over 80%, most, if not all, of the Ohio loans required mortgage insurance.

268.   In September 2011, the *American Banker* issued a series of reports of an investigation by HUD Inspector General that uncovered illegal reinsurance arrangements, including sham reinsurance contracts entered into by Balboa.  The *American Banker* reports included interviews with the current HUD Inspector General, Michael Stephens, and former HUD officials including a former HUD Inspector General, Ken Donohue. Donohue confirmed that the HUD had uncovered criminal conduct and referred the case to the United States Department of Justice for criminal prosecution.

269.   The HUD sources quoted by the *American Banker* explained how the scheme worked.  Countrywide used its leverage as one of the Nation's largest lenders to force all of its PMI insurers to pay Countrywide for the opportunity to provide mortgage insurance to insure against potential

1  default under loans originated by Countrywide that required such insurance.

2  Because kickbacks of these types are illegal under RESPA, Countrywide

3  disguised them by entering into sham reinsurance contracts.

4       270.   The PMI insurers were forced to remit to Balboa Reinsurance

5  approximately 40% of the premiums earned under mortgage insurance

6  policies. However, the reinsurance policies did not require Balboa to accept

7  40% of the losses under the policies. Balboa was only required to accept a

8  maximum of 10% of the losses and those losses were subject to the

9  mortgage insurers accepting the first 4% of loss. These so-called "4-10-40"

10  deals were not legitimate reinsurance. They were sham reinsurance

11  contracts because Countrywide did not assume real risk under the

12  reinsurance contracts.

13       271.   The mortgage insurance placed in CWL 2007-1 with MGIC

14  was subject to Balboa's "4-10-40" reinsurance deal with Balboa. As

15  reported by the *American Banker*, in 2003 MGIC attempted to stop

16  Countrywide's use of these sham reinsurance contracts. However,

17  Countrywide cut off its business with MGIC and MGIC was forced to relent

18  and agree to continue the sham reinsurance arrangements. Ultimately, the

19  scheme evolved such that Balboa took no economic risk.

20       272.   The *American Banker* reported that it had been granted access

21  to documents that revealed that Countrywide's actuaries who reviewed

22  Balboa's reinsurance agreement entered into between 2005 through 2007

23  determined that there was no reasonable possibility of loss under the

24  reinsurance agreements and, as a result, no risk transfer. These actuaries

25  also determined that no loss reserve associated with Balboa's sham

26  reinsurance agreements needed to be established.

27

273.   Countrywide described the following arrangement in its Form 10-K for 2005:

> We provide a mezzanine layer of reinsurance coverage for losses between minimum and maximum specified amounts to the insurance companies that provide primary mortgage insurance ("PMI") on loans in our servicing portfolio.  We provide this coverage with respect to substantially all of the loans in our portfolio that are covered by PMI, which generally includes all conventional loans with an original loan amount in excess of 80% of the property's appraised value.  In return for providing this coverage, we earn a portion of the PMI premiums.

274.   Countrywide made similar disclosures in its Form 10-K for 2006 and 2007.

275.   According to Countrywide's Form 10-Ks, Balboa collected $180.7 million in kickbacks in 2005, $223.6 million in 2006, and $288.5 million in 2007.  During the same period, Balboa incurred negligible levels of claim expense.  In 2005 and 2006, Balboa recorded claims expense of only 17% and 16% respectively, the bulk of which was likely due to ceding commissions paid to the insurers in a cash round trip that was necessary to disguise the sham transactions.  Even the most profitable reinsurance companies experience much higher claim payments relative to earned premiums.

276.   Countrywide's no-risk transfer deals encouraged its abandonment of underwriting guidelines.  According to industry expert Joshua Rosner, managing director of Graham Fisher & Co., the deals "gave the banks a false sense of confidence that they did not need to pay attention

to underwriting standards."  The more faulty loans it could originate the more it could earn from sham reinsurance contracts.

## XI.    COUNTRYWIDE ENGAGED IN BANK FRAUD

277.   Countrywide has engaged in numerous acts of bank fraud, including against the Federal Home Loan Bank ("FHLB") of Pittsburgh and FHLB of Chicago, Fannie Mae, Freddie Mac, and Countrywide Bank, Countrywide's affiliated source of funding unsecured mortgage loans.

278.   Each of FHLB of Pittsburgh, FHLB of Chicago, Fannie Mae, Freddie Mac, and Countrywide Bank is a financial institution under 18 U.S.C. § 1344 (Bank Fraud).

279.   The conduct of the Defendants in connection with sales of mortgage-backed securities to FHLB of Pittsburgh, FHLB of Chicago, Fannie Mae, and Freddie Mac substantially mirrors the conduct set forth herein and is further described in complaints filed by each of those financial institutions.  *See Fed. Home Loan Bank of Pittsburgh v. Countrywide Secs. Corp.*, 09-cv-1520 (U.S.D.C. Western Dist. Pa. Nov. 13, 2009); *Federal Home Loan Bank of Chicago v. Banc of Am.*, 10-2-36526-5 (King County, WA); *Federal Housing Finance Agency, as Conservator for the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation v. Countrywide Financial Corp. et al.*, 1:11-cv-06916 (S.D.N.Y.).

280.   The mortgage-backed securities sold to Fannie Mae include certificates from the CWALT 2006-14CB and CWALT 2007-5CB offerings, which are at issue in this case.

281.   Countrywide also defrauded Countrywide Bank, its affiliated source of funding for billions of dollars of mortgage loans that had yet to be securitized and foisted on unsuspecting investors like Western & Southern.

282.   Between December 2005 and December 2007, unsecuritized Countrywide loans financed by Countrywide Bank increased from $8 billion to an astounding $212 billion.  Countrywide thereby massively defrauded its affiliated financial institution by deliberately exposing it to the very same shoddy underwriting practices as it did investors like Western & Southern.

## XII.   WESTERN & SOUTHERN'S DETRIMENTAL RELIANCE AND DAMAGES

283.   In investing in the Certificates, Western & Southern relied upon Defendants' representations and assurances regarding the quality of the mortgage collateral underlying the Certificates, including the quality of the underwriting processes and the assignment of the underlying mortgage loans.  Western & Southern received, reviewed, and relied upon the Offering Materials, which described in detail the mortgage loans underlying each offering.

284.   In purchasing the Certificates, Western & Southern justifiably relied on Defendants' false representations and omissions of material fact detailed above, including the misstatements and omissions in the Offering Materials.  These representations materially altered the total mix of information upon which Western & Southern made its purchasing decisions.

285.   But for the misrepresentations and omissions in the Offering Materials, Western & Southern would not have purchased or acquired the Certificates as it ultimately did.

286.   The false and misleading statements of material facts and the omissions of material facts in the Offering Materials directly caused Western & Southern damage, because the Certificates were far riskier than Defendants described, and for that reason, far less valuable than the prices paid by Western & Southern.  The loans underlying the Certificates

experienced default and delinquency at extraordinarily high rates due to the abandonment of the disclosed underwriting guidelines.  And when the inevitable defaults followed, many of the underlying loans could not be foreclosed upon because Defendants failed to assign the mortgages properly.

287.   Numerous brokers are now active in making a secondary market for mortgage-backed securities, including Bank of America or its affiliates.

288.   Western & Southern has seen substantial losses in the market value of its Certificates.  Further, the income and principal payments that Western & Southern received have been less than Western & Southern expected under the "waterfall" provisions of the securitizations.

289.   The drastic and rapid loss in value of Western & Southern's Certificates was primarily and proximately caused by the issuance of loans to borrowers who could not afford them, in contravention of underwriting guidelines described in the Offering Materials, and by the failure to assign mortgage loans to each trust in a manner sufficient to allow the trust to foreclose upon the underlying property in the event of a default.

## XIII.  LIABILITY OF SPONSOR, DEPOSITORS, AND UNDERWRITERS AS SELLERS OF SECURITIES OR SALE PARTICIPANTS

290.   Defendants are sellers of securities or participants in the sale of securities under the Ohio Securities Act, including the sponsor (Countrywide Home Loans), the four depositors (CWALT, CWABS, CWHEQ and CWMBS), the three underwriters (Countrywide Securities, Credit Suisse Securities, and Deutsche Bank Securities), and eight the Officer Defendants (Defendants Mozilo, Sambol, Sieracki, Kripalani, Kurland, Spector, Adler,

and Sandefur).  Each is liable for misrepresentations in Offering Materials under ORC §§ 1707.41, 1707.43, 1707.44.

291.  As the sponsor for the securitizations at issue, Countrywide Home Loans originated or acquired the mortgage loans that were pooled together in the securitizations, and then sold, transferred, or otherwise conveyed title to those loans to the depositors pursuant to Pooling and Servicing Agreements.  Countrywide Home Loans had responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates and were identified on the Prospectuses and Prospectus Supplements.  Countrywide Home Loans profited from the sales of the Certificates.

292.  The depositors purchased the mortgage loans from the sponsor pursuant to the Pooling and Servicing Agreements.  The depositors then purportedly sold, transferred, or otherwise conveyed the mortgage loans to the Trusts, which held the loans as collateral for the Certificates.  The depositors shared responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates, and were identified on the Prospectuses and Prospectus Supplements.  In addition, the depositors were responsible for registering the offerings with the SEC.  The depositors profited from the sales of the Certificates.

293.  The trusts issued the Certificates that were sold to investors, including Western & Southern.  The trusts had beneficial interest in any assets and were mere vehicles for purposes of holding the pools of mortgage loans assembled by the sponsors and depositors, and issuing the Certificates for sale to the investors.

294.  The Countrywide Defendants took all steps necessary to facilitate the securitization transactions including approving such

1  transactions and directing the creation of the securitization trusts and related

2  SEC filings.

3      295.   The underwriters marketed and sold the Certificates on behalf

4  of the sponsor and the trusts.  The underwriters were responsible for

5  managing the sale of the Certificates, including screening the mortgage loans

6  for compliance with the appropriate underwriting guidelines.  The

7  underwriters also participated in the preparation of the Offering Materials.

8  The underwriters profited from the sales of the Certificates.

9      296.   The sponsors, the depositors, the underwriters, and the Officer

10  Defendants successfully solicited Western & Southern's purchase of the

11  Certificates at issue.

12  **XIV.  DEFENDANTS' LIABILITY AS CONTROL PERSONS**

13      297.   ***Countrywide Financial as Control Person.***  Countrywide

14  Financial operated its consolidated subsidiaries as a collective enterprise,

15  making significant strategic decisions for its subsidiaries, monitoring

16  enterprise-wide risk, and maximizing profit for Countrywide Financial's

17  executives and shareholders.  As reported in Countrywide Financial's 2003

18  Form 10-K, although mortgage banking remained Countrywide Financial's

19  "core business," it had expanded operations in recent years "to capitalize on

20  meaningful opportunities to leverage [its] core Mortgage Banking business

21  and to provide sources of earnings that are less cyclical than the mortgage

22  banking business."  In other words, in conjunction with its goal of

23  prioritizing the origination of loans regardless of the risk of default,

24  Countrywide developed its own "in-house" subsidiaries to facilitate its

25  ability to package and sell these risky products.

26      298.   Countrywide Financial managed Countrywide's enterprise-

27  wide risks, strategic direction, and business operations through executive

1  committees.  These committees included the Executive Strategy Committee,

2  the Corporate Credit Risk Committee, the Corporate Enterprise Risk

3  Committee, and the Asset/Liability Committee.

4      299.  ***The Executive Strategy Committee.***  The members of the

5  Executive Strategy Committee included four Officer Defendants:  Mozilo,

6  Sambol, Sieracki, and Kurland.  They were responsible for defining and

7  assessing Countrywide's enterprise-wide strategic direction and risk.  The

8  Committee's activities included developing Countrywide Financial's

9  strategic plan and reviewing the strategic plans of each of Countrywide

10  Financial's divisions, to ensure consistency and proper strategic alignment.

11      300.  ***The Corporate Credit Risk Committee and The Corporate***

12  ***Enterprise Risk Committee.***  The Corporate Credit Risk Committee and the

13  Corporate Enterprise Risk Committee interfaced directly with the Credit

14  Committee within Countrywide Financial's Board of Directors, assessed the

15  risks to which the Countrywide enterprise was exposed and decided which

16  risks Countrywide Financial should sell or otherwise mitigate.  The Credit

17  Risk group was also responsible for managing fraud prevention and

18  investigation.  Sieracki and Kurland were both members of the Corporate

19  Credit Risk Committee.

20      301.  ***The Asset/Liability Committee.***  The Asset/Liability Committee

21  was responsible for addressing market risk for the Countrywide enterprise,

22  across all Countrywide Financial subsidiaries.  The Asset/Liability

23  Committee engaged in extensive modeling for the performance of

24  Countrywide Financial's various financial products, and maintained a

25  dedicated Model Validation Subcommittee for that purpose.  Five Officer

26  Defendants, Mozilo, Sambol, Kurland, Sandefur, and Sieracki, were

27

members of the Asset/Liability Committee, and Sieracki became the acting Chairman of the committee in February 2006.

302.   Through the use of these committees and others, as well as regular communication with and among its subsidiaries and regular reporting regarding the performance of divisions across the enterprise, Countrywide Financial maintained a high level of day-to-day scrutiny and control over its subsidiaries.  Countrywide Financial controlled the guidelines for loan origination, decided which assets to sell and which to hold for its own investment portfolio by being advised of the quality of the underwriting and the loans originated, set protocols for servicing the vast portfolio of loans for which it had retained servicing rights and approved the manner in which it sold the loans it elected to securitize.

303.   ***Countrywide Capital Markets as Control Person.*** Countrywide Capital Markets exercised a high level of day-to-day control over its subsidiary, Countrywide Securities.  Countrywide Securities received directives from Countrywide Financial via Kripalani and Countrywide Capital Markets.  Kripalani, who was the President and CEO of both entities, ensured that Countrywide Securities followed the priorities and practices established by Countrywide Financial and Countrywide Capital Markets.

304.   As the division charged with marketing the loans originated and acquired by Countrywide Home Loans, Countrywide Capital Markets also exercised control over the Depositors and, through the Depositors, over the Trusts.  Along with Countrywide Financial, Countrywide Capital Markets determined and approved the manner in which Countrywide Securities and the Trusts selected and sold the securitized loans in the Certificate Offerings, and controlled the disclosures made in connection with each securitization.

305.   ***Mozilo as Control Person.***  Mozilo had the power to control and influence, and did in fact control and influence, all of the business operations of Countrywide Financial and its subsidiaries.  Mozilo had the power to control and influence, and did control and influence, Countrywide Financial and Countrywide Home Loans.  Mozilo also had the power to control and influence, and did control and influence, primary violator Countrywide Securities, a wholly-owned Countrywide Financial subsidiary.

306.   Mozilo directly supervised Sambol, who was the direct supervisor of Kripalani during Kripalani's tenure as President, Chief Executive Officer, and Managing Director of Countrywide Securities. Kripalani provided Sambol with regular business updates regarding Countrywide Securities, and Sambol shared and discussed this information with Mozilo.  As Sambol's supervisor, Mozilo had the power to control and did control Countrywide Securities.

307.   Mozilo exercised his control and influence through senior management meetings.  For example, Countrywide Financial's management held monthly "Business Review" meetings attended by Mozilo and other senior executives.  During these meetings, the operations and performance of each Countrywide entity were evaluated and discussed in great detail. Mozilo and the rest of the senior management team set the course for Countrywide Financial's various businesses including the business of Countrywide Securities.

308.   In numerous public statements, Mozilo portrayed himself as the face of Countrywide Financial and conveyed that he spoke on behalf of Countrywide Financial and all of its subsidiaries.  Mozilo exercised his control and influence over Countrywide Financial and other Countrywide entities by signing Countrywide Financial documents filed with the SEC.

These documents include Countrywide Financial's Form 10-Ks for the years 2003, 2004, 2005, and 2006.

309.   Mozilo controlled and influenced Countrywide Financial and its subsidiaries through membership on several Countrywide Financial management and Board of Directors committees.  He was a member of at least the Executive Strategy Committee, the Finance Committee, and the Credit Committee.

310.   Through his membership of Countrywide Financial committees and its board, Mozilo kept apprised of developments in the business practices of Countrywide Financial and its subsidiaries, and exercised control and influence over Countrywide Financial's entire business.

311.   Mozilo's ability to control and influence Countrywide Financial and its subsidiaries is further evidenced by his central role in bringing about the transformation of Countrywide Financial from a mortgage company with conservative underwriting policies into a loan-originating machine that ignored its own underwriting guidelines and took on increasingly risky loans.  Mozilo directed Sambol to initiate this sweeping change, and he aggressively pushed Countrywide Financial into numerous new product offerings that changed the risk profile for the loans Countrywide issued.

312.   Mozilo's control and influence of Countrywide Financial and its subsidiaries was further evidenced by his close involvement in the daily management of all aspects of Countrywide Financial's core operations.  This included approving and overseeing Countrywide Financial's and Countrywide Home Loans' mortgage and loan product offerings – the very same mortgages and loans that were packaged together for the Certificates.

313.   Mozilo exercised his power to control and influence Countrywide Financial and its subsidiaries through his involvement in

developing, modifying, and implementing Countrywide Financial's guidelines for making and underwriting new loans and mortgages. Mozilo acknowledged that "I participate every day in originations myself, and it keeps me apprised of what's happening."

314.   Mozilo exercised his control and influence over Countrywide Financial and its subsidiaries through his participation in all areas of Countrywide's business, including the activities of Countrywide Securities. For example, Mozilo exerted influence over various governance responsibilities relating to Countrywide Financial's "matching" strategy, including committee supervision and responsibility for (1) guideline review and verification; (2) surveillance; (3) pricing and valuation; (4) monitoring and economic conditions; (5) servicing coordination; and (6) Countrywide Financial's subprime market position.

315.   Mozilo decided not to intervene with respect to the loans included in the securitizations at issue even after he became aware that Sambol was directing Countrywide Securities to securitize pools of loans that featured extreme risk. Mozilo knew the loans of deteriorating quality were being included and allowed the inclusion of these loans to continue.

316.   It was well known within Countrywide Financial that Mozilo had such extensive control and influence over the loan and origination practices that he was personally responsible for instigating breaches in protocol on numerous occasions. For example, Mozilo personally approved loans that did not meet the applicable guidelines, including a loan internally flagged as "unsalable" because of a debt-to-income ratio of 89%; a loan for a high-profile borrower "on a reduced doc basis as in the past"; and a loan for that high-profile customer with 100% loan-to-value financing in July 2004.

317.   Mozilo's control and influence resulted in company-wide weak controls and procedures with respect to loan approval.  Countrywide Financial employees acknowledged that Mozilo's practice of personally approving loans for friends violated the stated requirements for obtaining a loan.  Mozilo personally controlled the risky practices about which he and others at Countrywide lied to the public.

318.   ***Sambol as Control Person.***  As set forth in above, Sambol had numerous positions and roles within Countrywide.

319.   By virtue of his senior management positions, Sambol had the power to control and influence, and did control and influence, Countrywide Financial and Countrywide Home Loans.  Sambol had the power to control and influence, and did control and influence, primary violator Countrywide Securities, a wholly-owned Countrywide Financial subsidiary.

320.   Sambol was the direct supervisor for Kripalani during Kripalani's tenure as President, Chief Executive Officer, and Managing Director of Countrywide Securities.  Kripalani provided Sambol with regular business updates regarding Countrywide Securities, and Sambol provided direction to Kripalani regarding Countrywide Securities' business.  Sambol had the power to control and influence, and did control and influence, Countrywide Securities in his role as Kripalani's supervisor.

321.   In numerous public statements, Sambol portrayed himself as a public face of Countrywide Financial and its subsidiaries, and conveyed that he spoke on behalf of Countrywide Financial, Countrywide Home Loans and Countrywide Financial's other subsidiaries (including Countrywide Securities).  Many of these representations were untrue for the same reasons the representations at issue in this case were untrue.

322.   Sambol also exercised his authority to control and influence Countrywide Financial and other Countrywide entities by signing numerous materially false and misleading Countrywide Financial documents filed with the SEC.  These documents include Countrywide Financial's:  (1) Form 10-Q filed on November 7, 2006; (2) Form 10-Q filed on May 9, 2007; (3) Form 10-Q filed on August 9, 2007; and (4) Form 10-Q filed on November 9, 2007.

323.   Sambol's ability to control and influence Countrywide Financial and its subsidiaries is further evidenced by his central role in bringing about the sweeping change that transformed Countrywide Financial from a mortgage company with conservative underwriting policies into a loan-originating entity that ignored its own historical underwriting guidelines and originated increasingly risky loans.  Sambol began this change in 2003 and aggressively pushed Countrywide Financial into numerous new product offerings that altered the risk profile of the loans Countrywide issued.

324.   Sambol's ability to control and influence Countrywide Financial and its subsidiaries was evidenced by his close involvement in the daily management of Countrywide's operations.  This included his creating, approving, and overseeing Countrywide Financial's mortgage and loan product offerings through its subsidiary Countrywide Home Loans – including loans that were packaged together for the securitizations at issue in this case.

325.   Sambol had the power to control and influence, and did control and influence, Countrywide Financial, Countrywide Home Loans, and Countrywide Financial's other subsidiaries through his heavy involvement with developing, modifying, and implementing guidelines for making and

1   underwriting new loans and mortgages.  Others within Countrywide

2   routinely acknowledged that Sambol had the ultimate approval power for

3   relaxing guideline requirements for issuing new loans and implementing any

4   Countrywide programs relating to exceptions processes.  Sambol created the

5   Exception Processing System, which was a computer system designed to

6   approve exception loans routinely, even though they did not satisfy even the

7   relaxed underwriting criteria.  Sambol also was responsible for changing

8   credit-score cut-offs under Countrywide's underwriting guidelines.

9       326.   Sambol had the power to control and influence, and did control

10   and influence, Countrywide Financial and its subsidiaries (including

11   Countrywide Securities and the Trusts) through his membership on several

12   Countrywide Financial management and Board of Directors committees.

13   Sambol was a member of at least the Executive Strategy Committee, the

14   Asset/Liability Committee, the Finance Committee, the Audit and Ethics

15   Committee, and the Committee to Set Loan Loss Allowance.  Through his

16   committee and Board memberships, Sambol was a key member of the

17   Countrywide decision-making team.

18       327.   Sambol's participation in the Countrywide Financial

19   committees and the Board also kept him apprised of developments in the

20   business practices of Countrywide Financial and its subsidiaries (including

21   Countrywide Securities and the Trusts) and afforded him further control and

22   influence over Countrywide Financial's entire business, including the

23   business of Countrywide Securities and other Countrywide subsidiaries.

24       328.   Sambol exercised his control and influence on numerous

25   occasions.  For example, Sambol mandated a series of changes to the

26   subprime mortgage business at Countrywide Financial and Countrywide

27   Home Loans.  At Sambol's direction, Countrywide Financial and

Countrywide Home Loans greatly expanded their roles in the subprime mortgage business despite warnings from employees that these loans were too risky.  The subprime mortgage market expansion is but one example of what everyone at Countrywide knew – if Sambol wanted a change to any Countrywide program (whether at Countrywide Financial, Countrywide Home Loans, Countrywide Securities, or any other Countrywide entity), then Sambol would be able to effect the change because of his control and influence.

329.   Sambol was the highest-ranking person to involve when issues arose in obtaining loan approval.  Account executives at Countrywide Home Loans told their subordinates to take an underwriter's decision not to approve the loan to Sambol to get the deal done.  Account executives and their subordinates recognized that Sambol had the power to approve any risky loan at Countrywide Financial or Countrywide Home Loans.

330.   Sambol threatened to fire subordinates unless they devised new ways for Countrywide Financial and Countrywide Home Loans to make money, including by pushing risky loan products.  Sambol pressured employees to price risky loans in a way that would not take into account the extent of the risk that the loans actually presented and would overstate the value of the loans.  Sambol also pressured employees to relax underwriting guidelines to enable increased production of risky loans.  Because of Sambol's ability to control and influence Countrywide Financial and its subsidiaries, employees solicited, approved, and issued the risky loans that Sambol wanted.

331.   Through his ability to control and influence Countrywide Financial and its subsidiaries, Sambol repeatedly crushed dissenting voices within Countrywide regarding the ever-increasing risks of its mortgage

programs.  For example, when employees raised concerns regarding increases in delinquencies, Sambol consistently pushed for risky loan products and downplayed or ignored concerns.  Sambol also used his control and influence to exclude individuals who managed and oversaw the credit risk positions from the decision-making process.  As a result of Sambol's actions, Countrywide Financial and Countrywide Home Loans continued their pursuit of risky loan products from 2003 through 2008.

332.   Sambol spearheaded the "lunge for growth" with respect to subprime mortgages that were inherently risky.  He brushed aside warnings from risk-control managers that underwriting standards were too lax, stating that being too cautious would turn Countrywide Financial and its subsidiaries into a "nice, little boutique."  Sambol pushed a policy of offering nearly the entire range of excessively risky mortgage products available in the market, including 100% financing, 80/20 loans, and low-doc and no-doc loans for borrowers with weak credit, and through his control Sambol was able to implement this policy throughout Countrywide.

## XV.   BANK OF AMERICA'S LIABILITY AS SUCCESSOR IN INTEREST BY DE FACTO MERGER

333.   On January 11, 2008, Bank of America announced that it would purchase Countrywide Financial for $4.1 billion.

334.   On July 1, 2008, Bank of America completed its merger with Defendant Countrywide Financial.

335.   On June 28, 2011, Bank of America announced that it would settle for $8.5 billion with BNY, as trustee for Countrywide mortgage-backed security trusts.  *See* Bank of America Corp., Form 8-K at 2 (June 29, 2011).

336.   Bank of America's Form 10-Q for the period ending September 3, 2009, reported that:  "On July 1, 2008, [Bank of America] acquired Countrywide through its merger with a subsidiary of the Corporation.  . . . The acquisition of Countrywide significantly expanded the Corporation's mortgage originating and servicing capabilities, making it a leading mortgage originator and servicer."  According to the 10-Q, "Countrywide's results of operations were included in the Corporation's results beginning July 1, 2008."

337.   On July 3, 2008, Countrywide Home Loans completed the sale of some or substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America used to effectuate the merger between Countrywide Financial and Bank of America.  NB Holdings Corporation is Countrywide Home Loans' successor.

338.   Countrywide Financial transferred substantially of its assets to Bank of America on November 7, 2008.  Around that time, Countrywide Financial ceased filing its own financial statements, instead including its assets and liabilities on Bank of America's financial statements.

339.   At the time of the November 2008 transactions, Countrywide Bank, FSB was the largest Countrywide subsidiary.  Countrywide's 2007 10-K revealed that "as of December 31, 2007, over 90% of [Countrywide's] monthly mortgage loan production occurred in Countrywide Bank" and that as of January 1, 2008 Countrywide's "production channels ha[d] moved into the Bank, completing the migration of substantially all of [Countrywide's] loan production activities from CHL to the Bank."  See Countrywide Financial Corporation Form 10-K (Feb.  29, 2008).  By transferring to itself Countrywide Bank, FSB, along with substantially all of the assets of Countrywide Home Loans, Bank of America left the remaining Countrywide

1  entities with only illiquid assets, no ongoing business, no ability to generate

2  revenue, and insufficient assets to satisfy their contingent liabilities.  This

3  conclusion is echoed by Bruce Bingham (who prepared a report on behalf of

4  BoNY, trustee for Countrywide-issued residential mortgage-backed

5  securities, attempting to value Countrywide Financial) who found that

6  Countrywide Financial "has negative earnings," "minimal operating

7  revenues," "does not originate, securitize, or service real estate loans" and

8  "has no operations that by themselves are economically viable on a go

9  forward basis."

10      340.   The transactions between Countrywide and Bank of America

11  were intentionally structured so that Countrywide's massive contingent

12  liabilities relating to its mortgage origination, securitization, and servicing

13  practices remained with Countrywide, while all of its assets and businesses

14  that generated revenue were sold to Bank of America, thus leaving

15  Countrywide unable to satisfy these liabilities.  Not only did Bank of

16  America control the Countrywide entities at the time these transactions were

17  entered into, but Bank of America did not provide adequate consideration

18  for the assets it received from Countrywide.  In other words, in self-dealing

19  transactions, and in exchange for inadequate consideration, Bank of America

20  intentionally rendered Countrywide insolvent and unable to satisfy its

21  creditors.  Moreover, Bank of America was fully aware of Countrywide's

22  contingent liabilities when it transferred these assets out of Countrywide.

23  For example, in an interview published on February 22, 2008 in the legal

24  publication Corporate Counsel, a Bank of America spokesperson

25  acknowledged Countrywide's liabilities:

26          Handling all this litigation won't be cheap, even for Bank of

27          America, the soon-to-be largest mortgage lender in the country.

Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations. 'We bought the company and all of its assets and liabilities,' spokesman Scott Silvestri says. 'We are aware of the claims and potential claims against the company and have factored these into the purchase.'

*See* Amy Miller, Countrywide in Crosshairs as Mortgage Crisis Fuels Litigation, Corporate Counsel, Feb. 22, 2008.

341.   On April 27, 2009, Bank of America rebranded Countrywide Home Loans as "Bank of America Home Loans." Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand. On the Form 10-K submitted by Bank of America on February 26, 2010, both Countrywide Capital Markets, LLC and Countrywide Securities Corporation were listed as Bank of America subsidiaries.

342.   Countrywide Financial's former website now redirects to the Bank of America website. Bank of America has assumed Countrywide Financial's liabilities, having paid to resolve litigation arising from various misconduct, such as predatory lending by Countrywide Financial.

343.   Countrywide Financial and its subsidiaries, which include each of the Countrywide Defendants, have now been merged into Bank of America. Bank of America is liable for the wrongdoing of the Countrywide Defendants, because it is the successor-in-interest to each of the Countrywide Defendants.

344.   Following its merger with Countrywide Financial, Bank of America took steps to expressly and impliedly assume Countrywide Financial's liabilities. Substantially all of Countrywide Financial's and

1   Countrywide Home Loans' assets were transferred to Bank of America on

2   November 7, 2008 "in connection with Countrywide's integration with Bank

3   of America's other businesses and operations," along with certain of

4   Countrywide's debt securities and related guarantees." According to the

5   Bank of America website, while the integration was being completed

6   "Countrywide customers . . .  ha[d] access to Bank of America's 6,100

7   banking centers."

8        345.   As is customary in large corporate mergers, at least some of the

9   Countrywide Defendants retained their pre-merger corporate names

10  following their merger with Bank of America.  However, Countrywide

11  operations are being fully consolidated into Bank of America, and the

12  Countrywide entities will soon lose (if they have not already) any

13  independent identity they maintained following the merger.  On April 27,

14  2009, Bank of America announced in a press release that "[t]he Countrywide

15  brand has been retired."  Bank of America announced that it would operate

16  its home loan and mortgage business through a new division named Bank of

17  America Home Loans, which "represents the combined operations of Bank

18  of America's mortgage and home equity business and Countrywide Home

19  Loans."

20        346.   The press release made clear that Bank of America planned to

21  complete its integration of Countrywide Financial into Bank of America in

22  2009.  The press release explained that Bank of America was in the process

23  of rebranding former Countrywide "locations, account statements, marketing

24  materials and advertising" as Bank of America Home Loans, and stated that

25  "the full systems conversion" to Bank of America Home Loans would occur

26  later in 2009.  "Bank of America Home Loans" is thus a direct continuation

27  of Countrywide's operations.  Although the Bank of America Defendants

claim that Bank of America Home Loans is a "trade name" rather than a separate legal entity, it is a Bank of America trade name and thus a part of Bank of America.

347.   As of September 21, 2009, former Countrywide bank deposit accounts were reportedly converted to Bank of America accounts.  On November 9, 2009, online account services for Countrywide mortgages were reportedly transferred to Bank of America's Online Banking website.  According to press reports, Bank of America Home Loans will operate out of Countrywide's offices in Calabasas, California with substantially the same employees as the former Countrywide entities.

348.   Countrywide Financial ceased filing its own financial statements in November 2008, and its assets and liabilities have been included in Bank of America's recent financial statements.  Bank of America has paid to restructure certain of Countrywide Financial's home loans on its behalf, including permitting Countrywide Financial and Countrywide Home Loans to settle a predatory-lending lawsuit brought by state Attorneys General and agreeing to modify up to 390,000 Countrywide loans at a cost of up to $8.4 billion.

349.   Under the "Merger History" tab of Bank of America's website, Countrywide is included among the list of companies Bank of America has acquired.  Under the "Time Line" tab, the website states that Bank of America "became the largest consumer mortgage lender in the country" following its acquisition of Countrywide in 2008.  Lastly, under the "Our Heritage" tab, the website states that the acquisition of Countrywide "resulted in the launch of Bank of America Home Loans in 2009, making the bank the nation's leading mortgage originator and servicer."

350.   Bank of America has described the transaction through which it acquired Countrywide Financial and its subsidiaries as a merger and made clear that it intended to integrate Countrywide Financial and its subsidiaries into Bank of America fully by the end of 2009.

351.   In a July 2008 Bank of America press release, Barbara Desoer, identified as the head of the "combined mortgage, home equity and insurance businesses" of Bank of America and Countrywide Financial, said: "Now we begin to combine the two companies and prepare to introduce our new name and way of operating."   The press release stated that the bank "anticipates substantial cost savings from combining the two companies. Cost reductions will come from a range of sources, including the elimination of positions announced last week, and the reduction of overlapping technology, vendor and marketing expenses.  In addition, Countrywide is expected to benefit by leveraging its broad product set to deepen relationships with existing Countrywide customers."

352.   Desoer was also interviewed for the May 2009 issue of *Housing Wire* magazine.  The article reported that:

> While the move to shutter the Countrywide name is essentially
> complete, the operational effort to integrate across two
> completely distinct lending and service systems is just getting
> under way.  One of the assets [Bank of America] acquired with
> Countrywide was a vast technology platform for originating
> and servicing loans, and Desoer says that the bank will be
> migrating some aspects of [Bank of America's] mortgage
> operations over to Countrywide's platforms.

353.   Desoer was also quoted as saying: "We're done with defining the target, and we're in the middle of doing the development work to prepare

1   us to be able to do the conversion of the part of the portfolio going to the

2   legacy Countrywide platforms."  Desoer explained that the conversion

3   would happen in the "late fall" of 2009, and that the integration of the

4   Countrywide Financial and Bank of America platforms was a critical goal.

5          354.   After the integration had progressed further, Desoer stated in

6   the October 2009 issue of *Mortgage Banking* that "the first year is a good

7   story in terms of the two companies [coming] together and meeting all the

8   major [goals and] milestones that we had set for ourselves for how we would

9   work to integrate the companies."  For Desoer, it was "the highlight of the

10  year . . .  when we retired the Countrywide brand and launched the Bank of

11  America Home Loans brand."  In the same issue, Mary Kanaga, a

12  Countrywide transition executive who helped oversee integration, likened

13  the process of integration to the completion of a mosaic: "Everything *[i.e.,*

14  each business element] counts.  Everything has to get there, whether it's the

15  biggest project of the smallest project.  It's very much putting a puzzle

16  together.  If there is a missing piece, we have a broken chain and we can't

17  complete the mosaic."

18         355.   In its 2008 Annual Report, Bank of America confirmed that

19  "[o]n July 1, 2008, we acquired Countrywide," and stated that the merger

20  "significantly improved our mortgage originating and servicing capabilities,

21  making us a leading mortgage originator and servicer."  The Q&A section of

22  the same report posed the question: "How do the recent acquisitions of

23  Countrywide and Merrill Lynch fit into your strategy?"  The Bank of

24  America response was that by acquiring Countrywide the bank became the

25  "No.1 provider of both mortgage originations and servicing" and "as a

26  *combined* company," it would be recognized as a "responsible lender who is

27  committed to helping our customers become successful homeowners."

1   (Emphasis added).  Similarly, in a July 1, 2008 Countrywide Financial press

2   release, Defendant Mozilo stated that "the *combination* of Countrywide and

3   Bank of America will create one of the most powerful mortgage franchises

4   in the world." (Emphasis added).

5        356.   In purchasing Countrywide Financial and its subsidiaries for

6   27% of its book value, Bank of America was fully aware of the pending

7   claims and potential claims against Countrywide, and factored them into the

8   transaction.  In an interview published on February 22, 2008 in the legal

9   publication *Corporate Counsel,* a Bank of America spokesperson admitted

10  that Bank of America had assumed Countrywide's liabilities:

11          Handling all this litigation won't be cheap, even for Bank of

12          America, the soon-to-be largest mortgage lender in the country.

13          Nevertheless, the banking giant says that Countrywide's legal

14          expenses were not overlooked during negotiations.  *"We bought*

15          *the company and all of its assets and liabilities," spokesman*

16          *Scott Silvestri says.  "We are aware of the claims and potential*

17          *claims against the company and have factored these into the*

18          *purchase."*

19  (Emphasis added).

20        357.   On October 6, 2008, during an earnings call, Joe Price, Bank of

21  America's Chief Financial Officer, stated that "[a]s we transfer those

22  operations (*i.e.,* Countrywide Financial and its subsidiaries) our company

23  intends to assume the outstanding Countrywide debt totaling approximately

24  $21 billion." When asked about the "formal guaranteeing" of Countrywide's

25  debt, Kenneth D.  Lewis, Bank of America's former Chairman and Chief

26  Executive Officer, responded that "[t]he normal process we followed is what

27  are the operational movements we'll make to *combine the operations.*  When

1   we do that we've said the debt would fall in line and quite frankly that's kind

2   of what we've said the whole time . . ..  [T]hat's been very consistent with

3   deals we've done in the past from this standpoint." (Emphasis added).

4       358.   Lewis was quoted in a January 23, 2009 *New York Times* article

5   reporting on the acquisition of Countrywide Financial and its subsidiaries, in

6   which he acknowledged that Bank of America knew of the legal liabilities of

7   Countrywide Financial and its subsidiaries and impliedly accepted them as

8   part of the cost of the acquisition:

9           We did extensive due diligence.  We had 60 people inside the

10          company for almost a month.  It was the most extensive due

11          diligence we have ever done.  So we feel comfortable with the

12          valuation.  We looked at every aspect of the deal, from their

13          assets to potential lawsuits and we think we have a price that is

14          a good price.

15      359.   Bank of America has made additional statements showing that

16  it has assumed the liabilities of Countrywide.  In a press release announcing

17  the merger, Lewis stated that he was aware of the "issues within the housing

18  and mortgage industries" and that "the transaction [with Countrywide]

19  reflects those challenges." Despite these challenges, Lewis stated in October

20  2009 that "[t]he Merrill Lynch and Countrywide integrations are on track

21  and returning value already."

22      360.   Likewise, in its 2009 Form 10-K, Bank of America

23  acknowledged that "[W]e face increased litigation risk and regulatory

24  scrutiny as a result of the Merrill Lynch and Countrywide acquisitions."

25      361.   Brian Moynihan, Bank of America's CEO and President,

26  testified before the Financial Crisis Inquiry Commission on January 13,

27  2010, that "our primary window into the mortgage crisis came through the

acquisition of Countrywide.  The Countrywide acquisition has positioned the bank in the mortgage business on a scale it had not previously achieved. There have been losses, and lawsuits, from the legacy of Countrywide operations, but we are looking forward."

362.   Addressing investor demands for refunds on faulty loans sold by Countrywide, Moynihan stated: "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we'll pay for the things that Countrywide did." And, in a *New York Times* article published in December 2010, Moynihan, speaking about Countrywide, stated: "Our company bought it and we'll stand up; we'll clean it up."

363.   Similarly, Jerry Dubrowski, a spokesman for Bank of America, was quoted in a December 2010 *Bloomberg* article that the bank will "act responsibly" and repurchase loans in cases where there were valid defects with the loans.  Through the third quarter of 2010, Bank of America has faced $26.7 billion in repurchase requests and has resolved, declined, or rescinded $18 billion of those claims.  It has established a reserve fund against the remaining $8.7 billion in repurchase requests, which at the end of the third quarter stood at $4.4 billion.

364.   During an earnings call for the second quarter of 2010, Charles Noski, Bank of America's Chief Financial Officer, stated that "we increased our reps and warranties expense by $722 million to $1.2 billion as a result of our continued evaluation of exposure to repurchases including our exposure to repurchase demands from certain monoline insurers." And during the earnings call for the third quarter of 2010, Noski stated that "[t]hrough September, we've received $4.8 billion of reps and warranties claims related

1   to the monoline-insured deals, of which $4.2 billion remains outstanding,

2   and approximately $550 million were repurchased."

3       365.   Bank of America has reached various settlement agreements in

4   which it has taken direct responsibility for Countrywide's liabilities.  Bank

5   of America recently agreed to pay $8.5 billion to settle put-back claims

6   relating to some of the Trusts.

7       366.   As part of a settlement agreement with certain state Attorneys

8   General, Bank of America agreed to forgive up to 30 percent of the

9   outstanding mortgage balances owed by former Countrywide customers.

10   The loans were made before Bank of America acquired Countrywide.

11       367.   In October 2010, the *New York Times* reported that Bank of

12   America is "on the hook" for $20 million of the disgorgement that

13   Defendant Mozilo agreed to pay in his settlement agreement with the SEC.

14   The agreement and plan of merger between Bank of America and

15   Countrywide provided that all indemnification provisions "shall survive the

16   merger and shall continue in full force and effect . . .  for a period of six

17   years." According to the article, "[b]ecause Countrywide would have had to

18   pay Mozilo's disgorgement, Bank of America took on the same obligation,

19   even though it had nothing to do with the company's operations at the time."

20       368.   Bank of America has generated substantial earnings from the

21   absorption of Countrywide's mortgage business.  For example, a Bank of

22   America press release regarding 2009 first quarter earnings stated that "[n]et

23   revenue nearly quadrupled to $5.2 billion primarily due to the acquisition of

24   Countrywide and from higher mortgage banking income as lower interest

25   rates drove an increase in mortgage activity."  Lewis was quoted as saying:

26   "We are especially gratified that our new teammates at Countrywide and

27

1   Merrill Lynch had outstanding performance that contributed significantly to
2   our success."

3       369.   A press release regarding Bank of America's 2009 second
4   quarter earnings similarly stated that "[n]et revenue rose mainly due to the
5   acquisition of Countrywide and higher mortgage banking income as lower
6   interest rates spurred an increase in refinance activity."  The press release
7   explained that "higher mortgage banking income, trading account profits and
8   investment and brokerage services income reflected the addition of Merrill
9   Lynch and Countrywide." Bank of America reported that its average retail
10  deposits in the quarter increased $136.3 billion, or 26 percent, from a year
11  earlier, including $104.3 billion in balances from Merrill Lynch and
12  Countrywide.

13      370.   Bank of America's 2009 annual report stated that "[r]evenue,
14  net of interest expense on a fully taxable-equivalent (FTE) basis, rose to
15  $120.9 billion, representing a 63% increase from $74.0 billion in 2008,
16  reflecting in part the addition of Merrill Lynch and the full-year impact of
17  Countrywide." Bank of America also reported that "[m]ortgage banking
18  income increased $4.7 billion driven by higher production and servicing
19  income . . .  primarily due to increased volume as a result of the full-year
20  impact of Countrywide . . . ." Insurance income also increased $927 million
21  "due to the full-year impact of Countrywide's property and casualty
22  businesses."

23      371.   Based on the above, Bank of America has "de facto" merged
24  with Countrywide Financial, consolidating and merging with the
25  Countrywide Defendants, and acquiring substantially all of the assets of all
26  the Countrywide Defendants.  Bank of America is the successor in liability
27

1  to Countrywide, and is jointly and severally liable for the wrongful conduct

2  of the Countrywide Defendants alleged herein.

3  **XVI.  WESTERN & SOUTHERN DID NOT KNOW AND COULD**

4  **NOT HAVE KNOWN OF ITS CLAIMS PRIOR TO APRIL 2009**

5          372.   Western & Southern purchased its Certificates to hold them to

6  maturity for long term interest income.  Four of the five Western & Southern

7  plaintiffs are insurance companies that are required to maintain certain levels

8  of loss reserves.  Statutory accounting rules impact the types of investments

9  these insurers can hold in order to meet certain reserve requirements.  As a

10  result, Western & Southern generally purchased only triple-A rated (or the

11  equivalent) mortgage-backed securities.

12          373.   Thirty-three of Western & Southern's thirty-six tranches were

13  originally triple-A rated or the equivalent.  Thirty-two of its thirty-six

14  tranches were Class A tranches located at the top of their respective

15  waterfalls.

16          374.   Countrywide knew that Western & Southern would use the

17  statistical metrics it provided to develop a proprietary model used to perform

18  loan-level analysis to determine the likelihood that Western & Southern

19  would receive the cash flows due under its Countrywide Certificates (and

20  certificates of other issuers).

21          375.   From at least 2007-2009, Countrywide (and following its

22  acquisition, Bank of America) also provided, directly or indirectly, loan

23  tapes for use by Western & Southern in its proprietary model to analyze cash

24  flows expected under its Countrywide Certificates.

25          376.   When Lehman Brothers filed for bankruptcy in 2008, the

26  market for securitized assets of many types – mortgage loans, credit card

27  debt, auto loans, student loans (to name a few) – essentially stopped trading.

Western & Southern believed the cessation of trading was due to fears of a cataclysmic collapse of the financial markets, and did not fairly reflect the intrinsic value of the underlying Certificates.  Additionally, third-party pricing sources were not equipped to accurately determine idiosyncratic deal risk.  Accordingly, in fall 2008, Western & Southern developed its proprietary "fair value pricing" model to determine the value of its Countrywide Certificates.

377.    Western & Southern used both its loan-level model and its fair value pricing model through June 2009 in an ongoing effort to determine the likelihood and magnitude of any losses it could expect to sustain with respect to its Countrywide Certificates.  In turn Western & Southern used that analysis to determine whether or not to impair certain Countrywide securities in its internal accounting as required under applicable insurance regulations.

378.    In fact, within a few months after the Lehman Brothers bankruptcy (by early 2009), changes in accounting rules required Western & Southern to analyze for impairment purposes its Countrywide Certificates based on the expected cash flows to be received under those Certificates discounted to present value using the same discount rate as the applicable yield on such certificates at the time of their acquisition.  By early 2009, Western & Southern was aware of the impending accounting change (which was adopted on September 14, 2009) and therefore analyzed its Countrywide Certificates for impairment purposes using (i) expected cash flows on the Countywide Certificates it owned which were determined by reference to actual default rates on the collateral underlying the Countrywide Certificates it owned, which were then (ii) discounted to present value using the yield on the Countrywide Certificates at the time of purchase.  To corroborate the

loss rates produced by its proprietary model, Western & Southern compared its loss rates to those provided by JPMorgan (which generally had the highest estimates of loss) and those reported by six to eight other sources (including the rating agencies, RMBS dealers and other third parties).  Using such analysis, as of April 2009, Western & Southern had not impaired twenty-seven out of thirty-six tranches it owned (meaning as a "buy and hold" investor Western & Southern did not have notice that it would take material losses on any Certificates it had not yet impaired).

379.   Western & Southern was a buyer, predominantly, of triple-A tranches of mortgage-backed securities involving almost exclusively Alt-A and prime loans.  With the aid of the analytical metrics provided by Countrywide, Western & Southern purchased a limited number of mezzanine tranches of Countrywide securitizations.  By April 2009, it was primarily the second lien certificates and mezzanine tranches which Western & Southern had impaired (and thus was on notice of an expected loss).

380.   The clear implication of the acts, and the impression made on Western & Southern by Countrywide, was that Countrywide had carefully and faithfully originated, assembled and analyzed their own mortgage loan pools such that the performance of those pools would be consistent with the statistical matrices presented to Western & Southern.  Countrywide's and Bank of America's fraudulent misrepresentation of loan characteristics to Western & Southern constitutes fraudulent concealment of Western & Southern's claims.

381.   On November 17, 2009, the National Association of Insurance Commissioners ("NAIC") announced that it had retained the giant fixed-income asset manager PIMCO to develop a cash-flow projection valuation

1 | model for determining appropriate risk based capital requirements for
2 | residential mortgage-backed securities.  The NAIC announcement stated:

3 | "Creating this new assessment process is an important step
4 | toward providing more transparency about these complex
5 | securities," said Roger Sevigny, NAIC President and New
6 | Hampshire Insurance Commissioner.  "This unique treatment of
7 | residential mortgage-backed securities distinguishes the NAIC
8 | as the only regulator to analyze these securities and require
9 | capital based upon the expected loss amount for a particular
10 | company."
11 | PIMCO will work with regulators to develop a set of price
12 | ranges for designations one through six to be used by insurers
13 | in their statutory financial statements and to calculate the risk-
14 | based capital charges for each specific security they own.
15 | These designations will apply only to year-end 2009 reporting.

16 | 382.   Prior to PIMCO's work, there was no market standard approach
17 | sufficient to value the Certificates.

18 | 383.   Up until no earlier than June 2009, Western & Southern had no
19 | reason to expect that its highly-rated senior Certificates would not weather
20 | what was then known about Countrywide's faulty loan underwriting
21 | practices.

22 | 384.   Based on over-collateralization data reported in the Offering
23 | Materials, Western & Southern could not suffer a net loss under twenty-six
24 | of the thirty-six tranches until an aggregate loss of an unprecedented 4% or
25 | more of loan principal.  In fact, Western & Southern did not suffer any
26 | diminution in interest or principal payments prior to February 2010 – and
27 | only six of Western & Southern's thirty-six tranches have suffered principal

1   or interest shortfalls to date (though it is now apparent that shortfalls will

2   expand dramatically in the near future).

3       385.   Up until no earlier than June 2009, Western & Southern

4   reasonably concluded that its tranches would continue to provide interest

5   and principal payments, and had no reasonable basis to believe that

6   Countrywide was operating a criminal enterprise whose purpose was to

7   place original loans that borrowers could not repay, and then securitize those

8   loans for sale to investors such as Western & Southern.  Information

9   concerning the criminal nature of the enterprise Mozilo founded and Bank of

10   America took over only began to become available to Western & Southern

11   in June 2009, when the SEC released internal Countrywide emails revealing

12   conscious disregard for the underwriting guidelines touted in the Offering

13   Materials and a deliberate scheme to originate toxic loans and sell them to

14   unsuspecting investors.

15       386.   Western & Southern did not know, and could not have known,

16   that Countrywide's misstatements regarding mortgage assignments and

17   transfers of notes and loan files to the trusts were materially false and

18   misleading prior to learning the facts described in Section VII.  And, as set

19   forth in Section VII, Defendants' massive conspiracy of robo-signing,

20   forgery, and outright perjury to hide the failure to assign mortgages and

21   transfer notes only began to surface in September 2010.

22       387.   This robo-signing conspiracy served to fraudulently conceal the

23   existence of Western & Southern's claims.  Similarly, Countrywide and

24   Bank of America's pervasive pattern of intimidation against internal

25   whistleblowers constitutes fraudulent concealment of Western & Southern's

26   claims.

27

388.   Tolling applies to Western & Southern's 1933 Act claims and Ohio Securities Act claims under *Vaccariello v. Smith & Nephew Richards, Inc.*, 94 Ohio St. 3d 380 (Ohio 2002), and ORC § 2305.19.

389.   Tolling applies to Western & Southern's 1933 Act claims under *American Pipe Construction Co. v. Utah*, 414 U.S. 538 (1974).

390.   On November 14, 2007, a class action was filed against various Countrywide entities, former officers, and underwriters on behalf of all investors who purchased or otherwise acquired certain mortgage-backed securities that were issued, underwritten, or sold by Countrywide.  *Luther v. Countrywide Home Loans Servicing LP,* BC380698 (Cal.  Super.  Ct. 2007).  The *Luther* complaint alleges claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933.

391.   Among the Countrywide offerings that Western & Southern invested in, the following were included in the November 2007 *Luther* class action: CWALT 2005-10CB, CWALT 2005-13CB, CWALT 2005-20CB, CWALT 2005-26CB,  CWALT 2005-28CB, CWALT 2005-30CB, CWALT 2005-46CB, CWALT 2005-47CB, CWALT 2005-49CB, CWALT 2005-54CB, CWALT 2005-J1, CWALT 2006-7CB, CWALT 2006-14CB, CWALT 2006-39CB, CWALT 2007-15CB.  As of November 14, 2007, Western & Southern was part of the defined class in *Luther* with respect to these offerings.

392.   On June 12, 2008, a different securities class action was filed against Countrywide in California state court, *Washington State Plumbing & Pipefitting Pension Trust v.  Countrywide Financial Corp.,* BC392571 (Cal. Super.  Ct.  2008).  Like *Luther,* this action alleged Section 11, 12(a)(2), and 15 claims against Countrywide, its former officers, and underwriters,

1   although *Washington State Plumbing* based its claims on different

2   securitizations than those in *Luther.*

3       393.   Among the Countrywide offerings that Western & Southern

4   invested in, the following were included in the June 12, 2008 *Washington*

5   *State Plumbing* class action:  CWALT 2005-28CB, CWALT 2005-30CB,

6   CWALT 2005-46CB, CWALT 2005-47CB, CWALT 2005-49CB, CWALT

7   2005-54CB, CWALT 2006-14CB, CWALT 2006-39CB, CWALT 2006-7

8   CB, CWALT 2007-15CB, CWALT 2007-16CB, CWALT 2007-17CB,

9   CWALT 2007-21CB, CWALT 2007-5CB, CWHL 2005-24, CWHL 2005-

10  25, CWHL 2005-J2, CWHL 2006-21, CWHL 2007-14, CWHL 2007-15,

11  CWHL 2007-5, CWL 2006-S8, CWL 2006-S9, CWL 2007-4, CWL 2007-

12  11, CWL 2007-S1, and CWL 2007-S2.  As of June 12, 2008, Western &

13  Southern was part of the defined class in *Washington State Plumbing* with

14  respect to these offerings.

15      394.   On September 9, 2008, the *Luther* complaint was amended to

16  add securitizations from *Washington State Plumbing*.  The *Washington State*

17  *Plumbing* action was consolidated with the original *Luther* action, and a

18  consolidated and amended complaint was filed on October 16, 2008.

19  Western & Southern was included in the defined class in the

20  *Luther/Washington State Plumbing* consolidated complaint with respect to

21  its investments in the following Countrywide offerings:  CWALT 2005-

22  10CB, CWALT 2005-13CB, CWALT 2005-20CB, CWALT 2005-26CB,

23  CWALT 2005-28CB, CWALT 2005-30CB, CWALT 2005-46CB, CWALT

24  2005-47CB, CWALT 2005-49CB, CWALT 2005-54CB, CWALT 2005-J1,

25  CWALT 2006-7CB, CWALT 2006-14CB, CWALT 2006-39CB, CWALT

26  2007-5CB, CWALT 2007-15CB, CWALT 2007-16CB, CWALT 2007-

27  17CB, CWALT 2007-21CB, CWHL 2005-24, CWHL 2005-25, CWHL

1    2005-J2, CWHL 2006-21, CWHL 2007-5, CWHL 2007-14, CWHL 2007-
2    15, CWL 2006-S8, CWL 2006-S9, CWL 2007-4, CWL 2007-11, CWL
3    2007-S1, and CWL 2007-S2.

4        395.   The consolidated *Luther* action was subsequently dismissed on
5    jurisdictional grounds, but the action was then reinstated on appeal, and the
6    tolling afforded by *Luther/Washington State Plumbing* continues.

7        396.   On January 14, 2010, *Maine State Retirement System v.*
8    *Countrywide Financial Corp.,* No. 10 Civ. 0302 (C.D. Cal. 2010) was filed.
9    Western & Southern was included in the defined class in the *Maine State*
10   complaint with respect to investments in the same Countrywide offerings
11   listed above with respect to *Luther/Washington State Plumbing*.

12       397.   On November 4, 2010, the *Maine State* court held that the
13   named plaintiffs in that class action had standing to sue Countrywide only
14   with respect to eighty-one of the offerings in which the named plaintiffs
15   themselves invested.  *Maine State Retirement System v. Countrywide*
16   *Financial Corp.,* No. 10 Civ. 0302 (C.D. Cal. Nov. 4, 2010).  The Court
17   rejected the argument that the plaintiffs could represent class members who
18   brought in other Countrywide offerings, even if the offerings emanated from
19   a common registration statement.

20       398.   On May 5, 2011, the *Maine State* court further ruled that the
21   named plaintiffs could bring claims only on behalf of holders of the same
22   tranche as held by the named plaintiffs.  The net effect of the *Maine State*
23   rulings is to narrow the *Maine State* class and to exclude class members
24   whose investments in Countrywide mortgage-backed securities do not
25   overlap with those of the named plaintiffs.

26                       **FIRST CAUSE OF ACTION**

27          **(Violation of Ohio Securities Act, ORC § 1707.41)**

399.   Western & Southern realleges each allegation above as if fully set forth herein.

400.   This claim is brought under the Ohio Securities Act, ORC § 1707.41 against all Defendants.  Defendants (a) offered securities for sale by a written or printed circular, prospectus, or advertisement; (b) Western & Southern purchased these securities relying on such written or printed circular, prospectus, or advertisement; and (c) such written or printed circular, prospectus, or advertisement contained untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.

401.   Defendants had knowledge of the untrue statements of material fact and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

402.   As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Western & Southern was misled into believing that the Certificates were more creditworthy investments than they actually were.

403.   By virtue of the foregoing, Defendants violated ORC § 1707.41.  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates and reduced interest or principal payments

## SECOND CAUSE OF ACTION

### (Violation of Ohio Securities Act, ORC § 1707.44(B)(4))

404.   Western & Southern realleges each allegation above as if fully set forth herein.

405.   This claim is brought under the Ohio Securities Act, ORC § 1707.44(B)(4), against all Defendants.  Defendants made false representations concerning material and relevant facts in the Offering Materials for the purpose of selling securities within the State of Ohio.

406.   Defendants had knowledge of the misrepresentations and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

407.   By virtue of the foregoing, Defendants violated ORC § 1707.44(B)(4).  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates and reduced principal and/or interest payments.

### THIRD CAUSE OF ACTION

### (Violation of Ohio Securities Act, ORC § 1707.44(J))

408.   Western & Southern realleges each allegation above as if fully set forth herein.

409.   This claim is brought under the Ohio Securities Act, ORC § 1707.44(J), against all Defendants.  Defendants knowingly made or caused to be made materially misleading false statements in the Offering Materials concerning the value of the Certificates.

410.   Defendants had knowledge of the misrepresentations and omissions of material facts set forth herein by virtue of the fact that, at a minimum, Defendants failed to exercise reasonable diligence in ascertaining their falsity.

411.   By virtue of the foregoing, Defendants have violated ORC § 1707.44(J).  As a direct and proximate result of Defendants' wrongful

conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates, and reduced principal and/or interest payments.

## FOURTH CAUSE OF ACTION

### (Violation of Ohio Securities Act, ORC § 1707.44(G))

412.   Western & Southern realleges each allegation above as if fully set forth herein.

413.   This claim is brought under the Ohio Securities Act, ORC § 1707.44(G), against all Defendants.  Defendants knowingly engaged in acts prohibited under the Ohio Securities Act in connection with the sale of the Certificates to Western & Southern.

414.   By virtue of the foregoing, Defendants violated ORC § 1707.44(G).  As a direct and proximate result of Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates, and reduced principal and/or interest payments.

## FIFTH CAUSE OF ACTION

### (Rescission pursuant to Ohio Securities Act, ORC § 1707.43)

415.   Western & Southern realleges each allegation above as if fully set forth herein, including but not limited to the First, Second, Third and Fourth Causes of Action herein.

416.   This claim is brought under the Ohio Securities Act, ORC § 1707.43, against all Defendants.  As set forth in the First, Second, Third and Fourth Causes of Action herein, Defendants made sales in violation of the Ohio Securities Act or participated in or aided the sellers in making such sale.

417.   Western & Southern is entitled to void and rescind the sale of Certificates under ORC § 1707.43 and recover the full amount of consideration paid for the Certificates and all taxable court costs.

## SIXTH CAUSE OF ACTION

### (Violation of Ohio Corrupt Activities Act, ORC § 2923.31-2923.36)

418.   Western & Southern realleges each allegation above as if fully set forth herein.

419.   This claim is brought against Defendants Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, Countrywide Securities, CWABS, CWALT, CWHEQ, CWMBS, Angelo Mozilo, David Sambol, Bank of America, Bank of America, N.A., and BAC Servicing (the "OCAA Defendants").

420.   The OCAA Defendants were members of an enterprise that included themselves and correspondent lenders belonging to Countrywide's correspondent lending program; underwriters of Countrywide mortgage-backed securities; appraisers of real property securing Countrywide mortgage loans; foreclosure law firms that promoted forgery and perjury in attempting to cover up Countrywide's faulty mortgage assignments and loan-file transfers; PMI insurers that paid unlawful kickbacks to Countrywide; and BNY, the trustee for the Countrywide mortgage-backed securities trusts, which neglected its duty to put back to Countrywide billions of dollars of loans that very plainly failed to meet applicable underwriting standards.

421.   The enterprise was an association-in-fact in which members played distinct roles for the common purpose of profiting from originating mortgage loans without regard for underwriting standards, including borrower ability to repay and legitimate property appraisals; packaging those

loans into mortgage-backed securities, and then underwriting and selling those securities through materially misleading and inaccurate Offering Materials; and servicing mortgage loans by means of, among other improper acts, "force-placed" insurance kickbacks, and grossly inflated and fraudulent charges to defaulting borrowers.

422.   As examples of the members' distinct roles role in furtherance of the enterprise, Countrywide Home Loans raised capital, originated and funded mortgage loans, and participated in the preparation of Offering Materials; Countrywide Capital directed the activities of Countrywide Securities, which in turn managed the sale of Countrywide securities and participated in the preparation of Offering Materials; CWALT, CWABS, CWHEQ, and CWMBS deposited mortgage loans to their respective mortgage-backed securities trusts; and Mozilo orchestrated Countrywide Financial's scheme to dominate the mortgage-lending market by abandoning underwriting standards, creating and selling fraudulent mortgage-backed securities, and engaging in various other wrongful acts.

423.   Members of the enterprise and their employees were compensated to perform illegal acts, and when employees of certain enterprise members sought to rectify the enterprise's wrongdoing, they were fired or otherwise excluded from the enterprise.

424.   The OCAA Defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity that included (1) multiple violations of the Ohio Securities Act, (2) multiple acts of forgery or falsification in violation of ORC § 2913.31, (3) multiple acts of perjury in violation of ORC § 2921.11, (4) multiple violations of ORC § 2913.47 (Insurance Fraud), (5) multiple violations of 18 U.S.C. § 1344 (Bank Fraud), (6) multiple acts of mail and wire fraud in violation of

18 U.S.C. §§ 1341, 1343, (7) at least one violation of 18 U.S.C. § 1513(e) (Retaliating Against a Witness, Victim, or an Informant), (8) multiple violations of ORC § 2913.02 (Theft), (9) multiple violations of ORC § 2921.12 (Tampering with Evidence), and (10) multiple violations of ORC § 2913.42 (Tampering with Records), all as elsewhere alleged with particularity herein.

425.   The acts of the enterprise injured or threatened to injure Western & Southern.

426.   As a result of the foregoing, Western & Southern has suffered damages according to proof and is entitled to recover treble damages and attorneys' fees and expenses.

## SEVENTH CAUSE OF ACTION
### (Ohio Negligent Misrepresentation)

427.   Western & Southern realleges each allegation above as if fully set forth herein.

428.   This is a claim for negligent misrepresentation against the CWALT, CWABS, CWHEQ, CWMBS, Countrywide Securities, Countrywide Home Loans, and Countrywide Financial (the "Negligent Misrepresentation Defendants").

429.   Because Countrywide arranged the creation and issuance of the Certificates, and originated or acquired, underwrote, and serviced all of the underlying mortgage loans, it had unique and special knowledge about the loans.  In particular, Countrywide had unique and special knowledge and expertise regarding the quality of the underwriting of those loans, as well as the servicing practices employed as to such loans.

430.   Because Western & Southern could not evaluate the loan files for the mortgage loans underlying its Certificates, and because Western &

Southern could not examine the underwriting quality or servicing practices on a loan-by-loan basis, it was heavily reliant on Countrywide's unique and special knowledge regarding the underlying mortgage loans in determining whether to make each of its investments in Certificates.

431.   Over the course of more than four years, Western & Southern relied on Countrywide's unique and special knowledge regarding the quality of the underlying Mortgage Loans and their underwriting when determining whether to invest in the Offerings.  This longstanding relationship, coupled with Countrywide's unique and special knowledge about the underlying loans, created a special relationship of trust, confidence, and dependence between Countrywide and Western & Southern.

432.   Countrywide was aware that Western & Southern was seeking to compile a portfolio of conservative investments and that Western & Southern relied on Countrywide's unique and special expertise and experience, and depended upon Countrywide for accurate and truthful information.  Countrywide also knew that the facts regarding Countrywide's compliance with its underwriting standards were exclusively within its knowledge.

433.   Based on its expertise, superior knowledge, and relationship with Western & Southern, Countrywide owed a duty to Western & Southern to provide complete, accurate, and timely information regarding the Mortgage Loans and the Offerings.  The Negligent Misrepresentation Defendants breached their duty to provide such information to Western & Southern.

434.   The Negligent Misrepresentation Defendants likewise made misrepresentations which they knew, or were negligent in not knowing at the time to be false, in order to induce Western & Southern's investment in the

Offerings.  At the time they made these misrepresentations, the Negligent Misrepresentation Defendants knew, or at a minimum were negligent in not knowing, that these statements were false, misleading, and incorrect.  Such information was known to the Negligent Misrepresentation Defendants but not known or readily known to Western & Southern, and the Negligent Misrepresentation Defendants knew that Western & Southern was acting in reliance on misleading information.

435.   Western & Southern reasonably relied on the information the Negligent Misrepresentation Defendants did provide and was damaged as a result of these misrepresentations.  Had Western & Southern known the true facts regarding Countrywide's underwriting practices and the quality of the loans making up the securitizations, it would not have purchased the Certificates.

436.   The Negligent Misrepresentation Defendants' material misrepresentations and omissions set forth above were made without any reasonable ground for believing that the representations were true.

437.   By reason of the foregoing, the Negligent Misrepresentation Defendants are liable to Western & Southern for negligent misrepresentation.

438.   As a result of the foregoing, Western & Southern has suffered damages according to proof.

## EIGHTH CAUSE OF ACTION

### (Violation of Section 10(b) of the 1934 Act and Rule 10b-5)

439.   Western & Southern realleges each allegation above as if fully set forth herein.

440.   This claim is brought under Section l0(b) of the 1934 Act, 15 U.S.C.  § 78j(b) and Rule l0b-5 promulgated thereunder by the SEC, 17

C.F.R. § 240.l0b-5, against Countrywide Home Loans, Countrywide Securities, CWALT, CWABS, CWHEQ, CWMBS, and the Bank of America Defendants as Countrywide's successors (the "Section l0(b) Defendants"). The Section l0(b) Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Western & Southern, in violation of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

441.   The Section l0(b) Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Certificates from Western & Southern.

442.   The Section 10(b) Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

443.   As a result of the Section l0(b) Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Western & Southern was misled into believing that the Certificates were more creditworthy investments than they actually were.

444.   Western & Southern purchased the Certificates without knowing that the Section 10(b) Defendants had misstated or omitted material facts about the Securitizations, including without limitation misstatements

and omissions regarding their underwriting practices and quality of the loans making up the securitizations.

445.   In  purchasing the Certificates, Western & Southern relied directly or indirectly on false and misleading statements made by the Section l0(b) Defendants, and/or an absence of material adverse information that was known to the Section l0(b) Defendants or recklessly disregarded by them but not disclosed in Countrywide's public statements or its communications with Western & Southern.  Western & Southern was damaged as a result of its reliance on the Section 10(b) Defendants' false statements and misrepresentations and omissions of material facts.

446.   At the time of the Section l0(b) Defendants' false statements, misrepresentations and omissions, Western & Southern was ignorant of their falsity and believed them to be true.  Western & Southern would not have purchased or otherwise acquired the Certificates had it known the truth about the matters discussed above.

447.   Western & Southern is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Western & Southern's claim, and within 5 years after the violations with respect to most of Western & Southern's investments.

448.   By virtue of the foregoing, the Section l0(b) Defendants have violated § l0(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

449.   As a direct and proximate result of the Section l0(b) Defendants' wrongful conduct, Western & Southern has suffered damages in connection with the purchase and subsequent decline in value of the Certificates and in connection with reduced interest payments on certain Certificates.

1

2

### NINTH CAUSE OF ACTION

### (Violation of Section 20(a) of the 1934 Act)

3   450.   Western & Southern realleges each allegation above as if fully

4   set forth herein.

5   451.   Each of the Section 10(b) Defendants is liable as a direct

6   participant and primary violator with respect to the wrongdoing discussed

7   herein.  Countrywide Financial, Mozilo and Sambol (the "Section 20(a)

8   Defendants"), by reason of their status as parent company and senior

9   executive officers and directors of Countrywide, directly or indirectly

10   controlled the conduct of Countrywide's business and its representations to

11   Western & Southern, within the meaning of § 20(a) of the 1934 Act.  The

12   Section 20(a) Defendants directly or indirectly controlled the content of the

13   Offering Materials related to Western & Southern's investments in the

14   Securities within the meaning of § 20(a) of the 1934 Act.  Therefore the

15   Section 20(a) Defendants are jointly and severally liable for Countrywide's

16   fraud, as alleged herein.

17   452.   The Section 20(a) Defendants controlled and had the authority

18   to control the content of certain of Countrywide's documents, including the

19   Certificates' Offering Materials.  Because of their close involvement in the

20   everyday activities of the Company, and because of their wide-ranging

21   supervisory authority, the Section 20(a) Defendants reviewed or had the

22   opportunity to review those documents prior to their issuance and therefore

23   knew or should have known that those documents contained

24   misrepresentations.  The Section 20(a) Defendants reviewed or could have

25   reviewed these documents prior to their issuance, or could have prevented

26   their issuance or caused them to be corrected.

27

453.   The Section 20(a) Defendants knew or recklessly disregarded the fact that Countrywide's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Section 20(a) Defendants did not act in good faith.

454.   By virtue of their high-level positions and their participation in and awareness of  Countrywide's operations and public statements, the Section 20(a) Defendants were able to and did influence and control Countrywide's decision-making, including controlling the content and dissemination of the documents that Plaintiffs contend contained materially false and misleading information and on which Plaintiffs relied.

455.   The Section 20(a) Defendants had the power to control or influence the particular transactions giving rise to the securities violations alleged herein.

456.   As set forth above, the Section l0(b) Defendants each violated § l0(b) of the 1934 Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Section 20(a) Defendants are also liable pursuant to § 20(a) of the 1934 Act.

457.   As a direct and proximate result of Defendants' wrongful conduct, including the wrongful conduct of Countrywide Financial, Mozilo and Sambol, Western & Southern suffered damages in connection with its purchase of mortgage-backed securities from Countrywide.

## TENTH CAUSE OF ACTION

### (Violation of Section 11 of the 1933 Act )

458.   Western & Southern realleges each allegation above as if fully set forth herein, except to the extent that Western & Southern expressly excludes from this cause of action any allegation that could be construed as

alleging fraud or intentional or reckless conduct.  This cause of action specifically excludes the allegations as to Defendants' scienter.

459.   This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.  This count is predicated upon the Section 11 Defendants' strict liability for making untrue and materially misleading statements in the Offering Materials.

460.   This claim is brought under Section 11 of the 1933 Act, 15 U.S.C.  §77k ("Section 11"), against Countrywide Securities, the Depositors, and the Signatories (Eric Sieracki, Ranjit Kripalani, Stanford Kurland, David A.  Spector, N.  Joshua Adler, and Jennifer Sandefur) (all together, the "Section 11 Defendants") arising from Western & Southern's purchases of the Certificates.

461.   Each of Western & Southern's purchases of the Certificates was made pursuant to the false and misleading Offering Materials, including the Registration Statements.

462.   The Offering Materials for the Offerings were materially untrue, misleading, contained untrue statements of material facts, and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  At the time it obtained the Certificates, Western & Southern did not know of the facts concerning the untrue and misleading statements and omissions alleged herein.

463.   The Section 11 Defendants caused to be issued and disseminated, directed other parties to disseminate at the time of the filing of the Offering Materials, and/or participated in the issuance and dissemination to Western & Southern of materially untrue statements of facts and omissions of material facts, which were contained in the Offering Materials.

464.   The Section 11 Defendants are strictly liable to Western & Southern for the materially untrue statements and omissions in the Offering Materials under Section 11.  The Depositors are liable as issuers of the Certificates.  Countrywide Financial is liable as an issuer, among other grounds, because it formed the Depositors as limited purpose finance subsidiaries for the purpose of issuing the Certificates and subsequently issued the Certificates via the Depositors.

465.   Defendant Countrywide Securities is liable for its role as the lead underwriter of both Securitizations, in accordance with Section 11 (a)(5) of the 1933 Act, 15 U.S.C. §77k(a)(5).

466.   The Signatories are liable for signing the Registration Statements, in accordance with Section 11(a)(l) of the 1933 Act, 15 U.S.C. § 77k(a)(l).

467.   The Section 11 Defendants owed to Western & Southern a duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.  The Section 11 Defendants failed to exercise such due diligence by failing to conduct a reasonable investigation.

468.   Western & Southern has sustained damages measured by the difference between the price Western & Southern paid for the certificates and (1) the value of the Certificates at the time this suit is brought, or (2) the price at which Western & Southern sold the Certificates in the market prior to the time suit is brought.  Western & Southern's Certificates lost substantial market value subsequent to and due to the materially untrue

1  statements of facts and omissions of material facts in the Offering Materials

2  alleged herein.

3      469.   By reason of the conduct herein alleged, the Section 11

4  Defendants violated Section 11 of the 1933 Act and are jointly and severally

5  liable for their wrongdoing.  By virtue of the foregoing, Western & Southern

6  is entitled to damages from each of the Section 11 Defendants.

7                    **ELEVENTH CAUSE OF ACTION**

8              **(Violation of Section 12(a)(2) of the 1933 Act)**

9      470.   Western & Southern realleges each allegation above as if fully

10  set forth herein, except to the extent that Western & Southern expressly

11  excludes from this cause of action any allegation that could be construed as

12  alleging fraud or intentional or reckless conduct.  This cause of action

13  specifically excludes the allegations as to Defendants' scienter.

14      471.   This cause of action is based solely on claims of strict liability

15  or negligence under the 1933 Act.  This is a claim brought under Section

16  12(a)(2) of the 1933 Act, 15 U.S.C.  §77I(a)(2) ("Section 12(a)(2)"), against

17  Countrywide Securities, the Depositors, and the Bank of America

18  Defendants as the Countrywide Defendants' successors (collectively the

19  "Section 12(a)(2) Defendants") arising from Western & Southern's

20  purchases of the Certificates.

21      472.   The Section 12(a)(2) Defendants offered and sold the

22  Certificates to Western & Southern by means of the defective Offering

23  Materials, including the Prospectuses and Prospectus Supplements, which

24  contained materially untrue statements of facts and omitted to state material

25  facts necessary to make the statements, in the light of the  circumstances

26  under which they were made, not misleading.  Western & Southern

27  purchased the Certificates directly from the Section 12(a)(2) Defendants,

who both transferred title to Western & Southern and who solicited Western & Southern for financial gain.

473.   The Section 12(a)(2) Defendants offered the Certificates for sale, sold them, and distributed them by the use of means or instruments of transportation and communication in interstate commerce.

474.   The Section 12(a)(2) Defendants owed to Western & Southern the duty to make a reasonable and diligent investigation of the statements contained in the Offering Materials, to ensure that such statements were true, and to ensure that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The Section 12(a)(2) Defendants failed to exercise such reasonable care.

475.   The Section 12(a)(2) Defendants knew, or in the exercise of reasonable care should have known, that the Offering Materials contained materially untrue statements of facts and omissions of material facts, as set forth above, at the time of the Offerings.  Conversely, Western & Southern did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

476.   Western & Southern sustained material damages in connection with its investments in the Securitizations and accordingly has the right to rescind and recover the consideration paid for the Certificates, with interest thereon, in exchange for tendering the Certificates.  Western & Southern hereby tenders its Certificates and demands rescission.

## TWELFTH CAUSE OF ACTION

### (Violation of Section 15 of the 1933 Act)

477.   Western & Southern realleges each allegation above as if fully set forth herein.

478.   This is a claim brought under Section 15 of the 1933 Act, 15 U.S.C. §770 ("Section 15"), against Countrywide Financial, Countrywide Home Loans, Countrywide Capital Markets, Sambol and against the Bank of America Defendants as Countrywide Financial's successors (the "Section 15 Defendants") for controlling-person liability with regard to the Section 11 and Section 12(a)(2) causes of actions set forth above.  The Section 15 Defendants were named as defendants in the Third Cause of Action in *Luther,* for "Violation of Section 15 of the Securities Act Against Countrywide Financial, Countrywide Securities, Countrywide Capital Markets and Countrywide Home Loans."

479.   The Section 15 Defendants are controlling persons within the meaning of Section 15 by virtue of their actual power over, control of, ownership of, and/or directorship of the Section 11 Defendants and the Section 12(a)(2) Defendants, defined above, at the time of the wrongs alleged herein and as set forth herein, including their control over the content of the Offering Materials.

480.   The Section 11 and 12(a)(2) Defendants acted negligently and without reasonable care regarding the accuracy of the information contained in and incorporated by reference in the Offering Materials.  The Section 11 and 12(a)(2) Defendants lacked reasonable grounds to believe that such information was accurate and complete in all material respects.

481.   The Section 15 Defendants had power and influence over the Section 11 and 12(a)(2) Defendants and exercised the same to cause those Defendants to engage in the acts described herein.  By virtue of their control, ownership, offices, directorship and specific acts, the Section 15 Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Section 11 and 12(a)(2)

Defendants named herein, including controlling the content of the Offering Materials.

482.   The Section 15 Defendants' control, ownership, and position made them privy to and provided them with actual knowledge of the material facts concealed from Western & Southern.

483.   None of the Defendants named herein conducted a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Materials were true, were without omissions of any material fact and were not misleading.

484.   Western & Southern did not know, nor in the exercise of reasonable diligence could it have known, of the untruths and omissions contained in the Offering Materials at the time it purchased the Certificates.

485.   By virtue of the conduct alleged herein, the Section 15 Defendants are liable for the aforesaid wrongful conduct, jointly and severally with – and to the same extent as – the entities they controlled for the violations of Sections 11 and 12(a)(2) by the controlled entities.

### THIRTEENTH CAUSE OF ACTION
### (Successor and Vicarious Liability)

486.   Western & Southern realleges each allegation above as if fully set forth herein.

487.   The Bank of America Defendants are liable for Countrywide's wrongdoing, in its entirety, under common law, because Bank of America and Countrywide merged or consolidated, because Bank of America has expressly or impliedly assumed Countrywide's tort liabilities, and because the Bank of America Defendants are a mere continuation of the Countrywide Defendants.

### FOURTEENTH CAUSE OF ACTION

**(Ohio Common Law Fraud)**

488.   Western & Southern realleges each allegation above as if fully set forth herein.

489.   This claim is brought against Countrywide Financial, Countrywide Home Loans, Countrywide Securities, and the Depositors (the "Common-Law Fraud Defendants"), and the Bank of America Defendants as Countrywide's successors.

490.   The material representations set forth above were fraudulent, and the Common-Law Fraud Defendants' representations fraudulently omitted material statements of fact.

491.   Each of the Common-Law Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made.  Each of the Common-Law Fraud Defendants made the misleading statements with intent to defraud Western & Southern.

492.   Western & Southern justifiably relied on the Common-Law Fraud Defendants' false representations and misleading omissions.

493.   Had Western & Southern known the true facts regarding the Common-Law Fraud Defendants' underwriting practices and quality of the loans making up the securitizations, it would not have purchased the Certificates.

494.   As a result of the Common-Law Fraud Defendants' false and misleading statements and omissions, as alleged herein, Western & Southern has suffered damages according to proof.  The Countrywide Defendants are liable to Western & Southern for common-law fraud, and the Bank of America Defendants are liable as their successors.

**SEVENTEENTH CAUSE OF ACTION**

**(Civil Conspiracy)**

495.   Western & Southern realleges each allegation above as if fully set forth herein.

496.   As set forth herein, Defendants violated the Ohio Securities Act, the federal Securities Act, the Ohio Corrupt Practices Act and committed fraud.

497.   The Defendants formed an association in fact of entities that conspired to underwrite and purchase fraudulently and improperly underwritten loans, to package those loans for resale, and to fraudulently service such loans through use of fraudulent and forged documents in foreclosures and overcharges to borrowers for insurance and other services.

498.   As set out above, each Defendant committed overt acts in furtherance of the conspiracy with malicious intent.

499.   As a result of the foregoing, Western & Southern has suffered damages according to proof.

## PRAYER FOR RELIEF

WHEREFORE Western & Southern prays for relief as follows:

An award of damages against Defendants in favor of Western & Southern against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, but including at a minimum:

a.   Rescission and recovery of the consideration paid for the Certificates, with interest thereon;

b.   Western & Southern's monetary losses, including loss of market value and loss of principal and interest payments, on all claims other than Western & Southern's Section 12(a)(2) claim or other claims for recission;

c.   Attorneys' fees and costs;

1       d.      Treble damages;

2       e.      Punitive damages;

3       f.      Prejudgment interest at the maximum legal rate; and

4       g.      Such other and further relief as the Court may deem just and

5                proper.

6   **JURY TRIAL DEMANDED**

7   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby

8   demand a trial by jury on all issues triable by jury.

9   Dated: November 7, 2011

10

11   By: *Brian C. Lysaght* — WESF

12   Brian C. Lysaght (Bar. No. 61965)

lysaghtlaw@hotmail.com

LYSAGHT LAW GROUP

12021 Wilshire Boulevard

Los Angeles, California 90025

Telephone: (310) 567-1111

Facsimile: (310) 472-0243

16                -and-

17   David H. Wollmuth (*pro hac vice*)

dwollmuth@wmd-law.com

Steven S. Fitzgerald (*pro hac vice*)

sfitzgerald@wmd-law.com

WOLLMUTH MAHER & DEUTSCH LLP

500 Fifth Avenue

New York, New York 10110

(212) 382-3300

*Attorneys for Plaintiffs The Western and Southern Life Insurance Company, Western-Southern Life Assurance Company, Columbus Life Insurance Company, Integrity Life Insurance Company, and Fort Washington Investment Advisors, Inc.*