# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In the matter of the application of          :

THE BANK OF NEW YORK MELLON (as          :
Trustee under various Pooling and Servicing
Agreement and Indenture Trustee under various          :
Indentures) *et al.*,                                    **2011-cv-5988 (WHP)**
                                                    :
          Petitioners,
                                                    :
          -against-
                                                    :
WALNUT PLACE LLC *et al.*,
                                                    :
          Intervenor-Respondents.
                                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# INSTITUTIONAL INVESTORS' STATEMENT IN SUPPORT OF SETTLEMENT AND CONSOLIDATED RESPONSE TO SETTLEMENT OBJECTIONS

WARNER PARTNERS, P.C.
*Attorneys for Intervenor-Petitioners*
950 Third Avenue, 32nd Floor
New York, New York 10022

Of Counsel:
GIBBS & BRUNS LLP
By: Kathy D. Patrick, Esq.
      Robert D. Madden, Esq.

Case 2:11-cv-07100-MRP-MAN Document 137-1 Filed 11/10/11 Page 2 of 152 Page ID
Case 1:11-cv-05988-WHP Document 424 Filed 10/31/11 Page 2 of 71
#:10225

# TABLE OF CONTENTS

|  |  | **Page** |
|---|---|---|

I.  Overview of the Issues ................................................................................ 3

II.  The Settlement is Reasonable Given the Terms of the Governing Agreements, the Result Achieved and the Potential Value of the Claims .................................................... 8

    A.  Overview of Contract Provisions and Claims ...................................................... 8

    B.  The Trustee's Common Law Duties Do Not Offer Any Path to a Greater Recovery for the Trusts ................................................................... 13

    C.  The Value and Reasonableness of the Settlement of the Repurchase Claims ................................................................................................ 15

        1.  The Terms that Govern the Repurchase Obligation ............................... 15

        2.  Arguments that the Claims "May Exceed $150 Billion" Ignore the Likelihood that they May Be Worth Far Less. ..................................... 19

            a.  Walnut Place ................................................................... 21

            b.  AIG ............................................................................ 22

            c.  FHFA ......................................................................... 22

        3.  Successor Liability Risks ...................................................... 24

    D.  Servicing Improvements and Litigation Risks ................................................. 27

    E.  The Document Indemnity ........................................................................ 32

    F.  What are the Alternatives to Settlement? ....................................................... 32

III.  Response to Objections ............................................................................. 36

    A.  Standard of Review ............................................................................. 38

    B.  The Institutional Investors Actions Were Open and Publicized, Not Secret ..... 39

    C.  The Institutional Investors Did Not Seek, Or Obtain, Any Individual Benefit. .................................................................................... 50

    D.  The Trustee's Alleged Conflict ............................................................... 51

    E.  The Trustee Is Entitled to Seek an Instruction Concerning Whether to Consummate the Settlement. ................................................................... 52

F.    The Settlement Was Not "Clandestine" or "Collusive" .................................... 54

       1.    Newly Revealed AIG Documents Refute Its "Clandestine" Negotiation Claim ...................................................................... 56

       2.    Walnut Place Also Knew of Settlement Discussions But Refused to Participate ............................................................................. 58

       3.    Knights of Columbus ........................................................................ 59

G.    Miscellaneous Objections ............................................................................... 60

       1.    Allocation Issues ............................................................................. 60

       2.    Waterfall Issue ................................................................................ 61

       3.    Former Holders ............................................................................... 62

       4.    Rights of Monoline and Financial Guaranty Insurers ........................... 62

       5.    Homeowners' Class Action ............................................................... 63

# TABLE OF AUTHORITIES

**Cases**

*AG Capital Funding Ptnrs., L.P. v. State Street Bank*
  *& Trust Co.*, 11 N.Y.3d 46, 896 N.E.2d 61, 866 N.Y.S.2d 578 (N.Y. 2008) ........................... 12

*Allstate Ins. Co., et al. v. Countrywide Financial Corp.*, et al.,
  No: 2:11-CV05236-MRP (MANx), slip op. at 43-44 (C.D. Cal. Oct. 21, 2011) .................... 25

*American International Group Inc. v. Bank of America Corp.*,
  Index No. 652199/2011 (N.Y. Sup. Ct. Aug. 8, 2011) ........................................................... 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................... 55

*ASR Levensverzekering NV v. Swiss Re Fin. Prods. Corp.*,
  Index No. 650557/09, slip op. at 7 (N.Y. Sup. Ct. Oct. 11, 2011) ......................................... 62

*Asset Securitization Corp. v. Orix Capital Mkts., LLC*,
  12 A.D.3d 215, 784 N.Y.S.2d 513 (N.Y.A.D. 1st Dep't. 2004) ................................................. 4

*Bank of America, N.A. v. PCV ST Owner L.P.*,
  Case No. 10-1178 (S.D.N.Y.) ................................................................................................. 39

*Bank of N.Y. v. Battery Park City Auth.*,
  251 A.D.2d 211 (1st Dep't 1998) ........................................................................................... 10

*Bankers Ins. Co. v. DLJ Mortg. Capital, Inc.*,
  2010 WL 4867533, (M.D. Fla. Oct. 8, 2010) ......................................................................... 10

*Batchelder v. Council Grove Water Co.*,
  131 N.Y. 42 (1982) ............................................................................................................. 3, 10

*Beal Sav. Bank v. Sommer*,
  8 N.Y.3d 318 (2007) ............................................................................................................... 10

*Beck v. Manufacturers Hanover Trust Co.*,
  218 A.D.2d 1, 632 N.Y.S.2d 520 (App. Div. 1st Dep't. 1995) ......................................... 13, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................... 55

*Campbell v. Hudson & Manhattan R.R. Co.*,
  277 A.D. 731 (N.Y. App. Div. 1951), *aff'd*, 302 N.Y. 902 (1951) ......................................... 10

*Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*,
  1997 WL 305829 (Del. Ch. 1997) ......................................................................................... 20

*Cruden v. Bank of New York,*
  957 F.2d 961 (2d Cir. 1992) ......................................................................... 5, 11, 38

*Desmond v. ASR Acquisition Corp.* (*In re Desmond*),
  Bk. No. 03-13878-MWV, Ch. 7, Adv. No. 04-1107-MWV, Adv. No. 04-1112-MWV,
  2006 BNH 20, 2006 Bankr. LEXIS 1021 (Bankr. D.N.H. 2006).............................. 20

*Feldbaum* v. *McCrory Corp.,*
  C.A. No. 11866, 1992 WL 119095 (Del. Ch. June 1, 1992) .................................... 10

*FHFA v. Bank of America Corp.,*
  No.11-cv-06195 (S.D.N.Y. Sept. 2, 2011) ............................................................ 23

*Greene* v. *N.Y. United Hotels, Inc.,*
  236 A.D. 647 (1st Dep't 1932), *aff'd,* 261 N.Y. 698 (1933) ................................... 10

*Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC*
  v. *Countrywide Fin. Corp.,* No. 650474/2008, slip op. at 6-7
  (Sup. Ct. N.Y. Oct. 7, 2010) .............................................................. 4, 9, 10, 31

*In re Adler,*
  No. 09-34791-BKC-RBR, Chapter 11, 2010 Bankr. LEXIS 3001
  (Bankr. S.D. Fla. Sept. 16, 2010).......................................................................... 20

*In re Application of IBJ Schroder Bank & Trust Co.,*
  Index No. 101530/1998, at 6 (N.Y. Sup. Ct. N.Y County Aug. 16, 2000)........................ 15, 52

*In re Innkeepers USA Trust,*
  448 B.R. 131 (Bktcy. S.D.N.Y. 2011) ............................................................ 3, 38, 62

*In re Refco, Inc.,*
  505 F.3d 109 (2nd Cir. 2007)................................................................................ 38

*In re Stillman,*
  107 Misc. 2d 102 (Sur. Ct. N.Y. County 1980)....................................................... 15

*In the Matter of Scarborough Properties Corp.,*
  255 N.E.2d 761, 25 N.Y.2d 553 (N.Y. 1969) ...................................................... 54

*JAS Partners, Ltd. v. Boyer,*
  No. 1:10-CV-303-TLS, 2011 U.S. Dist. LEXIS 42414 (N.D. Ind. Apr. 19, 2011)................. 20

*LaSalle Bank, N.A. v. Nomura Asset Capital Corp.,*
  180 F.Supp.2d 465 (S.D.N.Y. 2001) .................................................................... 4

*Levy v. Paramount Publix Corp.,*
  149 Misc. 129 (Sup. Ct. N.Y. Co. 1933), *aff'd,* 241 A.D. 711
  (1st Dep't 1934), *aff'd,* 265 N.Y. 629 (1934) ....................................................... 10

*Lichtenberg v. Zinn*,
  260 A.d.2d 741 (N.Y. 3d Dep't 1999) .................................................................................... 20

*Maine State Ret. Sys.* v. *Countrywide Fin. Corp.*,
  No. 2:10-CV-0302 MRP (MANx), 2011 WL 1765509 (C.D. Cal. Apr. 20, 2011) .................. 25

*McMahan & Co.* v. *Wherehouse Entertainment, Inc.*,
  65 F.3d 1044 (2nd Cir. 1995) ................................................................................................... 38

*Peak Partners, LP* v. *Republic Bank*,
  191 F. App'x 118 (3d Cir. 2006) .............................................................................................. 10

*Redmond v. Commerce Trust Co.*,
  144 F.2d 140 (8th Cir. 1944) ............................................................................................. 13, 53

*Relmar Holding Co.* v. *Paramount Publix Corp.*,
  147 Misc. 824 (Sup. Ct. N.Y. Co. 1932)
  *aff'd*, 237 A.D. 870 (1st Dep't 1933) ...................................................................................... 10

*Santos v. Elder* (*In re Macadam Computer, Inc.*),
  No. C 06-4889 SI, 2007 U.S. Dist. LEXIS 49848 (N.D. Cal. June 28, 2007) ........................ 20

*Schallitz* v. *Starrett Corp.*,
  82 N.Y.S.2d 89 (Sup. Ct. N.Y. Co. 1948) ............................................................................... 10

*SEC v. Mozilo*,
  No. 09-cv-03994 (C.D. Cal. June 4, 2009) ................................................................................ 9

*Sterling Fed. Bank, F.S.B.* v. *DLJ Mortg. Capital, Inc.*,
  2010 WL 3324705, (N.D. Ill. Aug. 20, 2010) ......................................................................... 10

*Sutter* v. *Hudson Coal Co.*,
  259 A.D. 1053 (2d Dep't 1940) ............................................................................................... 10

*Teachers Insurance & Annuity Ass'n. v.*
  *CRIIMI Mae Svcs. L.P.*, 681 F.Supp.2d 501 (S.D.N.Y. 2010) .......................................... 1, 38

*Van Wezel* v. *McCord Radiator & Mfg. Co.*,
  20 N.Y.S.2d 91 (N.Y. City Ct. 1939) ...................................................................................... 10

*Veal v. Am. Home Mortg. Servicing, Inc.* (*In re Veal*),
  449 B.R. 542 (B.A.P. 9th Cir. 2011) ....................................................................................... 17

*Victor v. Riklis*,
  1992 WL 122911 (S.D.N.Y. May 15, 1992) ............................................................................ 10

Case 2:11-cv-07190-MRP-MAN Document 177-2 Filed 01/10/12 Page 8 of 152 Page ID
#:10230
Case 1:10-cv-05988-WHP Document 124 Filed 10/31/11 Page 7 of 21

**Other**

RESTATEMENT (SECOND) OF TRUSTS § 187 (1959) ........................................................ 15

**Statutes**

N.Y. UCC §3-201 ........................................................................................................ 16

N.Y. UCC §3-204 ........................................................................................................ 16

N.Y. UCC §3-804 ........................................................................................................ 16

UCC §3.203 ................................................................................................................. 16

UCC §3.205 ................................................................................................................. 16

TO THE HONORABLE WILLIAM PAULEY III:

This brief in support of the settlement, and in consolidated response to the various settlement objections discussed below, is filed by BlackRock Financial Management Inc., Kore Advisors, L.P., Maiden Lane, LLC, Maiden Lane II, LLC, Maiden Lane III, LLC, Metropolitan Life Insurance Company, Trust Company of the West and affiliated companies controlled by The TCW Group, Inc., Neuberger Berman Europe Limited, Pacific Investment Management Company LLC, Goldman Sachs Asset Management, L.P., as adviser to its funds and accounts, Teachers Insurance and Annuity Association of America, Invesco Advisers, Inc., Thrivent Financial for Lutherans, Landesbank Baden-Wuerttemberg, LBBW Asset Management (Ireland) plc, Dublin, ING Bank fsb, ING Capital LLC, ING Investment Management LLC, New York Life Investment Management LLC, as investment manager, Nationwide Mutual Insurance Company and its affiliated companies, AEGON USA Investment Management LLC, authorized signatory for Transamerica Life Insurance Company, AEGON Financial Assurance Ireland Limited, Transamerica Life International (Bermuda) Ltd., Monumental Life Insurance Company, Transamerica Advisors Life Insurance Company, AEGON Global Institutional Markets, plc, LIICA Re II, Inc., Pine Falls Re, Inc., Transamerica Financial Life Insurance Company, Stonebridge Life Insurance Company, and Western Reserve Life Assurance Co. of Ohio, Federal Home Loan Bank of Atlanta, Bayerische Landesbank, Prudential Investment Management, Inc., and Western Asset Management Company (collectively, the "Institutional Investors").

The Institutional Investors support the Trustee's application to settle repurchase and servicing claims for 530 Countrywide RMBS Trusts ("Trusts"). The Trustee's decision to settle the claims was reasonable. The settlement is highly beneficial to the Trusts and to the investors in their securities. There is likely no litigation alternative for 341 Trusts at issue in the

1

settlement, so they will get nothing if the settlement is not approved.  For all Trusts, the $8.5 billion settlement obtains a final resolution with Bank of America, and thus protects them from the risks of a Countrywide bankruptcy.  The comprehensive servicing improvements, which will cost Bank of America $400 million but may spare investors billions of dollars of losses, could not be obtained through contested litigation.  The same is true of the defective document indemnity, under which Bank of America has agreed to indemnify the Trusts against 100% of the losses they suffer if the Trusts are unable to liquidate a loan due to unrecorded or incomplete mortgage or title policies.

The overwhelming majority of the thousands of investors who hold Trust securities have chosen *not* to contest the settlement.[1]    The interests of this "silent majority" of Certificateholders—none of whom opposes the settlement—should not be ignored.  They prefer settlement over:  a) litigation to contest the settlement, or b) pursuing litigation of the Trustee's claims themselves.  The interests of these investors, who prefer certainty over *any* form of litigation, are not served by disapproving the settlement.

The 44 objectors in this proceeding are not monolithic in opposition to the settlement. Half of the objectors express *no opposition* to the settlement.  Instead, as authorized by Justice Kapnick's order below, they appeared simply to seek additional information concerning one or more of its terms.[2]  The remaining objectors fall into four categories: a) financial guaranty and monoline insurers who seek only to clarify their rights under the settlement, b) waterfall objections that, necessarily, assume the settlement *will* be approved but seek clarification

---

[1] The settlement has been widely publicized and was the subject of a world-wide, months long notice program implemented by order of Justice Kapnick in the Supreme Court of New York.

[2] A chart listing the objections may be found at the beginning of Part III, *infra*.

concerning its distribution, c) objectors who are *litigating* their own, separate claims against BNY Mellon or Bank of America ("Litigation Claimants"), and d) miscellaneous objectors.

Given the requirement that Certificateholders act for the "common benefit" of the Trusts and their Certificateholders, the Litigation Claimants' objections must be scrutinized carefully to ensure they comply with PSA Section 10.08 and are not a prohibited "individual course of action," *Batchelder v. Council Grove Water Co.*, 131 N.Y. 42, 46 (1982), that seeks to advance "individual and conflicting pecuniary interests." *In re Innkeepers USA Trust*, 448 B.R. 131, 144 (Bktcy. S.D.N.Y. 2011). These Litigation Claimants offer only speculation and innuendo in opposing the settlement. Of this group, only one objector, Walnut Place, even proposes to litigate the Trustee's claims. Walnut's proposal covers at most <u>three</u> Trusts. It rests on the assumption that an anonymous LLC, formed for the purpose of litigating claims, has the financial wherewithal and staying power to obtain a better result through litigation than the excellent result the Trustee has already obtained through settlement, and it is devoid of any analysis as to whether or how that could be achieved. An anonymous hedge fund's desire to speculate with the Trustee's claims in this way does not portend any result, much less a better one, than the highly favorable resolution embodied in the Trustee's settlement.

The Trustee's decision to seek court approval through an Article 77 proceeding, which ensured all Certificateholders could and would be heard, is a well and firmly embodied procedure that appears in decades of federal and New York case law, New York statutory law, and the RESTATEMENT (SECOND) OF TRUSTS. The settlement should be approved and the objections to it should be overruled.

## I.    Overview of the Issues

1.    The Trusts exist pursuant to Pooling and Servicing Agreements (PSAs). The PSAs govern the rights and obligations of the Trustee, Certificateholders and the Mortgage

3

Sellers.[3]  Under the PSAs, the contract claims resolved in the settlement belong to the Trustee. *See* PSA §§ 2.01(b), 2.04.  The Trustee holds those contract claims for the ultimate benefit of the Certificateholders, but the claims do not belong to Certificateholders.  The Trustee has the power to pursue the claims, *see* PSA §§ 2.03(c), 2.04, and 3.03[4]; but it is not required to investigate them, *see* PSA § 8.02(iv), or to expend its own funds to do so, *see* PSA § 8.02(vi).  These provisions significantly limit the litigation options for the Trustee.

2.     The circumstances in which Certificateholders can pursue these claims are also very narrow.  The PSAs require Certificateholders to aggregate 25% of the Voting Rights, provide a financial indemnity to the Trustee, and give two consecutive sixty day notice periods. *See* PSA §§ 7.01, 8.01, 8.02 and 10.08; *see also Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC* v. *Countrywide Fin. Corp.*, No. 650474/2008, slip op. at 6-7 (Sup. Ct. N.Y. Oct. 7, 2010), attached as Ex. 1 to the Warner Declaration, filed herewith.[5]  Only then can Certificateholders file suit: but they must sue derivatively, on behalf of the Trusts, for the common benefit of Certificateholders.  *See* Part II(A), *infra*.

3.     The sole issue to be decided here is whether the Trustee's decision to settle the Trustee's claims was reasonable.  The PSAs authorize the Trustee to settle disputed claims.  *See* PSA §§ 2.01, 2.03(c), 2.04, and 3.03.  The Trustee retained five experts to advise it concerning the settlement, so it could make an informed, independent decision whether to accept it.  The

---

[3] Unless otherwise indicated, capitalized terms are defined consistently with the PSAs.

[4] See *also LaSalle Bank, N.A. v. Nomura Asset Capital Corp.*, 180 F.Supp.2d 465, 471 (S.D.N.Y. 2001) ("the plain meaning" of a conveyance of "all right, title, and interest in the mortgages to LaSalle as Trustee . . . ordinarily includes the power to bring suit to protect and maximize the value of the interest thereby granted.") and *Asset Securitization Corp. v. Orix Capital Mkts., LLC*, 12 A.D.3d 215, 784 N.Y.S.2d 513, 14 (N.Y.A.D. 1st Dep't. 2004) (under PSA, authority to sue "is committed solely to the trustee of the pooled loans").

[5] All subsequent references to Exhibits refer to Exhibits to the Warner Declaration.

4

Court has questioned whether the Trustee was entitled to rely on experts for this purpose. *See* Tr. of Sept. 1 Hearing at 27:3-5. The PSAs expressly permit the Trustee to do so. *See* PSA § 8.02(ii). In fact, the Trustee's good faith reliance on the opinion of these experts "shall be full and complete authorization and protection in any action taken or suffered or omitted by it hereunder." *Id.* The Second Circuit has recognized that, where an Indenture authorizes a trustee to rely on opinions of counsel, the *correctness* of the underlying opinion is irrelevant: "Nor is the Trustees' good faith put in question merely by virtue of the fact that the opinion relied upon may have been wrong; to so hold would eviscerate the opinion of counsel defense." *Cruden v. Bank of New York*, 957 F.2d 961, 972 (2d Cir. 1992). For this reason alone, the PSAs and applicable law require that the court approve the settlement. *See* Part II(C)(2), *infra*.

4.     Even if the court could ignore the plain language of the PSAs, and it cannot, the settlement itself is reasonable. The $8.5 billion settlement the Trustee asks the court to approve is the second-largest litigation settlement in history, and the largest ever achieved in private litigation. If approved, it will provide the Trusts with a favorable and early resolution of uncertain claims for repurchase of ineligible mortgages. It will substitute a solvent obligor, Bank of America, for the deeply insolvent Countrywide entities who are otherwise liable for the repurchase claims. It effects a complete reform of mortgage servicing, at Bank of America's expense, in a manner that is favorable not only to investors, but to borrowers. Finally, it provides the Trusts with a complete, and automatic, indemnity for losses they suffer as a result of unrecorded mortgages and defective and missing title policies.

5.     There are 530 Trusts involved in the settlement. The Institutional Investors hold 25% of the Voting Rights in 189 of these Trusts. If the settlement is not approved, they can and will litigate claims for those Trusts, but they do not believe litigation would achieve a better—or

more certain—result than the settlement the Trustee has in hand. Though they are prepared to litigate, they prefer the settlement. There are 341 other Trusts involved in the settlement. In all but two of those 341 Trusts, no group alleges that they hold 25% of the Voting Rights. In fact, of the over $40 billion in securities held by the Institutional Investors or by funds and clients they advise, almost $14 billion are in Trusts where the Institutional Investors lack the required 25% threshold. If the settlement is disapproved, these Trusts will receive no remedy at all. *See* Part II(F), *infra*. Rejection of the settlement would be devastating for these Trusts and their investors. The Court should press the objectors carefully to determine whether they have any plan, at all, to obtain relief for these Trusts if the settlement is disapproved.

6. If the settlement is rejected, the industry-reforming servicing improvements and the document indemnity will also be lost for all of the Trusts. These are affirmative, negotiated remedies. They are not mandated by the PSAs, so they cannot be achieved through contested litigation of prudent servicing claims. Destroying the settlement, and thus the servicing improvements, could cause investors to suffer billions of dollars of additional losses they will likely avoid if the settlement is approved. Borrowers will be hurt too, because the servicing improvements—which provide important protections and incentives for them—will not be implemented fully.

7. Evaluation of any settlement necessarily requires consideration not only of the terms of the proposed settlement but an estimate of the likely outcome of a litigated alternative. It is a truism, and also true, that litigation is inherently uncertain. The inaccurate assertion that there are "billions of dollars in toxic mortgage claims" in the pools does not establish that those claims will succeed if pursued in litigation. Speculative claims that Bank of America is liable as a successor in interest for contracts with the Countrywide Mortgage Sellers do little to assure

investors that years of contested litigation will not end with only an insolvent Countrywide to respond to their claims. The raw assertion that the Trustee's claims "*may* exceed $150 billion" similarly fails to grapple with the barriers to these claims imposed by the governing agreements. Also left unaddressed are the legal rulings and risks that might render these claims worthless, or at a minimum worth *far* less than the settlement the Trustee has actually achieved.

8.       The Institutional Investors are 22 of the world's largest and most reputable investors. They have appeared here to support the settlement because they believe it is reasonable. Their open support for the settlement, and their disclosed efforts to achieve it, were well known to the market and to investors in the Trusts' securities. As the Court has observed, the group grew over time because other investors observed what was happening, believed the Institutional Investors' litigation strategy had merit and wanted to be part of achieving the solution. We submit that the Institutional Investors' group grew for another reason: the market knew these were institutions of sterling reputation. It knew they were not pursuing these claims to obtain an individual advantage: they simply wanted the deals to work, as they were envisioned, for the common benefit of all Certificateholders.

9.       The Institutional Investors will receive the *same* benefit under the settlement that will flow to every other, similarly situated investor. None of them has offered to trade approval of this settlement for an individual advantage, whether in litigation or elsewhere. It remains to be seen whether the same is true of the objectors. The reasonableness of the settlement is also evident from another key fact: the vast majority of investors in securities issued by the Trusts, including institutions that hold billions of dollars of certificates, have chosen not to object to the settlement. The court must consider their interests, and those of the Institutional Investors who

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/11/12   Page 16 of 152   Page ID
Case 1:11-cv-05988-WHP   Document 124   Filed 10/31/11   Page 15 of 71   Page ID
#:10238

want the substantial benefits and certainty conferred by the settlement, in assessing whether to
approve the settlement.

10.     In the following sections, we provide more detail concerning the reasonableness
of the settlement, the feasibility of litigated alternatives, and specific responses to arguments
made to date by the objectors.  The Institutional Investors, like all other Certificateholders,
reserve their right to supplement this brief in support as additional information is disclosed
through discovery and litigation of the approval proceedings.

## II.     The Settlement is Reasonable Given the Terms of the Governing Agreements, the Result Achieved and the Potential Value of the Claims

### A.     Overview of Contract Provisions and Claims

11.     By the summer of 2010, the situation faced by investors in the Trusts' securities
had become dire.  By virtually *every* measure, Bank of America's home loan servicing was
*worse* than that of other firms in the industry.  Defaults and delinquencies in the underlying pool
of mortgages were mounting.  Investors' losses were mounting too.  Separately, monoline and
private mortgage insurers had filed suit seeking to rescind their insurance coverage on certain
Trusts, claiming that they contained high levels of mortgages that were originated in violation of
applicable reps and warranties.[6]  Emails released by the Securities and Exchange Commission
indicated that Countrywide had originated loans "through our channels with disregard for
process [and] compliance with guidelines," even though it knew of a "serious lack of compliance
within [its] origination system."  *See* Complaint ¶ 49, *SEC v. Mozilo*, No. 09-cv-03994 (C.D.

---

[6] "Rep and warranty" is the term used to describe the representations Mortgage Sellers make to
the Trusts when they sell a mortgage.  The violation of these representations and warranties gives
rise to a right, on the part of the Trusts, to demand that the Seller repurchase the mortgage if the
defect "materially and adversely affects the interests of Certificateholders in that Mortgage
Loan."  *See* PSA § 2.03(c).

Case 2:11-cv-07166-MRP-MAN Document 177-2 Filed 01/11/12 Page 17 of 152 Page ID
#:10239
Case 1:11-cv-05988-WHP Document 224 Filed 10/31/11 Page 16 of 71

Cal. June 4, 2009). Faced with mounting losses, a group of institutional investors began to organize to try to compel the Trustee to act.

12. The PSAs *prohibit* Certificateholders from enforcing the Trusts' contracts individually. Instead, they must do so *collectively*, for the good of *all* Certificateholders. *See* PSA § 10.08 ("no one or more Holders of the Certificates shall have any right in any manner whatever . . . to enforce any right under this Agreement, except in the manner provided in this Agreement and for the common benefit of all Certificateholders"). Certificateholders who seek to pursue claims derivatively for the Trusts must also meet a number of technical conditions precedent:

> a. A prior notice of an Event of Default that must be issued by investors holding not less than 25% of the Voting Rights in the Trust. *See* PSA § 7.01;
>
> b. The Event of Default must remain uncured for a period of sixty days. *Id.*;
>
> c. The 25% holders must then demand that the Trustee file suit. *See* PSA § 10.08;
>
> d. The 25% holders must couple their demand with an offer to indemnify the Trustee against all costs and expenses associated with pursuing any investigation or claims. *Id.*; and,
>
> e. The Trustee must fail to file suit for a period of sixty days, after which any Certificateholder who participated in the Notice of Non-Performance and offered the required indemnity may file suit derivatively on behalf of the Trusts. *Id.*

13. These "no-action" clauses have been rigorously enforced by the courts. As the New York Supreme Court recently observed in enforcing *a substantively identical provision*, under this "broad language," certificateholders "are barred from bringing [an] action" that does not strictly comply with the provision's terms. *Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC*, No. 650474/2008, slip op. at 6-7, attached as Ex. 1. No-action clauses, like the one

contained in Section 10.08, ensure that "the *judgment* of the Trustee concerning whether to resort to the courts is controlling upon all of the bondholders." *Campbell* v. *Hudson & Manhattan R.R. Co.*, 277 A.D. 731, 734 (N.Y. App. Div. 1951), *aff'd*, 302 N.Y. 902 (1951).[7]  These clauses "prevent[] individual bondholders from pursuing an individual course of action." *Batchelder* v. *Council Grove Water Co.*, 131 N.Y. 42, 46 (1892).  No-action clauses also "protect[] against the risk of strike suits," and against the risk that "a single bondholder or a small group of bondholders . . . might otherwise bring a suit against the issuer that most bondholders would consider not to be in their collective economic interest." *Feldbaum* v. *McCrory Corp.*, C.A. No. 11866, 1992 WL 119095, at *6 (Del. Ch. June 1, 1992) (applying New York law).  As the New York Supreme Court held in *Greenwich*, certificateholders "agree[] to" the restrictions of a no-action clause "when they purchase[] the certificates."  Slip op. at 7.  Courts applying New York law have repeatedly dismissed complaints on the basis of plaintiffs' failure to comply with no-action clauses.[8]

---

[7] Unless noted, all emphasis is added.

[8] *See, e.g., Peak Partners, LP v. Republic Bank*, 191 F. App'x 118, 126-27 (3d Cir. 2006); *Bankers Ins. Co. v. DLJ Mortg. Capital, Inc.*, 2010 WL 4867533, at *2-*4 (M.D. Fla. Oct. 8, 2010); *Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*, 2010 WL 3324705, at *3-*5 (N.D. Ill. Aug. 20, 2010); *Bank of N.Y. v. Battery Park City Auth.*, 251 A.D.2d 211 (1st Dep't 1998); *Greene v. N.Y. United Hotels, Inc.*, 236 A.D. 647, 648 (1st Dep't 1932), *aff'd*, 261 N.Y. 698 (1933); *Levy v. Paramount Publix Corp.*, 149 Misc. 129, 133-34 (Sup. Ct. N.Y. Co. 1933), *aff'd*, 241 A.D. 711 (1st Dep't 1934), *aff'd*, 265 N.Y. 629 (1934); *see also Sutter v. Hudson Coal Co.*, 259 A.D. 1053 (2d Dep't 1940) (denying plaintiff's motion for summary judgment); *Schallitz v. Starrett Corp.*, 82 N.Y.S.2d 89, 91 (Sup. Ct. N.Y. Co. 1948) (directing judgment); *Relmar Holding Co. v. Paramount Publix Corp.*, 147 Misc. 824, 825 (Sup. Ct. N.Y. Co. 1932) (denying motion to strike defense), *aff'd*, 237 A.D. 870 (1st Dep't 1933); *Van Wezel v. McCord Radiator & Mfg. Co.*, 20 N.Y.S.2d 91, 99-100 (N.Y. City Ct. 1939) (granting summary judgment); *McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 859 F. Supp. 743, 748-79 (S.D.N.Y. 1994) (granting summary judgment), *rev'd in part on other grounds*, 65 F.3d 1044 (2d Cir. 1995); *Victor v. Riklis*, 1992 WL 122911, at *6 (S.D.N.Y. May 15, 1992) (denying leave to amend complaint).  *Cf. Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 332 (2007) (enforcing contractual provision restricting individual lenders from initiating separate, multiple lawsuits).

14.     As a practical matter, no-action provisions *preclude* Certificateholders from pursuing claims on behalf of the Trusts unless they:  a) aggregate large numbers of holders and holdings sufficient to satisfy the Voting Rights thresholds and b) prove they have the financial wherewithal to indemnify the Trustee and the Trusts for the expenses associated with lengthy and arduous litigation of servicing and repurchase claims.[9]  *Compare Cruden*, 957 F.2d at 968 (noting that a no-action provision meant that "debenture holders could not bring suit 'upon or with respect to' the Indenture" without first complying with requirements of the clause).  This important limitation must be considered when the Court assesses whether a litigated alternative is even available for most of the Trusts.

15.     The Court has pressed the Trustee to explain why it acted (or failed to act) as it did.  The answer lies in the terms of the PSAs.  The PSAs significantly limit the Trustee's obligations to pursue these claims.  The term "Trustee" is, in fact, something of a misnomer, at least as it describes BNY Mellon's role under the PSAs.[10]  "The corporate trustee has very little in common with the ordinary trustee . . . .  The trustee under a corporate indenture has his [or her] rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement.  His [or her] status is more that of a stakeholder than one of a trustee."  *AG Capital Funding Ptnrs., L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 46, 896 N.E.2d 61, 866

---

[9] With one exception, none of the objecting investors has expressed any willingness to provide the financial indemnity that must be offered before a Certificateholder can compel the Trustee to pursue these claims.  The exception, however, is of dubious provenance:  an indemnity has allegedly been offered by the anonymously named "Walnut Place LLC," a hedge fund that has not disclosed its balance sheet.  Given the typical lifespan of most hedge fund partnerships, and the fact that it was organized *solely* to pursue litigation claims, Walnut's unstated resources offer the court (and other investors in the trusts for which it claims the right to act) no assurance that it has the financial wherewithal—or, indeed, the lifespan—to pursue these claims successfully through lengthy litigation.

[10] This "art of the possible" problem is endemic in this case, and must be borne carefully in mind when considering the alternatives to settlement.

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/11/12   Page 20 of 152   Page ID
#:10242
Case 1:11-cv-05988-WHP   Document 124   Filed 10/31/11   Page 19 of 71

N.Y.S.2d 578, 583-84 (N.Y. 2008).  Under the PSAs, the Trustee is not required to expend any

of its own funds to pursue claims or perform its duties, *see* PSA § 8.02(vi); it is not required to

assume any financial risk in the performance of its duties, *see id.*; it is not obligated to

investigate any fact unless instructed to do so by the holders of 25% of the Voting Rights, *see id.*

at § 8.02(iv); and, it is not under any "obligation to exercise any of the trusts, rights or powers

vested in it by this Agreement or to institute, conduct or defend any litigation . . . at the request

of the Certificateholders . . . unless such Certificateholders shall have offered to the Trustee

reasonable security or indemnity satisfactory to the Trustee against the costs, expenses and

liabilities which may be incurred." *See id.* at §§ 8.02 and 10.08.

16.     The Trustee was faced with competing demands from investors about what to do

with the Trustee's claims.  The Institutional Investors hold (or advise clients and funds that hold)

more than $40 billion of outstanding securities issued by the Trusts.  They believed the

settlement was favorable.  They wanted the Trustee to accept it.  The Walnut Place objectors, in

contrast, filed suit on February 23, 2011. *See* Walnut Place Objection, St. Doc. #28 at 2.  That

action, filed after repeated press releases by the Institutional Investors disclosed ongoing

discussions with BNY Mellon and Bank of America, sought relief for only a single trust:

CWALT Trust 2006-OA10, in which Walnut Place alleged to hold $704 million of original face

securities.[11]  *See id.*; *see also* St. Doc. #24, #25, Ex. A, p. 1-2.  The Institutional Investors had

sizeable holdings in the same trust.[12]

---

[11] Given payments of principal, the outstanding amount of these securities was likely no more
than $500 million.

[12] In April 2011, Walnut Place filed an amended complaint to include an additional Trust,
CWALT 2006-OA3, in which it alleged to hold $110 million of original face securities, and
alleged that it had begun to prepare a lawsuit on a third trust, CWALT 2006-OA21. *See* Walnut
Place Objection, St. Doc #28 at 2; St. Docs. #24, #25, Ex. A, p. 1-2. The Institutional Investors

Case 2:11-cv-07166-MRP-MAN Document 177-224 Filed 01/11/12 Page 21 of 152 Page ID
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 20 of 71
#:10243

17.     In the face of these conflicting demands, BNY Mellon *could have* simply settled the claims without seeking court approval. *See* PSA §§ 2.03, 2.04, 3.03; *Redmond v. Commerce Trust Co.,* 144 F.2d 140, 154-55 (8th Cir. 1944). It did not. Instead, BNY Mellon did precisely what the law and the PSAs permitted it to do: it made a judgment about whether the settlement benefitted the Trusts and should be accepted, then it filed suit asking the court to approve the settlement. When it filed suit, the Trustee's pleading disclosed openly both the settlement and the competing demands of the Walnut Place Plaintiffs. *See* Memorandum of Law in Support of Trustee's Original Petition, St. Doc. #12, at 13-14.

**B.     The Trustee's Common Law Duties Do Not Offer Any Path to a Greater Recovery for the Trusts**

18.     The Trustee's common law duty to avoid conflicts of interest does not offer any path to a greater recovery for the Trusts.[13] Nor do those duties alter the reality that—in the absence of a settlement—claims on behalf of hundreds of Trusts likely will never be pursued.

19.     A duty to avoid conflicts of interest cannot possibly be expanded to negate the PSAs' clear statement that the Trustee is not required to expend its own funds to pursue claims or perform its duties. PSA § 8.02(vi). Even after an Event of Default, when "the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary," *Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 12, 632 N.Y.S.2d 520, 527 (App. Div. 1st Dep't. 1995), New York law is clear "that this by-now relatively minor change in the legal landscape, if change it is, does not render the indenture irrelevant." *Id.* As the *Beck* court explained, the terms of the contract still govern and define the Trustee's obligations post-default:

---

had holdings in all three of those Trusts. It is as yet unclear how many of Walnut Place's securities were acquired *after* Walnut Place learned a settlement had been achieved; the Institutional Investors' holdings predate the settlement.

[13] *See* Part II(F), *infra*.

"The trustee must in the post-default context act prudently, *but only in the exercise of those rights and powers granted in the indenture*. The scope of the trustee's obligation then is still circumscribed by the indenture, albeit less narrowly. The Trustee is *not required to act beyond his contractually conferred rights and powers*, but must, as prudence dictates, exercise those singularly conferred prerogatives in order to secure the basic purpose of any trust indenture, the repayment of the underlying obligation." *Id.* (emphasis added).

20. Two principles thus emerge from *Beck* and the cases that apply it. First, in a post-default world, the Trustee is obligated to exercise those rights it has, prudently. Second, even in a post-default world, the Trustee is not required to act beyond its contractually conferred rights and powers. These principles matter. They have real consequences for the Trusts and their Certificateholders if the settlement is not approved. Under these agreements, the Trustee does not have—and will never have—an obligation to expend its own funds to pursue years of contentious and difficult litigation on behalf of the Trusts.[14] PSA § 8.02(vi). The Trustee does not have, and will never have, an obligation to investigate facts to determine whether an Event of Default has occurred unless 25% of the Certificateholders instruct it to do so. *Id.* at §8.02(iv). Even after an Event of a Default, if the Certificateholders seek to compel the Trustee to take action, they must offer the Trustee an indemnity of the expenses it will incur to do so.[15] Given

---

[14] No reported case has held that either of the common law duties cited by the Court—the duty to avoid conflicts and the duty to perform ministerial actions competently—would impose on a Trustee the obligation to expend its own funds, in the absence of an indemnity, to pursue claims for a Trust.

[15] *Id.* at §8.02(ix) (Trustee is "under no obligation to exercise any of the trusts, rights or powers vested in it by this Agreement or to institute, conduct or defend any litigation . . . at the request, order or direction of any of the Certificateholders, pursuant to the provisions of this Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which may be incurred therein or thereby").

the barriers imposed by these agreements, there is reason to question whether the Trustee would ever be obligated to pursue these claims in the future if the settlement were disapproved.

### C.     The Value and Reasonableness of the Settlement of the Repurchase Claims

21.     The issue here is not whether the Trustee's decision to enter into the settlement was right; the issue is whether it was reasonable. *See In re Application of IBJ Schroder Bank & Trust Co.*, Index No. 101530/1998, at 6 (N.Y. Sup. Ct. N.Y County Aug. 16, 2000) ("the trustee's decision to compromise the . . . action is within the scope of the trustee's powers, is reasonable and prudent, and is entitled to judicial deference"); *In re Stillman*, 107 Misc. 2d 102, 110 (Sur. Ct. N.Y. County 1980); *see also* RESTATEMENT (SECOND) OF TRUSTS § 187 (1959) ("Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion."). As in any decision regarding a settlement, the Trustee was entitled to consider the relative costs, benefits and risks associated with the proposed settlement and with the litigation alternative. A critical set of risks and uncertainties concerns the Trusts' rights to demand the repurchase of ineligible mortgages held in their collateral pools.

### 1.     The Terms that Govern the Repurchase Obligation

22.     The Mortgage Sellers' obligation to repurchase defective mortgages is found in Section 2.03 of the PSAs. In pertinent part, it reads as follows:

> "Upon discovery by any of the parties hereto of a breach of a representation or warranty with respect to a Mortgage Loan made . . . that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties. Each Seller hereby covenants that within 90 days of the earlier of its discovery or receipt of a written notice from any party of a breach of any representation or warranty with respect to a Mortgage Loan sold by it . . . shall cure such breach in all material respects, and if such breach is not so cured, shall . . . repurchase the affected Mortgage Loan . . . from the Trustee at the Purchase Price . . . ."

23. The "parties" to the agreement are Countrywide Home Loans, Inc. and various "Park" entities (Park Granada, Park Monaco, and/or Park Sienna, all of which were aggregation conduits for Countrywide). Countrywide Home Loans, Inc. is the Mortgage Seller obligated to repurchase defective loans. The other parties are the Depositor, Countrywide Home Loans Servicing, L.P. as Master Servicer, and BNY Mellon as Trustee. The Certificateholders are not parties to the agreements. They thus have no direct rights to demand the repurchase of defective Mortgage Loans. Repurchase claims, if they are pursued, must be pursued by the Trustee (or derivatively, for the common benefit of all Certificateholders, by Certificateholders who have met the conditions precedent).

24. Only the Mortgage Seller, Countrywide Home Loans, Inc., is obligated to repurchase defective mortgage loans. *See* PSA § 2.03(c). Countrywide Financial Corporation, the then-public parent company of Countrywide Home Loans has no obligation, under the PSAs, to repurchase defective mortgage loans. *Id.* It also made no representation or warranty concerning the credit quality or features of the underlying mortgage loans. *Id.* at § 2.03(a).

25. Bank of America, which at the time had no relationship at all with Countrywide, likewise is not a party to any of the PSAs. It therefore made no representation regarding the credit quality of the underlying mortgage loans. It also has no direct contractual obligation to repurchase defective Mortgage Loans. Instead, its sole liability—if it has any—is as the successor in interest to, or as a de facto merger party with, Countrywide Home Loans, Inc.

26. The PSAs require that a defective loan be cured or repurchased. Missing or defective loan documents, liens, endorsements and title policies can often be cured *without* triggering a repurchase obligation. This is authorized by the PSAs, *see* PSA § 2.03(c), and by

16

law.[16] Thus, an allegedly "toxic" defective mortgage may remain in the pools if the Mortgage Seller can cure the identified defect. Where a defect cannot be cured, the Seller is required to repurchase "that Mortgage Loan" if the defect "materially and adversely affects the interests of the Certificateholders in that Mortgage Loan." *Id.* The reference to "that Mortgage Loan" creates significant litigation uncertainties the Trustee was entitled to consider in deciding whether to settle the claims. Does this language require loan by loan litigation of thousands of individual loan files?[17] If not, how is a defect as to "that Mortgage Loan" to be proved?[18] The Trustee was also entitled to consider this likelihood of delay, if loan by loan litigation was

---

[16] *See, e.g.*, UCC §§ 3-203 (right of transferee for value to compel unqualified endorsement), 3-205 (permitting completion of blank endorsements), and 3-309 (permitting proof of existence of a missing note through a *valid* lost note affidavit). *See also* N.Y. UCC §§ 3-201, 3-204, and 3-804. All fifty states have enacted some version of the UCC. *See Veal v. Am. Home Mortg. Servicing, Inc.* (*In re Veal*), 449 B.R. 542, 554 (B.A.P. 9th Cir. 2011). That a lawful cure is permitted does not mean that robo-signing a false document or affidavit is sufficient to constitute a cure. To the contrary, signing false documents or affidavits would be an independent breach of the prudent servicing obligation that exposes the Trusts to liability and additional risks of loss. *See also* Ex. 2, Bank of America Presentation Regarding Settlement with GSEs, entitled "Addressing Legacy Mortgage Issues," at p. 4, n.4, Jan. 3, 2011 (noting that GSE claims included "approximately $832 million of missing document claims in the process of being cured").

[17] Assuming there are 260 court days per year (52 weeks x 5 days a week) and eight hours of court time in each day, there are only 2,080 hours per year of court time available. There are at least 770,000 loans held as collateral by these Trusts. The Institutional Investors concluded that *at least* 30% of the loans were eligible for repurchase; the Trustee's expert used a much lower, 14.4% defect rate. Even if one used the Trustee's calculation, it would mean that 110,880 loans would be the likely subject of repurchase litigation. At a mere thirty minutes per loan, it would take a court—working full time on nothing but repurchase claims—26.6 years to process and decide all of these potential repurchase claims, without considering time for appeal. Even if the cases were spread among a number of courts, and shorter processing and longer trial days were assumed (neither of which is likely realistic), the litigation of these repurchase claims could easily drag on for more than a decade, if not longer.

[18] While one court granted a motion in limine permitting a bond insurer to present sampling evidence on a fraud claim (but left open the question of whether such evidence would be sufficient proof of any element of the claim), we have found no case permitting a trustee to use sampling to demonstrate the breach of a representation or warranty in support of a repurchase claim for an individual mortgage loan or loans.

required, as well as the prospect that years of delay would significantly diminish the value of any ultimate litigation recovery.

27.      A separate area of uncertainty surrounds the issue of "material adversity" and when and how it must be demonstrated.  The Institutional Investors believe firmly that adversity need be demonstrated only at the time the loan is sold to the securitized trust.  Bank of America, however, has made two arguments the Trustee could reasonably consider in assessing the likelihood that litigation would achieve a better result.[19]  The first argument concerns adversity: when, if ever, is a loan that is *performing* eligible for repurchase?  The Institutional Investors have argued strenuously that performance is *not* a defense to repurchase claims.  To cite one extreme example:  if a Trust was represented to include loans that were only to prime borrowers, but some loans were made to subprime borrowers, the fact that the subprime borrowers were paying on their loans would not be sufficient to avoid a repurchase claim.  This is the logical interpretation of the contract.  It also vindicates the expectations of the investors and the contract parties at the time of the securitization.[20]  There is, however, no reported case even considering whether a performing loan may properly be the subject of a repurchase demand; much less one that concludes a repurchase claim is valid.  The second, more familiar argument, concerns "causation"; namely, the assertion that the Mortgage Sellers are not required to repurchase a Mortgage Loan unless the breach of the representation or warranty *caused* the loss that has been suffered on the loan.  In this view, losses caused by macro-economic factors such as intervening

---

[19] Regardless of whether the Trustee agreed with the merit of these arguments, the fact that Bank of America has made them previously in other cases was a clear indication that Bank of America might make them in any litigation of the Trustee's repurchase claims.  The Trustee therefore could reasonably consider the likelihood that it might succeed, or fail, in the argument that only initial adversity—at the time of the securitization—was required to prove a repurchase claim.

[20] Put bluntly, if this was not the intent, it is hard to understand why the structure would include a repurchase obligation for the breach of a representation or warranty.

Case 2:11-cv-07166-MRP-MAN Document 177-24 Filed 01/14/12 Page 27 of 152 Page ID
#:10249
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 26 of 71

declines in the housing market or the economy, or micro-economic factors such as a borrower's
job loss, may be offered as evidence to negate a repurchase claim. The Institutional Investors
reject this theory: the repurchase obligation exists because the Trusts are not supposed to be
exposed to *any* risks associated with ineligible mortgages, and the mortgages simply aren't
supposed to be in the Trusts. Having placed ineligible mortgages in the Trusts, the Sellers—not
the Trusts—should bear all subsequent micro- or macro-economic risks associated with them.
While the Institutional Investors believe logic and the contracts are firmly on their side in this
matter, this too is an issue subject to dispute and uncertainty.[21]

### 2. Arguments that the Claims "May Exceed $150 Billion" Ignore the Likelihood that they May Be Worth Far Less.

28. The Trustee faced substantial uncertainty concerning the size of potential
repurchase claims. It therefore retained experts to advise it, both with regard to legal issues
affecting the likelihood of success on the repurchase claims, and their potential size. The Court
has questioned whether the Trustee was entitled to estimate the size of the potential claim in
deciding to settle or to retain an expert to assist it in doing so. *See* Tr. of Sept. 1 Hearing, at
27:3-5. The Trustee's reliance on experts for this purpose is not only expressly permitted by the
terms of the PSAs, *see* PSA § 8.02(ii), in most circumstances it is conclusive. *Id.* The Trustee's
expert concluded the reasonable value of the repurchase claims was between $8.8 billion and $11
billion.[22] *See* Report of Brian Lin at 7 ("[T]he settlement range of approximately $8.8 to $11

---

[21] The Trustee retained an independent expert to advise it about these risks. *See* Report of
Professor Barry E. Adler. While the Institutional Investors have a different view of this risk, this
is an area in which the case law has not yet developed, so the value of a certain recovery that
eliminates these risks is higher.

[22] The Institutional Investors were not privy to the Trustee's expert reports before they were
made public. While we disagree with some of the conclusions drawn by the Trustee's experts,
the PSAs expressly permit the Trustee to rely on the opinions of experts in deciding whether to
settle or prosecute these claims. *See* PSA § 8.02(ii) ("Except as otherwise provided in §8.01, . . .

billion is reasonable *without applying* any legal haircuts.") (emphasis added).[23] Based on the data he reviewed, the Trustee's expert concluded a breach rate of 36%, and a success rate of 40%, for an overall defect rate of 14%, was a reasonable basis on which to estimate the size of the potential repurchase exposure in the Trusts. *Id.* at 8. Those claims, of course, would then have to be proved successfully to yield a recovery.

---

the Trustee may consult with counsel, financial advisers or accountants of its selection and the advice of any such counsel, financial advisers or accountants and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith . . . ."). The Trustee's ability to rely on experts for this purpose is not unique. In the context of derivative claims, for example, courts have held that special litigation committees are entitled to rely on advisors in deciding whether to dismiss such claims. *See, e.g., Lichtenberg v. Zinn*, 260 A.d.2d 741, 744 (N.Y. 3d Dep't 1999) (affirming SLC's dismissal of derivative suit; concluding that SLC's investigation was appropriate because "SLC retained experienced independent counsel and three unaffiliated experts to assist it in evaluating the specific allegations set forth in the complaint, and, further, in reviewing the multitude of documents requested by the SLC"); *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.*, 1997 WL 305829, at *18 (Del. Ch. 1997) (affirming SLC's decision to approve proposed settlement of derivative action brought against Delaware corporation, noting that SLC had exercised "a right to justifiably rely on an expert report"). Similarly, courts have held that bankruptcy trustees are entitled to rely on the advice of advisors in deciding whether to settle claims. *See, e.g., JAS Partners, Ltd. v. Boyer*, No. 1:10-CV-303-TLS, 2011 U.S. Dist. LEXIS 42414, at *17-*18 (N.D. Ind. Apr. 19, 2011) (rejecting argument that bankruptcy trustee failed to properly investigate claim where trustee consulted experts in assessing value of claims); *In re Adler*, No. 09-34791-BKC-RBR, Chapter 11, 2010 Bankr. LEXIS 3001, at *10-*11 (Bktcy. S.D. Fla. Sept. 16, 2010) (in finding that trustee acted in good faith in entering into settlement agreement, citing trustee's familiarity with claims and his extensive work with estate's counsel and forensic experts in evaluating such claims); *Santos v. Elder (In re Macadam Computer, Inc.)*, No. C 06-4889 SI, 2007 U.S. Dist. LEXIS 49848, at *13-*16 (N.D. Cal. June 28, 2007) (affirming bankruptcy court's approval of settlement where trustee had hired expert to opine on reasonableness of offer, and after thorough investigation, expert opined that settlement was reasonable); *Desmond v. ASR Acquisition Corp. (In re Desmond)*, Bk. No. 03-13878-MWV, Ch. 7, Adv. No. 04-1107-MWV, Adv. No. 04-1112-MWV, 2006 BNH 20, 2006 Bankr. LEXIS 1021 (Bktcy. D.N.H. 2006) (finding that bankruptcy trustee competently and fairly assessed costs, merits, and possible outcomes in deciding to accept settlement offer, where trustee based estimates on opinions of accounting and lending experts he had hired).

[23] Each of the expert reports has been posted to www.cwrmbssettlement.com.

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/14/12   Page 29 of 152   Page ID
#:10251
Case 1:11-cv-05988-WHP   Document 124   Filed 10/31/11   Page 28 of 71

29.     The Institutional Investors, in their separate assessment of the reasonableness of the settlement, estimated that the size of the potential repurchase claims was no more than $32.3 billion, *before* discounts for litigation risks and delay.  This estimate was derived based upon the supported assumption[24] that 60% of the loans had breaches of reps and warranties, and that 50% would be successfully repurchased by a solvent obligor.[25]  The $8.5 billion settlement thus represents a recovery of roughly 26.3 cents on the dollar for these claims, without the need to overcome legal hurdles such as the burden of proof, loss causation (if applicable), successor liability and losses associated with delay.[26]

30.     In contrast to the Trustee's careful analysis, the claim by Walnut Place that the Trustee's claims "may exceed $150 billion," *see* Removal Notice at ¶ 13, is unsupported by a citation to any data, expert report or even logic.  To be true, this would mean virtually every loan in the Trusts was eligible for repurchase.  That extreme claim is not even supported by Walnut's own lawsuit.  It also is not supported by the claim of any other objector.  Below is a summary of the objectors' allegations concerning rates at which loans in the Trusts allegedly breach reps and warranties:

a.      **Walnut Place**

---

[24] These assumptions were based on data from 150,000 actual loan repurchases on Countrywide originated loans, experience with whole loan repurchases, inquiries to loan review providers and a review of public data concerning loan repurchases.

[25] Successor liability, and whether these repurchase claims could be recovered, are discussed in the next section.

[26] In contrast, the class action structure advocated by certain objectors typically yields no more than two to seven cents on the dollar.  *See* Ellen M. Ryan and Laura E. Simmons, *Securities Class Action Settlements: 2010 Review and Analysis*, Cornerstone Research, at Figure 5; Jordan Milev, Robert Patton, and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2011 Mid-Year Review*, NERA Economic Consulting, at Figure 34 (July 26, 2011).

31.      Walnut's initial complaint alleged that CWALT Trust 2006-OA10 held a total of

6,531 loans.  Walnut Compl. at ¶ 2.  Walnut claimed to have "investigated" 2,166 loans and

determined that 1,432 had unspecified but false "representations and warranties."  *Id.*  This is a

breach rate of 66%, not 100%.  There is, of course, no guaranty that every repurchase claims on

these allegedly ineligible loans would succeed.

### b.      AIG

32.      Objector AIG filed a securities claim asserting that it had investigated 260,000

loans, and determined that 40% of them breached a representation or warranty.  *See* Complaint ¶

126, *American International Group Inc. v. Bank of America Corp.*, Index No. 652199/2011

(N.Y. Sup. Ct. Aug. 8, 2011).

### c.      FHFA

33.      FHFA's Office of Inspector General reported a breach rate of only 15% in a post-

mortem forensic review of loans purchased by Freddie Mac.  *See* Evaluation of the Federal

Housing Finance Agency's Oversight of Freddie Mac's Repurchase Settlement with Bank of

America, FHFA Office of Inspector General, at 31 (Sept. 27, 2011).[27]  This finding is especially

noteworthy because the reps and warranties contained in the loans purchased by Freddie Mac are

stronger than those contained in the Trusts' contracts.

34.      In a separate securities action it filed against Countrywide, FHFA alleged it had

conducted a "loan-level" analysis of 86 Countrywide securitizations, involving tens of thousands

of loans, to assess compliance with reps and warranties concerning owner occupancy rates and

---

[27] MBIA has a lawsuit alleging breach rates of 90% in an adversely selected population of
second lien deals. Only five Trusts in the Settlement involve second lien structures. Because they
are different in kind, and because MBIA's review was on an adversely selected loan population,
its findings regarding alleged breach rates do not undermine the reasonableness of the estimated
exposure calculated by the Trustee's expert.

Loan-to-Value ratios. *See* Complaint, Tables 7 and 8, *FHFA v. Countrywide Financial Corp.*, No.11-cv-06195 (Sup. Ct. NY. Sept. 2, 2011). On average, FHFA alleged that it found 11% of the mortgage loans in the pools breached owner occupancy reps and warranties, 25.6% breached reps and warranties regarding the percentage of loans in the pools with LTV's greater than 80%, and 13.2% breached reps and warranties regarding the percentage of loans in the pools with LTV's greater than 100%, many of which findings were likely on the same loans.[28] *Id.* FHFA's findings may well explain why, as the Conservator of Freddie Mac and Fannie Mae, it issued a press release stating that "[FHFA's objection] was filed to obtain any additional pertinent information developed in the matter. [FHFA] is aware of no basis upon which it would raise a substantive objection to the proposed settlement at this time."[29]

35. The Trustee recognized that the pursuit of repurchase claims could require years. It could yield nothing, something, or a lot. But "a lot" is what the Trustee recovered through the settlement. By any measure, $8.5 billion is an enormous amount of money. It dwarfs Bank of America's earlier estimate that the *entirety* of its remaining repurchase exposure—across all platforms—faced an upper range of potential loss of between $7 billion and $10 billion.[30] The settlement compares favorably with the amount received by the GSEs in their separate settlement

---

[28] These findings are far lower than the breach rates the Institutional Investors assumed in their own settlement analysis.

[29] *See* Federal Housing Finance Agency Press Release, Aug. 30, 2011, *available at* http://www.fhfa.gov/webfiles/ 22570/BofA83011.pdf.

[30] *See* Andrew Frye, *BofA Says $10 Billion is Top of Buybacks Forecast*, BLOOMBERG NEWS, Jan. 21, 2011, attached as Ex. 3. This "remaining exposure" at the time was estimated to include remaining claims for repurchases by the government sponsored enterprises Fannie Mae and Freddie Mac for their guaranty portfolio, private label repurchase claims such as those held by the Trusts, repurchase claims filed by monoline insurers like MBIA and Ambac, and repurchase claims filed by whole loan buyers.

Case 2:11-cv-07166-MRP-MAN Document 177-24 Filed 01/14/12 Page 32 of 152 Page ID
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 31 of 71
#:10254

of repurchase claims with Bank of America, even though the GSE contracts contain stronger contractual reps and warranties than those contained in the Trusts' contracts.

36.     The Trustee's filing of the instruction proceeding will permit all interested investors to test the reasonableness of the Trustee's decision to settle these claims.  A difference of opinion does not render the Trustee's decision to settle unreasonable.  Here, where there was substantial uncertainty concerning the likelihood that claims would be pursued for many Trusts, and where even those claims that might be pursued faced an uncertain legal landscape, the Trustee was entitled to conclude that it preferred an $8.5 billion "bird in the hand."

37.     The Trustee was also entitled to consider whether there was any "bird in the bush" if a settlement was rejected.  This was a particular concern given Countrywide's insolvency and the uncertainties concerning whether Bank of America could be held liable as its successor.  It is to that issue that we now turn.

### 3.     Successor Liability Risks

38.     The successor liability risk here is obvious.  Bank of America did not sign any of the PSAs.  It never promised to repurchase a single loan.  In 2008, Countrywide Financial Corporation (CFC) was merged into a subsidiary of Bank of America in a statutory Delaware merger.  CFC did not merge into Bank of America itself.  Though Bank of America assumed certain of CFC's corporate debt, it did not overtly assume the repurchase obligations owed by the Mortgage Seller, Countrywide Home Loans, Inc.

39.     The case for successor liability or de facto merger is far from clear.  A federal court in the Ninth Circuit has dismissed several Countrywide-based claims against Bank of America on separateness grounds, based on facts identical to those alleged by objectors such as

AIG.[31]   That court undertook detailed analyses of the law that should govern the issue of successor liability and de facto merger.   The *Maine State Retirement* opinion is particularly comprehensive and makes plain the stark risks the Trustee would face in litigating a successor liability/de facto merger claim.

40.    An outlier among the cases that have considered whether Bank of America may be liable as a successor to the Countrywide-affiliated Mortgage Sellers is a case brought by the bond insurer MBIA.   In that case, Justice Bransten denied *dismissal* of a claim of de facto merger after she concluded that MBIA had alleged sufficient facts to state such a claim under New York law.   The decision does not hold, of course, that Bank of America is liable for Countrywide's liabilities.   The court did not provide any basis to conclude that New York law applied to this issue (and other courts considering the matter have concluded it is governed by Delaware, rather than New York, law).

41.    The Trustee also sought and obtained advice from a leading corporate and securities professor, and a valuation expert, to assess the risks associated with pursuing a successor liability claim for the Trusts.   It was prudent for the Trustee to do so:   the issue of successor liability, and the potential to win or lose it, is a huge risk to any prospect of a litigated recovery on the Trustee's claims.   The Countrywide-affiliated Mortgage Sellers are deeply insolvent.   The financial press is rife with speculation concerning when Bank of America will place them in bankruptcy.

42.    The functional insolvency of the Countrywide entities was confirmed by the valuation report from the Trustee's expert, *see* Report of Capstone Valuation Services.   The

---

[31] *See Maine State Ret. Sys.* v. *Countrywide Fin. Corp.*, No. 2:10-CV-0302 MRP (MANx), 2011 WL 1765509, at *8-*9 (C.D. Cal. Apr. 20, 2011); *Allstate Ins. Co., et al.* v. *Countrywide Financial Corp.*, et al., No: 2:11-CV05236-MRP (MANx), slip op. at 43-44 (C.D. Cal. Oct. 21, 2011).

Case 2:11-cv-07166-MRP-MAN  Document 177-4 Filed 01/11/12  Page 34 of 152  Page ID
#:10256
Case 1:11-cv-05988-WHP  Document 124  Filed 10/31/11  Page 33 of 71

report contains a key finding that neither the court, nor any rational investor, should ignore in
evaluating whether to approve the settlement:  if the Trusts had to look solely to Countrywide
Financial Corporation to satisfy their repurchase claims,[32] their *maximum* potential recovery
would not exceed $4.8 billion. *See* Capstone Report at 3.  The Trusts have recovered almost
twice that amount—$8.5 billion—by way of this settlement.  It was inherently reasonable for the
Trustee to settle for twice the likely recovery from Countrywide, given the prospect that
successor liability issues might be lost.  Settlement is also entirely reasonable given the very real
prospect that Bank of America might yet bankrupt Countrywide, leaving the Trusts fighting for
what they could get in a Countrywide Bankruptcy.

43.     The Trustee was entitled to evaluate these risks and benefits in deciding whether
to settle.  The opinion of the Trustee's expert, Professor Robert Daines, makes clear that these
risks are serious and might be insurmountable.  *See* Daines Report at 38 (concluding as to a de
facto merger theory:  "I think the economic arguments and bulk of the case law favor BAC, but it
is possible — though not likely — that the Trustee could succeed on this . . . New York could
follow the lead of the recent decision in *MBIA v. Countrywide* and find that de facto merger
allegations are plausible enough to survive a motion to dismiss. . . .  The potential for a favorable
ruling however is muted by the fact that New York law may not even apply," and noting
elsewhere that "I do not believe New York law will apply.").  It was not unreasonable for the
Trustee to conclude that certainty, and the substitution of Bank of America as a solvent obligor,
were a better outcome for the Trusts than years of uncertain litigation at the end of which there
might be only a bankrupt Countrywide to satisfy the Trustee's claims.  Given the risks, the

---

[32] This analysis assumes success on an additional uncertainty; namely, whether the corporate veil
could be pierced between Countrywide Financial Corporation and its subsidiary, the Mortgage
Seller Countrywide Home Loans Inc.

Trustee's decision to settle might well have been the only truly *prudent* conclusion to be drawn.[33]

### D. Servicing Improvements and Litigation Risks

44.     A key component of the settlement is the near complete transformation of loan servicing that will occur upon the approval of the settlement. This is a matter of keen importance to all investors in the trusts, no matter the tranche in which they hold, because poor loan servicing magnifies investor losses and increases poor outcomes for borrowers. As the chart below demonstrates, at the time of the settlement, Bank of America was by far the worst of the major bank loan servicers. Its consistently poor performance was endemic: regardless of loan type, regardless of activity, Bank of America was at the bottom of nearly every category:

### Key Pool Statistics by Servicers – May 2011[34]

| Alt-A | Total Loans/# of Loans 90+ Delinquent | Percentage of Loans 90+ Delinquent | Roll Rate 30 to 60 Days DQ | Roll Rate 60 to 90 Days DQ | Number of Modifications Granted as % of UPB | 6 Mo Mod Redefault Rate | Weighted Avg. Mos to Liquidation (last 12) | WA Mos to Liq from Foreclosure |
|---|---|---|---|---|---|---|---|---|
| BofA | 503,000/56,900 | 11.3% | 43.2% | 52.1% | 11.2% | 12.3% | 21 | 23 |
| JPM Chase | 72,000/4,790 | 6.6% | 42.3% | 49.1% | 7.1% | 9.9% | 20 | 19 |
| CitiMortgage | 49,000/1,709 | 3.4% | 38.0% | 34.6% | 16.1% | 5.1% | 18 | 19 |
| Wells Fargo | 195,593/9,906 | 5.1% | 40.7% | 34.6% | 15.4% | 12.6% | 21 | 19 |
|  |  |  |  |  |  |  |  |  |
| Option ARM | Total Loans/# of Loans 90+ Delinquent | Percentage of Loans 90+ Delinquent | Roll Rate 30 to 60 | Roll Rate 60 to 90 | Number of Modifications Granted as % of UPB | 6 Month Redefault Rate | Weighted Avg. Mos to Liquidation |  |
| BofA | 153,604/36,876 | 24% | 44.3% | 57.0% | 15.6% | 17.2% | 24 | 29 |
| JPM Chase | 51,199/4,949 | 9.6% | 40.8% | 49.0% | 6.3% | 11.5% | 19 | 21 |
|  |  |  |  |  |  |  |  |  |
| Prime | Total Loans/# of Loans 90+ Delinquent | Percentage of Loans 90+ Delinquent | Roll Rate 30 to 60 | Roll Rate 60 to 90 | Number of Modifications Granted as % of UPB | 6 Month Redefault Rate | Weighted Avg. Mos to Liquidation |  |
| BofA | 131,568/10,163 | 7.7% | 43.5% | 54.3% | 5.3% | 9.3% | 19 | 21 |
| JPMorgan Chase | 105,688/5,582 | 5.2% | 49.2% | 53.5% | 3.8% | 8.2% | 17 | 13 |

---

[33] This is particularly true where the majority of Trusts lacked investors ready, willing, and able to fund the Trusts' litigation of these claims and bear the Trusts' substantial litigation risks.

[34] Source: RMBS My Final Look as of May 2011 Remittance, using data from CoreLogic Loan Performance, CoreLogic Home Price Index and RMBS 2000-2010 Vintages.

| Wells Fargo | 184,341/3,947 | 2.1% | 36.1% | 44.3% | 3.5% | 6.8% | 15 | 14 |
|---|---|---|---|---|---|---|---|---|
| **Subprime** | **Total Loans/# of Loans 90+ Delinquent** | **Percentage of Loans 90+ Delinquent** | **Roll Rate 30 to 60** | **Roll Rate 60 to 90** | **Number of Modifications Granted as % of UPB** | **6 Month Redefault Rate** | **Weighted Avg. Mos to Liquidation** | |
| BofA | 426,616/117,472 | 27.5% | 35.9% | 42.5% | 38.8% | 18.9% | 27 | 30 |
| JPMorgan Chase | 193,714/25,194 | 13% | 29.4% | 40.1% | 41.7% | 14.7% | 23 | 25 |
| Wells Fargo | 155,681/14,391 | 9.2% | 34.4% | 33.0% | 43.3% | 16.5% | 24 | 19 |

45.     Bank of America's poor servicing had real and lasting consequences for investors and borrowers. Its markedly longer time to resolution meant that it advanced more funds, for longer, to pay principal and interest on loans that were hopelessly in default. While on the surface these advances benefitted the trusts, in reality, they magnified collateral losses: every advance creates a super-senior lien that must be satisfied on liquidation, at the expense of holders in loss bearing tranches. Bank of America granted fewer modifications to troubled borrowers, and those it granted failed at a much higher rate, thus exacerbating losses that might have been avoided through competent implementation of an appropriate modification. Bank of America also had much higher rates of delinquencies, and did less to re-convert them to performing loans, than did any other major bank servicer.

46.     "Prudent servicing" plainly required a far better level of service than Bank of America was providing, but litigation offered little prospect of improving the situation. Litigation of servicing claims would likely be on a loan by loan basis; i.e., how much of the loss on Loan A could have been avoided through prudent servicing. This was an intractable problem, particularly for long term holders who depend on prudent servicing to minimize losses and maximize performance of their investments. Imprudent servicing was also exceedingly difficult to remedy under the PSAs. Certificateholders cannot compel the Trustee to replace a servicer without: a) amassing 66% of the Voting Rights, b) identifying a replacement subservicer acceptable to the rating agencies, and c) indemnifying the Trustee for any losses reasonably

occasioned by the instruction to replace the servicer.  *See* PSA §§ 7.01, 7.02, and 8.02(ix).  There are at least 770,000 loans in the Trusts' pools.  Even assuming a replacement servicer for such a massive volume of loans could be found, the requirement that Certificateholders must indemnify the Trustee against all losses occasioned by instructed termination and transfer of the Master Servicer was an insurmountable barrier.  No investor, much less the fiduciaries who were trying to achieve a better outcome for their investors, could indemnify the Trusts for the risk of loss associated with transferring servicing of $160 billion in loans.

47.     The settlement avoids these problems, because it is a consensual agreement.  Though the Trustee had no ability to force Bank of America to transfer loans to subservicing under the contracts,[35] by virtue of the settlement, Bank of America has agreed to do so at its own expense.  Bank of America has estimated that the costs of implementing these servicing improvements will be roughly $400 million over and above the settlement payment itself.  More important than these cost savings are the potential results.  The sub-servicers are specialists.  They are incentivized to provide outcomes that are beneficial to both borrowers and investors.  Simply in terms of the $400 million cost to provide it, this benefit is enormous; if it succeeds in returning borrowers to performance through modifications, and otherwise reduces delinquencies, defaults, and loss severities, its value will likely be many times that amount.

48.     This is not the only servicing improvement the Trustee has obtained in the settlement.  Bank of America has also agreed to benchmark its servicing performance to national servicing standards.  *See* Settlement Agreement at ¶ 5(c), attached as Ex. 25.  If the settlement is approved, Bank of America will be required to compensate the Trusts, automatically and on a monthly basis, for servicing efforts that fall below the stated benchmarks.  Nothing in the

---

[35] PSA § 3.02 (permitting, but not requiring, master servicer to transfer loans to subservicer).

contract requires Bank of America to do this. The Trusts could not have obtained this affirmative, automatic compensation mechanism through contested litigation. They will never be able to recover it if the settlement is not approved.[36] An annual, independent compliance review will monitor Bank of America's compliance with this requirement. *See* Settlement Agreement at ¶ 5(f) ("Reporting and Attestation of Compliance with Servicing Improvements"). These important servicing improvements will improve the performance of the Trusts' loans over time. They have substantial value to investors—value that will be destroyed, irretrievably, if the settlement is not approved.

49. The settlement also benefits borrowers. Ultimately, repayment of the securities issued by the Trusts depends upon the ability and willingness of borrowers to make their mortgage payments as and when they are due. The collapse in the American economy coupled with the decline in the housing and job markets has left many borrowers in deep financial distress. Many borrowers could and would benefit from loan modifications. It is widely recognized that principal reductions are one largely unused tool that could help troubled borrowers pay their loans. A positively performing loan, even at a reduced rate, is vastly preferable to having one more property in foreclosure. It is also preferable to ownership of a vacant property, in a depressed real estate market, that deteriorates because no one is there to maintain it. Bank of America (like many other servicers) faced uncertainty in implementing

---

[36] *See, e.g.*, Ex. 4, Amherst Mortgage Insight, "Amherst Analysis: The Bank of America Settlement," June 30, 2011 ("Most interesting, the settlement includes some sizeable steps to improve the servicing on the covered Trusts. Bank of America has agreed to move the servicing of high-risk loans to qualified sub-servicing firms, at Bank of America's expense . . . . We applaud this idea, but implementation of the transfer[s] will take time."); *see also* Ex. 5, *BofA to Move High-Risk Countrywide Mortgages to Subservicers*, HOUSING WIRE, July 28, 2011 ("'We believe that Bank of America's actions to move the servicing of high-risk loans to qualified sub-servicing firms, at Bank of America's expense, are particularly significant,' said Laurie Goodman, an analyst at Amherst Securities.").

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/14/12   Page 39 of 152   Page ID
#:10261
Case 1:11-cv-05988-WHP   Document 224   Filed 10/31/11   Page 38 of 71

significant principal reduction modifications or other innovations such as short sales or "cash for keys" programs because the generic "prudent servicing" mandate in the PSAs did not explicitly authorize them to do so.[37]

50.     The settlement cures this problem:  By confirming that principal reductions *are* permissible in the Trusts, the settlement offers hope to tens of thousands of borrowers who might otherwise have been unable to refinance and reduce their payments because their loans were under water.[38]  By requiring that the servicing of loans for troubled borrowers be transferred to specialty servicers who are incentivized to provide prompt modifications that work over the long term, the settlement increases the likelihood that deserving borrowers' loans will return to performing status promptly.  This outcome is plainly in the interest of borrowers and investors alike.  The court should consider whether any feasible alternative exists before it relegates the Trusts to "loan by loan" litigation of prudent servicing claims.

----

[37] The last time Bank of America agreed to implement large scale loan modifications in the Trusts was in connection with the Attorney Generals' multi-state settlement of predatory lending claims against Countrywide.  *See* March 24, 2010 Press Release of Hon. Martha Coakley, Attorney General of the Commonwealth of Massachusetts (mandating not only loan modifications but "significant principal forgiveness"), *available at* http://www.mass.gov/ago/news-and-updates/press-releases/2010/ag-coakley-secures-3-billion-in-loan.html, and Final Judgment by Consent, C.A.No. 10-1169, *Commonwealth of Massachusetts v. Countrywide Financial Corp., et al.*, in the Superior Court of the Commonwealth of Massachusetts.  This agreement precipitated a lawsuit by disgruntled investors who claimed that the Pooling and Servicing Agreements did *not* authorize principal reduction modifications of loans held in the Trusts.  *See Greenwich*, No. 650474/2008, attached as Ex. 1.

[38] The Institutional Investors are not privy to the ongoing discussions among various Banks, the federal government, and the state Attorneys General.  According to a recent Wall Street Journal article, the multi-state discussions with the Attorneys General appear to have been focused on loans in the "held for investment" portfolio of the target banks, rather than on those held in securitized trusts.  *See* Ruth Simon, Nick Timiraos, and Dan Fitzpatrick, *New Mortgage Plan Floated*, WALL ST. J., Oct. 18, 2011, *available at* http://online.wsj.com/article/SB1000142405 2970204346104576637513972299854.html.  While this may change or expand, the certainty that principal reductions *will be* available to borrowers whose loans are held in *these* Trusts removes any doubt and is an important benefit to borrowers.

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/11/12   Page 40 of 152   Page ID
Case 1:11-cv-05988-WHP   Document 124   Filed 10/31/11   Page 39 of 71   Page ID
#:10262

### E.    The Document Indemnity

51.    The settlement contains another automatic compensation mechanism that will spare the Trusts years of potentially costly and uncertain litigation:  the document indemnity. *See* Settlement Agreement at ¶ 6.  Recent Consent Judgments issued by the Office of the Controller of the Currency implemented important documentation requirements to protect borrowers against wrongful foreclosure.  Those requirements, however, did not address what happened to the Trusts when they were unable to liquidate a loan because the required mortgage and title policies were missing or incomplete.

52.    The settlement solves this problem, too.  The documentation cure provision in the settlement targets loans where the Trusts' ability to foreclose may be compromised by deficiencies in the recording of the mortgage and where the Trusts' ability to recover insurance proceeds may be compromised by deficiencies in the Trusts' title policies.  If the settlement is approved, Bank of America must either cure these deficiencies or, if it does not, and the Trusts cannot liquidate the loan as a first-lien holder as a result of these deficiencies, indemnify the Trusts for 100% of the loss suffered.  This automatic remedy is highly beneficial to the Trusts. By imposing an immediate incentive to cure document deficiencies, the settlement will avert many document issues that might arise later.  The indemnity for unrecorded mortgages and missing title policies affords the Trusts a certain, 100% recovery and avoids loan-by-loan litigation documentation issues.  No provision of the contract could be invoked to achieve this affirmative, comprehensive cure and indemnity obligation through litigation.  While individual loans certainly would be subject to repurchase claims if mortgages were unrecorded or title insurance did not exist, the expense and delay of loan by loan litigation is not a better option than an automatic compensation remedy for these defects.

### F.    What are the Alternatives to Settlement?

Case 2:11-cv-07166-MRP-MAN Document 177-2 Filed 01/11/12 Page 41 of 152 Page ID
Case 1:11-cv-05988-WHP Document 224 Filed 10/31/11 Page 40 of 71 Page ID
#:10263

53.     A key question in any settlement decision is:  what is the alternative?  That question must be probed carefully, because the  PSAs afford Certificateholders few rights and even fewer remedies.

54.     All parties agree on one fundamental fact:  the claims being settled (or that would have been pursued in litigation in the absence of a settlement) belong to the Trustee.  They do not belong to the Certificateholders individually.  Section 10.08 of the PSAs expressly denies the Certificateholders any right to "control the operation and management of the Trust Fund, or the obligations of the parties" — and grants to the Trustee the exclusive right to control the trust and litigation on behalf of the trust.  The provision goes on to provide, again in clear terms, that Certificateholders do not have the right to sue, but must instead rely on the Trustee: "No Certificateholder shall have any right by virtue or by availing itself of any provisions of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement . . . ." PSA § 10.08.

55.     There is, therefore, no mechanism under the PSAs by which Certificateholders have any possibility of litigating the Trustee's claims themselves, particularly over the Trustee's objection.  The PSAs, again, are explicit in providing that the claims belong to the Trustee, not Certificateholders.  In this, the Trust structure is not unique.  Disgruntled shareholders may not pursue a corporation's claims themselves; instead, they must meet strict requirements, and proceed derivatively on behalf of the corporation.  It would be extraordinary, therefore, to conclude that a party like the Trustee could not control the decision to prosecute—or settle—its own claims simply because a holder of one of its securities objected.  This is not the law as it pertains to the highly technical terms of a Pooling and Servicing Agreement.

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/11/12   Page 42 of 152   Page ID
#:10264
Case 1:11-cv-05988-WHP   Document 124   Filed 10/31/11   Page 41 of 71

56.     No action provisions are enforced strictly.[39]   The court must therefore consider
the following questions in evaluating the reasonableness of the Trustee's decision to settle and
the validity of the objectors' demand for an "opt out" right:

- How can an "opt out" right for Certificateholders be reconciled with the plain
  language of § 10.08, which vests exclusive control of litigation decisions in the
  Trustee?

- What plan do the proposed objectors offer to the Trusts if they succeed in
  destroying the settlement?   With few exceptions, none of the objectors has
  expressed a willingness to fund the litigation of these claims.   For many Trusts,
  there is no identified group of objectors that has aggregated the 25% Voting
  Rights required to permit them to do so.   This issue is important to the
  Institutional Investors, who have almost $14 billion in holdings in Trusts included
  in the settlement where they do not have (and no other objector has claimed to
  have) 25% of the Voting Rights.

- What certainty do the proposed objectors offer that the Trusts will recover more if
  the Trustee pursues these claims in litigation?   The answer, necessarily, is none.
  Litigation is inherently uncertain.

- What indemnity do the proposed objectors offer if (on some as yet unrecognized
  theory) they displace the Trustee's right to control the claims and successfully
  exclude a Trust from the settlement?   The answer, again, is none.   No objector has
  offered to provide an indemnity equal to the risks associated with pursuing
  litigation over settlement.   These risks include: loss of the settlement payment,

---

[39] *See* ¶ 13, *supra.*

loss of the funded servicing improvements, loss of the document indemnity *and* the costs of pursuing the contested litigation.

- What about the rights of investors who want to receive the benefits of the settlement? The PSAs require that the Trustee's claims be pursued for the common benefit of all Certificateholders. The views of those Certificateholders who value certainty over speculation are certainly entitled to deference, given the lack of any articulated plan for, or financial resources to pursue, litigation for most Trusts if the settlement is destroyed.

57. An order rejecting the settlement would also have broad implications for RMBS investors in other trusts created by other issuers. Stated plainly, if a group of well organized, reputable investors cannot gain approval of a settlement that is favorable to the Trusts, why would any other group of investors even try? If a trustee that has taken the extraordinary step of seeking court approval of a favorable settlement is sent packing, what assurance is there that any trustee would feel confident in settling claims later, for different trusts?

58. The law in this area is exceedingly difficult and unfavorable to investors. It imposes few burdens on trustees and interposes multiple barriers to investors' ability to compel trustees to act. This is a fact of life that cannot be ignored: absent this Settlement, it is difficult if not impossible to see how the investors in these Trusts could ever obtain benefits as great as those provided in the settlement. The PSAs present significant hurdles and obstacles to litigation by the Trustee, or the Certificateholders. Those difficulties here are magnified by the fact that no recovery approaching that guaranteed by the settlement could ever be achieved without also piercing the corporate veil and requiring Bank of America to answer for the liabilities of Countrywide—a formidable obstacle all by itself. Given this reality, the court should not lightly

Case 2:11-cv-07166-MRP-MAN Document 177-2 Filed 01/11/12 Page 44 of 152 Page ID
#:10266
Case 1:11-cv-05988-WHP Document 224 Filed 10/31/11 Page 43 of 71

conclude that litigation is a preferable alternative, much less that the outcome of a litigation effort would be better for the Trusts or for RMBS investors as a whole.

## III. Response to Objections

59. The objections lodged against the settlement fall into five general categories. *See supra* pp. 2-3. We address each, briefly, below but reserve the right to supplement this response when discovery is concluded. A chart listing the objections appears below:

| Objections to The Settlement | | | | |
|---|---|---|---|---|
| Seek Additional Information | Miscellaneous Objections | Litigation Claimant | Financial Guaranty And Monoline Insurers | Waterfall-Related Objections |
| American Equity Investment Life Insurance Co., et al. (8/31, St. Doc. #169) | Commonwealth Advisors, Inc. (8/30, St. Doc. #184) | American Fidelity Assurance Co. (8/30, St. Doc. #170) | Ambac Assurance Corporation, et al. (8/30, Doc. #29) | Waterfall Eden Master Fund, Ltd. (8/29, St. Doc. #165) |
| Ballantyne Re PLC (8/30, St. Doc. #187) | Cranberry Park LLC, et al. (8/2, St. Doc. #90) | American International Group, Inc., et al. (8/10, St. Doc. #131) | CIFG Assurance North America, Inc. (8/24, St. Doc. #155) | Clayhill Investors LLC (8/30, St. Doc. #180) |
| Blue Mountain Credit Alternatives Master Fund, LP (8/30, St. Doc. #188) | Monarch Debt Recovery Master Fund Ltd, et al. (8/30, St. Doc. #173) | Federal Home Loan Bank (FHLB) of Boston, et al. (7/13, St. Doc. #55) | Syncora Guarantee Inc. (8/30, Doc. #24) | |
| Federal Deposit Insurance Corporation (8/29, Doc. #3) | TMI Investors, LLC (7/13, St. Doc. #51) | Knights of Columbus (8/20, St. Doc. #141) | | |
| Federal Housing Finance Agency (8/30, Doc. #15) | Triaxx Prime CDO 2006-1, et al. (8/24, St. Doc. #156) | Mary Ellen Iesu, et al. (8/30, Doc. #22) | | |
| First Reliance Standard Life Insurance Co. (8/30, St. Doc. #33) | United States Debt Recovery VIII, L.P., et al. (8/30, St. Doc. #178) | Policemen's Annuity & Benefit Fund of Chicago, et al. (7/6, St. Doc. #32) | | |
| Good Hill Partners LP (8/29, St. Doc. #167) | Vertical Capital, LLC (8/25) (Ltr.) | Sterling Federal Bank, F.S.B., et al. (8/29, St. Doc. #166) | | |
| Goldman Sachs & Co. Securities Division (8/30, St. Doc. #190) | V Re-REMIC, LLC (7/14, St. Dkt. #61) | The Western and Southern Life Insurance Co., et al. (7/29, St. Doc. #85) | | |
| Liberty View LLC (8/30, Doc. #28) | | Walnut Place LLC, et al. (7/5, St. Doc. #28) | | |
| Maine State Retirement System, et al. (8/30, St. Doc. #183) | Attorney General of the State of Delaware (8/10, St. Doc. #129) | | | |
| Mortgage Bond Portfolio LLC (8/30, St. Doc. #181) | Attorney General of the State of New York (8/4, St. Doc. #101) | | | |
| National Credit Union Administration Board (8/30, Doc. #26) | | | | |
| Oriental Bank and Trust (8/30, St. Doc. #172) | | | | |
| Pine River Master Fund Ltd., et al. (8/30, Doc. #7) | | | | |
| Platinum Underwriters Re, et al. (8/30, Doc. #31) | | | | |
| Reliance Standard Life Insurance Co. (8/30, Doc. #32) | | | | |
| RMBS Acquisition Co. LLC (8/29, Doc. #4) | | | | |
| Safety National Casualty Corporation (8/30, Doc. #35) | | | | |
| Stone Creek LLC (8/30, St. Doc. #177) | | | | |
| Sun Life Assurance Co. of Canada (U.S.) (8/30, Doc. #36) | | | | |
| 20 | 10 | 9 | 3 | 2 |

Case 2:11-cv-07166-MRP-MAN Document 177-2 Filed 01/14/13 Page 46 of 152 Page ID
Case 1:11-cv-05988-WHP Document 224 Filed 10/31/11 Page 45 of 71 Page ID
#:10268

## A.     Standard of Review

60.     Each of the Certificateholders became "contractually obligated to speak with one voice," *In re Innkeepers USA Trust*, 448 B.R. 131, 145 (Bktcy. S.D.N.Y. 2011), when they purchased securities governed by a Pooling and Servicing Agreement.  The voice through which they speak, in the absence of compliance with the no action provision, is the voice of the Trustee.[40]  *Id.*  No action clauses are "strictly construed," *Cruden*, 957 F.2d at 968, and are "enforced in a variety of contexts in both state and federal courts."  *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1050-51 (2nd Cir. 1995); *see also Teachers Insurance & Annuity Ass'n. v. CRIIMI Mae Svcs. L.P.*, 681 F.Supp.2d 501, 506 (S.D.N.Y. 2010) (no action clauses "are common features of trust indentures" that bar suit by Certificateholders in the absence of compliance with the condition).  Claims by certificateholders that fail to comply with these provisions, or that otherwise seek to interfere with the decision of an RMBS trustee or Special Servicer, are routinely dismissed.  *See* ¶ 13, *supra*.

61.     A key reason no action provisions are enforced is this:  "Granting standing to a certificateholder would not only override the terms of the [agreement] and alter the bargained for-terms and risks investors undertook when they bought certificated interests, . . . it would encourage and embolden other certificateholders to hire their own counsel to challenge the special servicer's authority and to advance their individual and conflicting pecuniary interests."  *Innkeepers*, 448 B.R. at 145.  Many of the objectors have filed individual securities claims or

---

[40] An alleged conflict on the part of the Trustee does not change this analysis.  Instead, as the Second Circuit has recognized, albeit in a different context, the remedy certificateholders have against a conflicted trustee is an independent action for breach of fiduciary duty, *not* disapproval of the settlement.  "[A] bankruptcy court's obligation is to determine whether a settlement is in the best interests of *the estate*, not to ensure that the creditors' representatives are honoring their fiduciary duties."  *In re Refco, Inc.*, 505 F.3d 109, 119 (2d Cir. 2007) (denying "party in interest" bankruptcy standing to interest holders of a creditor who claimed their representative had breached a fiduciary duty in entering into a settlement) (emphasis original).

Case 2:11-cv-07166-MRP-MAN Document 177-24 Filed 01/11/13 Page 47 of 152 Page ID
Case 1:11-cv-05988-WHP Document 224 Filed 10/31/11 Page 46 of 71 Page ID
#:10269

securities class actions against Bank of America. Both the PSAs and applicable law strictly

prohibit these Certificateholders from using this proceeding—which concerns only the Trustee's

claims—to "advance their individual and conflicting pecuniary interests." We do not suggest

these objectors should not be heard;[41] rather, we submit that the Court should be vigilant to

ensure that the individual pecuniary interests of Certificateholders seeking to advance securities

claims do not deny the Trusts and their Certificateholders the common benefit of a highly

favorable, and otherwise unobtainable, settlement.

**B.**     **The Institutional Investors Actions Were Open and Publicized, Not Secret**

62.     Rhetoric is rarely a substitute for reason. In this case, however, rhetoric—in the

form of *ad hominem* attacks—has been employed to distract attention from the many reasons to

support approval of the settlement. These attacks are unworthy of those who have made them;

they are also inconsistent with the grave and important issues facing the Trusts, the Trustee and

the investors in the Trusts' securities. The Institutional Investors respond to them here.

63.     The Institutional Investors were not a secretive or exclusive "clique."[42] They

began with six like-minded investors[43] who sought the right to pursue litigation to redress the

---

[41] A number of courts have, however, denied standing to certificateholders who seek to interfere
with decisions of a trustee or Special Servicer unless the certificateholders have complied with
the no action provisions. *See, e.g.*, *Innkeepers*, 448 B.R at 144-45 citing Summary Order
Denying Motion to Intervene, *Bank of America, N.A. v. PCV ST Owner L.P.*, Case No. 10-1178
(S.D.N.Y.) [Doc. #89].

[42] The Court's use of this term to describe the Institutional Investors is regrettable. It was also
unfounded, even on the limited record then before it. *See, e.g.*, Institutional Investors' Response
Regarding Intervention of AIG at 4-5 (describing press releases); Trustee Response to Walnut
Objection at 3-4 (reciting Walnut's knowledge of settlement discussions and refusal to
participate in them).

[43] The initial six investors were Blackrock, Kore Capital, MetLife, Neuberger Berman, PIMCO
and one other investor who later dropped out. The fact that one investor dropped out
demonstrates yet another risk associated with the pursuit of these claims; namely, that a group

repurchase and servicing issues that were ravaging the performance of the Trusts. The PSAs require that this litigation effort proceed through the Trustee, either with or without its cooperation, so these investors contacted the Trustee, first. On June 17, 2010 these investors sent a letter to the Trustee requesting that it meet with them. On August 2, 2010 this meeting occurred at the offices of the Trustee's counsel in New York. By then, the group had expanded to include two additional investors: Freddie Mac and the New York Fed. Nothing in the PSA required the Trustee to give notice to the world that this meeting occurred. The PSA, moreover, expressly contemplates that holders of 25% of the Voting Rights can take certain actions without the consent of other investors, if they meet the other requirements of the contract.

64. The Trustee's initial response was less than helpful. On August 20 the group sent the Trustee a letter instructing it to open an investigation of ineligible mortgages securing over $26 billion of Countryside-issued RMBS. A few days later, they issued a press release informing the market that this letter had been sent. The press release, a copy of which is attached as Ex. 6, also informed the market that the Institutional Investors "issued their instruction letter *after they met with* senior representatives of the Trustee, and its counsel, on August 2." The public disclosure that a large and organized group of reputable holders was seeking to litigate claims for the Trusts gave other investors hope that litigation of these claims might actually be possible. Other investors thereafter contacted the group and offered to commit their holdings to aggregate Voting Rights, and their balance sheets to fund the indemnity required to pursue the claims. They were welcomed into the group and the group grew.

65. On September 3, BNY Mellon responded to the Institutional Investors' instruction. Citing its indemnity rights and issues related to the calculation of Voting Rights

will initially have 25% of the Voting Rights but will later lose the ability to provide binding instructions to the Trustee, if such instructions were needed.

Case 2:11-cv-07166-MRP-MAN Document 177-224 Filed 01/11/13 Page 49 of 152 Page ID
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 48 of 71
#:10271

under the PSAs, BNY Mellon initially resisted the investors' demand that it take action to enforce the agreements. Among the bases on which the Trustee refused to act was its claim that it had not been notified of any Event of Default that would require it to take action.[44] While unfortunate and unhelpful, BNY Mellon's position was nonetheless grounded in the terms of the PSAs. *See supra* Part II(A).

66.     BNY Mellon's response left the investors with no choice. On October 18, 2010, the Institutional Investors issued a Notice of Non-Performance to BNY Mellon, as Trustee, and to BAC Home Loans Servicing, as Master Servicer.[45] The group issuing the Notice of Non-Performance was markedly larger than the group that sent the initial instruction letter. Its holdings had ballooned to 115 Trusts whose outstanding loans were $47 billion.

67.     The Notice of Non-Performance is noteworthy for an additional reason: it was the first communication sent to BAC Home Loans Servicing (or any other affiliate of Bank of America) concerning the Institutional Investors' intent to pursue the Trusts repurchase and servicing claims through the Trustee. Notice was sent to BAC Home Loan Servicing because notice to the Master Servicer, and the running of a sixty day cure period, were mandatory conditions precedent to the Institutional Investors' ability to file suit and litigate claims. *See* PSA §§ 7.01 and 10.08.

68.     Because the issuance of a Notice of Non-Performance might be material to investors in the Trusts' securities, the Institutional Investors issued a press release disclosing they

---

[44] BNY Mellon's reluctance to act without the indemnity required by the contract is by no means unique among RMBS Trustees. Deutsche Bank, for example, sent a notice to RMBS investors indicating it was willing to take action to enforce pooling and servicing agreements, "subject to conditions stated in the governing documents." *See* Ex. 7, Oct. 25, 2010 Notice. Other Trustees have taken no action at all, despite widespread evidence of ineligible mortgages in their pools.

[45] By this time, one investor had dropped out of the group, but another investor—Western Asset Management Company—had joined.

Case 2:11-cv-07166-MRP-MAN Document 177-24 Filed 01/11/12 Page 50 of 152 Page ID
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 49 of 71
#:10272

had sent the Notice to BNY Mellon and Bank of America. *See* Ex. 8. This release informed the entire securities market that holders of securities in 115 Trusts had started the running of a clock toward the declaration of an Event of Default. *See* Ex. 9. The Notice of Non-Performance was widely covered in the media.[46] It was the subject of questions put to Bank of America CEO Brian Moynihan in Bank of America's public earnings call the following Tuesday morning.[47] The securities markets reacted with alarm: up to that point, Bank of America had indicated it was unable to estimate its repurchase exposure to private label securitizations because no group of investors had organized to pursue these claims.[48] In the wake of the Notice, Bank of America's stock price dropped by 4.4%.[49] It has never recovered.[50]

69. With the disclosure that the Institutional Investors group was growing, and was only weeks away from instituting litigation to pursue the Trustee's claims, the group continued to expand. From an original group of six, the group eventually came to include 22 institutions: nine independent investment advisers,[51] seven insurance companies,[52] two European banks,[53]

---

[46] A compilation of press reports regarding the October 18, 2010 Letter is attached as Ex. 10.

[47] *See* Nathaniel Popper, *BofA pressured to buy back loans; Separately, the bank reports a $7.3-billion loss, citing new debit-card fee rules*, LOS ANGELES TIMES, Oct. 20, 2010, Ex. 10 at 71.

[48] *See, e.g.*, Bank of America 3Q10 SEC Form 10-Q at 40.

[49] *See, e.g.*, Alistair Barr, *NY Fed among investors pressuring Bank of America on mortgages*, MARKETWATCH, Oct. 19, 2010, Ex. 10 at 32.

[50] Though the particular motives of the Institutional Investors are largely irrelevant, these events belie any claim that the Institutional Investors "colluded" with Bank of America regarding the settlement.

[51] The registered investment advisers in the group are a "who's who" of reputable, highly regarded mutual fund, pension fund and separate account advisers: Blackrock, PIMCO, TCW (Trust Company of the West), Western Asset Management (WAMCO), Invesco, Neuberger Berman, Goldman Sachs Asset Management, ING Investment Management LLC, and Prudential Investment Management.

Case 2:11-cv-07166-MRP-MAN Document 177-2 Filed 01/11/12 Page 51 of 152 Page ID
#:10273
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 50 of 71

and four other investors and financial institutions.[54]  From original holdings of 25% of 65 deals
in June 2010 (in which deals the group held $11.5 billion), the group expanded to cover 25% of
265 deals by May 2011 (in which deals the group held over $39 billion).  The table below sets
out the members of the group, and the size of the holdings involved in their effort, on specific
dates relevant to the settlement:



[52] The insurance company and annuity investors are:  MetLife, TIAA-CREF, Nationwide
Insurance, New York Life, AEGON Insurance, ING, and Thrivent Financial for Lutherans.

[53] The European Banks include Landesbank Baden-Wurttemberg (LBBW), Bayerische
Landesbank (BayernLB) and their affiliates.

[54] This category includes the New York Fed's Maiden Lane Portfolios, Freddie Mac, the Federal
Home Loan Bank of Atlanta and Kore Capital.

70.      The demonstrated expansion and openness of the Institutional Investor group is fundamentally *inconsistent* with the suggestion that the Institutional Investors were a preferred or secretive "clique" that excluded other investors from participating in their efforts to obtain a remedy that would benefit all of the Trusts and their investors.[55]  Belated complaints by some Certificateholders that the Trustee failed to "include" them  in ongoing settlement discussions also fail to consider these additional facts:

- The Institutional Investors were engaged in discussions with the Trustee because they were able to, and intended to, litigate the Trustee's claims.

- The Institutional Investor group expanded because it was open to other, like-minded investors willing to bear the risks, costs and burdens associated with contested litigation of the Trustee's claims.

- With the ostensible exception of Walnut Place, none of the remaining objectors has alleged that they ever *sought* to pursue claims on behalf of the Trusts, or made any demand that the Trustee do so, much less that they informed the Trustee they were willing to put their balance sheets on the line to fund the long term indemnity required to pursue the Trustee's claims derivatively.

- In contrast, the Institutional Investors were the *only* group of investors who *had* organized themselves for the purpose of litigating the Trustee's claims.  They:

  o amassed the requisite voting rights,
  o possessed the required financial resources to offer a satisfactory indemnity, *and*
  o sent the required notice to trigger the running of the time periods required to permit them to pursue the Trustee's claims by sending the Notice of Non-Performance.

- Though the Institutional Investors' activities were the subject of multiple press releases and much media attention,[56] not a single one of the objectors has alleged it sought to join the Institutional Investors' group but was rebuffed.

---

[55] In contrast to the openness of the Institutional Investors, the objectors' activities have been far more secretive and opaque. *See infra*, Part III(F).

[56] *See* ¶72, *infra* (listing press releases and other disclosures).

44

- None of the objectors has alleged that they made—or were willing to make—any effort to reform and cure mortgage servicing deficiencies for the *common benefit* of all Certificateholders.

- None of the objectors has alleged that they offered the Trustee a plan to improve mortgage servicing so that borrowers would have an easier route to returning their loans to performing status.

71.     Some objectors and observers have made the fatuous suggestion that the Trustee was required to "notify" other Certificateholders and "invite them" into the discussions. Nothing in the law or the PSA requires this. Every investor in these certificates understood that a group of holders of 25% of the Voting Rights, willing to provide a robust indemnity, *could* invoke their right to direct the Trustee to act *without* notice to any other Certificateholders. The PSAs do not require investors who do so to thereafter consult with (or obtain the consent of) investors who are bearing none of the risks and who have assumed none of the financial burdens associated with the indemnity. The agreements and the law impose no such requirement on the Trustee, either.

72.     To be clear: the Institutional Investors issued regular press releases informing other investors of their activities and advising them that forbearance agreements had been entered tolling claims for some, but not all, of the Trusts. Bank of America also issued press releases and discussed ongoing settlement negotiations in its public filings. In total, the Institutional Investors and Bank of America issued at least 10 press releases or other disclosures informing the market of the ongoing negotiations:

- September 3, 2010, Institutional Investors' press release announcing the instruction to the Trustee to take action. A copy is attached as Ex. 6.

- On October 18, 2010, counsel for the Institutional Investors sent Bank of America, Countrywide and the Trustee a letter alleging a variety of claims alleging improper handling of mortgages in the trusts. The Institutional Investors

45

issued a press release regarding the letter, which identified the Trusts to which it applied. A copy of the October 18, 2010 letter is attached as Ex.9, and a copy of the press release is attached as Ex. 8.

- The October 18 letter was reprinted in the New York Times's DealBook and received widespread coverage in the financial press. A compilation of selected articles reporting on the October 18 letter is attached as Ex. 10 (the New York Times's DealBook article is at pp. 35-49).

- Following the October 18 letter, the Institutional Investors' counsel received calls from entities interested in joining the Institutional Investor group. Over time, the group added an additional 14 entities.

- December 15, 2010, Bank of America issued a press release that notified the public of the "constructive dialogue" Bank of America was having with the Trustee and counsel for the Institutional Investors regarding the claims the Institutional Investors had raised, and that the parties had agreed to toll any time periods raised by the October 18, 2010 letter to "continue" that dialogue. A copy of Bank of America's press release, which lists the trusts covered by the tolling agreement, is attached as Ex. 11.

- Bank of America's December 15, 2010 announcement was widely covered in the press, which reported that Bank of America was in settlement talks with a group that had "expanded" and "now includes 17 investors and 167 bond deals." There was additional press coverage of the announcement of continued talks again in early-January 2011, in connection with Bank of America's separate settlement of

certain GSE-repurchase claims.  A compilation of selected articles reporting on the release is attached as Ex. 12 (quoted at p. 7).

- On a January 21, 2011 analyst call, Bank of America's then Chief Financial Officer indicated that Bank of America was open to discussions with interested parties:  "we always want to talk to everybody in the world to make sure we understand where they stand."  This invitation to investors was widely reported in the press.  A copy of the transcript from the analyst call is attached as Ex. 13 (quote at p. 11).

- On January 28, 2011, counsel for the Institutional Investors issued a press release stating that the parties had agreed to toll any time periods commenced by the Institutional Investors' October 18, 2010 letter discussing alleged Countrywide defaults, an obvious indication that discussions were ongoing.  This press release identifies the trusts covered by the tolling agreement.  A copy of the January 28, 2011 press release is attached as Ex. 14.

- On February 2, 2011, Bloomberg reported that the Institutional Investors had agreed to renew "their extensions of any time periods" in the October 18, 2010 letter alleging an Event of Default, and that Bank of America "confirmed that discussions were continuing."  A copy of the Bloomberg article is attached as Ex. 15.

- Throughout the winter, newspapers continued to report on the settlement negotiations.  For example, a February 15, 2011 article in Debtwire reported that the settlement being negotiated "could bind other CFC [Countrywide Financial Corporation] RMBS investors" and that the parties were "attempting to

encompass all Countrywide RMBS into the deal." A compilation of this article along with other press reports that appeared at the time is attached as Ex. 16. (the Debtwire article is at pp. 3-5)

- Another article, appearing on February 23, 2011, quoted David Grais, Esq., of Grais & Ellsworth, counsel for objectors now alleging "secrecy", as stating that an agreement among the negotiating parties "could bind all non-agency mortgage backed securities issued by Countrywide, BofA and potentially Merrill Lynch." A copy of this article is attached as Ex. 16, p. 6-7.

- On February 25, 2011, Bank of America released its 10-K. In that document, the Bank stated that "BAC Home Loans Servicing, LP and Gibbs & Bruns LLP on behalf of certain investors including those who signed the letter, as well as The Bank of New York Mellon, as trustee, have agreed to a short extension of any time periods commenced by the letter to permit the parties to explore dialogue around the issues raised." An excerpted copy of Bank of America's 10-K is attached as Ex. 17.

- On February 28, 2011, a Bloomberg article reported that the amount of debt the Institutional Investor group represented had almost doubled since October and that the number of deals had grown to 225, due to more investors joining the group. Citing the Institutional Investors' counsel, the article explains that "[t]he investors have only considered a settlement that pays through the mortgage trust, a channel that would serve even the bondholders Patrick doesn't represent" and that "enough progress" had been made in negotiations "to warrant continued talks." (Emphasis added.) A copy of the article is attached as Ex. 16, p.8-9.

- On March 31, 2011, counsel for the Institutional Investors again publicly reported that the parties had agreed to toll any time periods commenced by the Institutional Investors' October 18 letter discussing alleged Countrywide defaults. A copy of the press release issued by the Institutional Investors' counsel, which identifies the trusts covered by the tolling agreement, is attached as Ex. 18.

- On May 5, 2011, Bank of America issued its 10-Q for the first quarter 2011. In that document, the Bank stated that "[t]o permit the parties to discuss the issues raised by the letter, BAC Home Loans Servicing, LP and [Gibbs & Bruns LLP] on behalf of certain investors including those who signed the letter, as well as The Bank of New York Mellon, as trustee, have entered into multiple extensions to toll . . . [the time] periods commenced by the letter. We are in discussions with [Gibbs & Bruns], the investors and the trustee regarding the issues raised and more recently the parties have discussed possible concepts for resolution of any potential representations and warranties, servicing or other claims." An excerpted copy of Bank of America's 10-Q is attached as Exhibit 19.

73.     Not a single one of the objectors has asserted it was unaware of these press releases. Not a single one has alleged that they, in a similarly open and obvious fashion, disclosed their efforts (if, indeed, they made any) to pursue claims for the Trusts. Nor have any objectors alleged that they informed the Institutional Investors, or anyone else, of any of their efforts to negotiate separate settlements with Bank of America and/or BNY Mellon—though such efforts plainly occurred and may indeed be continuing without the Court's knowledge.

74.     The Trustee was entitled to consider the obvious facts that affected the likelihood that one or more investor groups might seek to pursue the Trustee's claims. The Institutional

49

Investors were organized. They had retained experienced trial counsel. They were moving forward aggressively, and publicly, to pursue the Trustee's claims. They had notified other investors they were doing so. They presented a credible threat of "hand to hand combat" to achieve a litigated recovery for the Trusts. The Trustee was also entitled to consider that investors who stood on the sidelines, unwilling to provide an indemnity to the Trustee, or those who would later seek a quick recovery for one or two trusts to serve their own interests rather than the common benefit of all Certificateholders, did not pose a credible threat. In these circumstances, it would be *unusual*—and inconsistent with the contract requirements—for BNY Mellon to invite other, unknown Certificateholders to participate in settlement negotiations when they had expressed neither an interest in, nor the willingness to pursue, the Trustee's claims.[57]

### C. The Institutional Investors Did Not Seek, Or Obtain, Any Individual Benefit.

75. Though the Institutional Investors were instrumental in forcing Bank of America and BNY Mellon to the negotiating table, they will receive the same benefit under the settlement that any similarly situated investor would receive, no more and no less. The settlement proceeds will flow down the waterfall, in accordance with the contract to which every investor agreed. As a result, pro rata amount of this settlement will likely flow to investors who did *nothing* to pursue the Trustee's claims. Even though they took no risks and invested no time or money, these investors will receive the same benefit as those who did.

76. This "free rider" problem is inherent in the structure of the Pooling and Servicing Agreements. Precisely because the agreements *require* collective action and *preclude* individual

---

[57] We address in Part III(F) below the false claims by AIG and Walnut Place that they were excluded from participating in settlement discussions. Whatever communications these entities may have had with BNY Mellon or Bank of America, they never contacted the Institutional Investors to express a desire to join the group or participate with them in efforts to obtain a recovery for the Trusts claims.

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/14/12   Page 59 of 152   Page ID
#:10281
Case 1:11-cv-05988-WHP   Document 124   Filed 10/31/11   Page 58 of 71

benefit at the expense of other Certificateholders, they create barriers to the effective assertion of the Trustee's claims by Certificateholders.  Under the PSAs, an investor (or group of investors) that seeks to pursue the Trustee's claims must commit itself to bear 100% of the costs to do so,[58] even though it will receive only its ratable share of any recovery.  In any Trust where an investor holds less than 100% of the certificates, the risk reward ratio is skewed to make it less likely the claims will be pursued, or pursued effectively.  That, too, is a factor the Court should consider in assessing whether the objectors' litigation preference actually represents a feasible alternative.

### D.      The Trustee's Alleged Conflict

77.      Eleven of the objectors  assert that the settlement process was flawed because the Trustee was conflicted, allegedly because it stood to gain an expanded indemnification upon entering into the settlement.  *See, e.g.*, Western & Southern Life Ins. Co. *et al.* Objection, St. Doc. #85 at 3.  This is false.  The indemnity the Trustee received in the settlement was no more and no less than the indemnity it was *already* entitled to receive under the contract.  *Compare* PSA §§ 8.02 and 8.05 (requirement of Master Servicer indemnity) *with* Indemnity Confirmation from Master Servicer at Settlement Agreement Ex. C.

78.      Another variant of the "conflict" claim is the contention that the Settlement Agreement indemnified the Trustee for any breach of fiduciary duty arising from entry into the settlement:  "[T]he relief sought here appears designed largely to insulate BNYM from fiduciary

---

[58] These costs are very high. *See, e.g.*, Ex. 20, Royal Bank of Scotland, *Non-Agency MBS Loan Repurchases: Practical Considerations*, Sept. 17, 2010 (estimating that "*without* litigation, the cost could range from $24 million to $88 million" just to review loan files, make demands and comply with initial cure periods . . ." on the 229,000 loans in the 55 deals then at issue in the Institutional Investors' instruction to BNY Mellon).  Extrapolating from that cost, to cover the more than 770,000 loans at issue in the settled trusts, yields a potential out of pocket cost—again exclusive of litigation expense and delay—of between $42.5 and $149.6 million.  None of the objectors has offered an indemnity sufficient to defray that cost (even assuming they held 25% of all Trusts), much less the years of attorneys' fees that would be incurred to evaluate and prosecute claims on those loans.

claims arising from the settlement." N.Y.A.G. Objection, St. Doc. #101-4 at 4. This is incorrect. The Settlement Agreement does not release any claim of breach of fiduciary duty against the Trustee. *See* Settlement Agreement at ¶ 9(a) (reciting releases *by* the Trustee but granting none *to* the Trustee). The settlement also does not release any individual tort, fraud or securities claims against either BNY Mellon or Bank of America. *See* Settlement Agreement at ¶¶ 9 and 10. The Trustee is not seeking—and will not obtain—any release of breach of fiduciary duty or fraud claims in the proposed judgment contemplated by the settlement. *Id.* at Ex. B. Nowhere in the Settlement Agreement has the Trustee been indemnified for breaching any fiduciary duty by entering into the settlement. *Id.* Importantly, the PSAs are not amended by the Settlement Agreement, *see* Settlement Agreement at ¶ 21, and they state plainly that "[n]o provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct . . ." PSA § 8.01.

### E. The Trustee Is Entitled to Seek an Instruction Concerning Whether to Consummate the Settlement.

79. Certain objectors have argued that the Trustee's use of an Article 77 Proceeding to seek court approval of the settlement was improper. The Court has also observed that, "Without exception, the often-uncontested proceedings described in these decisions and orders were garden-variety matters of trust administration." The objectors' argument, and the Court's observation, are each incorrect. A leading case recognizing the right of a trustee to seek court approval of a settlement of commercial litigation, in the face of a heated dispute among bondholders in a securitized trust, is a New York case arising under Article 77. *See In re Application of IBJ Schroder*, 271 A.D. at 322.[59] This case involved substantial litigation, as its

---

[59] This decision was attached as Ex. D to the Trustee's reply brief and was discussed at length in the reply briefs filed by the Trustee and the Institutional Investors in support of their motion to remand. Rather than restate those arguments here, we incorporate them by reference.

procedural history involves an appeal to and decision by the First Department prior to a final decision by the New York Supreme Court approving the Trustee's decision to enter into the settlement.

80.     New York and federal case law recognize that seeking an instruction is exactly what a Trustee *should* do when it: a) faces conflicting instructions from beneficiaries about what to do or b) is itself conflicted regarding a given course of action.  In *Redmond v. Commerce Trust Co.,* 144 F.2d 140, 154-55 (8th Cir. 1944), the court recognized the propriety of Trustee's decision to seek court approval to consummate a settlement: "Where it is reasonably prudent, in the exercise of good faith sound judgment, to make a contract of compromise, the trustee may do so but, if such compromise is made without proper court approval, the trustee takes the risk of his good faith and sound judgment being attacked successfully by the beneficiaries.  If the compromise is made only upon proper court approval, the trustee may safely do so and such is binding upon the beneficiaries."  The New York Court of Appeals[60] recognized that even a self-dealing trustee may proceed with a conflicted transaction, if it does so with court approval.  "The rule has long been established that a trustee 'should not be allowed to become a purchaser of trust property, because of the danger in such a case that the interest of the beneficiary might be prejudiced.  However, there is little danger of such prejudice if the transaction is subjected to prior judicial scrutiny and given court approval.  Accordingly, the rule against self-dealing has not been applied, *and does not apply*, to interdict the purchase of trust property by a trustee where the court, after conducting a full adversary hearing at which all interested parties are represented, approves and authorizes the sale."  *In the Matter of Scarborough Properties Corp.,*

---

[60] In this removed, state court proceeding which arose under state law, the Court is required to apply the substantive law of New York as established by the New York Court of Appeals.

255 N.E.2d 761, 25 N.Y.2d 553 (N.Y. 1969) (emphasis added and citations omitted). The right of a trustee to conditionally agree to a settlement, subject to court approval of its decision to do so, is so well-settled that it has been incorporated into the RESTATEMENT (SECOND) OF TRUSTS. *See id.* at §292 cmt. d (2010) ("If the trustee is in doubt whether he should compromise or submit to arbitration a claim, he may ask the instruction of the court or he may agree thereto conditionally upon the subsequent approval of the court.").

81.     The Trustee followed this clear law when it filed a proceeding seeking an instruction about whether it should consummate the settlement. The case filed in New York state court, which has now been removed to this court, was one in which all interested parties could be heard. It raises a single issue appropriate for resolution by a court: is the Trustee's decision to settle reasonable? That the case is now pending in federal court does not change its fundamental nature. It also does not negate the Trustee's right to obtain that which it is entitled to obtain under governing New York law; namely, an instruction concerning whether it is entitled to proceed with this settlement of disputed claims.

82.     The above discussion should put to rest the belated complaints by some Certificateholders that the Trustee failed to include them in settlement discussions. Even if there had been a way to include all Certificateholders in the settlement negotiations, the objectors' pleadings make clear that no consensus could have been reached. The Trustee would then have had no option but to do exactly what it did: make a good faith decision about whether to settle in the face of competing demands and then seek court approval of its decision.

**F.      The Settlement Was Not "Clandestine" or "Collusive"**

83.     AIG and a handful of other objectors have suggested that the Institutional Investors somehow "colluded" with Bank of America in negotiating the settlement. *See, e.g.,*

AIG Objection, St. Doc. #131 at 5-6. This is false. The attack on the Institutional Investors is also beyond absurd when the Court considers the illogical inferences on which it rests.

84.     Eight of the Institutional Investors are independent investment advisers. They will receive not a penny of this settlement for themselves; the recovery will go to their clients. These investment advisers are competitors with one another. Many are competitors with Bank of America. The bizarre suggestion that they would abandon their fiduciary and contractual obligations to their clients in an effort to "help" Bank of America is an irrational inference the Court should dismiss out of hand. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (explaining that to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is *plausible* on its face"); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citations omitted). The claim of collusions enter the realm of fantasy when it adds to the claimed cabal not only eight independent investment advisers but seven insurance companies, who hold these securities largely to fund policy payments to insurance and pension beneficiaries. Neither the insurance companies nor the investment advisers have a possible motive to take *less* than a fair settlement, anymore than do the other Institutional Investors who appear here to support the settlement.

85.     The simple fact is this: these investment advisers and the other Institutional Investors joined together precisely because, in the absence of a decision to cooperate, there was no way to aggregate the Voting Rights required to pursue litigation of the Trustee's claims derivatively, for their clients' benefit. Had they not done so, it is highly likely that none of these

Case 2:11-cv-07166-MRP-MAN Document 177-224 Filed 01/14/12 Page 64 of 152 Page ID
#:10286
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 63 of 71 Page ID

claims would have been pursued at all.[61]  Under every potentially applicable pleading standard,

these claims of collusion fail as a matter of law.

> **1.    Newly Revealed AIG Documents Refute Its "Clandestine" Negotiation Claim.**

86.    AIG's claims that the settlement was "clandestine" or "exclusive," *see* AIG

Objection, St. Doc. #131 at 5-6, are especially baseless in light of recent disclosures in AIG's

securities lawsuit against Bank of America (filed on the same day as its objection to the

settlement).  Newly filed pleadings in that action ***directly refute*** AIG's contention that it was

"kept in the dark by BoNY and the Inside Institutional Investors." *Id.* at 6.  *See* Defendants'

Motion to Disqualify Quinn Emmanuel as Counsel For Plaintiffs, Docs. #37, 39, and 42, No. 11-

cv-06212 (S.D.N.Y.).  In a letter attached as evidence to this motion, Quinn's disqualification

counsel states—on behalf of AIG and its counsel, Quinn Emmanuel—that "in March or April

[2011], AIG rejected [Bank of America's] express request that AIG stop seeking advice from

Quinn Emanuel as a condition of allowing AIG access to settlement talks between [Bank of

America] and certain institutional investors." *Id.* at Doc. #42, Ex. F to Dworsky Declaration, p.

4.  This letter establishes two facts that refute AIG's claim of clandestine negotiation.  First, by

its own admission, AIG knew about the ongoing "settlement talks."  Second, again by its own

admission, *if* AIG was excluded from settlement discussions, it was excluded by *Bank of*

---

[61] Even today, no group of holders has stepped forward to offer to fund the hundreds of millions
of dollars in litigation costs necessary to pursue the Trustee's claims.  *Compare* RBS Report re
Likely Cost of Litigation. Though Walnut Place has alleged it is willing to pursue claims for
three trusts, the Court can have no confidence that an anonymous LLC formed specifically for
the purpose of litigation has either the financial wherewithal—or the staying power—to litigate
hotly contested claims for years.

Case 2:11-cv-07166-MRP-MAN Document 177-24 Filed 01/14/12 Page 65 of 152 Page ID
#:10287
Case 1:11-cv-05988-WHP Document 324 Filed 10/31/11 Page 64 of 71

*America*, due to an alleged conflict on the part of AIG's counsel. Neither the Institutional
Investors nor the Trustee limited AIG's access to the settlement talks.[62]

87.    The AIG letter should be scrutinized closely by the Court for another reason. In
it, AIG acknowledges that it attended a mediation with Bank of America "in July of 2011." *Id.* at
4. The mediation obviously occurred *after* the settlement in this matter was announced on June
29, 2011. *See 22 Institutional Investors in Countrywide-Issued RMBS Announce Global
Settlement*, PR NEWSWIRE, June 29, 2011, attached as Ex. 21. AIG's objection was filed on
August 8, 2011, less than a month after it was unable to obtain an *individual* settlement with
Bank of America in the "July of 2011" mediation. Given the strictures of Section 10.08 of the
PSAs, and the prohibition on invoking rights under the agreement to advance "individual and
conflicting interests," *Inkeepers*, 448 B.R. at 145, the contents of AIG's letter are cause to
question whether AIG's objection is in good faith or seeks the common benefit of all
Certificateholders.

88.    AIG also questions the attorneys' fee that will be paid to the Institutional
Investors' counsel if the settlement is approved. It is normal and customary for counsel to be
paid for their work. The fee to be paid is markedly lower than the fees paid to counsel who
achieved similar results in complex, high stakes cases.[63] The fee is also significantly lower than
the contingent fee the Institutional Investors were prepared to instruct the Trustee to accept, if it
had become necessary to pursue contested litigation on behalf of the Trusts. When paid, the fee
will be in addition to, rather than out of, the settlement payment. That benefits investors in the

---

[62] To reiterate, AIG has not alleged that it ever contacted either the Institutional Investors'
counsel or counsel for BNY Mellon to ask to participate in the ongoing settlement discussion
with Bank of America.

[63] *See* Ex. 22, Cases of Comparable Size and Complexity Ranked by Attorneys' Fee.

Trusts, who will receive a superb settlement at no cost to them or the Trusts. The payment of fees in addition to the settlement amount is also in keeping with Section 2.03 of the PSAs, which permits the Trustee to recover not only the Purchase Price for ineligible mortgages but also "any expenses reasonably incurred by . . . the Trustee in respect of enforcing the remedies for such breach."

> **2. Walnut Place Also Knew of Settlement Discussions But Refused to Participate**

89. The secrecy allegations in the Walnut Place objection are particularly questionable, since its counsel — the Grais & Ellsworth firm — was provided with personal, first-hand information about ongoing settlement negotiations by both Bank of America and BNY Mellon[64].

90. Walnut Place's initial allegation was that "BNYM made no effort to inform Walnut Place" of the ongoing settlement negotiations. In response, the Trustee's counsel submitted a sworn declaration attesting that, to the contrary, on February 2, 2011, counsel for Walnut Place met with counsel for the Trustee, as well as counsel for Bank of America. During this meeting, counsel for the Trustee and counsel for Bank of America each "told counsel for Walnut Place that they were negotiating a settlement, . . . offered to report to Walnut Place on a current and ongoing basis about settlement discussions, [and] invited Walnut Place to provide input on settlement discussions. Walnut Place refused, and instead filed a lawsuit asserting claims against Countrywide, Bank of America and BNY Mellon (as nominal defendant) that are intended to be released by the Settlement." St. Doc. #43. Simply put, if the settlement

---

[64] The Institutional Investors did not participate in these private discussions with Walnut. What follows has been assembled from what has come to light since the settlement was announced.

negotiations took place behind Walnut Place's back, that is because Walnut Place turned its back on those negotiations.

91.     Walnut's counsel told newspaper reporters as far back as mid-February that he was evaluating "potential recourse against [BNY Mellon] in case it participates in the settlement." (That news article goes on to report in further detail BNY Mellon's involvement in the Settlement.). *See* Ex. 16, p. 3-5. Furthermore, though Walnut Place claims that it was not informed that the negotiations involved the two Trusts in which Walnut Place holds positions,[65] that claim is likewise unsupportable.  Walnut Place's counsel declared in open court at the August 5, 2011 hearing in the Settlement Court that *"the express purpose" behind the filing of its February 2011 lawsuit against Countrywide and the Trustee was "to stop the settlement" from extinguishing Walnut Place's claims.*[66]

### 3.     Knights of Columbus

92.     Similar allegations made in the Knights of Columbus objection are equally meritless.  The Knights of Columbus claims it was not personally informed by the Trustee of the settlement negotiations in correspondence about its separate lawsuit against the Trustee.[67]  Given the widespread public reports on the settlement negotiations, it is implausible for Knights of Columbus to suggest that it was unaware of the negotiations.  In fact, four of the Trusts in which the Knights of Columbus claims to own certificates — CWALT 2005-6CB, CWHL 2005-30,

---

[65]  Walnut Place Reply at 5 (St. Doc. #49).

[66]  *See* Ex. 23 (Transcript of August 5, 2011 hearing) at 33:20-23.

[67]  *See* Knights of Columbus Objection at 2-3, 7-11 (St. Doc. #141).

Case 2:11-cv-07166-MRP-MAN Document 177-24 Filed 01/14/12 Page 68 of 152 Page ID
Case 1:11-cv-05988-WHP Document 124 Filed 10/31/11 Page 67 of 71 Page ID
#:10290

CWHL 2004-14, and CWHL 2006-6 — were named in the press releases issued by Bank of America and Gibbs & Bruns regarding the settlement negotiations.[68]

## G.  Miscellaneous Objections

### 1.  Allocation Issues

93.  The proposed settlement allocation, both among the trusts and across the tranches of any individual trust, is the subject of nine objections.  In general, these objectors ask why the settlement documents do not specify the amounts that any given trust or tranche will actually receive when the settlement is eventually approved.  The Federal Home Loan Banks, for example, complain that "[i]n addition, the Banks need more information about the way in which the settlement fund would be allocated." FHLB Objection, St. Doc. #55 at 4.

94.  These objections are in error.  The methodology for allocating the Settlement Payment is described in detail in the Settlement Agreement and described precisely in the Trustee's filings.  *See* Ex. 25 (Settlement Agreement) at ¶ 3(c).  Specifically, the Trustee's independent allocation expert, NERA, will allocate the Settlement Payment among the Covered Trusts according to the amount of net realized and projected losses in each of the trusts.  *Id.* at 55.  NERA will determine the amount of net losses based on past losses and estimates of future losses (using models to determine the projected performance of the loans in the Covered Trusts and the loss severity on those loans).  *Id.*  A copy of NERA's methodology was attached as Exhibit E to the Trustee's Verified Petition, and is also attached as Ex. 24.  The reason an allocation is not available now is simple:  the allocation is based on losses of each, individual

---

[68] *See* Ex. 8 (October 18, 2010 Gibbs & Bruns LLP press release) (naming CWHL 2005-30); Ex. 11 (December 15, 2010 Bank of America press release) (naming CWALT 2005-6CB and CWHL 2005-30); Ex. 14 (January 28, 2011 Gibbs & Bruns LLP press release) (naming all four trusts); Ex. 18 (March 31, 2011 Gibbs & Bruns LLP press release) (same).  The trusts that Knights of Columbus allegedly holds certificates in are listed on Exhibit 1 to the Affirmation of Peter N. Tsapatsaris (St. Doc. #145).

Case 2:11-cv-07166-MRP-MAN   Document 177-2   Filed 01/11/12   Page 69 of 152   Page ID
#:10291
Case 1:11-cv-05988-WHP   Document 224   Filed 10/31/11   Page 68 of 71

Trust. That figure is constantly evolving and could vary considerably between the time the
Settlement Agreement was signed and the date on which the settlement is approved, particularly
if the approval process is protracted. The Trustee made a reasonable decision to avoid
preventing potentially misleading preliminary calculations that might confuse investors. Equally
in error is the suggestion that the settlement does not inform investors how it will be allocated
among tranches in a given trust. There was no need to include this in the settlement, because the
distribution mechanisms in each PSA already provide for the treatment of "Subsequent
Recoveries." The Settlement Agreement confirms that the payment would flow down the
tranches in each Trust in accordance with the existing waterfall in each PSA. *Id.* at ¶ 3(d)(i)-(vi).
This was consistent with investors' expectations and rights under the PSAs.

### 2. Waterfall Issue

95.     A related set of objections concerns the use of the payment waterfall in the
Governing Agreements to distribute settlement funds. One such objection complains that "the
settlement fund is allocated among investors in accordance with the 'payment waterfall' set forth
in the Pooling and Servicing Agreements, which may provide some investors with a windfall and
may not appropriately compensate others for their actual loss." *See* Policeman's Annuity &
Benefit Fund of Chicago Objection, St. Doc. #32 at 4; *see also* Clayhill Investors LLC
Objection, St. Doc. #180 at 2; The Western & Southern Life Ins. Co. *et al.* Objection, St. Doc.
#085 at 3. This form of payment is not an optional or negotiated matter: "[t]hat payment stream
is required by the governing agreements, to which all Certificateholders agreed when they
purchased trust certificates, and the Trustee is required to follow that agreement when it
disburses funds that flow into the trusts." *See* Mem. of Institutional Investors in Opposition to
the Policemen's Annuity's Motion to Intervene, St. Doc. #45 at 5. As the New York Supreme
Court recently held in a similar context, noteholders "are bound by the agreements that they

made." *ASR Levensverzekering NV v. Swiss Re Fin. Prods. Corp.*, Index No. 650557/09, slip op. at 7 (N.Y. Sup. Ct. Oct. 11, 2011); *see also Greenwich*, *supra* and *Innkeepers*, *supra*. This includes the contract terms establishing the payment waterfall. The use of the waterfall as a distribution mechanism is not only proper, it is required.

### 3. Former Holders

96. Other objectors claim that former Certificateholders should receive compensation or that initial purchasers should receive greater compensation than secondary-market purchasers. Those contentions seem to miss the point of the settlement entirely. The Settlement Agreement is a settlement of contract-based claims. The contracts provide no entitlements to former Certificateholders; all benefits flowing from the contracts transferred to the Certificateholders that purchased from the former holders. Likewise, the contracts provide no additional entitlements to original purchasers compared to secondary-market purchasers of the certificates. Regardless of when Certificateholders purchased their securities, they purchased the same exact bundle of contract rights under the PSAs. The Settlement treats all contract-right holders the same. There is nothing unreasonable about that.

More fundamentally, none of the allocation objections should bar Final Court Approval of the Settlement, regardless of what the Settlement Court determines is a reasonable allocation within each Covered Trust. The Settlement Agreement specifically provides that changes to the distribution method within each of the Covered Trusts will not constitute material changes to the terms of the Settlement. *See* Ex. 25 (Settlement Agreement) ¶ 3(d)(v). Accordingly, if the Settlement Court determines that a distribution according to the terms of the PSAs is not reasonable, it is free to refashion those distributionn provisions accordingly.

### 4. Rights of Monoline and Financial Guaranty Insurers

97.     Two monoline insurers, Syncora Guarantee Inc. and Ambac, and one financial guaranty insurer, CIFG, wrapped certain tranches in certain of the 530 settled Trusts or insured certain losses in one or more Trusts. They have appeared as objectors solely to confirm that the Settlement Agreement does not prejudice their rights to pursue recovery under their own insurance contracts with BOA and CW.  The Settlement Agreement fully preserves these separate contract rights.  *See id.* at ¶ 10(d) ("To the extent that any third-party guarantor or financial-guaranty provider with respect to any Covered Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustee, or the Covered Trusts, the release and waiver in Paragraph 9 is not intended to and shall not release such rights, or impair or diminish in any respect such obligations or any insurance of indemnity obligation owed by or to any such Person).  The agreement thus states plainly that it does not compromise or affect the monolines' independent contract rights.

### 5.     Homeowners' Class Action

The final objection is filed by a purported class of homeowners.  *See* Mary Ellen Iesu et al. Objection (Doc. #17).  It is not cognizable here.  The homeowners are neither parties to the PSAs nor holders of certificates issued by the Trusts.  They therefore lack standing to appear in this proceeding.  Respectfully submitted,

Dated:  New York, New York
       October 31, 2011

WARNER PARTNERS, P.C.

By:   /S/ Kenneth E. Warner     
       Kenneth E. Warner (KW-5524)

       950 Third Avenue, 32nd Floor
       New York ,New York  10022
       Phone:  (212) 593-8000

*Attorneys for Intervenor-Petitioners, the Institutional Investors*

Of Counsel:

GIBBS & BRUNS, LLP
By:  Kathy D. Patrick
     Robert J. Madden

# Exhibit 2

1

```
 1

 2   SUPREME COURT OF THE STATE OF NEW YORK

 3   COUNTY OF NEW YORK:  CIVIL TERM:  IAS PART 3

 4   - - - - - - - - - - - - - - - - - - x
     MBIA INSURANCE CORPORATION,
 5                Plaintiff,
                                              Index No.
 6                                            602825/08

 7            -against-

 8   COUNTRYWIDE HOME LOANS, INC.,
     COUNTRYWIDE SECURITIES CORP.,
     COUNTRYWIDE FINANCIAL CORP.,
 9   COUNTRYWIDE HOME LOANS SERVICING, L.P.,
     and BANK OF AMERICA CORP.,
10                Defendants.
     - - - - - - - - - - - - - - - - - - x
11
                         October 5, 2011
12                       60 Centre Street
                         New York, New York
13

14   B E F O R E :

15        HON. EILEEN BRANSTEN,

16                             Justice

17
     A P P E A R A N C E S :
18

19   QUINN EMANUEL URQUHART & SULLIVAN, LLP
     Attorneys for Plaintiff MBIA
20   51 Madison Avenue
     New York, New ork  10010
21   BY:  PHILIPPE Z. SELENDY, ESQ.
          NICHOLAS JOSEPH, ESQ.
22

23
     JONATHAN C. HARRIS, ESQ.
24   Attorney for Plaintiff MBIA
     113 King Street
25   Armonk, New York  10504

26
```

2

```
1

2    DEBEVOISE & PLIMPTON LLP
     Attorneys for Plaintiff Syncora
3    919 Third Avenue
     New York, New York  10022
4    BY:  DONALD W. HAWTHORNE, ESQ.
          KATE K. SMITH, ESQ.
5         JAMES H. GRAHAM, ESQ.

6

7    GOODWIN PROCTER LLP
     Attorneys for Countrywide Defendants
8    620 Eighth Avenue
     New York, New York  10018
9    BY:  MARK HOLLAND, ESQ.
          PAUL F. WARE, ESQ.
10        ABIGAIL K. HEMANI, ESQ.

11

12   O'MELVENY & MYERS LLP
     Attorneys for Defendant Bank of America
13   7 Times Square
     New York, New York  10036
14   BY:  WILLIAM J. SUSHON, ESQ.

15

16

17

18

19

20

21

22                        LEE RUTHEN
                          Official Court Reporter
23

24

25

26
```

62

Proceedings

1                                   Proceedings

2     representations.

3           MR. HOLLAND:  That's right, Judge, and that goes to

4     the element of materiality or, as Mr. Selendy characterized

5     it, "but for" causation, and that is essential for them to

6     prove.

7           My point is that the First Department has said

8     that's not the only point they have to prove, they also have

9     to prove when they have to pay out claims here, when they

10     incur the losses, why they are paying out those losses,

11     because they insured against some risks which legitimately

12     happened, such as the mortgage market meltdowns, and they

13     can't now avoid that risk by saying that we misrepresented

14     something with respect to some loans which may have had no

15     affect whatsoever on that.

16           So what they are doing is trying to take advantage

17     of the recession and the mortgage market meltdown to avoid

18     having to pay on a risk that they agreed that they would

19     insure against.

20           THE COURT:  But that's exactly what they are

21     saying, they are saying we would never have taken on that

22     risk had we known the risks that we were getting into, and,

23     in fact, that's what Countrywide did, they didn't tell us

24     the risks.

25           MR. HOLLAND:  But that's true of every fraud case,

26     Judge.  Every time somebody brings a claim for fraud they

# Exhibit 3

# Bank of America Corporation BAC
# Q3 2010 Earnings Call Transcript

Executives
- Charles H. Noski : CFO
- Kevin Stitt : IR
- David C. Darnell : President, Global Commercial Banking
- Brian T. Moynihan : President and CEO
- Neil A. Cotty : SVP and ACO

Analysts
- Michael Mayo : CLSA
- John McDonald : Sanford Bernstein
- Christopher Kotowski : Oppenheimer
- Glenn Schorr : Nomura
- Betsy Graseck : Morgan Stanley
- Edward Najarian : ISI Group
- Moshe Orenbuch : Credit Suisse
- Matthew O'Connor : Deutsche Bank
- Nancy Bush : NAB Research LLC

Transcript Call Date 10/19/2010

**Operator**: Good day, everyone, and welcome to Bank of America's Third Quarter Earnings Announcement Conference Call. At this time, all participants are in a listen-only mode. Please note this call may be recorded and I will be standing by if you should need any assistance.

It is now my pleasure to hand the call over to Kevin Stitt. Please go ahead.

**Kevin Stitt - IR**: Good morning. Before Brian Moynihan and Chuck Noski begin their comments, let me remind you that this presentation does contain some forward-looking statements regarding both our financial condition and financial results and that these statements involve certain risks that may cause actual results in the future to be different from our current expectations. These factors include, among other things, changes in economic conditions, changes in interest rates, competitive pressures within the financial services industry, and legislative or regulatory requirements that may affect our businesses. For additional factors, please see our press release and SEC documents.

Also joining us this morning, as he did last quarter, will be Neil Cotty, our Chief Accounting Officer. With that, let me turn it over to Brian.

**Brian T. Moynihan - President and CEO**: Good morning, everyone. Thank you for joining. Today we're going to talk about the third quarter earnings results. The part of the documents as you see today are based on the conversations that we've had with many of you over the last few months and especially obviously the mortgage discussions occurred over the last few weeks. So we tried to put some data in the package that will help frame some of those issues, so and we'll go through that.

As we told you many times, we committed that we would provide you additional data on our runoff portfolios which we've done. Chuck will take you through some data on the reps and warranties, and I'll take you through some of the foreclosure discussion.

We've also included our preliminary Basel III view. In addition, we included information on what we were doing in the consumer franchise including the outline of how we're trying to mitigate the impacts of various regulatory changes.

We know these are key issues that are on your mind and on our mind as shareholders and what our franchise faces.

So let's dive into the document. On page four you can see the headlines for the quarter. Excluding goodwill, the goodwill write-off which Chuck will cover later, earnings were $3.1 billion and it's consistent with the past few quarters as the continued credit improvement has offset some of the impacts of low rates, higher rep and warranty costs and other matters. But as we look across the business units, just to frame how we think we did this quarter, let me hit them from the high level.

I think Tom Montag and his team in global capital markets had a nice recovery as the sales and trading revenue there increased to $4.5 billion. Once again for the second quarter out of last three, we made money every trading day. We continue to hold the risk, the VAR relatively flat, and continue to drive that business off the core customer franchise it represents.

When we move into Tom's corporate banking side and David Darnell's commercial banking side, the good news this quarter is, we've seen stabilization in our C&I loan book. We've had good investment banking results and good Treasury management results.

In our commercial customer side, the credit quality continued to improve across the board, nonperforming assets –(indiscernible) have decreased, the charge-offs are better and even in CRE, we've seen the charge-offs fall pretty strongly over the last several quarters.

Sallie Krawcheck's and the global wealth and investment management team had another solid quarter. This business is going through the transition. In earnest, we sold First Republic this quarter. They converted millions of customer accounts and billions as customer balances. But all during the last few quarter, we've had continuous growth in financial advisors and wealth managers and private bankers through the period. We continue to see strong deposit capture, stable loan balances, and improving net customer flows over this last few quarters.

Let me get to our consumer businesses. Our card business continues to recover. Its net charge-offs continued to go down as Joe and the team worked hard to get that portfolio into shape. Interesting enough, this is the first quarter in many quarters where the actual yield on the portfolio exceeds the charge-off and that's a good sign as we move back to core profitability.

Joe and the team also sold more cards in the United States this quarter than last quarter, and we're continuing to see a recovery in our origination capabilities. As we

move to Joe's deposit side, we continue to make good customer progress there. Our customer scores are up, while account closures are down. During the quarter, Joe and the team implemented some of the mitigation plans, the e-account, which, as you know, it basically charges fees if customers don't use our lowest cost delivery mechanisms, an ATM emergency cash, which allows the customer make the choice to withdraw cash in emergency and pay an overdraft fee, and then other items including new account structure, which I'll talk about later. These will ultimately mitigate the cost of regulatory reform over time.

In the mortgage area, it's interesting enough, there's been a lot of discussion about this business and I'm sure we'll talk a lot about it today, but we're continuing to make progress. The operating loss continues to move forward, and Barbara and her team continue to make progress on driving that business back to profitability. the origination volumes have been strong in that business, and frankly, will only get stronger going forward as a market share and a percent of the market because as we went through integration we had to hold back volume because of our need to get the integration done.

We've seen the delinquencies and charge-offs in the mortgage products stabilize also. We're going to provide you a lot of data later in the presentation to help you assess the future cost from reps and warranties, but the one thing that we want to be clear is that when we look at the rep and warranty claims and the claims by the various investors, we're not going to just put this behind us to make us feel good. We're protecting your money. We're protecting the shareholders' money, and we're going to make sure that we'll pay when due, but not just to do a settlement to move the matter behind us.

The thing I want to be clear about is how we'll reposition the Company. We started the year and said we'd deliver a fortuitous balance sheet from a Company that had a balance sheet that needed repair. We've increased capital levels. We increased reserve coverage. We shed non-core activities. This quarter we continued to make good progress. Capital ratios were up, RWA was down. We had developed clear in how we're going to manage through the Basel accord changes. In addition, due to the fact that the capital levels in our industry are going to be higher, we have a intense focus on tangible book value per share growth and we continue to grow that this quarter.

So if you flip to page five, you can see how those figures roll out. From the beginning of the year, our RWA is down $87 billion. We've taken a snapshot from January 1 here because of the impact of 166, 167 that we wanted to show you. The long-term debt, which is something we don't talk a lot about is down $44 billion this year. We inherited a lot of high-cost debt in the prior transactions that we took over the Company and we're restructuring that. Mark Linsz and the team under Chuck have done a good job. We think over the next several years we can take that down by another $150 billion to $200 billion, which helps our margin.

You can see that the dollar amounts of tangible common, Tier 1 common, and the ratios that result from that common are all been increased during the year due to earnings, and importantly, by our willingness and desire to streamline this franchise

and remove capital from non-core and capital-intensive activities. The asset quality improvements you can see are strong, and then you can see at the bottom of the page – and as you move to page six, you can see the capital ratios.

In discussions I had early this year, we were clear with you that we thought from a pure risk basis that this Company should run on 8.5% to 9% Tier 1 common ratio under the current Basel accord and at 5.5% to 6% tangible common ratio, and we thought we'd get there by year-end 2010. We've, in fact, hit those targets a quarter earlier and we continue to work on them. This discipline that got us there on these targets is what we're going to depend on to manage through the environment of Basel II, Basel III, the Fed market rules and Dodd-Frank and the provisions thereof. What we've done gives us confidence that there is a lot of optimization left in this balance sheet. Simply put, there is a lot of work to do, but there's a lot of areas to do it upon.

On slide seven, we want to make it clear how we view the current Basel III guidelines and the preliminary impacts it will have. You have to start from beginning here about the progress we've made year-to-date in improving our Tier 1 common capital ratios and bringing down risk-weighted assets. We do those efforts consistent with the customer-centric focus we've had to sell those low-rated assets and the non-core equity stakes. Tier 1 common has reached 8.5% at the end of this quarter with $1.5 trillion in RWA.

By 2019 as you well know, we have to have a Tier 1 common ratio of 7% and also still to be decided are the couple big unanswered questions. First, what incremental capital we would need for systemically important? Second, what the rights of capital management, ability to manage capital during the phase-in periods?

Given that, under our assumptions, our Tier 1 common is estimated to remain above 8%, while we implement Basel II, the market risk rules, in 2011 and Basel III in 2012. The way we've calculated it assumes no phase-in period and, in fact, there is going to be one. So just to be clear on this, we simply took all the rules that are going to be applied in 2011, took all the rules going to be applied in 2012, assumed they are effective on the date they became, and there's no phase-in for any of the provisions.

What that resulted in is our reported numbers during those times will actually be higher than the 8% we're telling you because that allows for the phase-in. The key assumption, when you look at this, the key outcome is a increase before we mitigate about $600 billion in risk-weighted assets.

The mitigation we have will reduce that significantly by the end of 2012 and these activities are not core to driving this franchise. We've laid out the activities in some of the bullet points on the page. They include running down loan portfolios which aren't core to the franchise, exiting proprietary trading activities, reducing low-rated assets in our trading book and our discretionary portfolio, and other activities to reduce the positions that are subject to high capital charges including the benefits from counterparty-risk and CVA exposure as the derivatives go through exchanges.

Now let me give example of a transaction we've written about there. In the second
quarter, if you remember we took a $700 million hit to do a Re-REMIC transaction,
because it will relieve under the Basel III rules as fully implemented nearly $100
billion of risk-weighted assets. That was a great trade in our sense and that will put
the issue behind us, increase the credit card portfolio and obviously, took a lot of
RWA, future RWA risk away.

Post mitigation after we do all this work, we estimate that the risk-weighted assets
would be up about 25% from the $1.5 trillion we had at the end of September. When
you go to the numerator side of Basel III, assuming no phase-in, you're going to
have a capital reduction of $12 billion, and we're glad to say here, it's largely related
to DTA.

Now the mitigation we expect will be completed by year end 2012. There are aspects
of what we're doing that will actually occur after that and we are very comfortable
we'll accomplishing the mitigation by the year end 2012, and there is going to be
future opportunities to continue to manage this during the periods through 2019.

So, with that, it gives us the confidence that given everything we know today and
how we're operating this business that we won't have to raise additional capital
through common stock issuance to meet the new capital guidelines.

With that review of Basel III, I wanted to just tick quickly on slide eight. You can see
we've included some of the highlights from the customer franchise and we've
included some of those in the release, suffice to say, that customer franchise
continues to move forward and continues to make good progress across all the
different businesses as I stated earlier.

We're going to move to page nine now, and one of the questions come up in the
customer discussion was, what did we do on overdrafts and why did we do it? Some
of you have raised with me whether we've had the balance right between the
customers and shareholders. We're too customer-friendly in terms of the decision we
made. So what we tried to do on page nine is to make it clear that we made a
business decision last summer to repair customer franchise that will start to leak
customers badly.

Overdrafts on debit cards were in fact driving strong fee growth, but the customers
all as profiled widely and as we saw in our franchise, was hurting our franchise
industry and long-term would hurt our shareholders. The impact the effects of the
economy, the use of the debit cards and how people are using had an impact on the
customers that no one had envisioned.

The trust scores in the industry were down. Bank of America's customer scores were
down. In the year before we implemented this change, we had opened 10 million
checking accounts and closed 10 million. The closures had been growing at an annual
rate of 18%. The complaints around debit charges and customer complaints around
deposits were at an all-time high and also we knew that Reg-E was coming.

So, as we looked ahead, we had to plan for that outcome. But most importantly, we
had 80,000 people that work in Joe's group that work with our customers everyday to

do a great job in our stores and our call centers. Those associates didn't feel that we were doing the right thing for the customer. The reality was 10% of the customers were paying 70% of the overdraft, over $1,000 per customer per year, and the model was breaking and needed fixing.

So what did our team do? You can see it in the upper left hand box. We didn't stop overdrafts overall. What we stopped was unintentional small debit overdraft charge, which was causing us churn this customer dissatisfaction and complaints, where a customer has a chance, they have a choice, whether it's a check, a recurring draft, initiating an online payment, emergency ATM cash, they can make the choice, pay the fee and get the transaction completed.

So what's happened since our actions, you can see in the upper right. The closure rates have dropped to 27%. So, from a rise that was 18% per year that now dropped 27%. The customer scores have improved, complaint volumes are down and deposits, it now allows us to take out cost. Associates are supportive, and that gives us the right to have associates to get deeper penetration of the products. And for people who overdraft that we're seeing interest behaviors still early, but their account balances are higher and they are managing their cash better. We have seen debit card turndowns about half the rate we thought they do; i.e., when somebody swipes a card and can't complete the transaction. But as we move ahead, mitigating the impacts of regulatory reform are the core challenge for Joe and the consumer team. They have rolled out our new e-account. We are the low-cost platform by everything we see out there, but they rolled out the e-account in an effort to drive those costs even lower. They've implemented additional fees, which we think are fair. They're piloting, as we speak, a rollout of a new account structure which will drive to the franchise over the next 12 months. They've introduced the ATM emergency cash. An example of that is that 50% of the customers actually accept the fee, but they make provisional choice to do it.

We're going to continue to monitor these initiatives, do more work on pricing, more work on cost, more work on new products. So, in the end, the returns and deposits will get back to the pre-regulatory change levels. If customers' choices change, we will revisit decisions we made to make sure that shareholders get the return we need in this business.

Now I want to turn on to one of the consumer issue that I think is important. On the foreclosure area, as you know we announced that we changed, on slides 10 and 11, we changed and started to reinitiate the foreclosures yesterday. Barbara Desoer and her team, it's going to take us three or five weeks to get through and actually get all the judicial states taken care of. The teams reviewing data have not found information which is inaccurate, would affect the frame factors of the foreclosure; i.e., the customer's delinquency, et cetera.

We continue to do all we can to avoid foreclosure. We continue to modify the loans wherever we can. We ensure that we check and recheck those. If a person fits in those programs, see whether they can fit into any modification programs before we start the foreclosure. Our check-in is checked by other third parties. That being said,

we have to get through this difficult work on foreclosures to help the real estate markets heal.

Just to give you some examples of what went on in the second quarter, when we foreclosed, and the foreclosure sales took place in second quarter, 33% of those properties are vacant, 80% have not made a payment for a year, the delinquency averaged 1.5 years for those customers and reflecting the very tough times that these consumers were going through, 50% were either unemployed or lost their income.

So, on the foreclosures, the key thing is we continue to do a lot of work. We fixed the affidavit signing problem or will be fixed in very short order. We've begun to initiate the foreclosure process. But the broader context is this that we need to get through the foreclosures and restore the real estate business. This is something that's ahead of us, but it's not something we're not doing a lot of today.

During the second quarter, we transferred 40,000 houses from homeowner A to homeowner B for short sales and foreclosures. That were actual transfers to people who were happy to have their home and living in it, and so our job is to continue to help fuel this process on behalf of the American consumer and to help the real estate markets.

With that, I'm going to turn over to Chuck to take you through the numbers.

**Charles H. Noski - CFO**: Thanks, Brian, and good morning everyone. As you can see on slide 12, excluding the goodwill impairment charge, we earned $0.27 a share in the third quarter. Revenue was down $2.5 billion on an FTE basis from the second quarter, which included the positive impact from a handful of items.

This quarter, we saw a nice rebound in capital markets, strong investment banking and a higher mortgage banking revenue that were offset by lower net interest income which was down as anticipated.

Credit quality continue to improve with provision expense dropping $2.7 billion in the second quarter, reflecting lower charge-offs and a decrease in reserve levels.

Our income tax expense was approximately 31% this quarter after excluding the goodwill impact which doesn't get a tax benefit.

On slide 13, we've identified some of the larger items having both positive and negative impacts on results for the quarter. As you already know, the goodwill impairment in Global Card Services was $10.4 billion. Loan loss reserves were reduced by $1.8 billion versus a reduction of $1.5 billion last quarter.

We also recorded a $592 million reserve for exposure related to industry-wide sales practices in the U.K. involving payment protection insurance claims on consumer loan products. Litigation expense across all of our businesses this quarter was up $380 million.

Income tax expense includes a charge of approximately $400 million that we highlighted last quarter related to the revaluation of deferred tax assets as a result of the July enactment of 1% reduction in the U.K. corporate tax rate.

We also add $883 million in security gains during the quarter. As you'll recall, this compares to $37 million in the second quarter, which included $711 million loss on securities sold to reduce certain lower-rated position that flowed through securities gains in the second quarter.

The credit mark on structured liabilities under the fair value option resulted in a negative mark of $190 million compared to a positive mark of $1.2 billion in the second quarter and is reported in other income.

Impacting our tangible capital and total risk-based capital, but not Tier 1 capital or earnings, was the increase in the carrying value of our CCB investment through OCI since we are with them 12 months of the expiration on sales restrictions. That investment was written up $9.8 billion or $6.2 billion after tax.

As a result of the sale of First Republic, $17 billion of loans and $18 billion of deposits came up the balance sheet on July 1, reducing net interest income by approximately $230 million in the third quarter. Sale of Santander Mexico closed in late September and was carried on the balance sheet at $2.6 billion.

Let turn to slide 14 and discuss the details around the goodwill charge of $10.4 billion. Based upon our current interpretation of the Durban amendment, which has not changed from when we last spoke with you in July, the interchange revenue reported in our Global Card Services segment going forward will be significantly impacted.

The charge to goodwill slightly exceeded the estimated range we announced in July because we refined certain model assumptions. While it represents approximately 50% of the goodwill carried in the card services segment, it is 25% of book value, roughly $40 billion down to $30 billion.

I think it's important to note that goodwill impairment testing is done on a segment basis, not on a Company total basis. Because some mitigation activities will mostly benefit other business segments, mainly the deposit segment, these activities were not included in determining the impairment in the card services goodwill.

On that point and echoing Brian's earlier comments, we continue to be diligent in how we are repositioning the consumer bank for future success, given Durbin and other headwinds. We believe we can mitigate a good portion of the lost revenue across our retail businesses by offering new and attractive customer solutions based on our understanding the customer and offering straightforward choices for how they want to do business with us. Over the next several months, we'll be piloting new products, pricing deposits and accounts differently as well as incenting the customer to do more business with us.

Since Brian gave some color around our business segment performance already, let's skip slide 15 and move to slide 16. Net interest income on a FTE basis was $12.7

billion, down $480 million from the second quarter. Similar to what we saw in the second quarter, this trend was due to the impact of the low-rate environment and lower loan levels, further impacted by the sale of First Republic Bank.

During the quarter, the net interest yield of 2.72% decreased 5 basis points due mainly to a shift in the mix of earnings assets as higher yielding assets were replaced with lower yielding assets. Our average balance sheet for the quarter was down $119 billion, reflecting decreases in average loans and cash reserves held with the Fed. Cash declined due to a shift in liquidity mix from cash to liquid securities.

Consumer loans were down due to paydowns as well as charge-offs and weak demand. However, commercial loan demand stabilized in the second half of the quarter, and as we said earlier, commercial loans less real estate ended the quarter up 1% from the prior quarter. We expect these trends to continue over the next few quarters, but to diminish as loans and yields begin to stabilize.

While we have little control over rates and customer demand, we plan to offset these impacts through a reduction of long term debt. Our mergers with Merrill Lynch and Countrywide resulted in a larger long-term debt footprint than what we think is ideal. Consequently, over the next few years, we will allow long-term debt levels to decline through maturities. We believe we can lower our long-term debt footprint by 15% to 20% by the end of 2011.

On slide 17, we show that trends and loan levels and yields as well as deposit levels and rates paid for the past three quarters. Since the second quarter, while consumer loan yields have dropped 5 basis points, we've been able to drop rates paid by 3 basis points. Excluding First Republic, deposits were flat with the second quarter, but up nicely from the first quarter driven by our wealth management customers and commercial customers.

On slide 18 we've listed the portfolios where we expect to experience further loan runoff. The sale of First Republic was effective July 1 and drove much of the decrease in levels from the second quarter. Out of the total expected runoff of approximately $132 billion at the end of September, I don't think any of the area should be of much a surprise.

Going forward, we'll continue to provide this information so that you can differentiate between real growth and expected loan runoff. For instance, this quarter, excluding the runoff portfolios and net charge-offs, we had period end loan growth of approximately $9 billion, which we detailed for you on slide 19. As you can see on 19, after adjusting for the runoff portfolio and net charge-offs, we had period end net loan growth in the quarter of approximately $10 billion of consumer, $4 billion of C&I and a decrease in commercial real estate of $5 billion.

Card revenue on slide 20 has been somewhat flat over the past three quarters, reflecting the bulk of the impact from the CARD Act. Total interchange is down 5% from the second quarter, but still up 6% from a year ago on a managed basis due to high consumer spending.

On slide 21, we show service charges were down from second quarter levels to $2.2 billion. Driving a decrease was the impact of Reg E, which became effective in July for new customers and August for existing customers. We're estimating overall service charges in the fourth quarter to be around $2 billion, which we estimate fully reflects the impact of Reg E.

Mortgage banking revenue on slide 22, increased from the second quarter as a result of higher production income, including lower reps and warranties expense. Although, the MSR hedge was effective in the quarter, MSR performance, net of hedges, was lower than the prior quarter. Production volume in first mortgage was flat with the second quarter at $72 billion, but we experienced higher production margins.

The capitalization rate for the consumer mortgage MSR asset ended the quarter at 73 basis points versus 86 basis points in the second quarter. Given the level of mortgage interest rates over the past few weeks, we would expect production levels to remain in line with the third quarter.

Turning to slide 23, you can see the total reps and warranties expense in the quarter was $872 million, down from the $1.2 billion in the prior quarter. The reserve increased approximately $0.5 billion to $4.4 billion. Our unresolved repurchase request totaled approximately $12.9 billion, of which $6.8 billion or 53% are from the GSEs.

There have been a number of questions raised about the reps and warranties exposure that exist across the industry, and specifically at Bank of America. We've addressed this topic in the past in both our Forms 10-K and 10-Q and on our prior earnings calls. But given the level of discussion, we thought it made sense to try to lay out the components for you today.

So first, let's consider the exposures we have with loans sold to the GSEs. Both legacy Bank of America and legacy Countrywide have a long history with each of the GSEs. While the environment around repurchases continues to be challenging, we strive to maintain constructive relationships with the GSEs.

Our experience with them continues to evolve, but generally, once the facts surrounding a particular loan are fully developed, we usually have been able to reach agreement and whether we, as the originator, are obligated to repurchase the loan or indemnify the GSE for the related loss. That is not to say that we never had disputes, we do. But generally, they were in those areas creating the most controversy in the most difficult vintages, such as reasonableness of stated income, occupancy and undisclosed liabilities.

To give you a feel for the experience that we have with the GSEs, let me offer a few statistics as you can see on slide 24. From 2004 through 2008, legacy Bank of America and legacy Countrywide have sold approximately $1.2 trillion of loans to the GSEs. Through September, we've received approximately $18 billion in repurchase claims associated with that population, representing only 1.5% of the total loans sold to them. We've been able to successfully resolve $11.4 billion of these claims to-date with a net loss experience of approximately 22% or roughly $2.5 billion.

A level of repurchase claims from the GSEs has been elevated for the last few quarters, driving the outstanding repurchase claims up as it takes some time to work loans through the claims process. Our reserve for the GSE reps and warranties exposures at September 30 is computed to cover both the existing pipeline of claims and a projection of future claims we might receive on loans that have already defaulted and on future defaults predicted by our last forecast models.

When we compute our reserve for GSE-related exposures, we take into account our experience with them in working through these repurchase claims. So the repurchase experience I mentioned earlier on a base of $11.4 billion in claims along with current developments gives us a good dataset to project future experience.

In fact, one of the drivers of our provision this quarter is an expectation that our repurchase rate with the GSEs will increase. Based on our current models, we believe we've already received more than two-thirds of the expected repurchase claims from the GSEs for loans originated in the 2004 to 2008 vintages.

Although our experience with the GSEs could change in the future, we believe our predictive repurchase models, utilizing our historical repurchase experience with the GSEs and projections of future defaults, leaves us to the appropriate reserve amount for the exposures we have in this sold loan portfolio as we execute repurchases on a loan-by-loan basis.

The next category of exposure is loans sold into the private label securitizations, where the bondholders have some amount of protection from losses through insurance written by monoline insurers. I think it's important to understand that each of these reps and warranties counterparties has different contractual rights and experience with us, and as such, experience from one should not necessarily be extrapolated to another. The monoline insurers wrote protection for securitizations above first and second-lien transactions on legacy Countrywide loans included in securitization vehicles.

In total, approximately $160 billion of loans were sold into these monoline wrap securitizations, including $73 billion of first-lien mortgages and $87 billion of second-lien mortgages. Of these balances, approximately one-third of the first-lien mortgages and 60% of the second-lien mortgages have paid off as of September 30.

In addition, of the first-lien sold, we estimate $38 billion were sold as whole loans to other institutions, which subsequently included these loans with those of other originators in private label securitization deals in which the monolines typically insured one or more tranches.

Through September we've received $4.8 billion of reps and warranty claims related to the monoline insured deals, of which $4.2 billion remains outstanding and approximately $550 million were repurchased. Of the $4.2 billion are still outstanding, we have completed our review on $2.7 billion and declined the repurchase based on our assessment of whether a material breach exists, and we continue to look at the remaining $1.5 billion.

As we noted last quarter, we have had limited engagement with most of the monoline insurers in a repurchase process, which has meaningfully constrained our ability to resolve the open claims. Also, certain monoline insurers have instituted litigation against Countrywide and Bank of America, which further constrains a normal business relationship. Without this engagement, we believe it is not possible at this time to reasonably estimate future repurchase experience, and therefore, the liability that may exist in connection with these securitizations.

However, there is a subset of the monoline universe that has engaged with us in the repurchase process. Although the history with them is not as deep as the history we have with the GSEs, we do believe we can use that experience as a basis for computing a reserve on existing and future claims with the subset of counterparties and have done so.

The last category of potential reps and warranties exposure relates to loans either sold to whole-own investors or included in private label securitization transactions in which we believe there is no participation by monoline insurers. Much has been written and speculated about in recent months regarding this exposure, with the good part of the discussion implying a high degree of correlation between losses and reps and warranties liability for the banks.

We believe too little attention has been focused on some fundamental factors that call into question this linkage. For example, we believe many of the losses observed in these deals have been and continue to be driven by external factors like the substantial depreciation in home prices, persistently high unemployment and other economic trends, diminishing the likelihood that any loan defect, assuming one exist at all was the cause of the loans default.

Bondholders and other market participants assume the market and disclosed credit risks of the mortgage securities they purchased including loans backing these securities. The expansion of underwriting standards over time including higher loan-to-value ratios, lower FICOs, less loan documentation and the fact that exceptions were made to underwriting guidelines were disclosed to market participants.

The length of time a loan performs prior to a default is an important consideration as well. We believe that the longer a loan performs, the less likely an underwriting reps and warranties breach would have had a material impact on the loan's performance or that a breach even exist. We believe these factors in addition to the fact that the contractual reps and warranties are less rigorous than those given to the GSEs make it difficult to extrapolate the experience with the GSEs over this population.

Here are some data points about this private investor universe, excluding those with monoline insurance. From 2004 to 2008, the total principle balance of loan sold in this category, mostly by legacy Countrywide and to a lesser extent legacy Bank of America was approximately $750 billion, of which almost 40% has paid off. Through September of this year, we've received approximately $3.9 billion of reps and warranties claims related to this population and have result almost $2.9 billion.

We've reviewed approximately half of the remaining $1 billion till outstanding and have declined a repurchase based on our assessment of whether a material breach

exists. Many of the claims that we have received so far are from whole loan investors.

As it relates to private label securities, the ultimate reps and warranties exposure requires that counterparties have the ability to both assert a claim and actually prove that a loan has an actionable defect under the applicable contracts. However, until we have a meaningful repurchase experience with these counterparties, we believe it is not possible to reasonably estimate this exposure.

Just last weeks, a case against legacy Countrywide was dismissed due to the plaintiff's failure to comply with the contractual requirement of aggregating a minimum percentage of bondholders voting rights necessary to direct the trustee to act. More recently and our capacity as a servicer on 115 private label security transactions, we received a letter from eight investors purportedly owning interest in these transactions. The letter asserts breaches of certain servicing obligations including alleged failure to provide notice of breaches of reps and warranties.

While we continue to review and assess the letter and have a number of questions about its content including whether these investors actually have standing to bring these claims, we continue to believe the servicer is in compliance with his servicing obligations. The 115 deals have an original and current principal balance of approximately $104 billion and $46 billion, respectively. We will continue to closely monitor the activities of this group and other developments.

Overall, while we have concluded that a valid basis for repurchase does not exist, we think it is important for investors to know that we will vigorously contest such claims and defending interest of Bank of America shareholders. As for future provisions, as conditions change from period to period, this will have an impact on the level of required reserve and related provision. Also, as our experience with counterparties evolves, this too will have an impact on our reserve and provision.

As a result, as we told you last quarter, we expected the provision from quarter-to-quarter may be lumpy. In fact, if you look back over the past five quarters, as we've shown in the upper left hand corner of slide 23, you see the provision is variable driven by the impact of specific developments from quarter-to-quarter.

With that, let me turn to slide 25. Investment and brokerage revenue was down 9% from second quarter due to lower asset management fees and lower brokerage income. Excluding the impact from the sale of the former Columbia Management long-term business, asset management fees were flat despite lower market valuations at the end of the second quarter and the absence of seasonal tax fees. Net claim balances grew to more than $2.1 trillion during the quarter and we continue to see strong flows in the long-term asset management products.

Sales and trading revenue on slide 26 of $4.5 billion, which includes both net interest income and non-interest income, increased approximately 42% from the second quarter due to an improved trading environment particularly in our credit markets. Compared to the prior quarter, FICC revenue increased 52% to $3.5 billion, driven mainly by higher results in credit products as well as commodities and mortgages. Equity revenue was up 14% due to the rebound in the markets, and marks on legacy

assets within FICC resulted in gains of $264 million versus losses of $179 million in the second quarter.

Investment banking revenue on slide 27 increased 4% from the second quarter and was up 9% from levels a year ago. Results were driven by an increase in M&A and debt capital markets, and our overall global fee ranking remained stable at a strong number 2, while we ranked number 1 in the U.S.

Let me say a couple of things about expense levels on slide 28. Total expense excluding the goodwill impairment charge decreased $437 million from last quarter. Expenses this quarter included higher litigation expenses I said earlier. Personnel expenses compared to a year ago was up 10%, reflecting the build out of strategic hires in certain of our businesses, including international, as well as the higher level of headcount and expense at home loans and insurance related to default management staff and other loss mitigation activities.

As we continue to adjust to a new regulatory environment, renew our focus on customers and invest in growth initiatives, we are watching expense levels closely, adjusting where necessary and taking appropriate actions to achieve our longer term objectives.

Moving to asset quality on slide 29, let me comment on the trends we're seeing in credit quality. In short, credit quality is improving on most fronts, and it's ironic that we talk so much about it when it is deteriorating, but spends a little time on it when it turns positive. Both net charge-offs and delinquencies continue to improve excluding FHA insured loans.

Net charge-offs of $7.2 billion decreased $2.4 billion compared to the second quarter. Consumer losses versus second quarter were down $2 billion, mainly in consumer card and consumer real estate. Commercial asset quality also improved as net charge -offs, reservable criticized and non-performing levels all declined.

Turning to slide 30, the total allowance decreased $1.8 billion through reductions in provision expense reflecting improving credit performance. Even with this decline in reserve levels, the allowance for loan losses remained relatively stable at 4.7% versus the loan portfolio. As you can see on the slide, the current allowance coverage versus third quarter annualized net charge-offs remains very strong in residential mortgage, home equity and commercial portfolios even when you exclude the purchase credit impaired allowance. Since we believe credit trends will continue to improve, we expect continued reserve reduction over the next few quarters.

In summary, I realize remarks have been lengthy this morning, but we had several issues we wanted to discuss with you. Excluding the goodwill impact, earnings demonstrated progress on several fronts. Credit quality continues to get better, out capital continues to grow and we believe we can manage through the Basel requirements. The mortgage situation has several facets and we are addressing and managing all of them.

With that, let's open it up for questions.

Transcript Call Date 10/19/2010

**Operator**: John McDonald, Sanford Bernstein.

**John McDonald - Sanford Bernstein**: Chuck, so I get start on the reps and
warranties. So it sounds like there are two areas where you indicated you might not
have a reasonable basis for estimating potential claims that you mentioned the
monolines that you're litigating with and then some portion of the private
securitization. I was just wondering if I heard that correctly and if so, how are you
reserving for potential exposure in those areas?

**Charles H. Noski - CFO**: John, I do think you have that right. Appreciate that the
experience that we've had with the monolines is a bit of episodic and in the case of
the whole loan and private label securitization, it's even less mature. Given the fact
we don't have maturity in those experiences, other than the monolines we are
dealing with, we have been recognizing the losses that we've paid on and as incurred
basis. If and when we get enough of an experience that we can actually make a
rational estimate, we would then increase our reserves.

**John McDonald - Sanford Bernstein**: Again, is your experience with the other
monolines are to kind of analogize to what you might experience on the others?

**Charles H. Noski - CFO**: John, it's very episodic. I'll give you an example. For
example, one of the monoclines that we're not dealing with regularly, not too long
ago, sent us some number of thousands of mortgages. We had a third-party to look
at those mortgages and well less than 10% of those mortgages appeared to qualify
for repurchase. In other case, it's all over the map. We just don't have a mature
enough population and experience to be able to make any statically reasonable
estimate.

**John McDonald - Sanford Bernstein**: Second thing was on the whole loan privates
piece on the bottom of page 24. It seems that $1 billion of approved repurchase on
the base of $3.9 billion of requests, it seems like a high success rate for the
claimants. Even though you indicated the reps and warranties are less vigorous and
causation is tougher to prove there. Am I reading that correctly or can you comment
on that?

**Charles H. Noski - CFO**: John, let me try to give you a little bit more color in that
area. As you saw on chart 24, we said there's about $750 billion of loans sold, 40%
of which have been paid back. Of that $750 billion, something approaching but less
than 50% of those loans are basically jumbo prime loans, so pretty good quality.
Similarly, when you think about the $1 billion, we did repurchase in that particular
limited set of instances. I think our loss on that was about half of the repurchase
amount.

**John McDonald - Sanford Bernstein**: The other thing on that one was, what about
securitizations from Legacy Merrill, you mentioned Legacy Countrywide and Legacy
BAC, the Merrill securitization is in your Legacy Bank of America or is that not an area
where we should think about exposure?

**Charles H. Noski - CFO**: It's really modest John.

**John McDonald - Sanford Bernstein**: Why is that? Chuck, how is it different there?

**Charles H. Noski - CFO**: No, I'm saying the dollar amount involved is quite modest.

**John McDonald - Sanford Bernstein**: So that's about in there, but not matured enough to…

**Charles H. Noski - CFO**: John, it's in the table on the upper right hand corner of table 23. It's embedded in other. It's just not a big number.

**John McDonald - Sanford Bernstein**: One more thing on rep and warranty. Just reconciling on the GSE side being two-thirds done in your estimate with the idea that it looks like the pre-2004 claims are still growing, the vintage analysis gives you confidence that you may be two-thirds down on the GSE side. How could that be if you're still seeing some 2004 growth?

**Brian T. Moynihan - President and CEO**: Remember that's just pre-2004. This is not a big number. All of the claim experience, all of the reporting that we're getting is cranked into our loan forecasting models. Again, we're saying roughly two-thirds of those has been…

**Charles H. Noski - CFO**: Remember, John, those are gross dollar claims coming in. So it's $140 million of total dollars. That's not what we paid out. That's total dollars of unpaid (indiscernible) coming in.

**John McDonald - Sanford Bernstein**: One thing finally on the NIM, Chuck. When you consider your ability that you mentioned to lower funding costs in 2011 and then what you see on asset re-pricing, can you give us some framing of where you see the NIM headed next year or maybe just contextualize the smaller decline this quarter and how that might fold into next year?

**Charles H. Noski - CFO**: John, I think we see it flattening out. Obviously, there are different elements to the NIM. There's, obviously, the interest rates we collect from customers, there's a deposit pricing, and then there is also what we may be able to do with long-term debt.

**John McDonald - Sanford Bernstein**: So more decline next quarter or flattening out next quarter, can you guys guess that?

**Charles H. Noski - CFO**: Yes, we've got a couple of more quarters of reaching a flattening out as we look forward, but it's the rate of decline that's slowing but we've got couple of more quarters, middle next year to flatten out. You can see, John, back on 43, you got the classic bubble charts there that you can see the different impacts based on different rate structures.

**John McDonald - Sanford Bernstein**: Is the pace of decline of this quarter more likely what you'd expect than last quarter's to withdraw more?

**Charles H. Noski - CFO**: Yes.

**Operator**: Glenn Schorr, Nomura.

**Glenn Schorr - Nomura**: First of all, we appreciate all of the detail on capital and everything else. It brings up a couple of questions on slide seven. On the mitigation, which I'm a believer in, you mentioned $65 billion potential for you upon exiting prop trading and another $65 million mitigation on reducing lower rated assets in the trading book. I know there's a multiplier effect here, but I didn't realize those two categories were that big. I guess my question is on what do you think or how should we think about what the revenue impact on those assets are? They strike me as higher ROA type assets, but just thoughts around that.

**Brian T. Moynihan - President and CEO**: Tom and his team, he's got a whole team dedicated to this, Glenn. They have been looking at the travel that's across the next several years. So, (indiscernible) of different categories, think about the total increase in size would have more than doubled the RWA through the various means. But when we said, okay, come back and run the business differently, he could peel off several hundred billion in the RWA with basically a billion dollars of revenue, because we are still consolidating the systems at Merrill and consolidating positions. We are only on Basel II of the second quarter, now in parallel. There is a lot optimization involved, and if you just look at our RWA as a percentage of our total assets versus anybody else out there has businesses, it looks somewhat similar. There is a lot optimization as your models and the work you can do. So think about us as being inefficient here because of the fact we took two portfolios and put it together, then you have these new rules which change the market based risk rules, especially change the ratings dramatically and then you got to work on it. You can actually pull out a lot, but not a lot of core revenue. I know that sounds surprising, but it's the multiplier effect of the future rules on the certain types of categories that is the real efficient means of optimizing it as you go forward. So in other words, prop trading today under the rules will not be that big in RWA, but it's a huge amount of increase. The example I gave you early on the Re-REMIC, it is a very specific example. There would have been $20 billion by assets round numbers or something like that if remember, Neil and Chuck. Last quarter, it would have gone to $100 billion plus because the multiplier effect of the new Basel rules and by taking it out, you stay at $8 billion of Tier 1 common. So it's an optimization around that, not a lot of revenue involved, and also activity which frankly is not core to the customer activity which is the purpose of what we're trying to accomplish for the rules and also purpose we're trying to accomplish for franchise.

**Glenn Schorr - Nomura**: Are those assets, should we think of them as in a more of a natural runoff or is somebody out there actually purchasing some of these less liquid or higher future RWA assets?

**Brian T. Moynihan - President and CEO**: Let's put that in two categories, we've been running down our legacy assets pools because we think it's in the best interest. So even like the commercial real estate declines this quarter, in part because we're pushing stuff up. But let me give you an example of a kind of asset class which I think is something you think about. Our structured credit trading book, it's not wise for shareholders to sell it, but it runs off 13, 14, 15 and it will help on lot of mitigation as we move towards the end of this. There is a lot of stuff that's rolling off that we

sealed and start doing two years ago, or three years ago frankly, as we get to 2010 third quarter here, that has a duration to it, so most of this is natural occurring, not marks . We don't have big losses to move this stuff because it just runs off frankly.

**Glenn Schorr - Nomura**: Then just on the reprising side, maybe last question on the timing mismatches. I heard your comments on being able to recoup a lot of work at loss with the new Reg rules. What is the time – it sounds like you are starting to – trying to incent the customer as you put it to bring in new business your way. But what is the timing impact on when we can start seeing some of those revenues come back in, how quickly can you move your customer base that way?

**Brian T. Moynihan - President and CEO**: I think this is a multi quarter and even multiyear of work Glenn, because, first of all, Durban doesn't take effect till next year third quarter. So, all the revenue on the debit interchanges here, the rules aren't clear. So, this is a relentless pursued over quarters in '11 and '12 to get this '11, '12 because of this position. This is not a snappy finger that happens overnight, this will take time. But importantly, you've got to do at the right pace of the customers, because we don't want to do watching the competitors, watching what we're doing, making sure that we're competitive, make sure we're doing it to preserve the franchise long-term. This will take some time.

**Operator**: Nancy Bush, NAB Research LLC.

**Nancy Bush - NAB Research LLC**: Couple of questions here. Brian, could you just clarify where you are on this foreclosure review. I'm reading the slide here, the moratorium that you had on the judicial stake is now off, but I see at the bottom of the slide, you say we'll not complete a foreclosure sale at this time. So when do we get to that point when you actually start selling foreclosed assets again?

**Charles H. Noski - CFO**: I think we said – this timed out with the statements that we put out yesterday. I think you should look at those in terms of timing. I thought we said that we'd begin putting affidavits back in the process next week. That's a judicial process, and then the judge looks at the papers and takes you through. The non-judicial states will take a few more weeks to complete the review. So it begins next week, but it builds back up. Basically, if you step back in this, there's a thousand people working on this, its hundred thousand some in the judicial state. So it's not an amount of work that we're not used to getting done, and then we'll turn to the non-judicial states in that series. So the actual re-filing starts next Monday I thought we said.

**Nancy Bush - NAB Research LLC**: Just about foreclosure sales, of course, suspended until assessment is complete, so that doesn't mean you've completely backed off selling foreclosed homes. It's just…

**Brian T. Moynihan - President and CEO**: We're selling REO. That's our home business. It's actually going through the actual step in the process, says that title changes from the homeowner to us. That will start as the affidavits start to go through the system next week.

**Nancy Bush - NAB Research LLC**: Could you just step back from – I mean this foreclosure issue, foreclosure moratorium got blown out basically in the last week or so to a lot of other stocks. The fact that REMICs were not valid, that titles are not being conveyed properly in the REMIC process, et cetera, et cetera, could you just give us your view of whether this is a big deal, not a big deal, not as big a deal as the press has presented, et cetera?

**Brian T. Moynihan - President and CEO**: Here is what I'd say. I think when you're going through the issue of people losing their home, Nancy, there could be a lot of obstacles put up in front of that process by people who want to keep their homes and people representing them, and we know that, but that's been going on forever, frankly. So I think on the affidavits that some judges said we want these done right, we went and did it. I'm sure there will be other issues raised, but as we look at the so-called Merrill's issue, as we look at some of the other stuff that's raised, and I think you've seen a lot of people write on this and talk about it, we don't see the issues that people were worried about, quite frankly, but we've taken it very seriously. We're making sure we're right. For example, one of the issues was you needed to take title on your own name prior to foreclosure out of Merrill and we've done that. That's been our policy. So there's nuances in how all this thing plays out, but I think you're right. I think the best way to think about it is – I don't think the technical issue is big a deal. The issue of foreclosure is a big deal and the issue is we've got to get on with it because it will restore the health in the market. I think the other statement that this is all messed up, it's been going on for a while. We've been ramping up the people, us and the other servicers. A big volume of transactions have gone through in this last quarter. It will get bigger over the next few quarters, but within three or four quarters, it will peak and come down the other side in terms of this activity. It will still be elevated. So I think it's a big issue because people are losing homes. It's not a big issue for the kinds of issues than service.

**Nancy Bush - NAB Research LLC**: Just another quick question. On the implementation of the new retail strategy, are you having to do intensive training at the branch level on this and are we going to see additional training expenses, consulting expenses, et cetera, et cetera, over the next few quarters if this gets ramped up.

**Brian T. Moynihan - President and CEO**: I don't think so. I think we stabilized our headcount at the store level last year about this time because they've been moved just to take the cost out, which didn't help in the whole equation I talked about. Joe stabilized the number of people. Transaction volume moves the ATM and things like that that helps three of a time to do it. Our customer service, I think we fell behind the industry in terms of scores, but when you look at the branch level and scores we get from, we get very strong scores. The question is, has the overall brand has more damaging. It's improving and we'll continue to train people to do that, but it's not a big expense item. It's embedded in amount of expenses that we spend, and we're saving money on certain things and reinvesting those money.

**Operator**: Moshe Orenbuch, Credit Suisse.

**Moshe Orenbuch - Credit Suisse**: I was hoping maybe you could talk for a minute about the card business. Three of the other large players that have reported that significant sequential improvement in revenue as credit was getting better because of less of, I guess, call back of interest and fees. Your revenue and margin was up very slightly, but the dollars were kind of down. Any thoughts you could share in terms of the outlook there and how we should be thinking about that one?

**Brian T. Moynihan - President and CEO**: I'll give you a couple of comments and I'll let Chuck fill in. I think in the overall issue this is one that and that's why I made the point about sort of the yield minus the charge-off. We have been bringing down a lot of portfolios that were not strong and had revenue but also had charge-offs that were excessive. So as we're bringing that down, I think we're behind other people and finally stabilizing this, but we're closer to stability now than we have been. You've seen the balances start to stabilize. The credit quality, what's coming on is very high on the credit quality portfolio side. But I still think, remember we're still (at a) charge-off rate, 10% now numbers, that's got to get down yield to 5% or 6% – 5%, 5.5% levels for this business to return to normalcy. So we still got work to do. Look, we are worst than other people on this statistics. We lag them. We're catching up faster and I think as you look forward, you'll see this continue to improve in this area for us. But the revenue is more because we've also taken the portfolio down because of the risk we want to take down.

**Moshe Orenbuch - Credit Suisse**: Yeah, I know. Brian, you said about, I think you sort of – as you mentioned early in the speech, volumes originations is ought to improve. I think the portfolio start to stabilize, credit qualities improved and you'll continue to see some home reserves but to the extent you've seen in the past. So I think the worst is over.

**Moshe Orenbuch - Credit Suisse**: On a separate issue and I know you touched on this a little bit at the beginning. A number of the banks, regional banks, smaller and larger are reporting rates of opt-in on the point of sale overdrafts that are fairly high and in some cases over 50%. Could you just address kind of that idea? I know you've got some thoughts on that and maybe how you think about that part of the debit process as you go forward for your customers?

**Brian T. Moynihan - President and CEO**: I think we've seen some of those reports and as I said earlier, we continue to study as to make sure we didn't miss something on customer choice. We estimated that the levels of opt-in would be in the 30s, and made our judgment based on that, whether it was worth or not. We've heard higher, we've heard lower. I think it's still early to – when you look at the actual data. So just as you think about that, ask the question what does opt-in mean? 40% of our customers take overdraft protection programs now on the new accounts we sold. So there is a lot of things going in that factor. But I wouldn't get caught on all the ins and outs. We fundamentally would believe that if you opt somebody in to a transaction that they told you they don't like and then they get hit with it, they come back and are fired up and mad. Then when you say, well, you told us you want to do it. That's a tricky execution. That's why we said, look, it's probably not worth, because it can probably just lead to more and more customer churn. So that's why the point of sale debit, which is the most confusing to customers, we made the

decision we made. I think there are other business models we see out there, similar to what we do on the ATM, which is that we see out there and ability to do as technology continues to improve where you could say that you're going to get turned down for those transaction, do you want to approve it and pay more of a convenience fee type. We're looking at those types of models with not only ourselves but also some of the card issuers and stuff on the theory that is $5 a more reasonable payment or $10 is a more reasonable payment when you want to do something as opposed to $35. So what we try to stop, and I think people – whether people opt it or not, the account churned in that part of our portfolio was so high that the people just burned themselves up over time. 10% were 70% of the revenue, but actually 3% had a high number of it too when you start to look down at those types of customers. So we made the decision we're trying to be clear with customers, but on the other hand, we think their payment models that could evolve that says maybe is more of a convenient type fee, think of an ATM convenience fee were customers would say, you know what, I just need to get this done, I don't want to pay the fee to get it done.

**Operator**: Matt O'Connor, Deutsche Bank.

**Matthew O'Connor – Deutsche Bank**: Just another follow-up, I guess, on the private label repurchase risk. I would guess as you look out over the next few months, you'll start getting a little more clarity on what some of the risks might be. As you think about trying to set up some sort of reserve and get some of these issues behind you, is this something that we could expect looking forward next quarter or do you think this could take a little bit longer?

**Charles H. Noski - CFO**: As we've said, there is not much experience, not much activity in this private label space. I think, Matt, if you go back to slide 23, the upper left hand quadrant, you see the kind of behavior that we've had for provisions, you can see the earlier periods where we didn't have events and you can see in the later periods where we did have events kind of gives you a sense of the scale of what our experiences have been to-date. As we learn more – and again, our perspective on this, we're going to be quite diligent, as I said, in defending the interest of our shareholders. This really gets down to a loan-by-loan determination and we have, we believe, the resources to deploy against that kind of a review.

**Brian T. Moynihan - President and CEO**: I think the way to think about this is we're – as you think about the toughest areas of origination and going back on chart 23, you can see that the '07, '06 vintages are producing the highest volume. The '08 is much lower. We'll continue to work this through. So time is on your side because the activities have occurred or not occurred with three years past – the last quarter being three years past the date of origination, but if you think about people who come back and say, I bought a Chevy Vega, but I want it to be a Mercedes with a 12-cylinder, we're not putting up with that. We will be very ardent to protect the shareholders' interest. On the other hand, you guys – we love never have to talk about this, but until we have a history of accounting event, we can't put it behind us. So we will diligently fight this. It has worked to our benefit. We have thousands of people who will understand and look at everyone's loans. It's not in our best interest to be diligent about it. While we love to put this behind us and never talk about it

again, the right answer is to fight for it. If we make a decision to settle with
somebody, it's going to be because of the right interest of the shareholders.

**Matthew O'Connor - Deutsche Bank**: Then separately on page 18 where you
detailed the loan runoff, I think that's very helpful. My guess is these portfolios in
aggregate aren't generating that much of any profit because of the credit cost. But as
we think about just all the components, the revenue, the expenses, are there any
details that you can provide us on those things for this $132 billion runoff book?

**Brian T. Moynihan - President and CEO**: We'll take a look and try to give you a
charge-off. We just want to make sure we isolate it for you. Your instinct is not wrong
in terms of the credit cost embedded in these portfolios and that's why the credit
costs are coming down as these run down. So we'll take a look at whether we can
give you a little more clarity on the charge-offs by portfolio.

**Matthew O'Connor - Deutsche Bank**: Also, I think the revenue and expenses will
be helpful. Just lastly, I think it was last month or the month before, you made some
comments that you weren't reinvesting cash flow from your discretionary book, just
because you don't want to take much duration risk which I think make sense. But as
we think about the discretionary book, the securities and mortgages swap, I guess
pulls maybe $400 billion or so, how should we thinking about that level over time?

**Charles H. Noski - CFO**: I think that the way that we run the balance sheet, it will
be run to extract the value of the excess deposit position, and that's what we do at
the balance of book back. So it is not another way to make money in this company.
So, by and large, as loan demand picks up, it will probably come down as a
percentage of the assets. We either are reinvesting and hedging it, so that we don't
have long rate risk or not reinvesting, and we think that's the right answer. So even
if you see growth in this, it's pretty much hedged off as you said and that's why when
you look above of chart, there is very little movement. Even in the Basel III, we
assume zero on the OCI risk and we're working to manage the Company protect that.
That is the outcome.

**Brian T. Moynihan - President and CEO**: As we said, Matt, we're also looking to
shrink the long-term debt footprint.

**Operator**: Betsy Graseck, Morgan Stanley.

**Betsy Graseck - Morgan Stanley**: Question, just a follow-up on page 18 with
regards to runoff loan portfolios, can you just give us a sense as to what the
estimated time of the K is for these portfolios and if they differ from your core
portfolio?

**Charles H. Noski - CFO**: Betsy, I think the way to think about this, if you look at the
change over the quarter and adjusted for the impact of First Republic, that's probably
a good indicator of the pace of change.

**Brian T. Moynihan - President and CEO**: ...the forces out there. It's just running
off naturally. So I think Chuck's guidance is the good one.

**Charles H. Noski - CFO**: No, its collection and charge-offs that sort of thing.

**Betsy Graseck - Morgan Stanley**: But to the extent foreclosures ramp up, that would be I would expect more skew towards this portfolio than your non-runoff portfolio, is that fair?

**Charles H. Noski - CFO**: It could be. We'll get some detail on that as we move forward.

**Operator**: Edward Najarian, ISI Group.

**Edward Najarian - ISI Group**: Just a couple of quick questions. First on back to Basel III analysis. It sounds like you're sort of employing that there is not a real good chance of any return of capital in 2012. Obviously, we've got other banks talking about the return of capital, but I suspected your outlook is that that's more of '13 or '14 event. That would be first question.

**Charles H. Noski - CFO**: I would not assume that. We are paying dividends and et cetera. But we have to make sure we understand the phase-in periods and what the regulatory required on the capital management. But the way to think about that, remember, I'm giving you the 8% as the other things were fully phased in, we will report higher numbers because, for example, 2.5% is phased in over many years, the 2.5% of the 4.5%. It will be much higher than said. I think the Reg has been clear that they understand from you as investors that there has to be a sharing of this as we build it up and the idea was to build up across time. So I wouldn't assume. We didn't mean to create that impression, but embedded in here is a reasonable dividend.

**Edward Najarian - ISI Group**: So you're saying I should not assume no return of capital. Excuse my double negative, or maybe you're just saying no assumption on that return of capital.

**Charles H. Noski - CFO**: I'm saying that despite the fact that your grammar teacher might shoot me I'm saying the first.

**Edward Najarian - ISI Group**: Then I guess the follow-up question would be; I'm just looking at the $16.8 billion of operating expense run rate. It seems like there's some things in there that could come down over time in terms of potentially litigation or credit-related costs, what have you, but you're also talking a lot about different types of investment spending and things you're doing with new products offsetting Reg-E, what have you. Could you provide us with any kind of an outlook on where you think that run rate goes just over the next few quarters or over the next 12 months?

**Brian T. Moynihan - President and CEO**: I think you've got the exact rate. We're trying to make sure we make – let's take Tom Montag for example. He is building up against the opportunity outside the United States, and so we've talked a lot of about hiring, but at the same time we're managing the headcount inside the United States where he has the number 1 market position, the capital markets fairly effectively. So we're sort of having a rotation. Joe is a low-cost producer. If you look at our cost as a percentage of deposits and compare it to anybody you can get the information on, you'll find out we're very effective there. Our cost paid for deposits are the same as –

39 basis points or whatever it was this quarter, very effective. That being said, we've also brought the branch count down by a couple hundred and hope to continue to do that. At the same time, we want to get the conversions done at Northwestern California and that's going to take some investments. So we're going to make these judgments, but I think the run rate we're at right now is the run rate we are and we don't see things that we needed to in the net invest huge amounts of money. Even though the earnings are not what we want, we think in the near term we got to make sure we take care of some things. We got the benefits of rundowns and some of the work we've done on integration, but we got some build up in some areas. A dominant part of our cost structure in the near term from now looking forward over the next several quarters will be getting through the HL&I problems and reducing the amount of people dedicated to the workout task dramatically and some of the other businesses. I think we're going to have positive and negative pressures here, but we're trying to manage both the short-term aspect of being very disciplined and I've asked Chuck to make sure that the overheads are coming down and doing the things CFO needs to do, at the same time making sure we're making investment where we need to make them.

**Edward Najarian - ISI Group**: It looks like your level of revenue, trading revenue, investment banking revenue and the iBank, was a fairly normal quarter. It's always tough to predict. Were the incentive comp expenses around that number this quarter something that you would consider pretty normal as well given that level of revenue?

**Brian T. Moynihan - President and CEO**: Yes, on a full year basis, it's probably in mid-upper 30s.

**Charles H. Noski - CFO**: I figure 38 to 39 we've been giving based on performance. That's consistent with last quarter. They get some noise in the third quarter of last year versus third quarter of this year because we did a catch up last year on the hot – on the amount of deferral. We increased the percentage. So there will be some noise related to that, but pretty much a normal percentage of growth.

**Operator**: Michael Mayo, CLSA.

**Michael Mayo - CLSA**: Can you give us some more color on why OREO declined by 10% linked quarter?

**Brian T. Moynihan - President and CEO**: Mike, we'll get Kevin and those guys give it to you. Chuck just looked at me and said – we're moving stuff out and we're doing the work, but we'll get you some details of where it came from and which portfolio.

**Michael Mayo - CLSA**: I guess the point is that properties are moving on the backend even if it was clogged some on the front end.

**Brian T. Moynihan - President and CEO**: Not fast enough because we're still building inventories, but we are moving stuff out the back end at a pace now. I think over the last three quarters on the consumer side, for example, we moved up by 50% in terms of quarterly liquidations of properties that are on our books. Remember a lot of the OREO in the consumer also goes back to the agencies to handle.

**Michael Mayo - CLSA**: I know this question has been asked many times, but so why did provisions for reps and warranties decline one-fourth linked quarter when the outstanding claims strictly related to the GSE side increased?

**Brian T. Moynihan - President and CEO**: Remember last quarter we had a catch up on some monolines and stuff that was different. So there is, I think $600 million, $700 million, Neil, of additional catch up last quarter. It wasn't there this quarter related to monolines.

**Charles H. Noski - CFO**: Mike, if you look at this quarter, there's sort of additional amount over our historical numbers which was related to our reassessment of the GSE obligations.

**Michael Mayo - CLSA**: I am just trying to figure out what would be kind of a normal number going forward for this provision line?

**Brian T. Moynihan - President and CEO**: If you take out sort of the ups and downs and look back, you can see $500 million (this) quarter and I've said that, Mike, on occasion. It's just going to be lumpy because as we gave data, we'll move something forward and that may move something that would occur later on forward because these are looked at as like a portfolio. When we make an adjustment, it's not adjustment on what the claims we received in it. It's on the exposure that we see in our portfolio if we have a basis to make it. So if you look at sort of the resolution type of thing, and look back across the quarters we gave you, its $0.5 billion, $0.5 billion, $0.5 billion, $0.5 billion, so those are kinds of numbers that would be more occurring. In last couple of quarters we had some sort of significant movement in terms of catching up to some pieces. So the danger here is, it could be lumpy, but on average that's what we thought.

**Michael Mayo - CLSA**: How many years do you think that this provision expense might be incurred? I know there is a lot of uncertainties, this is like another year, three years, five years longer?

**Charles H. Noski - CFO**: Obviously Mike, it depends upon experience. We certainly think it's going to be pretty active the next couple of years or so.

**Neil A. Cotty – SVP and ACO**: Mike, again the GSEs we do like a loan is our reserve and then it a lot depends on where things go with the monolines and the private labels which, as Chuck said earlier, is very hard to predict. So, we'll see how our experiences materialize over the next couple of quarters.

**Charles H. Noski - CFO**: But Mike, I'd be careful separating, the risk is relatively sealed in this in terms of the vintages that have given rise to most of the claims. So the issue is, how long the flight will take.

**Michael Mayo - CLSA**: On the GSE side?

**Charles H. Noski - CFO**: On all of them. The loans are originated. If you're saying this origination defect – if you look at what's happened in '08 and in '09, there's just been favorable activity, so in the long quarter we've changed the underwriting standards. When we bought Countrywide, they had already changed their and so,

that occurred in '08, so you're not seeing new activity created here from new originations of any – what I'm saying is the origination activity between '04, '05, '06, '07, that's where the balances are. The underwriting was done then and now we're going to spend next few years sort of writing the truth.

**Michael Mayo - CLSA**: But just I want to understand this, just to clarify, the new activity though is more people coming to the window saying, I bought a Vega, I thought to get a Vega, I want my money back.

**Charles H. Noski - CFO**: The activity from the putbacks, but it relates to those periods and times origination as opposed to the new activity and new underwriting loans is not producing any activity. So the pig and the snake is sealed off now. Now, the is question we just got to work it through and that's going to take time.

**Michael Mayo - CLSA**: Then two other small question. One, what was loan utilization for the quarter, I'm just trying to get a read for incremental loan demand if there is any?

**Charles H. Noski - CFO**: In the C&I book and the revolvers, it was flattish quarter-to-quarter. We didn't get to the number. I always give the number and David is going to mark a book which is lower than the overall number. So we'll get to a number, I think it's 38, if I remember, right.

**David C. Darnell - President, Global Commercial Banking**: In commercial, that's correct.

**Charles H. Noski - CFO**: In commercial loan.

**Michael Mayo - CLSA**: So it's still around the all time low, so loan demand is still kind of sluggish.

**Charles H. Noski - CFO**: What we've seen, I'd say, is that, yes, overall demand is still slow, but I'd say, as you look in first quarter, second quarter, third quarter, we've seen the loan balances stabilize and demand with customers. It is not growing, we wouldn't say that, but it is stable. It's just stronger this quarter than it was second quarter.

**Michael Mayo - CLSA**: Lastly, would you consider any strategic actions to further boost capital. I know you said you'd be above 8%. You produced a little bit more by doing some other things. Would you consider those other things such as BlackRock?

**Brian T. Moynihan - President and CEO**: I'll let you speculate on what our ideas are.

**Operator**: Chris Kotowski, Oppenheimer.

**Christopher Kotowski - Oppenheimer**: Couple of things. One is I was wondering can you comment on the monthly trend in the trading environment and customer activity flows? As we come into September and October, do we find that normalizing at all or are investors still kind of in the risk averse posture that they were in most of the summer?

**Brian T. Moynihan - President and CEO**: I'd say it's better than the summer, but not normalized. It's still lower than we'd like to be, but it did improve and the new Asian calendar got very active. It turns to the debt capital market especially, some equity stuffs come through. The IPOs we have on file are actually bigger than we even had in the internet bubble timeframe. It's just the question of whether equity market support getting them out. Our investment banking pipeline is a high-quality pipeline, 50% of the pipeline we think will close in the fourth quarter. We'll get the fees in the fourth quarter. Debt capital markets are really not a major part of that, obviously, because they come more episodically. So I'd say the issuer side activity is pretty strong especially around the ability to access debt capital. You're seeing some buyouts being done in the recent past year. Our private equity clients are getting active in visiting with them, many of them over the last several months. They are looking for deals. They are finding deals that aren't actually striking deals. But I'd say that when you go into the sort of the core trading activity, it's still lower than we thought, but it improved during the course of the quarter – from July, August to September, got better in October, I I think it's been reasonably the same.

**Christopher Kotowski - Oppenheimer**: One last time on the risk-weighted assets and you said you can drive those – the mitigation efforts don't necessarily hit revenues that much. I'm curious, is that because there is a big charge for the inter-dealer exposure and is there a good way to net all that down or what does the industry need to do to – because everyone is talking about mitigation and it's not totally clear what all the components of that are and why they don't impact revenues.

**Brian T. Moynihan - President and CEO**: We are slightly different than other organizations in a sense that the Basel II implementation is new and we're finding more ability to optimizing that. Most importantly, remember that we're only converting the Merrill systems this fall in Tom Montag's business. So we've been able to manage the risk, but we had to manage it – the legacy risk on a system and all the risk being put on since the first part of '09 has been going on in the new system, but there is a book of legacy risk. As we can bring those systems and put them both on the same system, we're able to manage them separately, we're also finding a lot of room to optimize and counterparty optimization. So there's not a – as the team working on said, this should not be as easy as it is, and that's really a shame on us, but the reality is we had two systems. We had to work through them. We had to get approvals for models and all the work you have to do and we are busy doing that. It won't be snap your fingers, but this is not as hard for us because frankly we just haven't had the chance to go through the optimization that other companies – that appears other companies have gone to. So our RWA as a percentage to around 60 plus percent and other people were on 50% and other numbers, and as we get into that, we'll figure that. The other thing is don't forget, every quarter more of the legacy stuff which is very highly weighted under the rule just keeps running off. So this is hard work, Tom's got a team that's working on it. He has got a team that's dedicated to it, but they were able to – they're quite comfortable, they can mitigate in lot of this because these are positions we don't want to take auction rate securities. Over the next couple of years, they will run down dramatically. It's $10 billion a day. It was $12 billion to $13 billion at the beginning of the year. So it just one thing after another, just hard work.

**Christopher Kotowski - Oppenheimer**: Then lastly, just I was kind of – obviously, one of the other big banks put up their big litigation reserve and you didn't, and I am kind of curious why? Then also, you mentioned that most of the problems are in the '06, '07 vintages obviously, and is there a statute of limitations on putting loans back and when does that kick in, if at all?

**Brian T. Moynihan - President and CEO**: You said last and then you asked two more questions, but your last is probably – your second one on – there's no technical statute limitations from a standpoint on the repurchase, but the fact that the loan is performed for 36 months or more, obviously a defect that said this was a problem of the origination is getting a little hard through, but especially on a no-doc loan or something like that. So things like that. I forget the first part of the question, Chuck…

**Charles H. Noski - CFO**: First question on litigation expense, we actually don't compare ourselves to other companies as such. I know you folks do. I think every company's portfolio litigation is different and it comes at different times and has different stages of progress. We're reserving for that that we know about and we think we can estimate and understand that we would have exposure on. I can't really help you with what others were doing.

**Neil A. Cotty - SVP and ACO**: One follow-up before leaving, Mike, if you're still out there. On the card revenue line, it's flat. But remember, we had a big gain in the second quarter from MasterCard of about $450 million and we had the (U.K.) charge relative to some of the sale situation over there and that's about $600 million. So we had a flip of $1.2 billion. We haven't had that – those two instances, we would had revenue going up. I thank everyone for joining us.

**Operator**: This does conclude today's teleconference. Thank you for your participation. You may disconnect at anytime and have a wonderful day.

© Copyright 2012 Morningstar, Inc.

# Exhibit 4



LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright (c) 2011, by Matthew Bender & Company, a member
of the LexisNexis Group. All rights reserved.

*** This section is current through the December 28, 2011 issue of the ***
*** Federal Register with the exception of the amendment appearing at ***
*** 76 FR 79768, Dec. 22, 2011 ***

TITLE 17 -- COMMODITY AND SECURITIES EXCHANGES
CHAPTER II -- SECURITIES AND EXCHANGE COMMISSION
PART 229 -- STANDARD INSTRUCTIONS FOR FILING FORMS UNDER SECURITIES ACT OF 1933,
SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975 --
REGULATION S-K
SUBPART 229.1100 -- ASSET-BACKED SECURITIES (REGULATION AB)

**Go to the CFR Archive Directory**

*17 CFR 229.1121*

§ 229.1121 (Item 1121) Distribution and pool performance information.

(a) Describe the distribution for the related distribution period and the performance of the asset pool during the distribution period. Provide appropriate introductory and explanatory information to introduce any material terms, parties or abbreviations used (or a cross-reference to a Commission filing where such information may be found). Present statistical information in tabular or graphical format, if such presentation will aid understanding. While the material information regarding the related distribution and pool performance will vary depending on the nature of the transaction, such information may include, among other things:

(1) Any applicable record dates, accrual dates, determination dates for calculating distributions and actual distribution dates for the distribution period.

(2) Cash flows received and the sources thereof for distributions, fees and expenses (including portfolio yield, if applicable).

(3) Calculated amounts and distribution of the flow of funds for the period itemized by type and priority of payment, including:

(i) Fees or expenses accrued and paid, with an identification of the general purpose of such fees and the party receiving such fees or expenses.

(ii) Payments accrued or paid with respect to enhancement or other support identified in Item 1114 of this

17 CFR 229.1121

Regulation AB (such as insurance premiums or other enhancement maintenance fees), with an identification of the general purpose of such payments and the party receiving such payments.

(iii) Principal, interest and other distributions accrued and paid on the asset-backed securities by type and by class or series and any principal or interest shortfalls or carryovers.

(iv) The amount of excess cash flow or excess spread and the disposition of excess cash flow.

(4) Beginning and ending principal balances of the asset-backed securities.

(5) Interest rates applicable to the pool assets and the asset-backed securities, as applicable. Consider providing interest rate information for pool assets in appropriate distributional groups or incremental ranges.

(6) Beginning and ending balances of transaction accounts, such as reserve accounts, and material account activity during the period.

(7) Any amounts drawn on any credit enhancement or other support identified in Item 1114 of this Regulation AB, as applicable, and the amount of coverage remaining under any such enhancement, if known and applicable.

(8) Number and amount of pool assets at the beginning and ending of each period, and updated pool composition information, such as weighted average coupon, weighted average life, weighted average remaining term, pool factors and prepayment amounts. For asset-backed securities backed by leases where a portion of the securitized pool balance is attributable to residual values of the physical property underlying the leases, this information also would include turn-in rates and residual value realization rates.

(9) Delinquency and loss information for the period. In addition, describe any material changes to the information specified in Item 1100(b)(5) of this Regulation AB regarding the pool assets.

(10) Information on the amount, terms and general purpose of any advances made or reimbursed during the period, including the general use of funds advanced and the general source of funds for reimbursements.

(11) Any material modifications, extensions or waivers to pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time.

(12) Material breaches of pool asset representations or warranties or transaction covenants.

(13) Information on ratio, coverage or other tests used for determining any early amortization, liquidation or other performance trigger and whether the trigger was met.

(14) Information regarding any new issuance of asset-backed securities backed by the same asset pool, any pool asset changes (other than in connection with a pool asset converting into cash in accordance with its terms), such as additions or removals in connection with a prefunding or revolving period and pool asset substitutions and repurchases (and purchase rates, if applicable), and cash flows available for future purchases, such as the balances of any prefunding or revolving accounts, if applicable. Disclose any material changes in the solicitation, credit-granting, underwriting, origination, acquisition or pool selection criteria or procedures, as applicable, used to originate, acquire or select the new pool assets.

(b) During a prefunding or revolving period, or if there has been a new issuance of asset-backed securities backed by the same pool under a master trust during the fiscal year of the issuing entity, provide the information required by Items 1110, 1111 and 1112 of this Regulation AB applied taking the revised pool composition into account in the Form 10-D report ( § 249.312 of this chapter) for the last required distribution of the fiscal year of the issuing entity. In addition, provide such updated information in the first Form 10-D report for the period in which the prefunding or revolving period ends (if applicable). However, no disclosure need be provided by this paragraph if the information has

not materially changed from that previously provided in an Exchange Act report relating to the asset-backed securities or in an effective registration statement under the Securities Act or a prospectus timely filed pursuant to § 230.424 of this chapter under the same Central Index Key (CIK) code regarding a subsequent issuance of asset-backed securities backed by a pool of assets that includes the pool assets that are the subject of this paragraph.

(c) Repurchases and replacements. (1) Provide the information required by Rule 15Ga-1(a) (*17 CFR 240.15Ga-1(a)*) concerning all assets of the pool that were subject of a demand to repurchase or replace for breach of the representations and warranties.

(2) Include a reference to the most recent Form ABS-15G (17.CFR 249.1400) filed by the securitizer (as that term is defined in Section 15G(a) of the Securities Exchange Act of 1934) and disclose the CIK number of the securitizer.

**HISTORY:** *[70 FR 1506, 1612,* Jan. 7, 2005; *76 FR 4489, 4511,* Jan. 26, 2011]

**AUTHORITY:** AUTHORITY NOTE APPLICABLE TO ENTIRE PART:
*15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa(25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 777iii, 77jjj, 77nnn, 77sss, 78c, 78i, 78j,* 78 l, 78m, 78n, 78n-1, 78o, 78u-5, 78w, 78 ll, 78mm, 80a-8, 80a-9, 80a-20, 80a-29, 80a-30, 80a-31(c), 80a-37, 80a-38(a), 80a-39, 80b-11, and 7201 et seq.; and *18 U.S.C. 1350,* unless otherwise noted.
Section 229.303 is also issued under secs. 3(a) and 401(a), Pub. L. No. 107-204, *116 Stat. 745.*
Section 229.307 is also issued under secs. 3(a) and 302, Pub.L.No. 107-204, *116 Stat. 745.*
Section 229.401 is also issued under secs. 3(a) and 407, Pub. L. 107-204, *116 Stat. 745.*
Section 229.406 is also issued under secs. 3(a) and 406, Pub. L. 107-204, *116 Stat. 745.*
Section 229.601 is also issued under secs. 3(a) and 406, Pub. L. 107-204, *116 Stat. 745.*

**NOTES:** [EFFECTIVE DATE NOTE: *76 FR 4489, 4511,* Jan. 26, 2011, added paragraph (c), effective Mar. 28, 2011. For compliance date information, see: *76 FR 4489,* Jan. 26, 2011.]


NOTES APPLICABLE TO ENTIRE PART:
ATTENTION ELECTRONIC FILERS
THIS REGULATION SHOULD BE READ IN CONJUNCTION WITH REGULATION S-T (PART 232 OF THIS CHAPTER), WHICH GOVERNS THE PREPARATION AND SUBMISSION OF DOCUMENTS IN ELECTRONIC FORMAT. MANY PROVISIONS RELATING TO THE PREPARATION AND SUBMISSION OF DOCUMENTS IN PAPER FORMAT CONTAINED IN THIS REGULATION ARE SUPERSEDED BY THE PROVISIONS OF REGULATION S-T FOR DOCUMENTS REQUIRED TO BE FILED IN ELECTRONIC FORMAT.



CASE NOTES Applicable to entire Part:Part Note

# Exhibit 5

EXECUTION COPY

==================

CWMBS, INC.,

Depositor

COUNTRYWIDE HOME LOANS, INC.,

Seller

PARK GRANADA LLC,

Seller

PARK MONACO INC.,

Seller

PARK SIENNA LLC,

Seller

COUNTRYWIDE HOME LOANS SERVICING LP,

Master Servicer

and

THE BANK OF NEW YORK,

Trustee

----------------------------------

POOLING AND SERVICING AGREEMENT

Dated as of July 1, 2007

----------------------------------

CHL MORTGAGE PASS-THROUGH TRUST 2007-14

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-14

==================

ARTICLE I

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
REPRESENTATIONS AND WARRANTIES

SECTION 2.01. Conveyance of Mortgage Loans.

(a) Each Seller concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Initial Mortgage Loans, including all interest and principal received or receivable by such Seller, on or with respect to the applicable Initial Mortgage Loans after the Initial Cut-off Date and all interest and principal payments on the related Initial Mortgage Loans received prior to the Initial Cut-off Date in respect of installments of interest and principal due thereafter, but not including payments of principal and interest due and payable on such Initial Mortgage Loans, on or before the Initial Cut-off Date. On or prior to the Closing Date, Countrywide shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule (except that, in the case of the Delay Delivery Mortgage Loans (which may include Countrywide Mortgage Loans, Park Granada Mortgage Loans, Park Monaco Mortgage Loans and Park Sienna Mortgage Loans), such delivery may take place within thirty (30) days following the Closing Date or twenty (20) days following the applicable Supplemental Transfer Date, as applicable). Such delivery of the Mortgage Files shall be made against payment by the Depositor of the purchase price, previously agreed to by the Sellers and Depositor, for the Mortgage Loans. With respect to any Initial Mortgage Loan that does not have a first payment date on or before the Due Date in the month of the first Distribution Date or any Supplemental Mortgage Loan that does not have a first payment date on or before the Due Date in the month after the related Supplemental Transfer Date, Countrywide shall deposit into the Distribution Account on or before the Distribution Account Deposit Date relating to the first applicable Distribution Date, an amount equal to one month's interest at the related Adjusted Mortgage Rate on the Cut-off Date Principal Balance of such Mortgage Loan.

(b) Immediately upon the conveyance of the Initial Mortgage Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with the Depositor's right to require each Seller to cure any breach of a representation or warranty made herein by such Seller, or to repurchase or substitute for any affected Mortgage Loan in accordance herewith.

(c) In connection with the transfer and assignment set forth in clause (b) above, the Depositor has delivered or caused to be delivered to the Trustee (or, in the case of the Delay Delivery Mortgage Loans that are Initial Mortgage Loans, will deliver or cause to be delivered to the Trustee within thirty (30) days following the Closing Date and in the case of the Delay Delivery Mortgage Loans that are Supplemental Mortgage Loans, will deliver or cause to be delivered to the Trustee within twenty (20) days following the applicable Supplemental Transfer Date) for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned:

(i) (A) the original Mortgage Note endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note); or

II-1

(B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note;

(ii) except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, the original recorded Mortgage or a copy of such Mortgage, with recording information, certified by Countrywide as being a true and complete copy of the Mortgage (or, in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico, a true copy of the Mortgage certified as such by the applicable notary) and in the case of each MERS Mortgage Loan, the original Mortgage, or a copy of such mortgage, with recording information, noting the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage, or a copy of such assignment, with recording information, (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of such mortgage or a copy of such assignment, with recording information, (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates); provided that, if the related Mortgage has not been returned from the applicable public recording office, such assignment of the Mortgage may exclude the information to be provided by the recording office; provided, further, that such assignment of Mortgage need not be delivered in the case of a Mortgage for which the related Mortgaged Property is located in the Commonwealth of Puerto Rico;

(iv) the original or copies of each assumption, modification, written assurance or substitution agreement, if any;

(v) except as provided below, the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto; and

(vi) in the case of a Cooperative Loan, the originals of the following documents or instruments:

(A) The Coop Shares, together with a stock power in blank;

(B) The executed Security Agreement;

(C) The executed Proprietary Lease;

(D) The executed Recognition Agreement;

(E) The executed UCC-1 financing statement with evidence of recording thereon which have been filed in all places required to perfect the Seller's interest in the Coop Shares and the Proprietary Lease; and

(F) The executed UCC-3 financing statements or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken line

II-2

from the mortgagee to the Trustee with evidence of recording
thereon (or in a form suitable for recordation).

In addition, in connection with the assignment of any MERS
Mortgage Loan, each Seller agrees that it will cause, at the Trustee's
expense, the MERS(R) System to indicate that the Mortgage Loans sold by such
Seller to the Depositor have been assigned by that Seller to the Trustee in
accordance with this Agreement (and any Supplemental Transfer Agreement, as
applicable) for the benefit of the Certificateholders by including (or
deleting, in the case of Mortgage Loans which are repurchased in accordance
with this Agreement) in such computer files the information required by the
MERS(R) System to identify the series of the Certificates issued in connection
with such Mortgage Loans. Each Seller further agrees that it will not, and
will not permit the Master Servicer to, and the Master Servicer agrees that it
will not, alter the information referenced in this paragraph with respect to
any Mortgage Loan sold by such Seller to the Depositor during the term of this
Agreement unless and until such Mortgage Loan is repurchased in accordance
with the terms of this Agreement.

In the event that in connection with any Mortgage Loan that is not
a MERS Mortgage Loan the Depositor cannot deliver (a) the original recorded
Mortgage, or a copy of such mortgage, with recording information, (b) all
interim recorded assignments, or a copy of such assignments, with recording
information or (c) the lender's title policy or a copy of the lender's title
policy (together with all riders thereto) satisfying the requirements of
clause (ii), (iii) or (v) above, respectively, concurrently with the execution
and delivery of this Agreement because such document or documents have not
been returned from the applicable public recording office in the case of
clause (ii) or (iii) above, or because the title policy has not been delivered
to either the Master Servicer or the Depositor by the applicable title insurer
in the case of clause (v) above, the Depositor shall promptly deliver to the
Trustee, in the case of clause (ii) or (iii) above, such original Mortgage or
a copy of such mortgage, with recording information, or such interim
assignment or a copy of such assignment, with recording information, as the
case may be, with evidence of recording indicated thereon upon receipt thereof
from the public recording office, or a copy thereof, certified, if
appropriate, by the relevant recording office, but in no event shall any such
delivery of the original Mortgage and each such interim assignment or a copy
thereof, certified, if appropriate, by the relevant recording office, be made
later than one year following the Closing Date, or, in the case of clause (v)
above, no later than 120 days following the Closing Date; provided, however,
in the event the Depositor is unable to deliver by such date each Mortgage and
each such interim assignment by reason of the fact that any such documents
have not been returned by the appropriate recording office, or, in the case of
each such interim assignment, because the related Mortgage has not been
returned by the appropriate recording office, the Depositor shall deliver such
documents to the Trustee as promptly as possible upon receipt thereof and, in
any event, within 720 days following the Closing Date. The Depositor shall
forward or cause to be forwarded to the Trustee (a) from time to time
additional original documents evidencing an assumption or modification of a
Mortgage Loan and (b) any other documents required to be delivered by the
Depositor or the Master Servicer to the Trustee. In the event that the
original Mortgage is not delivered and in connection with the payment in full
of the related Mortgage Loan and the public recording office requires the
presentation of a "lost instruments affidavit and indemnity" or any equivalent
document, because only a copy of the Mortgage can be delivered with the
instrument of satisfaction or reconveyance, the Master Servicer shall execute
and deliver or cause to be executed and delivered such a document to the
public recording office. In the case where a public recording office retains
the original recorded Mortgage or in the case where a Mortgage is lost after
recordation in a public recording office, Countrywide shall deliver to the
Trustee a copy of such Mortgage certified by such public recording office to
be a true and complete copy of the original recorded Mortgage.

As promptly as practicable subsequent to such transfer and
assignment, and in any event, within one-hundred and twenty (120) days after
such transfer and assignment, the Trustee shall (A) as the

II-3

assignee thereof, affix the following language to each assignment of Mortgage: "CWMBS Series 2007-14, The Bank of New York, as trustee", (B) cause such assignment to be in proper form for recording in the appropriate public office for real property records and (C) cause to be delivered for recording in the appropriate public office for real property records the assignments of the Mortgages to the Trustee, except that, (i) with respect to any assignments of Mortgage as to which the Trustee has not received the information required to prepare such assignment in recordable form, the Trustee's obligation to do so and to deliver the same for such recording shall be as soon as practicable after receipt of such information and in any event within thirty (30) days after receipt thereof and (ii) the Trustee need not cause to be recorded any assignment which relates to a Mortgage Loan, the Mortgaged Property and Mortgage File relating to which are located in any jurisdiction (including Puerto Rico) under the laws of which the recordation of such assignment is not necessary to protect the Trustee's and the Certificateholders' interest in the related Mortgage Loan as evidenced by an opinion of counsel delivered by Countrywide to the Trustee within 90 days of the Closing Date (which opinion may be in the form of a "survey" opinion and is not required to be delivered by counsel admitted to practice law in the jurisdiction as to which such legal opinion applies).

        In the case of Mortgage Loans that have been prepaid in full as of the Closing Date, the Depositor, in lieu of delivering the above documents to the Trustee, will deposit in the Certificate Account the portion of such payment that is required to be deposited in the Certificate Account pursuant to Section 3.05 hereof.

        Notwithstanding anything to the contrary in this Agreement, within thirty (30) days after the Closing Date with respect to the Initial Mortgage Loans, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (i) deliver to the Depositor, or at the Depositor's direction, to the Trustee or other designee of the Depositor the Mortgage File as required pursuant to this Section 2.01 for each Delay Delivery Mortgage Loan or (ii) either (A) substitute a Substitute Mortgage Loan for the Delay Delivery Mortgage Loan or (B) repurchase the Delay Delivery Mortgage Loan, which substitution or repurchase shall be accomplished in the manner and subject to the conditions set forth in Section 2.03 (treating each Delay Delivery Mortgage Loan as a Deleted Mortgage Loan for purposes of such Section 2.03); provided, however, that if Countrywide fails to deliver a Mortgage File for any Delay Delivery Mortgage Loan within the thirty (30) day period provided in the prior sentence, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall use its best reasonable efforts to effect a substitution, rather than a repurchase of, such Deleted Mortgage Loan and provided further that the cure period provided for in Section 2.02 or in Section 2.03 shall not apply to the initial delivery of the Mortgage File for such Delay Delivery Mortgage Loan, but rather Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall have five (5) Business Days to cure such failure to deliver. At the end of such thirty (30) day period the Trustee shall send a Delay Delivery Certification for the Delay Delivery Mortgage Loans delivered during such thirty (30) day period in accordance with the provisions of Section 2.02.

        (d) Subject to the execution and delivery of the related Supplemental Transfer Agreement as provided in Section 2.01(e) hereof and the terms and conditions of this Agreement, each Seller sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, on each Supplemental Transfer Date, with respect to each Supplemental Mortgage Loan sold by such Seller to the Depositor, all the right, title and interest of that Seller in and to the Supplemental Mortgage Loans sold by it identified in such Supplemental Transfer Agreement, including all interest and principal received and receivable by such Seller on or with respect to the related Supplemental Mortgage Loans on and after the related Supplemental Cut-off Date (to the extent not applied in computing the Cut-off Date Principal Balance thereof) or deposited into the Certificate Account by the related Seller, other than principal and interest due on such Supplemental Mortgage Loans prior to the related Supplemental Cut-off Date.

                                II-4

Immediately upon the conveyance of the Supplemental Mortgage Loans referred to in the preceding paragraph, the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for benefit of the Certificateholders, without recourse, all right title and interest in all of the Supplemental Mortgage Loans.

Each Seller has entered into this Agreement in consideration for the purchase of the Mortgage Loans sold by such Seller to the Depositor and has agreed to take the actions specified herein. The Depositor, concurrently with the execution and delivery of this Agreement, hereby sells, transfers, assigns and otherwise conveys to the Trustee for the use and benefit of the Certificateholders, without recourse, all right title and interest in the portion of the Trust Fund not otherwise conveyed to the Trust Fund pursuant to Sections 2.01(a) or (b).

(e) Upon five (5) Business Days written notice to the Trustee, the Depositor, the Master Servicer (if the Master Servicer is not a Seller) and the Rating Agencies, on any other Business Day during the Funding Period designated by Countrywide, Park Granada, Park Monaco and Park Sienna, if applicable, the Depositor and the Trustee shall complete, execute and deliver a Supplemental Transfer Agreement so long as no Rating Agency has provided notice that the execution and delivery of such Supplemental Transfer Agreement will result in a reduction or withdrawal of any ratings assigned to the Certificates. After the execution and delivery of such Supplemental Transfer Agreement, on the Supplemental Transfer Date, the Trustee shall set aside in the Pre-Funding Account an amount equal to the Aggregate Supplemental Purchase Amount.

The transfer of Supplemental Mortgage Loans and the other property and rights relating to them on a Supplemental Transfer Date is subject to the satisfaction of each of the following conditions:

(i) each Supplemental Mortgage Loan conveyed on such Supplemental Transfer Date satisfies the representations and warranties applicable to it under this Agreement; provided, however, that with respect to a breach of a representation and warranty with respect to a Supplemental Mortgage Loan, the obligation under Section 2.03(c) of this Agreement of Countrywide, Park Granada, Park Monaco and Park Sienna, if applicable, to cure, repurchase or replace such Supplemental Mortgage Loan shall constitute the sole remedy against such Seller respecting such breach available to Certificateholders, the Depositor or the Trustee;

(ii) the Trustee, the Underwriters and the Rating Agencies are provided with an Opinion of Counsel or Opinions of Counsel with respect to the tax treatment of the Trust Fund, to be delivered as provided pursuant to Section 2.01(f);

(iii) the Rating Agencies and the Underwriters are provided with an Opinion of Counsel or Opinions of Counsel with respect to the validity of the conveyance of the Supplemental Mortgage Loans conveyed on such Supplemental Transfer Date, to be delivered as provided pursuant to Section 2.01(f);

(iv) the execution and delivery of such Supplemental Transfer Agreement or conveyance of the related Supplemental Mortgage Loans does not result in a reduction or withdrawal of any ratings assigned to the Certificates by the Rating Agencies;

(v) the Supplemental Mortgage Loans conveyed on such Supplemental Transfer Date were selected in a manner reasonably believed not to be adverse to the interests of the Certificateholders;

II-5

(vi) no Supplemental Mortgage Loan conveyed on such Supplemental Transfer date was 30 or more days delinquent;

(vii) the aggregate of the PO Percentages of the Stated Principal Balance of all Supplemental Mortgage Loans shall not exceed the PO Sublimit;

(viii) following the conveyance of the Supplemental Mortgage Loans on such Supplemental Transfer Date to the Trust Fund, the characteristics of the Mortgage Loans will comply with the Pool Characteristics (including the permitted variances listed therein); provided, that for the purpose of making these calculations, the characteristics for any Initial Mortgage Loan made will be taken as of the Initial Cut-off Date and the characteristics for any Supplemental Mortgage Loan will be taken as of the related Supplemental Cut-off Date;

(ix) none of the Sellers or the Depositor shall be insolvent or shall be rendered insolvent as a result of such transfer; and

(x) the Depositor shall have delivered to the Trustee an Officer's Certificate confirming the satisfaction of each of these conditions precedent.

The Trustee shall not be required to investigate or otherwise verify compliance with these conditions, except for its own receipt of documents specified above, and shall be entitled to rely on the required Officer's Certificate.

(f) Within seven Business Days after each Supplemental Transfer Date, upon (1) delivery to the Trustee by the Depositor or Countrywide of the Opinions of Counsel referred to in Sections 2.01(e)(ii) and (iii), (2) delivery to the Trustee by Countrywide of a revised Mortgage Loan Schedule reflecting the Supplemental Mortgage Loans conveyed on such Supplemental Transfer Date and (3) delivery to the Trustee by the Depositor of an Officer's Certificate confirming the satisfaction of each of the conditions precedent set forth in this Section 2.01(f), the Trustee shall pay to each Seller the portion of the Aggregate Supplemental Transfer Amount used to purchase Supplemental Mortgage Loans from such Seller from those funds that were set aside in the Pre-Funding Account pursuant to Section 2.01(e). The positive difference, if any, between the Aggregate Supplemental Transfer Amount and the Aggregate Supplemental Purchase Amount shall be reinvested by the Trustee in the Pre-Funding Account.

(g) The Trustee shall not be required to investigate or otherwise verify compliance with the conditions set forth in the preceding paragraph, except for its own receipt of documents specified above, and shall be entitled to rely on the required Officer's Certificate.

Within thirty days after the final Supplemental Transfer Date, the Depositor shall deliver to the Trustee a letter of a nationally recognized firm of independent public accountants stating whether or not the Supplemental Mortgage Loans conveyed on such Supplemental Transfer Date conform to the characteristics in Section 2.01(e)(vi), (vii) and (viii).

(h) Neither the Depositor nor the Trust will acquire or hold any Mortgage Loan that would violate the representations made by Countrywide set forth in clause (49) of Schedule III-A hereto.

SECTION 2.02. Acceptance by Trustee of the Mortgage Loans.

(a) The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit F-1 and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or

II-6

will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

The Trustee agrees to execute and deliver on the Closing Date to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) an Initial Certification in the form annexed hereto as Exhibit F-1. Based on its review and examination, and only as to the documents identified in such Initial Certification, the Trustee acknowledges that such documents appear regular on their face and relate to such Initial Mortgage Loan. The Trustee shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that the same are genuine, enforceable or appropriate for the represented purpose or that they have actually been recorded in the real estate records or that they are other than what they purport to be on their face.

On or about the thirtieth (30th) day after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Delay Delivery Certification with respect to the Initial Mortgage Loans in the form annexed hereto as Exhibit G-1, with any applicable exceptions noted thereon.

Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Final Certification with respect to the Initial Mortgage Loans in the form annexed hereto as Exhibit H-1, with any applicable exceptions noted thereon. If, in the course of such review, the Trustee finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification; provided, however that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days from the Closing Date, except that if the substitution or purchase of a Mortgage Loan pursuant to this provision is required by reason of a delay in delivery of any documents by the appropriate recording office, and there is a dispute between either the Master Servicer or Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) and the Trustee over the location or status of the recorded document, then such substitution or purchase shall occur within 720 days from the Closing Date. The Trustee shall deliver written notice to each Rating Agency within 270 days from the Closing Date indicating each Mortgage Loan (a) which has not been returned by the appropriate recording office or (b) as to which there is a dispute as to location or status of such Mortgage Loan. Such notice shall be delivered every 90 days thereafter until the related Mortgage Loan is returned to the Trustee. Any such substitution pursuant to (a) above or purchase pursuant to (b) above shall not be effected prior to the delivery to the Trustee of the Opinion of Counsel required by Section 2.05 hereof, if any, and any substitution pursuant to (a) above shall not be effected prior to the additional delivery to the Trustee of a Request for Release substantially in the form of Exhibit N. No substitution is permitted to be made in any

II-7

calendar month after the Determination Date for such month. The Purchase Price for any such Mortgage Loan shall be deposited by Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) in the Certificate Account on or prior to the Distribution Account Deposit Date for the Distribution Date in the month following the month of repurchase and, upon receipt of such deposit and certification with respect thereto in the form of Exhibit N hereto, the Trustee shall release the related Mortgage File to Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) and shall execute and deliver at Countrywide's (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) request such instruments of transfer or assignment prepared by Countrywide, in each case without recourse, as shall be necessary to vest in Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna), or its designee, the Trustee's interest in any Mortgage Loan released pursuant hereto. If pursuant to the foregoing provisions Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) repurchases an Initial Mortgage Loan that is a MERS Mortgage Loan, the Master Servicer shall either (i) cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) or its designee and shall cause such Mortgage to be removed from registration on the MERS(R) System in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS(R) System Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) or its designee as the beneficial holder of such Mortgage Loan.

(b) Upon delivery of the Supplemental Mortgage Loans pursuant to a Supplemental Transfer Agreement, the Trustee shall acknowledge receipt of the documents identified in any Supplemental Certification in the form annexed hereto as Exhibit F-2 and declare that it will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

The Trustee agrees to execute and deliver on the Supplemental Transfer Date to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Supplemental Certification in the form annexed hereto as Exhibit F-2. Based on its review and examination, and only as to the documents identified in such Supplemental Certification, the Trustee shall acknowledge that such documents appear regular on their face and relate to such Supplemental Mortgage Loan. The Trustee shall be under no duty or obligation to inspect, review or examine said documents, instruments, certificates or other papers to determine that the same are genuine, enforceable or appropriate for the represented purpose or that they have actually been recorded in the real estate records or that they are other than what they purport to be on their face.

On or about the twentieth (20th) day after the Supplemental Transfer Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Delay Delivery Certification with respect to the Supplemental Mortgage Loans in the form annexed hereto as Exhibit G-2, with any applicable exceptions noted thereon.

Not later than 90 days after the final Supplemental Transfer Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) a Final Certification with respect to the Supplemental Mortgage Loans in the form annexed hereto as Exhibit H-2, with any applicable exceptions noted thereon.

(c) If, in the course of such review of the Mortgage Files relating to the Supplemental Mortgage Loans, the Trustee finds any document constituting a part of a Mortgage File

II-8

which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification; provided, however that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall either (a) substitute for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days from the Closing Date, except that if the substitution or purchase of a Mortgage Loan pursuant to this provision is required by reason of a delay in delivery of any documents by the appropriate recording office, and there is a dispute between either the Master Servicer or Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) and the Trustee over the location or status of the recorded document, then such substitution or purchase shall occur within 720 days from the Closing Date. The Trustee shall deliver written notice to each Rating Agency within 270 days from the Closing Date indicating each Mortgage Loan (a) which has not been returned by the appropriate recording office or (b) as to which there is a dispute as to location or status of such Mortgage Loan. Such notice shall be delivered every 90 days thereafter until the related Mortgage Loan is returned to the Trustee. Any such substitution pursuant to (a) above or purchase pursuant to (b) above shall not be effected prior to the delivery to the Trustee of the Opinion of Counsel required by Section 2.05 hereof, if any, and any substitution pursuant to (a) above shall not be effected prior to the additional delivery to the Trustee of a Request for Release substantially in the form of Exhibit N. No substitution is permitted to be made in any calendar month after the Determination Date for such month. The Purchase Price for any such Mortgage Loan shall be deposited by Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) in the Certificate Account on or prior to the Distribution Account Deposit Date for the Distribution Date in the month following the month of repurchase and, upon receipt of such deposit and certification with respect thereto in the form of Exhibit N hereto, the Trustee shall release the related Mortgage File to Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) and shall execute and deliver at Countrywide's (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) request such instruments of transfer or assignment prepared by Countrywide, in each case without recourse, as shall be necessary to vest in Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna), or a designee, the Trustee's interest in any Mortgage Loan released pursuant hereto. If pursuant to the foregoing provisions Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) repurchases a Supplemental Mortgage Loan that is a MERS Mortgage Loan, the Master Servicer shall either (i) cause MERS to execute and deliver an assignment of the Mortgage in recordable form to transfer the Mortgage from MERS to Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) and shall cause such Mortgage to be removed from registration on the MERS(R) System in accordance with MERS' rules and regulations or (ii) cause MERS to designate on the MERS(R) System Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) or its designee as the beneficial holder of such Mortgage Loan.

(d) The Trustee shall retain possession and custody of each Mortgage File in accordance with and subject to the terms and conditions set forth herein. The Master Servicer shall promptly deliver to the Trustee, upon the execution or receipt thereof, the originals of such other

II-9

documents or instruments constituting the Mortgage File as come into the possession of the Master Servicer from time to time.

(e) It is understood and agreed that the respective obligations of each Seller to substitute for or to purchase any Mortgage Loan sold to the Depositor by it which does not meet the requirements of Section 2.01 above shall constitute the sole remedy respecting such defect available to the Trustee, the Depositor and any Certificateholder against that Seller.

SECTION 2.03. Representations, Warranties and Covenants of the Sellers and Master Servicer.

(a) Countrywide hereby makes the representations and warranties set forth in (i) Schedule II-A, Schedule II-B, Schedule II-C and Schedule II-D hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date, (ii) Schedule III-A hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date, or if so specified therein, as of the Initial Cut-off Date with respect to all of the Initial Mortgage Loans and as of the related Supplemental Cut-off Date with respect to all of the Supplemental Mortgage Loans, and (iii) Schedule III-B hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date, or if so specified therein, as of the Initial Cut-off Date with respect to the Initial Mortgage Loans that are Countrywide Mortgage Loans and as of the related Supplemental Cut-off Date with respect to the Supplemental Mortgage Loans that are Countrywide Mortgage Loans. Park Granada hereby makes the representations and warranties set forth in (i) Schedule II-B hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date and (ii) Schedule III-C hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date, or if so specified therein, as of the Initial Cut-off Date with respect to the Initial Mortgage Loans that are Park Granada Mortgage Loans and as of the related Supplemental Cut-off Date with respect to the Supplemental Mortgage Loans that are Park Granada Mortgage Loans. Park Monaco hereby makes the representations and warranties set forth in (i) Schedule II-C hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date and (ii) Schedule III-D hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date, or if so specified therein, as of the Initial Cut-off Date with respect to the Initial Mortgage Loans that are Park Monaco Mortgage Loans and as of the related Supplemental Cut-off Date with respect to the Supplemental Mortgage Loans that are Park Monaco Mortgage Loans. Park Sienna hereby makes the representations and warranties set forth in (i) Schedule II-D hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date and (ii) Schedule III-E hereto, and by this reference incorporated herein, to the Depositor, the Master Servicer and the Trustee, as of the Closing Date, or if so specified therein, as of the Initial Cut-off Date with respect to the Initial Mortgage Loans that are Park Sienna Mortgage Loans and as of the related Supplemental Cut-off Date with respect to the Supplemental Mortgage Loans that are Park Sienna Mortgage Loans.

(b) The Master Servicer hereby makes the representations and warranties set forth in Schedule IV hereto, and by this reference incorporated herein, to the Depositor and the Trustee, as of the Closing Date.

(c) Upon discovery by any of the parties hereto of a breach of a representation or warranty with respect to a Mortgage Loan made pursuant to Section 2.03(a) or a breach of a representation or warranty with respect to a Supplemental Mortgage Loan under Section 2.01(e)(i) that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties. Each Seller hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party

II-10

of a breach of any representation or warranty with respect to a Mortgage Loan sold by it pursuant to Section 2.03(a) and with respect to a breach of a representation and warranty with respect to a Supplemental Mortgage Loan sold by it under Section 2.01(e)(i) which materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below; provided, however, that any such substitution pursuant to (i) above shall not be effected prior to the delivery to the Trustee of the Opinion of Counsel required by Section 2.05 hereof, if any, and any such substitution pursuant to (i) above shall not be effected prior to the additional delivery to the Trustee of a Request for Release substantially in the form of Exhibit N and the Mortgage File for any such Substitute Mortgage Loan. The Seller repurchasing a Mortgage Loan pursuant to this Section 2.03(c) shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach. With respect to the representations and warranties described in this Section which are made to the best of a Seller's knowledge, if it is discovered by either the Depositor, a Seller or the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders therein, notwithstanding that Seller's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable representation or warranty.

(d) With respect to any Substitute Mortgage Loan or Loans, sold to the Depositor by a Seller, Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) shall deliver to the Trustee for the benefit of the Certificateholders the Mortgage Note, the Mortgage, the related assignment of the Mortgage, and such other documents and agreements as are required by Section 2.01, with the Mortgage Note endorsed and the Mortgage assigned as required by Section 2.01. No substitution is permitted to be made in any calendar month after the Determination Date for such month. Scheduled Payments due with respect to Substitute Mortgage Loans in the month of substitution shall not be part of the Trust Fund and will be retained by the related Seller on the next succeeding Distribution Date. For the month of substitution, distributions to Certificateholders will include the monthly payment due on any Deleted Mortgage Loan for such month and thereafter that Seller shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan. The Master Servicer shall amend the Mortgage Loan Schedule for the benefit of the Certificateholders to reflect the removal of such Deleted Mortgage Loan and the substitution of the Substitute Mortgage Loan or Loans and the Master Servicer shall deliver the amended Mortgage Loan Schedule to the Trustee. Upon such substitution, the Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement in all respects, and the related Seller shall be deemed to have made with respect to such Substitute Mortgage Loan or Loans, as of the date of substitution, the representations and warranties made pursuant to Section 2.03(a) with respect to such Mortgage Loan. Upon any such substitution and the deposit to the Certificate Account of the amount required to be deposited therein in connection with such substitution as described in the following paragraph, the Trustee shall release the Mortgage File held for the benefit of the Certificateholders relating to such Deleted Mortgage Loan to the related Seller and shall execute and deliver at such Seller's direction such instruments of transfer or assignment prepared by Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna), in each case without recourse, as shall be necessary to vest title in that Seller, or its designee, the Trustee's interest in any Deleted Mortgage Loan substituted for pursuant to this Section 2.03.

For any month in which a Seller substitutes one or more Substitute Mortgage Loans for one or more Deleted Mortgage Loans, the Master Servicer will determine the amount (if any) by which

II-11

the aggregate principal balance of all Substitute Mortgage Loans sold to the Depositor by that Seller as of the date of substitution is less than the aggregate Stated Principal Balance of all Deleted Mortgage Loans repurchased by that Seller (after application of the scheduled principal portion of the monthly payments due in the month of substitution). The amount of such shortage (the "Substitution Adjustment Amount") plus an amount equal to the aggregate of any unreimbursed Advances with respect to such Deleted Mortgage Loans shall be deposited in the Certificate Account by Countrywide (on its own behalf and on behalf of Park Granada, Park Monaco and Park Sienna) on or before the Distribution Account Deposit Date for the Distribution Date in the month succeeding the calendar month during which the related Mortgage Loan became required to be purchased or replaced hereunder.

In the event that a Seller shall have repurchased a Mortgage Loan, the Purchase Price therefor shall be deposited in the Certificate Account pursuant to Section 3.05 on or before the Distribution Account Deposit Date for the Distribution Date in the month following the month during which that Seller became obligated hereunder to repurchase or replace such Mortgage Loan and upon such deposit of the Purchase Price, the delivery of the Opinion of Counsel required by Section 2.05 and receipt of a Request for Release in the form of Exhibit N hereto, the Trustee shall release the related Mortgage File held for the benefit of the Certificateholders to such Person, and the Trustee shall execute and deliver at such Person's direction such instruments of transfer or assignment prepared by such Person, in each case without recourse, as shall be necessary to transfer title from the Trustee. It is understood and agreed that the obligation under this Agreement of any Person to cure, repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing shall constitute the sole remedy against such Persons respecting such breach available to Certificateholders, the Depositor or the Trustee on their behalf.

The representations and warranties made pursuant to this Section 2.03 shall survive delivery of the respective Mortgage Files to the Trustee for the benefit of the Certificateholders.

SECTION 2.04. Representations and Warranties of the Depositor as to the Mortgage Loans.

The Depositor hereby represents and warrants to the Trustee with respect to each Mortgage Loan as of the date hereof or such other date set forth herein that as of the Closing Date, and following the transfer of the Mortgage Loans to it by each Seller, the Depositor had good title to the Mortgage Loans and the Mortgage Notes were subject to no offsets, defenses or counterclaims.

The Depositor hereby assigns, transfers and conveys to the Trustee all of its rights with respect to the Mortgage Loans including, without limitation, the representations and warranties of each Seller made pursuant to Section 2.03(a)(ii) hereof, together with all rights of the Depositor to require each Seller to cure any breach thereof or to repurchase or substitute for any affected Mortgage Loan in accordance with this Agreement.

It is understood and agreed that the representations and warranties set forth in this Section 2.04 shall survive delivery of the Mortgage Files to the Trustee. Upon discovery by the Depositor or the Trustee of a breach of any of the foregoing representations and warranties set forth in this Section 2.04 (referred to herein as a "breach"), which breach materially and adversely affects the interest of the Certificateholders, the party discovering such breach shall give prompt written notice to the others and to each Rating Agency.

II-12

SECTION 3.13. Documents, Records and Funds in Possession of Master
Servicer to be Held for the Trustee.

Notwithstanding any other provisions of this Agreement, the Master
Servicer shall transmit to the Trustee as required by this Agreement all
documents and instruments in respect of a Mortgage Loan coming into the
possession of the Master Servicer from time to time and shall account fully to
the Trustee for any funds received by the Master Servicer or which otherwise
are collected by the Master Servicer as Liquidation Proceeds, Insurance
Proceeds or Subsequent Recoveries in respect of any Mortgage Loan. All
Mortgage Files and funds collected or held by, or under the control of, the
Master Servicer in respect of any Mortgage Loans, whether from the collection
of principal and interest payments or from Liquidation Proceeds and any
Subsequent Recoveries, including but not limited to, any funds on deposit in
the Certificate Account, shall be held by the Master Servicer for and on
behalf of the Trustee and shall be and remain the sole and exclusive property
of the Trustee, subject to the applicable provisions of this Agreement. The
Master Servicer also agrees that it shall not create, incur or subject any
Mortgage File or any funds that are deposited in the Certificate Account,
Distribution Account or any Escrow Account, or any funds that otherwise are or
may become due or payable to the Trustee for the benefit of the
Certificateholders, to any claim, lien, security interest, judgment, levy,
writ of attachment or other encumbrance, or assert by legal action or
otherwise any claim or right of setoff against any Mortgage File or any funds
collected on, or in connection with, a Mortgage Loan, except, however, that
the Master Servicer shall be entitled to set off against and deduct from any
such funds any amounts that are properly due and payable to the Master
Servicer under this Agreement.

SECTION 3.14. Servicing Compensation.

As compensation for its activities hereunder, the Master Servicer
shall be entitled to retain or withdraw from the Certificate Account an amount
equal to the Master Servicing Fee; provided, that the aggregate Master
Servicing Fee with respect to any Distribution Date shall be reduced (i) by an
amount equal to the aggregate of the Prepayment Interest Shortfalls on all of
the Mortgage Loans, if any, with respect to such Distribution Date, but not to
exceed the Compensating Interest for such Distribution Date, and (ii) with
respect to the first Distribution Date, an amount equal to any amount to be
deposited into the Distribution Account by the Depositor pursuant to Section
2.01(a) and not so deposited.

Additional servicing compensation in the form of Excess Proceeds,
Prepayment Interest Excess, prepayment charges, assumption fees, late payment
charges and all income and gain net of any losses realized from Permitted
Investments on funds in the Certificate Account and Distribution Account shall
be retained by the Master Servicer to the extent not required to be deposited
in the Certificate Account pursuant to Section 3.05 hereof. The Master
Servicer shall be required to pay all expenses incurred by it in connection
with its master servicing activities hereunder (including payment of any
premiums for hazard insurance and any Primary Insurance Policy and maintenance
of the other forms of insurance coverage required by this Agreement) and shall
not be entitled to reimbursement therefor except as specifically provided in
this Agreement.

SECTION 3.15. Access to Certain Documentation.

The Master Servicer shall provide to the OTS and the FDIC and to
comparable regulatory authorities supervising Holders and/or Certificate
Owners and the examiners and supervisory agents of the OTS, the FDIC and such
other authorities, access to the documentation regarding the Mortgage Loans
required by applicable regulations of the OTS and the FDIC. Such access shall
be afforded without charge, but only upon reasonable and prior written request
and during normal business hours at the offices designated by the Master
Servicer. Nothing in this Section shall limit the obligation of the Master
Servicer to observe any applicable law prohibiting disclosure of information
regarding the Mortgagors

III-15

basis to the Class A-9 Certificates, until its Class Certificate Balance is reduced to zero, and then any realized losses that would otherwise be allocated to the Class A-1 and Class A-4 Certificates will instead be allocated to the Class A-16 and Class A-20 Certificates, respectively, until their respective Class Certificate Balances are reduced to zero.

(b) The Class Certificate Balance of Subordinated Certificates then outstanding with the highest numerical Class designation shall be reduced on each Distribution Date by the sum of (i) the amount of any payments on the Class PO Certificates in respect of Class PO Deferred Amounts and (ii) the amount, if any, by which the aggregate of the Class Certificate Balances of all outstanding Classes of Certificates (after giving effect to the distribution of principal and the allocation of Realized Losses and Class PO Deferred Amounts on such Distribution Date) exceeds the Pool Stated Principal Balance for the following Distribution Date.

(c) Any Realized Losses allocated to a Class of Certificates or any reduction in the Class Certificate Balance of a Class of Certificates pursuant to Section 4.04(a) above shall be allocated among the Certificates of such Class in proportion to their respective Certificate Balances.

(d) Any allocation of Realized Losses to a Certificate or to any Component or any reduction in the Certificate Balance or Component Balance of a Certificate or Component, pursuant to Section 4.04(a) above shall be accomplished by reducing the Certificate Balance or Component Balance thereof, as applicable, immediately following the distributions made on the related Distribution Date in accordance with the definition of "Certificate Balance" or "Component Balance," as the case may be. All Realized Losses allocated to a Class of Component Certificates will be allocated, pro rata, to the related Components.

SECTION 4.05. [Reserved]

SECTION 4.06. Monthly Statements to Certificateholders.

(a) Concurrently with each distribution on a Distribution Date, the Trustee will forward by electronic delivery to each Rating Agency and make available to Certificateholders on the Trustee's website (http://www.bnyinvestorreporting.com) a statement generally setting forth the information contained in Exhibit U hereto. Such statement shall also indicate whether any exchanges of Exchangeable Certificates or Depositable Certificates have occurred since the immediately preceding Distribution Date and, if applicable, the Class designation, Class Certificate Balance or Notional Amount and Pass-Through Rate of any Classes of Certificates that were received by a Certificateholder as a result of such exchange as well as any Net Prepayment Interest Shortfalls and Realized Losses allocated to such Certificates as a result of such exchange.

(b) The Trustee's responsibility for disbursing the above information to the Certificateholders is limited to the availability, timeliness and accuracy of the information provided by the Master Servicer.

(c) On or before the fifth Business Day following the end of each Prepayment Period (but in no event later than the third Business Day prior to the related Distribution Date), the Master Servicer shall deliver to the Trustee (which delivery may be by electronic data transmission) a report in substantially the form set forth as Schedule VI hereto.

(d) Within a reasonable period of time after the end of each calendar year, the Trustee shall cause to be furnished to each Person who at any time during the calendar year was a Certificateholder, a statement containing the information set forth in items (1), (2) and (7) of Exhibit U

IV-7

hereto, aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Trustee pursuant to any requirements of the Code as from time to time in effect.

        SECTION 4.07. Determination of Pass-Through Rates for COFI Certificates.

        The Pass-Through Rate for each Class of COFI Certificates for each Interest Accrual Period after the initial Interest Accrual Period shall be determined by the Trustee as provided below on the basis of the Index and the applicable formulae appearing in footnotes corresponding to the COFI Certificates in the table relating to the Certificates in the Preliminary Statement.

        Except as provided below, with respect to each Interest Accrual Period following the initial Interest Accrual Period, the Trustee shall not later than two Business Days prior to such Interest Accrual Period but following the publication of the applicable Index determine the Pass-Through Rate at which interest shall accrue in respect of the COFI Certificates during the related Interest Accrual Period.

        Except as provided below, the Index to be used in determining the respective Pass-Through Rates for the COFI Certificates for a particular Interest Accrual Period shall be COFI for the second calendar month preceding the Outside Reference Date for such Interest Accrual Period. If at the Outside Reference Date for any Interest Accrual Period, COFI for the second calendar month preceding such Outside Reference Date has not been published, the Trustee shall use COFI for the third calendar month preceding such Outside Reference Date. If COFI for neither the second nor third calendar months preceding any Outside Reference Date has been published on or before the related Outside Reference Date, the Index for such Interest Accrual Period and for all subsequent Interest Accrual Periods shall be the National Cost of Funds Index for the third calendar month preceding such Interest Accrual Period (or the fourth preceding calendar month if such National Cost of Funds Index for the third preceding calendar month has not been published by such Outside Reference Date). In the event that National Cost of Funds Index for neither the third nor fourth calendar months preceding an Interest Accrual Period has been published on or before the related Outside Reference Date, then for such Interest Accrual Period and for each succeeding Interest Accrual Period, the Index shall be LIBOR, determined in the manner set forth below.

        With respect to any Interest Accrual Period for which the applicable Index is LIBOR, LIBOR for such Interest Accrual Period will be established by the Trustee on the related Interest Determination Date as provided in Section 4.08.

        In determining LIBOR and any Pass-Through Rate for the COFI Certificates or any Reserve Interest Rate, the Trustee may conclusively rely and shall be protected in relying upon the offered quotations (whether written, oral or on the Reuters Screen) from the Reference Banks or the New York City banks as to LIBOR or the Reserve Interest Rate, as appropriate, in effect from time to time. The Trustee shall not have any liability or responsibility to any Person for (i) the Trustee's selection of New York City banks for purposes of determining any Reserve Interest Rate or (ii) its inability, following a good-faith reasonable effort, to obtain such quotations from the Reference Banks or the New York City banks or to determine such arithmetic mean, all as provided for in this Section 4.07.

        The establishment of LIBOR and each Pass-Through Rate for the COFI Certificates by the Trustee shall (in the absence of manifest error) be final, conclusive and binding upon each Holder of a Certificate and the Trustee.

IV-8

SCHEDULE III-A

CWMBS, Inc.

Mortgage Pass-Through Certificates

Series 2007-14

Representations and Warranties of Countrywide as to all of the Mortgage Loans
-------------------------------------------------------------------------

Countrywide Home Loans, Inc. ("Countrywide") hereby makes the representations and warranties set forth in this Schedule III-A to the Depositor, the Master Servicer and the Trustee, with respect to all of the Initial Mortgage Loans as of the Closing Date, and with respect to all of the Supplemental Mortgage Loans as of the related Supplemental Transfer Date or if so specified herein, as of the related Supplemental Cut-off Date. Capitalized terms used but not otherwise defined in this Schedule III-A shall have the meanings ascribed thereto in the Pooling and Servicing Agreement (the "Pooling and Servicing Agreement") relating to the above-referenced Series, among Countrywide, as a seller, Park Granada LLC, as a seller, Park Monaco Inc., as a seller, Park Sienna LLC, as a seller, Countrywide Home Loans Servicing LP, as master servicer, CWMBS, Inc., as depositor, and The Bank of New York, as trustee.

1) The information set forth on Schedule I to the Pooling and Servicing Agreement with respect to each Initial Mortgage Loan is true and correct in all material respects as of the Closing Date and with respect to each Supplemental Mortgage Loan is true and correct in all material respects as of the related Supplemental Transfer Date.

2) As of the Closing Date, all payments due with respect to each Initial Mortgage Loan prior to the Initial Cut-off Date have been made. As of a Supplemental Transfer Date, none of the Supplemental Mortgage Loans conveyed on such Supplemental Transfer Date were 30 or more days delinquent.

3) No Mortgage Loan had a Loan-to-Value Ratio at origination in excess of 100.00%.

4) Each Mortgage is a valid and enforceable first lien on the Mortgaged Property subject only to (a) the lien of non delinquent current real property taxes and assessments, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the related Mortgage Loan, and (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by such Mortgage.

5) [Reserved].

6) There is no delinquent tax or assessment lien against any Mortgaged Property.

7) There is no valid offset, defense or counterclaim to any Mortgage Note or Mortgage, including the obligation of the Mortgagor to pay the unpaid principal of or interest on such Mortgage Note.

S-III-A-1

8) There are no mechanics' liens or claims for work, labor or material affecting any Mortgaged Property which are or may be a lien prior to, or equal with, the lien of such Mortgage, except those which are insured against by the title insurance policy referred to in item (12) below.

9) As of the Closing Date with respect to the Initial Mortgage Loans and as of the related Supplemental Transfer Date with respect to the Supplemental Mortgage Loans, to the best of Countrywide's knowledge, each Mortgaged Property is free of material damage and in good repair.

10) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, predatory and abusive lending laws, real estate settlement procedures, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws.

11) As of the Closing Date, with respect to the Initial Mortgage Loans and as of the related Supplemental Transfer Date with respect to the Supplemental Mortgage Loans, neither the Sellers nor any prior holder of any Mortgage has modified the Mortgage in any material respect (except that a Mortgage Loan may have been modified by a written instrument which has been recorded or submitted for recordation, if necessary, to protect the interests of the Certificateholders and the original or a copy of which has been delivered to the Trustee); satisfied, cancelled or subordinated such Mortgage in whole or in part; released the related Mortgaged Property in whole or in part from the lien of such Mortgage; or executed any instrument of release, cancellation, modification or satisfaction with respect thereto.

12) A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, in an amount at least equal to the Cut-off Date Stated Principal Balance of each such Mortgage Loan or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force and effect, and each such policy was issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located and acceptable to FNMA or FHLMC and is in a form acceptable to FNMA or FHLMC, which policy insures Countrywide and successor owners of indebtedness secured by the insured Mortgage, as to the first priority lien of the Mortgage subject to the exceptions set forth in paragraph (4) above; to the best of Countrywide's knowledge, no claims have been made under such mortgage title insurance policy and no prior holder of the related Mortgage, including Countrywide, has done, by act or omission, anything which would impair the coverage of such mortgage title insurance policy.

13) Each Mortgage Loan was originated (within the meaning of Section 3(a)(41) of the Securities Exchange Act of 1934, as amended) by an entity that satisfied at the time of origination the requirements of Section 3(a)(41) of the Securities Exchange Act of 1934, as amended.

14) To the best of Countrywide's knowledge, all of the improvements which were included for the purpose of determining the Appraised Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the Mortgaged Property.

15) To the best of Countrywide's knowledge, no improvement located on or being part of the Mortgaged Property is in violation of any applicable zoning law or regulation. To the best of Countrywide's knowledge, all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities, unless the lack thereof would not have a material

adverse effect on the value of such Mortgaged Property, and the Mortgaged Property is lawfully occupied under applicable law.

16) Each Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and under applicable law. To the best of Countrywide's knowledge, all parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties.

17) The proceeds of the Mortgage Loans have been fully disbursed, there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making, or closing or recording the Mortgage Loans were paid.

18) The related Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.

19) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Certificateholders to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor.

20) Each Mortgage Note and each Mortgage is in substantially one of the forms acceptable to FNMA or FHLMC, with such riders as have been acceptable to FNMA or FHLMC, as the case may be.

21) There exist no deficiencies with respect to escrow deposits and payments, if such are required, for which customary arrangements for repayment thereof have not been made, and no escrow deposits or payments of other charges or payments due Countrywide have been capitalized under the Mortgage or the related Mortgage Note.

22) The origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business.

23) There is no pledged account or other security other than real estate securing the Mortgagor's obligations.

24) No Mortgage Loan has a shared appreciation feature, or other contingent interest feature.

25) Each Mortgage Loan contains a customary "due on sale" clause.

26) As of the Closing Date 2.01% of the Initial Mortgage Loans provide for a prepayment charge.

27) Each Mortgage Loan which had a Loan-to-Value Ratio at origination in excess of 80.00% is the subject of a Primary Insurance Policy that insures that portion of the principal balance equal to a specified percentage times the sum of the remaining principal balance of the related Mortgage Loan, the accrued interest thereon and the related foreclosure expenses. The specified coverage percentage for mortgage loans with terms to maturity between 25 and 30 years is 12% for Loan-to-Value Ratios between

S-III-A-3

80.01% and 85.00%, 25% for Loan-to-Value Ratios between 85.01% and 90.00%, 30% for Loan-to-Value Ratios between 90.01% and 95.00% and 35% for Loan-to-Value Ratios between 95.01% and 100%. The specified coverage percentage for mortgage loans with terms to maturity of up to 20 years ranges from 6% to 12% for Loan-to-Value Ratios between 80.01% and 85.00%, from 12% to 20% for Loan-to-Value Ratios between 85.01% and 90.00% and 20% to 25% for Loan-to-Value Ratios between 90.01% and 95.00%. Each such Primary Insurance Policy is issued by a Qualified Insurer. All provisions of any such Primary Insurance Policy have been and are being complied with, any such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage subject to any such Primary Insurance Policy obligates either the Mortgagor or the mortgagee thereunder to maintain such insurance and to pay all premiums and charges in connection therewith, subject, in each case, to the provisions of Section 3.09(b) of the Pooling and Servicing Agreement. The Mortgage Rate for each Mortgage Loan is net of any such insurance premium.

28) As of the Closing Date or the related Supplemental Transfer Date, the improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy with a generally acceptable carrier that provides for fire and extended coverage and coverage for such other hazards as are customary in the area where the Mortgaged Property is located in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements securing such Mortgage Loan or (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds of such policy shall be sufficient to prevent the Mortgagor and/or the mortgagee from becoming a co-insurer. If the Mortgaged Property is a condominium unit, it is included under the coverage afforded by a blanket policy for the condominium unit. All such individual insurance policies and all flood policies referred to in item (29) below contain a standard mortgagee clause naming Countrywide or the original mortgagee, and its successors in interest, as mortgagee, and Countrywide has received no notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance including flood insurance at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor.

29) If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property with a generally acceptable carrier in an amount representing coverage not less than the least of (A) the original outstanding principal balance of the Mortgage Loan, (B) the minimum amount required to compensate for damage or loss on a replacement cost basis, or (C) the maximum amount of insurance that is available under the Flood Disaster Protection Act of 1973, as amended.

30) To the best of Countrywide's knowledge, there is no proceeding occurring, pending or threatened for the total or partial condemnation of the Mortgaged Property.

31) There is no material monetary default existing under any Mortgage or the related Mortgage Note and, to the best of Countrywide's knowledge, there is no material event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration under the Mortgage or the related Mortgage Note; and Countrywide has not waived any default, breach, violation or event of acceleration.

32) Each Mortgaged Property is improved by a one-to-four family residential dwelling including condominium units and dwelling units in PUDs, which, to the best of Countrywide's

S-III-A-4

knowledge, does not include cooperatives or mobile homes and does not constitute other than real property under state law.

33) Each Mortgage Loan is being master serviced by the Master Servicer.

34) Any future advances made prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Mortgage Loan Schedule. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan. The Mortgage Note does not permit or obligate the Master Servicer to make future advances to the Mortgagor at the option of the Mortgagor.

35) All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments or ground rents which previously became due and owing have been paid, or an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed, but is not yet due and payable. Except for (A) payments in the nature of escrow payments, and (B) interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage proceeds, whichever is later, to the day which precedes by one month the Due Date of the first installment of principal and interest, including without limitation, taxes and insurance payments, the Master Servicer has not advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required by the Mortgage.

36) Each Mortgage Loan was underwritten in all material respects in accordance with Countrywide's underwriting guidelines as set forth in the Prospectus Supplement.

37) Other than with respect to any Streamlined Documentation Mortgage Loan as to which the loan-to-value ratio of the related Original Mortgage Loan was less than 90% at the time of the origination of such Original Mortgage Loan, prior to the approval of the Mortgage Loan application, an appraisal of the related Mortgaged Property was obtained from a qualified appraiser, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; such appraisal is in a form acceptable to FNMA and FHLMC.

38) None of the Mortgage Loans are graduated payment mortgage loans or a growing equity mortgage loans.

39) Any leasehold estate securing a Mortgage Loan has a term of not less than five years in excess of the term of the related Mortgage Loan.

40) The Mortgage Loans were selected from among the outstanding fixed-rate one-to-four family mortgage loans in the portfolios of the Sellers at the Closing Date as to which the representations and warranties made as to the Mortgage Loans set forth in this Schedule III-A can be made. Such selection was not made in a manner intended to adversely affect the interests of Certificateholders.

41) Except for 129 Initial Mortgage Loans, each Mortgage Loan has a payment date on or before the Due Date in the month of the first Distribution Date.

42) With respect to any Mortgage Loan as to which an affidavit has been delivered to the Trustee certifying that the original Mortgage Note is a Lost Mortgage Note, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage by or on

behalf of the Trustee will not be materially adversely affected by the absence of the original Mortgage Note. A "Lost Mortgage Note" is a Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

43) The Mortgage Loans, individually and in the aggregate, conform in all material respects to the descriptions thereof in the Prospectus Supplement.

44) [Reserved]

45) [Reserved]

46) [Reserved]

47) [Reserved]

48) No Mortgage Loan originated between October 1, 2002 and March 7, 2003 is subject to the Georgia Fair Lending Act, as amended. No Mortgage Loan originated between October 1, 2002 and March 7, 2003 is secured by a Mortgaged Property located in the state of Georgia, and there is no Mortgage Loan originated on or after March 7, 2003 that is a "high cost home loan" as defined under the Georgia Fair Lending Act.

49) None of the Mortgage Loans are "high cost" loans as defined by applicable predatory and abusive lending laws.

50) None of the Mortgage Loans are covered by the Home Ownership and Equity Protection Act of 1994 ("HOEPA").

51) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 (N.J.S.A. 46:10B-22 et seq.).

52) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004 (N.M. Stat. Ann. ss.ss. 58-21a-1 et seq.).

53) No Mortgage Loan is a "High-Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 (Mass. Gen. Law ch. 183C).

54) [Reserved]

55) All of the Mortgage Loans were originated in compliance with all applicable laws, including, but not limited to, all applicable anti-predatory and abusive lending laws.

56) No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable, and with respect to the foregoing, the terms "High Cost Loan" and "Covered Loan" have the meaning assigned to them in the then current Standard & Poor's LEVELS(R) Version 6.0 Glossary Revised, Appendix E which is attached hereto as Exhibit Q (the "Glossary") where (x) a "High Cost Loan" is each loan identified in the column "Category under applicable anti-predatory lending law" of the table entitled "Standard & Poor's High Cost Loan Categorization" in the Glossary as each such loan is defined in the applicable anti-predatory lending law of the State or jurisdiction specified in such table and (y) a "Covered Loan" is each loan identified in the column "Category under applicable anti-predatory lending law" of the table entitled

# Exhibit 6

UNITED STATES

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549
--------------------

FORM 10-K
ANNUAL REPORT
PURSUANT TO SECTIONS 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

(Mark One)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

For the fiscal year ended:   December 31, 2007
-----------------

or

[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

For the transition period from            to
-------------    -------------

Commission file number of Issuing Entity: 333-140958-12
-------------

CHL Mortgage Pass-Through Trust 2007-14,
Mortgage Pass-Through Certificates, Series 2007-14
--------------------------------------------------
(Exact name of Issuing Entity as Specified in Its Charter)

Commission file number of Depositor: 333-140958
----------

CWMBS, Inc.
-----------
(Exact name of Depositor as Specified in Its Charter)

Countrywide Home Loans, Inc.
----------------------------
(Exact name of Sponsor as Specified in Its Charter)

Delaware                                    95-4449516
- ------------------------------------    ------------------------------
(State or Other Jurisdiction of          (I.R.S. Employer Identification
Incorporation or Organization of          No. of the Depositor)
the Depositor)

c/o  Countrywide Home Loans Servicing LP
     4500 Park Granada
     Calabasas, California                      91302
- ------------------------------------    ------------------------------
(Address of Principal Executive Offices        (Zip Code)
of the Depositor)

Registrant's telephone number, including area code:   (818) 225-3000
-------------

Securities registered pursuant to Section 12(b) of the Act:  None
----

Exhibit 33.1

------------

[LOGO OMITTED]
Countrywide
Financial(SM)

ASSESSMENT OF COMPLIANCE WITH APPLICABLE SERVICING CRITERIA

Countrywide Financial Corporation and certain of its subsidiaries, including its direct and indirect wholly-owned subsidiaries, Countrywide Home Loans, Inc. ("CHL"), Countrywide Tax Services Corporation, Newport Management Corporation, and Countrywide Home Loans Servicing, L.P., a wholly-owned subsidiary of CHL (collectively, the "Company"), provides this platform-level assessment, for which Countrywide Financial Corporation and such subsidiaries participated in servicing functions, as such term is described under Title 17, Section 229.1122 of the Code of Federal Regulations ("Item 1122 of Regulation AB"), of compliance in respect of the following Applicable Servicing Criteria specified in Item 1122(d) of Regulation AB in regard to the following servicing platform for the following period:

Platform: publicly-issued (i.e., registered with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended) residential mortgage-backed securities (securities collateralized by residential mortgage loans, including prime, alternative loan products, sub-prime, HELOC and closed seconds) issued on or after January 1, 2006 for which the Company provides cash collection and administration, investor remittances and reporting (except for those activities relating to trustee and paying agent services), and pool asset administration (except for those activities relating to custodial operations of pool assets and related documents), and for which the related issuer has a fiscal year end of December 31, 2007. The platform excludes any transactions issued by any government sponsored enterprise for which the Company provides the servicing functions described in the preceding sentence.

Period: as of and for the year ended December 31, 2007.

Applicable Servicing Criteria: all servicing criteria set forth in Schedule A hereto, to the extent required in the related agreements, except the criteria listed in the column titled "Inapplicable Servicing Criteria" on Schedule A hereto and the portions of the criteria footnoted on that schedule that are inapplicable to the Company based on the activities it performs with respect to the Platform.

With respect to the Platform and the Period, the Company provides the following assessment of compliance in respect of the Applicable Servicing Criteria:

1. The Company is responsible for assessing its compliance with the Applicable Servicing Criteria.

2. The Company has assessed compliance with the Applicable Servicing Criteria.

3. Other than as identified on Schedule B hereto, as of and for the Period, the Company complied in all material respects with the Applicable Servicing Criteria.

KPMG LLP, an independent registered public accounting firm, has issued an attestation report with respect to the Company's foregoing assessment of compliance as of and for the year ended December 31, 2007.

COUNTRYWIDE FINANCIAL CORPORATION

By:   /s/ Steve Bailey
      ----------------------------------------------------
      Steve Bailey

Its:  Senior Managing Director and Chief Executive Officer,
      Loan Administration


Dated: February 28, 2008


By:   /s/ Kevin Meyers
      ----------------------------------------------------
      Kevin Meyers

Its:  Managing Director and Chief Financial Officer,
      Countrywide Home Loans, Inc. Loan Administration


Dated: February 28, 2008

Schedule A
----------

Applicable Servicing Criteria
-----------------------------

| | | APPLICABLE SERVICING CRITERIA | | INAPPLICABLE SERVICING CRITERIA | |
|---|---|---|---|---|---|
| Reference | Criteria | Performed Directly by the Company | Performed By Vendor(s) for which the Company is the Responsible Party | Performed by subservicer(s) or vendor(s) for which the Company is NOT the Responsible Party | NOT performed the Company or by subservicer or vendor( retained b the Company |
| | General Servicing Considerations | | | | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | | X | | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | | X | | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the pool assets are maintained. | | | | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | | X | | |
| | Cash Collection and Administration | | | | |
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | | X | | |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | | X | | |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | | X | | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of overcollateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | | X | | |

| SERVICING CRITERIA | | APPLICABLE SERVICING CRITERIA | | INAPPLICABLE SERVICING CRITERIA | |
|---|---|---|---|---|---|
| Reference | Criteria | Performed Directly by the Company | Performed By Vendor(s) for which the Company is the Responsible Party | Performed by subservicer(s) or vendor(s) for which the Company is NOT the Responsible Party | NOT performed the Compa or by subservicer or vendor retained the Compa |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | X | | | |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access. | X | | | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | X | | | |
| | Investor Remittances and Reporting | | | | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of pool assets serviced by the Servicer. | X(1) | | | |

_____

(1) Servicing functions performed by the Company with respect to Item 1122(d)(3)(i)(B) do not relate to information other than that contained in the monthly remittance reports delivered by the Company to the master servicer, trustee, and/or bond administrator. Servicing functions performed by the Company with respect to Item 1122(d)(3)(i)(D) do not relate to the agreeing with investors' records as to the total unpaid principal balance and number of pool assets serviced by the Company.

| | | APPLICABLE SERVICING CRITERIA | | INAPPLICABLE SERVICING CRITERIA | |
|---|---|---|---|---|---|
| Reference | Criteria | Performed Directly by the Company | Performed By Vendor(s) for which the Company is the Responsible Party | Performed by subservicer(s) or vendor(s) for which the Company is NOT the Responsible Party | NOT performed the Compan or by subservicer or vendor( retained b the Compan |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X(2) | | | |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X(3) | | | |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X(4) | | | |
| | Pool Asset Administration | | | | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related mortgage loan documents. | X(5) | | | |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | X(5) | | | |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X | | | |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | X | | | |

(2) Servicing functions performed by the Company with respect to Item 1122(d)(3)(ii) do not relate to amounts other than amounts remitted by the Company to the master servicer, trustee, and/or bond administrator.

(3) Servicing functions performed by the Company with respect to Item 1122(d)(3)(iii) do not relate to records other than the applicable custodial bank account statements maintained by the Company pursuant to the transaction agreements.

(4) Servicing functions performed by the Company with respect to Item 1122(d)(3)(iv) do not relate to records other than custodial bank account statements and wire records of the Company and the remittance reports prepared and delivered by the Company.

(5) Servicing functions performed by the Company with respect to Item 1122(d)(4)(i) and Item 1122(d)(4)(ii) do not relate to the custodial operations of the pool assets and related documents (collateral file) by the document custodian responsible for such functions for the related transaction.

| Reference | Criteria | APPLICABLE SERVICING CRITERIA | | INAPPLICABLE SERVICING CRITERIA | |
|---|---|---|---|---|---|
| | | Performed Directly by the Company | Performed By Vendor(s) for which the Company is the Responsible Party | Performed by subservicer(s) or vendor(s) for which the Company is NOT the Responsible Party | NOT performed the Compa or by subservicer or vendor retained the Compa |
| 1122(d)(4)(v) | The Servicer's records regarding the pool assets agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X | | | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool assets (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X | | | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X | | | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X | | | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | X | | | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related pool assets, or such other number of days specified in the transaction agreements. | X | | | |

| Reference | Criteria | APPLICABLE SERVICING CRITERIA | | INAPPLICABLE SERVICING CRITERIA | |
|---|---|---|---|---|---|
| | | Performed Directly by the Company | Performed By Vendor(s) for which the Company is the Responsible Party | Performed by subservicer(s) or vendor(s) for which the Company is NOT the Responsible Party | NOT performed the Compa or by subservicer or vendor(s retained b the Compa |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the Servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X | | | |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the Servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X | | | |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the Servicer, or such other number of days specified in the transaction agreements. | X | | | |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X | | | |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | X(6) | | | |

---

(6) Servicing functions performed by the Company with respect to Item 1122(d)(4)(xv) do not relate to Item 1115 of Regulation AB (derivative transactions).

```
                    Schedule B
                    ----------

          Material Instances of Noncompliance
          -----------------------------------

No material instances of noncompliance: the Company has complied, in all
material respects, with the Applicable Servicing Criteria as of and for the
year ended December 31, 2007.
```

# Exhibit 7



**RRMS ADVISORS**
*Tactical Mortgage Strategists*
10 East 40th Street New York, NY 10016
**www.rrmsco.com**

Brian Lin
Managing Director
RRMS Advisors
10 East 40th Street
New York, NY 10016

June 7, 2011

The Bank of New York Mellon
One Wall Street, 11th Floor
New York, NY 10286

Subject:          Opinion Concerning Contemplated Settlement Amount for 530 Trusts

Gentlemen:

Attached please find my independent opinion regarding the contemplated settlement amount for 530 Trusts rendered at the request of your counsel, Mayer Brown.

Should you have any question, please feel free to contact me at (212) 843-9413.

Yours truly,

Brian Lin

Brian Lin
Managing Director

# RRMS ADVISORS
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

## Engagement

The Bank of New York Mellon (BNYM) currently acts as Trustee on behalf of the named Trusts and respective investors. In this capacity, BNYM has engaged me to render an independent professional opinion relating to the settlement amount of 530 Trusts (Settlement Portfolio). The underlying collateral are comprised predominately of Alt "A", Subprime, Prime and Pay-Option Arm with a diminutive amount of HELOC and Second Lien residential mortgage loans.

## Gibbs & Bruns Spreadsheet

## Opinion Summary

I, in conjunction with selected RRMS Advisors personnel under my supervision, have performed a review of the "All Consortium Deals" summarized in the spreadsheet provided by the Investor Group represented by Gibbs & Bruns (Investor Group). Based on the review performed and discussions with representatives from the Investor Group, the presentation appears reasonable with respect to the overall methodology utilized in calculating the settlement amount.

The pros and cons of their calculations are as follows:

**Pros:**
- ➢ Obtaining collateral information from a publicly available third party source.
- ➢ Stratification of aggregate population according to performance status.
- ➢ Logical calculations in order to determine projected losses.
- ➢ Logical calculations and utilization of "Breach Rate" and "Success Rate" haircuts.

**Cons:**
- ➢ Questionable default and loss severity assumptions.
- ➢ Aggressive "Breach Rate" and "Success Rate" assumptions.

**Assumptions:**
- ➢ Collateral information is as of the February 2011 remittance reports, and has been obtained from Intex.

## Detailed Opinion

Using certain assumptions obtained from Intex, Bank of America (BofA) mortgage research, along with a forensic underwriting review performed by an independent third party, the Investor Group has estimated BofA's exposure amount under various scenarios.

The first step in the methodology was to stratify the Settlement Portfolio on the basis of collateral type and performance status. Up to date balances were obtained from Intex with respect to non-delinquent loans as well as loans greater than 60 days delinquent (which also included the population of loans in bankruptcy, foreclosure and REO). The population of previously modified current loans was also

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

1



# RRMS ADVISORS
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

obtained from LoanPerformance, courtesy of MetLife. Please note that without verification, I have accepted the balances presented within each stratification bucket as being correct, and have drawn a conclusion accordingly. In addition, categorizing the pool on this basis proved logical since it allowed for the application of various default and loss assumptions to the different performance status buckets of the portfolio.

At the core of the analysis was the utilization of default and loss severity assumptions. Loss severity, the percentage of lost principal when a loan is foreclosed or sold, was directly obtained from Intex by utilizing data for the three most recent months (averaging 66% for the entire Settlement Portfolio). While based on historical information, this data point can be considered limited since it presents a very short-term time period sample. There is no guarantee that this degree of loss severity will be consistent going forward and based on longer-term trends observed in research reports and other publications, severity rates have in actuality been lower. As for default rates, this particular data was in part taken from Amherst and BofA mortgage research reports. For the population examined in these reports, it was projected that the default rate for loans over 60 days delinquent was approximately 90%. Using this data, a default rate of 50% was derived for the remaining population of the portfolio which represented the current non-modified loans (including loans 30 days delinquent). Furthermore, a 90% default rate assumption was made for previously modified current loans. Although I categorize these calculations as logical, I did not verify any assumptions used to calculate the projected loan default and loss severity figures of the underlying collateral in the research reports.

Default and loss severity rates were then applied to each performance status bucket of the Settlement Portfolio, resulting in a calculation of aggregate actual/projected losses. The actual/estimated loss figure was derived as follows: The sum of (a) actual realized losses ($25B – obtained from Intex), (b) projected losses on loans 60+ days delinquent as well as on previously modified current loans ($50.4B), and (c) projected losses on non-modified current loans (including loans 30 days delinquent) ($32.4B) totals $107.8B. While the assumptions used to project losses can be debated, the mathematical formulas utilized to obtain the results are clear-cut and unquestionable.

After actual and estimated losses were calculated, certain haircuts were applied. The first, "Breach Rate", is the percentage of representation & warranties breached for defected loans in the portfolio; not every loan experiencing a loss was covered by the representations & warranties given to private label securities. As a result, this haircut represents the percentage of loans found defective which were submitted to BofA for repurchase. There is a possibility that BofA may offer resistance relating to some of these loans, resulting in a buyback rejection; thus the "Success Rate" represents the percentage of loans submitted to BofA which would actually be repurchased. The product of (a) the actual/estimated losses of the Settlement Portfolio, (b) the "Breach Rate", and (c) the "Success Rate", represents the expected settlement amount. In my opinion, the calculation and utilization of these particular haircuts is logical since BofA's willingness and legal obligation to repurchase certain loans represents the largest hurdle from Investor Group's perspective.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

2



## RRMS ADVISORS

*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

The "Breach Rate" and "Success Rate" were obtained by a third party who completed a forensic underwriting project of a non-agency whole loan portfolio. This review consisted of approximately 250,000 loans of similar product types, and of the same origination period as the Settlement Portfolio. It was observed that there was an instance of a breach in approximately 60% of the loans examined and the actual repurchase rate of these loans by the originator ranged between 50% and 75%. I was not able to verify these figures since I was not given access to any documents or specifics pertaining to this underwriting review. However, based on the limited amount of publicly available information and my industry knowledge, it is my opinion that these percentages are too high.

Utilizing a range of "Breach Rates" and "Success Rates", expected settlement amounts were calculated for each performance status bucket of the Settlement Portfolio. Using BofA's haircut assumptions provided by Investor Group, the settlement amount totals $15.5B. Using assumptions from the Investor Group's analysis which are relatively more severe, the totals range from $27.0B to $52.6B.

In conclusion, although I classify certain assumptions as disputable to some degree, the overall methodology utilized is reasonable for the purposes of Investor Group's presentation.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

3

# RRMS ADVISORS
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

## April 11, 2011 BofA Presentation

## Opinion Summary

I, in conjunction with selected RRMS Advisors personnel under my supervision, have performed a review of the "Presentation to Gibbs & Bruns" dated April 11, 2011 provided by BofA. Based on the review performed and discussions with representatives from BofA, the presentation appears reasonable with respect to the overall methodology utilized in calculating the settlement amount.

The pros and cons of their calculations are as follows:

**Pros:**
- ➢ Utilized a reference mortgage pool representing actual repurchase experience.
- ➢ Reasonable approach in calculating "Defect Rates" for the Settlement Portfolio.

**Cons:**
- ➢ Comparison basis between conforming and non-conforming portfolios.
- ➢ Inconsistent methodology in calculating certain percentages for the subprime portion of the Settlement Portfolio.
- ➢ Lack of historical data to confirm BofA's "Defect Rates" and "Lesser Representation" haircut assumptions.

**Assumptions:**
- ➢ All collateral information is as of March 31, 2011.

## Detailed Opinion

Using certain assumptions based on the collateral performance of a GSE portfolio originated between 2004 and 2008, BofA has estimated their exposure as being approximately $4.0B with respect to the current negotiations with the Investor Group. In comparing the severely delinquent and defaulted populations of the GSE and the Settlement Portfolio (which include loans 180+ days delinquent), four separate haircuts were applied in their analysis in order to support the proposed settlement amount. I believe it would have been easier to compare two analogous portfolios rather than to utilize a comparison between conforming and non-conforming portfolios. However, due to the lack of available information, I am of the view that utilization of a GSE portfolio based on actual repurchase experience is a proper alternative with appropriate adjustments.

Please note that without verification, I have accepted the balances for each stratification bucket as being correct.

The first haircut in their analysis is the "Defect Rate", which represents the percentage of GSE buyback requests experienced by BofA. This information was available for the entire GSE portfolio, was categorized for each product type and further stratified by the number of payments the borrower has



**RRMS ADVISORS**

*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

made. The "Defect Rates" for each bucket were applied to the corresponding portion of the Settlement Portfolio, and were re-weighted according to the balance of the Investor Group loans found within each bucket. Given that the subprime portion of the GSE portfolio was insignificant, these particular "Defect Rates" were not simply assigned to the subprime portion of the Settlement Portfolio, but rather were determined as described below.

In order to calculate the "Defect Rates" of the subprime portion of the Settlement Portfolio, the balances of the two aggregate portfolios were similarly stratified according to documentation type and the number of payments made by the borrower. For each of these buckets, the "Defect Rates" of the GSE portfolio were calculated based on actual loan performance. As before, these rates were then assigned to the corresponding bucket of the aggregate Settlement Portfolio, and weighted average "Defect Rates" were calculated which were assigned to the subprime portion of the Settlement Portfolio. With "Defect Rates" available for each product type, these percentages were obtained according to the number of payments made by borrowers and for the aggregate Settlement Portfolio. I find this approach for determining the "Defect Rates" of the Settlement Portfolio to be a reasonable and logical first step in their methodology.

Taking the "Defect Rates" for each bucket according to the number of payments made by the borrower, a factor was then applied to each figure to account for expected claims for the forward unsettled portion with Fannie Mae. Relatively more loans will be bought back currently found in the bucket representing borrowers making more than 36 payments compared to those who have made between zero and 12 payments; thus the rationale for applying a higher factor to the former. In my opinion, the application of a factor to the calculated "Defect Rates" is reasonable, although I cannot validate the accuracy of each individual factor due to a lack of publicly available information.

The next haircut was based on "Lesser Representation", since the GSE portfolio received stronger reps & warranties because borrower misrepresentation would not be a basis for a claim within the Settlement Portfolio. Once again, stratifying the balances of the GSE portfolio according to product type and the number of payments made by the borrower, a figure for each bucket was calculated which represented the percentage of GSE loans repurchased due to borrower misrepresentation. In also stratifying the Settlement Portfolio in a similar fashion, the "Lesser Representation" haircuts for each bucket were applied to the corresponding portion of the Settlement Portfolio, and were re-weighted according to the balance of the Investor Group loans found within each bucket. As before, since the subprime portion of the GSE portfolio is insignificant, the Alt-A "Lesser Representation" haircuts were simply applied to the subprime portion of the Settlement Portfolio. I find this approach for determining the "Lesser Representation" haircut of the Settlement Portfolio to be reasonable. Please note that I find an inconsistency in their methodology pertaining to the manner in which figures were derived for the subprime portion of the GSE portfolio. Initially, while a complex analysis was undertaken in order to assign "Defect Rates" to the subprime portfolio, the Alt-A "Lesser Representation" haircuts were just assumed for the subprime portion of the Settlement Portfolio without any further calculations. The



## RRMS ADVISORS
### *Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

inconsistent methodology is still acceptable given the similarity of the two product types for these two attributes.

The "Lesser Representation" haircut is decreased since there could be instances within the Settlement Portfolio where other defects exist for a loan in addition to borrower misrepresentation. Based on BofA's experience, approximately half of private label loans with borrower misrepresentations still need to be repurchased because of these additional defects. This explains the 50% adjustment for each of the "Lesser Representation" haircuts. Based on my industry experience, the application of a factor is reasonable since repurchased loans will possibly have multiple simultaneous breaches. However, I cannot validate the accuracy of applying a factor of exactly 50%.

The third haircut is "Causation", which is based on whether there were material and adverse underwriting defects for the loans. In the case where only 0 - 12 payments were made by the borrower, it can be implied 100% of the time that faulty underwriting contributed to the loan default. These percentages were reduced as more payments were made on the loans, the logic being that the default for these loans was due to some factor other than the underwriting process (i.e., a borrower job loss). Different haircuts were applied to the various product types due to their distinctive payment requirements. A larger causation factor was applied to an option ARM making the same number of total payments as was applied to a fully amortizing loan, since the required payments are much lower. Thus, if the two loan types default after the same number of payments, there is a higher probability of underwriting irregularities with the option ARM. The percentages for Interest-Only loans simply take the average of the corresponding fully amortizing and option ARM percentages. Given that the amount of publicly available information is limited, the accuracy of each of these haircuts is difficult to quantify. In part for these reasons, I did not take these haircuts into consideration for my calculation.

The final haircut is "Presentation", which attempts to quantify whether senior certificate holders would commit to the expenses and time requirement to take action based on the projected amount of losses they would experience. Thus, with BofA's expectations being that the less senior classes will be written down, there is a reduced likelihood that legal action will proceed. Therefore, in the cases with no expected senior losses, BofA assumes no liability exposure whatsoever. In my opinion, the utilization of this haircut may not be necessary, since the Investor Group has already undertaken action(s) to recover damages.

The four haircuts which have been described were utilized in order to estimate a total settlement amount. The settlement amount results in approximately $4.0B by multiplying each of the haircuts by the projected and actual losses of the Settlement Portfolio.

In conclusion, although certain haircuts are difficult to validate and may require a proper expert to address the legal interpretation of their merits, the overall methodology utilized is reasonable for the purpose of BofA's presentation.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

6

# RRMS ADVISORS
## *Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for: The Bank of New York Mellon**
**June 7, 2011**

## Recommendation

In calculating a reasonable settlement figure, I utilized a mix of the methodologies found in the Investor Group and BofA presentations. As per my analysis below, the settlement range of approximately $8.8 to $11 billion is reasonable without applying any legal haircuts.

## Methodology and Calculations

Given that information was obtained from publicly available third-party sources, my analysis began with the Intex / LoanPerformance collateral balances (as provided by Investor Group) of the portfolio which was stratified according to delinquency status. This consisted of (1) a $72.5 billion balance for loans greater than 60 days delinquent (which also included the population in bankruptcy, foreclosure and REO); (2) a $12.8 billion balance for previously modified current loans and (3) a $98.6 billion balance for non-modified current loans (including loans 30 days delinquent). In addition, aggregate realized losses of $25 billion were also taken into account.

Based on publicly available information pertaining to historical mortgage loan performance, I determined reasonable default and loss severity percentages which would be applied to each delinquency bucket of the portfolio. The corresponding plateaus are dependent upon product type and loan size, but when weighted according to the actual collateral composition of the portfolio, loss severity is approximately 60%. In addition, based on information provided by BofA, the historical loss severity for the loans within the Settlement Portfolio is approximately 45%. Thus, these were the ranges utilized in my assumptions.

With respect to the default of previously modified current loans, performance has improved dramatically since the first round of loan modifications in early 2009 due to more aggressive methods taken by both servicers and the government. From recent trends in applicable research reports, defaults for these loans have ranged between 20% and 60%, depending on when the modification took place. In taking an average of the two figures as well as considering the stronger recent performance, I feel that a default rate for previously modified current loans ranging from 35% to 40% is reasonable.

High default rates seem to be leveling off based on historical data and research reports with regard to non-modified current loans (including loans 30 days delinquent). As before with loss severities, these particular plateaus vary depending on product type and year of origination, but when weighted according to the actual collateral composition of the portfolio, the default rate ranges between 11% and 16%. These percentages have been utilized for this portion of the portfolio.

A default rate of 90% was utilized for loans greater than 60 days delinquent, which was supported by an industry research report. It is rational to assume that once a loan becomes severely delinquent, it is uncommon for such loan to achieve performing status once again.

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

7

# RRMS ADVISORS
*Tactical Mortgage Strategists*

**Settlement Amount Opinion**
**Prepared for:  The Bank of New York Mellon**
**June 7, 2011**

The last variables used in my analysis were the "Breach" and "Success" rates which represent the amount of loans effectively submitted to BofA for repurchase.  Given the lack of meaningful public information regarding this data, I feel it would be reasonable to utilize BofA's percentages for both rates since they are based on the performance of a mortgage pool representing actual repurchase experience.  Specifically, a "Breach" rate of 36% and a "Success" rate of 40% were utilized.

Please note that these were the only haircuts utilized in my analysis.  The three other haircuts used in the BofA presentation were not included in my analysis due the lack of available data and furthermore, would require a proper expert to address any particular legal interpretation issues.

In conclusion, utilizing the stratified collateral balances of the portfolio and my re-calculated variables, a settlement figure somewhere between $8.8 and $11 billion is reasonable.  In my opinion, given the degree of assumptions used in my analysis, a small variance to the range indicated above is still reasonable. Please see the tables below for my assumptions and settlement range.

**Low Range**

| Description | Balance[1] | Default Rate | Severity Rate | Losses | Breach Rate | Success Rate | Settlement |
|---|---|---|---|---|---|---|---|
| Liquidated Loans | | | | $25.0 | 36.0% | 40.0% | $3.6 |
| 60+ Delinquent Loans | $72.5 | 90.0% | 45.0% | $29.4 | 36.0% | 40.0% | $4.2 |
| Mod. Current Loans | $12.8 | 35.0% | 45.0% | $2.0 | 36.0% | 40.0% | $0.3 |
| Non-Mod Current Loans / D30 | $98.6 | 11.0% | 45.0% | $4.9 | 36.0% | 40.0% | $0.7 |
| | | | | | | | $8.8 |

**High Range**

| Description | Balance[1] | Default Rate | Severity Rate | Losses | Breach Rate | Success Rate | Settlement |
|---|---|---|---|---|---|---|---|
| Liquidated Loans | | | | $25.0 | 36.0% | 40.0% | $3.6 |
| 60+ Delinquent Loans | $72.5 | 90.0% | 60.0% | $39.2 | 36.0% | 40.0% | $5.6 |
| Mod. Current Loans | $12.8 | 40.0% | 60.0% | $3.1 | 36.0% | 40.0% | $0.4 |
| Non-Mod Current Loans / D30 | $98.6 | 16.0% | 60.0% | $9.5 | 36.0% | 40.0% | $1.4 |
| | | | | | | | $11.0 |

*Note 1: The settlement range of approximately $8.8 - $11 billion was based on the balance of 543 Trusts provided by the Investor Group.  It is reasonable to assume the settlement range would be lower, given that 530 Trusts are now being considered for the contemplated settlement portfolio.*

Yours truly,

*Brian Lin*

Brian Lin
Managing Director

**Brian Lin**
**RRMS Advisors**
**Managing Director**
**Telephone: 212-843-9413**
**10 East 40th Street New York, NY 10016**

8