# Exhibit 11

```
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>v12827e424b5.txt
<DESCRIPTION>CWALT, INC. - REGISTRATION NO. 333-125902
<TEXT>
<PAGE>
```

As filed pursuant to Rule 424(b)(5)
Under the Securities Act of 1933
Registration No. 333-125902

PROSPECTUS SUPPLEMENT

(TO PROSPECTUS DATED JULY 25, 2005)

$959,309,669
(APPROXIMATE)

CWALT, INC.
DEPOSITOR

[COUNTRYWIDE HOME LOANS LOGO]
SELLER

COUNTRYWIDE HOME LOANS SERVICING LP
MASTER SERVICER

ALTERNATIVE LOAN TRUST 2005-54CB
ISSUER

MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-54CB
DISTRIBUTIONS PAYABLE MONTHLY, BEGINNING OCTOBER 25, 2005
------------------------

The following classes of certificates are being offered pursuant to this
prospectus supplement and the accompanying prospectus:

```
<Table>
<Caption>
```

| | INITIAL CLASS CERTIFICATE BALANCE | PASS-THROUGH RATE | | INITIAL CLASS CERTIFICATE BALANCE | PASS-THROUGH RATE |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Class 1-A-1 | $ 165,820,000 | Variable | Class 3-A-2 | N/A | Variable |
| Class 1-A-2 | N/A | Variable | Class 3-A-3 | $ 681,818 | 5.500% |
| Class 1-A-3 | $ 5,000,000 | 5.500% | Class 3-A-4 | $ 33,547,000 | 5.500% |
| Class 1-A-4 | $ 15,000,000 | 5.500% | Class 3-A-5 | $ 100,000,000 | 5.500% |
| Class 1-A-5 | $ 13,910,900 | 5.500% | Class 3-A-6 | $ 9,091,000 | 5.500% |
| Class 1-A-6 | $ 3,000,000 | 5.500% | Class 3-A-7 | $ 27,941,250 | 5.500% |
| Class 1-A-7 | $ 110,591,000 | 5.500% | Class 3-A-8 | $ 2,500,000 | 5.750% |
| Class 1-A-8 | $ 8,000,000 | 5.500% | Class 3-A-9 | $ 2,499,991 | 6.000% |
| Class 1-A-9 | $ 20,355,000 | 5.500% | Class 3-A-10 | $ 2,500,000 | 6.250% |
| Class 1-A-10 | $ 15,000,000 | 5.500% | Class 3-A-11 | $ 3,690,000 | 5.500% |
| Class 1-A-11 | $ 44,572,000 | 5.500% | Class 3-A-12 | $ 18,956,941 | 5.500% |
| Class 2-A-1 | $ 100,000,000 | 5.500% | Class 3-A-13 | $ 133,382,000 | 5.500% |
| Class 2-A-2 | $ 9,091,000 | 5.500% | Class PO | $ 4,592,169 | N/A |
| Class 2-A-3 | $ 28,161,765 | 5.500% | Class A-R | $ 100 | 5.500% |
| Class 2-A-4 | $ 18,217,000 | 5.500% | Class M | $ 16,959,000 | 5.500% |
| Class 2-A-5 | $ 21,354,235 | 5.500% | Class B-1 | $ 8,236,500 | 5.500% |
| Class 2-A-6 | $ 2,783,000 | 5.500% | Class B-2 | $ 3,876,000 | 5.500% |
| Class 3-A-1 | $ 10,000,000 | 5.125% | | | |

```
</Table>
```

```
<Table>
<S>                          <C>
```

| | |
|---|---|
| CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-8 IN THIS PROSPECTUS SUPPLEMENT | The Class PO Certificates are principal only certificates, and the Class 1-A-2 and Class 3-A-2 Certificates are interest only notional amount certificates. The pass-through rates for the Class 1-A-1 and Class 1-A-2 Certificates are calculated as described under "Description of the |

```
AND ON PAGE 5 IN THE         Certificates -- Interest" in this prospectus supplement.
PROSPECTUS.
                             The assets of the trust will consist primarily of a pool
                             consisting of three loan groups of 30-year conventional
                             fixed-rate mortgage loans secured by first liens on one- to
                             four-family residential properties.

</Table>
```

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND
EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES
AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE
ACCURACY OR ADEQUACY OF THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS. ANY
REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

Credit Suisse First Boston LLC will offer the Class A Certificates and
Countrywide Securities Corporation will offer the Class M, Class B-1 and Class
B-2 Certificates to the public at varying prices to be determined at the time of
sale. The proceeds to the depositor from the sale of these classes of
certificates are expected to be approximately $948,238,110, plus accrued
interest, before deducting expenses. The Class PO Certificates will not be
purchased by Credit Suisse First Boston LLC or Countrywide Securities
Corporation. They will be transferred to Countrywide Home Loans, Inc. on or
about September 29, 2005 as partial consideration for the sale of the mortgage
loans to the depositor. See "Method of Distribution." The offered certificates,
other than the Class A-R Certificates, will be available for delivery to
investors in book-entry form through the facilities of The Depository Trust
Company, Clearstream, Luxembourg and the Euroclear System.

```
CREDIT SUISSE FIRST BOSTON            COUNTRYWIDE SECURITIES CORPORATION
September 27, 2005
<PAGE>
                         TABLE OF CONTENTS
```

```
<TABLE>
<CAPTION>
PROSPECTUS SUPPLEMENT                                        PAGE
---------------------                                       ----
<S>                                                         <C>
Summary ...................................................  S-3
Risk Factors ..............................................  S-8
The Mortgage Pool .........................................  S-17
Servicing of Mortgage Loans ...............................  S-49
Description of the Certificates ...........................  S-54
Yield, Prepayment and Maturity Considerations .............  S-83
Credit Enhancement ........................................  S-103
Use of Proceeds ...........................................  S-103
Material Federal Income Tax Consequences ..................  S-103
Other Taxes ...............................................  S-107
ERISA Considerations ......................................  S-107
Method of Distribution ....................................  S-109
Legal Matters .............................................  S-111
Ratings ...................................................  S-111

Annex I - Global Clearance, Settlement And
   Tax Documentation Procedures ...........................  I-1
</TABLE>

<TABLE>
<CAPTION>
PROSPECTUS                                                  PAGE
----------                                                  ----
<S>                                                         <C>
Important Notice About Information in
   This Prospectus and Each Accompanying
   Prospectus Supplement ..................................  4
Risk Factors ..............................................  5
The Trust Fund ............................................  12
Use of Proceeds ...........................................  22
The Depositor .............................................  23
Mortgage Loan Program .....................................  23
Description of the Certificates ...........................  25
Credit Enhancement ........................................  38
Yield and Prepayment Considerations .......................  42
The Pooling and Servicing Agreement .......................  43
Certain Legal Aspects of the Mortgage Loans ...............  57
Material Federal Income Tax Consequences ..................  64
Other Tax Considerations ..................................  88
ERISA Considerations ......................................  88
Legal Investment ..........................................  91
Method of Distribution ....................................  92
Legal Matters .............................................  93
Financial Information .....................................  93
Rating ....................................................  93
Index to Defined Terms ....................................  94
</TABLE>
```

```
                              S-2
<PAGE>
                            SUMMARY
```

THIS SUMMARY HIGHLIGHTS SELECTED INFORMATION FROM THIS DOCUMENT AND DOES NOT CONTAIN ALL OF THE INFORMATION THAT YOU NEED TO CONSIDER IN MAKING YOUR INVESTMENT DECISION. TO UNDERSTAND ALL OF THE TERMS OF AN OFFERING OF THE CERTIFICATES, READ CAREFULLY THIS ENTIRE DOCUMENT AND THE ACCOMPANYING PROSPECTUS.

OFFERED CERTIFICATES

Alternative Loan Trust 2005-54CB will issue thirty-eight classes of certificates, thirty-five of which are being offered by this prospectus supplement and the accompanying prospectus. The assets of the trust fund that will support both the offered certificates and other classes of certificates will consist, on the closing date, of a pool of mortgage loans with an aggregate stated principal balance of approximately $870,595,288, as of September 1, 2005 and certain other property and assets described in this prospectus supplement. The mortgage loans will consist of 30-year conventional fixed-rate mortgage loans secured by first liens on one- to four-family residential properties. All of the mortgage loans have original principal balances that conform to the guidelines of Fannie Mae and Freddie Mac.

The mortgage pool consists of three loan groups. Loan group 1 will consist of mortgage loans expected to have an aggregate stated principal balance of approximately $415,516,645 as of the initial cut-off date. Loan group 2 will consist of mortgage loans expected to have an aggregate stated principal balance of approximately $183,743,951 as of the initial cut-off date. Loan group 3 will consist of mortgage loans expected to have an aggregate stated principal balance of approximately $271,334,693 as of the initial cut-off date.

The following chart lists certain characteristics of the classes of the offered certificates. The classes of certificates listed below will not be offered unless they are assigned the following ratings by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("S&P") and by Moody's Investors Service, Inc. ("Moody's"):

<TABLE>
<CAPTION>

| CLASS | S&P RATING | MOODY'S RATING | TYPE |
|-------|--------|---------|------|
| <S> | <C> | <C> | <C> |
| Class 1-A-1 | AAA | Aaa | Senior/Targeted Balance/Accretion Directed/Floating Rate |
| Class 1-A-2 | AAA | Aaa | Senior/Notional Amount/Interest Only/Inverse Floating Rate |
| Class 1-A-3 | AAA | Aaa | Senior/Targeted Balance/Accretion Directed |
| Class 1-A-4 | AAA | Aaa | Senior/NAS/Super Senior |
| Class 1-A-5 | AAA | Aaa | Senior/Accrual/ Companion |
| Class 1-A-6 | AAA | Aaa | Senior |
| Class 1-A-7 | AAA | Aaa | Senior/Planned Balance/Super Senior |
| Class 1-A-8 | AAA | Aaa | Senior/NAS/Support |
| Class 1-A-9 | AAA | Aaa | Senior/NAS |
| Class 1-A-10 | AAA | Aaa | Senior/Planned Balance |
| Class 1-A-11 | AAA | Aaa | Senior/Planned Balance/Super Senior |
| Class 2-A-1 | AAA | Aaa | Senior/Super Senior |
| Class 2-A-2 | AAA | Aaa | Senior/Support |
| Class 2-A-3 | AAA | Aaa | Senior/Super Senior |
| Class 2-A-4 | AAA | Aaa | Senior/NAS/Super Senior |
| Class 2-A-5 | AAA | Aaa | Senior |
| Class 2-A-6 | AAA | Aaa | Senior/NAS/Support |
| Class 3-A-1 | AAA | Aaa | Senior |
| Class 3-A-2 | AAA | Aaa | Senior/Notional Amount/Interest Only |
| Class 3-A-3 | AAA | Aaa | Senior |
| Class 3-A-4 | AAA | Aaa | Senior/NAS/Super Senior |
| Class 3-A-5 | AAA | Aaa | Senior/Super Senior |
| Class 3-A-6 | AAA | Aaa | Senior/Support |
| Class 3-A-7 | AAA | Aaa | Senior/Super Senior |
| Class 3-A-8 | AAA | Aaa | Senior |
| Class 3-A-9 | AAA | Aaa | Senior |
| Class 3-A-10 | AAA | Aaa | Senior |
| Class 3-A-11 | AAA | Aaa | Senior/NAS/Support |
| Class 3-A-12 | AAA | Aaa | Senior |
| Class 3-A-13 | AAA | Aaa | Senior |
| Class PO | AAA | Aaa | Senior/Principal Only/Component |
| Class A-R | AAA | Aaa | Senior/Residual |
| Class M | AA | Aa3 | Subordinate |
| Class B-1 | A | A3 | Subordinate |
| Class B-2 | BBB | Baa2 | Subordinate |
</TABLE>

A rating is not a recommendation to buy, sell or hold securities. These ratings may be lowered or withdrawn at any time by either of the rating agencies.

See "Ratings" in this prospectus supplement.

S-3

<PAGE>
See "Description of the Certificates -- General" and "--Book-Entry Certificates" in this prospectus supplement and "The Mortgage Pool" in this prospectus supplement, and "The Trust Fund -- The Mortgage Loans -- General" in the prospectus.

RELATIONSHIP AMONG THE LOAN GROUPS AND THE CERTIFICATE GROUPS

The numeric prefix for each class of senior certificates designates the group of senior certificates to which that class belongs and corresponds to the loan group of the same number. The senior certificates with a "1" prefix are sometimes referred to in this prospectus supplement as the group 1 senior certificates, the senior certificates with a "2" prefix are sometimes referred to in this prospectus supplement as the group 2 senior certificates and the senior certificates with a "3" prefix are sometimes referred to in this prospectus supplement as the group 3 senior certificates. The Class A-R Certificates are part of the group 1 senior certificates. The Class PO Certificates and the subordinated certificates correspond to the mortgage loans in each loan group. The certificates generally receive distributions based on principal and interest collected from the mortgage loans in the corresponding loan group or loan groups.

CUT-OFF DATE

For any mortgage loan included in the trust fund on the closing date, the later of September 1, 2005 and the date of origination for that mortgage loan (either of these dates is sometimes referred to in this prospectus supplement as the initial cut-off date). For any mortgage loan conveyed to the trust fund after the closing date, the later of the origination date for that mortgage loan and the first day of the month of the conveyance to the trust fund.

CLOSING DATE

On or about September 29, 2005.

DEPOSITOR

CWALT, Inc. is a limited purpose finance subsidiary of Countrywide Financial Corporation. Its address is 4500 Park Granada, Calabasas, California 91302, and its telephone number is (818) 225-3000.

SELLERS

Countrywide Home Loans, Inc. will be the seller of a portion of the mortgage loans. The remainder of the mortgage loans will be sold directly to the depositor by one or more special purpose entities that were established by Countrywide Financial Corporation, or one of it subsidiaries which, in turn, acquired those mortgage loans directly from Countrywide Home Loans, Inc.

MASTER SERVICER

Countrywide Home Loans Servicing LP.

TRUSTEE

The Bank of New York.

DISTRIBUTION DATES

We will make distributions on the 25th day of each month. If the 25th day of a month is not a business day, then we will make distributions on the next business day. The first distribution is scheduled for October 25, 2005.

RECORD DATE

The record date for any distribution date will be the last business day of the month preceding the month of that distribution date.

REGISTRATION OF CERTIFICATES

The offered certificates, other than the Class A-R Certificates, will initially be issued in book-entry form. Persons acquiring beneficial ownership interests in the certificates may elect to hold their beneficial interests through The Depository Trust Company, in the United States, or Clearstream, Luxembourg or the Euroclear System, in Europe.

See "Description of Certificates-Book-Entry Certificates" in this prospectus supplement.

INTEREST PAYMENTS

Interest will accrue at the rate specified on the cover page hereof or as described in this prospectus supplement, on each interest-bearing class of certificates on the basis of a 360-day year divided into twelve 30-day months.

# Exhibit 12

Filed by Bowne Pure Compliance                                                                                      Page 2 of 258

Table of Contents

As filed pursuant to Rule 424(b)(5)
Under the Securities Act of 1933
Registration No. 333-140962

**PROSPECTUS SUPPLEMENT**
**(To Prospectus dated June 27, 2007)**

$745,477,658
(Approximate)
**CWALT, INC.**
Depositor



**HOME LOANS**

**Sponsor and Seller**
**Countrywide Home Loans Servicing LP**
**Master Servicer**
**Alternative Loan Trust 2007-17CB**
**Issuing Entity**
**Mortgage Pass-Through Certificates, Series 2007-17CB**
**Distributions payable monthly, beginning July 25, 2007**

The issuing entity will issue certificates, including the following classes of certificates, that are offered pursuant to this prospectus supplement and the accompanying prospectus:

| | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) | | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) |
|---|---|---|---|---|---|
| Class 1-A-1 | $ 11,998,000 | 5.75% | Class 1-A-14 | $ 18,936,809(4) | Floating |
| Class 1-A-2 | $ 404,000 | 5.75% | Class 1-X | $ 292,378,990(3) | Variable |
| Class 1-A-3 | $ 50,300,000 | 5.75% | Class 2-A-1 | $ 160,000,000 | 5.75% |
| Class 1-A-4 | $ 65,000,000 | 5.75% | Class 2-A-2 | $ 11,524,000 | 5.75% |
| Class 1-A-5 | $ 47,755,882(3) | Floating | Class 2-A-3 | $ 43,788,000 | 5.75% |
| Class 1-A-6 | $ 284,052,000(4) | Floating | Class 2-A-4 | $ 1,471,000 | 5.75% |
| Class 1-A-7 | $ 11,726,000 | Floating | Class 2-X | $ 111,612,305(3) | Variable |
| Class 1-A-8 | $ 360,778,000(3)(4) | Floating | Class PO | $ 6,910,558 | (5) |
| Class 1-A-9 | $ 78,430,000(4) | (5) | Class A-R | $ 100 | 5.75% |
| Class 1-A-10 | $ 78,430,000(4) | Floating | Class M-1 | $ 9,000,000 | 5.75% |
| Class 1-A-11 | $ 284,052,000(4) | Floating | Class M-2 | $ 4,124,000 | 5.75% |
| Class 1-A-12 | $ 11,726,000(4) | Floating | Class B-1 | $ 4,500,000 | 5.75% |
| Class 1-A-13 | $ 265,115,191(4) | Floating | Class B-2 | $ 2,250,000 | 5.75% |

**Consider carefully the risk factors beginning on page S-22 in this prospectus supplement and on page 2 in the prospectus.**

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWALT, Inc., Countrywide Home Loans, Inc. or any of their affiliates.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

(1) This amount is subject to a permitted variance in the aggregate of plus or minus 5%.

(2) The pass-through rates for each class of certificates offered by this prospectus supplement, together with their pass-through rates, the method of calculating their pass-through rates and their initial ratings are listed in the tables under *"Summary — Description of the Certificates"* beginning on page S-6 of this prospectus supplement.

(3) The Class 1-A-5, Class 1-A-8, Class 1-A-12, Class 1-X and Class 2-X Certificates are interest only notional amount certificates. The notional amounts of these classes of certificates are shown in the table above but are not included in the aggregate class certificate balance of all of the certificates offered.

(4) The Class 1-A-10, Class 1-A-11, Class 1-A-13 and Class 1-A-14 Certificates are exchangeable for certain proportions of the Class 1-A-6, Class 1-A-8 and Class 1-A-9 Certificates as described in this prospectus supplement. The maximum initial class certificate balance of each class of exchangeable certificates is set forth in the table but is not included in the aggregate class certificate balance of the certificates offered.

(5) The Class 1-A-9 and Class PO Certificates are principal only certificates and will not accrue interest.

Credit enhancement and other support for the transaction will consist of:

• Subordination; and

• Cross-collateralization between loan groups.

The credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for the certificates is described in more detail in this prospectus supplement.

This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity. The certificates represent interests in a pool consisting of two loan groups of primarily 30-year conventional, fixed rate mortgage loans secured by first liens on one-to four-family residential properties.

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.**

Morgan Stanley & Co. Incorporated will offer the Class A Certificates and Credit Suisse Securities (USA) LLC will offer the Class M, Class B-1 and Class B-2 Certificates to the public at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of these classes of certificates are expected to be approximately $723,497,931, plus accrued interest, before deducting expenses. The Class PO and Class X Certificates will not be purchased by Morgan Stanley & Co. Incorporated or by Credit Suisse Securities (USA) LLC. They will be transferred to Countrywide Home Loans, Inc. on or about June 29, 2007 as partial consideration for

Filed by Bowne Pure Compliance

**Table of Contents**

**Distributions with Respect to Loan Group 2**

- Sequentially:

    (1) concurrently, to the Class 2-A-3 and Class 2-A-4 Certificates, pro rata, the group 2 priority amount (which is zero for the first five years and will increase as described under *"Description of the Certificates—Principal"* in this prospectus supplement), until their respective class certificate balances are reduced to zero;

    (2) concurrently, to the Class 2-A-1 and Class 2-A-2 Certificates, pro rata, until their respective class certificate balances are reduced to zero; and

    (3) concurrently, to the Class 2-A-3 and Class 2-A-4 Certificates, pro rata, without regard to the group 2 priority amount, until their respective class certificate balances are reduced to zero.

*Class PO Certificates:*

On each distribution date, principal will be distributed to each Class PO Component in an amount equal to the lesser of (x) the PO formula principal amount for the related loan group for that distribution date and (y) the product of:

- available funds for the related loan group remaining after distribution of interest on the senior certificates in the same certificate group; and

- a fraction, the numerator of which is the related PO formula principal amount and the denominator of which is the sum of that PO formula principal amount and the related senior principal distribution amount.

*Subordinated Certificates; Applicable Credit Support Percentage Trigger:*

On each distribution date and with respect to each loan group, to the extent of available funds available therefor, the non-PO formula principal amount for each loan group, up to the subordinated principal distribution amount for each loan group, will be distributed as principal of the subordinated certificates in order of their distribution priorities, beginning with the Class M-1 Certificates, until their respective class certificate balances are reduced to zero. Each class of subordinated certificates will be entitled to receive its pro rata share of the subordinated principal distribution amount from both loan groups (based on its respective class certificate balance); provided, that if the applicable credit support percentage of a class of subordinated certificates (other than the class of subordinated certificates then outstanding with the highest distribution priority) is less than the original applicable credit support percentage for that class (referred to as a "restricted class"), the restricted class will not receive distributions of partial principal prepayments and prepayments in full from any loan group. Instead, the portion of the partial principal prepayments and prepayments in full otherwise distributable to each restricted class will be allocated to those classes of subordinated certificates that are not a restricted class, pro rata, based upon their respective class certificate balances and distributed in the sequential order described above.

*Allocation of Realized Losses*

On each distribution date, the amount of any realized losses on the mortgage loans in a loan group will be allocated as follows:

- the applicable PO percentage of any realized losses on a discount mortgage loan in a loan group will be allocated to the related Class PO Component; provided, however, that on or before the senior credit support depletion date, (i) those realized losses will be treated as Class PO Deferred Amounts and will be paid on the related Class PO Component (to the extent funds are available from amounts otherwise allocable to the subordinated principal distribution amount) before distributions of principal on the subordinated certificates and (ii) the class certificate balance of the subordinated certificates then outstanding with the lowest distribution priority will be reduced by the amount of any payments of Class PO Deferred Amounts; and

S-16

# Exhibit 13

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3          HONORABLE MARIANA R. PFAELZER, JUDGE PRESIDING

 4   BANKERS INSURANCE COMPANY, et al.,          )
                         Plaintiffs,             )
 5              Vs.                              )   CV11-07152 MRP
     COUNTRYWIDE FINANCIAL CORPORATION, et al.   )
 6                       Defendants.             )
     _____)
     THRIVENT FINANCIAL FOR LUTHERANS,           )
 7                       Plaintiffs,             )
                Vs.                              )   CV11-07154 MRP
 8   COUNTRYWIDE FINANCIAL CORPORATION, et al.   )
                         Defendants.             )
 9   _____)
     STERLING FEDERAL BANK, F.S.B.,              )
                         Plaintiffs,             )
10              Vs.                              )   CV11-07163 MRP
     COUNTRYWIDE FINANCIAL CORPORATION, et al.   )
11                       Defendants.             )
     _____)
     DEXIA HOLDINGS, INC., et al.,               )
12                       Plaintiffs,             )
                Vs.                              )   CV11-07165 MRP
13   COUNTRYWIDE FINANCIAL CORPORATION, et al.   )
                         Defendants.             )
14   _____)
     WESTERN AND SOUTHERN LIFE INSURANCE COMPANY,)
     ET AL.,                                     )
15              Vs.                              )   CV11-07166 MRP
     COUNTRYWIDE FINANCIAL CORPORATION, et al.   )
16                       Defendants.             )
     _____)
     AMERICAN FIDELITY ASSURANCE COMPANY,        )
17                       Plaintiffs,             )
                Vs.                              )   CV11-07167 MRP
18   COUNTRYWIDE FINANCIAL CORPORATION, et al.,  )
     _____)
                         Defendants.             )
19
             REPORTER'S TRANSCRIPT OF STATUS CONFERENCE
20                   LOS ANGELES, CALIFORNIA
            THURSDAY, SEPTEMBER 29, 2011; 1:39 P.M.
21
               LEANDRA AMBER, CSR 12070, RPR
22          OFFICIAL U.S. DISTRICT COURT REPORTER
               312 NORTH SPRING STREET, # 408
23             LOS ANGELES, CALIFORNIA 90012
                   www.leandraamber.com
24                   (213) 894-6603

25
```

1                         **A P P E A R A N C E S**

2

3    **IN BEHALF OF THE PLAINTIFF,**
     **WESTERN AND SOUTHERN LIFE**          LYSAGHT LAW GROUP LLP
4    **INSURANCE COMPANY:**                 BY:  BRIAN C. LYSAGHT, ESQ.
                                            12021 WILSHIRE BOULEVARD
5                                           LOS ANGELES, CA 90025
                                            (310) 567-1111
6                                           lysaghtlaw@hotmail.com

7                                           WOLLMUTH MAHER & DEUTSCH LLP
                                            BY:  DAVID H. WOLLMUTH, ESQ.
8                                           500 FIFTH AVENUE
     **IN BEHALF OF THE PLAINTIFFS**        NEW YORK, NEW YORK 10110
9    **DEXIA & HOLDINGS, INC., ET**         (212) 382-3300
     **AL., AND THRIVENT FINANCIAL**        dwollmuth@wmd-law.com
10   **FOR LUTHERANS:**
                                            BERNSTEIN LITOWITZ BERGER &
11                                          GROSSMAN LLP
                                            BY:  TIMOTHY A. DeLANGE, ESQ.
12                                          12481 HIGH BLUFF DRIVE
                                            SUITE 300
13   **IN BEHALF OF THE PLAINTIFFS**        SAN DIEGO, CA 92130-3582
     **AMERICAN FIDELITY ASSURANCE**        (858) 793-0070
14   **COMPANY:**                           timothyd@blbglaw.com

15                                          FEDERMAN & SHERWOOD
                                            BY:  JENNIFER F. SHERRILL, ESQ.
16                                          10205 NORTH PENNSYLVANIA
                                            OKLAHOMA CITY, OK 73120
17                                          (405) 235-1560
                                            jfs@federmanlaw.com
18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT

1    **A P P E A R A N C E S**
                              (CONTINUED)

2

3                    CALDWELL LESLIE & PROCTOR, PC
                     BY:  CHRISTOPHER G. CALDWELL, ESQ.
                     1000 WILSHIRE BOULEVARD
4                    SUITE 600
                     LOS ANGELES, CA 90017-2463
5                    (213) 629-9040
                     caldwell@caldwell-leslie.com
6
                     ORRICK HERRINGTON & SUTCLIFFE LLP
7                    BY:  MICHAEL C. TU, ESQ.
                     777 SOUTH FIGUEROA STREET
8                    SUITE 3200
                     LOS ANGELES, CA 90017-5855
9                    (213) 612-2433
                     mtu@orrick.com
10
                     PAUL HASTINGS LLP
11                   WILLIAM F. SULLIVAN, ESQ.
                     515 SOUTH FLOWER STREET
12                   TWENTY-FIFTH FLOOR
                     LOS ANGELES, CA 90071
13                   (213) 683-6252
                     williamsullivan@paulhastings.com
14
                     IRELL & MANELLA LLP
15                   BY:  A. MATTHEW ASHLEY, ESQ.
                     840 NEWPORT CENTER DRIVE
16                   SUITE 400
                     NEWPORT BEACH, CA
17                   92660-6324
                     (949) 760-0991
18                   mashley@irell.com

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

4

**A P P E A R A N C E S**
(CONTINUED)

1

2

3  DLA PIPER
   BY:  GRANT P. ALEXANDER, ESQ.
   1999 AVENUE OF THE STARS
4  SUITE 400
   LOS ANGELES, CA 90067-6023
5  (310) 595-3020
   grant.alexander@dlapiper.com
6

7  BINGHAM McCUTCHEN LLP
   BY:  CATHY D. LEE, ESQ.
   355 SOUTH GRAND AVENUE
8  SUITE 4400
   LOS ANGELES, CA 90071-3106
9  (213) 680-6435
   cathy.lee@bingham.com
10

11 GOODWIN PROCTER
   BY:  BRIAN E. PASTUSZENSKI, ESQ.
        DANIEL ROESER, ESQ.
12 EXCHANGE PLACE
   BOSTON, MA 02109
13 (617) 570-1094
   bpastuszenski@goodwinprocter.com
14 droeser@goodwinprocter.com

15 O'MELVENY & MYERS LLP
   BY:  MATTHEW C. HIPP, ESQ.
16      WILLIAM J. SUSHON, ESQ.
   400 SOUTH HOPE STREET
17 LOS ANGELES, CA 90071-2899
   (213) 430-6000
18 mhipp@omm.com

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                            **I N D E X**

2                                                                   **PAGE**

3

4    **HEARING:**   STATUS CONFERENCE                              4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

```
 1    rulings.  And that's certainly going to govern the pen when

 2    it comes to amending this Complaint.

 3            And if there is -- which we think is -- which we

 4    think is going to be done successfully.  And so we do not

 5    want to be lumped into a -- in sort of consolidated statute

 6    of limitations inquiry notice motion because we think our --

 7    as a matter of fact, we're fairly certain our issues are

 8    going to be entirely different and on just about every level

 9    when they get to the amendment.

10            So that is really a principal concern about any

11    sort of consolidation for purposes of taking depositions or

12    written discovery.  I mean, that's just -- seems to me almost

13    housekeeping.  But the -- but consolidation for purposes of

14    having all the plaintiffs in one big ball of wax for purposes

15    of the statute of limitations -- we think that that would be

16    disregarding the unique issues that certainly we have

17    compared to some of the other plaintiffs.

18            THE COURT:  What you're talking about is an Ohio

19    law; right?

20            MR. LYSAGHT:  Certainly.

21            THE COURT:  Okay.  I have that.  Is there anything

22    else you want to say on behalf of that client?

23            MR. LYSAGHT:  Once again, your Honor?

24            THE COURT:  Anything else?

25            MR. LYSAGHT:  I don't think so.
```

1              May I?

2              (An off-the-record discussion was held.)

3              MR. LYSAGHT:  Well, just that our position is

4    unique on various of the Stichting levels, be it trans-level

5    issues or Ohio state law issues or a variety of things which

6    I think is going to become more clarified when --

7              THE COURT:  Do you really?  You have tranche issues

8    that are different?  Do you?

9              MR. LYSAGHT:  Yes, and when you see the Amended

10   Complaint, they'll be much more.

11             May I ask -- may counsel from New York, David,

12   speak?

13             THE COURT:  Yes.  Oh, please.

14             MR. WOLLMUTH:  My pro hoc is not signed yet.

15             THE COURT:  That's all right.

16             MR. WOLLMUTH:  That's why I didn't want to speak.

17             I think it is too early to know how featured this

18   will be when it comes down to final decisions before your

19   Honor, but not all tranches are created equal.

20             THE COURT:  You're talking -- you're really

21   preaching to the choir.

22             MR. WOLLMUTH:  So we have several tranches we never

23   even sued on, and we would say because they're not impaired.

24             THE COURT:  They're not impaired, no.

25             MR. WOLLMUTH:  Right.  So they're not in our case,

```
 1   and they're not going to be in our case.
 2            So with respect to those tranches that are not
 3   before the Court and are not going to be before your Honor
 4   because we're not going to sue on them -- for example, notice
 5   inquiry as to those tranches could have never arisen because
 6   there is no defect as far as we can tell sitting here today.
 7            THE COURT:  Isn't that interesting?  So you have --
 8   do you have some mezzanine tranches?
 9            MR. WOLLMUTH:  No.  We have only Triple A, your
10   Honor.
11            THE COURT:  Only Triple A.  I see.
12            MR. WOLLMUTH:  And one of the things I was
13   mentioning to Mr. Lysaght, when I read your Honor's ruling in
14   Stichting, which I'm sure I'm pronouncing wrong; so forgive
15   me.
16            THE COURT:  It doesn't matter.
17            MR. WOLLMUTH:  You had invited the Stitching
18   plaintiff to provide some pleading concerning the different
19   tranche level positions that he had and loan group similarity
20   or not.  And it appears from your Honor's ruling -- I haven't
21   read their Complaint -- that they passed on that invitation
22   from your Honor.
23            THE COURT:  They did.
24            MR. WOLLMUTH:  So what I was mentioning to
25   Mr. Lysaght is, you know, as long -- I assume those
```

1    invitations are still open to plaintiffs that have not yet

2    been before your Honor.

3            THE COURT:  I have no reason to feel differently

4    about it right now.

5            MR. WOLLMUTH:  So we will take the guidance that

6    they decline to take, and I just wanted to put a pin in that

7    point for now.  Not all tranches are the same.  I think it's

8    important to tell the Court we're not suing on certain

9    tranches, and I think that's a difference.

10           THE COURT:  Well, you have 37 as I recall.

11           MR. WOLLMUTH:  Yeah.  And I think we own 43 in

12   total.  That sounds like the the right number, but I wouldn't

13   swear to it.  I think 37 are in the lawsuit, and I don't want

14   to give away the company's confidential information.

15           THE COURT:  No.  That's all right.

16           MR. WOLLMUTH:  But there's smaller numbers that are

17   not impaired and we haven't sued on, and we looked, you know,

18   security by security when deciding whether to commence action

19   or not and, you know, we think that analysis is important.

20           THE COURT:  Well, it is important to this Court.  I

21   don't know -- I can't say -- we're in the process of

22   attempting to get some continuity and agreement.  We're going

23   to be a long time doing that.

24           MR. WOLLMUTH:  I understand.

25           And we are all in favor of coordination and

UNITED STATES DISTRICT COURT

# Exhibit 14

1 | LIONEL Z. GLANCY (#134180)
   MICHAEL GOLDBERG (#188669)
2 | 1801 Avenue of the Stars, Suite 311
   Los Angeles, California 90067
3 | Telephone: (310) 201-9150
   Facsimile: (310) 201-9160
4 | E-mail: info@glancylaw.com

5

6 | *Liaison Counsel for Lead Plaintiff Iowa Public*
   *Employees' Retirement System*
7 | *[Additional Counsel on Signature Page]*

8 | UNITED STATES DISTRICT COURT
9 | CENTRAL DISTRICT OF CALIFORNIA

10 | MAINE STATE RETIREMENT SYSTEM,
   Individually and On Behalf of All Others
11 | Similarly Situated,

   No. 2:10-CV-00302 MRP (MAN)

12 |         Plaintiff,

13 |        v.

   CLASS ACTION

14 | COUNTRYWIDE FINANCIAL
   CORPORATION; COUNTRYWIDE
15 | SECURITIES CORPORATION;
   COUNTRYWIDE HOME LOANS, INC.;
   **AMENDED CONSOLIDATED**
   **CLASS ACTION COMPLAINT**
16 | COUNTRYWIDE CAPITAL MARKETS;
   BANK OF AMERICA CORP.; NB
17 | HOLDINGS CORPORATION; CWALT,
   INC.; CWMBS, INC.; CWABS, INC.;
18 | CWHEQ, INC.; J.P. MORGAN
   SECURITIES, INC.; DEUTSCHE BANK
19 | SECURITIES INC.; BEAR, STEARNS &
   CO., INC.; JPMORGAN CHASE, INC.;
20 | BANC OF AMERICA SECURITIES LLC;
   UBS SECURITIES LLC; MORGAN
21 | STANLEY & CO., INC.; EDWARD D.
   JONES & CO., L.P.; CITIGROUP GLOBAL
22 | MARKETS, INC.; GOLDMAN, SACHS &
   CO.; CREDIT SUISSE SECURITIES (USA)
23 | LLC; RBS SECURITIES INC.; BARCLAY'S
   CAPITAL, INC.; HSBC SECURITIES (USA)
24 | INC.; BNP PARIBAS SECURITIES CORP.;
   MERRILL LYNCH, PIERCE, FENNER &
25 | SMITH, INC.; STANFORD L. KURLAND;
   DAVID A. SPECTOR; ERIC P. SIERACKI;
26 | N. JOSHUA ADLER; RANJIT KRIPALANI;
   JENNIFER S. SANDEFUR; THOMAS
27 | KEITH MCLAUGHLIN; THOMAS H.
   BOONE; JEFFREY P. GROGIN; DAVID A.
28 | SAMBOL,
        Defendants.

**CHAMBER'S COPY**

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 3 2010

CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

19.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c). Many of the acts and conduct complained of herein occurred in substantial part in this District, including the dissemination of the Offering Documents, which contained material misstatements and omissions, complained of herein.  In addition, Defendants conduct business in this District.

20.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

III.  **PARTIES**

A.  **Plaintiffs**

21.     **Iowa Public Employees' Retirement System** ("IPERS") is a public pension fund for employees of the State of Iowa.  IPERS acquired MBS pursuant and traceable to one or more Registration Statements and Prospectus Supplements. Each of these Registration Statements and Prospectus Supplements, as described herein, contained substantially similar or identical representations as every Registration Statement and Prospectus Supplement used to issue the MBS acquired by IPERS and/or the members of the Class, and this language was rendered materially misleading as a consequence of the same course of conduct by Defendants.   A certificate documenting IPERS' transactions in the subject securities and willingness to serve as a representative party in this litigation was filed with its motion for appointment as lead plaintiff.   IPERS purchased the following Certificates pursuant to the materially misleading Offering Documents:

| Offering | Class | Purchase | Price | Quantity |
|---|---|---|---|---|
| CWALT 2005-17 | 2B1 | 5/31/05 | $100.00 | $1,410,000 |
| CWALT 2005-24 | 2A1A | 5/10/05 | $97.14 | $3,500,103 |
| CWALT 2005-24 | 2A1A | 8/1/05 | $97.80 | $100,003 |
| CWALT 2005-56 | 1A1 | 10/9/07 | $100.00 | $9,200,000 |
| CWALT 2005-J4 | 2A2B | 5/5/05 | $100.00 | $2,250,000 |
| CWALT 2006-OA10 | 1A1 | 3/3/08 | $62.93 | $2,499,919 |
| CWALT 2006-OA21 | A1 | 3/27/08 | $73.75 | $8,900,000 |
| CWALT 2006-OC5 | 2A2A | 6/26/06 | $100.00 | $9,100,000 |
| CWALT 2007-5CB | 1A31 | 9/10/08 | $72.62 | $9,470,000 |
| CWALT 2007-J1 | 3A1 | 4/10/07 | $97.00 | $6,000,000 |
| CWHEQ 2006-S3 | A2 | 6/16/06 | $100.00 | $1,999,956 |
| CWHEQ 2006-S8 | A2 | 12/7/06 | $100.00 | $2,124,966 |
| CWHEQ 2006-S9 | A2 | 12/14/06 | $100.00 | $1,845,000 |
| CWHEQ 2007-E | A | 5/25/07 | $100.00 | $9,953,000 |
| CWHL 2005-HYB6 | 2A1 | 4/12/07 | $99.70 | $4,700,000 |
| CWHL 2006-3 | 2A1 | 4/12/07 | $71.00 | $13,200,000 |
| CWHL 2006-OA5 | 2A1 | 2/22/08 | $85.00 | $3,200,000 |
| CWHL 2006-OA5 | 3A1 | 4/12/07 | $100.00 | $12,700,000 |
| CWHL 2007-10 | A22 | 9/30/08 | $71.00 | $7,200,000 |
| CWHL 2007-16 | A1 | 8/30/07 | $99.95 | $8,600,000 |
| CWHL 2007-HYB1 | 2A1 | 5/1/07 | $97.00 | $9,800,000 |
| CWHL 2007-HYB2 | 3A1 | 8/23/07 | $94.00 | $4,000,000 |
| CWL 2005-11 | AF1 | 9/12/05 | $100.00 | $15,900,000 |
| CWL 2005-12 | 2A1 | 9/28/05 | $100.00 | $11,875,000 |
| CWL 2005-6 | M4 | 6/14/05 | $100.00 | $3,475,000 |
| CWL 2005-AB3 | 2A1 | 9/8/05 | $100.00 | $15,900,000 |
| CWL 2005-IM1 | A2 | 7/22/05 | $100.00 | $3,350,000 |
| CWL 2005-IM3 | A1 | 12/1/05 | $100.00 | $15,275,000 |
| CWL 2006-12 | 2A1 | 6/27/06 | $100.00 | $14,750,000 |
| CWL 2007-1 | 2A1 | 1/26/07 | $100.00 | $15,325,000 |
| CWL 2007-11 | 2A1 | 6/28/07 | $100.00 | $14,575,000 |
| CWL 2007-13 | 2A1 | 10/16/07 | $100.00 | $4,060,000 |

22.   **General Board of Pension and Health Benefits of the United Methodist Church** ("GBPHB") is the pension fund for the active and retired clergy and lay employees of the United Methodist Church.  GBPHB acquired MBS pursuant and traceable to one or more Registration Statements and Prospectus Supplements.  Each of these Registration Statements and Prospectus Supplements, as described herein, contained substantially similar or identical representations as every Registration Statement and Prospectus Supplement used to issue the MBS acquired by GBPHB and/or the members of the Class, and this language was

# Exhibit 15

UNITED STATES DISTRICT COURT                    **NOT FOR PUBLICATION**
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
PLUMBERS' & PIPEFITTERS' LOCAL #562 :
SUPPLEMENTAL PLAN & TRUST, et al.,              :
                                                :
                           Plaintiffs,          :        **MEMORANDUM & ORDER**
                                                :
                 - against -                    :
                                                :        No. 08 CV 1713 (ERK) (WDW)
J.P.      MORGAN        ACCEPTANCE :
CORPORATION I, et al.,                          :
                                                :
                           Defendants.          :
---------------------------------------------------------- X

KORMAN, District Judge.

        I assume familiarity with the facts of this case, a full description of which can be found in

a decision on the defendants' motion to dismiss filed contemporaneously with this memorandum

and order. There, I held, *inter alia,* that the Lead Plaintiff did not have Article III standing to

assert claims based on Certificates that it did not purchase. The motions at issue here attempt to

partially cure this standing deficiency.

                                      **BACKGROUND**

        On May 3, 2011, nonparties General Retirement System of the City of Detroit ("Detroit

GRS") and Police and Fire Retirement System of the City of Detroit ("Detroit PFRS")

(collectively, "the Detroit Funds") filed a motion to intervene as named plaintiffs. Detroit

Funds' Motion to Intervene, ECF No. 86. The Detroit Funds, purchasers of three Certificates

listed in the Amended Complaint but not held by the Lead Plaintiff, argue that they are entitled to

intervention as of right under F.R.C.P. 24(a)(2), or in the alternative, that they satisfy the

requirements for permissive intervention under F.R.C.P. 24(b)(1). Detroit Funds Mem. Law 2-7,

ECF No. 87. The Detroit Funds argue that their claims are timely because the Lead Plaintiff's

filing of the complaint tolled the statute of limitations applicable to the Securities Act of 1933. They argue, alternatively, that their claims relate back to the filing of the original complaint under F.R.C.P. 15(c) for statute of limitations purposes. *See* Detroit Funds Reply Mem. Law, ECF No. 96. On October 17, 2011, 1199SEIU Health Care Employees Pension Fund ("1199 Fund," collectively with the Detroit Funds, "the Intervenors")—who bought one Certificate listed in the Amended Complaint not held by the Lead Plaintiff or the Detroit Funds—also moved to intervene as a named plaintiff, asserting the same arguments as the Detroit Funds and incorporating by reference the Detroit Funds' briefs. 1199 Fund Mem. Law, ECF No. 106.

## DISCUSSION

### I. *Intervention As of Right Under Rule 24(a)*

Rule 24(a)(2) provides that, "[o]n timely motion, the court must permit anyone to intervene who claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." FED. R. CIV. PRO. 24(a)(2). To establish this, "an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *New York News, Inc. v. Kheel*, 972 F.2d 482, 485 (2d Cir. 1992). The Intervenors meet these requirements and the defendants do not argue otherwise.

### II. *Futility*

The defendants argue that regardless of fulfilling the elements of Rule 24, the motions should be denied as futile. Defs.' Mem. Law 4, ECF No. 91. Indeed, though not mentioned in the rule itself, "futility is a proper basis for denying a motion to intervene." *In re Merrill Lynch*

*& Co., Inc. Research Reports Secs. Litig.*, Nos. 02-1484, 02-8472, 2008 WL 2594819, *5

(S.D.N.Y. Jun. 26, 2008). Specifically, the defendants argue that the Intervenors' claims are

time-barred by the statute of limitations in Section 13 of the Securities Act of 1933:

> No action shall be maintained to enforce any liability . . . unless brought within
> one year after the discovery of the untrue statement or the omission, or after such
> discovery should have been made by the exercise of reasonable diligence . . . . In
> no event shall any such action be brought to enforce a liability created under
> [Section 11 or 12(a)(1)] more than three years after the security was bona fide
> offered to the public, or under [Section 12(a)(2)] more than three years after the
> sale.

15 U.S.C. § 77m (2006). The first sentence of § 77m is customarily referred to as a statute of

limitations because it establishes the event which triggers the accrual of a cause of action. The

second sentence of § 77m places an outside date not dependent on the date of accrual on which a

cause of action may be filed. Such a limitation is referred to as a statute of repose, even though it

is an essential part of the statute of limitations and serves the same purposes. *See, e.g., Davis v.

Munie*, 235 Ill. 620, 621, 85 N.E. 943, 944 (1908) ("Statutes of limitations are statutes of repose,

intended to prescribe a definite limit of time within which the remedies included within their

provisions must be prosecuted."). Indeed, in terms of the issue presented here, whether equitable

tolling is applicable, the Supreme Court has more accurately described the applicable principle as

follows: "It is hornbook law that limitations periods are customarily subject to equitable tolling .

. . unless tolling would be inconsistent with the text of the relevant statute." *Young v. United

States*, 535 U.S. 43, 49 (2002) (quotations and citations omitted). Against this backdrop, I turn

to the issue whether the cause of action which the Intervenors assert is barred by the statute of

limitations.

A.  *The First Sentence of Section 13*

The first sentence of Section 13 requires that the claims here be brought "within one year

after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence . . . ." 15 U.S.C. § 77m. This class action was filed on March 26, 2008, and plaintiff's counsel issued a press release describing the case on January 21, 2009. Decl. of James A. Harrod Ex. C, ECF No. 20. This placed the Intervenors' on inquiry notice prior to one year before filing these respective motions to intervene. *See Menowitz v. Brown*, 991 F.2d 36, 42 (2d Cir. 1996).

The Intervenors, however, argue that their claims are timely because filing of the class action tolled the statute of limitations—an argument with which the Supreme Court agreed in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552-53 (1974). The Supreme Court there held that the statute of limitations was tolled for class members who moved to intervene after class certification was denied. The tolling created by *American Pipe* "depended heavily on the fact that [the timely prior filings] involved exactly the same cause of action subsequently asserted. This factor was more than an abstract or theoretical consideration because the prior filing in [*American Pipe*] necessarily operated to avoid the evil against which the statute of limitations was designed to protect." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 467-68 (1975). Moreover, failure to toll would "undermine the policies of 'efficiency and economy of litigation' that underlie Rule 23," *In re Wachovia Equity Secs. Litig.*, 753 F. Supp. 2d 326, 372 (S.D.N.Y. 2011) (citing *American Pipe*), by punishing "class members for relying on the very thing Rule 23 is intended to provide: an efficient method for resolving class claims common to a class of individuals without the need for wasteful and duplicative litigation." *In re Initial Public Offering Secs. Litig.*, Nos. 21-92, 01-9741, 01-10899, 2004 WL 3015304, *5 (S.D.N.Y. Dec. 27, 2004) (applying *American Pipe* tolling to intervenors' claims where the lead plaintiff lacked standing). Particularly where, as here, no class certification decision has been

made, "defendants generally are not prejudiced by continued tolling because the purposes of the statute of limitations will have been met by service of the original complaint." *In re National Australia Bank Secs. Litig.*, 03-6537, 2006 WL 3844463, *4 (S.D.N.Y. Nov. 8, 2006).

The defendants rely on *Korwek v. Hunt*, in which the Second Circuit refused to apply *American Pipe* tolling to claims filed by plaintiffs in a subsequent class action after an identical class action was denied class certification. 827 F.2d 874, 876 (2d Cir. 1987). *Korwek*, held that "the tolling rule established by *American Pipe* . . . was not intended to be applied to suspend the running of statutes of limitations for class action suits filed after a definitive determination of class certification; such an application of the rule would be inimical to the purposes behind statutes of limitations and the class action procedure." *Id.* at 879. Here, however, there has been no determination of class certification. More importantly, applying tolling here does not undermine the statute of limitations because the defendants have been on notice of the Intervenors' claims since the original class action was filed and the defendants are not forced to prejudicially relitigate class certification issues. The *Korwek* Court was also concerned with allowing the "perpetual tolling of the statute of limitations," *id.* (quotations omitted), but that is not a risk here because the *Korwek* decision itself extinguishes tolling upon the decision on class certification.

The defendants also rely on *In re Crazy Eddie Secs. Litig.*, 747 F.Supp. 850, 853 (E.D.N.Y. 1990). There, class action claims were dismissed for lack of standing because none of the plaintiffs held the debentures at issue. *Id.* at 853. A second, separate class action was filed by a holder of the same debentures. Because that cause of action was otherwise barred by the statute of limitations, the plaintiff argued that the dismissed class action claims tolled the statute of limitations. *Id.* at 856. Judge Nickerson declined to hold that a dismissed claim, particularly

one dismissed for lack of standing on the part of the plaintiff, tolled the statute of limitations for other plaintiffs who were not parties to the initial complaint. This case is distinguishable for two reasons. First, the initial class action here has not been dismissed as to those Certificates for which the Lead Plaintiff has standing. Because there is an appropriate plaintiff here for some of the Certificates, permitting intervention in such a case will not "condone or encourage attempts to circumvent the statute of limitations by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of the tolling rule." *In re Elscint, Ltd. Secs. Litig.*, 674 F.Supp. 374 (D. Mass. 1987) (relied upon by Judge Nickerson in *Crazy Eddie*). Second, this is an action by parties whose claims were asserted in the Lead Plaintiff's complaint and the Intervenors seek to cure any argument that their claims are not properly represented by the Lead Plaintiff because it lacked standing.

While not precisely on point, *Mullaney v. Anderson*, 342 U.S. 415 (1952) is analogous in some respects. There, the petitioner, for the first time on appeal, raised the issue of the standing of the Alaska Fisherman's Union and its Secretary-Treasurer to prosecute a lawsuit challenging fishing license fees for out-of-state fisherman far greater than those imposed on in-state fisherman. This argument clearly had merit because, at the time, the Supreme Court had not recognized associational standing. In order to overcome this argument, the Secretary-Treasurer moved for leave to add as parties two of its members. Pursuant to Rule 21 of the Federal Rules of Civil Procedure, the Supreme Court granted the motion. In so doing, it observed that

> [t]he original plaintiffs alleged without contradiction that they were authorized by the nonresident union members to bring this action in their behalf. This claim of authority is now confirmed in the petition supporting the motion to add the member-fishermen as plaintiffs. To grant the motion merely puts the principal, the real party in interest, in the position of his avowed agent. The addition of these two parties plaintiff can in no wise embarrass the defendant. Nor would their earlier joinder have in any way

> affected the course of the litigation. To dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste and runs counter to effective judicial administration—the more so since, with the silent concurrence of the defendant, the original plaintiffs were deemed proper parties below. Rule 21 will rarely come into play at this stage of a litigation. We grant the motion in view of the special circumstances before us.

*Id.* at 417. The Supreme Court would later observe that *Mullaney* "cannot be explained as a case involving a technical change to identify the real parties in interest. The addition of the union members was considered necessary to establish the existence of a justiciable case." *Newman-Green*, 490 U.S. at 834 n.8.

While the instant case involves the intervention of a party with standing rather than leave to add parties, this should arguably make no difference. *See Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 411 F.2d 451, 455 (2d Cir. 1969). *Mullaney* can be read to stand for the proposition that, where appropriate, considerations of policy may justify the intervention of class members who have standing to assert certain claims that were asserted by the lead plaintiff on behalf of those class members. While the class members in this case may not have given the lead plaintiff permission to assert claims on their behalf, their intervention can be viewed as constituting a ratification of the lead plaintiff's representation of them. In the present case, different considerations of policy than those present in *Mullaney* provide a sufficient basis to permit intervention in a class action over which this court has jurisdiction.

### B. *The Second Sentence of Section 13*

The second sentence in Section 13 of the Securities Act of 1933 provides that, even if the complaint was filed within the period of time prescribed after the accrual of the cause of action, "[i]n no event shall any such action be brought to enforce a liability created under [Section 11 or 12(a)(1)] more than three years after the security was bona fide offered to the public, or under

[Section 12(a)(2)] more than three years after the sale." 15 U.S.C. § 77m (2006). The Certificates on which the Intervenors seek to sue were offered to the public and sold to the Intervenors more than three years prior to either of the motions to intervene.[1] Nevertheless, the Intervenors argue that their claims are timely because their claims were tolled at the filing of the original complaint on March 26, 2008. Detroit Funds Reply Mem. Law 5, ECF No. 96. The Intervenors argue that *American Pipe and Construction Co. v. Utah*, which held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action," 414 U.S. 538, 554 (1974), also applies to the second sentence of Section 13.

*American Pipe* only dealt with a statute of limitations, and courts within the Second Circuit, and across the country, are largely split on whether its reasoning also applies to statutes of repose. *Compare Joseph v. Wiles*, 223 F.3d 1155, 1167 (10th Cir. 2000) (holding that *American Pipe* tolling applies to the statute of repose in Section 13) *and Intl. Fund Mgmt. S.A. v. Citigroup Inc.*, Nos. 09-8755, 10-7202, 10-9325, 11-314, 2011 WL 4529640, *8 (S.D.N.Y. Sept. 30, 2011) (same) *with In re Lehman Brothers Secs. and ERISA Litig.*, No. 09-2017, 2011 WL 1453790, *3 (S.D.N.Y. Apr. 13, 2011) (holding that *American Pipe* tolling does not apply to the statute of repose in Section 13).

---

[1]  The Detroit Funds purchased JPMMT 2006-A7 on 1/18/07, JPMALT 2006-A1 on 2/6/06, and JPMALT 2006-S4 on 3/19/08. These Certificates were offered to the public on 12/22/06, 2/28/06, and 11/29/06, respectively. Decl. of Dorothy J. Spenner, ECF No. 92. The Detroit Funds' motion to intervene was filed on May 3, 2011, which is more than three years after the sale date or the date any of the Detroit Funds' Certificates were offered to the public. The 1199 Funds purchased JPMALT 2002-A2 on 1/5/07, which was offered to the public on 4/27/06. Decl. of Dorothy J. Spenner Ex. A, ECF No. 110. The 1199 Funds motion to intervene was filed on October 17, 2011, which is also more than three years after the purchase or offer date of its Certificate.

8

I find the Tenth Circuit's reasoning in *Joseph* to be particularly persuasive and adopt it here. I add these brief words responding to concerns that the "absolute language" used in the statute of repose disallows tolling. The statute of repose and the statute of limitations in Section 13 must be read in unison. The statute of limitations begins to run when the plaintiff has actual or constructive notice. *See Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993). Because this accrual date, dependent as it is upon actual or constructive knowledge, has the potential to indefinitely extend the statute of limitations, Congress chose to prescribe an outside limit of three years on when such actions can be brought. Otherwise, all of the policies underlying the statute of limitations would be completely undermined. Under these circumstances, the "in no event" language should be read, as it was by the Tenth Circuit, to have been legally tolled upon the filing of a class action complaint within the three year period. Such a holding does not undermine any of the policies underlying the statute of limitations and is entirely consistent with the legislative goals underlying Rule 23. *See Joseph v. Wiles*, 223 F.3d 1155, 1167 (10th Cir. 2000); *Intl. Fund Mgmt. S.A. v. Citigroup Inc.*, Nos. 09-8755, 10-7202, 10-9325, 11-314, 2011 WL 4529640, *8 (S.D.N.Y. Sept. 30, 2011).

## CONCLUSION

Because the Intervenors have established intervention as of right under Rule 24(a)(2) and their respective claims are not time-barred by Section 13's statute of limitations or statute of repose, the motions to intervene are granted. Because an order granting a motion to intervene is not appealable, *see Ionian Shipping Co. v. British Law Ins.*, 426 F.2d 186, 188 (1970), and because the issue is a close one in which the case law—consisting of thoughtful and well-reasoned opinions—goes both ways, I would be willing to entertain a motion to amend the opinion to include a certification pursuant to 28 U.S.C. 1292(b). The motion should be made within ten days of the date of this order.

**SO ORDERED.**

Brooklyn, New York
December 13, 2011

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge

10