Brian E. Pastuszenski (*pro hac vice*)
bpastuszenski@goodwinprocter.com
Inez Friedman-Boyce (*pro hac vice*)
ifriedmanboyce@goodwinprocter.com
Brian C. Devine (SBN 222240)
bdevine@goodwinprocter.com
Caroline H. Bullerjahn (*pro hac vice*)
cbullerjahn@goodwinprocter.com
**GOODWIN PROCTER** LLP
Exchange Place
Boston, MA 02109-2802
Tel.: 617-570-1000
Fax: 617-570-1231

Lloyd Winawer (SBN 157823)
lwinawer@goodwinprocter.com
**GOODWIN PROCTER** LLP
601 South Figueroa Street, 41st Floor
Los Angeles, California 90017
Tel.: 213-426-2500
Fax: 213-623-1673

*Attorneys for Defendants*
Countrywide Financial Corporation, Countrywide Home Loans, Inc., CWALT, Inc., CWMBS, Inc., CWABS, Inc., CWHEQ, Inc., Countrywide Capital Markets, Countrywide Securities Corporation, and N. Joshua Adler

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 11-ML-02265-MRP (MANx) |
|---|---|
| | **OMNIBUS REPLY MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS** |
| | Date/Time: February 13, 2012 11:00 a.m. |
| | Date/Time: February 14, 2012 1:00 p.m. |
| | Courtroom: 12 |
| | Judge: Hon. Mariana R. Pfaelzer |

1    PUTNAM BANK, Individually and
2    on Behalf of All Others Similarly Sit-
     uated,
3
                    Plaintiff,
4              v.                              Case No. 11-CV-04698-MRP (MANx)
5    COUNTRYWIDE FINANCIAL
     CORPORATION, *et al.*,
6                 Defendants.
7
8    BANKERS INSURANCE COM-
     PANY, *et al.,*
9
                    Plaintiffs,
10                                             Case No. 11-CV-07152-MRP (MANx)
11             v.
12   COUNTRYWIDE FINANCIAL
     CORPORATION, *et al.*,
13
                    Defendants.
14
15   STERLING FEDERAL BANK,
     F.S.B.,
16
                    Plaintiff,
17                                             Case No. 11-CV-07163-MRP (MANx)
18             v.
19   COUNTRYWIDE FINANCIAL
     CORPORATION, *et al.*,
20
21                Defendants.
22   WESTERN AND SOUTHERN LIFE
     INSURANCE COMPANY, *et al.*,
23
24                Plaintiffs,
                                               Case No. 11-CV-07166-MRP (MANx)
25             v.
26   COUNTRYWIDE FINANCIAL
27   CORPORATION, *et al.*,
28

     OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS



1          Defendants.

2

3    AMERICAN FIDELITY ASSUR-
     ANCE COMPANY

4
                   Plaintiff,
5
                                              Case No. 11-CV-07167-MRP (MANx)
6          v.

7    COUNTRYWIDE FINANCIAL
     CORPORATION, *et al.*,
8
                   Defendants.
9

10   SEALINK FUNDING LIMITED,

11                 Plaintiff,
                                              Case No.  11-CV-08896-MRP (MANx)
12         v.

13   COUNTRYWIDE FINANCIAL
     CORPORATION, et al.,
14
                   Defendants.
15
     NATIONAL INTEGRITY LIFE IN-
16   SURANCE COMPANY,

17                 Plaintiff,                 Case No.  11-CV-09889-MRP (MANx)

18         v.

19   COUNTRYWIDE FINANCIAL
     CORPORATION, et al.,
20
                   Defendants.
21

22

23

24

25

26

27

28

# **Table of Contents**

**Page**

PRELIMINARY STATEMENT………………………………...………..……1

ARGUMENT……………………………………………………………....…5

I.  ALL CLAIMS IN *PUTNAM ARE* TIME-BARRED……………….…....…5

    A.  Putnam's 1933 Act Claims Are Untimely………………………..……5

    B.  Putnam's 1934 Act Claims Are Untimely……………………..……7

    C.  Putnam's CUSA Claims Are Untimely…………………………..……9

II.  ALL CLAIMS IN *AFAC* ARE TIME-BARRED……………………..……9

    A.  AFAC Concedes That, Absent Tolling, All Claims Are Untimely……9

    B.  The 1933 Act Limitations And Repose Periods Were Not Tolled…...10

    C.  AFAC Concedes Its 1934 Act Claims Must Be Dismissed………....11

    D.  The State Law Limitations Periods Were Not Tolled………………...12

III.  ALL CLAIMS IN *WESTERN & SOUTHERN* AND *NATIONAL INTEGRITY* ARE TIME-BARRED………………………………………………..……13

    A.  The *WS/NI* Plaintiffs' 1933 Act Claims Are Untimely…………..…...13

        1.  Shared Loan Pools Do Not Create Standing……………….......14

        2.  The *WS/NI* Plaintiffs Identify No Basis For This Court To Reconsider Its Previous Rulings On American Pipe Tolling…....…16

    B.  The *WS/NI* Plaintiffs' 1934 Act Claims Are Untimely…………..…...18

    C.  The OSA And Common Law Fraud Claims Fail……………………19

        1.  The OSA's Two-Year Statute Of Limitations Applies To The *WS/NI* Plaintiff's Common Law Fraud Claims………………..19

        2.  The *WS/NI* Plaintiffs' Title Transfer Claims Are Untimely…...20

        3.  The "Abandonment" Claims are Time-Barred………………..23

        4.  Allegations Of Fraudulent Concealment Do Not Save The *WS/NI* Plaintiffs' Claims……………………………..……..27

i

          5.      Plaintiffs' Argument About When They Supposedly Became Aware of Injury Lacks Merit.......................................29

    D.    The Ohio Savings Statute Does Not Save Plaintiffs' OSA Claims....30

    E.    The *WS/NI* Plaintiffs Should Not Be Allowed To Re-Plead............33

IV.   *NATIONAL INTEGRITY'S* CLAIMS MUST BE DISMISSED FOR SEVERAL INDEPDENT REASONS..............................................33

    A.    Plaintiffs' Admitted Forum Shopping Warrants Dismissal.......33

    B.    National Integrity's Common Law Fraud Claims Are Time-Barred....35

V.   THE *BANKERS'* PLAINTIFFS' CLAIMS ARE BARRED...................38

    A.    Restatement § 148(2)(c) Favors California Law.......................39

    B.    California's Limitations Period Bars Plaintiffs' Claims...............43

VI.   ALL CLAIMS IN *STERLING* ARE TIME-BARRED.....................46

    A.    Sterling's Claims Are Time-Barred Under Illinois Law...............47

    B.    Sterling's Claims Are Time-Barred Under California Law............48

        1.     llinois' Borrowing Statute Applies...............................48

        2.     California's Law Bars Sterling's Claims.........................50

VII.  SEALINK LACKS STANDING AND ITS CLAIMS ARE TIME-BARRED IN ANY EVENT.........................................................52

    A.    Sealink Has No "Injury In Fact" That Would Confer Standing.......52

    B.    Sealink Was On Notice Of Its Claims By The End Of 2007............54

    C.    Under New York Law, Sealink's Negligent-Misrepresentation Claims Is Subject To A Three-Year Limitations Period..........................60

ii

1

## <u>TABLE OF AUTHORITIES</u>

2

3  CASES

4  *Acri v. Int'l Assn'n of Machinists & Aerospace Workers*,
5      781 F.2d 1393 (9th Cir. 1986)...........................................................................33

6  *Adams v. Dean Witter Reynolds, Inc.*,
7      1999 WL 401394 (Ohio Ct. App. 8th Dist. June 17, 1999) ..............................20

8  *Aetna Cas. & Sur. Co. v. Stewart Constr. Co., Inc.*,
9      780 So.2d 1253 (La. Ct. App. 2001) .................................................................46

10  *Aetna Cas. & Sur. Co. v. Kerr-McGee Chem.*,
11      875 F.2d 1252 (7th Cir. 1989).........................................................................34

12  *AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*,
13      646 F. Supp. 2d 385 (S.D.N.Y. 2009)..............................................................54

14  *Allstate Ins. Co. v. Countrywide Fin. Corp.*,
15      --- F. Supp. 2d ---, 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011)..............*passim*

16  *Allstate Ins. Co. v. Countrywide Fin. Corp.*,
17      2011 WL 2360274 (S.D.N.Y. June 14, 2011).........................................................41

18  *Am. Nat'l Bank & Trust Co. v. City of Chi.*,
19      826 F.2d 1547 (7th Cir. 1987)...........................................................................32

20  *American Pipe & Constr. Co. v. Utah*,
21      414 U.S. 538 (1974) ..........................................................................................5

22  *Antone v. Gen. Motors Corp. v. Buick Motor Div.*, 473 N.E.2d 742 (N.Y.
23      1984)...................................................................................................................36

24  *Appel v. Kidder, Peabody & Co.*,
      628 F. Supp. 153 (S.D.N.Y. 1986)......................................................................55

25

26  *Arandell Corp. v. Am. Elec. Power Co., Inc.*,
27      2010 WL 3667004 (S.D. Ohio Sept. 15, 2010).................................................31

28

iii

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
   57 F.3d 146 (2d Cir. 1995) ................................................................. 53

*Bradigan v. Strongsville City Schools*,
   2007 WL 1643191 (Ohio Ct. App. June 7, 2007) ........................ 25, 26

*Brashears v. Sight 'N Sound Appliance Centers, Inc.*,
   981 P.2d 1270 (Okla. Civ. App. 1999) ......................................... 12, 13

*Breitz v. Lykes-Pasco Packing Co.*,
   561 So.2d 1204 (Fla. Dist. Ct. App. 1990) ......................................... 46

*Bullfrog Films, Inc. v. Wick*,
   847 F.2d 502 (9th Cir. 1988) .............................................................. 53

*Campbell v. Upjohn Co.*,
   676 F.2d 1122 (6th Cir. 1982) ........................................................... 28

*Catholic Social Servs., Inc. v. I.N.S.*,
   232 F.3d 1139 (9th Cir. 2000) ............................................................. 7

*Centaur Classic Conv. Arb. Fund Ltd. v. Countrywide Fin. Corp.*,
   No. 10-CV-05699-MRP, slip op. (C.D. Cal. Jan. 20, 2011) ......... 9, 14, 17

*Children's Hosp. & Med. Ctr. Found. of Omaha v. Countrywide Fin. Corp.*,
   No. 11-CV-02056-MRP, slip op. (C.D. Cal. Aug. 22, 2011) ............. 8

*Citigroup, Inc. v. City Holding Co.*,
   97 F. Supp. 2d 549 (S.D.N.Y. 2000) ................................................. 34

*City of Painesville v. First Montauk Fin. Corp.*,
   178 F.R.D. 180 (N.D. Ohio 1998) ............................................... 22, 27

*Cundall v. U.S. Bank*,
   909 N.E.2d 1244 (Ohio 2009) ........................................................... 25

*Clemens v. DaimlerChrysler Corp.*,
   534 F.3d 1017 (9th Cir. 2008) ............................................................. 9

*Cline v. Reliance Trust Co.*,
   245 Fed. App'x 503 (6th Cir. 2007) ................................................. 22

iv

*Community Maritime Park Assoc., Inc. v. Maritime Park Develop. Partners, LLC,*
  2011 2790185, at *4 (N.D. Fla. July 14, 2011) ................................................... 46

*Dawson v. Tindell,*
  733 P.2d 407 (Okla. 1987) ................................................................................ 12

*Day v. NLO, Inc.,*
  798 F. Supp. 1322 (S.D. Ohio 1992) ................................................................. 32

*DeChant v. Devs.,*
  1978 WL 218188 (Ohio Ct. App. 8th Dist. Oct. 26, 1978) .............................. 20

*Delman v. City of Cleveland Heights,*
  534 N.E.2d 835 (Ohio 1989) ........................................................................ 32, 33

*Dewey v. State of Oklahoma,*
  28 P.3d 539 (Okla. 2001) ............................................................................. 12, 13

*Digoia v. H. Koch & Sons, Div. of Wickes Mfg. Co.,*
  944 F.2d 809 (11th Cir. 1991) ........................................................................ 43

*Employers Ins. of Wasau v. Ehlco Liquidating Trust,*
  723 N.E.2d 687 (Ill. App. Ct. 1999) ................................................................ 48

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976) ...................................................................................... 23

*Fed. Deposit. Ins. Corp. v. Cohen,*
  1996 WL 87248 (S.D.N.Y. Feb. 29, 1996) ....................................................... 36

*Federated Mgmt. Co. v. Coopers & Lybrand,*
  738 N.E.2d 842 (Ohio Ct. App. 2000) ............................................................ 25

*Ferron v. Metareward, Inc.,*
  698 F. Supp. 2d 992 (S.D. Ohio 2010) ............................................................. 32

*Frank E. Basil, Inc. v. Liedesdorf,*
  713 F. Supp. 1194 (N.D. Ill. 1989) .................................................................. 47

v

*Futch v. Drug Enforcement Agency*,
   2007 WL 1615135 (S.D. Ga. June 4, 2007) .......................................................... 6

*Garnier v. Ludwick*,
   2003 WL 21734029 (Cal. Ct. App. 2003) ............................................................ 17

*Gaudin v. K.D.I. Corp.*,
   417 F. Supp. 620 (S.D. Ohio 1976) ..................................................................... 27

*Gordon & Co. v. Ross*,
   63 F. Supp. 2d 405 (S.D.N.Y. 1999) .................................................................... 54

*Gorlin v. Bond Richman & Co.*,
   706 F. Supp. 236 (S.D.N.Y. 1989) ...................................................................... 55

*Greenburg v. Hiner*,
   359 F. Supp. 2d 675 (N.D. Ohio 2005) ............................................................... 22

*Greenberg Traurig of New York, P.C. v. Moody,* 161 S.W.3d 56 (Tex. Ct.
   App. 2004) ........................................................................................................... 45

*Global Fin. Corp. v. Triarc Corp.*,
   715 N.E.2d 482 (N.Y. 1999) ................................................................................ 37

*Goldberg v. Cohen*,
   2002 WL 1371031 (Ohio Ct. App. 7th Dist. June 13, 2002) ...................... 19, 30

*Groch v. Gen. Motors. Corp.*,
   883 N.E.2d 377 (Ohio 2008) ............................................................................... 30

*Hardin v. Reliance Trust Co.*,
   2006 WL 2850455 (N.D. Ohio Sept. 29, 2006) .............................................25, 27

*Hardy v. VerMeulen*,
   512 N.E.2d 626 (Ohio 1987) ............................................................................... 31

*Harner v. Prudential-Bache Sec., Inc.*,
   1994 WL 494871 (6th Cir. Sept. 8, 1994)............................................................ 28

*Hater v. Gradison Div. of McDonald & Co. Sec., Inc.*,
   655 N.E.2d 189 (Ohio Ct. App. 1st Dist. 1995)................................................. 19

vi

*Helman v. EPL Prolong, Inc.*,
    743 N.E.2d 484 (Ohio Ct. App. 7th Dist. 2000) ....................................20, 19, 28

*Howard v. Allen*,
    283 N.E.2d 167 (Ohio 1972) ........................................................................31

*In re Alstom SC Sec. Litig.*,
    406 F. Supp. 2d 402 (S.D.N.Y. 2005) ...........................................................22

*In re Direxion Shares ETF Trust*,
    2012 WL 259384 (S.D.N.Y. Jan. 27, 2012) .....................................................5

*In re Elscint, Ltd. Sec. Litig.*,
    674 F. Supp. 374 (D. Mass. 1987) ..................................................................6

*In re Magnesium Corp. of Am.*,
    399 B.R. 722 (Bankr. S.D.N.Y. 2009) ...........................................................37

*In re Morgan Stanley Mortg. Pass-Through Cert. Litig.*,
    2011 WL 4089580 (S.D.N.Y. Sept. 15, 2011) .......................................6, 11, 17

*In re Nat'l Century Fin. Enters.*,
    755 F. Supp. 2d 857 (S.D. Ohio 2010) ...........................................................24

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2012 WL 149632 (N.D. Cal. Jan. 18, 2012) .....................................................5

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2012 WL 149637 (N.D. Cal. Jan. 18, 2012) .....................................................5

*In re Trasylol Prods. Liab. Litig.-MDL-1928*,
    2011 WL 2784237 (S.D. Fla. July 13, 2011) ..................................................42

*In re Urethane Antitrust Litig.*,
    663 F. Supp. 2d 1067 (D. Kan. 2009) ............................................................12

*In re Vioxx Prod. Liab. Litig.*,
    2007 WL 3334339 (E.D. La. Nov. 8, 2007).....................................................12

*In re Wells Fargo Mortg.-Backed Cert. Litig.*
    2010 WL 4117477 (N.D. Cal. Oct. 19, 2010)..........................................5, 11, 17

vii

1
2

3
4

5
6

7
8

9
10

11
12

13
14

15
16

17
18

19
20

21
22

23
24

25
26

27
28

*Judge v. Am. Motors Corp.*,
    908 F.2d 1565 (11th Cir. 1990) ................................................................43, 44

*Kegg v. Mansfield*,
    2001 WL 474264 (Ohio Ct. App. Apr. 30, 2001) ..........................................28

*Kellen Co. v. Calphalon Corp.*,
    54 F. Supp. 2d 218 (S.D.N.Y. 1999) ..............................................................35

*Kelley v. Microsoft Corp.*,
    251 F.R.D. 544 (W.D. Wash. 2008) ..........................................................40, 45

*Kerr v. Hurd*,
    694 F. Supp. 2d 817 (S.D. Ohio 2010) ...........................................................32

*Kondrat v. Morris*,
    692 N.E.2d 246 (Ohio Ct. App. 8th Dist. 1997) ......................................20, 30

*Keystone Fruit Mktg. v. Nat'l Fire Ins. Co.*,
    2011 WL 3293390 (E.D. Wash. Aug. 1. 2011) ..............................................35

*Korman v. Iglesias*,
    825 F. Supp. 1010 (S.D. Fla. 1993) ................................................................46

*LaBarbera v. Batsch*,
    227 N.E.2d 55 (Ohio 1967) .............................................................................32

*Lang v. Paine, Webber, Jackson & Curtis, Inc.*,
    582 F. Supp. 1421 (S.D.N.Y. 1984) ...............................................................54

*Lanthorn v. Cincinnati Ins. Co.*,
    2002 WL 31768796 (Ohio Ct. App. Dec. 5, 2002) .........................................32

*Leaton v. Paramount Lake Eola, L.P.*,
    2009 WL 1396293 (M.D. Fla. 2009) ..............................................................41

*LeBlanc v. G.D. Searle & Co.*,
    533 N.E.2d 41 (Ill. App. Ct. 1988) ...........................................................49, 50

*Lehman Bros. Bank, FSB v. Frank T. Yoder Mortg.*,
    415 F. Supp. 2d 636 (E.D. Va. 2006) .............................................................49

viii

*Lopardo v. Lehman Bros., Inc.*,
    548 F. Supp. 2d 450 (N.D. Ohio 2008) ................................................................ 30

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 53

*Lynch v. Dean Witter Reynolds, Inc.*,
    731 N.E.2d 1205 (Ohio Ct. App. 2d Dist. 1999)................................................... 20

*Maine State. Zanders v. O'Gara-Hess & Eisenhardt Armoring Co.*,
    1992 WL 2906 (6th Cir. Jan. 9, 1992)................................................................... 32

*Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*,
    58 F.3d 616 (Fed. Ct. App. 1995) ......................................................................... 34

*McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    727 F. Supp. 833 (S.D.N.Y 1989) ........................................................................ 37

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011)..................................................*passim*

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
    722 F. Supp. 2d 1157 (C.D. Cal. 2010)...........................................................*passim*

*Medimmune, Inc. v. Genentech, Inc.*,
    2004 WL 5327194 (C.D. Cal. Feb. 18, 2004) ...................................................... 33

*Metz. v. Unizan Bank*,
    2008 WL 2017574 (N.D. Ohio May 7, 2008) ....................................................... 30

*Metz v. Unizan Bank*,
    416 F. Supp. 2d 568 (N.D. Ohio Feb. 24, 2006) .................................................. 20

*Metz v. Unizan Bank*, 649 F.3d 492 (6th Cir. 2011)................................................ 19

*Monroe v. Stop-N-Go Food Stores, Inc.*, 631 N.E.2d 1138 (Ohio Ct. App.
    1993) ................................................................................................................. 31, 32

*Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 716 N.E.2d 829 (Ill. App. Ct.
    1999) ....................................................................................................................... 51

ix

1

2   *Nat'l Union Fire Ins. Co. of Pittsburgh v. Forman 635 Joint Venture,*
3        1996 WL 507317 (S.D.N.Y. Sept. 6, 1996) .......................................................37

4   *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
5        743 F. Supp. 2d 288 (S.D.N.Y. 2010) ...............................................................54

6   *Newdow v. Congress of U.S. of Am.,*
7        435 F. Supp. 2d 1066 (E.D. Cal. 2006) ............................................................11

8   *Newport v. Dell, Inc.,*
9        2008 WL 4347311 (D. Ariz. Aug. 21, 2008) ....................................................12

10  *Pan Am. West, Ltd. v. Cardinal Commercial Development, LLC,*
11       50 So.3d 68 (Fla. Dist. Ct. 2010).....................................................................46

12  *Pereira v. Cogan,*
13       2001 WL 243537 (S.D.N.Y. March 8, 2001)....................................................37

14  *Perkumpulan Investor Crisis Ctr. Dressel-WBG v. Regal Fin. Bancorp, Inc.,*
15       781 F. Supp. 2d 1098 (W.D. Wash. 2011) ........................................................53

16  *Pro Bono Inv., Inc. v. Gerry,*
17       2008 WL 4755760 (S.D.N.Y. Oct. 29, 2008) ...................................................53

18  *Pub. Serv. Co. of Okla. v. A Plus, Inc.,*
19       2011 WL 3329181 (W.D. Okla. Aug. 2, 2011)..................................................13

20  *Putnam Bank v. Countrywide Fin. Corp.,*
21       3:11-cv-00145, slip op. (D. Conn. May 16, 2011) ................................41, 45, 52

22  *R&P Co. v. Ranger Mining Assocs.,*
23       1991 WL 346393 (N.D. Ohio July 10, 1991)....................................................28

24  *Rein v. David A. Noyes & Co.,*
25       595 N.E.2d 565 (Ill. App. Ct. 1992).................................................................47

26  *Ryan v. Ambrosio,*
27       2008 WL 5258308 (Ohio Ct. App. 8th Dist. Dec. 18, 2008) ...........................20

28

x

*Sabena Belgian World Airways v. United Airlines, Inc.*,
 1991 WL 78175 (N.D. Ill. May 7, 1991) ............................................................. 49

*S.E.C. v. Glenn W. Turner Enters., Inc.*,
 474 F.2d 476 (9th Cir. 1973) ............................................................................. 24

*Sherman v. Air Reduction Sales Co.*,
 251 F.2d 543 (6th Cir. 1958) ............................................................................. 32

*Shermohmad v. Ebrahimi*,
 945 So.2d 119 (La. Ct. App. 2006) ............................................................... 46, 47

*Silver v. Slusher*,
 770 P.2d 878 (Okla. 1989) ................................................................................. 13

*Southcrest, LLC v. Bovis Lend Lease, Inc.*,
 2011 WL 3881495 (N.D. Okla. Sept. 2, 2011) .................................................. 13

*Spirit Partners, LP v. Stoel Rives LLP*,
 157 P.3d 1194 (Or. Ct. App. 2007) ............................................................... 40, 45

*Sportscare of Am., P.C. v. Multiplan, Inc.*,
 2011 WL 589955 (D.N.J. Feb. 10, 2011) ........................................................... 11

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
 554 U.S. 269 (2008) ........................................................................................... 53

*Steele v. Hosp. Corp. of Am.*,
 36 F.3d 69 (9th Cir. 1994) ................................................................................. 53

*Stewardship Credit Arbitrage Fund LLC v. Charles Zucker Culture Pearl Corp.*,
 2011 WL 1744217 (N.Y. Sup. Ct. May 4, 2011) ............................................... 53

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
 802 F. Supp. 2d 1125 (C.D. Cal. 2011) ......................................................*passim*

*Studio & Partners, s.r.l. v. KI*,
 2008 WL 426496 (E.D. Wis. Feb. 14, 2008) ..................................................... 55

xi

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Super Sulky, Inc. v. U.S. Trotting Assoc.*,
    174 F.3d 733 (6th Cir. 1999) ............................................................. 20

*The Investigative Grp., Inc. v. Brooke Grp. Ltd., Inc.*,
    1997 WL 727484 (S.D.N.Y. Nov. 21, 1997) ...................................... 37

*Tosti v. Los Angeles*,
    754 F.2d 1485 (9th Cir. 1985) ............................................................ 8

*Townsend v. Sears, Roebuck and Co.*,
    879 N.E.2d 893 (Ill. 2007) ......................................................... 50, 51

*United Fin. Casualty Co. v. Countrywide Fin. Corp.*,
    No. 11-CV-04766-MRP, slip op. (C.D. Cal. Nov. 16, 2011) .......... 1, 7

*Vaccariello v. Smith & Nephew Richards, Inc.*,
    763 N.E.2d 160 (Ohio 2002) ...................................................... 30, 31

*Valentino v. Bond*,
    2008 WL 3889603 (N.D. Fla. Aug. 19, 2008) ....................... 43, 44, 46

*Ware v. Kowars*,
    2001 WL 58731 (Ohio Ct. App. 10th Dist. Jan. 25, 2001) ......... 19, 20

*Wydallis v. U.S. Fidelity & Guaranty Co.*,
    63 N.Y.2d 872 (1984) ....................................................................... 36

*Wyser-Pratte Mgmt Co. v. Telxon Corp.*,
    413 F.3d 553 (6th Cir. 2005) ...................................................... 19, 23

*Zemcik v. LaPine Truck Sales & Equip. Co.*,
    706 N.E.2d 860 (Ohio Ct. App. 1998) .............................................. 28


**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Securities Act of 1933 ............................................................*passim*

Securities Exchange Act of 1934....................................................*passim*

12 U.S.C. § 1464(x) .......................................................................... 49

xii

1

12 U.S.C. § 1464(a)(1) ........................................................................49

2

Fed. R. Civ. P. 12(b)(6) ....................................................................41

3

Fed. R. Civ. P. 23 ...............................................................................13

4

5

6

OTHER: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS

7

735 ILL. COMP. STAT. 5/13-210 .......................................................48

8

815 ILL. COMP. STAT. 5/13(D) .........................................................47

9

C.P.L.R. § 202 ..........................................................................35, 36, 37

10

FLA. STAT. §§ 95.11(3)(j), 95.031(2)(a) ...........................................46

11

12

Restatement (Second) Conflict of Laws § 148(2) (1971) ................*passim*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PRELIMINARY STATEMENT

All of the claims alleged in the *Putnam*, *AFAC, Western & Southern*, *National Integrity*, *Bankers, Sterling*, and *Sealink* actions are time-barred under the applicable statutes of limitations and repose and this Court's prior rulings involving nearly identical claims in *Maine State*, *Stichting*, *Allstate*, and *Progressive*.[1] The opposition briefs filed by plaintiffs in these actions provide no basis for the Court to reach a different result here. More specifically, all these claims should be dismissed with prejudice for the following reasons:

*Putnam*: Putnam concedes that, absent tolling, its claims under the Securities Act of 1933 ("1933 Act"), the Securities Exchange Act of 1934 ("1934 Act"), and the Connecticut Uniform Securities Act ("CUSA") are untimely under this Court's rulings. Putnam also concedes that because the *Luther/Washington State* named plaintiffs did not purchase any of the mortgage-backed securities ("MBS") purchased by Putnam, those class actions triggered no tolling under this Court's rulings. Although Putnam argues the Court should reconsider those rulings, it fails to identify any factual or legal basis for doing so. In addition, because *Luther/Washington State* did not put defendants on notice of potential fraud claims (as required by *American Pipe*)—indeed, those complaints disclaimed any allegations of fraud—*Luther/Washington State* could not toll Putnam's 1934 Act claims in any event. Likewise, *American Pipe* tolling could not apply to Putnam's CUSA claims, because it is an exclusively federal tolling doctrine inapplicable to state law claims.

*AFAC*: Like Putnam, AFAC concedes that—absent tolling—the applicable statutes of limitations and repose have expired. Unlike Putnam, AFAC simply ig-

---

[1] *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157 (C.D. Cal. 2010) ("*Maine State I*"); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689 (C.D. Cal. May 5, 2011) ("*Maine State II*"); *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125 (C.D. Cal. 2011) ("*Stichting*"); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, --- F. Supp. 2d ---, 2011 WL 5067128 (C.D. Cal. Oct. 21, 2011); *United Fin. Cas. Co. v. Countrywide Fin. Corp.*, No. 11-CV-04766-MRP (MANx), slip op. (C.D. Cal. Nov. 16, 2011) ("*Progressive*") (RJN Ex. 104).

1

1  nores this Court's rulings in *Maine State*, *Stichting*, and *Allstate*.  Those rulings re-

2  quire dismissal of AFAC's 1933 Act claims because the *Luther/Washington State*

3  named plaintiffs lacked standing as to all nine MBS purchased by AFAC, thus trig-

4  gering no tolling.  AFAC also implicitly concedes that its 1934 Act claims are time-

5  barred—it nowhere addresses them in its opposition.  Although AFAC argues that

6  its common law fraud, aiding and abetting, and negligent misrepresentation claims

7  were tolled under Oklahoma law, the opposite is true:  (1) Oklahoma has not adopt-

8  ed cross-jurisdictional tolling based on class actions filed in other state courts (*Lu-*

9  *ther/Washington State* were filed in California); (2) neither *Luther* nor *Washington*

10  *State* provided adequate notice of the factual elements required for each of AFAC's

11  common law claims; and (3) the Oklahoma Supreme Court likely would not toll

12  where (as here) the class action named plaintiffs lacked standing.

13      ***Western & Southern***:  The *Western & Southern* plaintiffs do not dispute that,

14  absent *American Pipe* tolling, their 1933 Act claims are time-barred under this

15  Court's rulings and identify no reason for the Court to reconsider those rulings.

16  They argue that there should be tolling as to those few MBS tranches that are

17  "backed by the same loan pools as [different] tranches purchased by the *Luther*

18  plaintiffs" (*WS/NI* Opp. at 31), but this argument ignores this Court's ruling that

19  each MBS tranche is "indisputably a separate security" with different payment

20  terms, credit enhancement features, credit ratings, and so on.  *Maine State II*, 2011

21  WL 4389689, at *5.  Plaintiffs barely mention their 1934 Act claims in their opposi-

22  tion, essentially conceding that this Court's ruling in *Stichting,* 802 F. Supp. 2d at

23  1139 (that a "reasonable plaintiff exercising reasonable diligence . . . should have

24  discovered facts sufficient to state every element of its [Section 10(b)] claim at least

25  prior to February 14, 2009"), bars those claims.  The *Western & Southern* plaintiffs'

26  Ohio Securities Act ("OSA") and common law claims are also barred by the appli-

27  cable Ohio two-year statute of limitations.  Their arguments that widely available

28  press reports and previously-filed complaints somehow did not place them on notice

of their claims (*WS/NI* Opp. at 9-18) have already been squarely rejected by this Court in *Stichting* and *Allstate*. In addition, their argument that their OSA claims are timely under the Ohio savings statute (*WS/NI* Opp. at 36) is plainly wrong for several reasons, including that it is based on the incorrect premise that those claims were "all clearly alive as of the filing of *Maine State*" (*WS/NI* Opp. at 38) (in fact, they had expired before *Maine State* was filed and thus could not be "saved").

**National Integrity**: The *National Integrity* complaint should be dismissed because, as National Integrity itself admits, it filed that action in the Southern District of New York specifically "in response to" (*i.e.*, to end run) this Court's dismissal of virtually identical claims in *Stichting* and *Allstate*. *WS/NI* Opp. at 28. Such blatant forum shopping warrants dismissal. Dismissal is also required for the same reasons dismissal of the substantively identical *Western & Southern* complaint is required. Among other things, the common law claims are time-barred under Ohio's two-year statute of limitations, because—as National Integrity's own allegations confirm—it is a resident of Ohio (not New York) for purposes of the New York borrowing statute.

**Bankers**: California has the most significant relationship to the *Bankers* action given the complaint's focus on the allegedly systemic conduct of Countrywide that (if true) indisputably would have occurred in California, the relatively minimal relationship between this action and Florida, and the fact that (according to the complaint itself) Countrywide's alleged conduct was directed neither at Plaintiffs nor Florida in particular. Plaintiffs' opposition does not seriously dispute any of this, simply arguing that Florida law should apply because most of the *Bankers* plaintiffs are allegedly located there. California's two- and three-year statutes of limitations thus apply, and the *Bankers* plaintiffs' claims are time-barred because (as this Court has held) reasonably diligent MBS investors were on notice of their claims by late 2007 or early 2008 (more than three years before the July 2011 *Bankers* complaint).

**Sterling**: Sterling's claims are essentially identical to those in *Bankers* (plain-

3

tiffs' counsel are the same in each case), and likewise should be dismissed.  Sterling
concedes that its claims based on three of its four purchases are time-barred under
Illinois law, and its claims based on its one remaining 2006 purchase are also time-
barred for its conceded failure to allege any basis to toll the three-years-from-date-
of-sale limitations period under the Illinois Securities Law.  Because the Illinois bor-
rowing statute applies to Sterling and makes California law relevant as well, Plain-
tiff's claims are also barred under California's limitations periods for the very same
reasons that the identical claims in *Bankers* are barred under California law.  Plain-
tiff's argument that the borrowing statute is inapplicable because it has its principal
place of business in Illinois is flatly wrong, ignoring Illinois case law that unequivo-
cally holds that the borrowing statute applies unless the plaintiff entity is incorpo-
rated in Illinois.  Sterling, a federally chartered bank, is incorporated under federal
law, not in Illinois.

*Sealink*.  Sealink's public and undisputed admission that certain German
banks will (a) assume "all losses" on the MBS over which it has sued and (b) also
have issued a "guarantee" against "all indirect and direct risks relating to payment
defaults" on these MBS warrants dismissal for two reasons.  First, Sealink lacks
standing to pursue claims as to which it will not incur any losses.  Sealink's argu-
ment that these German banks will bear only "payment shortfalls" flies in the face of
the plain language of its public disclosure that Sealink will be held harmless as
against "all losses" (not "some" or "certain" losses).  In addition, the plain language
of its disclosure explicitly references the "guarantee" against risks relating to "pay-
ment defaults" as being separate and independent from the Banks' agreement to as-
sume "all losses."  Second, even if Sealink had standing (which it does not), its
claims are time-barred.  Under New York's borrowing statute, Germany's three-year
statute of limitations applies because the borrowing statute points to the place of any
injury (here Germany).  Under German law, the three-year period expired before
this suit was filed because Sealink knew (or was grossly negligent in not knowing)

4

1   of its potential claims by the end of 2007 given the numerous reports in the global

2   media and publicly-filed complaints in 2007 that asserted the same allegations that

3   appear in the complaint Sealink filed years later.

4   <u>**ARGUMENT**</u>

5   **I.   <u>ALL CLAIMS IN *PUTNAM* ARE TIME-BARRED.</u>**

6   **A.   <u>Putnam's 1933 Act Claims Are Untimely.</u>**

7   Putnam concedes in its opposition ("*Putnam* Opp.") that, absent tolling under

8   *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), the 1933 Act's one-year

9   statute of limitations and three-year statute of repose have expired as to all eight

10   MBS Putnam bought.  *See Putnam* Opp. at 11-19.  Putnam further concedes that un-

11   der this Court's rulings in *Maine State*, *Stichting*, and *Allstate*, *American Pipe* toll-

12   ing does not apply because the *Luther/Washington State* plaintiffs did not buy—and

13   lacked standing to sue over—any of the securities Putnam bought.  *See Putnam*

14   Opp. at 14.[2]  Although it argues that this Court should reconsider these rulings, *id.*, it

15   merely repeats the same arguments and cites the same cases the Court already has

16   considered and rejected.

17   For example, Putnam argues that it "relied on the prior class actions as pro-

18   tecting its rights against Defendants."  *Putnam* Opp. at 18.  But the Court rejected

19   this exact argument in *Maine State I*:  "[a]ny putative class member relying on *Lu-*

20   *ther* and/or *Washington State* can fairly be expected to understand that such a law-

21   suit would require a named plaintiff with standing to protect their claims."  722 F.

22   Supp. 2d at 1167.[3]  Putnam's other arguments—that denying tolling here "would

23   
_____

24   [2] Since this Court's last decision on these issues, the following opinions have been
issued which concur with the rulings made by this Court: *In re TFT-LCD (Flat
Panel) Antitrust Litig.*, 2012 WL 149632, at *3 (N.D. Cal. Jan. 18, 2012) (rejecting

25   tolling where named plaintiffs lacked standing); *In re TFT-LCD (Flat Panel) Anti-
trust Litig.*, 2012 WL 149637, at *2-3 (N.D. Cal. Jan. 18, 2012) (same); *In re Direx-*

26   *ion Shares ETF Trust*, 2012 WL 259384, at *14-16 (S.D.N.Y. Jan. 27, 2012) (same).
[3] *Accord In re Wells Fargo Mortg.-Backed Cert. Litig.*, 2010 WL 4117477, at *5

27   (N.D. Cal. Oct. 19, 2010) (where named plaintiffs lacked standing, class members
"had no reason to rely on the filing of the [*Luther*] and [*Washington State*] com-

28   plaints to protect their claims").

5

1  encourage future plaintiffs to rush to court," that the *Luther* plaintiffs' lack of stand-

2  ing was "unforeseeable," and that Defendants were "on notice" of Putnam's claims

3  against them—were all made by the *Allstate* plaintiffs and rejected by this Court.

4  *Putnam* Opp. at 15-16; *see Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 11-CV-

5  5236, Opp. to Mot. to Dismiss at 97-98, 105-06 (filed May 9, 2011) (Dkt. No. 97)

6  ("*Allstate* Opp."); *Allstate*, 2011 WL 5067128, at *10.[4]  In short, Putnam has not

7  identified any reason why the Court should revisit its prior rulings, and "[t]hose rul-

8  ings apply with equal force here."  *Allstate*, 2011 WL 5067128, at *10.

9        Putnam's 1933 Act claims also should be dismissed for the separate and inde-

10  pendent reason that Putnam was a party to *Maine State* and is bound by the Court's

11  ruling dismissing its claims.  By its own admission, Putnam was not merely an ab-

12  sent class member in *Maine State*.  Rather, it appeared in the case, actively partici-

13  pated, and "moved to be appointed lead plaintiff and counsel."  *Putnam* Opp. at 7.

14  Even after its motion was denied, Putnam argues that it "remained a party to *Maine*

15  *State*."  *Id*.  Thus, Putnam was still a party in *Maine State* when the Court dismissed

16  its claims as time-barred, and it is bound by that ruling.  Putnam attempted to cir-

17  cumvent this ruling by filing a new suit in the District of Connecticut asserting the

18  same 1933 Act claims, based on the same factual allegations, and concerning the

19  same MBS.  But Putnam "cannot now simply file a new lawsuit for a 'do-over.'"

20  *Futch v. Drug Enforcement Agency*, 2007 WL 1615135, at *2 (S.D. Ga. June 4,

21  _____

22  [4] Indeed, all but one of the cases Putnam cites were also cited by the *Allstate* plain-
tiffs.  *See Putnam* Opp. at 16-17; *Allstate* Opp. at 106-08 (citing *In re Flag Telecom
Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429 (S.D.N.Y. 2005); *In re Wachovia
23  Equity Sec. Litig.*, 753 F. Supp. 2d 326 (S.D.N.Y. 2011); *In re Initial Pub. Offering
Sec. Litig.*, 2004 WL 3015304 (S.D.N.Y. Dec. 27, 2004); *Rose v. Ark. Valley Envtl.
24  & Util. Auth.*, 562 F. Supp. 1180 (W.D. Mo. 1983)); Reply RJN Ex. 143 (*Allstate*
Sept. 21, 2011 Hr'g Tr.) at 37-38 (citing *In re Morgan Stanley Mortg. Pass-Through
25  Cert. Litig.*, 2011 WL 4089580 (S.D.N.Y. Sept. 15, 2011)).  The one case not cited
in *Allstate, Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1095-98 (3d Cir. 1975),
26  is plainly inapposite (presumably the reason it was not cited in *Allstate*).  This case
involved a class that was certified but later decertified, and the initial certification
27  was held to be sufficient to justify absent class members' reliance on the class action
to protect their rights.  *See In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 378-79
28  (D. Mass. 1987) (distinguishing *Haas*).

6

1   2007).[5]  Its 1933 Act claims must be dismissed.[6]

2         **B.   <u>Putnam's 1934 Act Claims Are Untimely</u>.**

3         This Court already has held that a reasonable investor in Countrywide MBS

4   should have discovered facts sufficient to state every element of a 1934 Act claim

5   based on the alleged abandonment of underwriting guidelines (including scienter) by

6   no later than December 27, 2008.  *See Allstate*, 2011 WL 5067128, at *11-13; *ac-

7   cord Stichting*, 802 F. Supp. 2d at 1131-39; *Progressive*, RJN Ex. 104 at 2-3.  Put-

8   nam asserts the same claims based on virtually the same factual allegations, and by

9   definition also reasonably should have discovered such facts before January 27,

10  2009—*i.e.*, more than two years before the Putnam complaint was filed.

11        As with its 1933 Act claims, Putnam concedes that this Court's prior rulings

12  in *Allstate*, *Stichting*, and *Progressive* (which dismissed as untimely substantially

13  similar—and some earlier-filed—1934 Act claims) require the dismissal of its 1934

14  Act claims here as well.  *See Putnam* Opp. at 19-20.  Putnam "urges the Court to re-

15  consider its decision[s]," incorporating by reference the arguments made by plain-

16  tiffs in *Allstate* and *Stichting* to preserve them "for purposes of appeal."  *Id*.  But

17  Putnam cites no law or factual allegations not already considered by this Court and

18  identifies no basis for reconsideration.[7]

19   

20  [5] Putnam argues that it filed a new lawsuit because it was "involuntarily excluded" from *Maine State* on standing grounds.  *Putnam* Opp. at 8-9.  Not so.  Putnam's

21  claims were not "excluded"—rather, these claims were *dismissed* as time-barred.

   [6] Putnam's argument as to how this case is "similar" to *Luther* is irrelevant.  *Putnam*

22  Opp. at 6-7, 17-18.  Because the *Luther* named plaintiffs lacked standing to sue over the eight MBS purchased by Putnam, *American Pipe* tolling is inapplicable regard-

23  less of the similarity in the factual allegations.  In addition, *Catholic Social Servs., Inc. v. I.N.S.*, 232 F.3d 1139 (9th Cir. 2000) (*see Putnam* Opp. at 12-13), is inappo-

24  site.  That case merely held that *American Pipe* tolling—if otherwise applicable— may apply to a subsequent class action where the plaintiff is not trying to relitigate a

25  denial of class certification.  It did not hold that a subsequent class action is always entitled to tolling, even where the plaintiffs in the first class action lacked standing.

26  *See Maine State I*, 722 F. Supp. 2d at 1166 (citing *Catholic Social Servs.*).

   [7] Putnam also does not dispute that the 1934 Act's five-year repose period has ex-

27  pired as to CWALT 2005-43.  *See* Consolidated Memorandum of Points & Au- thorities in Support of the Countrywide Defendants' Motions to Dismiss ("CW

28  Op. Br.") at 19 n.23.

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1    Putnam also argues that the 1934 Act limitations period was tolled by the fil-

2  ing of the *Luther*, *Washington State*, and *Maine State* class actions. *See Putnam*

3  Opp. at 20-22. Citing *Tosti v. Los Angeles*, 754 F.2d 1485 (9th Cir. 1985), Putnam

4  argues that "these specific causes of action [*i.e.*, 1934 Act claims] need not have

5  been alleged in those previous complaints" for *American Pipe* tolling to apply. *Id.*

6  at 20. This argument is specious. As Putnam itself acknowledges, *Tosti* held that "a

7  second plaintiff's claims need not be identical to the original plaintiff's claims, *as*

8  *long as the defendant is on notice of the claims brought against it*." *Putnam* Opp. at

9  21 (emphasis added); *Tosti*, 754 F.2d at 1489. Here, however, *Luther*, *Washington*

10 *State*, and *Maine State* all asserted 1933 Act claims only, and did not put the Coun-

11 trywide Defendants on notice of potential fraud claims. In fact, in each case, the

12 plaintiffs *expressly disclaimed any allegations of fraud, scienter, or intentional mis-*

13 *conduct*. *See* RJN Ex. 74 (*Luther* Compl.) ¶¶ 3, 195; Ex. 73 (*Washington State*

14 Compl.) ¶¶ 1, 78; Ex. 79 (*Maine State* Compl.) ¶¶ 2, 205. And in *Stichting*, this

15 Court held that because the *Luther*, *Washington State*, and *Maine State* complaints

16 were "explicitly missing facts necessary to plead a fraud claim," they "certainly

17 would not have put Defendants on notice of facts regarding an impending fraud

18 claim." *Stichting*, 802 F. Supp. 2d at 1134 (citing *Percy v. S.F. Gen. Hosp.*, 841

19 F.2d 957, 978 (9th Cir. 1998)); *accord Children's Hosp. & Med. Ctr. Found. of*

20 *Omaha v. Countrywide Fin. Corp.*, No. 11-CV-02056-MRP (MANx), slip op. at 7

21 (C.D. Cal. Aug. 22, 2011) (Reply RJN Ex. 145) (holding *American Pipe* tolling in-

22 applicable where "the proof required for the two claims is markedly different").[8]

23 The same reasoning applies here, and *American Pipe* tolling cannot apply.[9]

24 _____

25 [8] In *Stichting*, the Court was addressing the relation back doctrine, which turns on a notice requirement similar to the notice required for tolling in *Tosti*. It analyzed the *American Pipe* cases as analogous, and found them "persuasive." *Id.*

26 [9] In any event, any theoretical tolling effect of the *Luther*, *Washington State*, and

27 *Maine State* complaints would be limited only to those claims for which the named plaintiffs had standing. *See Maine State I*, 722 F. Supp. 2d at 1166-67; *Maine State*

28 *II*, 2011 WL 4389689, at *2-8; *Stichting*, 802 F. Supp. 2d at 1130-31; *Allstate*, 2011 WL 5067128, at *1, 10. Because the *Luther/Washington State* named plaintiffs

8

C.     **Putnam's CUSA Claims Are Untimely.**

Putnam concedes that this Court's prior rulings in *Allstate*, *Stichting*, and *Progressive* require the dismissal of its CUSA claims, which (like its 1934 Act claims) are subject to a two-year statute of limitations. *See Putnam* Opp. at 19-22. Once again, Putnam "urges the Court to reconsider its decision[s]," but (as with its 1934 Act claims) provides no basis for reconsideration. *Id.* at 19-20.

Putnam also argues that its CUSA claims "are entitled to *American Pipe* toll-ing." *Id.* at 20. But this is incorrect. As this Court held in *Centaur Classic Conv. Arb. Fund Ltd. v. Countrywide Fin. Corp.*, No. 10-CV-05699-MRP (MANx), slip. op. at 7 (C.D. Cal. Jan. 20, 2011) (Reply RJN Ex. 146), citing the Ninth Circuit's decision in *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1025 (9th Cir. 2008), "[t]he rule of *American Pipe* allows tolling within the federal court system in federal question class actions only. The rule is not binding on state law claims, which are governed by state law statutes of limitations and state law tolling principles."

II.     **ALL CLAIMS IN *AFAC* ARE TIME-BARRED.**

A.     **AFAC Concedes That, Absent Tolling, All Claims Are Untimely.**

In its opposition brief ("*AFAC* Opp."), AFAC concedes that, unless tolling applies, all of its claims are time-barred by the applicable statutes of limitations and repose. More specifically, AFAC does not dispute that, absent tolling:

- The 1933 Act's three-year statute of repose expired as to all nine MBS at is-sue, as those MBS were offered to the public and purchased by AFAC prior to April 1, 2008 (more than three years before the complaint was filed);

- The 1933 Act's one-year statute of limitations expired as to all nine MBS, be-cause AFAC reasonably should have discovered the alleged misstatements prior to April 1, 2010 (more than one year before the complaint was filed);

- The 1934 Act's two-year statute of limitations expired as to all nine MBS, as

lacked standing to assert *any* claims related to the eight MBS at issue here, the filing of those complaints could not trigger *American Pipe* tolling.

9

1  AFAC reasonably should have discovered the facts underlying its claims prior

2  to April 1, 2009 (more than two years before the complaint was filed);

3  • The 1934 Act's five-year statute of repose expired as to CWALT 2005-21CB,

4  because the alleged violation occurred in April 2005 (more than five years be-

5  fore the complaint was filed);

6  • Under the applicable Oklahoma borrowing statute, the relevant statute of limi-

7  tations for AFAC's common law claims is governed by either Oklahoma law

8  or California law;

9  • Under Oklahoma law, the two-year statute of limitations applicable to both

10  common law fraud and negligent misrepresentation claims has expired, as

11  AFAC reasonably should have discovered the facts underlying its claims prior

12  to April 1, 2009 (more than two years before the complaint was filed); and

13  • Under California law, both the three-year statute of limitations for common

14  law fraud and the two-year statute of limitations for negligent misrepresenta-

15  tion have expired, as AFAC reasonably should have discovered the facts un-

16  derlying its claims prior to April 1, 2008 (more than three years before the

17  complaint was filed).

18  *See AFAC* Opp. at 5-8.  As explained below for each claim, tolling is inapplicable

19  under both *American Pipe* and the Oklahoma class action tolling doctrine asserted

20  by AFAC.  Thus, all of AFAC's claims are time-barred, and AFAC's complaint

21  must be dismissed in its entirety.

22  **B.    The 1933 Act Limitations And Repose Periods Were Not Tolled.**

23  As AFAC itself concedes (*AFAC* Compl. ¶ 387; *AFAC* Opp. at 5), the *Luther*

24  named plaintiffs did not purchase any of the nine MBS AFAC bought.  *See* CW Op.

25  Br. at 20-22.  Under this Court's prior rulings, the *Luther* named plaintiffs lacked

26  standing as to these nine MBS, and *American Pipe* tolling was not triggered.  *See*

27  *id.*; *Maine State I*, 722 F. Supp. 2d at 1166-67; *Stichting*, 802 F. Supp. 2d at 1130;

28  *Allstate*, 2011 WL 5067128, at *1; *Maine State II*, 2011 WL 4389689, at *6.

10

1     In its opposition, AFAC ignores this Court's prior rulings—entirely.  It does

2   not cite them, much less argue that they were wrongly decided or should be recon-

3   sidered.  And it does not even try to explain why *Maine State*, *Stichting*, and *Allstate*

4   do not require the dismissal of its identical 1933 Act claims.  *See AFAC* Opp. at 5-7.

5   Instead, AFAC's brief reads as if this Court has never addressed these issues, and

6   merely asserts in a single paragraph that "*American Pipe* tolling should be applied

7   even if the class representative is later found to lack standing to represent the class."

8   *Id*. at 7.  But this Court has addressed these issues, and its rulings make clear that

9   *American Pipe* tolling does not apply here.[10]  *See* CW Op. Br. at 11-17.  AFAC's

10   1933 Act claims must therefore be dismissed as time-barred.

11        **C.      AFAC Concedes Its 1934 Act Claims Must Be Dismissed.**

12     AFAC does not assert tolling with respect to its 1934 Act claims.  *See* AFAC

13   Opp. at 1-8.  In fact, AFAC *does not even address its 1934 Act claims at all in its*

14   *opposition brief.  See id*.  Instead, by its silence, AFAC has conceded that its 1934

15   Act claims are time-barred under *Stichting* and *Allstate* (*see* CW Op. Br. at 22-23).

16   *See, e.g.*, *Newdow v. Congress of U.S. of Am.*, 435 F. Supp. 2d 1066, 1070 n.5 (E.D.

17   Cal. 2006) ("The court interprets plaintiff's silence as a non-opposition to defen-

18   dants' motions on these claims."); *Sportscare of Am., P.C. v. Multiplan, Inc.*, 2011

19   WL 589955, at *1 (D.N.J. Feb. 10, 2011) ("In most circumstances, failure to re-

20   spond in an opposition brief to an argument put forward in an opening brief consti-

21   tutes waiver or abandonment in regard to the uncontested issue.").  AFAC's 1934

22   _____

23   [10] AFAC's only argument is that it "was entitled to rely upon the original class defi-
nition in deciding whether or not to refrain from filing litigation." *AFAC* Opp. at 6.
But this Court has already rejected that argument.  *See Maine State I*, 722 F. Supp.
24   2d at 1167; *supra*, at 5; *accord Wells Fargo*, 2010 WL 4117477, at *5.  The only
case cited by AFAC is *Morgan Stanley*, but in *Allstate* this Court considered that
25   case and found it unpersuasive.  *See* Reply RJN Ex. 143 (*Allstate* Sept. 21, 2011
Hr'g Tr.) at 37-38 (citing *Morgan Stanley*).  Moreover, the *Morgan Stanley* court
26   acknowledged that "[t]here may be circumstances where the [class] representative
so clearly lacks standing that no reasonable class member would have relied." 2011
27   WL 4089580, at *18.  That was the case here, as neither the *Luther* nor the *Wash-
ington State* plaintiffs pled a single fact indicating that they had purchased even one
28   of the thousands of MBS certificates they sued over.

11

1    Act claims thus must be dismissed with prejudice.

2         **D.    The State Law Limitations Periods Were Not Tolled.**

3         AFAC argues that the limitations periods applicable to common law claims

4    for fraud, aiding and abetting, and negligent misrepresentation were tolled under

5    Oklahoma's class action tolling rule.  *See AFAC* Opp. at 7-8.[11]  That is incorrect.

6         First, although Oklahoma courts have adopted class action tolling with respect

7    to class actions filed in *Oklahoma state court, see Brashears v. Sight 'N Sound Ap-*

8    *pliance Ctrs., Inc.*, 981 P.2d 1270, 1272 (Okla. Civ. App. 1999), the Oklahoma Su-

9    preme Court has not yet ruled on whether *cross-jurisdictional* tolling can be trig-

10   gered by class actions filed in *courts outside of Oklahoma*—like *Luther* and *Wash-*

11   *ington State*, both of which were filed in California state court.  In the absence of

12   clear Oklahoma authority adopting cross-jurisdictional tolling, this Court should de-

13   cline to apply any such tolling here under Oklahoma law.  And "the Ninth Circuit

14   has . . . held that it will not import the doctrine of cross-jurisdictional tolling into

15   state law where the state has not expressly adopted such cross-jurisdictional tolling."

16   *Newport v. Dell, Inc.*, 2008 WL 4347311, at *5 (D. Ariz. Aug. 21, 2008).[12]

17        Second, like the federal *American Pipe* doctrine, the Oklahoma class action

18   tolling rule is limited to claims as to which the defendant had notice.  *See Dewey v.*

19   *State of Oklahoma*, 28 P.3d 539, 547 (Okla. 2001) (to trigger tolling, class action

20   must provide notice of "class members' substantive claims").  Because AFAC's

21   common law claims each require factual elements not required for the 1933 Act

22   claims asserted in *Luther* and *Washington State*—*e.g.*, fraud requires (among other

23   things) scienter,[13] aiding and abetting fraud requires knowledge of fraud and sub-

24

25   _____
     [11] AFAC does not assert tolling under California state law.  In fact, AFAC does not
26   reference California law at all, implicitly conceding that its common law fraud and
     negligent misrepresentation claims are time-barred under California law.
27   [12] *Accord In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067 (D. Kan. 2009); *In*
     *re Vioxx Prod. Liab. Litig.*, 2007 WL 3334339, at *6 (E.D. La. Nov. 8, 2007).
28   [13] *See Dawson v. Tindell*, 733 P.2d 407, 408 (Okla. 1987).

                                            12

     OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1  stantial assistance,[14] and negligent misrepresentation requires a "special relation-

2  ship" between the parties[15]—the filing of the *Luther* and *Washington State* class ac-

3  tions did not provide notice of these allegations, and thus did not toll the Oklahoma

4  statute of limitations for these common law claims. *See supra*, at 8.

5      Third, Oklahoma's state law tolling rule is based on the federal *American*

6  *Pipe* doctrine. *Brashears*, 981 P.2d at 1272 n.4. As such, there is every reason to

7  believe that—like this Court—the Oklahoma Supreme Court likely would rule that

8  class action tolling is limited to only those claims for which the class action named

9  plaintiffs had standing. *See Dewey*, 28 P.3d at 547 (noting similarity between Okla-

10  homa's class action statute and Federal Rule 23 and "recogniz[ing] the insight which

11  can be garnered through consideration of federal court decisions addressing feder-

12  ally-evolved concepts reflected in Oklahoma's procedural regime," such as *Ameri-*

13  *can Pipe* tolling). Because the *Luther* named plaintiffs lacked standing as to the

14  nine MBS purchased by AFAC, class action tolling is inapplicable and AFAC's

15  state law claims should be dismissed as time-barred.

16  **III.   ALL CLAIMS IN *WESTERN & SOUTHERN* AND**
**   *NATIONAL INTEGRITY* ARE TIME-BARRED.**

17

18      **A.   The *WS/NI* Plaintiffs' 1933 Act Claims Are Untimely.**

19      In their opposition (the "*WS/NI* Opp."), the *Western & Southern* and *National*

20  *Integrity* plaintiffs (together, the "*WS/NI* plaintiffs") do not contest—and therefore

21  concede—that absent *American Pipe* tolling, the 1933 Act's one-year statute of limi-

22  ───────────────
[14] "[T]he Oklahoma Supreme Court has not recognized a civil cause of action based

23  on aiding and abetting fraud." *Pub. Serv. Co. of Okla. v. A Plus, Inc.*, 2011 WL
332918I, at *10 (W.D. Okla. Aug. 2, 2011). "Even if it had done so," however,

24  such a cause of action would require AFAC to plead and prove "defendant's knowl-
edge of the fraud" and that it "provided substantial assistance to advance the fraud's

25  commission." *Id.*

[15] "The Oklahoma Supreme Court has not expressly recognized the tort of negligent

26  misrepresentation." *Southcrest, LLC v. Bovis Lend Lease, Inc.*, 2011 WL 3881495,
at *5 (N.D. Okla. Sept. 2, 2011). Oklahoma law does recognize "constructive

27  fraud," but that claim requires "a breach of some legal or equitable duty" arising out
of a "special relationship" between the parties. *Silver v. Slusher*, 770 P.2d 878, 882

28  n.11 (Okla. 1989).

13

1   tations and three-year statute of repose have expired as to *all* of the MBS that they
2   purchased.  *See WS/NI* Opp. at 29-36.  Although only 2 of the 36 securities
3   (tranches) the *WS/NI* plaintiffs bought had also been bought by a plaintiff in *Lu-*
4   *ther/Washington State*, they argue nonetheless that tolling under *American Pipe* ex-
5   tends to their claims as to six tranches "backed by the same loan pools as [different]
6   tranches purchased by the *Luther* plaintiffs."  *WS/NI* Opp. at 31.  But this argument
7   lacks merit, ignoring this Court's holding that each MBS tranche is "indisputably a
8   separate security."  *Maine State II*, 2011 WL 4389689, at *5.[16]  The *WS/NI* plaintiffs
9   also argue that the Court should reconsider its previous rulings that "a party may
10  seek tolling from *Luther* or *Maine State* only to the extent that a named plaintiff in
11  either one of those cases purchased certificates in the same tranches" (*WS/NI* Opp. at
12  33), but provide no basis whatsoever for reconsideration.[17]

13              **1.     <u>Shared Loan Pools Do Not Create Standing.</u>**

14          The relevant question for standing purposes is whether the *Luther/Washington*
15  *State* plaintiffs purchased the same "*securit[ies]* upon which [Plaintiffs] seek[] to
16  sue."  *Maine State II*, 2011 WL 4389689, at *4 (emphasis added).  The *WS/NI* plain-
17  tiffs do not deny that, as this Court has held, "each tranche is a separate and unique
18  security," *id.* at *5, and that they bought different tranches—and hence different se-
19  curities—than the *Luther/Washington State* plaintiffs did.  This is the beginning and
20  end of the standing inquiry, and tolling is inapplicable as to any MBS tranches for
21  which the *Luther/Washington State* named plaintiffs lacked standing.  *Id.*

_____

22  [16] In addition, contrary to the *WS/NI* plaintiffs' argument that *American Pipe* tolling
23  applies to their OSA claims (Opp. at 36), this Court has already held "[t]he rule of
    *American Pipe* . . . . is not binding on state law claims, which are governed by state
24  law statutes of limitations and state law tolling principles." *Centaur*, slip op. at 7
    (Reply RJN Ex. 146). *See also supra at* 9.
25  [17] For the reasons set forth in the memoranda in support of Mr. Sieracki's, Mr. Spec-
    tor's and Mr. Kurland's motions to dismiss, the *Western & Southern* plaintiffs'
26  claims with respect to their purchase of CWHEQ 2006-S9 are likewise time-barred
    because the statutes of limitations and repose expired after *Luther* was dismissed on
27  January 6, 2010, but before their complaint was filed on April 27, 2011. *See* Sier-
    acki Mem. at 36; Spector Mem. at 7; Kurland Mem. at 16.  The Countrywide De-
28  fendants hereby join in these arguments.

                                                    14

1    Even assuming that some of the tranches purchased by the *WS/NI* plaintiffs

2    and different tranches purchased by the *Luther/Washington State* plaintiffs may un-

3    der some circumstances receive payments from the same loan groups, that does not

4    change the fact that each tranche is, as this Court has recognized, "indisputably a

5    separate security." *Id.* Although this Court acknowledged that the existence of dis-

6    tinct loan pools backing certain tranches within particular MBS offerings is *one rea-*

7    *son* why each tranche is "indisputably a separate security," *id.*, that was by no means

8    the *only reason* on which the Court based its decision. Rather, the Court observed

9    that each tranche is a separate security also because each has "a unique CUSIP

10   number, an individual credit rating, a different interest rate, different rights to distri-

11   bution of principal and interest payments, [and] distinct credit enhancement rights."

12   *Id.* This Court also explicitly rejected the argument that an investor may have stand-

13   ing to sue on tranches different from the ones it purchased because "tranches may

14   share a common pool of mortgages," acknowledging this "interconnectedness" but

15   holding that it is "largely irrelevant." *Id.* at *7. The *WS/NI* plaintiffs' common loan

16   group argument is simply a retooling at the tranche level of the "common pool" ar-

17   gument made and rejected by this Court in *Maine State II*.

18   Indeed, that each of the *WS/NI* tranches at issue is a "separate and unique se-

19   curity," *id.* at *5, distinct from the different *Luther/Washington State* tranches that

20   may share a pool of mortgages, is obvious when one compares the differences in

21   these tranches. For example, although the *Luther/Washington State* plaintiffs pur-

22   chased a *senior* tranche (1A3) of CWALT 2007-17CB, the *WS/NI* plaintiffs bought

23   *subordinate* tranche M1. *See* RJN, Ex. 102 at 4196; *W&S* AC, Ex. A at 28. Al-

24   though these two different tranches are backed—in part—by the same loan group,

25   each tranche has very different payment and credit enhancement rights. For exam-

26   ple, the *Luther/Washington State* plaintiffs have the right to receive all interest and

27   principal payments they are due *before* any such payments are made to the *WS/NI*

28   plaintiffs. *See* Reply RJN Ex. 121 (CWALT 2007-17CB Pro. Supp.) at S-15-18.

1    Another example, which the *WS/NI* plaintiffs themselves point to (*WS/NI* Opp. at

2    31), is CWHEQ 2006-S9.  Although all tranches in this offering were backed by a

3    single loan group (*see* Lysaght Decl., Ex. 8), the *Luther/Washington State* plaintiffs

4    (as purchasers of tranche A3) were generally entitled to receive principal distribu-

5    tions from this loan pool *before* any such payments were made to the *WS/NI* plain-

6    tiffs (as purchasers of tranches A4 and A6), with the exception of "NAS [non-

7    accelerating senior] principal distribution amount[s]," which were to be paid first to

8    the *WS/NI* plaintiffs' A6 certificates.  *See* Reply RJN, Ex. 122 (CWHEQ 2006-S9

9    Pro. Supp.) at S-7; *W&S* AC, Ex. A at 45-47.[18]  These examples confirm this

10   Court's observation that "each tranche provided a different investment opportunity

11   with unique characteristics."  *Maine State II*, 2011 WL 4389689, at *7.  *American*

12   *Pipe* tolling thus does not apply to any of the *WS/NI* plaintiffs' tranches that were

13   not also bought in *Luther/Washington State*, and the 1933 Act claims based on those

14   tranches must be dismissed as untimely.

15          **2.      The *WS/NI* Plaintiffs Identify No Basis For This Court To**
                      **Reconsider Its Previous Rulings On *American Pipe* Tolling.**
16

17          The *WS/NI* plaintiffs acknowledge that this Court has previously rejected

18   *American Pipe* tolling for 1933 Act claims in the exact same circumstances pre-

19   sented here—*i.e.*, where the class action named plaintiffs did not purchase the same

20   tranches at issue, and therefore lacked standing.  *See WS/NI* Opp. at 33.  The *WS/NI*

21   plaintiffs also do not dispute that only two of the 36 MBS tranches that the *Western*

22   *& Southern* plaintiffs purchased were also purchased by the *Luther* plaintiffs.

23   *WS/NI* Opp. at 30.[19]  With respect to *all* of the remaining 34 tranches the *Western &*

24   [18] The prospectus supplement for this Offering defines "NAS" as "[a] class that, for
     the period of time . . . will not receive . . . . (1) principal prepayments on the underly-
25   ing Trust Fund Assets that are allocated disproportionately to the senior securities
     because of the shifting interest structure of the securities in the trust and/or (2)
26   scheduled principal payments on the underlying Trust Fund Assets . . . .  During the
     lock out period, the portion of the principal distributions on the underlying Trust
27   Fund Assets that the NAS class is locked out of will be distributed to the other clas-
     ses of senior securities."  Reply RJN Ex. 122 (CWHEQ 2006-S9 Pro. Supp.) at 38.
28   [19] The *WS/NI* plaintiffs argue (in a footnote) that the repose period for CWALT

                                        16

1  *Southern* plaintiffs bought, the *WS/NI* plaintiffs say only that this Court should "re-

2  consider those rulings." *Id.* at 33.[20]

3      The *WS/NI* plaintiffs, however, fail to identify any basis for reconsideration,

4  simply repeating the same arguments and citing the same cases that the Court has

5  already considered and rejected in *Maine State*, *Stichting*, and *Allstate*.[21]  For exam-

6  ple, the *WS/NI* plaintiffs argue that "there was at least some authority as of Decem-

7  ber 2008 that indicated that a reasonable class member could have believed that [the

8  named plaintiff] had standing to sue on behalf of purchasers from other trusts."

9  *WS/NI* Opp. at 35 (quoting *Morgan Stanley*, 2011 WL 4089580, at *18).  But this

10 Court has already held that "[a]ny putative class member relying on *Luther* and/or

11 *Washington State* can fairly be expected to understand that such a lawsuit would re-

12 quire a named plaintiff with standing to protect their claims."  *Maine State I*, 722 F.

13 Supp. 2d at 1167; *accord Wells Fargo*, 2010 WL 4117477, at *5.  And "[t]hose rul-

---

14 2005-26CB A6, one of the two MBS tranches that both they and the *Luther* plain-
   tiffs purchased, did not expire because "the named plaintiff's claims related back to
15 the date of the initial filing of the *Luther* action (November 14, 2007)."  *WS/NI* Opp.
   at 30 n.26.  This argument, however, ignores this Court's holding that a plaintiff
16 may not assert 1933 Act claims "for any certificate for which the three-year statute
   of repose expired before the *Luther* plaintiff either acquired the security or joined
17 the *Luther* case."  *Stichting*, 802 F. Supp. 2d at 1131.  Moreover, the *WS/NI* plain-
   tiffs' reliance on one unpublished California decision, *Garnier v. Ludwick*, 2003 WL
18 21734029 (Cal. Ct. App. 2003), is misguided, as state law tolling rules do not apply
   to 1933 Act claims.  *See* Reply RJN Ex. 146 (*Centaur* slip. op. at 6-7).  Moreover,
19 contrary to the *WS/NI* plaintiffs' claim that class certification was denied in *Garnier*
   because the "original named plaintiffs lacked standing" (*WS/NI* Opp. at 30 n.26),
20 there is no indication in the decision that this in fact was the basis of the court's de-
   nial of class certification.
21 [20] The *WS/NI* plaintiffs do not dispute—and thus concede—that none of their 1933
   Act claims with respect to the 26 MBS purchased by the *National Integrity* plaintiffs
22 are tolled.  Nor could they, as no named *Luther* plaintiff bought 25 of the 26 MBS
   which *National Integrity* bought, and the repose period expired for the one remain-
23 ing tranche before the first *Luther* complaint that included a named plaintiff that
   purchased the relevant tranche was filed.  *See* CW Op. Br. at 46; n.17 *supra*.
24 [21] The only case the *WS/NI* plaintiffs cite that was not considered by the Court be-
   fore it issued its decision in *Allstate* is *Genesee Cnty. Emps.' Ret. Sys. v. Thornburg*
25 *Mortg. Sec. Trust 2006-3*, 2011 WL 5840482 (D.N.M. Nov. 12, 2011), which post-
   dates *Allstate*.  Although the *Genesee* court held that *American Pipe* tolling would
26 apply even if the named plaintiffs did not have standing (*id.* at *61), it noted that
   *Genesee*—unlike *Luther*—was not a case where "the representative so clearly lacks
27 standing that no reasonable class member would have relied" on the filing of the
   class action (*id.* at *62, quoting *Morgan Stanley*, 2011 WL 4089580, at *18).
28

17

1    ings apply with equal force here." *Allstate*, 2011 WL 5067128, at *10.[22]

2        **B.    The *WS/NI* Plaintiffs' 1934 Act Claims Are Untimely.**

3        The *WS/NI* plaintiffs' 1934 Act claims are plainly time-barred by this Court's

4    ruling in *Stichting* that a "reasonable plaintiff exercising reasonable diligence . . .

5    should have discovered facts sufficient to state every element of its [Section 10(b)]

6    claim at least prior to February 14, 2009." *Stichting*, 802 F. Supp. 2d at 1139; *ac-*

7    *cord Allstate*, 2011 WL 5067128, at *11 (dismissing § 10(b) claim because plaintiffs

8    should have discovered every element of their claim by December 27, 2008 at the

9    latest, two years prior to the filing of the *Allstate* complaint).  The *WS/NI* plaintiffs

10   do not seriously dispute that the two-year statute of limitations applicable to their

11   1934 Act claims expired well before they filed their complaints on April 27, 2011

12   (*Western & Southern*) and November 9, 2011 (*National Integrity*), long after the

13   *Stichting* complaint was filed.  In fact, the *WS/NI* plaintiffs barely mention their

14   1934 Act claims at all in their opposition, instead making only two passing refer-

15   ences to those claims in their arguments addressing their state common law and

16   statutory claims.[23]  Filed more than two years after a reasonable investor would have

17   ─────────────────────

18   [22]  The *Western & Southern* plaintiffs' argument that their claims were "tolled by
     their inclusion in *Maine State*" (*WS/NI* Opp. at 35-36) is also misplaced.  Because
19   this Court held that the *Luther* plaintiffs lacked standing as to tranches they did not
     purchase and, therefore, that there was no tolling with respect to those tranches, the
20   *Western & Southern* plaintiffs' claims as to the vast majority of the MBS they pur-
     chased were time-barred before *Maine State* was even filed.  *Maine State* therefore
     could not, and did not, revive the *WS/NI* plaintiffs' untimely claims.  *National Integ-*
21   *rity* concedes that *Maine State* does not revive its claims.  *WS/NI* Opp. at 35 n.34.
     [23]  First, in arguing that their title transfer allegations render their OSA claims timely,
22   the *WS/NI* plaintiffs state in passing that their 1934 Act claims are "similarly timely
     to the extent not precluded by the [1934 Act's] 5-year statute of repose."  *WS/NI*
23   Opp. at 14.  However, as explained below (*see infra* at 20-22), those title transfer
     allegations are part of the overall alleged scheme to offload mortgages into the sec-
24   ondary markets, which this Court has already held that MBS investors were on no-
     tice of by no later than December 27, 2008.  *Allstate*, 2011 WL 5067128, at *11.
25   Second, the *WS/NI* plaintiffs state obliquely (and in a footnote) that their arguments
     as to why they allegedly were not on notice of their state statutory and common law
26   claims based on "systemic abandonment of underwriting guidelines" are "generally
     applicable to Western & Southern's Exchange Act claims based on misstatements
27   regarding underwriting guidelines, and those claims are timely as a result."  *WS/NI*
     Opp. at 24 n.19.  Again, however, this Court has already held that a reasonable
28   plaintiff exercising reasonable diligence was on notice of fraud claims based

                                    18

     OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1    been on notice of those claims, the *WS/NI* plaintiffs' 1934 Act claims are untimely.

2        **C.   The OSA And Common Law Fraud Claims Fail.**[24]

3            **1.   The OSA's Two-Year Statute Of Limitations Applies To
                     The *WS/NI* Plaintiffs' Common Law Fraud Claims.**

4

5        The *WS/NI* plaintiffs argue (in a footnote) that their common law fraud claims

6    are not subject to the Ohio Securities Act's ("OSA") two-year statute of limitations.

7    *WS/NI* Opp. at 14-15 n.13.  Although they concede that the "majority of Ohio inter-

8    mediate appellate courts" have ruled that the OSA's two-year statute of limitations

9    applies to common law fraud claims (like these) arising out of the sale of securities,

10   they nonetheless argue without any support that if the issue came before it, the Ohio

11   Supreme Court would apply a four-year statute of limitations to such fraud claims.

12   *Id.*  As the Sixth Circuit has recognized, however, "*Ohio law is clear* that [where]

13   fraud claims arise out of or are predicated on the sale of securities, they are gov-

14   erned by the specific statute of limitations set forth in . . . § 1707.43(B); not the

15   four-year general statute of limitations for fraud claims . . . ."  *Wyser-Pratte Mgmt*

16   *Co. v. Telxon Corp.*, 413 F.3d 553, 561 (6th Cir. 2005); *Metz v. Unizan Bank*, 649

17   F.3d 492, 499 (6th Cir. 2011) (same).[25]  Plaintiffs do not explain why it would be

18   ─────────────────────────────────

19   on alleged systemic abandonment of underwriting guidelines by no later than late
     2008.  *See infra* at 23-27.

20   [24] While National Integrity alleges claims under the OSA that are identical to those
     alleged by Western & Southern (*W&S* AC ¶¶ 399-417; *NI* Compl. ¶¶ 399-417), the

21   joint opposition only references Western & Southern's OSA claims, particularly
     with respect to the arguments raised and refuted in this section.  *See WS/NI* Opp. at
     14-25.  Given that National Integrity's OSA claims fail for the same reasons that

22   Western & Southern's OSA claims fail (*see* CW Op. Br. at 48), Countrywide ad-
     dresses both in this section.

23   [25]  *See also Goldberg v. Cohen*, 2002 WL 1371031, at *3 (Ohio Ct. App. 7th Dist.
     June 13, 2002) ("In general, claims based on common-law fraud are governed by the

24   four year statute of limitations set forth in [§] 2305.09. However, the Ohio General
     Assembly has carved out an exception applicable to allegations of fraud predicated

25   upon a sale made in violation of . . . Chapter 1707."); *Hater v. Gradison Div. of
     McDonald & Co. Sec., Inc.*, 655 N.E.2d 189, 198 (Ohio Ct. App. 1st Dist. 1995)

26   (applying the OSA's two-year statute of limitations where "the allegations of fraud
     are inextricably interwoven with the sale of the partnership units"); *Ware v. Kowars*,

27   2001 WL 58731, at *5 (Ohio Ct. App. 10th Dist. Jan. 25, 2001) (applying the OSA's
     two-year statute of limitations to common law claims for breach of contract, breach

28   of fiduciary duty, conversion, and fraudulent breach of fiduciary duty); *Helman v.*

                                          19

1   reasonable for this Court to assume the Ohio Supreme Court would interpret the

2   OSA differently from virtually *all* Ohio state and federal courts to have considered

3   the issue.[26]  For the same reason, there is no basis to certify this question to the Ohio

4   Supreme Court. *Super Sulky, Inc. v. U.S. Trotting Assoc.*, 174 F.3d 733, 744 (6th

5   Cir. 1999) (refusing to certify to the Ohio Supreme Court because the Sixth Circuit

6   had previously applied the "prevailing Ohio law" and, "[u]nless and until the Ohio

7   Supreme Court rules to the contrary, this is not an open question").[27]

8                    **2.    The *WS/NI* Plaintiffs' Title Transfer Claims Are Untimely.**

9        The *WS/NI* plaintiffs attempt to end run this Court's rulings in *Stichting* and

10   *Allstate* by arguing that their OSA claims regarding alleged title transfer representa-

11   _____

12   *EPL Prolong, Inc.*, 743 N.E.2d 484, 493-94 (Ohio Ct. App. 7th Dist. 2000) (apply-
     ing two-year statute of limitations to contract action where the breach of contract
13   claim was "based upon and inextricably interwoven with a fraudulent sale of securi-
     ties," and reasoning that "we 'must look to the actual nature or subject matter of the
14   case, rather than the form in which an action is pleaded, to determine the applicable
     limitations period.'" (citing *Lawyers Coop. Pub. Co. v. Muething*, 603 N.E.2d 969,
15   973 (Ohio 1992)); *Lynch v. Dean Witter Reynolds, Inc.*, 731 N.E.2d 1205, 1206-07
     (Ohio Ct. App. 2d Dist. 1999) (applying OSA's two-year statute of limitations to a
16   breach of contract claim).
     [26] The *WS/NI* plaintiffs cite only *one* (34-year old) case, *DeChant v. Devs.*, 1978 WL
17   218188 (Ohio Ct. App. 8th Dist. Oct. 26, 1978), in which the court applied a four-
     year statute of limitations to common law fraud claims.  As Plaintiffs themselves
18   acknowledge, however, *DeChant* is an outlier, and the vast majority of Ohio courts
     (and federal courts within the Sixth Circuit applying Ohio law) have ruled that the
19   OSA's two-year statute of limitations applies to common law fraud claims. *See su-*
     *pra* n.25.  In fact, courts in the same judicial district as *DeChant* have repeatedly
20   adopted this majority rule. *See, e.g., Ryan v. Ambrosio*, 2008 WL 5258308, at *2
     (Ohio Ct. App. 8th Dist. Dec. 18, 2008) (applying OSA two-year statute of limita-
21   tions to common law fraud claims and recognizing that "[c]laims that are predicated
     on a sale of securities are governed by the statute of limitations found in [§]
22   1707.43."); *Adams v. Dean Witter Reynolds, Inc.*, 1999 WL 401394, at *3, 5 (Ohio
     Ct. App. 8th Dist. June 17, 1999) (same); *Kondrat v. Morris*, 692 N.E.2d 246, 250-
23   51 (Ohio Ct. App. 8th Dist. 1997) (same).
     [27] As the district court recognized in *Metz v. Unizan Bank*, 416 F. Supp. 2d 568, 574
24   (N.D. Ohio Feb. 24, 2006), in refusing to certify, "[t]he decision to certify a question
     to the Ohio Supreme Court is within the district court's sound discretion."  Certifica-
25   tion may be appropriate where there are "[n]ovel or unsettled questions of state law"
     and "will save time, energy and resources, or where there are conflicting federal in-
26   terpretations of an important state law question which would otherwise evade state
     court review." *Id.*  But here there is no "novel or unsettled question of law" or "con-
27   flicting federal interpretations."  To the contrary, Ohio state and federal courts uni-
     versally have held that the OSA's two-year statute of limitations applies to common
28   law claims based on the purchase or sale of securities.

                                                    20

tions are timely because they are not part of the "fraudulent origination practices earlier considered by this Court." *WS/NI* Opp. at 12-13.  But this argument is contradicted by their Complaints, which allege that the supposed title transfer misrepresentations were one part of a unified scheme to "originate as many loans as possible . . . and then to sell off the bottom of the barrel to mortgage-backed securities investors." *W&S* AC ¶ 178; *see also NI* Compl. ¶ 178.  Specifically, they allege:

> In their zeal to offload toxic loans to investors such as Western & Southern, Countrywide did not come close to complying with the strict rules governing assignment of mortgages, and transfer of promissory notes and loan files. Countrywide lost much of the paperwork relating to the loans underlying the securitizations, or made no attempt to assign mortgages and deliver the original mortgage notes to the issuing trusts as required under state law.  They have engaged in a cover up of their failure validly to assign mortgage notes by filing false documentation in courts nationwide and forging assignment documents.  *The cover-up made possible and facilitated the execution of additional securitizations which damaged investors such as Western & Southern.*

*W&S* AC ¶ 209 (emphasis added); *see also NI* Compl. ¶ 209.  And they allege that these representations were integral to the supposed scheme because "transfer to a mortgage-backed security trust of good title to mortgage loans underlying the security" is a "*fundamental step*" in the overall "mortgage securitization process." *W&S* AC ¶ 197; *see also NI* Compl. ¶ 197.

Moreover, in *Stichting*, this Court held that the "gravamen" of the plaintiff's fraud claim was that "Countrywide knowing and systematically abandoned its underwriting practices in a desire to increase its market share and sell ever-more shaky mortgages into the secondary market as MBS," and that this alleged "abandonment" took many "forms," ***including*** allegedly "failing to properly convey title to secondary purchasers."  *Stichting*, 802 F. Supp. 2d at 1137 (citing ¶¶ 140-47 of the *Stichting* FAC).  The Court's ruling in *Stichting* that a reasonable plaintiff "should have

21

1 discovered facts sufficient to state every element of its [fraud] claim at least prior to

2 February 14, 2009," *id.* at 1139, thus encompassed these title transfer allegations as

3 well as loan-origination-related allegations. *Stichting* applies with equal force here

4 because the title transfer allegations (including the allegations about the role of title

5 transfer in the scheme) are substantially identical across these cases. *See* App. 1.

6       In any event, "Plaintiffs need not know all of the details or narrow aspects of

7 the alleged fraud to trigger the limitations period; instead, the period begins to run

8 from the time at which plaintiff should have discovered the general fraudulent

9 scheme." *Cline v. Reliance Trust Co.*, 245 Fed. App'x 503, 505 (6th Cir. 2007)

10 (quoting *In re NAHC, Inc., Sec. Litig.*, 306 F.3d 1314, 1326 (3rd Cir. 2002)). In

11 *Cline*, the Sixth Circuit held that the plaintiffs' Ohio securities fraud claims were

12 barred by the two-year statute of limitations because the plaintiffs were on notice of

13 the defendant's "involvement" in the alleged "general fraudulent scheme" more than

14 two years before they filed suit. *Id.* at 505.[28] The cases the *WS/NI* plaintiffs cite for

15 the proposition that notice of one misstatement does not provide notice as to all al-

16 leged misstatements are inapposite, as those cases involved alleged misrepresenta-

17 tions regarding entirely unrelated fraudulent conduct.[29]

18 ─────────────

[28] *Accord Greenburg v. Hiner*, 359 F. Supp. 2d 675, 682 (N.D. Ohio 2005)
19 ("[I]nquiry notice is triggered by evidence of the possibility of fraud, not the full ex-
position of the scam itself. . . . The plaintiff need only possess a low level of aware-
20 ness; he need not fully learn of the alleged wrongdoing. . . ."); *cf. Stichting*, 802 F.
Supp. 2d at 1137-38 ("[T]he statute [of limitations] begins to run when a plaintiff
21 has (or a reasonably diligent plaintiff should have) information and evidence [suffi-
cient] to survive a motion to dismiss, *not when a plaintiff has every conceivable fact*
22 that it will ultimately use to prove its case.").

[29] For example, in *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402 (S.D.N.Y. 2005),
23 stock purchasers brought federal securities claims against a corporation alleging that
the company concealed: (a) vendor financing agreements with certain customers
24 and (b) the costs necessary to fix turbines in the company's power division. *Id.* at
422-23. In analyzing whether the *Alstom* plaintiffs were on constructive notice of
25 their claims, the court explained that statements by the company providing notice of
the vendor financial agreements "in no way relate[d] to the allegedly fraudulent con-
26 duct claimed to underlie the Turbine Fraud." *Id.* at 424. Accordingly, the *Alstom*
court held that the latter claims were not time-barred because "the fraud involved
27 *entirely separate courses of conduct* relating to *different products* of *different divi-*
*sions* of the company." *Id.* (emphasis added). Similarly, in *City of Painesville v.*
28 *First Montauk Fin. Corp.*, 178 F.R.D. 180 (N.D. Ohio 1998), the Court held that a

22

3.     **The "Abandonment" Claims Are Time-Barred.**

The *WS/NI* plaintiffs concede in their opposition that their OSA and Ohio common law fraud claims based on Countrywide's alleged systemic abandonment of its underwriting standards are untimely if they knew or reasonably should have known of their claims prior to April 27, 2009 (*i.e.*, two years before the *Western & Southern* plaintiffs filed their original complaint). *WS/NI* Opp. at 14. These claims thus must be dismissed because, as this Court held in *Stichting*, a "reasonable plaintiff exercising reasonable diligence . . . should have discovered facts sufficient to state every element of its [securities fraud] claim at least prior to *February 14, 2009*." *Stichting*, 802 F. Supp. 2d at 1139 (emphasis added); *accord Allstate*, 2011 WL 5067128, at *11-13 (dismissing § 10(b) claim because plaintiffs should have discovered every element of their claim by December 27, 2008).

The *WS/NI* plaintiffs argue, however, that *Stichting* is not relevant here because it applied federal notice standards and under Ohio law MBS investors supposedly would not be deemed to have been on notice of their claims until some unspecified later date, citing nebulous "unique policy objectives of Ohio law and the OSA as regards limitations." *WS/NI* Opp. at 15. But this argument is unsupported and plainly wrong. To the contrary, as the Sixth Circuit has explained, "because Ohio has adopted a limitations period specific to claims arising out of the sale of securities . . . Ohio courts would apply a standard consistent with the . . . standard applicable to similar federal securities fraud claims," *Wyser-Pratte*, 413 F.3d at 561-62, which like the OSA are intended to "protect the investing public" against fraud and exploitation.[30] *Stichting* (and *Allstate*) thus bar the OSA claims here as untimely.

---

previous lawsuit did not provide inquiry notice of later fraud claims because it "did not allege the price manipulation scheme at issue in the present action." *Id.* at 195.
[30] *Compare W&S/NI* Opp. at 15 (quoting *In re Columbus Skyline Sec.*, 660 N.E.2d 427, 429 (Ohio 1996)) (the OSA is intended to "prevent the fraudulent exploitation of the investing public through the sale of securities" and was "drafted broadly to protect the investing public from its own imprudence as well as the chicanery of unscrupulous securities dealers") *with Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976) ("[T]he Securities Act of 1933 . . . was designed to provide investors with

23

1

           **a.**     **Public Press Reports Put The *WS/NI* Plaintiffs On Notice Of Their OSA and Fraud Claims.**

2

3        The *WS/NI* plaintiffs argue that press reports "relating to systemic abandon-

4  ment of origination guidelines" were insufficient to put them on notice of their

5  claims because they were supposedly "counterbalanced" by Countrywide's public

6  statements and denials of wrongdoing.  *WS/NI* Opp. at 16.  They cite *In re Nat'l*

7  *Century Fin. Enters.*, 755 F. Supp. 2d 857 (S.D. Ohio 2010), for the proposition that

8  "firm denials of wrongdoing plainly negate allegations of wrongdoing for determin-

9  ing constructive notice under the OSA."  *WS/NI* Opp. at 17.  But as the *National*

10  *Century* court itself noted, "the Sixth Circuit [has] found that Ohio courts would ap-

11  ply the standard used in federal securities fraud claims" in assessing when an inves-

12  tor was on notice of its Ohio common law and OSA claims for limitations purposes.

13  *See id.* at 868 (*citing Wyser-Pratte*, 413 F.3d at 562).  "Under the federal standard,

14  knowledge of 'suspicious facts' or 'storm warnings' triggers a plaintiffs duty to in-

15  vestigate, and the limitation period 'begins to run only when a reasonably diligent

16  investigation would have discovered the fraud.'"  *Id.* (quoting *Wyser-Pratte*, 413

17  F.3d at 562-63).[31]  Applying this very same standard, this Court determined that the

18  *very same* "public press reports" that the *WS/NI* plaintiffs dismiss "make clear that a

19

20  full disclosure of material information concerning public offerings of securities in commerce, [and] to protect investors against fraud . . . .") *and S.E.C. v. Glenn W.*

21  *Turner Enters., Inc.*, 474 F.2d 476, 481 (9th Cir. 1973) ("The Acts were designed to protect the American public from speculative or fraudulent schemes of promoters.").

22  [31] *National Century* is also factually inapposite and provides no basis not to apply *Stichting* here.  In *National Century*, defendants argued that the statute of limitations

23  applicable to the plaintiffs' fraud claims began to run upon the publication of an ar-ticle entitled "NCFE Investigated Amid Charges of Fraud," which referenced three

24  anonymous letters implying that defendant NCFE has misstated its receivables on its financial statements.  755 F. Supp. 2d at 868.  The Court held that this article did not

25  trigger the limitations period because it merely reported anonymous allegations that NCFE was being investigated.  *Id.* at 870.  The Court also noted that plaintiffs per-sonally had met with NCFE and were assured that the allegations were "false," and

26  that an investigation by a ratings agency (Fitch) was "well down the road" and had "uncovered nothing."  *Id.* at 871.  The Court also noted that "the consensus at the

27  time was that the anonymous allegations were unfounded" based on an independent audit report by Deloitte & Touche and an affirmation by Fitch regarding its ratings.

28  *Id.*  No such facts are alleged by the WS/NI plaintiffs here.

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1   reasonable investor would have been aware of problems with underwriting at Coun-

2   trywide by early 2008." *Stichting*, 802 F. Supp. 2d at 1136.  Based in part upon

3   these press reports, the Court concluded that "a reasonable plaintiff exercising rea-

4   sonable diligence . . . should have discovered facts sufficient to state every element

5   of its [Section 10(b)] claim at least prior to February 14, 2009." *Id.* at 1139.  Like

6   the plaintiff in *Stichting*, the *WS/NI* plaintiffs should have discovered facts underly-

7   ing their OSA and common law fraud claims "by early 2008," *i.e.,* more than two

8   years before they filed their respective complaints.[32]

9       The *WS/NI* plaintiffs also argue that the fact that "a powerful and sophisti-

10   cated financial institution such as Bank of America agreed—after exhaustive due

11   diligence—to pay $4.1 billion for Countrywide more than counterbalanced" these

12   press reports.  *WS/NI* Opp. at 17.  But the *WS/NI* plaintiffs ignore that this Court

13   *held just the opposite* in *Allstate*, noting that Bank of America's acquisition of

14   Countrywide in 2008 "was for a substantial discount from book price and may itself

15   have served as a warning regarding Countrywide's core business operations."  2011

16   WL 5067128, at *10.[33]

17   _____

18   [32]  *Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842 (Ohio Ct. App. 2000) (cited in *WS/NI* Opp. at 16) is also factually inapposite.  In *Federated*, a cor-
porate defendant argued that plaintiffs were put on notice of their fraud claims when
19   an analyst report was published criticizing the defendant's accounting accruals.  *Id.*
at 867.  There was evidence, however, that the plaintiffs had directly questioned de-
20   fendants "at road shows" regarding the report and that defendants "sufficiently re-
sponded to any concerns."  *Id.*  Moreover, another analyst issued a report less than
21   two months later indicating that the defendant's financial accounting was appropri-
ate.  *Id.*  The court thus held that there were issues of fact precluding summary
22   judgment on notice.  *Id* at 867-68.  No such facts are remotely alleged here.
[33]  Because the *WS/NI* plaintiffs' civil conspiracy claims have the "same factual ba-
23   sis" as their OSA and common law fraud claims, they are likewise time-barred by
the OSA's two-year statute of limitations.  *See Hardin v. Reliance Trust Co.*, 2006
24   WL 2850455, at *11 (N.D. Ohio Sept. 29, 2006) (applying OSA's two-year statute
of limitations to civil conspiracy claim based on same allegations as securities fraud
25   claim); *see also* CW Op. Br. at 39 (detailing the common allegations underlying the
*WS/NI* plaintiffs' fraud claims and conspiracy claims).  The *WS/NI* plaintiffs argue
26   that their conspiracy claim is timely because it is "supported" by their Ohio Corrupt
Activities Act claim.  *WS/NI* Opp. at 29.  As the Ohio Supreme Court has held, how-
27   ever, in order to determine "the appropriate statute of limitations for a given case,
we look to the 'essential character' of the plaintiffs' claims."  *Cundall v. U.S. Bank*,
28   909 N.E.2d 1244, 1249 (Ohio 2009) (emphasis added); *see also Bradigan v.*

25

**b.    Previously Filed Lawsuits Put The *WS/NI* Plaintiffs On Notice Of Their OSA and Fraud Claims.**

The *WS/NI* plaintiffs argue that earlier complaints against Countrywide "involving different frauds" did not put them on notice of their claims based upon alleged systemic abandonment of underwriting guidelines. *WS/NI* Opp. at 18.  Specifically, the *WS/NI* plaintiffs argue that many of these complaints "involve claims brought by investors in Countrywide's common stock or equity securities" and that it "alleges an entirely different fraud." *Id*.  This argument, however, also has already been considered and rejected by this Court. *See Stichting,* 802 F. Supp. 2d at 1138.  As the Court held in *Stichting*:

> The shareholder, debenture holder, and derivative suits against Countrywide all made the same allegation:  Countrywide stock/debt decreased in value when the market realized that Countrywide had been misrepresenting the quality of the loans it was writing.  These allegations involve the same underlying conduct (abandonment of underwriting standards) and the same fraudulent purpose (concealing true loan quality from the market so that Countrywide could continue to increase market share, sell RMBS, and inflate its stock price) as alleged here . . . Plaintiff's attempt to distinguish the earlier-filed complaints are fruitless.

*Id.* at 1138-39. [34]

*Strongsville City Sch.*, 2007 WL 1643191, at *2 (Ohio Ct. App. June 7, 2007) ("In determining which limitation period will apply, courts must look to the actual nature or subject matter of the case, rather than to the form in which the action is pleaded.").  Here, the allegations on which the *W&S/NI* plaintiffs' base their conspiracy claim make clear that the "essential character" or "actual nature" of its conspiracy claim is fraud-based.  *W&S* AC ¶ 497; *NI* Compl. ¶ 497.  Accordingly, the OSA's two-year statute of limitations applies and bars the *WS/NI* plaintiffs' civil conspiracy claim.

[34]   In an attempt to distinguish *Stichting*, Plaintiffs try to re-characterize their complaints as primarily alleging fraud based on "off-load[ing] of toxic loans" while "cherry picking" more creditworthy loans for its own account.  *WS/NI* Opp. at 18.  This argument is specious.  For one thing, the *WS/NI* complaints contain only *four* allegations about the "cherry picking" of loans (*W&S* AC ¶¶ 87-90; *see also NI* Compl. ¶¶ 87-90)—as in *Stichting*, the vast majority of the allegations relate to alleged abandonment of underwriting standards (*id.* ¶¶ 10, 65-66, 68, 70, 76-86, 91-

26

1    The one case cited by the *WS/NI* plaintiffs, *City of Painesville v. First Mon-*

2 *tauk Fin. Corp.*, 178 F.R.D. 180 (N.D. Ohio 1998), does not call into question this

3 Court's words quoted above in *Stichting*. Just the opposite. In *Painesville,* the court

4 held that a lawsuit did not provide notice of a later-filed fraud claim because the ear-

5 lier suit did not contain *any* allegations pertaining to the later fraud. *Id.* at 195.

6 Moreover, unlike the complaints addressed in *Stichting*, the previous lawsuit in

7 *Painesville* was against *different defendants*. *Id.* at 193. In any event, as in *Sticht-*

8 *ing*, Ohio courts have held that the filing of earlier suits alleging fraud against the

9 same defendants is an "objective indicia of when the fraud should have been discov-

10 ered." *Gaudin v. K.D.I. Corp.*, 417 F. Supp. 620, 629 (S.D. Ohio 1976).[35]

11          **4.      Allegations Of Fraudulent Concealment Do Not Save The**
                     **_WS/NI_ Plaintiffs' Claims.**
12

13    The *WS/NI* plaintiffs argue that under the doctrine of fraudulent concealment,

14 their "OSA claims based on Countrywide's misrepresentations concerning adher-

15 ence to underwriting guidelines were tolled until at least June 2009." *WS/NI* Opp. at

16 22. Specifically, the *WS/NI* plaintiffs allege that from the fall of 2008 through June

17 2009, they "utilized information in monthly Remittance Reports generated by Coun-

18 trywide . . . to monitor and value the Certificates through Western & Southern's in-

19 ternal system" (*id*. at 20), and that the allegedly false information in these reports

20 "prevented [them] from discovering the true nature of the mortgage loans underly-

21 ing the Certificates" (*id*. at 22). But the *WS/NI* plaintiffs do not say what data was

22 ──────────────────────────────────────

23 130, 185, 276, 286, 289, 311, 323, 325, 385). There is also nothing new or unique
   about the *WS/NI* plaintiffs' "cherry picking" allegations—in fact, the *Stichting*,
   *Allstate,*and *Progressive* complaints all contain the very same "cherry picking" alle-
24 gations. *See* Appendix 2. Indeed, in *Stichting*, this Court noted that the Section
   10(b) claims were based in part on allegations that Countrywide "cherry-pick[ed]
25 good loans for its own portfolio while selling low-quality loans into the secondary
   market ([*Stichting* Compl.] at ¶¶ 148-51)" and held that the plaintiff knew or should
26 have known about such facts "at least prior to February 14, 2009." *Stichting*, 802 F.
   Supp. 2d at 1135, 1139.

27 [35] *See also Hardin*, 2006 WL 2850455, at *7-9 (holding that plaintiffs had construc-
   tive notice of OSA claims based in part on lawsuits against the company alleging
28 fraud and conspiracy filed more than two years before plaintiffs filed their action).

                                            27
       OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1    contained in these "Remittance Reports" (other than vague references to "statistical

2    metrics" and "loan tapes" (*W&S* AC ¶¶ 374-75; *NI* Compl. ¶¶ 374-75)), much less

3    allege not a single fact suggesting that anything in this data was false or misleading.

4    Absent such facts, there can be no fraudulent concealment.[36]

5         In any event, regardless of the information allegedly contained in these re-

6    ports, by late 2007 or early 2008—*months* before the *WS/NI* plaintiffs supposedly

7    began monitoring their MBS—reasonable investors already were on notice of facts

8    giving rise to their OSA claims. *Stichting*, 802 F. Supp. 2d at 1139; *Maine State I*,

9    722 F. Supp. 2d at 1165-66.  And under Ohio law, "[o]nce sufficient indicia of fraud

10   are shown, a party cannot rely on its unawareness . . . to toll the statute." *Zemcik v.*

11   *LaPine Truck Sales & Equip. Co.*, 706 N.E.2d 860, 866 (Ohio Ct. App. 1998).[37]

12        The cases the *WS/NI* plaintiffs cite are inapposite.  In *Iron Workers Local Un-*

13   *ion No. 17 Ins. Fund v. Philip Morris, Inc.*, the court *refused* to toll plaintiffs' claims

14   ────────────
15   [36] The *WS/NI* plaintiffs incorrectly argue that *Helman*, 743 N.E.2d 484, also sup-
     ports equitable tolling here.  *WS/NI* Opp. at 19.  *Helman*, however, holds that equi-
16   table tolling requires a plaintiff to show either "'an affirmative statement that the
     statutory period to bring an action was larger than it actually was' or 'promises to
     make a better settlement of the claim if plaintiff did not bring the threatened suit' or
17   'similar representations or conduct' on defendant's part."  743 N.E.2d at 495 (citing
     *Cerney v. Norfolk & W. Ry. Co.*, 662 N.E.2d 827, 830 (Ohio Ct. App. 1995)).  Be-
18   cause the *WS/NI* plaintiffs have not alleged any such misrepresentations, they cannot
     invoke equitable tolling.  *See Kegg v. Mansfield*, 2001 WL 474264, at *5 (Ohio Ct.
19   App. Apr. 30, 2001) ("The only evidence provided by appellant . . . pertains to al-
     leged misrepresentations concerning the value of the investments, which are in no
20   way related to misrepresentations concerning the statute of limitations or a promise
     of settlement as envisioned by *Cerney*.").
21   [37] Moreover, as the Sixth Circuit has recognized, there can be no fraudulent con-
     cealment and, thus, no tolling of fraud claims based on fraudulent concealment
22   where, as here, widely available press reports and lawsuits publicized the very same
     allegedly fraudulent conduct on which a plaintiff bases its claims.  *See Harner v.*
23   *Prudential-Bache Sec., Inc.*, 1994 WL 494871, at *6 (6th Cir. Sept. 8, 1994) ("[I]t is
     questioned whether concealment can exist at all without some act by the defendant
24   that denies the plaintiff access to the relevant knowledge. . . . Here, it is clear that
     the state of the airline industry was public knowledge that plaintiffs could have dis-
25   covered from some of the many newspaper articles they now rely on to claim
     fraud."); *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1127-28 (6th Cir. 1982) (tolling
26   cannot apply where a reasonable investigation would uncover an "avalanche of evi-
     dence that would put all but the most indiligent plaintiffs on notice of a cause of ac-
27   tion"); *R&P Co. v. Ranger Mining Assocs.*, 1991 WL 346393, at *6, 9 (N.D. Ohio
     July 10, 1991) (an investor cannot "ignore facts at his disposal or fail to acquire in-
28   formation concerning his investment when the information is available to him").

                                             28

1   based on fraudulent concealment because "plaintiffs . . . failed to plead their due

2   diligence with any specificity."  29 F. Supp. 2d 801, 809 (N.D. Ohio 1998).  Al-

3   though the court in *In re Polyurethane Foam Antitrust Litig.* upheld a claim of

4   fraudulent concealment, it did so because, unlike here, "no facts existed that did or

5   should have excited plaintiffs' suspicions."  799 F. Supp. 2d 777, 804 (N.D. Ohio

6   2011).  *National Century*, 541 F. Supp. 2d 986, is also inapposite.  In *National Cen-*

7   *tury*, the court sustained a claim of fraudulent concealment based on allegations—

8   absent here—that the plaintiffs directly approached defendants with their concerns

9   and defendants falsely assured them of the health of the note programs for which de-

10  fendants served as underwriter.  *Id.* at 1006.  Accordingly, the *National Century*

11  court held that the plaintiffs' complaints sufficiently alleged that plaintiffs "could

12  not have reasonably discovered the wrongful conduct until the time of [defendant's]

13  collapse."  *Id.*  No such facts are alleged here, and this Court already has held that

14  reasonable investors should have discovered their fraud claims more than three

15  years before the *Western & Southern* complaint was filed.

16          **5.      Plaintiffs' Argument About When They Supposedly Became**
                      **Aware Of Injury Lacks Merit.**
17

18          The *WS/NI* plaintiffs concede that they knew, prior to April 2009, that at least

19  nine of the 36 MBS they claim to have purchased allegedly would incur material

20  losses.  *WS/NI* Opp. at 24 ("*With the exception of nine tranches*[,] . . . Western &

21  Southern did not determine that any of its . . . tranches were impaired . . . prior to

22  June 2009.") (emphasis added.).  Nevertheless, the *WS/NI* plaintiffs contend that

23  they "did not know, nor could it have known, prior to April 27, 2009 that Country-

24  wide's misstatements . . . injured Western & Southern" because they did not deter-

25  mine, through their "proprietary" internal models, that the remaining 27 MBS they

26  allegedly purchased would incur any losses until June 2009.  *WS/NI* Opp. at 23-24.

27  But this argument is foreclosed by the Court's rulings in *Stichting* and *Allstate* that

28  any injury manifested itself when facts about the claimed misstatements came to

29

1    light, as Countrywide explained in its opening brief.  CW Op. Br. at 30-31.  Tell-

2    ingly, the *WS/NI* plaintiffs do not address these rulings or respond to this point in

3    their opposition, effectively conceding it.  *See WS/NI* Opp. at 23-24.  In short, like

4    the plaintiffs in *Stichting* and *Allstate*, the *WS/NI* plaintiffs reasonably should have

5    discovered the factual basis for their OSA and 1934 Act claims long before April

6    27, 2009, two years prior to the filing of the *Western & Southern* complaint.[38]

7         **D.     The Ohio Savings Statute Does Not Save Plaintiffs' OSA Claims.**

8         The *WS/NI* plaintiffs contend that their OSA claims are timely under the Ohio

9    savings statute.  Apparently invoking Ohio's class action tolling rule as adopted in

10   *Vaccariello v. Smith & Nephew Richards, Inc.*, 763 N.E.2d 160 (Ohio 2002), they

11   argue that these claims "were all clearly alive as of the filing of *Maine State*" and

12   then somehow "save[d]" when this Court dismissed the claims based on the same

13   _____

14   [38]  The *WS/NI* plaintiffs also argue that none of Western & Southern's OSA claims
     are barred by the OSA's statute of repose because "absolute statutes of repose are
15   unenforceable under Article I, Section 16 of the Ohio Constitution."  *WS/NI* Opp. at
     24.  The Ohio Supreme Court, however, has expressly rejected this argument: "To
16   the extent that [precedent] stands for the proposition that all statutes of repose are
     repugnant to Section 16, Article I, we expressly reject that conclusion."  *Groch v.
17   Gen. Motors. Corp.*, 883 N.E.2d 377, 403 (Ohio 2008).  The *Groch* court reasoned
     that a statute of repose is constitutional where it does not take away an existing, ac-
18   tionable claim before the injured party discovers such a claim or has a reasonable
     amount of time to file suit.  *Id.* at 398.  The court further highlighted the strong pre-
19   sumption in favor of upholding the "Legislature's ability to guide the development
     of the law."  *Id.*  Although the Ohio Supreme Court has never specifically ruled on
20   the constitutionality of the OSA's statute of repose, Ohio courts consistently apply
     the OSA's statute of repose to bar untimely claims.  *See, e.g., Goldberg*, 2002 WL
21   1371031, at *6; *Kondrat v. Morris*, 692 N.E.2d at 250.  The cases cited by the
     *WS/NI* plaintiffs (*WS/NI* Opp. at 25-26) are inapposite—all of those cases held that
22   the application of the OSA's statute of repose in those particular cases was unconsti-
     tutional because the repose period expired *before* plaintiffs discovered their claims.
23   *Lopardo v. Lehman Bros., Inc.*, 548 F. Supp. 2d 450, 466 (N.D. Ohio 2008); *Metz. v.
     Unizan Bank*, 2008 WL 2017574, at *4-5 (N.D. Ohio May 7, 2008); *Hardy v. Ver-
24   Meulen*, 512 N.E.2d 626, 629-30 (Ohio 1987).  Indeed, in *Groch*, the Ohio Supreme
     Court distinguished *Hardy* because the "statute of repose interpreted in them took
25   away an existing . . . claim *before* the injured person discovered the injury . . . and
     therefore denied the injured party's right to a remedy for those reasons." 883 N.E.2d
26   at 404 (emphasis added).  Here, because the *WS/NI* plaintiffs' earliest purchases
     were in June 2005 (*see W&S* AC ¶ 74 and Ex. A; *see also NI* Compl. ¶ 75 and Ex.
27   A), June 2010 is earliest that the OSA's five-year repose period would have expired.
     The *WS/NI* plaintiffs knew or reasonably should have known of the facts giving rise
28   to their OSA claims by December 2008, *Allstate*, 2011 WL 5067128, at *11—*years*
     before the statute of repose expired.

                                          30

1   tranches the *WS/NI* plaintiffs bought.  *WS/NI* Opp. at 38, 40.  But the savings statute

2   does not apply here, both because the OSA claims were time-barred prior to the fil-

3   ing of *Maine State* (and thus could not be "saved") and also because the disposition

4   of those claims in *Maine State* was "on the merits."

5         The Ohio savings statute could not save the *WS/NI* plaintiffs' OSA claims be-

6   cause they were stale by the time *Maine State* was filed.  Although the Ohio Su-

7   preme Court has adopted class action tolling, it has confined it narrowly to class ac-

8   tions filed "in Ohio or the federal court system." *Vaccariello*, 763 N.E.2d at 163.[39]

9   Thus the filing of the *Luther/Washington State* complaints in California state court

10  could not trigger this Ohio tolling rule, and the *WS/NI* plaintiffs do not dispute this.

11  *See WS/NI* Opp. at 40 ("Ohio clearly does not allow cross jurisdictional tolling from

12  a foreign-filed state action to Ohio").  And under this Court's prior rulings, federal

13  *American Pipe* tolling likewise did not toll those claims because the tranches the

14  *WS/NI* plaintiffs bought had not been bought by the *Luther/Washington State* plain-

15  tiffs.  CW Op. Br. at 28.  Thus, because the *WS/NI* plaintiffs were "clearly on notice

16  of Countrywide's misrepresentations regarding underwriting standards by late 2007

17  or early 2008," *Stichting*, 802 F. Supp. 2d at 1137, the two-year statute of limitations

18  applicable to the *WS/NI* plaintiffs' OSA claims had already expired by the time

19  *Maine State* was filed on January 14, 2010.  *See* CW Op. Br. at 34-35.  Because

20  those claims were untimely, the savings statute is inapplicable.  *See Howard v. Al-*

21  *len*, 283 N.E.2d 167, 169 (Ohio 1972) ("The Ohio saving clause cannot save an ac-

22  tion from the running of the statute of limitation unless the original action was

23  commenced or attempted to be commenced within the applicable period of limita-

24  tion . . . .");  *Monroe*, 631 N.E.2d at 1139-40 (same).  The *WS/NI* plaintiffs do not

25  respond to these points in their opposition, much less dispute them.

26  _____

27  [39]  *See also Arandell Corp. v. Am. Elec. Power Co., Inc.*, 2010 WL 3667004, at *10 (S.D. Ohio Sept. 15, 2010) (citing *Ruble v. Ream*, 2003 WL 22532858, at *6 (Ohio Ct. App. Oct. 29, 2003)); *Monroe v. Stop-N-Go Food Stores, Inc.*, 631 N.E.2d 1138,

28  1139 (Ohio Ct. App. 1993)).

1    Even if the OSA claims had been timely when *Maine State* was filed, the

2    Ohio savings statute would still not have applied for two additional reasons.  First,

3    the savings statute applies only if the dismissal of the original claim is not "on the

4    merits."  But in *Maine State*, this Court held that limitations periods had run as to

5    any claims for which the *Luther/Washington State* plaintiffs lacked standing, *see*

6    722 F. Supp. 2d at 1166-67; *accord Maine State II*, 2011 WL 4389689, at *6, and

7    that ruling was unquestionably "on the merits."  *See, e.g.*, *LaBarbera v. Batsch*, 227

8    N.E.2d 55, 63 (Ohio 1967) (dismissal on limitations grounds "on the merits" for

9    purposes of the Ohio savings statute); *see also Am. Nat'l Bank & Trust Co. v. City of*

10   *Chi.*, 826 F.2d 1547, 1552-53 (7th Cir. 1987) (disposition is "on the merits" if it bars

11   further litigation).  Second, "when a new complaint contains factual allegations that

12   were not alleged in the original complaint, and further contains a new theory of re-

13   lief based on the new factual allegations, the savings statute will not apply."

14   *Lanthorn v. Cincinnati Ins. Co.*, 2002 WL 31768796, at *5 (Ohio Ct. App. Dec. 5,

15   2002); *accord Ferron v. Metareward, Inc.*, 698 F. Supp. 2d 992, 1006 (S.D. Ohio

16   2010); *accord Day v. NLO, Inc.*, 798 F. Supp. 1322, 1329 (S.D. Ohio 1992) (savings

17   statute inapplicable where new complaint contained claims for emotional distress

18   not mentioned in previous complaint).  Here, the *WS/NI* plaintiffs' OSA and Ohio

19   common law claims[40] assert legal theories and contain elements not present in

20   *Maine State*, which asserted only non-scienter 1933 Act claims.[41]

21   ─────────────────────

22   [40] For example, the *WS/NI* plaintiffs' common law negligent misrepresentation claims depend on factual allegations that were not alleged in the *Luther* and *Maine State* complaints, namely allegations that the plaintiffs justifiably relied on an alleg-

23   edly misleading statement and that such reliance caused the plaintiffs' loss.  *See, e.g.*, *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989).

24   [41] The cases the *WS/NI* plaintiffs cite (*WS/NI* Opp. at 39) are inapposite.  To the ex-tent it has not been abrogated by more recent Ohio cases, *Sherman v. Air Reduction*

25   *Sales Co.*, 251 F.2d 543 (6th Cir. 1958), simply holds that "a new action for negli-gence, although it had many more specifications of negligent conduct than the prior

26   case dismissed without prejudice, was substantially the same case."  *Kerr v. Hurd*, 694 F. Supp. 2d 817, 837 (S.D. Ohio 2010).  Here, the *WS/NI* plaintiffs are asserting

27   new legal theories involving entirely different required elements (scienter, reliance, etc.) not involved in *Maine State*.  *Zanders v. O'Gara-Hess & Eisenhardt Armoring*

28   *Co.*, 1992 WL 2906 (6th Cir. Jan. 9, 1992) (an unpublished disposition), did not

32

**E.**   **The *WS/NI* Plaintiffs Should Not Be Allowed To Replead.**

The *WS/NI* plaintiffs argue that they should be allowed to replead any claims that the Court dismisses on the sole basis that they "have never had the opportunity to address any inadequacies that may exist in their pleadings." *WS/NI* Opp. at 50. The *WS/NI* plaintiffs, however, filed their operative complaints *after* this Court issued its rulings in *Allstate* and *Stichting*. Indeed, National Integrity admits that the complaint it filed in the Southern District was crafted *in response to* this Court's decision in *Allstate*. *WS/NI* Opp. at 28. Indeed, the *WS/NI* plaintiffs apparently sought to end-run these rulings by adding multiple pages of new allegations and three entirely new claims. *See, e.g.*, *W&S* AC ¶¶ 372-87; *NI* Compl. ¶¶ 372-87 (new allegations regarding alleged discovery of injury); *id*. ¶¶ 412-14 (new additional OSA claim); *id*. ¶¶ 418-26 (new Ohio Corrupt Activities Act claim); *id*. ¶¶ 495-99 (new civil conspiracy claim). But those new allegations changed nothing, and allowing the *WS/NI* plaintiffs to replead their failed claims *yet again* would prejudice Countrywide, particularly because the *WS/NI* plaintiffs have not, and cannot, provide "any satisfactory explanation for [their] failure to fully develop [their] contentions originally." *Medimmune, Inc. v. Genentech, Inc.*, 2004 WL 5327194, at *2 (C.D. Cal. Feb. 18, 2004) (denying leave to amend for undue delay is proper "where the movant presents no new facts but only new theories and provides no satisfactory explanation for his failure to fully develop his contentions originally").[42]

**IV.   NATIONAL INTEGRITY'S CLAIMS MUST BE DISMISSED FOR SEVERAL INDEPENDENT REASONS.**

**A.   Plaintiffs' Admitted Forum Shopping Warrants Dismissal.**

National Integrity *admits* to forum shopping, brazenly stating that it "had

---

even concern the Ohio savings statute, but rather addressed only the issue of relation back under EEOC regulations. *See id.* at *3-4.

[42] *See also Acri v. Int'l Assn'n of Machinists & Aerospace Workers*, 781 F.2d 1393, 1398 (9th Cir. 1986) (holding that it would constitute prejudice to allow leave to amend when Plaintiffs' attorney admitted that the delay in bringing the cause of action was a "tactical choice").

33

1  every right to respond to this Court's holding in *Allstate* by filing a New York ac-

2  tion." *See WS/NI* Opp. at 28. This conduct requires dismissal here.

3      Although it does not deny it forum shopped, National Integrity nonetheless

4  argues dismissal would be improper because (it says) it is "a distinct legal entity."

5  *WS/NI* Opp. at 27-28. Whether or not it is a distinct legal entity, however, National

6  Integrity itself was a plaintiff in the original action. It voluntarily dismissed, refiled

7  in the Southern District of New York, and then took action to return to this Court,

8  but only after (it hoped) it had triggered New York law by filing there. That is all

9  the Court needs to know, and National Integrity's argument about being a separate

10  entity is beside the point and legally irrelevant. Moreover, dismissal has been or-

11  dered (and sustained on appeal) in circumstances nearly identical to those here. Na-

12  tional Integrity is "a wholly-owned subsidiary" of *Western & Southern* plaintiff In-

13  tegrity Life Insurance Company. *W&S* Compl. ¶ 23. In *Aetna Cas. & Sur. Co. v.*

14  *Kerr-McGee Chem.*, 875 F.2d 1252, 1257 (7th Cir. 1989), the Seventh Circuit af-

15  firmed dismissal of a successive action involving subsidiaries of parties to an earlier

16  suit concerning the same subject matter, holding that dismissal was appropriate

17  "even though technically distinct corporate entities are involved in the various pend-

18  ing actions." *Accord Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616,

19  619 (Fed. Ct. App. 1995) (parent-subsidiary relationship is "so close as to justify

20  barring . . . successive actions").

21      National Integrity also tries to avoid the consequences of its forum shopping

22  by arguing that the cases Countrywide cited are irrelevant because many of them

23  address motions to transfer, not dismissal. *See WS/NI* Opp. at 29 n. 24. But Na-

24  tional Integrity ignores the fact that courts apply precisely the "same factors" in de-

25  ciding dismissal as they do in deciding "whether transfer is appropriate." *Citigroup,*

26  *Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 560 (S.D.N.Y. 2000) (citing cases).

27  The cases that are inapposite are the ones National Integrity cited, as each involved

28  the abstention doctrine (on which Countrywide does not rely). *See WS/NI* Opp. at

34

1   27, citing *Fed. Deposit. Ins. Corp.  v. Nichols*, 885 F.2d 633, 637-38 (9th Cir. 1989)

2   ("the district judge abused her discretion in abstaining") and *Keystone Fruit Mktg. v.*

3   *Nat'l Fire Ins. Co.*, 2011 WL 3293390, at *2 (E.D. Wash. Aug. 1. 2011) (plaintiff

4   moved "under a theory of abstention").

5          National Integrity correctly notes that courts typically exercise discretion to

6   dismiss a second-filed suit only in "exceptional circumstances." *WS/NI* Opp. at 27

7   n.22.  In *Kellen Co. v. Calphalon Corp.*, 54 F. Supp. 2d 218, 221 (S.D.N.Y. 1999),

8   such circumstances were found where, like here, where the second-filed suit in the

9   Southern District of New York was the "same" as an earlier-filed suit in Ohio.  It is

10  undisputed here that National Integrity asserts in New York *precisely the same* alle-

11  gations against the *same* defendants for the *same* MBS purchases challenged by its

12  corporate affiliates in other pending litigation before this Court—litigation in Ohio

13  in which it originally was a plaintiff.  *See generally* CW Op. Br. at 40-45.  In aban-

14  doning its chosen forum, New York, for *all* proceedings (including trial) (*WS/NI*

15  Opp. at 27-29), National Integrity concedes the duplicative nature of the present ac-

16  tion and the lack of any meaningful connection with New York.  Its separate action

17  should therefore be dismissed.

18          **B.      National Integrity's Common Law Fraud Claims Are Time-Barred.**

19          National Integrity does not dispute that, according to its own allegations, its

20  principal place of business is in Ohio.  *See NI* Compl. ¶¶ 16-18.  In an attempt to

21  avoid dismissal of its untimely clams under Ohio's statutes of limitations, however,

22  National Integrity argues that it is incorporated in New York and that a New York

23  corporation is a resident of New York for purposes of the New York borrowing stat-

24  ute "even if its principal place of business is outside the state." *WS/NI* Opp. at 25.[43]

25  _____

    [43]   For the purposes of the borrowing statute (N.Y. C.P.L.R. § 202), National Integ-
    rity bears the burden to show that it was a resident of New York when its cause of
26  action accrued. 2A Carmody-Wait 2d New York Prac. § 13:47 (West 2011).  Na-
    tional Integrity's perfunctory assertion that it is incorporated in New York (*WS/NI*
27  Opp. at 25; *NI* Compl. ¶ 15) fails to meet this burden, particularly given that its own
    complaint confirms that its principal place of business is *not* in New York, and the
28  cases cited by Countrywide holding that it is a corporation's principal place of busi-

35

1   National Integrity is wrong.

2        National Integrity cites *Wydallis v. U.S. Fid. & Guar. Co.*, 63 N.Y.2d 872,

3   873-75 (1984), in which the court held that the plaintiff—a corporation incorporated

4   in New York that had its principal place of business in another state—was a New

5   York resident under the borrowing statute. *WS/NI* Opp. at 25. *Wydallis*, however,

6   contains no analysis whatsoever regarding how that determination was made in that

7   case or how courts generally should determine a corporation's residency under the

8   New York borrowing statute. *See Wydallis*, 63 N.Y.2d at 873.[44] It is entirely un-

9   clear what factors, if any, the Court considered in reaching the conclusion it did, and

10  it certainly does not stand for the proposition that a New York corporation with its

11  principal place of business elsewhere will in all instances be treated as a "resident"

12  under the borrowing statute. It also does not appear that residency was even dis-

13  puted by the parties in *Wydallis*.

14       In any event, *Wydallis* has never once been cited by a single New York court

15  (state or federal) on this issue. Moreover, *Wydallis* has effectively been superseded

16  on this issue. Since *Wydallis*, the New York Court of Appeals has held that for a

17  plaintiff to be considered a New York resident for purposes of C.P.L.R. § 202, it

18  must have a "significant connection" to the state. *Antone v. Gen. Motors Corp. v.*

19  *Buick Motor Div.*, 473 N.E.2d 742, 746 (N.Y. 1984). In addition, since *Wydallis*,

20  the Court of Appeals has held that *both* a corporation's state of incorporation *and* its

21  principal place of business are relevant for determining whether the corporation is a

22  resident under C.P.L.R. § 202. *See Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d

23  482, 485 (N.Y. 1999) (noting that "[w]hen an alleged injury is purely economic, the

24  place of injury usually is where the plaintiff resides" and holding that "plaintiff[]

25  _____

ness that determines residency for purposes of C.P.L.R. § 202.

26  [44] Rather, in its analysis of whether a particular provision of an insurance policy
(which limited the time period in which a suit could be filed) applied to suits filed

27  outside of Massachusetts, the court held that "an action lawfully instituted in New
York by a New York resident" is governed by New York's statute of limitations. *Id.*

28  at 875.

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1   [corporation's] causes of action are time-barred whether one looks to its State of in-

2   corporation *or* its principal place of business") (emphasis added).

3           Indeed, Southern District of New York Judge Stanton noted this development

4   in New York law in applying the borrowing statute in *Nat'l Union Fire Ins. Co. of*

5   *Pittsburgh v. Forman 635 Joint Venture*, 1996 WL 507317, at *3-4 (S.D.N.Y. Sept.

6   6, 1996), explaining that although "[t]here is authority which seems to hold that a

7   corporation's residence is its state of incorporation," "[m]ore recently, courts have

8   stated that a corporation's state of incorporation is its domicile, and its principal

9   place of business is its residence." *Accord Fed. Deposit Ins. Corp. v. Cohen*, 1996

10  WL 87248, at *3 (S.D.N.Y. Feb. 29, 1996) (same).  And the cases Countrywide

11  cited in its opening brief (*see* CW Op. Br. at 49-50), which National Integrity fails to

12  meaningfully distinguish, reflect this development in New York law as well, ex-

13  pressly holding that "[a] corporation's principal place of business, rather than its

14  state of incorporation, determines its residence" for purposes of N.Y. C.P.L.R. §

15  202.  *McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 727 F. Supp.

16  833, 834 (S.D.N.Y 1989) (citing *Allegaert v. Warren*, 480 F. Supp. 817, 820

17  (S.D.N.Y. 1979)).[45]

18          Under this current formulation for assessing residency for purposes of the

19  New York borrowing statute, the *National Integrity* complaint and the *WS/NI* oppo-

20  sition both make clear that National Integrity's only connection to New York with

21  respect to this action for purposes of the borrowing statute is that it is technically in-

22  corporated in the state.  Its complaint and opposition brief likewise confirm that the

23  state with which it has a "significant connection" is Ohio.  *NI* Compl. ¶¶ 15-18 (al-

---

45  *See also In re Magnesium Corp. of Am.*, 399 B.R. 722, 743 (Bankr. S.D.N.Y. 2009) ("In New York, residency is defined as a corporation's principal place of business."); *Pereira v. Cogan*, 2001 WL 243537, at *18 (S.D.N.Y. March 8, 2001) (a plaintiff's "state of residence for purposes of the borrowing statute is New York, where it maintains its principal place of business"); *The Investigative Grp., Inc. v. Brooke Grp. Ltd., Inc.*, 1997 WL 727484, at *3 (S.D.N.Y. Nov. 21, 1997) ("For purposes of the borrowing statute, plaintiff is not a resident of New York because a corporation's residence is its principal place of business.").

37

1  leging that all senior management is located in Ohio, that all of its "investment deci-

2  sions, including the decision to purchase [the] Certificates" were made in Ohio, and

3  that its investments are managed in Ohio by portfolio managers located in Ohio).

4  New York law thus requires borrowing Ohio's two-year limitations period, under

5  which National Integrity's common law claims are time-barred.  *See* CW Op. Br. at

6  38-39; 49-52.

7  **V.    THE *BANKERS* PLAINTIFFS' CLAIMS ARE BARRED.**

8         In their opposition ("*Sterling & Bankers* Opp."),[46] the *Bankers* plaintiffs con-

9  tend that their claims are not time-barred because either:  (i) it is "premature" for

10  this Court to determine whether California or Florida has the most significant rela-

11  tionship to the parties and the action; or (ii) this determination would not be prema-

12  ture, and their complaint contains sufficient allegations to conclude that Florida's

13  statute of limitations, as opposed to California's, applies.  *Sterling & Bankers* Opp.

14  at 16.  They are wrong on both points.  Even taking into account the additional facts

15  that the *Bankers* plaintiffs say they can allege (but have not alleged),[47] which they

16  say would show that the *Bankers* plaintiffs received and acted on the alleged misrep-

17  resentations in Florida,[48] California would still have the most significant relationship

18

19  [46] The *Bankers* and *Sterling* plaintiffs, represented by the same counsel, have filed a

20  joint opposition brief, with one section of that brief addressed to the *Bankers* case
   and the other to the *Sterling* case.  In the joint opposition, the *Bankers* plaintiffs in-

21  corporate by reference many of the arguments also made in the *Sterling* case.  To
   avoid duplication, the Countrywide Defendants address in this *Bankers* section of

22  their reply brief (and do not repeat in full in the *Sterling* section) points from both
   the *Bankers* and the *Sterling* sections of the opposition brief, to the extent they are

23  overlapping.  Although the points made in this section are denominated as pertain-
   ing to *Bankers*, the points pertain equally to *Sterling*, and the Countrywide Defen-

24  dants respectfully request that this Court consider these arguments in relation to
   *Sterling* also.

25  [47] The *Bankers* plaintiffs concede that their complaint does not allege where the al-
   leged misrepresentations were received or relied upon, but ask this Court to con-

26  clude that receipt and reliance occurred in Florida, and offer to amend their com-
   plaint as necessary.  *See Sterling & Bankers* Opp. at 18.

27  [48] The Countrywide Defendants take these facts as true solely for purposes of this
   motion to dismiss and do not otherwise concede that the *Bankers* plaintiffs received

28  or relied upon the claimed representations in Florida.

38

1   to the primary-liability claims.[49]  Given the *Bankers* complaint's overwhelming fo-

2   cus on Countrywide's allegedly systemic conduct that (if true) indisputably would

3   have occurred in California, and the relatively minimal relationship between the

4   primary-liability claims and Florida, California has the greatest interest in the pri-

5   mary-liability claims and its limitations period therefore controls.  CW Op. Br. at

6   55-58.

7        A.    **Restatement § 148(2)(c) Favors California Law.**

8        The *Bankers* plaintiffs try to avoid California law by disputing that factor (c)

9   of Restatement (Second) Conflict of Laws § 148(2) (1971) favors California law.

10  Factor (c) requires the Court to consider "the place where the defendant *made* the

11  misrepresentations."  Restatement § 148(2)(c) (emphasis added).  The *Bankers*

12  plaintiffs incorrectly argue that, because they allegedly *viewed* the representations in

13  Florida, factor (c) points to Florida.  *Sterling & Bankers* Opp. at 19.  In making this

14  argument, the *Bankers* plaintiffs contend that misrepresentations do not become ac-

15  tionable until the documents are disseminated and received and (the theory goes)

16  must have been made where they were received by the plaintiff.  *Id.* at 10, 18.  But

17  this argument improperly conflates "the place where the defendant made the misrep-

18  resentations" [Restatement § 148(2)(c)] with the wholly separate factor of "the place

19  where the plaintiff received the misrepresentations" [Restatement § 148(2)(b)],

20  which the Restatement treats as distinct inquiries.  Were it adopted, the *Bankers*

21  plaintiffs' approach would render factor (c) meaningless.

22       Contrary to how the *Bankers* plaintiffs would have this Court interpret factor

23  (c), it must mean something different than factor (b).  And, in fact, the comments to

24  Restatement § 148 make clear that "the place where the defendants made the repre-

25  sentations" is distinct from "the place where the plaintiff received the representa-

26

---

27  [49] *See* CW Op. Br. at 52-54 (to determine applicable limitations period, Florida
    courts evaluate which state has the most significant relationship to the action pursu-

28  ant to Restatement §§ 145 and 148).

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1   tions."  For instance, in noting that § 148(2)(c) is "as important as, and occupies a

2   position wholly analogous to, the place of the conduct that results in injury to per-

3   sons or tangible things [in Restatement §§ 146 and 147]," § 148, comment *h* ex-

4   plains that § 148(2)(c) ("the place where the defendant made the representations") is

5   meant to encompass ***the defendant's conduct***.[50]  So does the case law applying this

6   factor.[51]  In short, factor (c) pertains to the defendant's conduct in making the repre-

7   sentations at issue—not to the plaintiff's actions in receiving them.[52]

8          The *Bankers* plaintiffs also try to discount the importance of factor (c) in the

9   choice of law analysis by suggesting that the Court cannot conclude at this stage that

10  the challenged representations were made in California.  *See Sterling & Bankers*

11  Opp. at 18.  But it cannot reasonably be disputed that the conduct at issue in the

12  *Bankers* complaint (if true) occurred in California, based on the allegations of the

13  complaint itself and facts this Court can judicially notice.  Specifically, the *Bankers*

14  complaint alleges that Countrywide engaged in a "deceptive scheme" whereby the

15  Company allegedly disregarded its underwriting guidelines "in order to maximize its

16  profits from the sale of . . . loans to the secondary market," *Bankers* Compl. ¶ 10,

17  and that this alleged scheme was allegedly carried out at the direction of Country-

18  wide's executives.[53]  Countrywide's executives indisputably were located in Cali-

19  ─────────────────────
    [50] Likewise, comment *g* to § 148 makes clear that the place of plaintiff's receipt is
20  different from the place where the misrepresentations were made, explaining that the
    place of receipt "constitutes approximately as important a contact as does the place
21  where the defendant made the representations."  Restatement §148, cmt *g*.
    [51] *See, e.g., Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 552 (W.D. Wash. 2008)
22  (concluding Washington had most significant relationship to claims because, under
    § 148(2)(c), the allegedly deceptive and unfair acts originated in Washington, de-
23  spite plaintiffs' reliance elsewhere); *Spirit Partners, LP v. Stoel Rives LLP*, 157 P.3d
    1194, 1201 (Or. Ct. App. 2007) (in analyzing §148(2)(c), stating: "the representation
24  at issue here—defendant's change to the warrant agreement—was made in Oregon .
    . . The fact that plaintiff later received the disputed warrant agreement from Audio-
25  highway does not somehow alter the location of defendant's conduct").
    [52] That the challenged statements were allegedly *disseminated* nationwide, including
26  through the use of EDGAR, *Sterling & Bankers* Opp. at 10 n.3, does not speak to
    "*the place where the defendant made the misrepresentations*."  Conversely, these
27  allegations confirm that the alleged misstatements also were not directed either to
    Plaintiffs or to the state of Florida.
28  [53] *See* CW Op. Br. at 55 (detailing allegations of *Bankers* complaint relating to sup-

                                           40

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1    fornia.  *See* Countrywide Fin. Corp., Annual Report (Form 10-K) (March 1, 2007)

2    (Calabasas, CA is the "[a]ddress of principal executive offices"), Reply RJN Ex.

3    123.[54]  Indeed, faced with a similar complaint, U.S. District Judge Hall transferred

4    *Putnam* to this Court because the "[a]llegations of systemic wrongdoing by a corpo-

5    rate defendant clearly call into issue the conduct of corporate policy makers, who

6    were located at corporate headquarters within the Central District of California."

7    *Putnam Bank v. Countrywide Fin. Corp.*, 3:11-cv-00145, slip op. at 10 (D. Conn.

8    May 16, 2011) (Reply RJN Ex. 147).

9            Furthermore, the gravamen of the *Bankers* complaint is that Countrywide al-

10   legedly misstated the riskiness and credit quality of the mortgage loans backing the

11   MBS certificates that the *Bankers* plaintiffs bought through registration statements,

12   prospectuses and prospectus supplements, term sheets and other written materials

13   issued in connection with the sale and offering of those securities.  The *Bankers*

14   plaintiffs allege that supposed false representations were made both through these

15   documents and through public statements made by Countrywide executives from

16   2004 through 2008.  Virtually all of the alleged conduct underlying their claim (if

17   true) therefore would have occurred where the executives were located and where

18   relevant offering materials were negotiated, approved and issued—in short, in Cali-

19   fornia.  *See id.* at 9-10 (noting that "[t]he documents were approved in and issued

20   out of Countrywide's offices in Calabasas, California"); *accord Allstate Ins. Co. v.*

21   *Countrywide Fin. Corp.*, 2011 WL 2360274, at *1 (S.D.N.Y. June 14, 2011) (trans-

22   ferring case to Central District of California after considering, among other factors,

23   "the locus of operative facts").[55]

24   _____
     posed "deceptive scheme" allegedly carried out by executives).

25   [54] In considering a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), includ-
     ing on grounds of statute of limitations, a court may consider the allegations of the

26   complaint, documents central to the complaint and matters judicially noticed.  *See*
     *Leaton v. Paramount Lake Eola, L.P.*, 2009 WL 1396293, at *1 (M.D. Fla. 2009).

27   [55] In addition, the *Bankers* complaint focuses on the conduct of the Depositor De-
     fendants, *see, e.g., Bankers* Compl. ¶¶ 45-46 (describing Depositor Defendants' role

28   in securitizations of loan pools), all of which the complaint itself alleges were lo-

                                        41

This case is therefore different from the cases cited by the *Bankers* plaintiffs, in which it was uncertain where the conduct took place and the courts accordingly declined to presume on the basis of the defendant's place of business alone that the conduct was committed there. *See Sterling & Bankers* Opp. at 19.[56] Here, however, no presumptions are necessary—the allegations of the *Bankers* complaint itself describe the conduct being challenged in the primary claims and contain more than sufficient facts from which the Court can infer that the conduct originated in California.[57] And the *Bankers* plaintiffs suggest no reasonable alternative as to where Defendants' conduct may have occurred. In sum, given the *Bankers* complaint's focus on allegedly systemic conduct by Countrywide originating in California and allegedly impacting investors nationwide (as opposed to being directed to Florida), and the otherwise minimal relation of the *Bankers* complaint's allegations to the *Bankers* plaintiffs or to Florida, the location of the alleged misstatements under § 148(2) factor (c) points squarely to California and requires application of California law.[58]

---

cated *in California*. *See id.* ¶ 31 (defining CWALT, Inc., CWMBS, Inc., CWABS, Inc. and CWHEQ, Inc. as "Depositor Defendants"); *id.* ¶¶ 27-30 (alleging each of the Depositor Defendants had principal executive offices in Calabasas, California).

[56] For instance, in *Calixto v. BASF Constr. Chems., LLC*, the court, applying Restatement § 145, concluded that it could not determine the substantive law applicable to the plaintiff's claims because it was unclear how and where the defendants tortiously interfered with the plaintiff's contract. 2008 WL 2490454, at *4 (S.D. Fla. 2008).

[57] To the extent that Plaintiffs contend that the significant relationship analysis must *always* be conducted at a later stage, this is clearly incorrect—courts do undertake this analysis at the motion to dismiss stage. *See, e.g., In re Trasylol Prods. Liab. Litig.-MDL-1928*, 2011 WL 2784237, at *2-3 (S.D. Fla. July 13, 2011) (on motion for judgment on the pleadings, conducting significant relationship analysis under Florida borrowing statute).

[58] Plaintiffs are wrong that the Countrywide Defendants contend the mere creation of this MDL requires the application of California law. *Sterling & Bankers* Opp. at 19 n.10. Rather, the Countrywide Defendants have cited decisions transferring cases into the MDL to underscore the point recognized in those decisions that California is the center of gravity for litigation concerning Countrywide MBS because Countrywide's relevant core business activities all occurred in California and the alleged facts (if true) would have occurred in California.

42

B.     **California's Limitations Period Bars Plaintiffs' Claims.**

The Opposition fails to refute that California has the most significant relation-ship to the primary-liability claims in this action for choice of law purposes.  Con-trary to what the *Bankers* plaintiffs may argue, the Countrywide Defendants do not contend that different factors ought to be substituted for those outlined in § 145 and § 148 of the Restatement or that the guidance contained in the Restatement's com-ments should be ignored.  *Sterling & Bankers* Opp. at 15-16.  Rather, the Country-wide Defendants' opening brief appropriately recognizes the factors as providing the framework, and the comments as providing guidance, for the determination of which jurisdiction has the most significant relationship to the parties and the action.  As the Countrywide Defendants explained (CW Op. Br. at 54), the factors are a tool "to determine which sovereign has the most significant contact" based on the facts and circumstances presented in each individual case.  *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1568 (11th Cir. 1990).  But there are no "hard-and-fast rules" to guide the significant relationship test, because such questions "cannot be resolved by reciting general pronouncements."  *Digoia v. H. Koch & Sons, Div. of Wickes Mfg. Co.*, 944 F.2d 809, 812-13 (11th Cir. 1991).  Instead, the analysis requires con-sideration of the facts and circumstances of the particular case to determine what ju-risdiction has the most significant relationship.  *See Valentino v. Bond*, 2008 WL 3889603, at *6 (N.D. Fla. Aug. 19, 2008) ("[T]hese contacts are to be evaluated ac-cording to their relative importance with respect to the particular issue.").[59]

In any event, the *Bankers* plaintiffs provide no *substantive analysis* of the

---

[59] The *Bankers* plaintiffs agree that § 148(2) factors (e) and (f) are not applicable in the instant case.  They do try to argue that factor (d), "the domicil[e], residence, na-tionality, place of incorporation and place of business of the parties," favors Florida. They emphasize that several of the Countrywide Defendants (though having a prin-cipal place of business in California) are organized under the law of states other than California.  Yet in the next breath they try to minimize the fact that factor (d) does not point cleanly to Florida given that one of the *Bankers* plaintiffs is both organized under the laws of, and located in, a state other than Florida.  *See Sterling & Bankers* Opp. at 19-20.

43

1  central question here—which state, California or Florida, has the most significant

2  relationship to the primary-liability claims in this case?  Rather, their argument boils

3  down to nothing more than a conclusory contention that Florida law should apply

4  because more factors favor Florida than favor California.  But courts applying Flor-

5  ida law do not simply add up the Restatement factors and apply "the law of the sov-

6  ereign with the greatest numerical total."  *Judge*, 908 F.2d at 1569.  Indeed, *Valen-*

7  *tino* (the case on which the *Bankers* plaintiffs principally rely) holds that "[t]he pur-

8  pose of the test is not to find the sovereign with the most contacts; rather, the analy-

9  sis is done to determine which jurisdiction has the most 'significant' contacts."

10  2008 WL 3889603, at *6.  "[I]t is the jurisdiction that has the most significant con-

11  tacts rather than the greatest number of contacts whose laws should be applied."  *Id.*

12  at *9.[60]

13      When the Restatement's factors and comments are considered ***in the context***

14  ***of the facts and circumstances of this particular case***, as they must be, they point

15  to California as the state with the most significant relationship to the primary-

16  liability claims in this action.  The vast majority of the *Bankers* complaint details the

17  supposed actions and statements of Countrywide entities and personnel, occurring in

18  California.  *See, e.g., Bankers* Compl. ¶¶ 35-151, 161-86.  Its allegations relate only

19  minimally to the actions of the *Bankers* plaintiffs (in Florida or elsewhere).  Indeed,

20  according to the Complaint, the alleged abandonment of underwriting guidelines

21

22  ―――――――――――――
[60] The Countrywide Defendants acknowledge that comment *j* to Restatement § 148
notes that if the plaintiff acted in reliance on the defendant's representations in a

23  single state, this state will "usually" be the state of the applicable law if the plaintiff
also received the representations in the state, or if the state is the state of the plain-

24  tiff's principal place of business.  But this same comment then cautions that "[n]o
definite rules as to the selection of the applicable law can be stated."  Indeed, were it

25  the case that the state of reliance, plus another factor, is always determinative, then
there would be no need for a balancing test.  Moreover, Florida law (and Illinois

26  law) are clear that there are no "hard-and-fast rules" and the analysis is not meant to
be a counting exercise.  *See Judge*, 908 F.2d at 1569.  With regard to this comment

27  in particular, the Countrywide Defendants further note that one of the *Bankers* plain-
tiffs is incorporated in and has its principal place of business in Louisiana, not Flor-

28  ida.  *Bankers* Compl. ¶ 21.

44

1   was not limited to the specific securitizations purchased by the *Bankers* plaintiffs,

2   but rather affected all of the MBS that Countrywide's subsidiaries issued and that

3   were sold to investors nationally and internationally.  Nor is there any allegation that

4   the alleged misrepresentations at issue were directed to the *Bankers* plaintiffs spe-

5   cifically or to Florida in particular.  Rather, the *Bankers* plaintiffs allege *systemic*

6   conduct occurring over many years by Countrywide in California and representa-

7   tions that were allegedly widely disseminated to investors nationwide.  As the dis-

8   trict court noted in granting the motion to transfer the *Putnam* case to this Court,

9   "[t]he single, individual state with the strongest interest in this action would appear

10  to be California, the state where the primary defendants were located and where the

11  allegedly unlawful activities occurred.  California presumably has a strong interest

12  in allegations of illegal activity on the part of one of its largest financial institu-

13  tions."  Reply RJN Ex. 147 (*Putnam* slip op. at 9-10).[61]  The court's words are en-

14  tirely apt here.

15       Under California's three- and two-year statutes of limitations,[62] plaintiffs'

16  claims are time-barred for the same reasons this Court dismissed the common law

17  ───────────────

18  [61] Contrary to the *Bankers* plaintiffs' suggestion that the guiding principles con-
tained in Restatement § 6 cut in favor of Florida law, *see Sterling & Bankers* Opp. at
16-17 n.8, § 6(c) favors California law because California has an interest in regulat-

19  ing allegations of fraud within its borders.  *See, e.g., Greenberg Traurig of New
York, P.C. v. Moody,* 161 S.W.3d 56, 72-76 (Tex. Ct. App. 2004) (applying New

20  York law because defendant's misrepresentations emanated from New York, where
defendant law firm had offices and performed services; holding that "when evaluat-

21  ing fraud-based claims to determine governing law, the principal focus is where the
conduct occurred" and that New York has "substantial interest in regulating fraudu-

22  lent conduct occurring in New York"); *Kelley,* 251 F.R.D. at 553 (finding, in fraud
case, that "Washington has a unique and substantial relationship with Defendant,

23  one of Washington's largest corporate citizens, and the acts complained of by Plain-
tiffs took place in Washington"); *Spirit Partners,* 157 P.3d at 1201 ("Oregon has a

24  substantial interest in regulating" the conduct of an Oregon firm with respect to
fraud and negligent misrepresentation claims).

25  [62] The *Bankers* plaintiffs argue that their claims for negligent misrepresentation are
subject to a three-year statute, instead of the ordinary two-year statute, given that

26  they are "coupled with fraud claims."  *Sterling and Bankers* Opp. at 15.  But the
*Bankers* plaintiffs expressly disclaim all scienter-based allegations in their negligent

27  misrepresentation claim, *see Bankers* Compl. ¶ 230, undercutting this argument.  As
a result, California's two-year limitations period applies to the *Bankers* plaintiffs'

28  negligent misrepresentation claim.  *See Stichting*, 802 F. Supp. 2d at 1141, n.11.

45

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1   claims in *Stichting* as time-barred.  Like the plaintiff in *Stichting*, Plaintiffs here

2   were on inquiry notice of their claims more than three years before their complaint

3   was filed.[63]  *See* CW Op. Br. at 58-59.[64]

4   ## VI.   **ALL CLAIMS IN *STERLING* ARE TIME-BARRED.**

5          Sterling's claims are time-barred by both Illinois and California law.[65]

---

[63] The Countrywide Defendants have not, as Plaintiffs suggest, conceded that Plaintiffs' claims are timely under Florida law.  Rather, the Countrywide Defendants have argued that California law applies given that California has the most significant relationship to this action.  Assuming for argument's sake only that Florida law governed, which it does not, the *Bankers* plaintiffs' claims would still be barred.  Under Florida law, claims for fraud and negligent misrepresentation must be brought within four years from the time "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence."  FLA. STAT. §§ 95.11(3)(j), 95.031(2)(a); *Valentino*, 2008 WL 3889603, at *8.  "[T]he limitations period for fraud begins to run when a plaintiff has notice of the 'possible invasion of his legal rights' and it is not imperative that the plaintiff know all elements of the cause of action," including defendant's alleged fraudulent intent.  *See Korman v. Iglesias*, 825 F. Supp. 1010, 1015 (S.D. Fla. 1993); *Breitz v. Lykes-Pasco Packing Co.*, 561 So.2d 1204, 1205 (Fla. Dist. Ct. App. 1990).  Here, the alleged facts that form the basis of the *Bankers* plaintiffs' claims were reported in numerous public sources more than four years prior the filing of this case (i.e., prior to July 22, 2007).  *See* public reports and other disclosures collected in App. 3.  Accordingly, their claims with respect to the six securities allegedly purchased prior to July 22, 2007 would be time-barred under Florida law and must be dismissed.  Plaintiffs' claims based on the 13 remaining purchases—all but one of which were made between March and July of 2008—would be barred for lack of reliance because reliance is not possible where information inconsistent with the claimed misstatement has become public.  *See, e.g., Cmty. Mar. Park Assocs., Inc. v. Maritime Park Dev. Partners, LLC*, 2011 WL 2790185, at *4 (N.D. Fla. July 14, 2011) (describing reliance element of fraud claim); *Pan Am. W., Ltd. v. Cardinal Commercial Dev., LLC*, 50 So.3d 68, 72 (Fla. Dist. Ct. 2010) (describing reliance element of negligent misrepresentation claim); *Stichting*, 802 F. Supp. 2d at 1136-37 (reasonable MBS investor should have discovered "by late 2007 or early 2008" that "Countrywide wholly abandoned its underwriting standards").

[64] To the extent that Louisiana's limitations period applies to the claims of Louisiana-based plaintiff BSIC, those claims also would be barred.  Under Louisiana law, fraud and negligent misrepresentation claims are subject to a one-year limitations period, *Shermohmad v. Ebrahimi*, 945 So.2d 119, 122 (La. Ct. App. 2006) (fraud); *Aetna Cas. & Sur. Co. v. Stewart Constr. Co., Inc.*, 780 So.2d 1253, 1256 (La. Ct. App. 2001) (negligent misrepresentation), and fraud claims brought more than one year after a plaintiff "was aware or should have been aware of the alleged damage" are barred.  *Shermohmad*, 945 So.2d at 122.  At the latest, BSIC was aware or reasonably should have been aware of its alleged damage by late 2007 or early 2008.  *See Stichting*, 2011 WL 3558173, at *12 (damage arises at date of alleged misstatement).

[65] Sterling does not dispute that its claims must be timely under *both* the forum state's (Illinois') statute of limitations and any statute of limitations that the forum state borrows from another jurisdiction in accordance with the forum state's borrowing statute.  *See* CW Op. Br. at 59.

46

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

**A.**   **Sterling's Claims Are Time-Barred Under Illinois Law.**

Sterling concedes that its claims based on three of its four purchases are time-barred by the five-year repose period of 815 ILL. COMP. STAT. 5/13(D).[66] *Sterling & Bankers* Opp. at 3; *see also* CW Op. Br. at 60-62.  Sterling's claims with respect to its one remaining purchase (of CWALT 2006-26CB A19, allegedly on November 6, 2006), *Sterling* Compl. at 77-78 n.11, also should be dismissed under Illinois' three-year statute of limitations given Sterling's failure to plead facts sufficient to invoke the equitable tolling exception contained in the Illinois Securities Law.  Unless tolled, the Illinois Securities Law required the claims to be brought within three years of the date of sale.[67]  Sterling has alleged no facts whatsoever regarding when it discovered the alleged violations, any efforts undertaken to discover the alleged violations, or why the exercise of reasonable diligence would not have led to the discovery of the alleged violations.  Nor does Sterling allege anything remotely resembling fraudulent concealment by any Defendant.

Sterling does not dispute that it was required to plead specific facts to invoke the Illinois statute's equitable tolling provision and in fact concedes that its complaint is deficient in this regard when it states:  "Given that Sterling did not predict a challenge to the timeliness of its common law claims, and the need to pleading [sic] allegations supportive of equitable tolling, allegations can be supplied via an amended pleading." *Sterling & Bankers* Opp. at 14.  Because Sterling did not file its action until March 23, 2011 (more than three years after its purchase), and because Sterling has failed to plead any facts supporting equitable tolling, its claims

---

[66] These purchases are: CWALT 2004-15 2A2 (purchased 9/30/04); CWMBS 2004-22 M (purchased 10/29/04); and CWMBS 2005-HYB6 5A2 (purchased 10/25/05). *Sterling* Compl. at 2 & ¶ 6.
[67] *See Rein v. David A. Noyes & Co.*, 595 N.E.2d 565, 568 (Ill. App. Ct. 1992) (equitable tolling provision of 815 ILL. COMP. STAT. 5/13(D) may extend the three year limitations period by up to two years, "provided that plaintiffs properly allege and demonstrate the requisite grounds"); *Frank E. Basil, Inc. v. Liedesdorf*, 713 F. Supp. 1194, 1201 (N.D. Ill. 1989) (Illinois' tolling principles require a plaintiff to plead both due diligence and fraudulent concealment).

47

1   based on its November 2006 purchase are time-barred.[68]

2   **B.   <u>Sterling's Claims Are Time-Barred Under California Law</u>.**

3   **1.   <u>Illinois' Borrowing Statute Applies</u>.**

4   Sterling argues that Illinois' borrowing statute, 735 ILL. COMP. STAT. 5/13-

5   210, is inapplicable (and, in turn, that conducting the significant relationship analy-

6   sis is unnecessary) because Sterling must be considered a resident of Illinois given

7   its alleged place of business in Illinois.[69]  *Sterling & Bankers* Opp. at 3-6.  For pur-

8   poses of the Illinois borrowing statute, however, a corporation is considered a resi-

9   dent only of the state in which it is incorporated" and "is not considered a resident of

10  the state in which it has its principal place of business or the state where it is li-

11  censed to do business."  *Employers Ins. of Wasau v. Ehlco Liquidating Trust*, 723

12  N.E.2d 687, 693 (Ill. App. Ct. 1999).  Here, Sterling is not incorporated in Illinois—

13  it is incorporated under federal law.

14  Sterling argues that the Court should apply the federal statutory standard for

15  assessing citizenship for diversity jurisdiction purposes found in 12 U.S.C. §

16  1464(x) (stating that a federally chartered savings bank is a citizen of its "home

17  state" for diversity purposes).[70]  *Sterling & Bankers* Opp. at 5.  But application of

18  _____

19  [68] Even if Sterling had invoked equitable tolling in its complaint (which it did not),
    its claims based on the November 6, 2006 purchase nevertheless would be barred
20  under the statute's inquiry notice standard.  Sterling reasonably should have discov-
    ered the facts underlying its claims no later than January 2008—more than three
21  years before the filing of the Complaint.  *See* CW Op. Br. at 61-62, n.66.  The Coun-
    trywide Defendants respectfully acknowledge this Court's holding in *Allstate* that
22  the Illinois Securities Law requires a plaintiff to have had actual knowledge of facts
    that should have triggered an investigation that in turn would have unearthed actual
23  knowledge of a violation, as opposed to inquiry notice of its claim.  *See* CW Op. Br.
    at 62 n.66.  In any event, these claims must be dismissed because they are untimely
24  under California's limitations period, which the Illinois borrowing statute requires
    Plaintiff to have met.  *See infra* at 50-52.

25  [69] Illinois' borrowing statute is applied only when none of the parties are Illinois res-
    idents.  *See* CW Op. Br. at 62-63.

26  [70] Sterling argues that this Court should, in the alternative, apply the "localized"
    conduct test (which, Sterling claims, prior to the enactment of § 1464(x), was the
27  test for determining citizenship for diversity purposes).  But Sterling itself acknowl-
    edges that it has found no case applying the "localized conduct" test outside of a di-
28  versity jurisdiction analysis.  *Sterling & Bankers* Opp. at 4-5.

48

1   the Illinois borrowing statute—as interpreted by Illinois courts—turns not on no-

2   tions of citizenship (much less citizenship for federal diversity jurisdiction), but on

3   the place of incorporation.  And there is no dispute that Sterling is incorporated not

4   under Illinois law, but under federal law.  In making this argument, Sterling also

5   misinterprets *LeBlanc v. G.D. Searle & Co.*, 533 N.E.2d 41, 42 (Ill. App. Ct. 1988),

6   in which the court held that "a corporation like a natural person must have a legal

7   residence," incorrectly arguing that this language means that legal residence must be

8   in a ***state***.  *Sterling & Bankers* Opp. at 5.  In fact, however, this language is part of a

9   broader discussion that makes clear that a corporation's legal residence can be either

10  a "***state or a country***."  *LeBlanc*, 533 N.E.2d at 42-43.  Indeed, in *Ehlco*, 723 N.E.2d

11  at 699, the Illinois Court of Appeals described *LeBlanc* as holding that "the resi-

12  dency of a corporation is the state *or country by and under whose laws it was organ-*

13  *ized.*" (Emphasis added.)  Here, Sterling is "a federal savings bank chartered under

14  the laws of the United States," *Sterling* Compl. ¶ 19, and is thus a resident of the

15  United States and not of any state.  *See* 12 U.S.C. § 1464(a)(1); *Lehman Bros. Bank,*

16  *FSB v. Frank T. Yoder Mortg.*, 415 F. Supp. 2d 636, 642 (E.D. Va. 2006)

17  ("[F]ederally chartered corporations . . . have no state of incorporation.").

18      Sterling also ignores the fact that Illinois courts specifically have declined to

19  apply the test for assessing "citizenship" for federal diversity jurisdiction purposes

20  to the Illinois borrowing statute.[71]  Indeed, courts have squarely held that "[t]he

21  mere fact that a [foreign] corporation has its principal office in a particular state,

22  does not make it a resident of that state," *LeBlanc*, 533 N.E.2d at 43:

23      [O]ur legislature has left our borrowing statute intact notwithstanding the ju-

---

[71] Illinois courts have limited residency for purposes of Illinois' borrowing statute to place of incorporation, declining, for example, to treat as an Illinois resident either (i) a corporation incorporated in another state but with a principal place of business in Illinois or (ii) an entity organized under the laws of another country.  *See Le-Blanc*, 533 N.E.2d at 44 (borrowing statute applied to a corporation which had principal place of business in Illinois but which was incorporated in Delaware); *Sabena Belgian World Airways v. United Airlines, Inc.*, 1991 WL 78175, at *2 (N.D. Ill. May 7, 1991) (borrowing statute applied to a Belgian corporation).

1   dicially created residency exception in favor of Illinois residents . . . .  Had

2   the legislature intended to make foreign corporations, either doing business

3   in Illinois or having their principal place of business here, residents for pur-

4   pose of the borrowing statute, it could easily have done so.

5   *Id.* at 44.  Because Sterling is not an Illinois resident within the meaning of the Illi-

6   nois borrowing statute, and no Defendant resides in Illinois, the Illinois borrowing

7   statute applies and requires consideration of California's limitations periods.

8   ## 2.   **California's Law Bars Sterling's Claims.**

9       The *Sterling* complaint is nearly identical to the *Bankers* complaint, which

10  was filed by the same counsel.  Like the *Bankers* plaintiffs, Sterling predictably ar-

11  gues that the claims based on its remaining 2006 purchase are not time-barred under

12  California law because either:  (i) it is premature for this Court to determine whether

13  California or Illinois has the most significant relationship to the parties and the ac-

14  tion; or (ii) this determination would not be premature, and its complaint contains

15  sufficient allegations to conclude that Illinois' statute of limitations, as opposed to

16  California's, applies.[72]  *Sterling & Bankers* Opp. at 7.  For the same reasons that

17  California has the most significant relationship to the primary-liability claims in the

18  *Bankers* action, making California law applicable under Restatement § 148(2)(c),[73]

19  California's limitations periods apply to the essentially identical *Sterling* complaint.

20  *See* CW Op. Br. at 64-65.[74]

---

21  [72] Like the *Bankers* plaintiffs, Sterling concedes that the Complaint does not allege
22  where the alleged misrepresentations were received or allegedly relied upon.  *See Sterling & Bankers* Opp. at 9.

23  [73] Sterling argues that Restatement § 148(2)(c) ("[t]he place where the defendant made the misrepresentations") should be viewed as favoring the application of Illi-
24  nois law or, alternatively, as neutral at this stage of the proceeding.  *Sterling & Bankers* Opp. at 9-10.  For the same reasons addressed above in regard to *Bankers*,
25  *supra* at 39-42, the application of Restatement § 148(2)(c) points to California (where the alleged misconduct occurred) and not (as Sterling and the *Bankers* plain-
26  tiffs both argue) where the plaintiff received the representations.

27  [74] Countrywide does not contend that a presumption for "the place where the mis-
    representations were made *supplants* the place-of-loss presumption" in *Townsend v.*
    *Sears, Roebuck and Co.*, 879 N.E.2d 893, 903 (Ill. 2007).  *Sterling & Bankers* Opp.
28  at 7-8 (emphasis added).  Rather, what Countrywide explained in its opening brief is

50

1    Like the *Bankers* plaintiffs, Sterling does not explain how application of the

2  Section 148 factors would weigh in favor of applying Illinois law over California

3  law, but instead simply asserts that "more than two of the contacts for Sterling are

4  located in Illinois, not California." *Sterling & Bankers* Opp. at 13.[75]  Yet Illinois

5  courts have rejected this sort of numerical approach because a simple tally of sup-

6  posed "contacts" does not adequately account for the various interests potentially at

7  stake. *See Morris B. Chapman & Assocs., Ltd. v. Kitzman*, 716 N.E.2d 829, 837 (Ill.

8  App. Ct. 1999).[76]  When the Restatement's factors and comments are considered in

9  the context of the allegations in this case (as in *Bankers*), they point to California as

10  having the most significant relationship to the parties and Sterling's primary-liability

11  claims.  This is because (among other things):  (i) the *Sterling* complaint focuses on

12  the allegedly systemic conduct of Countrywide occurring in California, and its alle-

13  gations relate only minimally to the actions of Sterling; (ii) California was the hub

14  of the Countrywide Defendants' loan origination and MBS-related activity (and the

15  location where the allegedly misleading offering materials were negotiated, ap-

16  proved and issued) as well as where Countrywide was alleged to have masterminded

17

18  that, when considering fraud allegations—which *Townsend* did not involve—"the
  place of the loss *is less important* than the place the defendant allegedly made the

19  misrepresentations."  CW Op. Br. at 64 (citing *First Nat'l Bank of Boston v. Heuer*,
  702 F. Supp. 173, 175 (N.D. Ill. 1988) (emphasis added).  Indeed, as courts in Illi-

20  nois, Florida and elsewhere have held, the Restatement's significant relationship test
  does not set forth a definitive rule or presumption, but rather a tool for evaluating

21  which state has the most significant relationship to the particular case based on the
  weighing of the enumerated factors.  In this case, California's relationship out-

22  weighs that of Illinois or any other state.

23  [75] Like the *Bankers* plaintiffs, Sterling argues that § 148's comments reflect that fac-
  tor (d) ("the domicil[e], residence, nationality, place of incorporation and place of

24  business of the parties") favors Illinois.  But Illinois courts have viewed this factor
  as a "wash" where a plaintiff is located or incorporated in one jurisdiction and the

25  defendant in another.  *Townsend*, 879 N.E.2d at 906.

26  [76] Although § 148's comments guide the analysis of which jurisdiction has the most
  significant relationship to the parties and the action, Illinois courts have held that

27  this analysis must be conducted with reference to the interests and policies of the po-
  tentially interested jurisdictions and must be informed by the particular allegations

28  in the case.  It is not simply an exercise in totaling up contacts.  *See Kitzman*, 716
  N.E.2d at 837.

51

1  the supposedly deceptive scheme;[77] and (iii) there is no allegation that the represen-

2  tations at issue were directed to Sterling or Illinois in particular.[78]

3       In short, California's three-year limitations period applies, and Sterling's

4  claims are time-barred because it was on inquiry notice of its claims more than three

5  years before it sued.  *See* CW Op. Br. at 66; *Stichting*, 802 F. Supp. 2d at 1140-41.

6  **VII.  SEALINK LACKS STANDING AND ITS CLAIMS ARE TIME-
7  BARRED IN ANY EVENT.**

8      **A.    Sealink Has No "Injury In Fact" That Would Confer Standing.**

9       Sealink does not dispute the public statements it made in its year-end 2009 fi-

10  nancial statements that it is being held harmless as against potential "losses" on its

11  MBS holdings and also has received a guarantee as against potential "payment de-

12  faults" on those MBS:

13      *[A]ny losses* made by the Company are ultimately borne by the Loan hold-

14      ers.  The Company has *also* been furnished with a €2.75 billion guarantee

15      which results in the Guarantor assuming *all indirect and direct risks* in *rela-*

16      *tion to payment defaults on the portfolio assets* up to this amount.

17  RJN Ex. 116 at 7 (emphasis added); *accord id.* at 10 ("[A]ll losses made by the

18  Company will ultimately be borne by the loan holders.").  And the *Sealink* Opposi-

19  tion confirms that "[a]s part of the financing agreement" with the various German

20  banks, "Sealink pays the Free State of Saxony for a guarantee on up to €2.75 billion

21  in actual payment defaults (*i.e.*, realized principal and interest payment shortfalls)

22  that the MBS portfolio incurs." *Sealink* Opp. at 5-6.  Thus, by its own words,

23  Sealink demonstrates that it cannot incur an "injury in fact . . . by the showing of a

24

25  [77] *See* CW Op. Br. at 65 (detailing allegations of *Sterling* complaint relating to sup-
posed "deceptive scheme" allegedly carried out by executives).

26  [78] *See Putnam* slip. op., Reply RJN Ex. 147 at 9-10 (transferring case because Cali-
fornia is "[t]he single, individual state with the strongest interest in th[e] action,"

27  given that the alleged conduct occurred in California and in light of California's
"strong interest in allegations of illegal activity on the part of one of its largest fi-

28  nancial institutions").

1   pecuniary injury." *Bullfrog Films, Inc. v. Wick*, 847 F.2d 502, 506 (9th Cir. 1988)

2   (cited by Sealink); *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)

3   (injury in fact an "irreducible constitutional minimum").

4        Neither of the two arguments Sealink makes in the Opposition supplies the

5   missing injury in fact.  First, Sealink argues that it has standing as an assignee to

6   "pursue the claims at issue" because it supposedly "stands in the shoes of the injured

7   SPVs." *Sealink* Opp. at 6-11.  Even assuming that the SPVs have assigned their

8   claims to Sealink, as Sealink argues, the fact that Sealink has received guarantees *as*

9   *to those claims* that shift from it to German lenders and guarantors "any losses" and

10  "all indirect and direct risks" *as to those claims* makes it impossible for Sealink to

11  incur an injury in fact.  Sealink's citation of cases in which the assignee had stand-

12  ing to bring the assignor's claims is therefore misplaced,[79] because the German

13  lenders and guarantors—not the assignor SPVs—are the only parties here that could

14  incur losses as to Sealink's claims here.  *See Steele v. Hosp. Corp. of Am.*, 36 F.3d

15  69, 70 (9th Cir. 1994) (plaintiffs lacked standing where non-party insurers—not

16  plaintiffs—"suffered financial loss").

17        Second, Sealink argues that its public disclosure that these German banks will

18  cover "*all* losses" actually means that they will cover only *some* losses—"actual

19  payment shortfalls, not losses resulting from fraud." *Sealink* Opp. at 10.  But the

20  plain language of Sealink's public statements does not support this argument.  First,

21  "all" means all and not "some"—there is nothing in the public statements that sug-

22  gests any ambiguity or that would support a contrary inference.  Second, if the refer-

23  ence to "all losses" meant only "payment defaults," there would have been no rea-

---

24  [79] *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.,* 554 U.S. 269, 272 (2008)

25  (analyzing assignee's standing where assignor—not another third-party—could in-
    cur losses); *Perkumpulan Investor Crisis Ctr. Dressel-WBG v. Regal Fin. Bancorp,*

26  *Inc.,* 781 F. Supp. 2d 1098, 1103 n.1 (W.D. Wash. 2011) (same); *Pro Bono Inv., Inc.*
    *v. Gerry,* 2008 WL 4755760, at *15 (S.D.N.Y. Oct. 29, 2008) (same); *Banque Arabe*

27  *et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 152-53 (2d Cir.
    1995) (same); *Stewardship Credit Arbitrage Fund LLC v. Charles Zucker Culture*

28  *Pearl Corp.,* 2011 WL 1744217, at *5 (N.Y. Sup. Ct. May 4, 2011) (same).

1    son for Sealink to have made the separate and additional disclosure that it "also" had

2    received a "€2.75 billion guarantee" as against "payment defaults on the portfolio

3    assets."  RJN Ex. 116 at 7.  The effect of the German banks holding Sealink harm-

4    less against "all losses" coupled with their guarantee as against any "payment de-

5    faults" means that Sealink will not incur any injury-in-fact from these MBS.[80]

6        **B.    Sealink Was On Notice Of Its Claims By The End Of 2007.**

7        Sealink's disclosure that German banks will bear "all losses" and guarantee

8    against all "payment shortfalls" also makes Germany's three-year limitations period

9    for tort claims applicable, under which its claims are time-barred.  Sealink originally

10   sued in New York.  New York's borrowing statute borrows the limitations law of

11   the location where the claim "accrued," and a claim for borrowing statute purposes

12   "accrues where the injury is sustained."  *Allstate*, 2011 WL 5067128, at *8.  Here,

13   Sealink has admitted publicly that any injury will be incurred in Germany as a result

14   of the hold-harmless agreement and payment guarantee received from the German

15   banks.  Although injury is often sustained in the place where the plaintiff resides,

16   courts have held in several cases that injury for purposes of the borrowing statute

17   can accrue away from the plaintiff's residence after considering "all relevant factors

18   in determining where the loss is felt."  *Lang v. Paine, Webber, Jackson & Curtis,*

19   *Inc.*, 582 F. Supp. 1421, 1425-26 (S.D.N.Y. 1984); *accord Gordon & Co. v. Ross,*

20   63 F. Supp. 2d 405, 408 (S.D.N.Y. 1999) (finding that plaintiff partnership felt

21

22   [80] Whether an investor in MBS as a legal matter may recover for alleged losses aris-
     ing from market value declines (as opposed to losses arising from shortfalls in re-

23   quired payments from the MBS itself) is a legal issue this Court need not resolve on
     this motion.  *See generally AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC*,

24   646 F. Supp. 2d 385, 403 (S.D.N.Y. 2009) ("presumption that shares [of common
     stock] are purchased for the purpose of investment and their true value to the inves-

25   tor is the price at which they may later be sold" does not apply to MBS investors);
     *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 743 F. Supp. 2d

26   288, 292 (S.D.N.Y. 2010) ("Because NECA made an investment [in MBS] that it
     knew might not be liquid, it may not allege an injury based upon the hypothetical

27   price of the Certificates on a secondary market at the time of suit.").  Nothing in
     Sealink's public disclosures limits it to recovery as against the German banks to one

28   type of claimed loss or the other.

1  "economic impact" of fraud in Massachusetts, where partners who bear the risk of

2  loss reside).[81]

3        Sealink's claims are untimely under Germany's three-year limitations period,

4  which begins to run at the end of the year in which the plaintiff obtains knowledge

5  (or would have obtained knowledge but for its own gross negligence) of the relevant

6  factual circumstances giving rise to the claim and the responsible party's identity.

7  *See* Reply Declaration of Thomas Buhl ("Buhl Reply Decl.") ¶¶ 3, 6; Declaration of

8  Michael Neises in Support of Plaintiff's Opposition to Defendants' Motion to Dis-

9  miss ¶ 5 ("Neises Decl.").[82]  Press reports and publicly filed complaints may form

10  the basis of a plaintiff's knowledge.  For example, the Higher Regional Court of

11  Munich found in an analogous fraud case that plaintiffs' claims were time-barred

12  because numerous newspapers and magazines had reported on the underlying facts

13  more than three years before plaintiffs filed their complaint.  Buhl Reply Decl. ¶ 5.

14        The same is true here.  Sealink sued on September 29, 2011, and Sealink

15  knew (or was grossly negligent in not knowing) of its potential claims against Coun-

16  trywide by the end of 2007 because of numerous contemporaneous press reports and

17  _____

18  [81] None of the cases Sealink cites (*Sealink* Opp. at 12-14) involved a situation like that in this case where all risks and losses will arise away from the plaintiff's resi-

19  dence.  And the cases it cites acknowledge that there can be circumstances where injury will arise in a place other than plaintiff's residence.  *See, e.g.*, *Appel v. Kid-*

20  *der, Peabody & Co.*, 628 F. Supp. 153, 156 (S.D.N.Y. 1986) (injury is sustained "where the economic impact of the defendant's conduct is felt, *usually but not in-*

21  *variably* at the plaintiff's place of residence") (emphasis added)); *Gorlin v. Bond Richman & Co.*, 706 F. Supp. 236, 240 n.8 (S.D.N.Y. 1989) (noting absence of "un-

22  usual circumstances which require a deviation" from usual rule that economic im-pact is felt at plaintiff's place of residence).

23  [82] Although the Neises Declaration states that different limitations periods apply to different instances of a tort (Neises Decl. ¶ 6), Sealink does not allege in its com-

24  plaint (or identify in its opposition papers) any facts that would support the applica-tion of multiple limitations periods.  And its own foreign law declaration (which

25  states that knowledge of facts sufficient to "file a law suit which has a reasonable chance of success" is enough (Neises Decl. ¶ 5)) contradicts the proposition for

26  which Sealink cites *Studio & Partners, s.r.l. v. KI*, 2008 WL 426496 (E.D. Wis. Feb. 14, 2008) (*Sealink* Opp. at 16 n.8) (German law supposedly requires knowledge of

27  "*all* facts that give rise to a claim").  In any event, the *Studio* court primarily consid-ered the *Italian* statute of limitations and did not endorse plaintiff's argument as to

28  German law or any interpretation of German law.

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS

1    publicly-filed complaints.  Indeed, this Court in *Stichting* found that "[t]he press and
2    numerous widely reported lawsuits" put plaintiff in that case on notice of virtually
3    identical claims.  *Stichting*, 802 F. Supp. 2d at 1137.  Sealink in its opposition brief
4    does not address these 2007 complaints and press reports even though they involve
5    the same underlying conduct that forms the basis of Sealink's claims here:

6        •    *2007 complaints.*  Sealink does not address the several complaints that
7    were filed in 2007 against Countrywide (including *Argent* (Oct. 2007), *Arkansas*
8    *Teacher* (Oct. 2007), *Luther* (Nov. 2007), and several other putative securities class
9    action complaints filed beginning August 2007).[83]  Each of those complaints made
10   virtually the same allegations (including allegations about Countrywide's loan
11   origination practices) as the complaint Sealink filed four years later in 2011, as de-
12   scribed at length in Countrywide's opening brief.  *See* CW Op. Br. at 72-74; Appen-
13   dix 15.  Rather, Sealink ignores those complaints, cherry-picks certain 2008 events
14   noted in the *Stichting* decision, and incorrectly argues that "[t]his Court has repeat-
15   edly recognized that reasonable investors could not have known about Country-
16   wide's fraud relating to its sale of MBS before early 2008."  *Sealink* Opp. at 15.
17   This Court has done no such thing.  Although it considered post-2007 facts that put
18   the *Stichting* plaintiff on notice of its claims by "early 2008" and "at least prior to
19   February 14, 2009," it did not announce an exact date on which a Countrywide MBS
20   investor should have been on notice.  *Stichting*, 802 F. Supp. 2d at 1136, 1139.
21   Rather, after considering *Argent*, *Arkansas Teacher*, *Luther*, and other publicly
22   available information, the Court held that "[t]he press and numerous widely reported
23   lawsuits had made exactly this allegation [*i.e.*, that Countrywide allegedly had aban-
24   doned its underwriting standards and packaged unexpectedly risky loans into MBS]
25

26   _____
     [83] *See* CW Op. Br. at 72 n.75 (citing *Saratoga Advantage Trust v. Countrywide Fin.
     Corp.*, No. 07-CV-06635 (C.D. Cal. Oct. 11, 2007) (RJN Ex. 77); *Norfolk Cnty. Ret.*
27   *Sys. v. Countrywide Fin. Corp.*, No. 07-CV-05727 (C.D. Cal. Aug. 31, 2007) (RJN
     Ex. 76); *Pappas v. Countrywide Fin. Corp.*, No. 07-CV-05295 (C.D. Cal. Aug. 14,
28   2007) (RJN Ex. 75)).

by the end of 2007."[84]  *Id.* at 1137.  The fact that all these plaintiffs—on the basis of then publicly-knowable information—made the same allegations in multiple suits in 2007 that Sealink made four years later is indisputable evidence that Sealink should have sued sooner.  Like all these other plaintiffs, Sealink either knew this same information or would have known it but for its own gross negligence.

- • *Press reports.*  In addition to these complaints that made precisely the same allegations found in the complaint Sealink filed more than three years later, Sealink also had notice of its potential claim against Countrywide from the public press reports that this Court considered in *Stichting* (which Sealink ignores in its opposition).  *See* CW Op. Br. at 74.  These reports were prevalent throughout the world in 2007, as the chart below demonstrates:

| Press Reports | Allegations in Report that Underlie Sealink's Claim |
|---|---|
| **February 17, 2007**<br>*The Economist*, "Bleak Houses."  Reply RJN Ex. 136. | "But as interest rates have climbed, these *loans have soured and the shares of bigger subprime lenders, such as Countrywide Financial and IndyMac, have sagged.*"<br>"*[Mortgage lenders] loosened their lending standards as the demand for loans started to drop in 2004.* They also resorted to 'alternative' products with enticing terms and off-putting names, such as 'negative-amortisation' loans (which set repayments so low that the debt gets bigger) or 'hybrid' adjustable-rate mortgages (with low teaser rates that jump after a few years). About 27% of all mortgages made in 2006 were of such non-traditional kinds." (emphasis added). |
| **February 27, 2007**<br>*The Wall Street Journal*, "Subprime Game's Reckoning Day – Risky Lending Fallout Threatens to Spread; Uncertain ARM Strength." Reply RJN Ex. 137. | "There also is a concern that if the real-estate market remains cool, some borrowers with better credit histories might also begin struggling to make payments on certain popular, but unorthodox, |

---

[84] *See Stichting*, 802 F. Supp. 2d at 1139 ("[P]ublic press reports and earlier-filed lawsuits placed Plaintiff on notice regarding the scienter element of its claim."); *accord Allstate*, 2011 WL 5067128, at *11 ("[A] sufficient inference of scienter exists to support the allegation that Countrywide knew that it had abandoned its underwriting standards.").

| Press Reports | Allegations in Report that Underlie Sealink's Claim |
|---|---|
| | mortgages.  *These types of loans allow borrowers to skip monthly payments, carry low short-term teaser rates or don't require detailed financial documentation.  If that happens, companies such as BankUnited Financial Corp. and Countrywide Financial Corp. could suffer.*" (emphasis added). |
| **July 25, 2007** *Los Angeles Times*, "Even Best Borrowers Are Falling Behind, Lender Says; Countrywide's Profit and Stock Price Fall as More 'Prime' Mortgage Holders Miss Payments." Reply RJN Ex. 138. | "*Countrywide Financial Corp. helped trigger a Wall Street sell-off Tuesday* when it said that a growing number of customers once considered to be good credit risks were having trouble making their mortgage payments.  Until recently, such problems had been almost exclusively limited to the so-called sub-prime market, for borrowers with flawed credit records and high-cost mortgages.  *But Countrywide, the nation's biggest home loan company, reported Tuesday that it was seeing more of its good credit 'prime' borrowers do the same.*" (emphasis added). |
| **August 1, 2007** *International Herald Tribune*, "US Mortgage Woes Spread Deeper; German Bank's Securities Freefall Rattles Markets in Europe." Reply RJN Ex. 139. | "The developments are the latest indications that the housing slump will affect a broader segment of the mortgage industry and that the problems will last longer than many officials had suggested earlier this year. Just last week, the nation's biggest home lender, *Countrywide Financial, acknowledged that defaults on second mortgages to prime borrowers were rising quickly.*" (emphasis added). |
| **August 26, 2007** *The New York Times*, "Inside the Countrywide Lending Spree."  RJN Ex. 112. | "[F]ew companies benefited more from the mortgage mania than Countrywide . . . [T]he company is Exhibit A for the lax and, until recently, highly lucrative lending that has turned a once-hot business ice cold and has touched off a housing crisis of historic proportions.  '*In terms of being unresponsive to what was happening, to sticking it out the longest, and continuing to justify the garbage they were selling, Countrywide was the worst lender,*' said Ira Rheingold, executive director of the National Association of Consumer Advocates.*" |

58

| Press Reports | Allegations in Report that Underlie Sealink's Claim |
|---|---|
| | (emphasis added). |
| **September 3, 2007**<br>*Los Angeles Times*, "Countrywide's Confident Tone Turned to Crisis." RJN Ex. 111. | "Countrywide's financial reports and recent comments by Mozilo and other executives show that the company, the nation's largest mortgage lender, has been less a role model in the home-loan market than a prisoner of competitive trends. Delinquency and foreclosure rates have soared on many Countrywide loans, including mortgages that were thought to be relatively sound, such as home-equity lines of credit. The tone of executives' comments has gone from complacent to almost apocalyptic . . . *Countrywide suggests that mortgage pricing and underwriting standards during the housing boom were set by the most aggressive—that is, least rigorous—lenders, and that it was all but powerless to impose its own standards.*" (emphasis added). |
| **September 5, 2007**<br>*Financial Times*, "Distressed Debt Relief." Reply RJN Ex. 140. | "Already, the subprime crisis is spawning new sources of distressed debt. New Century Financial and two Bear Stearns hedge funds have filed for bankruptcy protection. *Countrywide Financial caused jitters when it tapped lines of credit in August. With fraud allegations starting to surface in the US mortgage market, investors need to know whether the claims they are buying could prove worthless.*" (emphasis added). |
| **October 27, 2007**<br>*The Guardian*, "Countrywide Upbeat Despite $1bn Sub-prime Hit." Reply RJN Ex. 141. | "In a fresh sign of the severity of America's home loans crisis, Countrywide took a $1bn one-off charge to cover its exposure to *mortgage-backed securities which collapsed in value as the capital markets seized up over the summer.* The firm accounts for one in seven American mortgages and it led the industry in providing high-risk loans to less affluent families. *Many of these deals offered an initial period of discounted 'teaser' rates which are now expiring, leaving customers unable to meet repayments.*" (emphasis added). |

59

| Press Reports | Allegations in Report that Underlie Sealink's Claim |
|---|---|
| *December 14, 2007*<br>*The International Herald Tribune*, "Additional Scrutiny for Countrywide Financial." Reply RJN Ex. 142. | *"The Illinois attorney general is investigating the home loan unit of Countrywide Financial* as part of the state's expanding inquiry into dubious lending practices that have trapped borrowers in high-cost mortgages they can no longer afford."* (emphasis added). |

In short, these complaints and publications put Sealink on notice by December 31, 2007 that it had a potential lawsuit against Countrywide.[85] As in both *Stichting* and *Allstate*, Sealink's claims are time-barred as a matter of law.

### C.   Under New York Law, Sealink's Negligent-Misrepresentation Claim Is Subject To A Three-Year Limitations Period.

New York's three-year limitations period applies to Sealink's negligent-misrepresentation claim because Sealink's complaint "expressly disclaims any claim of fraud or intentional misconduct." *Sealink* Compl. ¶ 153; *see* CW Op. Br. at 75-76. Although Sealink argues—in a footnote—that the six-year limitations period for fraud applies, *Sealink* Opp. at 17 n. 11, none of the cases it cites involved a similar fraud disclaimer, much less support that argument. In view of Sealink's express fraud disclaimer here, its negligent-misrepresentation claim (Count IV) is time-barred under New York law.

Dated:  February 3, 2012

**GOODWIN PROCTER LLP**

/s/ Brian E. Pastuszenski
Brian E. Pastuszenski (*pro hac vice*)
Lloyd Winawer (State Bar No. 157823)
Inez H. Friedman-Boyce (*pro hac vice*)
Brian C. Devine (State Bar No. 222240)
Caroline H. Bullerjahn (*pro hac vice*)

*Counsel for the Countrywide Defendants*

---

[85] None of the German cases cited in the Neises Declaration involves notice in the context of the abundant publicly available materials present here. *See* Buhl Reply Decl. ¶¶ 4, 5.

OMNIBUS REPLY IN SUPPORT OF THE COUNTRYWIDE DEFENDANTS' MOTIONS TO DISMISS