Brian E. Pastuszenski (*pro hac vice*)
bpastuszenski@goodwinprocter.com
Inez Friedman-Boyce (*pro hac vice*)
ifriedmanboyce@goodwinprocter.com
Brian C. Devine (SBN 222240)
bdevine@goodwinprocter.com
Caroline H. Bullerjahn (*pro hac vice*)
cbullerjahn@goodwinprocter.com
**GOODWIN PROCTER** LLP
Exchange Place
Boston, MA 02109-2802
Tel:  617-570-1000
Fax:  617-570-1231

Lloyd Winawer (SBN 157823)
lwinawer@goodwinprocter.com
**GOODWIN PROCTER** LLP
601 South Figueroa Street, 41st Floor
Los Angeles, California 90017
Tel.:  213-426-2500
Fax:  213-623-1673

*Attorneys for Defendants*
Countrywide Financial Corporation,
Countrywide Home Loans, Inc., CWALT,
Inc., CWMBS, Inc., CWABS, Inc., CWHEQ,
Inc., Countrywide Capital Markets,
Countrywide Securities Corporation, and N.
Joshua Adler

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 11-ML-02265-MRP (MANx) |
| | **APPENDIX OF TABLES IN SUPPORT OF COUNTRYWIDE DEFENDANTS' OMNIBUS REPLY BRIEF IN SUPPORT OF MOTIONS TO DISMISS** |
| | Date/Time:  February 13, 2012  11:00 a.m. |
| | Date/Time:  February 14, 2012  1:00 p.m. |
| | Courtroom:  12 |
| | Judge:  Hon. Mariana R. Pfaelzer |

PUTNAM BANK, Individually and on Behalf of All Others Similarly Situated,

              Plaintiff,

              v.

COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,

              Defendants.

Case No. 11-CV-04698-MRP (MANx)

BANKERS INSURANCE COMPANY, *et al.,*

              Plaintiffs,

              v.

COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,

              Defendants.

Case No. 11-CV-07152-MRP (MANx)

STERLING FEDERAL BANK, F.S.B.,

              Plaintiff,

              v.

COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,

              Defendants.

Case No. 11-CV-07163-MRP (MANx)

WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, *et al.*,

              Plaintiffs,

              v.

COUNTRYWIDE FINANCIAL CORPORATION, *et al.*,

              Defendants.

Case No. 11-CV-07166-MRP (MANx)

AMERICAN FIDELITY ASSURANCE COMPANY

| | |
|---|---|
| 1                   Plaintiff, | Case No. 11-CV-07167-MRP (MANx) |
| 2            v. | |

1                   Plaintiff,           Case No. 11-CV-07167-MRP (MANx)

2            v.

3 COUNTRYWIDE FINANCIAL
4 CORPORATION, *et al.*,

5                 Defendants.

6 SEALINK FUNDING LIMITED,

7                   Plaintiff,       Case No.  11-CV-08896-MRP (MANx)

8            v.

9 COUNTRYWIDE FINANCIAL
CORPORATION, et al.,

10                 Defendants.

11 NATIONAL INTEGRITY LIFE
12 INSURANCE COMPANY,

13                   Plaintiff,      Case No.  11-CV-09889-MRP (MANx)

14            v.

15 COUNTRYWIDE FINANCIAL
CORPORATION, et al.,

16                 Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX OF TABLES ISO COUNTRYWIDE DEFENDANTS' OMNIBUS REPLY BRIEF ISO MOTIONS TO DISMISS

1

<u>**TAB**</u>                                                 <u>**TABLES**</u>

2       1          Representative Examples Showing How The *Western &*
3                  *Southern/National Integrity* Plaintiffs' Title Transfer Allegations
                   Parallel Allegations In *Stichting* And *Progressive*

4       2          Representative Examples Showing How The *Western &*
5                  *Southern/National Integrity* Plaintiffs' "Cherry-Picking" Allegations
                   Parallel Allegations In *Stichting*, *Progressive*, And *Allstate*

6       3          Public Disclosures Detailing Why *Bankers'* Plaintiffs Were On Notice
7                  By July 22, 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Dated:  February 3, 2012          **GOODWIN PROCTER LLP**

2                                     /s/ Brian E. Pastuszenski
                                      Brian E. Pastuszenski (*pro hac vice*)
3                                     Lloyd Winawer (State Bar No. 157823)
                                      Inez H. Friedman-Boyce (*pro hac vice*)
4                                     Brian C. Devine (State Bar No. 222240)
                                      Caroline H. Bullerjahn (*pro hac vice*)

5
                                     *Counsel for the Countrywide Defendants*
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

APPENDIX OF TABLES ISO COUNTRYWIDE DEFENDANTS' OMNIBUS REPLY BRIEF ISO MOTIONS
TO DISMISS

# TAB 1

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)
*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

## APPENDIX 1

**REPRESENTATIVE EXAMPLES SHOWING HOW
THE *WS/NI* PLAINTIFFS' TITLE TRANSFER ALLEGATIONS
PARALLEL ALLEGATIONS IN *STICHTING* AND *PROGRESSIVE***

| Allegations in *Stichting* | Allegations in *Progressive* | Allegations in *Western & Southern* | Allegations in *National Integrity* |
|---|---|---|---|
| "The Offering Documents for the Certificates represented in substance that the Issuing Trust for the respective offering had obtained good title to the mortgage loans comprising the pool underlying the offering. However, in actual fact, <u>Countrywide routinely and systematically failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments.</u> This has come to light as a result of recent foreclosure proceedings in connection with mortgage loans securitized by Countrywide." FAC ¶ 144. | "The Offering Documents for the Certificates represented in substance that the Issuing Trust for the respective offering had obtained good title to the mortgage loans comprising the pool underlying the offering. However, in actual fact, <u>Countrywide routinely and systematically failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments.</u> This has come to light as a result of recent foreclosure proceedings in connection with mortgage loans securitized by Countrywide." Compl. ¶ 143. | "In their zeal to offload toxic loans to investors such as Western & Southern, Countrywide did not come close to complying with the strict rules governing assignment of mortgages, and transfer of promissory notes and loan files. <u>Countrywide lost much of the paperwork relating to the loans underlying their securitizations, or made no attempt to assign mortgages and deliver the original mortgage notes to the issuing trusts as required under state law.</u>" AC ¶ 209<br><br>"[A] Bank of America employee testified that the <u>failure to deliver mortgage loan files to the securitization trust that purportedly own the loans</u> | "In their zeal to offload toxic loans to investors such as Western & Southern, Countrywide did not come close to complying with the strict rules governing assignment of mortgages, and transfer of promissory notes and loan files. <u>Countrywide lost much of the paperwork relating to the loans underlying their securitizations, or made no attempt to assign mortgages and deliver the original mortgage notes to the issuing trusts as required under state law.</u>" Compl. ¶ 209.<br><br>"[A] Bank of America employee testified that the <u>failure to deliver mortgage loan files to the securitization trust that purportedly own the loans</u> |

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)

*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

| Allegations in <br> _Stichting_ | Allegations in <br> _Progressive_ | Allegations in <br> _Western & Southern_ | Allegations in <br> _National Integrity_ |
|---|---|---|---|
| | | is standard practice." AC ¶ 211. | is standard practice." Compl. ¶ 211. |
| "For example, in *Kemp* v. *Countrywide Home Loans, Inc.,* Bkrtcy. 25 No. 08-18700 (D.N.J.), Countrywide sought to prove that the Bank of New York, as trustee for an issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage. <u>Countrywide presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing L.P. ("Countrywide Servicing"), a servicer of residential home mortgage loans, for almost ten years</u> as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing." FAC ¶ 145. | "For example, in *Kemp* v. *Countrywide Home Loans, Inc.,* Bkrtcy. 25 No. 08-18700 (D.N.J.), Countrywide sought to prove that the Bank of New York, as trustee for an issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage. <u>Countrywide presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing L.P. ("Countrywide Servicing"), a servicer of residential home mortgage loans, for almost ten years</u> as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing." Compl. ¶ 144. | "In *Kemp v. Countrywide Home Loans, Inc.*, Bankr. No. 08-18700 (D.N.J.), . . . Bank of America, as successor to Countrywide, sought to prove that the BNY, as trustee for an issuing trust that purportedly held the mortgage in question was entitled to enforce the mortgage. <u>Bank of America presented testimony by Linda DeMartini, who had been employed by Bank of America or Countrywide for almost ten years</u> as of August 2009, and was then a supervisor and operational team leader for the litigation management at Countrywide." AC ¶ 211. | "In *Kemp v. Countrywide Home Loans, Inc.*, Bankr. No. 08-18700 (D.N.J.), . . . Bank of America, as successor to Countrywide, sought to prove that the BNY, as trustee for an issuing trust that purportedly held the mortgage in question was entitled to enforce the mortgage. <u>Bank of America presented testimony by Linda DeMartini, who had been employed by Bank of America or Countrywide for almost ten years</u> as of August 2009, and was then a supervisor and operational team leader for the litigation management at Countrywide." Compl. ¶ 211. |
| "According to Ms. DeMartini, Defendant CHL originated Mr. Kemp's loan in 2006 and transferred it to the Bank of | "According to Ms. DeMartini, Defendant CHL originated Mr. Kemp's loan in 2006 and transferred it to the Bank of | "[Ms. DeMartini] testified that Countrywide originated the mortgage in 2006 and transferred it to the BNY | "[Ms. DeMartini] testified that Countrywide originated the mortgage in 2006 and transferred it to the BNY |

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)

*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

| Allegations in *Stichting* | Allegations in *Progressive* | Allegations in *Western & Southern* | Allegations in *National Integrity* |
|---|---|---|---|
| New York as trustee for the issuing trust, but Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer for the loan." FAC ¶ 146. | New York as trustee for the issuing trust, but Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer for the loan." Compl. ¶ 145. | as trustee for the issuing trust, but that Countrywide retained the original note in its own possession." AC ¶ 211. | as trustee for the issuing trust, but that Countrywide retained the original note in its own possession." Compl. ¶ 211. |
| "Ms. DeMartini further testified that an "allonge" to the promissory note, which purported to transfer the note to the trust by indorsement, was prepared only for purposes of the litigation in 2009, long after the purported transfer of the loan to the trust in 2006, and also was never delivered to the trustee." FAC ¶ 146. | "Ms. DeMartini further testified that an "allonge" to the promissory note, which purported to transfer the note to the trust by indorsement, was prepared only for purposes of the litigation in 2009, long after the purported transfer of the loan to the trust in 2006, and also was never delivered to the trustee." Compl. ¶ 145. | "[Ms. DeMartini] testified that an allonge to the promissory note, which purported to transfer the note to the trust by endorsement, was created only in preparation for the litigation in 2009, long after the purported transfer of the note to the trust in 2006, and was never delivered to the trustee." AC ¶ 212. | "[Ms. DeMartini] testified that an allonge to the promissory note, which purported to transfer the note to the trust by endorsement, was created only in preparation for the litigation in 2009, long after the purported transfer of the note to the trust in 2006, and was never delivered to the trustee." Compl. ¶ 212. |
| Ms. DeMartini testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred. Critically, Ms. DeMartini testified that it was standard operating procedure for the physical documents to | "Ms. DeMartini testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred. Critically, Ms. DeMartini testified that it was standard operating procedure for the physical documents to | "DeMartini testified that the original note was retained by Countrywide and was never delivered to the trustee. Most significantly, she testified on direct examination that not delivering the original note to the trustee was standard | "DeMartini testified that the original note was retained by Countrywide and was never delivered to the trustee. Most significantly, she testified on direct examination that not delivering the original note to the trustee was standard |

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)

*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

| Allegations in *Stichting* | Allegations in *Progressive* | Allegations in *Western & Southern* | Allegations in *National Integrity* |
|---|---|---|---|
| be retained within the corporate entity, that is, Countrywide, as opposed to providing it to the relevant issuing trust. According to Ms. DeMartini, that was *'the normal course of business [because] we are the servicer, [and] we're the ones that are doing all the servicing, and that would include retaining the documents.'"* FAC ¶ 146. | be retained within the corporate entity, that is, Countrywide, as opposed to providing it to the relevant issuing trust. According to Ms. DeMartini, that was *'the normal course of business [because] we are the servicer, [and] we're the ones that are doing all the servicing, and that would include retaining the documents.'"* Compl. ¶ 145. | business practice." AC ¶ 213. | business practice." Compl. ¶ 213. |
| "In this manner, <u>Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for RMBS transactions</u>, but rather retained the original documents itself. Consequently, <u>Defendants failed to validly assign the promissory notes and security instruments associated with many of the mortgage loans underlying the Certificates purchased by Plaintiff ABP.</u>" FAC ¶ 147. | "In this manner, <u>Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for RMBS transactions</u>, but rather retained the original documents itself. Consequently, <u>Defendants failed to validly assign the promissory notes and security instruments associated with many of the mortgage loans underlying the Certificates purchased by Plaintiff Progressive.</u>" Compl. ¶ 146. | "As DeMartini testified, <u>parties to mortgage-backed securitizations routinely fail to transfer the original mortgage loan documents to the issuing trusts for MBS transactions</u>. The servicer typically retains the original documents itself because it is easier than complying with state laws regarding assignment. Thus, <u>Defendants failed validly to transfer the promissory notes and security instruments for many of the mortgage loans underlying the Certificates to the issuing trusts.</u>" AC ¶ 217. | "As DeMartini testified, <u>parties to mortgage-backed securitizations routinely fail to transfer the original mortgage loan documents to the issuing trusts for MBS transactions</u>. The servicer typically retains the original documents itself because it is easier than complying with state laws regarding assignment. Thus, <u>Defendants failed validly to transfer the promissory notes and security instruments for many of the mortgage loans underlying the Certificates to the issuing</u> |

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)

*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

| Allegations in _Stichting_ | Allegations in _Progressive_ | Allegations in _Western & Southern_ | Allegations in _National Integrity_ |
|---|---|---|---|
| | | | trusts." Compl. ¶ 217. |
| "These representations were false because Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs. These representations were also false because Defendants routinely failed to execute valid indorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs. The Issuing Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in the event of default."  FAC ¶ 167. | "These representations were false because Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs. These representations were also false because Defendants routinely failed to execute valid indorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs. The Issuing Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in the event of default."  Compl. ¶ 165. | "[C]ontrary to the Defendants' assertions in the Offering Materials, the mortgage note or file for each underlying loan was not transferred properly and none of the trusts has the right to foreclose on any of the affected underlying loans." AC ¶ 210. | "[C]ontrary to the Defendants' assertions in the Offering Materials, the mortgage note or file for each underlying loan was not transferred properly and none of the trusts has the right to foreclose on any of the affected underlying loans." Compl. ¶ 210. |

TAB 2

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)
*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

### APPENDIX 2

**REPRESENTATIVE EXAMPLES SHOWING HOW
THE *WS/NI* PLAINTIFFS' "CHERRY-PICKING" ALLEGATIONS
PARALLEL ALLEGATIONS IN *STICHTING*, *PROGRESSIVE*, AND *ALLSTATE***

| Allegations in *Stichting* | Allegations in *Progressive* | Allegations in *Allstate* | Allegations in *Western & Southern* | Allegations in *National Integrity* |
|---|---|---|---|---|
| "Countrywide's former Chief Risk Officer, <u>Clifford Rossi</u>, testified that in general the Company attempted to cherry-pick the best loans for its own investment portfolio. Rossi stated that 'the general strategy . . . was to <u>originate and to cherry pick the better quality assets</u>.'" FAC ¶ 150. | "Countrywide's former Chief Risk Officer, <u>Clifford Rossi</u>, testified that in general the Company attempted to cherry-pick the best loans for its own investment portfolio. Rossi stated that 'the general strategy . . . was to <u>originate and to cherry pick the better quality assets</u>.'" Compl. ¶ 149. | "That Countrywide was 'cherry-picking' the loans it would keep for itself was also confirmed by the testimony of <u>Clifford Rossi</u>, a Countrywide Risk Officer, who testified that the 'bank was to <u>originate and to cherry pick the better quality assets</u>.'" Compl. ¶ 183. | "That Countrywide was 'cherry-picking' the loans it would keep for itself was also confirmed by <u>Clifford Rossi</u>, a Countrywide Risk Officer, who testified that the practice of the 'bank was to <u>originate and to cherry pick the better quality assets</u>.'" AC ¶ 90. | "That Countrywide was 'cherry-picking' the loans it would keep for itself was also confirmed by <u>Clifford Rossi</u>, a Countrywide Risk Officer, who testified that the practice of the 'bank was to <u>originate and to cherry pick the better quality assets</u>.'" Compl. ¶ 90. |
| "On <u>August 2, 2005</u>, Defendant Sambol expressed his concerns regarding the company's policy of '<u>cherry-picking</u>' the best loans for itself in an e-mail to Mozilo. . . . He stated, 'While it makes sense for us to be selective as to the loans which the Bank retains, <u>we need to analyze the securitization</u> | "On <u>August 2, 2005</u>, Defendant Sambol expressed his concerns regarding the company's policy of '<u>cherry-picking</u>' the best loans for itself in an e-mail to Mozilo. . . . He stated, 'While it makes sense for us to be selective as to the loans which the Bank retains, <u>we need to analyze the securitization</u> | "On <u>August 2, 2005</u>, Sambol actually questioned the company's policy of '<u>cherry picking</u>' the best loans for itself while leaving the higher-risk leftovers for securitization: 'While it makes sense for us to be selective as to the loans which the Bank retains, <u>we need to analyze</u> | "On <u>August 2, 2005</u>, Officer Defendant Sambol discussed Countrywide's strategy of '<u>cherry picking</u>' loans so that Countrywide would retain less risky loans while the most toxic loans were offloaded on investors. As Sambol wrote to Mozilo, '<u>we need to analyze the securitization implications on what</u> | "On <u>August 2, 2005</u>, Officer Defendant Sambol discussed Countrywide's strategy of '<u>cherry picking</u>' loans so that Countrywide would retain less risky loans while the most toxic loans were offloaded on investors. As Sambol wrote to Mozilo, '<u>we need to analyze the securitization implications on what</u> |

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)

*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

| Allegations in *Stichting* | Allegations in *Progressive* | Allegations in *Allstate* | Allegations in *Western & Southern* | Allegations in *National Integrity* |
|---|---|---|---|---|
| implications on what remains if [Countrywide Bank] is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans.'" FAC ¶ 151. | implications on what remains if [Countrywide Bank] is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans.'"  Compl. ¶ 150. | the securitization implications on what remains if [Countrywide Bank] is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans.'"  Compl. ¶ 169. | remains if [Countrywide Bank] is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans.'"  AC ¶ 87. | remains if [Countrywide Bank] is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans.'"  Compl. ¶ 87. |
| | | "McMurray testified that he specifically raised concerns about the risks presented by Countrywide's securities. Part of this concern was not only Countrywide's aggressive standards, but also that: 'There's another element that we need to bring in here that's important with respect to securities performance. Countrywide's bank tended to – on – on some of the key products, tended to select the best loans out of the ones that were originated. By best – I'm talking about from a credit risk standpoint, so let me clarify that. So as – as those | "Countrywide's Chief Risk Officer John McMurray specifically raised concerns about the risks presented by Countrywide's practice of 'cherry picking' toxic loans for inclusion in securitizations. As McMurray later testified: 'Countrywide's bank tended to - on - on some of the key products, tended to select the best loans out of the ones that were originated,' by best - I'm talking about from a credit risk standpoint, so let me clarify that. So as - as those loans are drawn out of the population, what's left to put into the securities were | "Countrywide's Chief Risk Officer John McMurray specifically raised concerns about the risks presented by Countrywide's practice of 'cherry picking' toxic loans for inclusion in securitizations. As McMurray later testified: 'Countrywide's bank tended to - on - on some of the key products, tended to select the best loans out of the ones that were originated,' by best - I'm talking about from a credit risk standpoint, so let me clarify that. So as - as those loans are drawn out of the population, what's left to put into the securities were |

*Western & Southern Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07166-MRP (MANx)

*Nat'l Integrity Life Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-09889-MRP (MANx)

| Allegations in *Stichting* | Allegations in *Progressive* | Allegations in *Allstate* | Allegations in *Western & Southern* | Allegations in *National Integrity* |
|---|---|---|---|---|
| | | loans are drawn out of the population, what's left to put into the securities were not – are not as good as what you started out with, and then <u>that can have an adverse effect on securities performance</u>.'" Compl. ¶ 182. | not - are not as good as what you started out with, and then <u>that can have an adverse effect on securities performance</u>.'" AC ¶ 89. | not - are not as good as what you started out with, and then <u>that can have an adverse effect on securities performance</u>.'" Compl. ¶ 89. |

3

TAB 3

*Bankers Ins. Co., et al. v. Countrywide Fin. Corp., et al.*, No. 11-CV-07152-MRP (MANx)

## APPENDIX 3

## PUBLIC DISCLOSURES DETAILING
## WHY *BANKERS'* PLAINTIFFS WERE ON NOTICE BY JULY 22, 2007

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| "From at least the beginning of 2005, Countrywide implemented a program which allowed loan officers to 'match' the most aggressive product or policy of any loan origination competitor, including purely subprime lenders, even if that product or policy violated Countrywide's stated underwriting guidelines. Countrywide's liberal use of any competitor's 'composite guideline' made the Company's loan origination practices 'the most aggressive in the industry.'" *Bankers* Compl. ¶ 75.<br><br>"Countrywide never disclosed to Bankers or other investors that it had a matching strategy that caused the Company to cede its credit policy to the most aggressive lenders in the market. Executives knew and kept it a secret that the quality of loans originated by Countrywide was deteriorating, and would continue to worsen. . . . Information that Countrywide was actually the most aggressive lender in the industry would have been extremely material to Bankers and other investors." *Bankers* Compl. ¶ 80. | "[O]ur share growth strategy is to *maintain the broadest product line in the mortgage industry*, which is a claim that we can safely make, in fact, today. *It's our intent to carry every product or program for which there is reasonable demand.* Our value proposition to our business partners, whether they be realtors, builders, brokers or correspondents is that *if your customer can legitimately qualify for a loan anywhere else in the U.S., they'll qualify at Countrywide.* And if they have a product or loan preference that product will be on our menu."<br><br>March 30, 2004, *CFC Analyst Forum*, statements of David Sambol, at 31 (Reply RJN Ex. 148). |
| "[John] McMurray later testified in the SEC Action that the matching strategy at Countrywide was a 'corporate principle and practice that had a profound effect on credit policy' at Countrywide. The aggressiveness of these composite guidelines was never disclosed by Countrywide." *Bankers* Compl. ¶ 77. | "*CFC's commitment not to turn down any mortgage borrower that was approved by any other lender was a bit jolting as an underwriting guideline . . .*"<br><br>May 25, 2005, *Jeffries & Co., Inc. Equity Research Update*, Charlotte A. Chamberlain, "No Customer Left Behind," at 1 (Reply RJN Ex. 124). |
| "Countrywide executives were strongly encouraged to inflate the appraised value of homes, which not only misled the buyer, but also the secondary mortgage market by overstating the | "*Where you do have problems in fraud is really . . . on the appraisal side. . . .*<br><br>I mean, again, if you look at the performance of the loans over the last |

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| value of the property securing the mortgage note." *Bankers* Compl. ¶ 130. | five years it's been very good.  *Now, no question what's covered up a lot of these sins is the increase in values.  The values keep on going up and people sort of work their way out – if they have a problem they're able to sell the house, make a few bucks, get out.  If you have value stabilizing going down I think that as somebody said a long time ago is that you don't go swimming naked till the tide goes out, and when the tide goes out or the dollar value is going lower you'll see some more problems."*  February 28, 2006, *CFC Fixed Income Analyst Forum*, statements of Angelo Mozilo, at 12 (Reply RJN Ex. 149). |
| "Countrywide . . . did not disclose the exceptions and expansion of guidelines in order to retain its existing share of the mortgage origination market.  This lack of disclosure continued even in the face of Countrywide discovering that borrower misrepresentation, speculation, and fraud was increasing at a rampant rate." *Bankers* Compl. ¶ 93.  "Despite touting the security of the Pay-Options ARMs products in public, Mozilo raised resounding alarms within Countrywide regarding the Company's risky reliance on stated income and reduced documentation for these loans, but concealed his concerns from Bankers and other investors." *Bankers* Compl. ¶ 102. | "[T]here's an increased risk on stated income because you're really, at the end of the day, [you] really don't know what's going on."  March 30, 2006, *CFC Financial Equity Investor Forum*, statements of Angelo Mozilo, at 71 (Reply RJN Ex. 150). |
| "Even worse, Countrywide's internal risk assessors knew that in a substantial number of its stated-income loans borrowers overstated their income, yet disregarded this and other signs of fraud in order to increase Countrywide's market share." *Bankers* Compl. ¶ 106. | "SISA stands for a stated income, stated asset.  That's the borrower's telling us what they're [*sic*] income and assets are but not documenting it.  And so, you can take away from this chart that some of them may have lied."  September 13, 2006, *CFC Fixed Income Investor Forum*, statements of John McMurray, at 62 (Reply RJN Ex. 151). |
| "As a result of the Countrywide Defendants' failure to follow their | *"Investors are concerned that Calabasas-based Countrywide is* |

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| underwriting standards and guidelines . . . delinquencies and defaults in the loan pools underlying the Certificates have skyrocketed." *Bankers* Compl. ¶ 11.<br><br>"[Countrywide's] representations were false and misleading and omitted material facts because they directly contradicted the reality that Countrywide was knowingly originating an increasing number of poor-quality loans that did not comply with its stated underwriting guidelines. . . ." *Bankers* Compl. ¶ 41. | *expanding into the riskiest parts of the mortgage business just as the housing market slows.* As much as $20 billion of the $118 billion in mortgages Countrywide made in the second quarter gave borrowers the option to defer full payments in the first few years, increasing the amount of debt owed.. . . Last month, 4.5% of all Countrywide loans had delinquent payments, up from 4.15% in August. The increase was caused in part by loans to people with bad credit."<br><br>October 17, 2006, *Los Angeles Times*, "Buyers Wary of Lender's Bonds," at 1-2 (Reply RJN Ex. 125). |
| "Countrywide's deviation from its stated underwriting practices resulted in approval of loans in situations where loan applications lacked key documentation, such as a verification of borrower assets or income; included an invalid or incomplete appraisal; demonstrated fraud by the borrower on the face of the application . . . ." *Bankers* Compl. ¶ 70. | "[Countrywide increased its market share] through a product extension in Alt-As, which are more likely to be relied upon by ultimately marginal borrowers. *The low/no documentation feature of Alt-A products . . . means increased difficulty to accurately gauge individual borrowers' credit profile, increased odds of loans being miss-priced and increased probability that loans go into default.*"<br><br>October 27, 2006, *Banc of America Securities,* Robert Lacoursiere, "Market Disconnects from Fundamentals: Reiterating Sell Rating," at 6 (Reply RJN Ex. 126). |
| "Countrywide's deteriorating underwriting practices enabled loan applications that reflected borrower fraud, inadequate documentation . . . and other material violations of guidelines. These violations made Countrywide's related representations regarding its adherence to stated underwriting guidelines materially false and misleading . . . ." *Bankers* Compl. ¶ 66. | The "*liars' loan*" "*phenomenon*" began "in 1998, when the housing market was booming and stated-income loans (those based on what you tell the bank you're earning) became the rage. Given *widespread income exaggeration* by eager home buyers, such loans soon became known in the real estate industry as the '*liar's loan*."<br><br>December 20, 2006, *New York Sun,* Dan Dorfman, Liars' Loans Could Make Many Moan," at 1 (Reply RJN Ex. 127). |
| "[T]he credit agencies essentially | "Should loan losses climb, investors in |

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| worked backwards, starting with Countrywide's target rating and thereafter working toward a structure that could conceivably yield the desired rating." *Bankers* Compl. ¶ 137.<br><br>"The Countrywide Defendants knew that the AAA and other investment grade ratings assigned to the Certificates were false because, unbeknownst to Bankers, the underwriting and appraisal standards of Countrywide Home had been abandoned and, as such, no reliable estimate could be made concerning the level of enhancement necessary to ensure that the top tranches purchased by Bankers were of AAA quality." *Bankers* Compl. ¶ 143. | mortgage-backed securities will also get burnt, especially those holding the riskier, higher-yielding bonds. *Financial engineers worked their mysterious magic with these securities, turning the junkiest mortgages into high-grade, sometimes AAA-rated, securities. They could do this only with the blessing of credit-ratings agencies, which made a profitable business out of rating these securities. But critics say the agencies got complacent, and doubt the pooled loans were sufficiently diverse, or sliced up with sufficient art truly to have dispersed risk.* One possible blind spot is that the dodgiest mortgages all behave similarly in times of stress."<br><br>February 17, 2007, *The Economist*, "How Will America's Banks Cope With Bad Mortgages?", at 2 (Reply RJN Ex. 136). |
| "[Countrywide] did not disclose the results of the 4506 Audit demonstrating that a large percentage of the stated income information was misstated. In fact, Countrywide did not obtain independent verification of income for borrowers who applied for these loans. . . ." *Bankers* Compl. ¶ 105. | "Wall Street firms and entrepreneurs made fortunes issuing questionable securities, in this case pools of home loans taken out by risky borrowers. . . .<br><br>*Looking to expand their reach and their profits, lenders were far too willing to lend, as evidenced by the creation of new types of mortgages—known as 'affordability products'—that required little or no down payment and little or no documentation of a borrower's income. . . .*<br><br>Mortgages requiring little or no documentation became known colloquially as 'liar loans'. . . .<br><br>*[I]n almost 60 percent of cases [from an analysis comparing 100 stated income loans to the borrowers' tax returns] borrowers inflated their incomes by more than half.*"<br><br>March 11, 2007, *New York Times*, Gretchen Morgenson, "Crisis Looms in |

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| | Mortgages" at 1, 3 (Reply RJN Ex. 128). |
| "Countrywide engaged in widespread appraisal-related misconduct by inflating the value of properties in order to support the loans it wished to make. . . . Further, Countrywide engaged in a practice of pressuring and intimidating appraisers into using appraisal techniques that meet Countrywide's business objectives even if the use of such appraisal technique is improper and in violation of industry standards." *Bankers* Compl. ¶ 129. | "Last month, a survey of the national appraisal industry conducted by October Research Corp. reported that *90 percent of appraisers feel pressure to inflate the value of homes to meet expectations*. . . . 'Appraisers were fast becoming the enablers to fraud . . . .'" March 18, 2007, *San Francisco Chronicle*, Carol Lloyd, "In Tough Real Estate Market, Appraisers Under Pressure," at 1 (Reply RJN Ex. 129). |
| "Countrywide normally approved loans in which a borrower's income and/or assets were not verified. Such loans were called 'limited' or 'reduced' documentation loans, and a large subset of those loans were called 'stated income' loans. It is now clear that Countrywide covertly inflated the stated income of borrowers on loan applications for the loans that fueled its securitizations. These fraudulent practices materially affected every Certificate purchased by Bankers. Many of these inflated incomes were in the loan files of Pay-Option ARMs, a loan product that was ostensibly a 'prime' or near prime product. Countrywide represented to Bankers that a large percentage of the underlying loans originated by Countrywide Home and contained within the Certificates were 'prime' or 'conventional,' indicating that these loans were of high credit quality. Included within this 'prime' category of loans were Pay-Option ARMs." *Bankers* Compl. ¶¶ 98-99. "Contrary to the Countrywide Defendant's above statements, the Countrywide Defendants knew that a large percentage of these Pay-Option ARMs were originated based on the borrowers' stated income, meaning that | "Far from being limited to the subprime market, the data show [that] *risky loan features have become widespread*. . . . [T]he number of no or low documentation loans—so called 'liar loans'—has increased to 49% last year from 18% of purchase loans in 2001. . . . *Fully 81% of Alt-A loans last year were no or low documentation loans*." March 21, 2007, *Wall Street Journal*, Andy LaPierre, "Mortgage Meltdown," at 2 (Reply RJN Ex. 130). |

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| the borrowers provided no documentation proving their income." *Bankers* Compl. ¶ 102. | |
| "Pay-Option ARMs increased from approximately 6% of loan production by year-end 2004 to approximately 19% by year-end 2005."  *Bankers* Compl. ¶ 99. | "[C]ompanies that write the Alt-A mortgages are finding that investors are less willing to buy securities that are backed by mortgages or are demanding significantly higher returns. <br><br> *Among the biggest Alt-A lenders in 2006 were . . . Countrywide Financial Corp. of Calabasas, Calif. . . .* " <br><br> April 10, 2007, *Associated Press*, "Weakness Spreads from Subprime Mortgages to So-called Alt-A Segment," at 2 (Reply RJN Ex. 131). |
| "Countrywide allowed its sales personnel and account executives to order and control the appraisal process. These individuals were typically on a commission only pay structure and were therefore motivated to close as many loans as possible.  These individuals would pressure appraisers to appraise properties at artificially high levels and threaten that if the appraisers did not that they would not be hired again." *Bankers* Compl. ¶ 123. | "*The four largest trade groups representing appraisers . . . are asking for federal financial regulators to crack down on lenders and loan officers who put pressure on appraisers to raise valuations to let overpriced deals go through. . . .* <br><br> National studies repeatedly have shown that commissioned loan officers often demand that appraisers cooperate to hit whatever number is needed to push the transaction to closing – or lose future business. . . . <br><br> Lender complacency about appraisals also has enabled con artists to bilk banks and investors of billions of dollars in home-mortgage-fraud schemes." <br><br> April 21, 2007, *The Washington Post*, Kenneth R. Harney, "Appraisal Inflation," at 1, 2 (Reply RJN Ex. 132). |
| "In order to originate more loans, Countrywide created and approved riskier loan products not only by implementing looser stated underwriting guidelines but also by applying numerous exceptions to its already weakened standards." *Bankers* Compl. | "*[M]ortgage lenders created a surge in delinquencies in the past year by repeatedly breaking their own underwriting guidelines to capture business. . . .  So-called 'exceptions' to loans were made. . . .*" |

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| ¶ 42.<br><br>"Countrywide's deteriorating underwriting practices enabled loan applications that reflected borrower fraud [and] inadequate documentation . . . .  These violations made Countrywide's related representations regarding its adherence to stated underwriting guidelines materially false and misleading because, in reality, Countrywide undertook an undisclosed and unprecedented loosening of its underwriting guidelines such that exceptions became the standard without compensating factors." *Bankers* Compl. ¶ 66.<br><br>"Countrywide undertook a deliberate practice of routinely making new exceptions to and expanding its underwriting guidelines, yet did not disclose the exceptions and expansion of the guidelines in order to retain its existing share of the mortgage origination market." *Bankers* Compl. ¶ 93. | April 30, 2007, *Reuters News*, Al Yoon, "Subprime Lenders Made Record Exceptions," at 1 (Reply RJN Ex. 133). |
| "Over a period of several years, the Countrywide Defendants employed a deceptive scheme whereby they constantly expanded Countrywide's share of the consumer market for mortgage loans, without regard for the Company's stated underwriting guidelines and through a wide variety of deceptive practices, in order to maximize its profits from the sale of those loans into the secondary market." *Bankers* Compl. ¶ 10. | "[A] detailed inquiry into the situation at New Century and other subprime lenders suggests that *in the feeding frenzy for housing loans, basic quality controls were ignored in the mortgage business*, while the big Wall Street investment banks that backed these firms looked the other way."<br><br>May 7, 2007, *The Washington Post*, David Cho, "Pressure at Mortgage Firm Led to Mass Approval of Bad Loans," at 1 (Reply RJN Ex. 134). |
| "'Investment grade' products are understood in the marketplace to be stable, secure and safe.  Using S&P's scale, 'investment grade' ratings are AAA, AA, A, and BBB, and represent, high credit quality (AAA), upper-medium credit quality (AA and A) and medium credit quality (BBB)." *Bankers* | *"Standard & Poors said that it would probably downgrade bonds [backed by mortgages] totaling . . . \$12 billion, a move that surprised investors with its tone and timing. . . .*<br><br>[A]nalysts note that the expectations for losses have been steadily rising and if |

| Allegations in Bankers' Complaint | Public Disclosures Prior to July 22, 2007 |
|---|---|
| Compl. ¶ 132.<br><br>"The Certificates did not deserve did not deserve these investment grade ratings, as evidenced most clearly by the fact that all of the tranches of Certificates purchased by Bankers have now been downgraded. . . ." *Bankers* Compl. ¶ 136. | S.&P.'s worst case is realized most of the bonds below AA ratings will be wiped out.  A downgrading of AAA bonds could be significant. . . ."<br><br>July 11, 2007, *The New York Times*, Vikas Bajaj, "Rate Agencies Move Toward Downgrading Some Mortgage Bonds," at 2 (Reply RJN Ex. 135). |