# Exhibit 121

As filed pursuant to Rule 424(b)(5)
Under the Securities Act of 1933
Registration No. 333-140962

**PROSPECTUS SUPPLEMENT**
**(To Prospectus dated June 27, 2007)**

# $745,477,658
## (Approximate)
# CWALT, INC.
### Depositor



### Sponsor and Seller
## Countrywide Home Loans Servicing LP
### Master Servicer
## Alternative Loan Trust 2007-17CB
### Issuing Entity
# Mortgage Pass-Through Certificates, Series 2007-17CB
### Distributions payable monthly, beginning July 25, 2007

The issuing entity will issue certificates, including the following classes of certificates, that are offered pursuant to this prospectus supplement and the accompanying prospectus:

| | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) | | Initial Class Certificate Balance/Initial Notional Amount(1) | Pass-Through Rate(2) |
|---|---|---|---|---|---|
| Class 1-A-1 | $ 11,998,000 | 5.75% | Class 1-A-14 | $ 18,936,809(4) | Floating |
| Class 1-A-2 | $ 404,000 | 5.75% | Class 1-X | $ 292,378,990(3) | Variable |
| Class 1-A-3 | $ 50,300,000 | 5.75% | Class 2-A-1 | $ 160,000,000 | 5.75% |
| Class 1-A-4 | $ 65,000,000 | Floating | Class 2-A-2 | $ 11,524,000 | 5.75% |
| Class 1-A-5 | $ 47,755,882(3) | Floating | Class 2-A-3 | $ 43,788,000 | 5.75% |
| Class 1-A-6 | $ 284,052,000(4) | Floating | Class 2-A-4 | $ 1,471,000 | 5.75% |
| Class 1-A-7 | $ 11,726,000 | Floating | Class 2-X | $ 111,612,305(3) | Variable |
| Class 1-A-8 | $ 360,778,000(3)(4) | Floating | Class PO | $ 6,910,558 | (5) |
| Class 1-A-9 | $ 78,430,000(4) | (5) | Class A-R | $ 100 | 5.75% |
| Class 1-A-10 | $ 78,430,000(4) | Floating | Class M-1 | $ 9,000,000 | 5.75% |
| Class 1-A-11 | $ 284,052,000(4) | Floating | Class M-2 | $ 4,124,000 | 5.75% |
| Class 1-A-12 | $ 11,726,000(3) | Floating | Class B-1 | $ 4,500,000 | 5.75% |
| Class 1-A-13 | $ 265,115,191(4) | Floating | Class B-2 | $ 2,250,000 | 5.75% |

**Consider carefully the risk factors beginning on page S-22 in this prospectus supplement and on page 2 in the prospectus.**

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWALT, Inc. or any of their affiliates.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

(1) This amount is subject to a permitted variance in the aggregate of plus or minus 5%.

(2) The classes of certificates offered by this prospectus supplement, together with their pass-through rates, the method of calculating their pass-through rates and their initial ratings are listed in the tables under *"Summary — Description of the Certificates"* beginning on page S-6 of this prospectus supplement.

(3) The Class 1-A-5, Class 1-A-8, Class 1-A-12, Class 1-X and Class 2-X Certificates are interest only notional amount certificates. The notional amounts of these classes of certificates are shown in the table above but are not included in the aggregate class certificate balance of all of the certificates offered.

(4) The Class 1-A-10, Class 1-A-11, Class 1-A-13 and Class 1-A-14 Certificates are exchangeable for certain proportions of the Class 1-A-6, Class 1-A-8 and Class 1-A-9 Certificates as described in this prospectus supplement. The maximum initial class certificate balance of each class of exchangeable certificates is set forth in the table but is not included in the aggregate class certificate balance of the certificates offered.

(5) The Class 1-A-9 and Class PO Certificates are principal only certificates and will not accrue interest.

This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity. The certificates represent interests in a pool consisting of two loan groups of primarily 30-year conventional, fixed rate mortgage loans secured by first liens on one-to four-family residential properties.

Credit enhancement and other support for the transaction will consist of:

• Subordination; and

• Cross-collateralization between loan groups.

The credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for the certificates is described in more detail in this prospectus supplement.

**These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.**

Morgan Stanley & Co. Incorporated will offer the Class A Certificates and Credit Suisse Securities (USA) LLC will offer the Class M, Class B-1 and Class B-2 Certificates to the public at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of these classes of certificates are expected to be approximately $723,497,931, plus accrued interest, before deducting expenses. The Class PO and Class X Certificates will not be purchased by Morgan Stanley & Co. Incorporated or by Credit Suisse Securities (USA) LLC. They will be transferred to Countrywide Home Loans, Inc. on or about June 29, 2007 as partial consideration for the sale of the mortgage loans to the depositor. See "Method of Distribution" in this prospectus supplement. The offered certificates (other than the Class A-R Certificates) will be available for delivery to investors in book-entry form through the facilities of the Depository Trust Company and the Euroclear System.

EXHIBIT 121    9

**Morgan Stanley**
June 28, 2007

**Credit Suisse**

EXHIBIT 121      10

On each distribution date, each class of exchangeable certificates will be entitled to receive a proportionate share of the amounts distributed as interest on the related depositable certificates that have been deposited.

The Class 1-A-9 and Class PO Certificates do not bear interest.

*See "Description of the Certificates — Interest" in this prospectus supplement.*

### *Allocation of Net Interest Shortfalls*

For any distribution date, the interest entitlement for each class of interest-bearing certificates will be reduced by the amount of net interest shortfalls experienced by the mortgage loans in the related loan group or loan groups resulting from:

- prepayments on the mortgage loans; and

- reductions in the interest rate on the related mortgage loans due to Servicemembers Relief Act reductions or debt service reductions.

Net interest shortfalls for a loan group on any distribution date will be allocated pro rata among all interest-bearing classes of the related senior certificates and the classes of subordinated certificates based on their respective entitlements (or, in the case of the subordinated certificates, based on interest accrued on each subordinated class' share of the assumed balance, as described more fully under *"Description of the Certificates — Interest"* ), in each case before taking into account any reduction in the interest entitlements due to shortfalls.

If on any distribution date, available funds for a loan group are not sufficient to make a full distribution of the interest entitlement on the related certificates in the order described below under *"— Priority of Distributions Among Certificates"* , interest will be distributed on each class of related certificates of equal priority, pro rata, based on their respective entitlements. Any unpaid interest amount will be carried forward and added to the amount holders of each affected class of certificates will be entitled to receive on the next distribution date.

On each distribution date, each class of exchangeable certificates will be allocated a proportionate share of the net interest shortfalls allocated to the related depositable certificates that have been deposited.

*See "Description of the Certificates — Interest" and " — Allocation of Interest Shortfalls" in this prospectus supplement.*

### *Principal Payments*

On each distribution date, certificateholders will only receive a distribution of principal on their certificates if there is cash available on that date for the payment of principal according to the principal distribution rules described in this prospectus supplement.

All payments and other amounts in respect of principal of the mortgage loans in a loan group will be allocated between the related Class PO Component, on the one hand, and the related senior certificates (other than the notional amount certificates and the related Class PO Component) and the subordinated certificates, on the other hand, in each case based on the applicable PO percentage and the applicable non-PO percentage, respectively, of those amounts. The non-PO percentage with respect to any mortgage loan in a loan group with a net mortgage rate less than the related required coupon will be equal to the net mortgage rate divided by the related required coupon and the PO percentage of that mortgage loan will be equal to 100% minus that non-PO percentage. With respect to a mortgage loan in a loan group with a net mortgage rate equal to or greater than the related required coupon, the non-PO percentage will be 100% and the PO percentage will be 0%. The required coupon for loan group 1 and loan group 2 is 5.75%. The applicable non-PO percentage of amounts in respect of principal will be allocated to the related senior certificates (other than the notional amount certificates and the related Class PO Component) as set forth below, and any remainder of that non-PO amount is allocated to the subordinated certificates:

S-12

EXHIBIT 121    11

- in the case of scheduled principal collections, the amount allocated to the related senior certificates is based on the ratio of the aggregate class certificate balance of those senior certificates to the non-PO percentage of the principal balance of the mortgage loans in the related loan group; and

- in the case of principal prepayments, the amount allocated to the related senior certificates is based on a fixed percentage (equal to 100%) until the fifth anniversary of the first distribution date, at which time the percentage will step down as described herein, if the specified conditions are met.

Notwithstanding the foregoing, no decrease in the senior prepayment percentage of any loan group will occur unless certain conditions related to the loss and delinquency performance of the mortgage loans are satisfied with respect to each loan group.

Principal will be distributed on each class of senior and subordinated certificates entitled to receive principal payments as described below under "— *Amounts Available for Distributions on the Certificates* ."

On each distribution date, each class of exchangeable certificates will be entitled to receive a proportionate share of the amounts distributed as principal of the related classes of depositable certificates that have been deposited.

The notional amount certificates do not have class certificate balances and are not entitled to any distributions of principal but will bear interest during each interest accrual period on their respective notional amounts.

*See "Description of the Certificates — Principal" in this prospectus supplement.*

### Exchanging Certificates Through Combination and Recombination

Depositable certificates may be exchanged for a proportionate interest in one or more classes of exchangeable certificates as shown on Annex I. Depositable certificates can be exchanged for the exchangeable certificates by notifying the trustee, depositing the correct proportions of the applicable depositable certificates and paying an exchange fee. Principal of and interest on the depositable certificates so deposited is used to pay principal of and interest on the related exchangeable certificates. Annex I lists the available combinations of the depositable certificates eligible for exchange for the exchangeable certificates.

*See "Description of the Certificates — Exchangeable Certificates" in this prospectus supplement and "Description of the Securities — Exchangeable Securities" in the prospectus for a description of Exchangeable Certificates and exchange procedures and fees.*

### Amounts Available for Distributions on the Certificates

The amount available for distributions on the certificates on any distribution date will be calculated on a loan group by loan group basis and generally consists of the following with respect to the mortgage loan in a loan group (after the fees and expenses described under the next heading are subtracted):

- all scheduled installments of interest and principal due and received on the mortgage loans in that loan group in the applicable period, together with any advances with respect to them;

- all proceeds of any primary mortgage guaranty insurance policies and any other insurance policies with respect to the mortgage loans in that loan group, to the extent the proceeds are not applied to the restoration of the related mortgaged property or released to the borrower in accordance with the master servicer's normal servicing procedures;

S-13

Table of Contents

- net proceeds from the liquidation of defaulted mortgage loans in that loan group by foreclosure or otherwise during the calendar month preceding the month of the distribution date (to the extent the amounts do not exceed the unpaid principal balance of the mortgage loan, plus accrued interest);

- subsequent recoveries with respect to mortgage loans in that loan group;

- partial or full prepayments with respect to mortgage loans in that loan group collected during the applicable period, together with interest paid in connection with the prepayment, other than certain excess amounts payable to the master servicer, and the compensating interest; and

- any substitution adjustment amounts or purchase price in respect of a deleted mortgage loan or a mortgage loan in that loan group repurchased by a seller or originator or purchased by the master servicer during the applicable period.

Fees and Expenses

The amounts available for distributions on the certificates on any distribution date generally will not include the following amounts:

- the master servicing fee and additional servicing compensation due to the master servicer (as described in this prospectus supplement under *"Servicing of Mortgage Loans— Servicing Compensation and Payment of Expenses"* and *"Description of the Certificates —Priority of Distributions Among Certificates"* );

- the trustee fee due to the trustee;

- lender-paid mortgage insurance premiums, if any;

- the amounts in reimbursement for advances previously made and other amounts as to which the master servicer and the trustee are entitled to be reimbursed from the Certificate Account pursuant to the pooling and servicing agreement; and

- all other amounts for which the depositor, a seller or the master servicer is entitled to be reimbursed.

Any amounts paid from amounts collected with respect to the mortgage loans will reduce the amount that could have been distributed to the certificateholders.

***Servicing Compensation***

*Master Servicing Fee:*

The master servicer will be paid a monthly fee (referred to as the master servicing fee) with respect to each mortgage loan. The master servicing fee for the mortgage loans in each loan group will equal one-twelfth of the stated principal balance of each mortgage loan multiplied by the servicing fee rate. The servicing fee rate for each mortgage loan will be 0.250% per annum. The amount of the servicing fee is subject to adjustment with respect to certain prepaid mortgage loans, as described under *"Servicing of Mortgage Loans—Adjustment to Servicing Compensation in Connection with Certain Prepaid Mortgage Loans"* in this prospectus supplement.

*Additional Servicing Compensation:*

The master servicer is also entitled to receive, as additional servicing compensation, all late payment fees, assumption fees and other similar charges, including prepayment charges, and all reinvestment income earned on amounts on deposit in certain of the issuing entity's accounts and excess proceeds with respect to liquidated mortgage loans as described under *"Description of the Certificates — Priority of Distributions Among Certificates"* .

*Source and Priority of Distributions:*

The master servicing fee and the additional servicing compensation described above will be paid to the master servicer from collections on the mortgage loans prior to any distributions on the certificates.

S-14

EXHIBIT 121    13

*See "Servicing of Mortgage Loans — Servicing Compensation and Payment of Expenses" and "Description of the Certificates — Priority of Distributions Among Certificates" in this prospectus supplement.*

### Priority of Distributions

<u>Priority of Distributions Among Certificates</u>

In general, on any distribution date, available funds for each loan group will be distributed in the following order:

- to interest on each interest-bearing class of senior certificates related to that loan group, pro rata, based on their respective interest entitlements;
- to principal of the classes of senior certificates and components relating to that loan group then entitled to receive distributions of principal, in the order and subject to the priorities set forth below;
- to any deferred amounts payable on the Class PO Component related to that loan group, but only from amounts that would otherwise be distributed on that distribution date as principal of the subordinated certificates;
- to interest on and then principal of each class of subordinated certificates, in the order of their distribution priorities, beginning with the Class M-1 Certificates, in each case subject to the limitations set forth below; and
- any remaining available amounts to the Class A-R Certificates.

<u>Principal</u>

On each distribution date, the non-PO formula principal amount for each loan group will be distributed first as principal of the related classes of senior certificates (other than the notional amount certificates and the related Class PO Component) as specified below, and second as principal of the subordinated certificates, in an amount up to the subordinated principal distribution amount for each loan group.

*Senior Certificates (other than the notional amount certificates and the Class PO Certificates):*

On each distribution date, the non-PO formula principal amount related to each loan group, in each case up to the amount of the senior principal distribution amount for that loan group, will be distributed as principal of the following classes of related senior certificates:

**Distributions with Respect to Loan Group 1**
- Sequentially:

    (1) to the Class A-R Certificates, until its class certificate balance is reduced to zero; and

    (2) concurrently,

        (a) 12.4926779702%, in the following order:

            (i) concurrently, to the Class 1-A-1 and Class 1-A-2 Certificates, pro rata, the group 1 priority amount (which is zero for the first five years and will increase as described under *"Description of the Certificates—Principal"* in this prospectus supplement), until their respective class certificate balances are reduced to zero;

            (ii) to the Class 1-A-3 Certificates, until its class certificate balance is reduced to zero; and

            (iii) concurrently, to the Class 1-A-1 and Class 1-A-2 Certificates, pro rata, without regard to the group 1 priority amount, until their respective class certificate balances are reduced to zero; and

        (b) 87.5073220298%, concurrently, to the Class 1-A-4, Class 1-A-6, Class 1-A-7 and Class 1-A-9 Certificates, pro rata, until their respective class certificate balances are reduced to zero.

EXHIBIT 121    14

**Distributions with Respect to Loan Group 2**

- Sequentially:

    (1) concurrently, to the Class 2-A-3 and Class 2-A-4 Certificates, pro rata, the group 2 priority amount (which is zero for the first five years and will increase as described under *"Description of the Certificates—Principal"* in this prospectus supplement), until their respective class certificate balances are reduced to zero;

    (2) concurrently, to the Class 2-A-1 and Class 2-A-2 Certificates, pro rata, until their respective class certificate balances are reduced to zero; and

    (3) concurrently, to the Class 2-A-3 and Class 2-A-4 Certificates, pro rata, without regard to the group 2 priority amount, until their respective class certificate balances are reduced to zero.

*Class PO Certificates:*

On each distribution date, principal will be distributed to each Class PO Component in an amount equal to the lesser of (x) the PO formula principal amount for the related loan group for that distribution date and (y) the product of:

- available funds for the related loan group remaining after distribution of interest on the senior certificates in the same certificate group; and

- a fraction, the numerator of which is the related PO formula principal amount and the denominator of which is the sum of that PO formula principal amount and the related senior principal distribution amount.

*Subordinated Certificates; Applicable Credit Support Percentage Trigger:*

On each distribution date and with respect to each loan group, to the extent of available funds available therefor, the non-PO formula principal amount for each loan group, up to the subordinated principal distribution amount for each loan group, will be distributed as principal of the subordinated certificates in order of their distribution priorities, beginning with the Class M-1 Certificates, until their respective class certificate balances are reduced to zero. Each class of subordinated certificates will be entitled to receive its pro rata share of the subordinated principal distribution amount from both loan groups (based on its respective class certificate balance); provided, that if the applicable credit support percentage of a class of subordinated certificates (other than the class of subordinated certificates then outstanding with the highest distribution priority) is less than the original applicable credit support percentage for that class (referred to as a "restricted class"), the restricted class will not receive distributions of partial principal prepayments and prepayments in full from any loan group. Instead, the portion of the partial principal prepayments and prepayments in full otherwise distributable to each restricted class will be allocated to those classes of subordinated certificates that are not a restricted class, pro rata, based upon their respective class certificate balances and distributed in the sequential order described above.

***Allocation of Realized Losses***

On each distribution date, the amount of any realized losses on the mortgage loans in a loan group will be allocated as follows:

- the applicable PO percentage of any realized losses on a discount mortgage loan in a loan group will be allocated to the related Class PO Component; provided, however, that on or before the senior credit support depletion date, (i) those realized losses will be treated as Class PO Deferred Amounts and will be paid on the related Class PO Component (to the extent funds are available from amounts otherwise allocable to the subordinated principal distribution amount) before distributions of principal on the subordinated certificates and (ii) the class certificate balance of the subordinated certificates then outstanding with the lowest distribution priority will be reduced by the amount of any payments of Class PO Deferred Amounts; and

S-16

EXHIBIT 121    15

- the applicable non-PO percentage of any realized losses on the mortgage loans in a loan group will be allocated in the following order of priority:

  - first, to the subordinated certificates in the reverse order of their priority of distribution, beginning with the class of subordinated certificates outstanding, with the lowest distribution priority until their respective class certificate balances are reduced to zero; and

  - second, concurrently to the senior certificates (other than the notional amount certificates and the related Class PO Component) related to that loan group, pro rata, based upon their respective class certificate balances, except that (i) the non-PO percentage of any realized losses on the mortgage loans in loan group 1 that would otherwise be allocated (x) to the Class 1-A-1 Certificates will instead be allocated to the Class 1-A-2 Certificates, until its class certificate balance is reduced to zero and (y) to the Class 1-A-4 and Class 1-A-6 Certificates will instead be allocated concurrently and on a pro rata basis to the Class 1-A-7 Certificates, until its class certificate balance is reduced to zero and (ii) the non-PO percentage of any realized losses on the mortgage loans in loan group 2 that would otherwise be allocated to the Class 2-A-1 and Class 2-A-3 Certificates will instead be allocated to the Class 2-A-2 and Class 2-A-4 Certificates, respectively, until their respective class certificate balances are reduced to zero.

On each distribution date, the class certificate balance of each class of then outstanding exchangeable certificates will be reduced by a proportionate share of the amount of the realized losses allocated on that distribution date to the related classes of depositable certificates that have been deposited.

In addition, if, on any distribution date, following all distributions and the allocation of realized losses, the aggregate class certificate balance of all classes of senior and subordinated certificates exceeds the pool principal balance, then the class certificate balance of the class of subordinated certificates then outstanding with the lowest distribution priority will be reduced by the amount of the excess.

### Credit Enhancement

The issuance of senior certificates and subordinated certificates by the issuing entity is designed to increase the likelihood that senior certificateholders will receive regular distributions of interest and principal.

#### Subordination

The senior certificates will have a distribution priority over the classes of subordinated certificates. Among the subordinated certificates, the Class M Certificates will have a distribution priority over the Class B Certificates. Within the Class M and Class B Certificates, each class of certificates will have a distribution priority over those classes of certificates, if any, with a higher numerical designation.

Subordination is designed to provide the holders of certificates with a higher distribution priority with protection against losses realized when the remaining unpaid principal balance of a mortgage loan exceeds the proceeds recovered upon the liquidation of that mortgage loan. In general, this loss protection is accomplished by allocating the realized losses on the mortgage loans in a loan group first, to the subordinated certificates, beginning with the class of subordinated certificates then outstanding with the lowest distribution priority and second, to the related senior certificates (other than the notional amount certificates) in accordance with the priorities set forth above under "— *Allocation of Realized Losses.* " Further, the class certificate balance of the class of subordinated certificates with the lowest distribution priority will be reduced by the amount of distributions on the Class PO Certificates in reimbursement for the Class PO deferred amounts as described above under "— *Allocation of Losses.* "

S-17

EXHIBIT 121     16

Additionally, as described above under "— *Principal Payments* ," the senior prepayment percentage related to a loan group (which determines the allocation of unscheduled payments of principal among the related senior certificates and the subordinated certificates) will exceed the related senior percentage (which represents such senior certificates' pro rata percentage interest in the mortgage loans in that loan group) for the first 9 years after the closing date. This disproportionate allocation of unscheduled payments of principal will have the effect of accelerating the amortization of the senior certificates which receive these unscheduled payments of principal while, in the absence of realized losses, increasing the interest in the principal balance of the mortgage pool evidenced by the subordinated certificates. Increasing the interest of the subordinated certificates relative to that of the senior certificates is intended to preserve the availability of the subordination provided by the subordinated certificates.

*See "Description of the Certificates — Allocation of Losses" in this prospectus supplement and "Credit Enhancement — Subordination" in this prospectus supplement and in the prospectus.*

*Cross-Collateralization*

If on any distribution date the aggregate class certificate balance of the senior certificates of a senior certificate group, other than the related Class PO Component and related notional amount certificates, after giving effect to distributions to be made on that distribution date, is greater than the non-PO pool balance for that loan group (any such group, an ″undercollateralized group ″ ), all amounts otherwise distributable as principal to the subordinated certificates (or, following the senior credit support depletion date, the amounts described in the following sentence) will be distributed as principal to the senior certificates of that undercollateralized group, other than the related Class PO Component and related notional amount certificates, until the aggregate class certificate balance of the senior certificates, other than the related Class PO Component and related notional amount certificates, of the undercollateralized group equals the non-PO pool balance for that loan group (such distribution, an ″undercollateralization distribution ″ ). If the senior certificates, other than the related Class PO Component and related notional amount certificates, of a senior certificate group constitute an undercollateralized group on any distribution date following the senior credit support depletion date, undercollateralization distributions will be made from the excess of the available funds for the other loan group remaining after all required amounts for that distribution date have been distributed to the senior certificates, other than the related Class PO Component and related notional amount certificates, of that senior certificate group.

Accordingly, the subordinated certificates will not receive distributions of principal until the undercollateralized group is no longer undercollateralized.

All distributions described in this *"Cross-Collateralization"* section will be made in accordance with the priorities set forth below under *"Distributions on the Certificates — Principal — Senior Principal Distribution Amount" and "— Subordinated Principal Distribution Amount."*

**Advances**

The master servicer will make cash advances with respect to delinquent payments of principal and interest on the mortgage loans to the extent the master servicer reasonably believes that the cash advances can be repaid from future payments on the mortgage loans. These cash advances are only intended to maintain a regular flow of scheduled interest and principal payments on the certificates and are not intended to guarantee or insure against losses.

*See "Servicing of Mortgage Loans — Advances" in this prospectus supplement.*

S-18

# Alternative Loan Trust 2007-17CB
**Issuing Entity**

# CWALT, INC.
**Depositor**



**Sponsor and Seller**

## Countrywide Home Loans Servicing LP
**Master Servicer**

## $745,477,658
*(Approximate)*

# Mortgage Pass-Through Certificates, Series 2007-17CB

**Prospectus Supplement**

## Morgan Stanley
## Credit Suisse

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the Series 2007-17CB Mortgage Pass-Through Certificates in any state where the offer is not permitted.

Dealers will deliver a prospectus supplement and prospectus when acting as underwriters of the Series 2007-17CB Mortgage Pass-Through Certificates and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the Series 2007-17CB Mortgage Pass-Through Certificates will be required to deliver a prospectus supplement and prospectus until 90 days after the date of this prospectus supplement.

June 28, 2007

EXHIBIT 121    18

# Exhibit 122

Filed Pursuant to Rule 424b5
Registration File No. 333-132375

**PROSPECTUS SUPPLEMENT**
**(To Prospectus dated November 15, 2006)**

$1,000,000,100
(Approximate)
**CWHEQ, INC.**
**Depositor**
**COUNTRYWIDE HOME LOANS, INC.**
**Sponsor and Seller**
**Countrywide Home Loans Servicing LP**
**Master Servicer**
**CWHEQ Home Equity Loan Trust, Series 2006-S9**
**Issuing Entity**
**Home Equity Loan Asset Backed Certificates, Series 2006-S9**

Distributions payable monthly, beginning January 25, 2007
_____

The issuing entity will issue certificates, including the following classes of certificates that are offered pursuant to this prospectus supplement and the accompanying prospectus:

| Class | Initial Certificate Principal Balance (1) | Price to Public(2) | Underwriting Discount | Proceeds to Depositor(3) |
|-------|-------------------------------------------|--------------------|-----------------------|--------------------------|
| A-1 | $ 428,653,000 | 100.00000% | 0.02107% | 99.97893% |
| A-2 | $ 114,126,000 | 99.99989% | 0.03000% | 99.96989% |
| A-3 | $ 195,418,000 | 99.99741% | 0.05000% | 99.94741% |
| A-4 | $ 75,532,000 | 99.99640% | 0.06667% | 99.92973% |
| A-5 | $ 86,271,000 | 99.99568% | 0.11667% | 99.87901% |
| A-6 | $ 100,000,000 | 99.99543% | 0.12667% | 99.86876% |
| A-R | $ 100 | (4) | (4) | (4) |

**Consider carefully the risk factors beginning on page S-14 in this prospectus supplement and on page 5 in the prospectus.**

The certificates represent obligations of the issuing entity only and do not represent an interest in or obligation of CWHEQ, Inc., Countrywide Home Loans, Inc. or any of their affiliates.

This prospectus supplement may be used to offer and sell the offered certificates only if accompanied by the prospectus.

(1)     This amount is subject to a permitted variance in the aggregate of plus or minus 5%.

(2)     Plus accrued interest, if any, in the case of the Class A-2, Class A-3, Class A-4, Class A-5 and Class A-6 Certificates.

(3)     Before deducting expenses payable by the Depositor estimated to be approximately $ 799,700 in the aggregate.

(4)     The Class A-R Certificates will not be purchased by the underwriters and are being transferred to Countrywide Home Loans, Inc. as partial consideration for the sale of the mortgage loans. See "Method of Distribution" in this prospectus supplement.

The classes of certificates offered by this prospectus supplement are listed, together with their interest rates, in the tables under "Summary — Description of the Certificates" on pages S-3 and S-4 of this prospectus supplement. This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed above and not to the other classes of certificates that will be issued by the issuing entity.

The certificates represent interests in a pool of closed-end, fixed rate loans that are secured by second liens on one- to four-family residential properties, as described in this prospectus supplement.

Credit enhancement for the certificates consists of:

- overcollateralization,
- a credit insurance policy,
- a limited loss coverage guarantee provided by the sponsor,
- excess interest, and
- with respect to the classes of offered certificates other than the Class A-R Certificates, a financial

EXHIBIT 122   19

guaranty insurance policy issued by MBIA Insurance Corporation.

**MBIA**

The credit enhancement for each class of certificates varies. Not all credit enhancement is available for every class. The credit enhancement for the certificates is described in more detail in this prospectus supplement.

The Class A-1 certificates will also have the benefit of an interest rate corridor contract.

These securities have not been approved or disapproved by the Securities and Exchange Commission or any state securities commission nor has the Securities and Exchange Commission or any state securities commission passed upon the accuracy or adequacy of this prospectus supplement or the prospectus. Any representation to the contrary is a criminal offense.

These securities will be offered if, as and when delivered on or about December 29, 2006, subject to the satisfaction of certain conditions. See "Method of Distribution" in this prospectus supplement.

**Countrywide Securities Corporation**

                                                                                      **RBS Greenwich Capital**

December 28, 2006

EXHIBIT 122   20

*Amounts Available for Distributions on the Certificates*

<u>Amounts Available with respect to Interest Distributions</u>

The amount available for interest distributions on the certificates on any distribution date will generally consist of the following amounts (after the fees and expenses as described below are subtracted):

- scheduled payments of interest on the mortgage loans collected during the applicable period,

- interest on prepayments to the extent not allocable to the master servicer as additional servicing compensation,

- interest amounts advanced by the master servicer and any required compensating interest paid by the master servicer related to certain prepayments on certain mortgage loans,

- proceeds allocable to interest in respect of any mortgage loans repurchased by a seller or purchased by the master servicer,

- liquidation proceeds on the mortgage loans during the applicable period (to the extent allocable to interest),

- net proceeds from the credit insurance policy allocable to interest, and

- any payments made by the sponsor under its loss coverage obligation described under " *Description of the Certificates — Sponsor Loss Coverage Obligation* " in this prospectus supplement that are allocable to interest.

<u>Amounts Available with respect to Principal Distributions</u>

The amount available for principal distributions on the certificates on any distribution date will generally consist of the following amounts (after fees and expenses as described below are subtracted):

- scheduled payments of principal of the mortgage loans collected during the applicable period or advanced by the master servicer,

- prepayments collected in the applicable period,

- the stated principal balance of any mortgage loans repurchased by a seller or purchased by the master servicer,

- the excess, if any, of the stated principal balance of a deleted mortgage loan over the stated principal balance of the related substitute mortgage loan,

- liquidation proceeds on the mortgage loans during the applicable period (to the extent allocable to principal),

- net proceeds from the credit insurance policy allocable to principal,

- any payments made by the sponsor under its loss coverage obligation described under " *Description of the Certificates — Sponsor Loss Coverage Obligation* " in this prospectus supplement that are allocable to principal,

- excess interest (to the extent available) in an amount necessary to reach or maintain the targeted overcollateralization level as described under " *Description of the Certificates — Overcollateralization Provisions* "  in this prospectus supplement, and

- charged-off loan proceeds (to the extent available) as described under " *—Priority of Distributions; Distributions of Charged-off Loan Proceeds* " below.

<u>Fees and Expenses</u>

The amounts available for distributions on the certificates on any distribution date generally will not include the following amounts:

- the master servicing fee and additional servicing compensation (as described in this prospectus supplement under *"Description of the Certificates — Withdrawals from the Certificate Account"* and *"—Withdrawals from the Distribution Account"* ) due to the master servicer,

- the certificate insurance premium,

EXHIBIT 122   21

- the trustee fee due to the trustee,

- amounts reimbursed to the master servicer and the trustee in respect of advances previously made by them and other amounts for which the master servicer and servicer are entitled to be reimbursed,

S-6

EXHIBIT 122   22

- the premium payable to the credit insurance provider in connection with the credit insurance policy,

- all prepayment charges (which are distributable only to the Class P Certificates), and

- all other amounts for which the depositor, a seller, the master servicer or any NIM Insurer is entitled to be reimbursed.

Any amounts netted from the amount available for distribution to the certificateholders will reduce the amount distributed to the certificateholders.

### Servicing Compensation

*Master Servicing Fee:*

The master servicer will be paid a monthly fee (referred to as the master servicing fee) with respect to each mortgage loan equal to one-twelfth of the stated principal balance of that mortgage loan multiplied by 0.50% per annum (referred to as the servicing fee rate). The master servicer will not be entitled to receive the master servicing fee with respect to a charged-off mortgage loan beginning with the due period after the charge-off date.

*Additional Servicing Compensation:*

The master servicer is also entitled to receive additional servicing compensation from amounts in respect of interest paid on certain principal prepayments, late payment fees, assumption fees and other similar charges (excluding prepayment charges) and investment income earned on amounts on deposit in certain of the issuing entity's accounts.

*Source and Priority of Payments:*

These amounts will be paid to the master servicer from collections on the mortgage loans prior to any distributions on the certificates.

*See "Servicing of the Mortgage Loans — Servicing Compensation and Payment of Expenses," "Description of the Certificates — Withdrawals from the Certificate Account" and "— Withdrawals from the Distribution Account" in this prospectus supplement.*

### Priority of Payments; Distributions of Interest

In general, on any distribution date, interest funds will be distributed in the following order:

- to the certificate insurer, the monthly premium for the certificate insurance policy,

- concurrently, to each class of Class A Certificates, current interest, pro rata, based on their respective entitlements,

- to the certificate insurer, any unpaid insurer reimbursement amounts,

- concurrently, to each class of Class A Certificates, interest accrued but not previously paid with respect to prior distribution dates, pro rata, based on their respective entitlements, and

- any remaining interest funds to be distributed as part of excess cashflow.

### Priority of Payments; Distributions of Principal

*General*

In general, on any distribution date, principal funds will be distributed in the following order:

- to the certificate insurer, any unpaid monthly premium for the certificate insurance policy remaining after application of interest funds,

- to the Class A Certificates, principal up to the principal distribution amount for that distribution date in the order of priority described below,

- to the certificate insurer, any unpaid insurer reimbursement amounts remaining after application of interest funds, and

EXHIBIT 122   23

- any remaining principal funds to be distributed as part of excess cashflow.

*Principal Distributions on the Class A Certificates*

On any distribution date, the principal distribution amount will be distributed to the Class A Certificates in the following order:

- to the Class A-6 Certificates, the NAS principal distribution amount (which is zero for the first three years and will increase as described under *"Description of the Certificates—Distributions—Distributions of Principal"* in this prospectus supplement), until its certificate principal balance is reduced to zero, and

- sequentially, to the Class A-1, Class A-2, Class A-3, Class A-4, Class A-5 and Class A-6 Certificates, in that order, in each case until the certificate principal balance of that class of certificates is reduced to zero.

S-7

EXHIBIT 122   24

*Effect of the Stepdown Date if a Trigger Event is not in Effect*

On any distribution date, available principal funds will be distributable as principal on the Class A Certificates in an amount based on the targeted level of overcollateralization. This amount is subject to reduction on and after the stepdown date.

*Trigger Events*

A "trigger event" refers to a delinquency trigger event or a cumulative loss trigger event. A "delinquency trigger event" refers to certain specified levels of delinquencies on the mortgage loans, and a "cumulative loss trigger event" refers to specified levels of realized losses on the mortgage loans.

If a trigger event is in effect on the related distribution date, the targeted amount of overcollateralization will be equal to the targeted amount of overcollateralization for the immediately preceding distribution date. The definitions of "Delinquency Trigger Event" and "Cumulative Loss Trigger Event" in this prospectus supplement provide information regarding the specified levels of delinquencies and losses that will cause a trigger event to occur.

*The Stepdown Date*

The stepdown date will be the later of (i) the distribution date in July 2009 and (ii) the first distribution date on which the aggregate stated principal balance of the mortgage loans as of the end of the related due period (after giving effect to principal prepayments received during the prepayment period that ends during that due period) is less than 50.00% of the aggregate stated principal balance of the mortgage loans as of the cut-off date.

**Priority of Distributions; Distributions of Charged-off Loan Proceeds**

Except as specified below, any mortgage loan with a scheduled payment that has not been paid in full within 180 days of the due date for that scheduled payment will be a charged-off mortgage loan. The last day of the due period in which the 180th day after the due date related to a delinquent scheduled payment occurs is referred to as the charge-off date. A charged-off mortgage loan does not include (i) a mortgage loan that has been charged-off by the master servicer as bad debt prior to the related charge-off date, (ii) a mortgage loan with a claim that is pending or a claim that has been paid under the credit insurance policy and (iii) a mortgage loan that has been the subject of a payment under the loss coverage obligation of Countrywide Home Loans, Inc.

Any net proceeds received with respect to a charged-off mortgage loan in any due period after the related charge-off date will be charged-off loan proceeds. Charged-off loan proceeds will be distributable only in accordance with the priorities set forth below and will not be available to make any other distributions or to pay any fees or expenses of the issuing entity other than the master servicer's expenses in connection with auctions of the charged-off mortgage loans and the related auction fee.

On each distribution date, the charged-off loan proceeds received during the related due period, if any, will be distributed in the following order:

- to the certificate insurer, any unpaid insurer reimbursement amounts remaining after application of interest funds, excess cashflow and principal funds on such distribution date,

- to the class or classes of Class A Certificates then entitled to receive distributions in respect of principal, in an aggregate amount equal to the overcollateralization deficiency amount (after taking into account all distributions on that distribution date other than the distribution of charged-off loan proceeds and the payments under the certificate insurance policy), payable to each such class in the same priority in which the principal distribution amount is distributed to such classes,

- concurrently, to each class of Class A Certificates, any unpaid realized loss amount for each such class (after taking into account all distributions on that distribution date other than the distribution of charged-off loan proceeds and the payments under the certificate insurance policy) pro rata based on their respective unpaid realized loss amounts, and

- to the Class E-P Certificates, any remaining charged-off loan proceeds.

**Excess Cashflow**

Excess cashflow generally refers to the remaining amounts (if any) available for distribution to the certificates after interest and principal distributions have been made.

EXHIBIT 122   25

EXHIBIT 122   26

On any distribution date, the excess cashflow (if any) will be distributed in the following order to the extent of the remaining excess cashflow:

- to the class or classes of certificates then entitled to distributions of principal, the amounts necessary to build or restore overcollateralization to the target overcollateralization level;

- concurrently, to each class of Class A Certificates, any unpaid realized loss amount for each such class, pro rata based on their respective unpaid realized loss amounts;

- to each class of Class A Certificates (in the case of the Class A-1 Certificates, after payments of amounts available (if any) under the corridor contract), pro rata based first on their respective certificate principal balances and then on any unpaid amount of net rate carryover, to the extent needed to pay any unpaid net rate carryover for the Class A Certificates; and

- to the Class C and Class A-R Certificates, as specified in the pooling and servicing agreement.

*See "Description of the Certificates — Overcollateralization Provisions" in this prospectus supplement.*

### Credit Enhancement

Credit enhancement provides limited protection to holders of certain certificates against shortfalls in payments received on the mortgage loans. This transaction employs the following forms of credit enhancement:

<u>Overcollateralization</u>

"Overcollateralization" refers to the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate certificate principal balance of the certificates.

On the closing date, it is expected that the aggregate stated principal balance of the mortgage loans will approximately equal the initial aggregate certificate principal balance of the certificates.

Prior to the stepdown date, the targeted amount of overcollateralization will equal 1.65% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. On or after the stepdown date, the targeted amount of overcollateralization will be equal to the greater of: (1) 3.30% of the aggregate stated principal balance of the mortgage loans for the related distribution date and (2) 0.50% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. If a trigger event is in effect on the related distribution date, the targeted amount of overcollateralization will equal the targeted amount of overcollateralization for the immediately preceding distribution date. If the amount of overcollateralization is below the targeted level for a distribution date, excess interest on the mortgage loans (if any) will be used to reduce the aggregate certificate principal balance of the Class A Certificates, until the required level of overcollateralization has been reached or restored.

On any distribution date, the amount of overcollateralization (if any) will be available to absorb the losses from liquidated mortgage loans, if those losses are not otherwise covered by excess cashflow (if any) from the mortgage loans.

*See "Description of the Certificates—Overcollateralization Provisions" in this prospectus supplement.*

<u>Credit Insurance</u>

Old Republic Insurance Company, a Pennsylvania insurance corporation, will issue a credit insurance policy that will cover mortgage loans with principal balances equaling approximately 49.67% of the aggregate stated principal balance of the mortgage loans as of the cut-off date. The mortgage loans covered by the credit insurance policy were selected by the credit insurance provider from the mortgage pool in accordance with its selection criteria. Subject to certain limitations, the credit insurance policy will generally be available to cover losses resulting from the failure by the borrowers to make scheduled payments on the covered loans that are not subject to a policy exclusion, up to an aggregate amount equal to 10.00% of the aggregate principal balance of the covered loans (approximately $49,674,241 ) .

*See "The Credit Insurance Policy" in this prospectus supplement.*

<u>Loss Coverage Provided by the Sponsor</u>

The sponsor will make payments to the issuing entity pursuant to a corporate guaranty if any claim on the mortgage loans covered by the credit insurance policy is fully or partially denied payment by the credit insurance provider due to a policy exclusion to the extent of the amount denied by the credit insurance provider. The loss coverage obligation will initially be equal to approximately $10,000,000 which is approximately

EXHIBIT 122   27

1.00% of the aggregate stated principal balance of the mortgage loans as of the cut-off date.

See "Description of the Certificates—Sponsor Loss Coverage Obligation" in this prospectus supplement.

S-9

EXHIBIT 122   28

- any amounts remaining under letters of credit, pool policies or other forms of credit enhancement.

Where applicable, any amount set forth above may be expressed as a dollar amount per single security of the relevant class having the percentage interest specified in the related prospectus supplement. The report to securityholders for any series of securities may include additional or other information of a similar nature to that specified above.

In addition, within a reasonable period of time after the end of each calendar year, the master servicer or the trustee will mail to each securityholder of record at any time during the related calendar year a report (a) as to the aggregate of amounts reported pursuant to the first two items for the related calendar year or, in the event the person was a securityholder of record during a portion of that calendar year, for the applicable portion of the year and (b) other customary information as may be deemed necessary or desirable for securityholders to prepare their tax returns.

### Categories of Classes of Securities

The securities of any series may be comprised of one or more classes. These classes, in general, fall into different categories. The following chart identifies and generally defines certain of the more typical categories. The prospectus supplement for a series of securities may identify the classes which comprise the related series by reference to the following categories.

| Categories of Classes | Definition<br>Principal Types |
| --- | --- |
| Accretion Directed | A class that receives principal payments from the accreted interest from specified accrual classes. An accretion directed class also may receive principal payments from principal paid on the underlying Trust Fund Assets for the related series. |
| Companion Class | A class that receives principal payments on any distribution date only if scheduled payments have been made on specified planned principal classes, targeted principal classes or scheduled principal classes. |
| Component Securities | A class consisting of "components." The components of a class of component securities may have different principal and/or interest payment characteristics but together constitute a single class. Each component of a class of component securities may be identified as falling into one or more of the categories in this chart. |

EXHIBIT 122   29

Non-Accelerated Senior or NAS

A class that, for the period of time specified in the related prospectus supplement, generally will not receive (in other words, is locked out of) (1) principal prepayments on the underlying Trust Fund Assets that are allocated disproportionately to the senior securities because of the shifting interest structure of the securities in the trust and/or (2) scheduled principal payments on the underlying Trust Fund Assets, as specified in the related prospectus supplement. During the lock-out period, the portion of the principal distributions on the underlying Trust Fund Assets that the NAS class is locked out of will be distributed to the other classes of senior securities.

Notional Amount Securities

A class having no principal balance and bearing interest on the related notional amount. The notional amount is used for purposes of the determination of interest distributions.

Planned Principal Class or PACs

A class that is designed to receive principal payments using a predetermined principal balance schedule derived by assuming two constant prepayment rates for the underlying Trust Fund Assets. These two rates are the endpoints for the "structuring range" for the planned principal class. The planned principal classes in any series of certificates may be subdivided into different categories (e.g., primary planned principal classes, secondary planned principal classes and so forth) having different effective structuring ranges and different principal payment priorities. The structuring range for the secondary planned principal class of a series of certificates will be narrower than that for the primary planned principal class of the series.

Scheduled Principal Class

A class that is designed to receive principal payments using a predetermined principal balance schedule but is not designated as a planned principal class or targeted principal class. In many cases, the schedule is derived by assuming two constant prepayment rates for the underlying Trust Fund Assets. These two rates are the endpoints for the "structuring range" for the scheduled principal class.

Sequential Pay

Classes that receive principal payments in a prescribed sequence, that do not have predetermined principal balance schedules and that under all circumstances receive payments of principal continuously from the first distribution date on which they receive principal until they are retired. A single class that receives principal payments before or after all other classes in the same series of securities may be identified as a sequential pay class.

Strip

A class that receives a constant proportion, or "strip," of the principal payments on the underlying Trust Fund Assets.

38

EXHIBIT 122   30

| | |
|---|---|
| Super Senior | A class that will not bear its proportionate share of realized losses (other than excess losses) as its share is directed to another class, referred to as the "support class" until the class principal balance of the support class is reduced to zero. |
| Support Class | A class that absorbs the realized losses other than excess losses that would otherwise be allocated to a Super Senior Class (or would not otherwise be allocated to the Senior Class) after the related classes of subordinate securities are no longer outstanding. |
| Targeted Principal Class or TACs | A class that is designed to receive principal payments using a predetermined principal balance schedule derived by assuming a single constant prepayment rate for the underlying Trust Fund Assets. |

**Interest Types**

| | |
|---|---|
| Fixed Rate | A class with an interest rate that is fixed throughout the life of the class. |
| Floating Rate or Adjustable Rate | A class with an interest rate that resets periodically based upon a designated index and that varies directly with changes in the index. |
| Inverse Floating Rate | A class with an interest rate that resets periodically based upon a designated index and that varies inversely with changes in the index. |
| Variable Rate | A class with an interest rate that resets periodically and is calculated by reference to the rate or rates of interest applicable to specified assets or instruments (e.g., the Loan Rates borne by the underlying loans). |
| Interest Only | A class that receives some or all of the interest payments made on the underlying Trust Fund Assets and little or no principal. Interest Only classes have either a nominal principal balance or a notional amount. A nominal principal balance represents actual principal that will be paid on the class. It is referred to as nominal since it is extremely small compared to other classes. A notional amount is the amount used as a reference to calculate the amount of interest due on an interest only class that is not entitled to any distributions of principal. |
| Principal Only | A class that does not bear interest and is entitled to receive only distributions of principal. |

39

EXHIBIT 122   31

| | |
|---|---|
| Partial Accrual | A class that accretes a portion of the amount of accrued interest thereon, which amount will be added to the principal balance of the class on each applicable distribution date, with the remainder of the accrued interest to be distributed currently as interest on the Partial Accrual Class. This accretion may continue until a specified event has occurred or until the Partial Accrual Class is retired. |
| Accrual | A class that accretes the amount of accrued interest otherwise distributable on that class, which amount will be added as principal to the principal balance of that class on each applicable distribution date. This accretion may continue until some specified event has occurred or until the accrual class is retired. |

**Indices Applicable to Floating Rate and Inverse Floating Rate Classes**

*LIBOR*

The applicable prospectus supplement may specify some other basis for determining LIBOR, but if it does not, on the LIBOR determination date (as defined in the related prospectus supplement) for each class of securities of a series for which the applicable interest rate is determined by reference to an index denominated as LIBOR, the person designated in the related pooling and servicing agreement as the calculation agent will determine LIBOR in accordance with one of the two methods described below (which method will be specified in the related prospectus supplement):

*LIBO Method*

Unless otherwise specified in the related prospectus supplement, if using this method to calculate LIBOR, the calculation agent will determine LIBOR on the basis of the rate for U.S. dollar deposits for the period specified in the prospectus supplement that appears on Telerate Screen Page 3750 as of 11:00 a.m. (London time) on the interest determination date (as defined in the related prospectus supplement). If the rate does not appear on the Telerate Screen Page 3750 (or any page that may replace the page on that service, or if this service is no longer offered, another service for displaying LIBOR or comparable rates as may be reasonably selected by the calculation agent), LIBOR for the applicable accrual period will be the Reference Bank Rate.

"Reference Bank Rate" with respect to any accrual period, means

(a)     the arithmetic mean (rounded upwards, if necessary, to the nearest whole multiple of 0.03125%) of the offered rates for United States dollar deposits for one month that are quoted by the reference banks as of 11:00 a.m., New York City time, on the related interest determination date to prime banks in the London interbank market, provided that at least two reference banks provide the rate; and

(b)     If fewer than two offered rates appear, the Reference Bank Rate will be the arithmetic mean (rounded upwards, if necessary, to the nearest whole multiple of 0.03125%) of the rates quoted by one or more major banks in New York City, selected by the calculation agent, as of 11:00 a.m., New York City time, on the related interest determination date for loans in U.S. dollars to leading European banks.

EXHIBIT 122   32

**$1,000,000,100**
**(Approximate)**

**Home Equity Loan Asset Backed Certificates, Series 2006-S9**

**CWHEQ Home Equity Loan Trust, Series 2006-S9**
**Issuing Entity**

**CWHEQ, INC.**
**Depositor**

**Countrywide Home Loans, Inc. Logo**
**Sponsor and Seller**

**Countrywide Home Loans Servicing LP**
**Master Servicer**

_____

**PROSPECTUS SUPPLEMENT**

_____

# Countrywide Securities Corporation

# RBS Greenwich Capital

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the Home Equity Loan Asset Backed Certificates, Series 2006-S9 in any state where the offer is not permitted.

Dealers will deliver a prospectus supplement and prospectus when acting as underwriters of the Home Equity Loan Asset Backed Certificates, Series 2006-S9 and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the Home Equity Loan Asset Backed Certificates, Series 2006-S9 will be required to deliver a prospectus supplement and prospectus for 90 days after the date of the prospectus supplement.

December 28, 2006

EXHIBIT 122   33

# Exhibit 123

# COUNTRYWIDE FINANCIAL CORP

## FORM 10-K
### (Annual Report)

## Filed 03/01/07 for the Period Ending 12/31/06

| | |
|---|---|
| Address | 4500 PARK GRANADA BLVD |
| | CALABASAS, CA 91302 |
| Telephone | 8182253000 |
| CIK | 0000025191 |
| Symbol | CFC.A |
| SIC Code | 6035 - Savings Institutions, Federally Chartered |
| Industry | Consumer Financial Services |
| Sector | Financial |
| Fiscal Year | 12/31 |

http://www.edgar-online.com
© Copyright 2009, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

EXHIBIT 123   34

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C. 20549

# Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2006**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 1-8422**

# Countrywide Financial Corporation

(Exact name of registrant as specified in its charter)

| Delaware | 13-2641992 |
|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **4500 Park Granada, Calabasas, CA** | **91302** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(818) 225-3000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.05 Par Value | New York Stock Exchange |
| Preferred Stock Purchase Rights | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒     No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐     No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒     No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐     No ☒

As of June 30, 2006, the last business day of the registrant's most recently completed second fiscal quarter, the aggregate market value of the Registrant's Common Stock held by non-affiliates was $23,108,648,689 based on the closing price as reported on the New York Stock Exchange.

As of February 26, 2007, there were 589,817,197 shares of Countrywide Financial Corporation Common Stock, $0.05 par value, outstanding.

**Documents Incorporated By Reference**

| Document | Parts Into Which Incorporated |
|---|---|
| Proxy Statement for the Annual Meeting of Stockholders to be held June 13, 2007 | Part III |

EXHIBIT 123   35

# Exhibit 124

# Jefferies & Company, Inc.

# Equity Research

**Banks, Thrifts, Market Makers & Traders**

**Update – May 25, 2005**

Charlotte A. Chamberlain, Ph.D. (310) 575-5194 cchamber@jefco.com

Hai H. Vu, Ph.D., CFA (310) 575-5147 hvu@jefco.com
Christopher R. Donat (310) 575-5130 cdonat@jefco.com

## Countrywide Financial Corp.
## NYSE: CFC - $36.26
## Rating: Hold

| 52-Week Range | $39.93 - $30.30 | FYE Dec. | 2003A | 2004A | 2005E | 2006E |
|---|---|---|---|---|---|---|
| Shares Out - FD (MM) | 586.2 | Total Assets | $97,944 | $128,496 | $141,756 | $147,296 |
| Float (MM) | 583.0 | Net Inc. | $2,373 | $2,225 | $2,261 | $2,443 |
| Institutional Ownership | 94.5% | ROCE | 32.0% | 22.4% | 17.7% | 19.5% |
| Avg. Daily Vol. (3 mos) | 4,103,640 | 1Q | $0.61 | $0.90 | $1.13 | $0.88 |
| Equity Market Cap (MM) | $21,256 | 2Q | $0.68 | $1.29 | $0.94 | $1.10 |
| Total Assets (MM) | $137,033 | 3Q | $1.93 | $0.81 | $0.89 | $1.13 |
| Dividend/Yield | $0.60/1.65% | 4Q | $0.91 | $0.61 | $0.75 | $0.89 |
| | | OP EPS | $4.16 | $3.60 | $3.70 | $4.00 |
| ($MM), except per share data | | P/E | 8.7x | 10.1x | 9.8x | 9.1x |

## No Customer Left Behind

We are reiterating our Hold rating on shares of Countrywide Financial Corp. and maintaining our 2005 and 2006 EPS estimates and also our price target of $38. After attending a thoroughly proper British briefing for analysts, we felt totally spoiled by the amount of data Countrywide lavishes on its investors. However, like the analyst who confessed to total modeling frustration in front of Countrywide's 300-person audience, we're not sure if all (or any of) that data can be condensed into useful information. Nevertheless, it just feels so comforting to have it anyway. CFC's commitment not to turn down any mortgage borrower that was approved by any other lender was a bit jolting as an underwriting guideline, as was the Company's new interest in "small" mortgage company acquisitions and goal to grow Treasury Bank to $250 billion in less than 5 years from the current $50 billion base. However none could compare to the debut of CFC's "veiled-in proprietary-information" fixed income and derivatives hedge fund, Sunfish. Further, management seems to be sending up "trial balloons" regarding raising additional capital. Apparently the recent launch of Sunfish and its off-balance sheet assets, was in part motivated by the desire to mitigate the onerous capital requirements that the rating agencies impose on residual securities — almost dollar for dollar. However since CFC management said that Sunfish can leverage its investments, we'll be interested to see how the rating agencies and bank regulators react to Countrywide's newest investment initiative. According to the management these funds can be leveraged and operated as a joint venture with outside money managers and private investors. Apparently the rating agencies have more stringent capital requirements for retained residuals than for MSRs. The Company also toning down its growth expectations to reflect the realities of the current competitive market for originations. The revised timeframe to reach its 30% production market share goal is now 2010 from 2008 previously. The recent decline of the 10-year Treasury yield to 4.03% has prompted a resurgence in fixed-rated refinancings, which tends to boost CFC's competitors' market share. And with lower long rates, we also expect further impairments to CFC's servicing asset this quarter. Unlike the last time in February when the 10-year was this low, the yield curve is 44 bps flatter now thanks to the FOMC's tighter monetary policy. This means that net interest margins will be pressured as interest expenses rise while asset yields stagnate. While May and June production will undoubtedly show improvement from April, we remain cautious that gain on sale margins can be maintained in what is probably the last gasp of the interest rate cycle. Our EPS estimate for 2Q05 is $0.94 vs. $1.13 for 1Q05 based on lower production margins. CFC shares trade at 9.1x our 2006 $4.00 EPS estimate (Table 1), which is low relative to peers but within its near-term historical range of 8 -10x forward year earnings (Chart 1). We cover the other highlights of the meeting below:

Please see Important Disclosure Information on the last pages of this Report.



EXHIBIT 124    36

- **Is an Acquisition in the Works?** We got the impression from management's comments during the Investor Day that while they would prefer organic growth, they are open to considering an acquisition, perhaps of a medium-size mortgage bank.

- **Residuals to Sunfish**: It came up during discussions that Countrywide has a "new vehicle" to which the company can off-load residual risk from securitizations. Management was tight-lipped about the entity called Sunfish, which is apparently structured as a private LLC.

- **Production Market Share Growth**: Relative to 2000, Countrywide's retail channel has exhibited the fastest growth in market share from 1.7% to 4.5% (Chart 2). Countrywide's share of total market origination pie is currently 14.2% with the goal for 2010 of 30%.

### Chart 1 – P/E History for CFC



Source: Factset, FirstCall and Jefferies & Company, Inc.®

---

### Chart 2 – Production Market Share Growth



### Chart 3 – Servicing Multiples



Source: Company Documents and Jefferies & Company, Inc.®

---

- **Fixed Rate MSRs More Valuable than ARMs:** In Chart 3, the Company lays out the relative pricing multiples of fixed-rate MSRs vs. adjustable rate. ARMs tend to refi into fixed in rising rate environments and therefore are slower to rise than their fixed rate counterparts.

- **MSRs + Hedges Benefits in Rising Rates**: During the presentation, management detailed in theory how they expected MSRs to perform (Chart 4). Actual performance in past quarters has often not been easily predictable.

- **CFC Origination and Securitization Channels More Diverse**: While CEO Angelo Mozilo came out against legislation that would limiting GSEs' portfolios, it's clear that Countrywide has gradually migrated away from originating conforming mortgages and securitizing with Fannie Mae (FNM - $58.00, NC) or Freddie Mac (FRE -

### Chart 4 – MSRs + Hedges in Different Rate Scenarios



Source: Company Documents and Jefferies & Company, Inc.®

---

Please see Important Disclosure Information on the last pages of this Report.
Page 2 of 8

**Jefferies & Company, Inc.**

EXHIBIT 124     37

$64.29, NC).  Non-GSE securitizations grew from 22% to 55% from 2002 to 1Q05 (Chart 5).  This is perhaps due to the production side of the residential business, which is now only 41% GSE conforming vs. 59% in 2002 (Chart 6).

| Chart 5 – Securitization Mix | Chart 6 – Residential Production Mix |
|---|---|



Source: Company Documents and Jefferies & Company, Inc.®

- **Update on Market Conditions: 2 out of 3 Improve –** The yield curve continues to steepen, which should be a challenge to Countrywide's net interest margin (Chart 7).  However volatility is back to December levels, which will likely benefit the valuations on Countrywide's option-based hedges (Chart 8).  Finally, CFC's measurement of basis risk efficiency improved back to December quarter levels.

| Chart 7 – Yield Curve Flattens Further | Chart 8 – Fixed Income Volatility Rebounds | Chart 9 – Mortgage Spreads Widen |
|---|---|---|



Source:  Bloomberg and Jefferies & Company, Inc.®

- **Valuation.**  CFC shares trade at 9.1x our 2006 $4.00 EPS estimate (Table 1), which is low relative to peers but within its near-term historical range of 8 -10x forward year earnings.

## Table 1: Valuation

| Ticker | Company Name | Rating | Price 5/24/05 | Book Value | Price/ Book | First Call Estimates | | | | P/E | | | | EPS Growth | ROE | ROA | % Net Int Margin | Div. Yield | Market ($B) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2003 | 2004 | 2005 | 2006 | 2003 | 2004 | 2005 | 2006 | | | | | | |
| ASO | AmSouth Bancorp | NC | $26.55 | $9.89 | 2.7x | $1.77 | $1.89 | $2.02 | $2.16 | 15.0x | 14.0x | 13.2x | 12.3x | 6.2% | 20.20 | 1.42 | 3.41 | 3.77 | $9.37 |
| BAC | Bank of America Corp | NC | $46.61 | $24.35 | 1.9x | $3.57 | $3.69 | $4.22 | $4.48 | 13.1x | 12.6x | 11.0x | 10.4x | 12.6% | 19.01 | 1.56 | 3.09 | 3.86 | $187.45 |
| BBT | BB&T Corp | NC | $40.11 | $19.73 | 2.0x | $2.77 | $2.82 | $3.02 | $3.30 | 14.5x | 14.2x | 13.3x | 12.2x | 3.1% | 14.50 | 1.57 | 3.92 | 3.49 | $21.91 |
| CMA | Comerica Inc | NC | $56.73 | $29.81 | 1.9x | $3.75 | $4.36 | $4.57 | $4.86 | 15.1x | 13.0x | 12.4x | 11.7x | 10.4% | 15.69 | 1.57 | 3.95 | 3.88 | $9.58 |
| FITB | Fifth Third Bancorp | NC | $42.76 | $16.03 | 2.7x | $2.89 | $2.68 | $3.09 | $3.43 | 14.8x | 16.0x | 13.8x | 12.5x | 3.8% | 17.79 | 1.60 | 3.33 | 3.27 | $23.73 |
| FHN | First Horizon National Corp | NC | $41.64 | $16.86 | 2.5x | $3.62 | $3.54 | $3.53 | $3.87 | 11.5x | 11.8x | 11.8x | 10.8x | 6.9% | 21.46 | 1.28 | 3.10 | 4.13 | $5.17 |
| FNM | Fannie Mae | NC | $58.00 | $22.74 | 2.6x | $7.29 | $7.55 | $7.05 | $7.32 | 8.0x | 7.7x | 8.2x | 7.9x | 3.8% | NA | NA | 1.18 | 1.79 | $56.14 |
| FRE | Freddie Mac | NC | $64.29 | NA | NA | $6.79 | $3.78 | $6.67 | $7.01 | 9.5x | 17.0x | 9.6x | 9.2x | -22.2% | 4.77 | 0.19 | 1.08 | 2.18 | $44.26 |
| HBAN | Huntington Bancshares Inc/OH | NC | $23.84 | $11.15 | 2.1x | $1.53 | $1.71 | $1.77 | $1.90 | 15.6x | 13.9x | 13.5x | 12.5x | 9.5% | 15.28 | 1.18 | 3.27 | 3.61 | $5.54 |
| KEY | Keycorp | NC | $33.05 | $17.58 | 1.9x | $2.12 | $2.48 | $2.60 | $2.78 | 15.6x | 13.3x | 12.7x | 11.9x | 4.6% | 14.89 | 1.16 | 3.65 | 3.93 | $13.47 |
| MI | Marshall & Ilsley Corp | NC | $43.84 | $17.58 | 2.5x | $2.39 | $2.71 | $3.01 | $3.32 | 18.3x | 16.2x | 14.6x | 13.2x | 11.4% | 17.05 | 1.65 | 3.32 | 2.19 | $10.04 |
| MTG | MGIC Investment Corp | NC | $60.60 | $43.92 | 1.4x | $4.75 | $5.51 | $6.39 | $6.71 | 12.8x | 11.0x | 9.5x | 9.0x | 3.0% | 17.46 | 11.35 | NA | 0.99 | $5.72 |
| NCC | National City Corp | NC | $34.50 | $19.86 | 1.7x | $3.43 | $3.57 | $3.01 | $3.26 | 10.1x | 9.7x | 11.5x | 10.6x | 5.1% | 15.15 | 1.40 | 3.83 | 4.06 | $21.97 |
| NFB | North Fork Bancorporation Inc | NC | $27.28 | $18.89 | 1.4x | $1.73 | $1.84 | $2.34 | $2.61 | 15.7x | 14.8x | 11.7x | 10.5x | 10.8% | 11.49 | 1.72 | 3.74 | 3.23 | $13.03 |
| PNC | PNC Financial Services Group | NC | $55.31 | $26.78 | 2.1x | $3.96 | $4.21 | $4.28 | $4.66 | 14.0x | 13.1x | 12.9x | 11.9x | 0.7% | 18.88 | 1.70 | 3.01 | 3.62 | $15.68 |
| RF | Regions Financial Corp | NC | $33.60 | $22.98 | 1.5x | $1.91 | $2.29 | $2.41 | $2.68 | 17.6x | 14.7x | 13.9x | 12.5x | 3.1% | 9.02 | 1.15 | 3.79 | 4.05 | $15.59 |
| SOV | Sovereign Bancorp Inc | NC | $22.18 | $15.24 | 1.5x | $1.45 | $1.68 | $1.85 | $2.05 | 15.3x | 13.2x | 12.0x | 10.8x | 12.7% | 10.46 | 1.02 | 3.22 | 0.72 | $8.09 |
| STI | SunTrust Banks Inc | NC | $74.46 | $44.59 | 1.7x | $4.73 | $5.25 | $5.56 | $6.08 | 15.7x | 14.2x | 13.4x | 12.3x | 5.0% | 12.22 | 1.22 | 3.21 | 2.95 | $26.92 |
| SNV | Synovus Financial Corp | NC | $29.12 | $8.68 | 3.4x | $1.28 | $1.41 | $1.62 | $1.83 | 22.8x | 20.7x | 18.0x | 15.9x | 10.2% | 17.28 | 1.84 | 4.02 | 2.51 | $9.06 |
| USB | US Bancorp | NC | $29.37 | $10.43 | 2.8x | $1.92 | $2.18 | $2.40 | $2.63 | 15.3x | 13.5x | 12.2x | 11.2x | 9.3% | 21.63 | 2.18 | 4.05 | 4.09 | $53.83 |
| WB | Wachovia Corp | NC | $52.15 | $29.48 | 1.8x | $3.36 | $3.95 | $4.28 | $4.77 | 15.5x | 13.2x | 12.2x | 10.9x | 6.4% | 13.73 | 1.30 | 3.30 | 3.53 | $82.21 |
| WFC | Wells Fargo & Co | NC | $61.03 | $22.76 | 2.7x | $3.65 | $4.09 | $4.55 | $5.05 | 16.7x | 14.9x | 13.4x | 12.1x | 11.1% | 19.34 | 1.72 | 4.81 | 3.15 | $102.98 |
| ZION | Zions Bancorporation | NC | $71.34 | $31.39 | 2.3x | $4.08 | $4.47 | $5.01 | $5.54 | 17.5x | 16.0x | 14.2x | NA | 11.6% | 15.61 | 1.38 | 4.46 | 2.02 | $6.40 |
| | | | | | | | | | | | | | | | | | | | |
| GDW | Golden West Financial Corp.* | Buy | $61.80 | $22.56 | 2.7x | $3.57 | $4.12 | $4.70 | $5.40 | 17.3x | 15.0x | 13.1x | 11.4x | 15.4% | 18.78 | 1.27 | 2.62 | 0.39 | $18.88 |
| WM | Washington Mutual* | Underperform | $41.99 | $24.98 | 1.7x | $4.21 | $3.25 | $3.30 | $3.10 | 10.0x | 12.9x | 12.7x | 13.5x | -6.6% | 16.64 | 1.17 | 2.73 | 4.48 | $36.84 |
| | | | | | | | | | | | | | | | | | | | |
| | Median | | | | 2.0x | | | | | 15.3x | 13.9x | 12.7x | 11.8x | 6.9% | 16.17 | 1.41 | 3.33 | 3.49 | |
| | Average | | | | 2.2x | | | | | 13.9x | 13.4x | 12.0x | 11.1x | 7.3% | 16.53 | 1.53 | 3.25 | 3.29 | |
| | | | | | | | | | | | | | | | | | | | |
| CFC | Countrywide Financial Corp. | Hold | $36.26 | $18.68 | 1.9x | $4.16 | $3.60 | $3.70 | $4.00 | 8.7x | 10.1x | 9.8x | 9.1x | 31.7% | 25.16 | 2.08 | 2.77 | 1.65 | $21.26 |

\* Jefferies & Co. Inc. Research Estimates

Source: Reuters, Bloomberg, SNL Securities and Jefferies & Company, Inc.®

Please see Important Disclosure Information on the last pages of this Report.
Page 4 of 8

Jefferies & Company, Inc.

EXHIBIT 124     39

## Table 2: Earnings Model

**COUNTRYWIDE FINANCIAL SERVICES, INC. AND SUBSIDIARIES**
Amounts in millions, except per-share data

| | 3 Months Ending | | | | FY 2004 | 3 Months Ending | | | | FY 2005 | 3 Months Ending | | | | FY 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar-04 | Jun-04 | Sep-04 | Dec-04 | | Mar-05 | Jun-05 | Sep-05 | Dec-05 | | Mar-06 | Jun-06 | Sep-06 | Dec-06 | |
| Loan production revenue | 1,117 | 1,480 | 1,104 | 1,262 | 4,963 | 1,362 | 1,232 | 1,153 | 967 | 4,714 | 878 | 1,053 | 1,053 | 790 | 3,774 |
| Interest income | 1,050 | 1,074 | 1,173 | 1,261 | 4,558 | 1,481 | 1,491 | 1,512 | 1,532 | 6,017 | 1,552 | 1,586 | 1,603 | 1,603 | 6,344 |
| Interest expense | -518 | -576 | -655 | -825 | -2,573 | -996 | -1,048 | -1,058 | -1,069 | -4,170 | -945 | -959 | -966 | -966 | -3,836 |
| Net interest earned | 532 | 499 | 518 | 436 | 1,985 | 485 | 444 | 454 | 464 | 1,847 | 608 | 627 | 637 | 637 | 2,509 |
| Provision for loan losses | -21 | -20 | -8 | -23 | -72 | -20 | -20 | -20 | -20 | -78 | -20 | -20 | -20 | -20 | -78 |
| Loan servicing fees | 757 | 803 | 813 | 897 | 3,270 | 972 | 819 | 829 | 850 | 3,471 | 893 | 915 | 938 | 950 | 3,696 |
| Amortization & impairment of MSRs | -414 | -570 | -394 | -563 | -1,940 | -472 | -572 | -550 | -536 | -2,130 | -489 | -476 | -464 | -446 | -1,875 |
| Recovery of retained interests | -996 | 1,179 | -796 | -36 | -648 | 315 | - | - | - | 315 | - | - | - | - | - |
| Servicing hedge gains | 673 | -1,149 | 591 | -330 | -215 | -552 | - | - | - | -552 | - | - | - | - | - |
| Net loan servicing fees | 20 | 262 | 214 | -31 | 466 | 263 | 247 | 279 | 314 | 1,104 | 404 | 439 | 475 | 504 | 1,822 |
| Net insurance premiums earned | 195 | 187 | 195 | 205 | 783 | 200 | 202 | 204 | 206 | 810 | 208 | 210 | 212 | 214 | 843 |
| Commissions and other revenue | 121 | 127 | 138 | 146 | 532 | 115 | 117 | 120 | 122 | 474 | 125 | 127 | 130 | 132 | 514 |
| Total revenues | 1,965 | 2,536 | 2,160 | 1,995 | 8,656 | 2,405 | 2,222 | 2,190 | 2,053 | 8,870 | 2,202 | 2,436 | 2,487 | 2,258 | 9,383 |
| Salaries and related expenses | 681 | 770 | 850 | 836 | 3,137 | 786 | 794 | 802 | 810 | 3,193 | 818 | 827 | 835 | 843 | 3,323 |
| Occupancy and other office expenses | 168 | 164 | 175 | 210 | 718 | 200 | 202 | 204 | 206 | 813 | 208 | 210 | 213 | 215 | 846 |
| Marketing expenses | 32 | - | - | 50 | 82 | 55 | 55 | 55 | 55 | 221 | 55 | 55 | 55 | 55 | 221 |
| Insurance net losses | 85 | 84 | 107 | 115 | 390 | 76 | 77 | 79 | 81 | 313 | 82 | 84 | 86 | 87 | 339 |
| Other operating expenses | 117 | 172 | 190 | 164 | 644 | 138 | 139 | 141 | 142 | 560 | 144 | 145 | 147 | 148 | 583 |
| Total expenses | 1,083 | 1,190 | 1,322 | 1,376 | 4,971 | 1,256 | 1,269 | 1,282 | 1,295 | 5,101 | 1,308 | 1,321 | 1,335 | 1,348 | 5,312 |
| Earnings before income taxes | 883 | 1,345 | 838 | 619 | 3,686 | 1,149 | 954 | 908 | 759 | 3,770 | 894 | 1,115 | 1,152 | 909 | 4,071 |
| Provision for income taxes | 339 | 538 | 335 | 248 | 1,461 | 460 | 382 | 363 | 304 | 1,508 | 358 | 446 | 461 | 364 | 1,628 |
| Net earnings | 543 | 807 | 503 | 372 | 2,225 | 689 | 572 | 545 | 455 | 2,261 | 537 | 669 | 691 | 546 | 2,443 |
| **Earnings per Share** | | | | | | | | | | | | | | | |
| Diluted | $0.90 | $1.29 | $0.81 | $0.61 | $3.60 | $1.13 | $0.94 | $0.89 | $0.75 | $3.70 | $0.88 | $1.10 | $1.13 | $0.89 | $4.00 |
| Cash dividends per share | $0.08 | $0.10 | $0.12 | $0.14 | $0.38 | $0.14 | $0.15 | $0.15 | $0.15 | $0.40 | $0.15 | $0.15 | $0.15 | $0.15 | $0.40 |
| **Weighted Average Shares Outstanding** | | | | | | | | | | | | | | | |
| Basic | 556.0 | 559.8 | 563.5 | 576.6 | 560.9 | 583.2 | 583.2 | 583.2 | 583.2 | 572.5 | 583.2 | 583.2 | 583.2 | 583.2 | 572.5 |
| Diluted | 606.6 | 625.8 | 620.8 | 609.2 | 617.6 | 610.7 | 610.7 | 610.7 | 610.7 | 640.0 | 610.7 | 610.7 | 610.7 | 610.7 | 640.0 |

Source: Company Documents and Jefferies & Company, Inc.®

Please see Important Disclosure Information on the last pages of this Report.
Page 5 of 8

Jefferies & Company, Inc.

EXHIBIT 124    40

I, Charlotte A. Chamberlain, Ph.D., certify that all of the views expressed in this research report accurately reflect my personal views about the subject security(ies) and subject company(ies).  I also certify that no part of my compensation was, is, or will be, directly or indirectly, related to the specific recommendations or views expressed in this research report.

## IMPORTANT DISCLOSURES

**Please read this information in conjunction with the attached report.  This will inform you of any actual or potential conflicts of interest that Jefferies & Company, Inc. and our affiliates (collectively "Jefferies") may have in connection with the issuance of this report.**

At this time, Jefferies does not expect to receive or intend to seek paid investment banking assignments from  any of the companies mentioned in this report within the next three months.  As is the case with all Jefferies employees, the analyst(s) responsible for the coverage of the financial instruments discussed in this report receive compensation based in part on the overall performance of the firm, including investment banking income.  Within the past twelve months, Jefferies and/or its affiliates received non-investment banking, securities related compensation for client services it provided to Washington Mutual Inc. and  Golden West Financial Corp.   Jefferies & Company, Inc. and Jefferies International Limited and their affiliates and their respective directors, officers and employees may buy or sell securities mentioned herein as agent or principal for their own account.  Additional and supporting information is available upon request. Charlotte Chamberlain owns shares of Countrywide Financial Corp common stock.  Charlotte Chamberlain owns shares of Golden West Financial Corp. common stock.

### Meanings of Jefferies & Company, Inc. Ratings

**Buy -** Describes stocks that we expect to provide a total return (price appreciation plus yield) of 10% or more within a 12-month period. A Buy-rated stock's total return is expected to exceed the average total return of the analyst's (or industry team's) industry coverage universe, on a risk-adjusted basis.

**Hold -** Describes stocks that we expect to provide a total return (price appreciation plus yield) of plus or minus 10% within a 12-month period. A Hold-rated stock's total return is expected to be in line with the average total return of the analyst's (or industry team's) industry coverage universe, on a risk-adjusted basis.

**Underperform -** Describes stocks that we expect to provide a total negative return (price appreciation plus yield) of 10% or more within a 12-month period. An Underperform-rated stock's total return is expected to be below the average total return of the analyst's (or industry team's) industry coverage universe, on a risk-adjusted basis.

**NR -** The investment rating and price target have been temporarily suspended. Such suspensions are in compliance with applicable regulations and/or Jefferies & Company, Inc. policies.

**CS -** Coverage Suspended. Jefferies & Company, Inc. has suspended coverage of this company.

**NC -** Not covered. Jefferies & Company, Inc. does not cover this company.

**Speculative Buy -** Describes stocks we view with a positive bias, whose company fundamentals and financials are being monitored, but for which there is insufficient information for Jefferies & Company, Inc. to assign a Buy, Hold or Underperform Rating. At the discretion of the analyst, a Speculative buy-rated stock could also include stocks with a price under $5, or where the company is not investment grade to highlight the risk of the situation.

**Speculative Underperform -** Describes stocks we view with a negative bias, whose company fundamentals and financials are being monitored, but for which there is insufficient information for Jefferies & Company, Inc. to assign a Buy, Hold or Underperform Rating. At the discretion of the analyst, a Speculative underperform-rated stock could also include stocks with a price under $5, or where the company is not investment grade to highlight the risk of the situation.

### Valuation Methodology

Jefferies' methodology for assigning ratings may include the following: market capitalization, maturity, growth/value, volatility and expected total return over the next 12 months.  The price targets are based on several methodologies, which may include, but are not restricted to, analyses of market risk, growth rate, revenue stream, discounted cash flow (DCF), EBITDA, EPS, cash flow (CF), free cash flow (FCF), EV/EBITDA, P/E, PE/growth, P/CF, P/FCF, premium (discount)/average group EV/EBITDA, premium (discount)/average group P/E, sum of the parts, net asset value, dividend returns, and return on equity (ROE) over the next 12 months.

### Risk which may impede the achievement of our Price Target

This report was prepared for general circulation and does not provide investment recommendations specific to individual investors.  As such, the financial instruments discussed in this report may not be suitable for all investors and investors must make their own investment decisions based upon their specific investment objectives and financial situation utilizing their own financial advisors as they deem necessary. Past performance of the financial instruments recommended in this report should not be taken as an indication or guarantee of

future results. The price, value of, and income from, any of the financial instruments mentioned in this report can rise as well as fall and may be affected by changes in economic, financial and political factors. If a financial instrument is denominated in a currency other than the investor's home currency, a change in exchange rates may adversely affect the price of, value of, or income derived from the financial instrument described in this report. In addition, investors in securities such as ADRs, whose values are affected by the currency of the underlying security, effectively assume currency risk.

## Distribution of Ratings

The table below lists the distribution of investment ratings for our coverage universe, and the percentage of those companies in each rating category that are banking clients:

|  | % Companies Covered | % Banking Clients |
|---|---|---|
| Buy | 51 | 19 |
| Hold/Neutral | 43 | 12 |
| Underperform/Sell | 6 | n/a |

## Price Chart(s)

Price charts for the equity securities referenced in this research report are available at http://www.jefco.com.

### Countrywide Financial Corp. Stock Price Chart



(Source: Bloomberg)

▲ Dec. 10, 2002   Initiating Price target to $15.10
☐ Dec. 10, 2002   Initiating Coverage - Buy
▲ Dec. 11, 2002   Price target changed to $61.00
☐ Dec. 11, 2002   Rating changed to Buy
▲ Jan. 24, 2003   Price target changed to $16.58
▲ Jul. 22, 2003   Price target changed to $18.81
☐ Jul. 22, 2003   Rating changed to Hold
☐ Oct. 10, 2003   Price target suspended
▲ Jan. 12, 2004   Price target changed to $21.45
▲ Jan. 27, 2004   Price target changed to $29.37
▲ Mar. 09, 2004   Price target changed to $34.65
▲ Apr. 21, 2004   Price target changed to $35.00
☐ Apr. 21, 2004   Rating changed to Buy
▲ Jun. 16, 2004   Price target changed to $42.50

---

Please see Important Disclosure Information on the last pages of this Report.   **Jefferies & Company, Inc.**
Page 7 of 8

EXHIBIT 124    42

▲ Oct. 20, 2004        Price target changed to $38.00
▲ Dec. 09, 2004       Price target changed to $40.00
▲ Mar. 08, 2005       Price target changed to $38.00
☐ Mar. 08, 2005       Rating changed to Hold

## OTHER DISCLOSURES

This material has been prepared by Jefferies & Company, Inc. a U.S.-registered broker-dealer, employing appropriate expertise, and in the belief that it is fair and not misleading.  The information upon which this material is based was obtained from sources believed to be reliable, but has not been independently verified, therefore, we do not guarantee its accuracy.  Additional and supporting information is available upon request.   This is not an offer or solicitation of an offer to buy or sell any security or investment.  Any opinion or estimates constitute our best judgment as of this date, and are subject to change without notice. Jefferies & Company, Inc. and Jefferies International Limited and their affiliates and their respective directors, officers and employees may buy or sell securities mentioned herein as agent or principal for their own account.

### Additional information for UK and Canadian investors

This material is approved for distribution in the United Kingdom by Jefferies International Limited regulated by the Financial Services Authority ("FSA").  While we believe this information and materials upon which this information was based are accurate, except for any obligations under the rules of the FSA, we do not guarantee its accuracy.  This material is intended for use only by professional or institutional investors falling within articles 19 or 49 of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 and not the general investing public.  None of the investments or investment services mentioned or described herein are available to other persons in the U.K. and in particular are not available to "private customers" as defined by the rules of the FSA.  For Canadian investors, this material is intended for use only by professional or institutional investors.  None of the investments or investment services mentioned or described herein are available to other persons or to anyone in Canada who is not a "Designated Institution" as defined by the Securities Act (Ontario).

Copyright 2005 Jefferies & Company, Inc..  All rights reserved.  Any unauthorized use or disclosure is prohibited.

# Exhibit 125



1 of 1 DOCUMENT

Copyright 2006 Los Angeles Times
All Rights Reserved
Los Angeles Times

October 17, 2006 Tuesday
Home Edition

**SECTION:** BUSINESS; Business Desk; Part C; Pg. 4

**LENGTH:** 434 words

**HEADLINE:** Markets;
Buyers Wary of Lender's Bonds;
Investors want an extra yield as mortgage giant Countrywide sells debt amid housing slump.

**BYLINE:** From Bloomberg News

**BODY:**

Countrywide Financial Corp. is getting buffeted by bondholders as it prepares to sell as much as $4.5 billion of new debt in a slumping housing market.

Investors are demanding an extra yield to own the company's $1 billion of 6.25% notes due in 2016, data show. This extra yield, or "spread," compared with similar-maturity U.S. Treasury notes has widened by 24 basis points to 136 basis points since they were sold in May.

Spreads on bonds of rivals with comparable credit ratings have risen by less than 2 basis points, Merrill Lynch & Co. index data show. One basis point is 0.01%.

Investors are concerned that Calabasas-based Countrywide is expanding into the riskiest parts of the mortgage business just as the housing market slows. As much as $20 billion of the $118 billion in mortgages Countrywide made in the second quarter gave borrowers the option to defer full payments in the first few years, increasing the amount of debt owed.

"Bondholders have to ask themselves if it's worth taking the risk" of more bad news about the housing market, said Scott MacDonald, director of research at hedge fund Aladdin Capital Management in Stamford, Conn. Aladdin manages $11.5 billion in assets, including bonds of Countrywide.

Investors who bought Countrywide's 10-year subordinated notes in May have earned 3.52%, including reinvested interest, according to Trace, the bond-price reporting system of NASD (formerly the National Assn. of Securities Dealers). A Merrill Lynch index that contains the bonds and those of Countrywide's peers has returned 4.94%.

New-home prices in the U.S. will fall this year for the first time since 1991, and existing houses will have the

EXHIBIT 125    44

Markets; Buyers Wary of Lender's Bonds; Investors want an extra yield as mortgage giant Countrywide sells debt amid housing slump. Los Angeles Times October 17, 2006 Tuesday

smallest gain ever as a glut of properties forces sellers to accept lower offers, the National Assn. of Realtors said recently.

Last month, 4.5% of all Countrywide loans had delinquent payments, up from 4.15% in August. The increase was caused in part by loans to people with bad credit, and missed payments will probably continue to rise, JPMorgan Securities Inc. analysts said.

"There's been some broader concern about the mortgage market, and when people think about the mortgage industry, they think about Countrywide," said Banc of America Securities analyst John Guarnera.

Countrywide said Sept. 8 that it planned to raise $3.5 billion to $4.5 billion in debt this year. Chairman and Chief Executive Angelo Mozilo has warned investors the mortgage business will slow.

"It's no secret that the housing market is cooling rapidly," Mozilo said at the company's investor forum Sept. 12.

On Monday, Countrywide shares slipped 24 cents to $36.12.

**LOAD-DATE:** October 17, 2006

EXHIBIT 125     45

# Exhibit 126

**EQUITY RESEARCH**
United States

**Bank of America**

**October 27, 2006**

**Specialty Finance**

## CFC

$38.52

**12-Month Target:**
$33.00

**Total Return To Target:**
(12.8%)

## Sell

| Market Cap. | Volatility |
|---|---|
| $23.8 BB | Medium |

**Robert Lacoursiere**
212.847.5677
robert.lacoursiere@bofasecurities.com

**Martin Ji, CFA**
212.847.6576
martin.ji@bofasecurities.com

**Steven C. Sherowski**
212.847.5164
steven.c.sherowski@bofasecurities.com

## Countrywide Financial Corporation

### Market Disconnects from Fundamentals: Reiterating Sell Rating

▶ The 9% rally in CFC post 3Q06 (vs. S&P500 +0.9%) earnings has surprised us, prompting a detailed reexamination of the quarter's results.

▶ Profitability and quality of new business was significantly weaker and with MSR and residual write-downs so was the past. Management comments suggest more pressure and less upside.

▶ NIM is expanding, but loan growth has stalled and credit continues to deteriorate - yet CFC is not as conservatively reserved as peers making them prone to 'catch-up' reserving (see Relative Reserve chart on pg 15) adding to downside risk of $0.29/share.

▶ Growth opportunities are disappearing. CFC is turning to buybacks, efficiencies and share gains in competitive channels & riskier products for EPS support, curtailing bank diversification efforts & making them more vulnerable to the cyclical downturn (see Strategic Positioning charts on pgs 8 & 9).

▶ Results and management actions we think are the hallmark of a high growth company hitting their limits. Buffeted by the crosswinds of an inevitable credit downturn and further slowing industry originations, we see signs that company may be losing the ability to complete a 'high wire' transition act to more diversified-less volatile business model.

▶ We would use the recent price surge to dispose of positions of CFC.

▶ **Valuation and Target Price Analysis:** Our target price of $33 implies a P/E of 8.99x and P/B of 1.22x, compared with current levels of 8.89x and 1.62x.

▶ **PORTFOLIO MANAGERS' SUMMARY: Page 3.**

**Relative Reserve Profiles**



Source: Company reports, Banc of America Securities LLC estimates.

---

**Changes at a glance**

(Please see page 2 for additional detail)



▶ **Rating?** No — Maintain Sell
▶ **Target Price?** Yes — $30.00 to $33.00

▶ **Revenue (BB)**

| | | Prev | Curr |
|---|---|---|---|
| FY05 | * | – | $10.0 |
| FY06E | * | – | $11.5 |

▶ **EPS**

| | | Prev | Curr | P/E |
|---|---|---|---|---|
| FY05 | No | – | $4.11 | 9.4 |
| FY06E | Yes | $4.39 | $4.30 | 9.0 |
| FY07E | Yes | $4.00 | $4.31 | 8.9 |

* No Previous Values

△ = Up; ▽ = Down; ≡ = No Change. ** These estimates adjusted to account for FAS 123r, Expensing of Employee Stock Options.

---

**This report has been prepared by Banc of America Securities LLC (BAS), member NASD, NYSE and SIPC. BAS is a subsidiary of Bank of America Corporation. Please see the important disclosures and analyst certification on page 25 of this report. BAS and its affiliates do and seek to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report. Investors should consider this report as only a single factor in making their investment decision.**

EXHIBIT 126      46

**Equity Research**
October 27, 2006

**Bank of America**

# Countrywide Financial Corporation

| Company Data | |
|---|---|
| 52-Week Range | $44-30 |
| Market Capitalization (BB) | $23.8 |
| Shares Outstanding (MM) | 617.7 |
| Float (MM) | 607.9 |
| Short Interest | 3.6% |
| Average Daily Volume | 4,311,989 |
| Dividend/Yield | $0.60/1.6% |
| 09/06 ROE/ROIC | 17.6%/N/A |
| Exchange-Traded Funds | XLF,JKF |
| Convertibles | YES |
| Proj. 3-Yr EPS Growth Rate | N/M |

| Balance Sheet (09/06) | |
|---|---|
| Net Cash/Share | N/A |
| Book Value/Share | $24.06 |
| Price/Book Value | 1.6x |
| Debt/Cap. | 54.5% |

| Estimates (FYE Dec) | 2005A | 2006E Prev | 2006E Curr | 2007E Prev | 2007E Curr |
|---|---|---|---|---|---|
| **EPS\*** | | | | | |
| 1Q (Mar) | $1.13 | – | $1.10A | $0.91 | $0.98 |
| 2Q (Jun) | 0.92 | – | 1.15A | 0.98 | 1.13 |
| 3Q (Sep) | 1.03 | 1.15 | 1.03A | 1.13 | 1.23 |
| 4Q (Dec) | 1.03 | 0.99 | 1.00E | – | 0.98 |
| **Fiscal Year** | **$4.11** | $4.39 | **$4.30** | $4.00 | **$4.31** |
| First Call Mean | | | $4.37 | | $4.76 |
| **Calendar Year** | **$4.11** | $4.39 | **$4.30** | $4.00 | **$4.31** |
| P/E | 9.4 | | 9.0 | | 8.9 |
| – | | | | | |
| **Revenue (BB)** | | | | | |
| 1Q (Mar) | $2.4 | – | $2.8A | – | $2.7 |
| 2Q (Jun) | 2.3 | – | 3.0A | – | 2.8 |
| 3Q (Sep) | 2.7 | – | 2.8A | – | 2.8 |
| 4Q (Dec) | 2.6 | – | 2.8E | – | 2.6 |
| **Fiscal Year** | **$10.0** | – | **$11.5** | – | **$10.9** |
| First Call Mean | | | $11.8 | | $12.6 |

\* These estimates adjusted to account for FAS 123r, Expensing of Employee Stock Options. First Call Mean estimates might not have been similarly adjusted.

**Top Picks**
**Freddie Mac**
(FRE, $69.15, B, $72.25 Target)

**Least Favorites**
**Countrywide Financial Corporation**
(CFC, $38.52, S, $33.00 Target)

**IndyMac Bancorp**
(NDE, $45.57, S, $36.00 Target)

**Company Description**
▶ Founded in 1969, Countrywide Financial Corporation is the largest mortgage company and the largest mortgage loan servicer in the country. The company originates, purchases, securitizes, sells, and services prime and nonprime loans and provides other related financial services.

**Sector View**
▶ Higher rates-induced origination decline should intensify competition and provoke credit deterioration; the subprime, broker/correspondent and sale gain dependent are the most vulnerable, in our opinion.

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126    47

Equity Research

October 27, 2006

**Bank of America**

## Portfolio Managers' Summary

▶ **Our 12-month thesis on the stock.** Countrywide is expected to face headwinds in earnings growth with the mortgage industry origination slowdown, as the company relies heavily on gain on sale and is vulnerable to the cyclical downturn. As industry profitability is deteriorating and CFC has chosen to pursue increased leverage and origination market share gains to hold up earnings, it is more susceptible to cyclicality and the associated credit risk in a declining competitive market. Slower loan portfolio growth and increased exposure to potential credit risk also should weigh on the stock valuation.

▶ **Our call today in a nutshell.** The surprising 9% rally in CFC post 3Q06 (Vs. S&P500 +0.9%) earnings prompted our detailed reexamination of the quarter's results. Profitability and quality of new business was significantly weaker and with MSR and residual write-downs so was the past. Management comments suggest more pressure and less upside. NIM is expanding, but loan growth has stalled and credit continues to deteriorate - yet CFC's below peer reserves make them prone to 'catch-up' reserving on the order of $0.29/share. With growth opportunities disappearing, CFC is turning to buybacks, efficiencies and share gains in competitive channels & riskier products for EPS support, curtailing bank diversification & making them more vulnerable to the cyclical downturn. Results and management actions we think are the hallmark of a high growth company hitting its limits. We recommend investors use the recent price surge to dispose of positions in CFC.

▶ **Upcoming catalysts.** While weak economic data may prompt the Fed to cut, deteriorating industry fundamentals should continue to put pressure on stock valuation. The weekly and monthly data points for mortgage applications, as well as CFC's monthly production releases, should be used to gauge the magnitude of the anticipated origination falloff. 4Q06 quarterly results should also help investors gauge the company's credit performance.

▶ **12-month valuation.** With a weakening outlook for industry production and credit quality, we think CFC should suffer valuation pressure as increased competition hampers its market share & earnings growth prospects. Diminishing earnings confidence has us applying a 15% discount to the proprietary risk-adjusted DCF analysis that we use to derive our December '07 target price of $33. The target price implies a forward P/E of 8.99x and P/BV of 1.22x, compared to the current of 8.89x and 1.62x.

▶ **Risks to our call.** Calls for credit deterioration have been made before and have apparently been early. Easing energy prices could allow a retreat in rates sparking a refi induced respite for problematic mortgages with payment shock potential.

EXHIBIT 126      48

**Equity Research**
October 27, 2006

**Bank of America**

## Summary and Investment Conclusions

The strong rally in CFC share price post 3Q06 earnings has surprised us. Our initial characterization of the quarter's results was negative. Now that we have had the opportunity to hear from management and the time to more profoundly analyze the figures, we have reexamined the quarter's results in the context of our investment thesis on the stock. This is what we have concluded;

- ▶ Profitability of new business (originations) was significantly weaker than expected and past profitability of originations (gain on sale) was over stated (given MSR and residual write-downs) which together with management's outlook suggests further pressure and less eventual upside.

- ▶ While net interest margins are expanding, loan growth has stalled and the credit quality outlook continues to deteriorate - yet the company is not as conservatively reserved as its peers. We think CFC is more vulnerable than peers to 'catch-up' reserving (see chart of Relative Reserve Profiles on page 15) should the much anticipated credit cycle turn occur.

- ▶ Organic growth opportunities are nearly exhausted. CFC is now turning to increased leverage, cost efficiencies and more competitive channels (correspondent) and riskier products (Alt-A) for EPS support. The net result is more vulnerable strategic positioning (see Product and Channel Positioning charts on pages 8 and 9) should the origination volume declines continue.

- ▶ With capital going towards share buybacks, bank diversification efforts are being curtailed

We think CFC's results and management actions are the hallmark of a high growth company hitting a growth wall. Being a central element to our bearish investment thesis on CFC, we had expected this and were concerned of the risks as they made the difficult moves to transition to more diversified-less volatile but slower growing earning streams. Buffeted by the crosswinds of an inevitable credit downturn and slowing industry originations, we see signs that company may be losing its ability to complete this 'high wire' transition act.

The market seems to be taking great solace in the announced share buybacks. But we wonder if it's understood that it comes at the expense of foregoing an increased proportion of earnings from higher valued spread income that would have come from more loan retention. Alternatively it's an explicit signal from management that their view of credit has diverged from the MBS market because portfolioing credit does not meet their hurdle equity return rate. Furthermore this divergence must be thought to be ongoing because if management really thought this situation would improve wouldn't have the decision be to hold the 'excess equity' in order to deploy it later when the opportunities presented themselves?

We think the signals are pretty clear. Mortgage industry profitability is deteriorating and CFC has chosen to pursue increased leverage and origination market share gains to hold up earnings making them more susceptible to cyclicality and the associated credit risk with large share gains in a declining competitive market. So although we raised our 2007 and 2008 estimates (from $4.00 and $3.46 to $4.31 and $3.67 respectively) as well as our Price Target (from $30 to $33), we reiterate our Sell rating on CFC, recommending investors use the recent price surge to dispose of positions.

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126   49

## 3Q06 Earnings Review and Analysis

Countrywide's 3Q06 EPS of $1.03 was short of consensus of $1.08 and our estimate of $1.15. The miss relative to our expectation was driven by a lower than expected GOS margin ($0.18/share), an MSR under-hedge (0.03/share), and a retained residual write-down ($0.14/share), partially offset by surprisingly better net interest margin ($0.06/share), reduced provisioning ($0.06/share), better expenses ($0.09/share), and a lower effective tax rate ($0.03/share). Management also lowered '06 earnings guidance and announced $1 – $2 billion of buybacks for 4Q06.

### Despite Sales outpacing Production, Gain on Sale Fell on Margin Pressure.

In 3Q06, Countrywide's mortgage banking segment sold $107 billion of loans (101% of production), exceeding our estimate of $96 billion and $95 billion in 2Q06. Despite besting our sales volume estimate by $11 billion, 3Q06's total mortgage gain on sale of $1,166 million was well below our $1,357 million forecast, with the difference representing $0.18 of EPS. The shortfall was the result of a narrowing in the gain on sale margin from 1.38% in 2Q06 to 1.09% compared to our 1.41% estimate. Management revealed that GOS margin compression occurred across all products, the consequence of increased competition and deteriorating credit spreads. Management also pointed to hedge timing differences on HELOC and nonprime loans having negatively impacted sale gains. But that only amounted to $60 million, which if included would only have increased the GOS margin by 5 bps to 1.14%, still well below 2Q06's 1.38%. While some of that might get recaptured in 4Q06, management did confirm that 2Q06's margin also benefited.

### Increased Reliance on Correspondent Production.

We think a more important factor in the GOS margin compression was the increased reliance on the lower-margin correspondent channel (38.6% of total mortgage originations vs. 33.5% in 2Q06) –quite a reversal from management's intention disclosed in 2Q06's earnings call to pull back from the correspondent channel due to irrational pricing from the investment banks. In addition, management disclosed increased Alt-A production (without quantifying the $ amount) via correspondent channel resulting from broadening their offering in that area.



---

**Jumping Back into the Correspondent Water...**

**Correspondent as % of Total Residential Mortgage Production**



Source: Company reports.

---

3Q06 results revealed that in order to mitigate the industry origination downturn CFC also increased market share. While some may be applaud such an accomplishment, we are much more apprehensive given how it was achieved through an indirect channel (which is responsible for some recent negative headlines due to fraud) which also because of low entry barriers just a few months earlier management characterized as suffering from irrational competitive behavior. In addition, it was accomplished through a product extension in Alt-As, which are more likely to be relied upon by ultimately marginal borrowers. The low/no documentation feature of Alt-A products combined with the indirect nature of the correspondent channel means increased difficulty to accurately gauge individual borrowers' credit profile, increased odds of loans being miss-priced and increased probability that loans go default.

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126    51

**Bank of America**

---

Residential Mortgage Market Share Rebounded With Channel Mix Shifted toward Correspondent



Source: Company reports, MBA origination estimates.

---

Take a look at the pair of following graphs. We believe it demonstrates how CFC's strategic positioning – already relatively more vulnerable than peers to the envisaged credit and origination downturn, is becoming more so.

EXHIBIT 126      52

**Equity Research**
October 27, 2006

**Bank of America**

---

**Mortgage Industry Product Origination Risk Profile**



Source: Company reports, Banc of America Securities LLC estimates.
*Note: Data is from LTM before 2Q06; Potentially low risk (lower left corner) - low indirect originations / total originations implies better customer credit risk control.  Potentially high risk (upper right corner) - higher subprime + Alt-A + option ARM / total originations ratio.

---

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126     53

Equity Research
October 27, 2006

**Bank of America**

### Mortgage Industry Origination and Funding Channel Positioning



Source: Company reports, Banc of America Securities LLC estimates.

## Cash Terms of Sale Deteriorated.

While gain on sale revenue was under pressure due to shrinking margins, the quality of the gain on sale revenue also deteriorated, as the quarterly gross addition of MSR and retained residuals (before valuation adjustments) were more than the gain on sale revenue booked ($1.9 billion vs. $1.2 billion recorded, or 166.7% of total gain on sale realized, deteriorated from 122.6% in 2Q06), indicating that the cash gain on sale was more negative than the previous quarter (or alternatively the leverage in the securitization declined). We examined the same data since early 2002 and found that not surprisingly for most of the quarters, MSR and retained residuals recorded from loan sales were over 100% of GAAP gain on sale revenues, indicating consistent negative cash gains. Since retained residuals arising from loan sales are not disclosed but rather calculated using the change in period end balances (adjusted for disclosed valuation adjustments), we could be under-estimating the residuals booked given CFC does not disclose residual sales. This means the cash gain on sale could be more negative than illustrated in the chart below (or those few quarters of positive cash gains indicated may not actually be negative).

**Bank of America** 🏦

**Increasingly Negative Cash Gain on Sales**



Source: Company reports, Banc of America Securities LLC estimates.

## Surprising Better than Expected NIM Expansion but Loan Growth Stalled.

3Q06 banking segment NIM expanded 16 bps from 2Q06's 2.12% to 2.28% up. We were surprised by the NIM expansion due to the continuation of a flat / inverted yield curve. 3Q06 results from Washington Mutual for example revealed a NIM contraction of 13 bps. Management attributed the widening of the NIM largely to a reduction in the drag from "teaser rates" as they roll-off but little ("a basis point or two") further benefit is seen in the coming quarter. Margin expansion going forward will now be more driven by a decline in the asset/liability re-pricing drag, an effect that will be more pronounced if loan growth is curtailed as we think is being signaled. CFC only modestly increased their retained portfolio from $79.8 billion in 2Q06 to $80.8 billion. The modest increase in CFC's retained portfolio along with the unexpected NIM expansion resulted in net interest income of $799 million, compared to $690 million in 2Q06 and our estimate of $741 million, adding $0.06 to EPS.

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126     55

**Equity Research**
October 27, 2006

**Bank of America**



**NIM Started to Recover and Should Approach Higher Historical Level**

Source: Company reports, Banc of America Securities LLC estimates.

### Servicing Income Hit by Hedging and Credit.

3Q06 net servicing income was $246.4 million, down 44% from 2Q06's $438.5 million and lower than the $462 million we modeled, negatively impacting our estimates by $0.21/share.  Similar to peers that have reported their 3Q06 earnings, a MSR fair valuation impairment exceeding hedge benefit hit servicing income. For CFC the negative impact was $33 million or $0.03/share.  More important however, Countrywide also reported a $142 million write-down in its retained residuals.  When asked about this write-down, management indicated that approximately $100 million was due to changes in interest rates increasing prepayments, while the remaining $42 million was caused by assumption changes due to an increase in the market demanded yield on the residuals (widening credit spreads caused by increasing credit concerns in our view).  We believe that future residual write-downs are likely as credit spreads widen from historically tight levels.

### MSR & Residual Write-downs Signals Poor Earnings Quality.

Although the market appears to have taken the MSR and retained residual write-downs as temporary in nature and not reflective of underlying earnings, we think it reflects poorly upon the quality of past earnings and should have significant implications on how current gain on sale income is viewed and on CFC's equity quality. As previously discussed the quarterly creation of MSR and retained residuals due to loan sales is greater than the recorded gain on sale revenues. The subsequent mark-downs (net of hedges) are in fact the reversal of previously booked earnings that came from gain on sales. If mark-downs are consistent, it signals over-statement of historical earnings and suggests that recent gains may similarly not stand up.

**Equity Research**

October 27, 2006

**Bank of America**

From 1Q03 through 3Q06 CFC reported cumulative gain on sales of $19.9 billion and cumulative valuation write-downs (net of hedges) on MSRs and retained residuals of $2.8 billion. In other words for this period, 14% of the recorded gain on sale revenue was subsequently reversed by valuation mark-downs. Given how important loans sales are to CFC's business model that is not a trivial amount. To put that into perspective the reversals amounted to 15.8% of pre-tax and pre-write down earnings since 4Q02. Additionally, this also suggests past reported gain on sale margins were ultimately over stated, which we think should be taken into consideration on how much gain on sale margins could recover should competitive pressures recede.

**MSR and Retained Residual Valuation Write-downs Suggest Poor Earnings Quality (1Q03-3Q06)**



Source: Company reports.

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126      57

**Bank of America**

**MSR and Retained Interest Balance was 75% of Total Equity at 3Q06**



Source: Company reports, Banc of America Securities LLC estimates.

On a cumulative basis, retained residuals grew to $2.98 billion from $2.75 billion in 2Q06, while MSR was $15.0 billion. The sum of the two adjusted for tax amounted to 74.5% of total equity, although improved from 76.5%, was still higher than WM's 25.4% (in absence of 3Q06 data, we assumed 2Q06 residual balance including credit card residuals. Without the credit card component, the ratio would be 15.5%) and NDE's 66.8% (2Q06). Given the management announcement of share buyback in 4Q06, increased capital leverage and high MSR and residual balance proportional to its equity suggest weaker-than-peer capital position.

**Credit Risk Exposure Continued to Increase...**

CFC does not report consolidated credit metrics in the earning releases. However, CFC did report the bank segment NPA to loans held for investment ratio rose to 0.45% from 0.32% in 2Q06. The company's OREO also increased to $191 million from $146 million. Further concerns on the credit front were an increase in accumulated negative amortization of $471.3 million or 0.58% of total loan held for investment, up from 0.38% last quarter (3.12% of total equity vs. 2.11% in 2Q06). Gross quarterly deferred interest, which CFC disclosed for the first time was $214.8 million or 26.9% of net interest income versus 23.8% in 2Q06 and 5.6% in 3Q05. Although management suggested that many of the borrowers building up negative amortization were paying back, we found that the pace of this type of payback has slowed down to 15% of the beginning-of-the-quarter cumulative NegAm balance from 19% in 2Q06 and 285% in 3Q05. Even on a 4-quarter lag basis (to mitigate the fact that more fresh NegAm build-ups may skew the ratio), the ratio dropped to 174% from 1518% in 1Q06 (the earliest quarter with relevant data available to us).

**Equity Research**
October 27, 2006

**Bank of America**

### Sizing up the Negative Amortization

|  | Sep-05 | Dec-05 | Mar-06 | Jun-06 | Sep-06 |
|---|---|---|---|---|---|
| BOP Balance | 6,000 | 25,487 | 74,748 | 169,000 | 301,000 |
| Gross addition (quarterly deferred interest) | 36,565 | 69,458 | 109,433 | 164,036 | 214,776 |
| Implied NegAm curtailment | 17,078 | 20,197 | 15,181 | 32,036 | 44,451 |
| EOP Balance | 25,487 | 74,748 | 169,000 | 301,000 | 471,325 |
|  |  |  |  |  |  |
| NegAm curtailment as % of BOP balance | 284.6% | 79.2% | 20.3% | 19.0% | 14.8% |
| NegAm curtailment as % of BOP balance (4 quarters lag) | NA | NA | 1518% | 534% | 174% |
|  |  |  |  |  |  |
| Cumulative deferred interest income as % of LHFI | 0.04% | 0.11% | 0.23% | 0.38% | 0.58% |
| Cumulative deferred interest income as % of equity | 0.21% | 0.58% | 1.25% | 2.11% | 3.12% |
| Quarterly gross addition as % of net interest income | 5.6% | 10.4% | 15.8% | 23.8% | 26.9% |

Source: Company reports.

Note: Historical gross addition from company cash flow statements

### CFC is still Under-reserved vs. its peers despite 3Q06 Rise in Reserve Ratio.

The provisioning for the quarter declined to $38.0 million down from $61.9 million last quarter and below our estimate of $103.4 million ($0.06/share EPS impact). While not detailed in the release, Management confirmed to us that the quarter's net charge-off was $13.6 million –or just 7 bps of LHFI, sharply lower than $58.8 million or 30 bps of LHFI reported in 2Q06. While this was positive, we found it somewhat surprising given the continued deterioration in credit quality albeit to still healthy levels. As a result of the better than expected charge-offs, the reserve to loans held for investment portfolio improved 3 bps to 0.26% from 2Q06's 0.23% even though loan loss provisioning was lower than the previous quarter.

Despite the fact that Countrywide's loan loss reserves ratio improved, we still believe that the company is aggressively reserved.  The below bubble chart plots the average yield on earning assets to reserves over earnings assets for Countrywide and its peers. As one would intuitively expect, the chart shows that the higher the yield on earning assets, the more a company should reserve (relative to earning assets).  The line going through the middle of chart represents what we think is a peer consistent level of reserves in relation to the earning asset yield.  Companies above the line are then conservatively reserved, on the line are sufficiently reserved and below the line are aggressively reserved, meaning that we believe they are more likely to have to build reserves to cover credit deterioration.  Clearly, Countrywide is one of the more aggressively reserved relative to its peers.  We think that based off of Countrywide's relative position compared to its peers, it should have a reserves to earning assets ratio of 30 bps, compared to its current 12 bps.  To do so, it implies CFC would need an additional $291 million of reserves, bringing the total to $501 million from the current $210 million, and increasing its LLR to LHFI ratio from 26 to 62 bps.  The additional necessary reserves translate into $182 million of after tax income representing $0.29 EPS or 121 bps of ROE.  The $0.29 EPS is approximately 6.0% of consensus 2007 EPS of $4.80 or 1.9% of earnings since Countrywide started significantly growing its retained portfolio at the beginning of 2003 ($0.03 of EPS per quarter).

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126      59



Bank of America

**Relative Reserve Profiles**



Source: Company reports, Banc of America Securities LLC estimates.

## Better than Expected Non-Interest Expenses.

Total non-interest expenses excluding insurance claims declined 1.1% over sequential quarter to $1.68 billion from $1.70 billion, compared to our estimate of $1.74 billion, adding $0.09 to our EPS estimate.  The reduction included declines in compensation expenses ($4.8 million QoQ) and occupancy expenses ($3.2 million QoQ). While some of the improvement may be associated with the $500 million annualized expense savings initiative (includes gross layoffs of 2,500 employees), management indicated the expected reductions will come until 4Q06.  While the expense control is viewed as positive, we are surprised by slower than expected advertising and promotion expense growth of ($69.0 million vs. $82.0 million our estimate), given the intensifying competition in the current origination environment. Our enthusiasm is also tempered by CFC's decision to shift back to a less cost intensive yet lower margin correspondent channel which would result in lowered consolidated operating expenses because the associated indirect costs would be lower. In the absence of the 10Q filing, we also note that operating expenses could be lowered should there be any change in either the policy of expenses deferral or the pace at which accumulated deferral are amortized (which would occur is prepayment speed assumptions are slowed).

## Aggressive Share Buybacks in 4Q06.

Given that management admitted slow growth prospect, CFC reported that the board had approved a $2.5 billion stock buyback program and the company intends to repurchase between $1 billion and $2 billion worth of shares in 4Q06. Based on the pre 3Q06 earnings release closing price of $35.21, it implies 4Q06 buybacks of between 28.4 million shares and 56.8 million shares. CFC's daily trading volume in the last month was 3.6 million shares. With 46 trading days left in 4Q06, the total trading

**Equity Research**
October 27, 2006

**Bank of America**

volume assuming the same daily average would amount to 167.4 million shares. The management suggested magnitude of buybacks would be 17% to 34% of the total trading volume, which we believe is somewhat aggressive and the company may have to pay with inflated price to complete the targeted buybacks. In addition, the current equity to asset ratio was 7.82%. $1.5 billion of share buybacks would reduce the capital ratio by 78 bps to 7.04%. To avoid rating agency actions, management stated the repurchases should be made in concurrence with issuance of "high-equity content" debt securities.

### 3Q06 Earnings - Estimate vs. Actual

| ($ in thousand) | 3Q05 | 2Q06 | 3Q06E | 3Q06A | Amount diff | % difference | EPS Impact |
|---|---|---|---|---|---|---|---|
| Net interest income | 651,189 | 690,474 | 740,784 | 798,970 | 58,186 | 7.85% | 0.06 |
| Provision for loan and lease losses | 54,834 | 61,898 | 103,391 | 37,996 | (65,395) | -63.25% | -0.06 |
| | | | | | | | |
| Gain on sale of loans and securities | 1,284,992 | 1,527,450 | 1,562,817 | 1,373,901 | (188,916) | -12.09% | -0.18 |
| Loan servicing fees & other inc. from retained interests | 1,103,533 | 1,207,159 | 1,242,930 | 1,228,541 | (14,389) | -1.16% | -0.01 |
| MSR valuation changes due to paydowns | (653,351) | (768,132) | (784,822) | (807,356) | (22,534) | 2.87% | -0.02 |
| Valuation changes of retained interests & MSRs | 853,667 | 620,500 | 159,449 | (1,209,177) | (1,368,626) | -858.34% | -1.31 |
| Servicing hedge (losses) gains | (837,241) | (621,074) | (155,482) | 1,034,353 | 1,189,835 | -765.26% | 1.14 |
| Net servicing fees & other inc. frm retained int | 466,608 | 438,453 | 462,076 | 246,361 | (215,715) | -46.68% | -0.21 |
| Net Insurance Premiums Earned | 240,079 | 284,226 | 307,301 | 300,774 | (6,527) | -2.12% | -0.01 |
| Commissions & Other Income | 123,584 | 121,511 | 108,593 | 140,485 | 31,892 | 29.37% | 0.03 |
| Total non-interest income | 2,115,263 | 2,371,640 | 2,440,788 | 2,061,521 | (379,267) | -15.54% | -0.36 |
| Compensation Expenses | 988,614 | 1,143,707 | 1,154,846 | 1,138,901 | (15,945) | -1.38% | -0.02 |
| Occupancy & Other Office Expenses | 228,263 | 261,080 | 275,528 | 257,908 | (17,620) | -6.40% | -0.02 |
| Insurance Claim Expenses | 183,758 | 102,809 | 136,003 | 101,951 | (34,052) | -25.04% | -0.03 |
| Advertising & Promotion Expenses | 56,412 | 65,686 | 81,954 | 68,955 | (12,999) | -15.86% | -0.01 |
| Other Operating Expenses | 202,893 | 232,911 | 228,518 | 218,568 | (9,950) | -4.35% | -0.01 |
| Total non-interest expense | 1,659,940 | 1,806,193 | 1,876,849 | 1,786,283 | (90,566) | -4.83% | -0.09 |
| | | | | | | | |
| Pre-tax | 1,051,678 | 1,194,023 | 1,201,332 | 1,036,212 | (165,120) | -13.74% | (0.16) |
| Income taxes | 417,793 | 471,833 | 474,526 | 388,648 | (85,878) | -18.10% | 0.03 |
| | | | | | | | |
| Net Income | 633,885 | 722,190 | 726,806 | 647,564 | (79,242) | -10.90% | (0.13) |
| | | | | | | | |
| EPS | 1.03 | 1.15 | 1.15 | 1.03 | (0.12) | -10.45% | (0.12) |
| | | | | | | | |
| Book Value | 20.49 | 22.82 | 24.26 | 24.48 | 0.22 | 0.91% | |
| Diluted Share Outstanding | 616,992 | 626,610 | 631,892 | 627,572 | (4,320) | -0.68% | 0.01 |
| | | | | | | | |
| ROA | 1.54% | 1.55% | 1.48% | 1.33% | -0.14% | -9.55% | |
| ROE | 21.22% | 20.78% | 19.83% | 17.62% | -2.21% | -11.13% | |
| Effective tax rate | 39.7% | 39.5% | 39.5% | 37.5% | -1.99% | -5.05% | |
| Expense ratio | 4.57% | 4.54% | 4.45% | 4.28% | -0.17% | -3.80% | |
| | | | | | | | |
| ($ in million) | | | | | | | |
| Total production | 147,123 | 117,606 | 112,531 | 115,053 | 2,522 | 2.24% | |
| sales | 139,084 | 110,685 | 120,401 | 126,046 | 5,645 | 4.69% | |
| Sales margin (mortgage banking) | 0.97% | 1.38% | 1.41% | 1.09% | -0.32% | -22.60% | |
| NIM | 1.79% | 1.74% | 1.76% | 1.91% | 0.16% | 9.02% | |
| | | | | | | | |
| Loan HFS | 35,217 | 35,391 | 33,972 | 28,877 | (5,095) | -15.00% | |
| Loans held for investment | 67,776 | 79,808 | 84,982 | 80,797 | (4,186) | -4.93% | |
| EOP Deposit | 37,799 | 50,552 | 53,830 | 55,896 | 2,066 | 3.84% | |
| LLR | 185 | 184 | 222 | 208 | (14) | -6.22% | |
| EOP Borrowings | 109,345 | 114,689 | 117,465 | 105,342 | (12,123) | -10.32% | |
| EOP Equity | 12,239 | 14,297 | 15,025 | 15,099 | 74 | 0.49% | |
| | | | | | | | |
| Average Loans HFS | 32,698 | 33,729 | 34,682 | 32,134 | (2,548) | -7.35% | |
| Average Loans HFI | 65,152 | 76,958 | 82,395 | 80,302 | (2,093) | -2.54% | |
| Average Earning Assets | 145,344 | 159,156 | 168,727 | 166,922 | (1,805) | -1.07% | |
| Average Deposit | 34,206 | 47,965 | 52,191 | 53,224 | 1,033 | 1.98% | |
| Average Borrowings | 106,421 | 109,921 | 114,510 | 110,015 | (4,494) | -3.92% | |
| Average Equity | 11,947 | 13,902 | 14,661 | 14,698 | 37 | 0.25% | |

Source: Company reports, Banc of America Securities LLC estimates.

16

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126    61

**Bank of America** ⋘

# Earnings Model Revisions

On the back of 3Q06's results we revised our earnings model for CFC, raising our 4Q06 EPS estimate by a penny to $1.00 which together with 3Q06 miss lowers our 2006 EPS estimate from $4.39 to $4.30. We have also upped our 2007 EPS estimate by $0.31 from $4.00 to $4.31 and our 2008 number by $0.21 from $3.46 to $3.67. These increases reflect newly incorporated share buy back assumptions ($1.5 billion in 4Q06 and $500 million in each of 1Q07 and 2Q07). The other major revisions were reduced gain on sale revenue due to lowered sales margin assumptions (partially offset by a higher proportion of production being sold) and slower loan growth (offset by raised NIM assumptions and reduced provisioning on unchanged charge-off and reserve ratio assumptions), lowered MSR write-downs due to slower prepayments, and better than previously forecasted expense control.  The highlights of the model changes are outlined as follows:

## Lowered loan growth on unchanged production assumptions but higher sales.

We maintained our total origination forecasts (4Q06 of $101.2 billion and $400 billion for 2007 and 2008) but increased our sales estimates to reflect lower loan growth than our previous forecast. We took down our 2006 EOP estimates for loans held for investment to $80.7 billion from $89.0 billion and our 2007 EOP estimates to $82.9 billion from $110.8 billion.

## Lowered GOS margins reduces gains despite increased sales volumes.

Despite raising our loan sales volume estimates, we expect continued reliance on the lower margin correspondent and conduit channels and increased pricing pressure from competition to narrow the gain on sales margin by a further 5 bps from 3Q06 to 104 bps in 4Q06 and by 7 bps in 2007 to 97 bps before rebounding modestly to 99 bps in 2008.  As a result of these two changes, we reduced our 4Q06 gain on sale revenue estimate with an EPS impact of $0.17, our 2007 by $0.95 and our 2008 by $0.75.

## Now expect greater NIM expansion but on lowered loan balances.

3Q06 provided a higher starting point for the anticipated NIM expansion. As a result of our 19 bps increase in NIM to 1.99% in 4Q06, we added $0.05/share to our estimate despite the lower loan balance assumptions. However, for 2007 and 2008 despite raised margin assumptions (22 bps for 2007 and 31 bps for 2008) the slower earning asset growth results in lower net interest income representing $0.05 and $0.36/share respectively.

## Still expect credit deterioration but lowered loans trims provisioning needs.

While 3Q06's net charge off rate was better than expected, the increase in OREO and NPAs ratios (at the bank level), and continued negative amortization on its option ARM portfolio had us still expecting credit quality to deteriorate. However, the slower loan portfolio growth ends up lowering our loan loss provision assumptions for 2007 and 2008 adding $0.06 and $0.09/share to estimates respectively.

EXHIBIT 126      62

**Equity Research**

October 27, 2006

 **Bank of America**

### Improving net servicing fee and other non-interest income.

While net servicing fee for 4Q06 was lowered modestly ($0.01/share EPS impact), we raised our 2007 and 2008 estimates to $2.0 billion and $1.7 billion ($0.26/share and $0.14/share impact). The revision was driven by our scaled back prepayment assumptions on the servicing portfolio and subsequently reduced MSR decay. We also raised our other non-interest income estimates for 2007 and 2008 to $1.8 billon and $1.9 billion ($0.07/share and $0.10/share impact), reflecting primarily better insurance operations.

### Controlled expense growth driven by cost cutting initiatives.

We also revised our expense growth assumptions downward to incorporate CFC's cost savings initiative, the better than expected 3Q06 performance and reduced on balance sheet growth assumption. This change accounted for a $0.08/share increase to our 4Q06 EPS estimate ($1.78 billion versus $1.87 billion), a $0.55/share increase to our 2007 EPS estimate ($6.72 billion versus $7.31 billion) and $0.66/share increase to our 2008 EPS estimate ($6.96 billion versus $7.69 billion).

### Incorporating share buybacks helps EPS.

Taking into account CFC's announcement to buyback between $1 billion to $2 billion in stock in 4Q06, we built into our model approximately 39 million shares of buyback or approximately $1.5 billion. This resulted in a positive impact of $0.03/share to 4Q06 earnings. We also assumed additional buybacks of 41 million shares ($1 billion) throughout 1H07. As a result we lowered our average fully diluted share estimates to 588.5 million from 646.2 million for 2007 ($0.38/share positive impact $0.22/share net of associated interest expense) and to 605.1 million from 664.2 million for 2008 ($0.32/share gross and $0.16/share net positive impact).

### Model Revisions

($ in thousands)

| | 2006E | | | | 2007E | | | | 2008E | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Old | New | Change | EPS Impact | Old | New | Change | EPS Impact | Old | New | Change | EPS Impact |
| Net Interest Income | 2,899,498 | 2,999,990 | 100,491 | 0.11 | 3,547,548 | 3,469,813 | (57,736) | (0.06) | 4,319,298 | 3,925,128 | (394,170) | (0.36) |
| Provision for Loan Losses | 330,776 | 246,411 | (74,365) | (0.07) | 619,131 | 556,343 | (62,788) | (0.00) | 1,154,748 | 1,057,199 | (97,549) | (0.09) |
| Net Interest Income after Prov. for Loan Loss | 2,568,722 | 2,752,579 | 183,857 | 0.18 | 2,928,417 | 2,933,470 | 5,053 | 0.00 | 3,164,549 | 2,867,929 | (296,620) | (0.27) |
| **OTHER INCOME** | | | | | | | | | | | | |
| Loan Servicing Fees & Other Income from Ret. Int. | 4,925,983 | 4,894,481 | (31,502) | (0.03) | 5,189,677 | 5,178,152 | (11,524) | (0.01) | 5,250,753 | 5,383,552 | 132,798 | 0.12 |
| MSR valuation changes due to paydowns | (3,085,846) | (3,093,694) | (7,848) | (0.01) | (3,467,445) | (3,164,330) | 303,115 | 0.28 | (3,570,536) | (3,331,907) | 438,629 | 0.40 |
| Valuation Change of ret. Int. & MSRs, net of hedge | (22,188) | (205,575) | (183,387) | (0.18) | 24,335 | 5,433 | (18,902) | (0.02) | (166,352) | (580,290) | (413,938) | (0.38) |
| Net Loan Servicing Fees & Other Inc. Ret. Int. | 1,817,949 | 1,595,212 | (222,737) | (0.21) | 1,746,566 | 2,019,265 | 272,689 | 0.26 | 1,513,866 | 1,671,355 | 157,489 | 0.14 |
| Gain on Sale of loans | 5,786,971 | 5,422,466 | (364,504) | (0.35) | 5,200,896 | 4,186,113 | (1,014,783) | (0.95) | 4,993,083 | 4,170,182 | (822,901) | (0.75) |
| Other non-interest income | 1,645,634 | 1,695,019 | 49,385 | 0.05 | 1,705,659 | 1,779,906 | 74,347 | 0.07 | 1,818,359 | 1,927,901 | 109,543 | 0.10 |
| Total Non-Interest Income | 9,250,553 | 8,712,697 | (537,856) | (0.52) | 8,653,122 | 7,985,274 | (667,848) | (0.63) | 8,325,307 | 7,769,438 | (555,870) | (0.51) |
| Total Non-Interest Expenses | 7,268,269 | 7,090,908 | (177,362) | (0.17) | 7,307,390 | 6,723,720 | (583,670) | (0.55) | 7,691,080 | 6,963,504 | (727,577) | (0.66) |
| Pretax Income | 4,551,006 | 4,374,368 | (176,638) | (0.17) | 4,274,149 | 4,195,024 | (79,126) | (0.07) | 3,798,776 | 3,673,863 | (124,913) | (0.11) |
| Income Taxes | 1,791,347 | 1,698,159 | (93,188) | 0.04 | 1,688,289 | 1,657,312 | (30,977) | (0.00) | 1,500,517 | 1,451,419 | (49,098) | (0.00) |
| Net Earnings | 2,759,658 | 2,676,209 | (83,450) | (0.13) | 2,585,860 | 2,537,712 | (48,148) | (0.07) | 2,298,260 | 2,222,444 | (75,815) | (0.11) |
| Diluted Weighted Avg Shares (in millions) | 628,403 | 622,587 | (5,817) | 0.04 | 646,231 | 588,522 | (57,709) | 0.38 | 664,209 | 605,106 | (59,103) | 0.32 |
| Diluted EPS | $4.39 | $4.30 | ($0.09) | (0.09) | $4.00 | $4.31 | $0.31 | 0.31 | $3.46 | $3.67 | $0.21 | 0.21 |
| Dividends per share | $0.62 | $0.60 | ($0.02) | | $0.77 | $0.72 | ($0.05) | | $0.95 | $0.92 | ($0.03) | |
| Book Value per share | $24.65 | $23.08 | ($1.56) | | $28.03 | $26.97 | ($1.06) | | $30.70 | $29.92 | ($0.78) | |

Source: Company reports, Banc of America Securities LLC estimates.

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126          63

**Equity Research**

October 27, 2006

Bank of America

## Model Assumptions

| ($ million) | 2006E | | | 2007E | | | 2008E | | |
|---|---|---|---|---|---|---|---|---|---|
| | Old | New | Change | Old | New | Change | Old | New | Change |
| CFC SFR Mortgage Originations | 382,573 | 385,769 | 3,196 | 341,596 | 341,610 | 14 | 335,786 | 335,743 | (44) |
| CFC SFR Market Share | 16.44% | 16.58% | 0.14% | 17.22% | 17.22% | 0.00% | 17.68% | 17.67% | 0.00% |
| CFC Total Originations | 435,377 | 438,194 | 2,817 | 398,972 | 399,938 | 966 | 396,972 | 399,951 | 2,979 |
| Total Loan Sales | 455,350 | 472,146 | 16,796 | 403,646 | 429,504 | 25,858 | 385,921 | 420,677 | 34,756 |
| Gain on Sales Margin | 1.27% | 1.15% | -0.12% | 1.29% | 0.97% | -0.31% | 1.29% | 0.99% | -0.30% |
| | | | | | | | | | |
| NIM | 1.78% | 1.87% | 0.09% | 1.93% | 2.15% | 0.22% | 2.06% | 2.37% | 0.31% |
| Efficiency Ratio | 59.87% | 60.55% | 0.68% | 59.89% | 58.59% | -1.30% | 60.82% | 59.54% | -1.28% |
| Expense Ratio | 4.48% | 4.42% | -0.05% | 3.98% | 4.14% | 0.17% | 3.67% | 4.21% | 0.54% |
| Effective tax rate | 39.36% | 38.82% | -0.54% | 39.50% | 39.51% | 0.01% | 39.50% | 39.51% | 0.01% |
| ROE | 19.35% | 18.97% | -0.37% | 15.24% | 17.20% | 1.96% | 11.85% | 13.01% | 1.16% |
| ROA | 1.45% | 1.43% | -0.02% | 1.20% | 1.34% | 0.14% | 0.94% | 1.15% | 0.21% |
| | | | | | | | | | |
| EOP Loans Held for Investment | 89,034 | 80,650 | (8,384) | 110,849 | 82,909 | (27,939) | 138,132 | 90,819 | (47,314) |
| EOP Total Loans | 120,321 | 107,386 | (12,935) | 140,458 | 111,396 | (29,062) | 168,682 | 120,562 | (48,120) |
| EOP Total Assets | 200,119 | 188,119 | (12,000) | 225,345 | 189,104 | (36,241) | 259,963 | 196,356 | (63,607) |
| EOP Deposits | 56,396 | 55,794 | (602) | 70,214 | 57,357 | (12,857) | 87,496 | 62,829 | (24,667) |
| EOP Borrowings | 115,325 | 104,710 | (10,615) | 123,243 | 102,582 | (20,661) | 137,106 | 101,956 | (35,150) |
| EOP Equity | 15,644 | 14,216 | (1,428) | 18,288 | 15,926 | (2,362) | 20,591 | 18,392 | (2,199) |
| | | | | | | | | | |
| Average Loans HFI | 79,587 | 77,492 | (2,094) | 100,956 | 81,397 | (19,558) | 125,030 | 86,990 | (38,040) |
| Average Earning Assets | 162,364 | 160,350 | (2,014) | 183,791 | 162,268 | (21,523) | 209,541 | 165,532 | (44,008) |
| Average Total Assets | 189,811 | 186,843 | (2,968) | 215,835 | 189,881 | (25,954) | 244,467 | 193,578 | (50,890) |
| Average Deposit | 49,419 | 49,861 | 441 | 63,948 | 56,311 | (7,637) | 79,197 | 60,180 | (19,017) |
| Average Interest-Bearing Liabilities | 160,778 | 157,624 | (3,155) | 182,216 | 158,428 | (23,788) | 207,029 | 159,907 | (47,122) |
| Average Equity | 14,265 | 14,105 | (160) | 16,970 | 14,756 | (2,215) | 19,392 | 17,076 | (2,316) |
| | | | | | | | | | |
| Delinquency ratio | 4.80% | 4.80% | 0.00% | 5.19% | 5.19% | 0.00% | 5.09% | 5.09% | 0.00% |
| NCOs | 272 | 220 | (52) | 558 | 547 | (11) | 1,028 | 1,001 | (28) |
| NCO ratio (to Avg Loans HFI) | 0.34% | 0.28% | -0.06% | 0.55% | 0.67% | 0.12% | 0.82% | 1.15% | 0.33% |
| Provisions/Avg Loans HFI | 0.40% | 0.32% | -0.09% | 0.61% | 0.68% | 0.07% | 0.92% | 1.22% | 0.29% |
| Loan Loss Reserves | 232 | 210 | (22) | 294 | 220 | (74) | 420 | 276 | (144) |
| Loan Loss Reserve to LHFI Ratio | 0.26% | 0.26% | 0.00% | 0.27% | 0.27% | 0.00% | 0.30% | 0.30% | 0.00% |
| | | | | | | | | | |
| EOP Equity/Assets | 7.82% | 7.56% | -0.26% | 8.12% | 8.42% | 0.31% | 7.92% | 9.37% | 1.45% |
| EOP Tangible Equity/Tangible Assets | 7.82% | 7.56% | -0.26% | 8.12% | 8.42% | 0.31% | 7.92% | 9.37% | 1.45% |
| Avg Equity/Assets | 7.52% | 7.55% | 0.03% | 7.86% | 7.77% | -0.09% | 7.93% | 8.82% | 0.89% |
| Avg Tangible Equity/Tangible Assets | 7.52% | 7.55% | 0.03% | 7.86% | 7.77% | -0.09% | 7.93% | 8.82% | 0.89% |
| **Year-Over-Year % Change** | | | | | | | | | |
| CFC SFR Mortgage Originations | -14.65% | -13.94% | 0.71% | -10.71% | -11.45% | -0.74% | -1.70% | -1.72% | -0.02% |
| Total CFC Mortgage Originations | -12.02% | -11.45% | 0.57% | -8.36% | -8.73% | -0.37% | -0.50% | 0.00% | 0.50% |
| Sales | -2.77% | 0.81% | 3.59% | -11.35% | -9.03% | 2.32% | -4.39% | -2.06% | 2.34% |
| | | | | | | | | | |
| EOP Loans Held for Investment | 27.51% | 15.50% | -12.01% | 24.50% | 2.80% | -21.70% | 24.61% | 9.54% | -15.07% |
| EOP Total Assets | 14.30% | 7.44% | -6.85% | 12.61% | 0.52% | -12.08% | 15.36% | 3.83% | -11.53% |
| EOP Deposits | 43.00% | 41.47% | -1.53% | 24.50% | 2.80% | -21.70% | 24.61% | 9.54% | -15.07% |
| EOP Equity | 22.07% | 10.93% | -11.14% | 16.90% | 12.03% | -4.87% | 12.59% | 15.48% | 2.89% |
| | | | | | | | | | |
| Average Loans HFI | 36.77% | 33.17% | -3.60% | 26.85% | 5.04% | -21.81% | 23.85% | 6.87% | -16.98% |
| Average Earning Assets | 19.63% | 18.15% | -1.48% | 13.20% | 1.20% | -12.00% | 14.01% | 2.01% | -12.00% |
| Average Total Assets | 22.71% | 20.79% | -1.92% | 13.71% | 1.63% | -12.08% | 13.27% | 1.95% | -11.32% |
| Average Deposit | 59.65% | 61.08% | 1.43% | 29.40% | 12.94% | -16.46% | 23.85% | 6.87% | -16.98% |
| Average Equity | 22.95% | 21.57% | -1.38% | 18.97% | 4.62% | -14.35% | 14.27% | 15.73% | 1.46% |
| | | | | | | | | | |
| Net interest Income | 22.77% | 27.42% | 4.65% | 22.77% | 16.37% | -6.41% | 21.75% | 12.47% | -9.28% |
| Loan Loss Provisions | 177.28% | 113.00% | -64.28% | 93.01% | 125.78% | 32.77% | 86.51% | 90.03% | 3.52% |
| Non-Interest Income | 18.9% | 12.0% | -6.91% | -6.5% | -8.3% | -1.89% | -3.8% | -2.7% | 1.09% |
| Non-Interest Expense | 23.84% | 20.82% | -3.02% | 0.54% | -5.18% | -5.72% | 5.25% | 3.57% | -1.68% |
| Net Income | 9.16% | 5.86% | -3.30% | -6.30% | -5.18% | 1.12% | -11.12% | -12.42% | -1.30% |
| | | | | | | | | | |
| EPS | 6.81% | 4.62% | -2.19% | -8.88% | 0.23% | 9.12% | -13.50% | -14.85% | -1.35% |
| Dividends per share | 5.21% | 1.85% | -3.36% | 24.08% | 19.53% | -4.55% | 23.31% | 27.78% | 4.46% |
| Book Value per share | 18.75% | 11.22% | -7.52% | 13.73% | 16.82% | 3.08% | 9.54% | 10.96% | 1.42% |

Source: Company reports, Banc of America Securities LLC estimates.

## Valuation Summary

We maintain our bearish outlook on the mortgage industry as we expect mortgage production to continue its decline through 2008 and credit losses to increase significantly in 2007 and to peak in 2008. Furthermore, declining production, shrinking sale margin, and increased concerns about its credit profile reinforce our belief that the gain on sale dependent business model of CFC is most vulnerable to the deterioration in industry fundamentals that we foresee. CFC performed an apparent about-face in its decision to continue its sizable presence in the low margin, extremely competitive correspondent channel which was characterized by management as having "irrational pricing." This indicates that CFC is seeking to maintain as much volume as possible at the expense of margin. This is another sign in our view that re-affirms our investment opinion on the stock.

We also believe the stock price spike of 9.4% (1.4% for WM and 2.3% for NDE, 0.9% for S&P 500 Index) since its share buyback announcement with its 3Q06 earnings release on Oct 24, 2006 was not supported by any improvement in fundamentals, but rather by the market anticipation that the large repurchase expected in the remainder of 4Q06 would drive up the stock price due to trading liquidity. As can be seen from the following chart, since CFC's 2Q06 earnings release on July 25, 2006, CFC and its major peers NDE and WM all suffered in valuation due to the weakening in industry fundamentals signaled by the quarterly results (although being a more defensive name, WM was less sensitive to the deterioration of industry fundamentals). Since early September, the three mortgage stocks recovered somewhat as market concerns eased (and again, being more sensitive to the perception of fundamentals, NDE and CFC reacted more strongly than WM). Nevertheless, since September 18, 2006, when WM as the first major mortgage company to report its 3Q06 results, all three stocks skidded on the back of continued signs of deterioration in the business environment. However, even though CFC's earnings guidance was lowered with its 3Q06 earnings release, the stock took off. While we are not surprised that the large size of the expected buyback helped bid up the price on CFC, the spike should be temporary in nature, producing an attractive investment exit point.

EXHIBIT 126    65

**Equity Research**
October 27, 2006

**Bank of America**

---

**CFC Price Movement Since 2Q06 Earnings Release vs. NDE, WM & the S&P 500**



Source: FactSet.

---

On the back of our model revisions, we rolled out our 12-month price target to December 2007 and raised it to $33 from $30. We derived our new price target by applying a 15% discount to the price target of $38.82 our risk adjusted DCF analysis suggests, as we are increasingly concerned about CFC's growth headwind, lower earnings visibility, and heightened credit risk exposure. The target implies 8.99x forward P/E and 1.22x price to book, compared to the current level of 8.89x and 1.62x. With a potential downside of 12.8% including dividend yield, we reiterate our Sell rating on the stock.

---

**Equity Research**
October 27, 2006

**Bank of America**

## CFC Valuation

| | Trailing 3 Year Average | Trailing Year Average | Trailing Quarter Average | Current | Target | Implied Change from Current | Implied Change from Quarter Avg | Implied Change from Year Avg | Implied Change from 3 Year Avg |
|---|---|---|---|---|---|---|---|---|---|
| Price | $33.95 | $35.88 | $35.20 | $38.52 | $33.00 | -14.3% | -6.2% | -8.0% | -2.8% |
| | | | | | | | | | |
| Forward P/E Consensus | 8.44 | 8.08 | 7.83 | 8.45 | 8.99 | 6.4% | 14.9% | 11.2% | 6.5% |
| Forward P/E BAS Est/Actual | 8.45 | 8.49 | 8.20 | 8.89 | 8.99 | 1.2% | 9.7% | 5.9% | 6.4% |
| P/B | 1.89 | 1.63 | 1.48 | 1.62 | 1.22 | -24.5% | -17.5% | -24.8% | -35.3% |
| Forward P/B | 1.59 | 1.47 | 1.36 | 1.46 | 1.10 | -24.6% | -19.1% | -25.1% | -30.7% |
| Forward Adjusted P/B | 2.91 | 2.98 | 2.86 | 3.10 | 2.77 | -10.6% | -3.3% | -7.1% | -4.7% |
| | | | | | | | | | |
| **Implied Multiple Expansion/(Contraction) from Average** | | | | | | **-10.4%** | **-3.1%** | **-8.0%** | **-13.3%** |

| | Trailing 3 Year Min | Trailing Year Min | Trailing Quarter Min | Current | Target | Implied Change from Current | Implied Change from Quarter Min | Implied Change from Year Min | Implied Change from 3 Year Min |
|---|---|---|---|---|---|---|---|---|---|
| Forward P/E Consensus | 6.48 | 7.03 | 7.15 | 8.45 | 8.99 | 6.4% | 25.8% | 28.0% | 38.8% |
| Forward P/E BAS Est/Actual | 6.43 | 7.04 | 7.61 | 8.89 | 8.99 | 1.2% | 18.1% | 27.6% | 39.8% |
| P/B | 1.38 | 1.38 | 1.38 | 1.62 | 1.22 | -24.5% | -11.1% | -11.1% | -11.1% |
| Forward P/B | 1.25 | 1.27 | 1.27 | 1.46 | 1.10 | -24.6% | -13.2% | -13.2% | -12.1% |
| Forward Adjusted P/B | 2.48 | 2.62 | 2.70 | 3.10 | 2.77 | -10.6% | 2.7% | 5.6% | 11.8% |
| | | | | | | | | | |
| **Implied Multiple Expansion/(Contraction) from Minimums** | | | | | | **-10.4%** | **4.5%** | **7.4%** | **13.8%** |

| | Trailing 3 Year Max | Trailing Year Max | Trailing Quarter Max | Current | Target | Implied Change from Current | Implied Change from Quarter Max | Implied Change from Year Max | Implied Change from 3 Year Max |
|---|---|---|---|---|---|---|---|---|---|
| Forward P/E Consensus | 10.39 | 9.48 | 8.50 | 8.45 | 8.99 | 6.4% | 5.7% | -5.1% | -13.5% |
| Forward P/E BAS Est/Actual | 10.67 | 10.23 | 8.94 | 8.89 | 8.99 | 1.2% | 0.6% | -12.1% | -15.8% |
| P/B | 2.44 | 1.91 | 1.63 | 1.62 | 1.22 | -24.5% | -24.9% | -35.8% | -49.9% |
| Forward P/B | 1.99 | 1.74 | 1.48 | 1.46 | 1.10 | -24.6% | -25.6% | -36.8% | -44.5% |
| Forward Adjusted P/B | 3.40 | 3.40 | 3.11 | 3.10 | 2.77 | -10.6% | -11.0% | -18.4% | -18.4% |
| | | | | | | | | | |
| **Implied Multiple Expansion/(Contraction) from Maximums** | | | | | | **-10.4%** | **-11.0%** | **-21.6%** | **-30.9%** |

Source: Company reports, Banc of America Securities LLC estimates.

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126   67

**Equity Research**
October 27, 2006

**Bank of America**

**Forward Cash Book Multiple Comparison**



Source: Company reports, Banc of America Securities LLC estimates.

## CFC Income Statement

| ($ in 000's) | 2005A | Mar-06 | Jun-06 | Sep-06 | Dec-06E | 2006E | Mar-07E | Jun-07E | Sep-07E | Dec-07E | 2007E | 2008E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | | | | | | |
| Gain on Sale of Loans & Securities | 4,861,780 | 1,361,178 | 1,527,450 | 1,373,901 | 1,159,937 | 5,422,466 | 1,051,940 | 1,075,541 | 1,073,899 | 984,733 | 4,186,113 | 4,170,182 |
| Interest Income | 7,970,045 | 2,593,758 | 2,845,580 | 3,288,160 | 3,322,822 | 12,050,320 | 3,414,764 | 3,503,931 | 3,574,319 | 3,523,487 | 14,016,501 | 14,640,088 |
| Interest Expense | (5,616,425) | (1,899,323) | (2,155,106) | (2,489,190) | (2,507,711) | (9,051,330) | (2,587,749) | (2,643,875) | (2,679,850) | (2,615,214) | (10,526,688) | (10,714,960) |
| **Net Interest Income** | 2,353,620 | 694,435 | 690,474 | 798,970 | 815,111 | 2,998,990 | 827,015 | 860,056 | 894,469 | 908,273 | 3,489,813 | 3,925,128 |
| Provision for Loan Losses | (115,685) | (63,138) | (61,898) | (37,996) | (83,379) | (246,411) | (88,712) | (104,601) | (125,709) | (237,320) | (556,343) | (1,057,199) |
| **Net Interest Income After Provision** | 2,237,935 | 631,297 | 628,576 | 760,974 | 731,732 | 2,752,579 | 738,303 | 755,455 | 768,760 | 670,953 | 2,933,470 | 2,867,929 |
| Loan Servicing Fees & Other Inc. fm Retained Interests | 4,281,254 | 1,199,887 | 1,207,159 | 1,228,541 | 1,258,894 | 4,894,481 | 1,274,689 | 1,272,300 | 1,314,479 | 1,316,684 | 5,178,152 | 5,383,552 |
| Amortization of mortgage servicing rights | (2,288,354) | (738,567) | (768,132) | (807,356) | (779,639) | (3,093,694) | (787,084) | (784,190) | (790,519) | (802,537) | (3,164,330) | (3,131,907) |
| (Impairment) Recovery of Retained Interests | 23,345 | 857,627 | 620,500 | (1,209,177) | (14,219) | 254,731 | (5,982) | 8,086 | (5,146) | (68,326) | (71,367) | (1,034,386) |
| Servicing hedge (losses) gains | (523,078) | (885,870) | (621,074) | 1,034,353 | 12,284 | (460,307) | 4,652 | (6,225) | 4,001 | 74,373 | 76,800 | 454,096 |
| Net Loan Servicing Fees & Other Inc. | 1,493,167 | 433,077 | 438,453 | 246,361 | 477,321 | 1,595,212 | 486,274 | 489,971 | 522,816 | 520,194 | 2,019,255 | 1,671,355 |
| Net Insurance Premiums Earned | 953,647 | 279,793 | 284,226 | 300,774 | 316,486 | 1,181,279 | 307,772 | 330,413 | 330,099 | 342,715 | 1,311,000 | 1,435,827 |
| Commissions & Other Income | 470,179 | 130,603 | 121,511 | 140,485 | 113,483 | 513,740 | 92,263 | 131,484 | 129,458 | 115,701 | 468,906 | 492,075 |
| **Total Revenues** | 10,016,708 | 2,835,948 | 3,000,216 | 2,822,495 | 2,798,959 | 11,465,276 | 2,676,552 | 2,782,864 | 2,825,032 | 2,634,296 | 10,918,744 | 10,637,367 |
| | | | | | | | | | | | | |
| **EXPENSES** | | | | | | | | | | | | |
| Compensation Expenses | 3,615,483 | 1,074,818 | 1,143,707 | 1,138,901 | 1,104,330 | 4,461,756 | 1,053,186 | 1,019,274 | 985,681 | 1,006,009 | 4,064,145 | 4,102,351 |
| Occupancy & Other Office Expenses | 879,680 | 245,331 | 261,080 | 257,908 | 260,751 | 1,025,070 | 260,836 | 263,141 | 263,761 | 265,946 | 1,053,684 | 1,135,786 |
| Insurance Claim Expenses | 441,584 | 124,042 | 102,809 | 101,951 | 115,189 | 443,991 | 116,028 | 119,083 | 118,863 | 125,215 | 479,189 | 541,328 |
| Advertising & Promotion Expenses | 229,183 | 60,230 | 65,686 | 68,955 | 83,520 | 278,391 | 76,299 | 70,427 | 65,603 | 67,850 | 280,179 | 282,286 |
| Other Operating Expenses | 703,012 | 212,164 | 232,911 | 218,568 | 218,057 | 881,700 | 210,241 | 218,506 | 207,552 | 210,223 | 846,523 | 901,752 |
| **Total Expenses** | 5,868,942 | 1,716,585 | 1,806,193 | 1,786,283 | 1,781,847 | 7,090,908 | 1,716,585 | 1,690,432 | 1,641,460 | 1,675,243 | 6,723,720 | 6,963,504 |
| | | | | | | | | | | | | |
| Earnings Before Income Taxes | 4,147,766 | 1,119,363 | 1,194,023 | 1,036,212 | 1,017,112 | 4,374,368 | 959,967 | 1,092,432 | 1,183,572 | 959,053 | 4,195,024 | 3,673,863 |
| Provision for Income Taxes | 1,619,676 | 435,852 | 471,833 | 388,648 | 401,826 | 1,698,159 | 379,251 | 431,583 | 467,589 | 378,889 | 1,657,312 | 1,451,419 |
| **Net Earnings** | 2,528,090 | 683,511 | 722,190 | 647,564 | 615,285 | 2,676,209 | 580,717 | 660,849 | 715,983 | 580,164 | 2,537,712 | 2,222,444 |
| | | | | | | | | | | | | |
| EPS Diluted (split adjusted) | $4.11 | $1.10 | $1.15 | $1.03 | $1.00 | $4.30 | $0.98 | $1.13 | $1.23 | $0.98 | $4.31 | $3.67 |
| Dividend (split adjusted) | $0.59 | $0.15 | $0.15 | $0.15 | $0.15 | $0.60 | $0.18 | $0.18 | $0.18 | $0.18 | $0.72 | $0.92 |
| WEIGHTED AVERAGE SHARES | | | | | | | | | | | | |
| Diluted (split adjusted) | 615,037 | 620,332 | 626,610 | 627,572 | 615,832 | 622,587 | 594,427 | 585,176 | 583,902 | 590,581 | 588,522 | 605,106 |

Source: Company reports, Banc of America Securities LLC estimates.

**Equity Research**

October 27, 2006

 **Bank of America**

---

## CFC Balance Sheet

| ($ in 000's) | 2005A | Mar-06 | Jun-06 | Sep-06 | Dec-06E | Mar-07E | Jun-07E | Sep-07E | Dec-07E | 2008E |
|---|---|---|---|---|---|---|---|---|---|---|
| ASSETS | | | | | | | | | | |
| Cash | 1,031,108 | 2,644,621 | 2,369,346 | 1,583,722 | 1,542,114 | 1,520,354 | 1,590,637 | 1,569,096 | 1,550,191 | 1,609,638 |
| Mortgage Loans & MBS Held for Sale | 36,808,185 | 32,067,881 | 35,390,972 | 28,877,092 | 26,744,399 | 24,316,999 | 30,954,842 | 30,680,996 | 28,486,746 | 29,743,150 |
| Trading Sec. Owned, at Market Value | 10,314,384 | 11,050,549 | 14,212,594 | 15,971,469 | 15,240,820 | 15,025,770 | 15,720,383 | 15,507,485 | 15,320,649 | 15,908,165 |
| Trading Securities Pledged as Collateral | 668,189 | 1,022,396 | 1,143,122 | 3,465,175 | 3,458,874 | 3,477,267 | 3,494,769 | 3,484,359 | 3,555,780 | 3,894,990 |
| Repos & Sec. Borrowed | 23,317,361 | 21,516,259 | 25,285,191 | 25,103,616 | 23,221,876 | 22,894,211 | 22,994,465 | 21,548,903 | 20,224,816 | 18,519,594 |
| Loans Held for Investment, net | 69,865,447 | 74,107,611 | 79,807,599 | 80,796,708 | 80,649,782 | 81,078,659 | 81,486,753 | 81,244,021 | 82,909,322 | 90,818,602 |
| Inv. in Other Financial Instruments | 11,260,725 | 11,111,631 | 11,596,534 | 12,193,051 | 11,813,345 | 11,646,656 | 11,575,807 | 10,848,086 | 10,556,626 | 9,744,319 |
| Mortgage Servicing Rights, net | 12,610,839 | 14,171,804 | 15,320,575 | 15,018,415 | 15,469,612 | 15,550,775 | 15,786,673 | 16,117,271 | 16,091,216 | 14,919,349 |
| Premises and Equipment, net | 1,279,659 | 1,338,293 | 1,469,203 | 1,569,894 | 1,672,845 | 1,765,773 | 1,867,298 | 1,959,602 | 2,060,155 | 2,529,300 |
| Other Assets | 7,929,473 | 8,561,011 | 8,389,327 | 8,615,430 | 8,305,190 | 8,188,002 | 8,566,518 | 8,450,503 | 8,348,691 | 8,668,846 |
| **TOTAL ASSETS** | **175,085,370** | **177,592,056** | **194,984,463** | **193,194,572** | **188,118,856** | **185,464,466** | **194,038,146** | **191,410,321** | **189,104,192** | **196,355,952** |
| | | | | | | | | | | |
| LIABILITIES | | | | | | | | | | |
| Notes Payable | 78,473,057 | 72,554,228 | 76,527,368 | 67,632,078 | 69,825,960 | 67,555,717 | 75,139,270 | 74,177,163 | 72,200,831 | 74,135,755 |
| Repos | 34,153,205 | 32,599,845 | 38,161,225 | 37,710,297 | 34,883,573 | 34,391,360 | 34,541,961 | 32,370,457 | 30,381,432 | 27,819,872 |
| Deposit Liabilities | 39,438,916 | 45,377,942 | 50,552,049 | 55,895,651 | 55,794,007 | 56,090,706 | 56,373,028 | 56,205,105 | 57,357,170 | 62,828,858 |
| Accounts Payable & Accrued Liabilities | 6,358,158 | 5,920,045 | 7,742,575 | 8,526,122 | 8,487,283 | 8,356,896 | 8,780,800 | 8,606,218 | 8,457,454 | 8,713,656 |
| Income Taxes Payable | 3,846,174 | 4,240,615 | 4,626,962 | 4,935,590 | 4,911,980 | 4,809,186 | 4,747,845 | 4,816,264 | 4,781,142 | 4,465,874 |
| Drafts Payable | 2,285,171 | 3,393,128 | 3,077,327 | 3,395,686 | 3,315,747 | 3,264,287 | 3,424,047 | 3,359,074 | 3,301,928 | 3,393,180 |
| **TOTAL LIABILITIES** | **162,269,510** | **164,085,803** | **180,687,506** | **178,095,424** | **173,902,804** | **171,203,865** | **179,582,904** | **176,175,206** | **175,178,028** | **177,964,014** |
| | | | | | | | | | | |
| SHAREHOLDERS' EQUITY | | | | | | | | | | |
| Preferred Stock | - | - | . | - | - | - | - | - | - | - |
| Common Stock | 30,008 | 30,251 | 30,551 | 30,851 | 30,851 | 30,851 | 30,851 | 30,851 | 30,851 | 30,851 |
| Additional Paid-in Capital | 2,954,019 | 3,071,443 | 3,268,420 | 3,435,882 | 2,133,214 | 1,753,768 | 1,398,931 | 1,572,687 | 1,794,495 | 2,592,483 |
| Acc. Other Comprehensive Income | 61,114 | (26,403) | (63,840) | 14,878 | (88,080) | (139,559) | (147,431) | (155,303) | (163,174) | (177,515) |
| Retained Earnings | 9,770,719 | 10,430,962 | 11,061,826 | 11,617,537 | 12,140,066 | 12,615,540 | 13,172,891 | 13,786,879 | 14,263,992 | 15,946,118 |
| **TOTAL SHE** | **12,815,860** | **13,506,253** | **14,296,957** | **15,099,148** | **14,216,052** | **14,260,600** | **14,455,242** | **15,235,115** | **15,926,164** | **18,391,938** |
| **TOTAL LIABILITES & SHE** | **175,085,370** | **177,592,056** | **194,984,463** | **193,194,572** | **188,118,856** | **185,464,466** | **194,038,146** | **191,410,321** | **189,104,192** | **196,355,952** |
| | | | | | | | | | | |
| Book Value per Share | 20.75 | 21.77 | 22.82 | 24.06 | 23.08 | 23.99 | 24.70 | 26.09 | 26.97 | 29.92 |

Source:  Company reports, Banc of America LLC estimates.

---

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126      69

**Equity Research**
October 27, 2006

**Bank of America**

# REG AC - ANALYST CERTIFICATION

The primary research analyst whose name appears in this research report certifies the following: (1) that all of the views expressed in this research report accurately reflect his or her personal views about any and all of the subject securities or issuers; and (2) that no part of the research analyst's compensation was, is, or will be directly or indirectly related to the specific recommendations or views expressed by the research analyst in this research report.

# IMPORTANT DISCLOSURES

## Banc of America Securities LLC (BAS) and Banc of America Securities Limited (BASL) Stock Rating System

The rating system is based on a stock's forward -12-month expected total return (price appreciation *plus* dividend yield). The prospective rates of return that help define the Buy, Neutral and Sell ranges are subject to change from time to time, corresponding with changes in prospective rates of return on competing investments. The specific volatility levels that divide our stocks into low, medium, high, and extreme ranges are subject to change from time to time, corresponding with changes in the volatility of benchmark indexes and the companies that comprise them.

| Volatility | | Ratings | | |
|---|---|---|---|---|
| | | **Buy** | **Neutral** | **Sell** |
| Low | 0%-25% | 11%+ | 10.9%-0.1% | 0% or worse |
| Medium | 25%-35% | 15%+ | 14.9%-(2.9)% | (3)% or worse |
| High | 35%-55% | 20%+ | 19.9%-(6.9)% | (7)% or worse |
| Extreme | 55%+ | 32%+ | 31.9%-(14.9)% | (15)% or worse |

Source for volatility: Bloomberg.

### Rating Distribution*

**Global Coverage**

| Coverage Universe | Companies | Pct. | Investment Banking Clients | Companies | Pct.** |
|---|---|---|---|---|---|
| Buy | 362 | 41 | Buy | 290 | 80 |
| Hold | 476 | 54 | Hold | 356 | 75 |
| Sell | 38 | 4 | Sell | 28 | 74 |

**Finance Sector**

| Coverage Universe | Companies | Pct. | Investment Banking Clients | Companies | Pct.** |
|---|---|---|---|---|---|
| Buy | 39 | 30 | Buy | 32 | 82 |
| Hold | 81 | 63 | Hold | 68 | 84 |
| Sell | 9 | 7 | Sell | 7 | 78 |

\*    For the purposes of this Rating Distribution, "Hold" is equivalent to our "Neutral" rating.
\*\*   Percentage of companies in each rating group that are investment banking clients.
As of 10/01/2006.

The analysts and associates responsible for preparing this research report receive compensation that is based on various factors, including the total revenue of BAS and its affiliates, a portion of which is generated by investment banking business. They do not receive compensation based on revenue from any specific investment banking transaction.

BAS and BASL prohibit analysts and members of their households from maintaining a financial interest in the securities or options of any company that the analyst covers or that falls within the analyst's coverage sector except in limited circumstances (for securities and options acquired prior to July 9, 2002), as permitted by the New York Stock Exchange and the NASD. Stock ownership in the companies mentioned in this report by the analyst who has prepared this report and

**Bank of America**

members of his or her household is disclosed below. The absence of such disclosure means that the analyst(s) preparing this report (including members of his or her household) does not have any direct stock ownership in companies mentioned in this report. BAS and BASL also permit analysts and members of their households to own diversified mutual funds and to maintain financial interests in funds and other private investments that may include companies in a sector that the analyst covers if the person acquired the financial interest prior to July 9, 2002.

BAS and BASL policy prohibits research personnel from disclosing a rating, recommendation or investment thesis for review by an issuer prior to the publication of a research report containing such rating, recommendation or investment thesis. Materials prepared by BAS and BASL research personnel are based on public information.

With the exception of members of research management named on the directory located at www.bofa.com/login or on the back page of this report, the persons listed on this directory have the title of "research analyst." Any other contributors named on the front cover of this research report but not shown on this directory have the title "research associate."

For applicable current disclosures, please call us at 1-888-583-8900 and ask for your BAS representative, or write us at Banc of America Securities LLC, Attn. Compliance Department, 40 West 57th Street, New York, NY 10019, or visit our website at www.bofa.com/login, containing all applicable current disclosures.  If you do not have a username or password, please contact your BAS representative or call the number above.

**Further information on any security or financial instrument mentioned herein is available upon request.**


## Company - Specific Disclosures

BAS and/or its affiliates have lead- or co-managed an offering of securities for this company in the previous 12 months: Countrywide Financial Corporation; Freddie Mac.

This company, its subsidiaries and/or its affiliates are (is) or have (has) been a client of BAS in the previous 12 months. During this period, BAS has performed investment banking services for this company, its subsidiaries and/or its affiliates and has received compensation for those services: Countrywide Financial Corporation; Freddie Mac; IndyMac Bancorp; Washington Mutual, Inc..

BAS and/or its affiliates expect(s) to receive, or intend(s) to seek, compensation during the next three months for investment banking services from this company, its subsidiaries and/or its affiliates: Countrywide Financial Corporation; Freddie Mac; IndyMac Bancorp; Washington Mutual, Inc..

This company, its subsidiaries and/or its affiliates are (is) or have (has) been a client of BAS in the previous 12 months. During this period, BAS has performed non-investment banking securities-related services for this company, its subsidiaries and/or its affiliates and has received compensation for those services: Countrywide Financial Corporation; Washington Mutual, Inc..

This company, its subsidiaries and/or its affiliates are (is) or have (has) been a client of BAS in the previous 12 months. During this period, BAS has performed non-securities services for this company, its subsidiaries and/or its affiliates and has received compensation for those services: Countrywide Financial Corporation; Freddie Mac; IndyMac Bancorp; Washington Mutual, Inc..

| Countrywide Financial Corporation (CFC) | |
| --- | --- |
| **Target Price, Valuation Method, Risk Factors** | |
| **Target Price:** | $33.00 |
| **Valuation Method Used To Reach Target Price:** | Our target price of $33 implies a P/E of 8.99x and P/B of 1.22x, compared with current levels of 8.89x and 1.62x. |

**Risk Factors:**

| 1 | Accelerating rate of mortgage originations declines. |
| --- | --- |
| 2 | Deteriorating credit quality fundamentals. |
| 3 | Gain on sale dependent earnings |

**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126      71

**Equity Research**

October 27, 2006

**Bank of America**

---

**Freddie Mac (FRE)**

**Target Price, Valuation Method, Risk Factors**

| | |
|---|---|
| **Target Price:** | $72.25 |
| **Valuation Method Used To Reach Target Price:** | Our $72.25 price target, representing a 9.4x forward P/E, is the product of a sum-of-the-parts valuation using an 11.6% DCF discount rate for "mission" cash flows versus a 14.1% discount rate (owing to high uncertainty on speed of portfolio shrinkage) for "non-mission supportive" cash flows. This results in a per share target value of $35.61 for the "mission" business, implying a 14.3x target P/E and 1.78x P/B; and a $36.64 value for the "non-mission supportive" portfolio, implying a 7.1x target P/E and 1.51x P/B. |

**Risk Factors:**
1.  Exposure to regulatory induced changes in business model
2.  Singular focus on US housing market entering cyclical downturn
3.  Not yet filing timely financial statements
4.  Incomplete accounting review

---

**IndyMac Bancorp (NDE)**

**Target Price, Valuation Method, Risk Factors**

| | |
|---|---|
| **Target Price:** | $36.00 |
| **Valuation Method Used To Reach Target Price:** | With a less-sanguine industry origination outlook and diminished earnings confidence, we applied a 15% discount to the value of $42.35 suggested by our risk-adjusted DCF analysis to get a target price of $36. |

**Risk Factors:**
1.  Slower-than-expected declines in mortgage originations
2.  Steeper-than-expected yield curve
3.  Delayed deterioration in credit quality

---

**Washington Mutual, Inc. (WM)**

**Target Price, Valuation Method, Risk Factors**

| | |
|---|---|
| **Target Price:** | $43.00 |
| **Valuation Method Used To Reach Target Price:** | With diminished earnings confidence we used a 15% discount to our proprietary risk-adjusted cash earnings DCF derived valuation of $50.50 to get a 12-month target price of $43. |

**Risk Factors:**
1.  Decelerating rate of mortgage origination
2.  Flattening yield curve
3.  Credit risk profile is increasing.

---

EXHIBIT 126      72

**Equity Research**
October 27, 2006

**Bank of America**





**Countrywide Financial Corporation**
**Robert Lacoursiere 212.847.5677**

EXHIBIT 126      73

**Equity Research**
October 27, 2006

**Bank of America**





 **Bank of America**

## Disclaimers

This report has been prepared independently of any issuer of securities mentioned herein and not in connection with any proposed offering of securities or as agent of any issuer of any securities. None of BAS, BASL, their affiliates or their analysts (collectively, BofA) have any authority whatsoever to make any representation or warranty on behalf of the issuer(s). This report is provided for information purposes only and is not an offer or a solicitation for the purchase or sale of any financial instrument. Any decision to purchase or subscribe for securities in any offering must be based solely on existing public information on such security or the information in the prospectus or other offering document issued in connection with such offering, and not on this report.

For securities recommended in this report in which BofA is not a market maker, BofA usually provides bids and offers and may act as principal in connection with such transactions. BofA is a regular issuer of traded financial instruments linked to securities that may have been recommended in this report. BofA may hold, at any time, a trading position (long or short) in the shares of the subject company(ies) discussed in this report. BofA may engage in securities transactions in a manner inconsistent with this research report and, with respect to securities covered by the report, will buy or sell from customers on a principal basis.

Securities recommended, offered or sold by BofA are not insured by the Federal Deposit Insurance Corporation, are not deposits or other obligations of any insured depository institution (including Bank of America, N.A.) and are subject to investment risks, including the possible loss of the principal amount invested. The information contained in this report (with the exception of the information set forth under the captions "Regulation AC Certification" and "Important Disclosures") has been obtained from and is based on sources believed to be reliable, we do not guarantee its accuracy, and it may be incomplete or condensed. All opinions, projections and estimates constitute the judgment of the author as of the date of the report and are subject to change without notice. Prices also are subject to change without notice. BofA's ability to publish research on the subject company(ies) in the future is subject to applicable quiet periods.

Investing in non-U.S. securities, including ADRs, may entail certain risks. The securities of non-U.S. issuers may not be registered with, nor be subject to, the reporting requirements of the U.S. Securities and Exchange Commission. There may be limited information available on foreign securities. In general, foreign companies are not subject to uniform audit and reporting standards, practices and requirements comparable to those of U.S. companies. In addition, exchange rate movements may have an adverse effect on the value of an investment in a foreign stock and its corresponding dividend payment for U.S. investors. Net dividends to ADR investors are estimated, using withholding tax rate conventions, deemed accurate, but investors are urged to consult their tax advisor for exact dividend computations. Investors who have received this report from BAS or an affiliate may be prohibited in certain states or other jurisdictions from purchasing securities mentioned in this report from BAS or its affiliate(s).

Investments in general, and derivatives (that is, options, futures, warrants, and contracts for differences) in particular, involve numerous risks, including, among others, market risk, counterparty default risk and liquidity risk. Derivatives are not suitable investments for all investors, and an investor may lose all principal invested and, in some cases, may incur unlimited losses. It may be difficult to sell an investment and to obtain reliable information about its value or the risks to which it is exposed. Exchange Traded Funds (ETFs) are subject to risks similar to those of stocks. Investment returns will fluctuate and are subject to market volatility, so that an investor's shares, when redeemed or sold, may be worth more or less than their original cost. To obtain a copy of an ETF's prospectus or a product description, please ask a BAS or affiliate representative. Past performance of securities, loans or other financial instruments is not indicative of future performance.

This report is not prepared as or intended to be investment advice and is issued without regard to the specific investment objectives, financial situation or particular needs of any specific recipient. In the event that the recipient received this report pursuant to a contract between the recipient and BAS for the provision of research services for a separate fee, and in connection therewith BAS may be deemed to be acting as an investment adviser, such status relates, if at all, solely to the person with whom BAS has contracted directly and does not extend beyond the delivery of this report (unless otherwise agreed specifically in writing by BAS). BAS is and continues to act solely as a broker-dealer in connection with the execution of any transactions, including transactions in any securities mentioned in this report. Neither BAS, BASL nor any officer or employee of BAS, BASL or any affiliate thereof accepts any liability whatsoever for any direct, indirect or consequential damages or losses arising from any use of this report or its contents.

BofA does not provide tax advice. Accordingly, any statements contained herein as to tax matters were neither written nor intended by the sender or BofA to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer. If any person uses or refers to any such tax statement in promoting, marketing or recommending a partnership or other entity, investment plan or arrangement to any taxpayer, then the statement expressed above is being delivered to support the promotion or marketing of the transaction or matter addressed and the recipient should seek advice based on its particular circumstances from an independent tax advisor.

Notwithstanding anything herein to the contrary, any party hereto (and any of its employees, representatives and other agents) may disclose to any and all persons, without limitation of any kind the tax treatment or tax structure of this transaction.

With the exception of information regarding BAS, BASL and their affiliates, materials prepared by BAS and BASL research personnel are based on public information. Facts and views presented in this material have not been reviewed by, and may not reflect information known to, professionals in other business areas of BAS, BASL and their affiliates, including investment banking personnel.

*To European and Asian Customers:* This report is distributed in Europe by BASL and in Asia by Banc of America Securities Asia Limited.

*To U.S. Customers:* BAS has accepted responsibility for the distribution of this report in the United States to BAS clients, but not to the clients of its affiliate, Banc of America Investment Services, Inc. (BAI). Transactions by U.S. persons (other than BAI and its clients) in any security discussed herein must be carried out through BAS. BAS provides research to its affiliate, BAI. BAI is a registered broker-dealer, member NASD and SIPC, and is a nonbank subsidiary of Bank of America N.A.

*To U.K. Customers:* This document has been approved for distribution in the United Kingdom by BASL, which is authorized and regulated by the Financial Services Authority for the conduct of investment business in the United Kingdom. Prices, values or income ascribed to investments in this report may fall against your interests. The investments may not be suitable for you, and if in any doubt, you should seek advice from an investment advisor. Changes in rates of exchange may have an adverse effect on the value, price or income from an investment. Levels and basis for taxation may change. The protection provided by the U.K. regulatory regime, including the Financial Services Scheme, do not apply in general to business coordinated by BAS or its affiliates from an office outside of the United Kingdom.

These disclosures should be read in conjunction with the BASL general policy statement on the handling of research conflicts-available upon request.

*To German Customers:* In Germany, this report should be read as though BAS or BASL, as applicable, has acted as a member of a consortium that has underwritten the most recent offering of securities during the past five years for companies covered in this report and holds 1% or more of the share capital of such companies.

*To Canadian Customers:* The contents of this report are intended solely for the use of, and only may be issued or passed on to, persons to whom BAS is entitled to distribute this report under applicable Canadian securities laws. In the province of Ontario, any person wishing to effect a transaction should do so with BAS, which is registered as an International Dealer. With few exceptions, BAS only may effect transactions in Ontario with designated institutions in foreign securities as such terms are defined in the Securities Act (Ontario).

*To Hong Kong Customers:* Any Hong Kong person wishing to effect a transaction in any securities discussed in this report should contact Banc of America Securities Asia Limited.

*To Customers in Other Countries:* This report, and the securities discussed herein, may not be eligible for distribution or sale in all countries or to certain categories of investors. In general, this report may be distributed only to professional and institutional investors.

This report may not be reproduced or distributed by any person for any purpose without the prior written consent of BAS. Please cite source when quoting. All rights reserved.

**Countrywide Financial Corporation
Robert Lacoursiere 212.847.5677**

EXHIBIT 126    75

**Equity Research**

October 27, 2006

**Bank of America**

---

BAS (United States)
Banc of America Securities LLC

9 West 57th Street
New York, New York 10019
Tel. Contact: 212-583-8000

600 Montgomery Street
San Francisco, California 94111
Tel. Contact: 415-627-2000

100 North Tryon Street
Charlotte, North Carolina 28255
Tel. Contact: 888-279-3457

© 2006 Bank of America Corporation

BASL (United Kingdom)
Banc of America Securities Limited

5 Canada Square
London E14 5AQ, England
Tel. Contact: +44 20 7174 4000

**Equity Web Site:** www.bofa.com/login
**Bloomberg:** Type BOAX [GO]
**First Call:** www.firstcall.com
**Reuters:** www.reuters.com
**TheMarkets.com:** www.themarkets.com
For access, please contact your sales representative.

BASAL (Hong Kong)
Banc of America Securities  Asia Limited

Bank of America Tower
2nd Floor, Hong Kong
Tel. Contact: 852-2847-6175

**Bank of America.**

# Exhibit 127



1 of 1 DOCUMENT

Copyright 2006 The New York Sun, Two SL, LLC
All Rights Reserved
The New York Sun

December 20, 2006 Wednesday

**SECTION:** BUSINESS; Pg. 8

**LENGTH:** 768 words

**HEADLINE:** Liars' Loans Could Make Many Moan

**BYLINE:** DAN DORFMAN

**BODY:**

After months of relentless shopping, you finally do what Mr. Blandings did: discover your dream house. Hallelujah.

To make it yours, though, the bank says you need an income after your down payment of $100,000 a year. Your annual earnings are only $82,000, so you fib and tell the bank that you're making $100,000, hoping somehow you'll find a way to work it out and that the bank will never check (which it rarely does).

Such scenarios led to a phenomenon that made its debut in 1998, when the housing market was booming and stated-income loans (those based on what you tell the bank you're earning) became the rage. Given widespread income exaggeration by eager home buyers, such loans soon became known in the real estate industry as the "liar's loan."

In 1998, liars' loans - those with little or no documentation - amounted to 24% of all mortgage originations, according to the Mortgage Brokers Association for Responsible Lending, an advocacy group in Redwood City, Calif., whose stated goal is to protect consumers and the loan industry from outlandish and counterproductive loan programs. So far this year, the association notes, liars' loans have shot up to an estimated 62% of mortgage originations.

Interestingly, a recent sampling of 100 stated-income loans by an auditing firm in Virginia (based on IRS records) found that 90% of the income statements were exaggerated by 5% or more, while almost 60% of the stated amounts were exaggerated by more than 50%.

The significance of this is that the liar's loan could wreak havoc on the economy, the president of MBARL, Steven Krystofiak, says. In fact, this is precisely what he expects.

Why so? For starters, he says he believes that of this year's estimated stated-income loans, "most, if not all, are fraudulent." Against this background, he points out that roughly $1 trillion worth of American home mortgages will be reset over the next year (about 11% of the $9 trillion of mortgages outstanding), most at higher rates because of the steep rise in interest rates in recent years. In general, he says, the mortgage rate will rise by 0.5% to 1.5%, meaning, he says, many monthly payments could easily rise 50%.

EXHIBIT 127      77

Liars' Loans Could Make Many Moan The New York Sun December 20, 2006 Wednesday

For example, he notes, a 4.5% interest rate on a fixed mortgage from three years ago could be reset at more than 6%, leading to that 50% hike in monthly payments.

In response to this financial burden, Mr. Krystofiak says, untold numbers of homeowners will simply no longer be able to afford their homes. They'll face a double whammy: their mortgage payments will increase and they won't be able to refinance because the value of their homes has declined. What's more, he points out, they won't be able to sell them because they'll owe more money on their homes than they're worth.

This housing horror show, he predicts, will lead to an explosive rise in delinquencies and foreclosures.

The hardest-hit areas in this respect, he believes, will be New York, California, Florida, Boston, Arizona, and Colorado.

The latest word from the Mortgage Bankers Association tends to give some credence to Mr. Krystofiak's concerns. About a week ago, it reported late payments and new foreclosures on American homes in the third quarter rose versus the prior quarter, and it predicted further growth as a massive wave of adjustable-rate mortgages reset at higher interest rates.

Looking at specific numbers, the mortgage delinquency rate rose to 4.67% in the third quarter from 4.39% in the prior quarter, and 4.44% in the third quarter of last year. Meanwhile, new foreclosures, climbing at a much slower clip, rose to 0.46% from 0.43% in the prior quarter.

Majority thinking on Wall Street has it that the housing slump will bottom out around mid-2007, and that therefore fears of a full-blown housing crisis are way overdone. Mr. Wystofiak, a mortgage broker - admittedly, not an economist - disagrees. He says his sense is that the enormous number of liars' loans, along with the huge wave of rate resetting, falling home prices, and slowing sales, will lead to a significantly greater housing downturn than expected and unmistakably put the economy at risk

Thus, he figures that a hard landing, not the widely expected soft landing, is a foregone conclusion; he also thinks there's a strong chance that housing difficulties could precipitate a nasty recession in the second half of 2007 that could easily spill over into 2008.

The bottom line from our mortgage broker is hardly encouraging: The full brunt of the housing weakness has yet to be seen. If he's right, of course, hopes for a soft landing may be little more than a passing dream.

dandordan@aol.com

**LOAD-DATE:** December 20, 2006

EXHIBIT 127     78

# Exhibit 128



97 of 100 DOCUMENTS


Copyright 2007 The New York Times Company
The New York Times

March 11, 2007 Sunday
Correction Appended
Late Edition - Final

**SECTION:** Section 1; Column 5; National Desk; NEWS ANALYSIS; Pg. 1

**LENGTH:** 2651 words

**HEADLINE:** Crisis Looms In Mortgages

**BYLINE:** By GRETCHEN MORGENSON

**BODY:**

On March 1, a Wall Street analyst at Bear Stearns wrote an upbeat report on a company that specializes in making mortgages to cash-poor homebuyers. The company, New Century Financial, had already disclosed that a growing number of borrowers were defaulting, and its stock, at around $15, had lost half its value in three weeks.

What happened next seems all too familiar to investors who bought technology stocks in 2000 at the breathless urging of Wall Street analysts. Last week, New Century said it would stop making loans and needed emergency financing to survive. The stock collapsed to $3.21.

The analyst's untimely call, coupled with a failure among other Wall Street institutions to identify problems in the home mortgage market, isn't the only familiar ring to investors who watched the technology stock bubble burst precisely seven years ago.

Now, as then, Wall Street firms and entrepreneurs made fortunes issuing questionable securities, in this case pools of home loans taken out by risky borrowers. Now, as then, bullish stock and credit analysts for some of those same Wall Street firms, which profited in the underwriting and rating of those investments, lulled investors with upbeat pronouncements even as loan defaults ballooned. Now, as then, regulators stood by as the mania churned, fed by lax standards and anything-goes lending.

Investment manias are nothing new, of course. But the demise of this one has been broadly viewed as troubling, as it involves the nation's $6.5 trillion mortgage securities market, which is larger even than the United States treasury market.

Hanging in the balance is the nation's housing market, which has been a big driver of the economy. Fewer lenders means many potential homebuyers will find it more difficult to get credit, while hundreds of thousands of homes will go up for sale as borrowers default, further swamping a stalled market.

EXHIBIT 128    79

Crisis Looms In Mortgages The New York Times March 11, 2007 Sunday Correction Appended

"The regulators are trying to figure out how to work around it, but the Hill is going to be in for one big surprise," said Josh Rosner, a managing director at Graham-Fisher & Company, an independent investment research firm in New York, and an expert on mortgage securities. "This is far more dramatic than what led to Sarbanes-Oxley," he added, referring to the legislation that followed the WorldCom and Enron scandals, "both in conflicts and in terms of absolute economic impact."

While real estate prices were rising, the market for home loans operated like a well-oiled machine, providing ready money to borrowers and high returns to investors like pension funds, insurance companies, hedge funds and other institutions. Now this enormous and important machine is sputtering, and the effects are reverberating throughout Main Street, Wall Street and Washington.

Already, more than two dozen mortgage lenders have failed or closed their doors, and shares of big companies in the mortgage industry have declined significantly. Delinquencies on loans made to less creditworthy borrowers -- known as subprime mortgages --recently reached 12.6 percent. Some banks have reported rising problems among borrowers that were deemed more creditworthy as well.

Traders and investors who watch this world say the major participants -- Wall Street firms, credit rating agencies, lenders and investors -- are holding their collective breath and hoping that the spring season for home sales will reinstate what had been a go-go market for mortgage securities. Many Wall Street firms saw their own stock prices decline over their exposure to the turmoil.

"I guess we are a bit surprised at how fast this has unraveled," said Tom Zimmerman, head of asset-backed securities research at UBS, in a recent conference call with investors.

Even now the tone accentuates the positive. In a recent presentation to investors, UBS Securities discussed the potential for losses among some mortgage securities in a variety of housing markets. None of the models showed flat or falling home prices, however.

The Bear Stearns analyst who upgraded New Century, Scott R. Coren, wrote in a research note that the company's stock price reflected the risks in its industry, and that the downside risk was about $10 in a "rescue-sale scenario." According to New Century, Bear Stearns is among the firms with a "longstanding" relationship financing its mortgage operation. Mr. Coren, through a spokeswoman, declined to comment.

Others who follow the industry have voiced more caution. Thomas A. Lawler, founder of Lawler Economic and Housing Consulting, said: "It's not that the mortgage industry is collapsing, it's just that the mortgage industry went wild and there are consequences of going wild."

"I think there is no doubt that home sales are going to be weaker than most anybody who was forecasting the market just two months ago thought. For those areas where the housing market was already not too great, where inventories were at historically high levels and it finally looked like things were stabilizing, this is going to be unpleasant."

Like worms that surface after a torrential rain, revelations that emerge when an asset bubble bursts are often unattractive, involving dubious industry practices and even fraud. In the coming weeks, some mortgage market participants predict, investors will learn not only how lax real estate lending standards became, but also how hard to value these opaque securities are and how easy their values are to prop up.

Owners of mortgage securities that have been pooled, for example, do not have to reflect the prevailing market prices of those securities each day, as stockholders do. Only when a security is downgraded by a rating agency do investors have to mark their holdings to the market value. As a result, traders say, many investors are reporting the values of their holdings at inflated prices.

EXHIBIT 128    80

Crisis Looms In Mortgages The New York Times March 11, 2007 Sunday Correction Appended

"How these things are valued for portfolio purposes is exposed to management judgment, which is potentially arbitrary," Mr. Rosner said.

At the heart of the turmoil is the subprime mortgage market, which developed to give loans to shaky borrowers or to those with little cash to put down as collateral. Some 35 percent of all mortgage securities issued last year were in that category, up from 13 percent in 2003.

Looking to expand their reach and their profits, lenders were far too willing to lend, as evidenced by the creation of new types of mortgages -- known as "affordability products" -- that required little or no down payment and little or no documentation of a borrower's income. Loans with 40-year or even 50-year terms were also popular among cash-strapped borrowers seeking low monthly payments. Exceedingly low "teaser" rates that move up rapidly in later years were another feature of the new loans.

The rapid rise in the amount borrowed against a property's value shows how willing lenders were to stretch. In 2000, according to Banc of America Securities, the average loan to a subprime lender was 48 percent of the value of the underlying property. By 2006, that figure reached 82 percent.

Mortgages requiring little or no documentation became known colloquially as "liar loans." An April 2006 report by the Mortgage Asset Research Institute, a consulting concern in Reston, Va., analyzed 100 loans in which the borrowers merely stated their incomes, and then looked at documents those borrowers had filed with the I.R.S. The resulting differences were significant: in 90 percent of loans, borrowers overstated their incomes 5 percent or more. But in almost 60 percent of cases, borrowers inflated their incomes by more than half.

A Deutsche Bank report said liar loans accounted for 40 percent of the subprime mortgage issuance last year, up from 25 percent in 2001.

Securities backed by home mortgages have been traded since the 1970s, but it has been only since 2002 or so that investors, including pension funds, insurance companies, hedge funds and other institutions, have shown such an appetite for them.

Wall Street, of course, was happy to help refashion mortgages from arcane and illiquid securities into ubiquitous and frequently traded ones. Its reward is that it now dominates the market. While commercial banks and savings banks had long been the biggest lenders to home buyers, by 2006, Wall Street had a commanding share -- 60 percent -- of the mortgage financing market, Federal Reserve data show.

The big firms in the business are Lehman Brothers, Bear Stearns, Merrill Lynch, Morgan Stanley, Deutsche Bank and UBS. They buy mortgages from issuers, put thousands of them into pools to spread out the risks and then divide them into slices, known as tranches, based on quality. Then they sell them.

The profits from packaging these securities and trading them for customers and their own accounts have been phenomenal. At Lehman Brothers, for example, mortgage-related businesses contributed directly to record revenue and income over the last three years.

The issuance of mortgage-related securities, which include those backed by home-equity loans, peaked in 2003 at more than $3 trillion, according to data from the Bond Market Association. Last year's issuance, reflecting a slowdown in home price appreciation, was $1.93 trillion, a slight decline from 2005.

In addition to enviable growth, the mortgage securities market has undergone other changes in recent years. In the 1990s, buyers of mortgage securities spread out their risk by combining those securities with loans backed by other assets, like credit card receivables and automobile loans. But in 2001, investor preferences changed, focusing on specific types of loans. Mortgages quickly became the favorite.

EXHIBIT 128     81

Crisis Looms In Mortgages The New York Times March 11, 2007 Sunday Correction Appended

Another change in the market involves its trading characteristics. Years ago, mortgage-backed securities appealed to a buy-and-hold crowd, who kept the securities on their books until the loans were paid off. "You used to think of mortgages as slow moving," said Glenn T. Costello, managing director of structured finance residential mortgage at Fitch Ratings. "Now it has become much more of a trading market, with a mark-to-market bent."

The average daily trading volume of mortgage securities issued by government agencies like Fannie Mae and Freddie Mac, for example, exceeded $250 billion last year. That's up from about $60 billion in 2000.

Wall Street became so enamored of the profits in mortgages that it began to expand its reach, buying companies that make loans to consumers to supplement its packaging and sales operations. In August 2006, Morgan Stanley bought Saxon, a $6.5 billion subprime mortgage underwriter, for $706 million. And last September, Merrill Lynch paid $1.3 billion to buy First Franklin Financial, a home lender in San Jose, Calif. At the time, Merrill said it expected First Franklin to add to its earnings in 2007. Now analysts expect Merrill to take a large loss on the purchase.

Indeed, on Feb. 28, as the first fiscal quarter ended for many big investment banks, Wall Street buzzed with speculation that the firms had slashed the value of their numerous mortgage holdings, recording significant losses.

As prevailing interest rates remained low over the last several years, the appetite for these securities only rose. In the ever-present search for high yields, buyers clamored for securities that contained subprime mortgages, which carry interest rates that are typically one to two percentage points higher than traditional loans. Mortgage securities participants say increasingly lax lending standards in these loans became almost an invitation to commit mortgage fraud. It is too early to tell how significant a role mortgage fraud played in the rocketing delinquency rates -- 12.6 percent among subprime borrowers. Delinquency rates among all mortgages stood at 4.7 percent in the third quarter of 2006.

For years, investors cared little about risks in mortgage holdings. That is changing.

"I would not be surprised if between now and the end of the year at least 20 percent of BBB and BBB- bonds that are backed by subprime loans originated in 2006 will be downgraded," Mr. Lawler said.

Still, the rating agencies have yet to downgrade large numbers of mortgage securities to reflect the market turmoil. Standard & Poor's has put 2 percent of the subprime loans it rates on watch for a downgrade, and Moody's said it has downgraded 1 percent to 2 percent of such mortgages that were issued in 2005 and 2006.

Fitch appears to be the most proactive, having downgraded 3.7 percent of subprime mortgages in the period.

The agencies say that they are confident that their ratings reflect reality in the mortgages they have analyzed and that they have required managers of mortgage pools with risky loans in them to increase the collateral. A spokesman for S.& P. said the firm made its ratings requirements more stringent for subprime issuers last summer and that they shored up the loans as a result.

Meeting with Wall Street analysts last week, Terry McGraw, chief executive of McGraw-Hill, the parent of S.& P., said the firm does not believe that loans made in 2006 will perform "as badly as some have suggested."

Nevertheless, some investors wonder whether the rating agencies have the stomach to downgrade these securities because of the selling stampede that would follow. Many mortgage buyers cannot hold securities that are rated below investment grade -- insurance companies are an example. So if the securities were downgraded, forced selling would ensue, further pressuring an already beleaguered market.

Another consideration is the profits in mortgage ratings. Some 6.5 percent of Moody's 2006 revenue was related to the subprime market.

EXHIBIT 128     82

Crisis Looms In Mortgages The New York Times March 11, 2007 Sunday Correction Appended

Brian Clarkson, Moody's co-chief operating officer, denied that the company hesitates to cut ratings. "We made assumptions early on that we were going to have worse performance in subprime mortgages, which is the reason we haven't seen that many downgrades," he said. "If we have something that is investment grade that we need to take below investment grade, we will do it."

Interestingly, accounting conventions in mortgage securities require an investor to mark his holdings to market only when they get downgraded. So investors may be assigning higher values to their positions than they would receive if they had to go into the market and find a buyer. That delays the reckoning, some analysts say.

"There are delayed triggers in many of these investment vehicles and that is delaying the recognition of losses," Charles Peabody, founder of Portales Partners, an independent research boutique in New York, said. "I do think the unwind is just starting. The moment of truth is not yet here."

On March 2, reacting to the distress in the mortgage market, a throng of regulators, including the Federal Reserve Board, asked lenders to tighten their policies on lending to those with questionable credit. Late last week, WMC Mortgage, General Electric's subprime mortgage arm, said it would no longer make loans with no down payments.

Meanwhile, investors wait to see whether the spring home selling season will shore up the mortgage market. If home prices do not appreciate or if they fall, defaults will rise, and pension funds and others that embraced the mortgage securities market will have to record losses. And they will likely retreat from the market, analysts said, affecting consumers and the overall economy.

A paper published last month by Mr. Rosner and Joseph R. Mason, an associate professor of finance at Drexel University's LeBow College of Business, assessed the potential problems associated with disruptions in the mortgage securities market. They wrote: "Decreased funding for residential mortgage-backed securities could set off a downward spiral in credit availability that can deprive individuals of home ownership and substantially hurt the U.S. economy."

**URL:** http://www.nytimes.com

**CORRECTION-DATE:** March 20, 2007

**CORRECTION:**

A chart with a front-page news analysis article on March 11 about a looming crisis in the mortgage market mislabeled the size of the market that trades mortgage-backed securities. It trades in hundreds of billions of dollars a day, not hundreds of millions.

**GRAPHIC:** Chart: "A Booming Market"Mortgage-backed securities boomed along with the housing market as consumers borrowed ever more and took equity out of their homes. Now that housing has cooled, troubles in risky loans are causing tremors in this $6.5 trillion market.Graph tracks home equity extraction . . . since 1991 as the following: a percentage of disposable incomea percentage of gross domestic product*Graph tracks mortgage-backed securities issuance (both public agencies and private entities) since 1999.Graph tracks mortgage-backed securities trading (public agencies only) since 1999.*2006 figure is an estmate based on the first two quarters(Source by Portales Partners Securities Industry and Financial Markets Association)(pg. 25)

**LOAD-DATE:** March 11, 2007

EXHIBIT 128    83

# Exhibit 129



1 of 1 DOCUMENT

Copyright 2007 San Francisco Chronicle
All Rights Reserved

# San Francisco Chronicle

THE SAN FRANCISCO CHRONICLE (California)

March 18, 2007 Sunday
FINAL Edition

**SECTION:** BUSINESS; SURREAL ESTATE; Pg. D2

**LENGTH:** 1134 words

**HEADLINE:** In tough real estate market, appraisers under pressure

**BYLINE:** Carol Lloyd

**BODY:**

With the Bay Area real estate boom splitting into so many divergent microtrends -- some neighborhoods careening southward, others chugging along, with still others gaining speed despite all odds -- the necessity of an accurate appraisal has become more crucial than ever.

Hired by lenders or mortgage brokers or sometimes attorneys, appraisers determine the value of a property by looking at recent sales of comparable properties, doing inspections and analyzing the larger market. Unlike agents, brokers and lenders, all of whom get paid on commission, appraisers are just about the only ones who have no vested interest in the deal going through. Instead, they get paid for their work by the job: usually between $100 and $500, but sometimes as much as $2,000 for a sprawling rural estate.

Yet in an era when people increasingly use their homes as piggy banks through serial refinancing or are selling their homes with the expectation of early retirement, more appraisers are feeling the uncomfortable sensation of many parties breathing down their necks and pressuring them to keep home prices up.

Last month, a survey of the national appraisal industry conducted by October Research Corp. reported that 90 percent of appraisers feel pressure to inflate the value of homes to meet expectations -- be it a purchase price or an estimated value for a refinance.

Of course, this isn't the first time evidence of appraiser pressure has been aired. Just four years ago, during the boom, a similar study found that a full 55 percent of appraisers had had lenders, brokers or owners attempt to inflate their values. In 2005, Jonathan Miller, appraiser and bubble blogger, created Soapbox to vent about the "pressure myself, my firm and my profession was under to make the number 'or else.' "

"It seemed that no one really cared about ethics or the risk placed on (the) banking system," he wrote recently. "Appraisers were fast becoming the enablers to fraud and a whole lot of 'gray areas' that I wanted no part of."

In the boom market, meeting the expected price was not as hard to do. Everyone was making lots of money and less anxious about each individual deal going through. But now that sales volumes are down, re-fi fever has cooled and some markets have softened, mortgage brokers and even lenders try to set their target value in advance of hiring their appraiser. This leaves the appraiser caught between a house and a hard place.

EXHIBIT 129      84

In tough real estate market, appraisers under pressure THE SAN FRANCISCO CHRONICLE (California) March 18, 2007 Sunday

"Internet-based mortgage companies call all the time," says Curt Thor of the Real Estate Appraisals Association of Northern California and a Marin appraiser with North Bay Real Estate Appraisals for more than 20 years. "They're fishing for appraisers. They tell me what the number is and ask me if I can match it."

Thor says he typically won't even look at such offers because if he can't match the number once he visits that house, he knows he'll find himself battling with mortgage brokers over being paid for his time. Once when this happened, he filed a complaint about the broker with the Department of Real Estate and sent a copy to the broker's boss. "I got a check very quickly," he told me.

John Philipp, an appraiser based in Sonoma County, says that he's experienced similar "dialing for appraisals" when mortgage brokers routinely call and ask him to complete a "comp check" before offering the appraisal assignment. "They want me to research the subject property and based on county information do research through the MLS and give them a value before seeing the property. Sometimes they tell me what value they need to make their loan go through, which is illegal. The appraiser is not supposed to be made aware of the owner's estimate of value, or the value that is needed to make the loan, so as not to be influenced or have a predetermined number prior to the inspection," he writes in an e-mail about refinance appraisals. "Basically, the broker wants an appraisal without having to pay for it."

Philipp knows from experience that these brokers are not a source of future business. "Once I advise these callers that I don't perform this service and that it is illegal to even ask, I don't hear from them again."

Indeed, all the appraisers I spoke to -- no matter their county -- mentioned that times are increasingly tough, especially for ethical appraisers who refuse to cook the numbers. Additionally, the industry has recently been flooded with newly licensed appraisers (according to one expert, the number in California has doubled in recent years).

"The professionals are generally leaving the business or going into other areas of real estate appraisal -- like legal cases," explained Miller. He says that the pressure on appraisers has been growing since the 1990s, when banks began to eliminate their in-house appraisal offices and outsource the business of managing appraisals to appraisal management companies. Suddenly, mortgage brokers -- who may have the biggest stake in the deal going through -- were in the business of hiring appraisers directly.

Miller, who sometimes reviews "portfolios" for large lenders by looking at a pool of 50 to 100 appraisals and judging their accuracy, says that at least in his area -- Manhattan -- the pressure on appraisers is working. "About 90 percent of the appraisals I've reviewed are about 10 to 11 percent inflated," he says. "It's amazing -- it gets me really angry."

From the looks of it, the profession faces an uphill battle.

Finally, even as it may become more necessary to get a professional appraisal of a house in a fluctuating market, "point-and-click" valuation services like Zaio (www.zaio.com) -- which said last week that it will add 100,000 homes a day across the country to its instant appraisal database -- may make consumers expect that getting an appraisal is as easy as a credit report.

How might the decline of accurate appraisals influence the consumer? It's hard to say. On one hand, buyers, sellers and refinancing homeowners tend to be as impatient as anyone to push the deal through. And who really cares if the appraisal is done by a computer or a person, or managed by a middleman?

But in the long run, a practice of lending based on inaccurate or inflated valuations could be dangerous to the banking system, a network of institutions whose mistakes the American people generally foot the bill for. The bad real estate deals that led to the savings and loan bailout of the 1980s were often founded on inflated appraisals. And if the largest lenders in the country don't know what they've got on their books, it corrupts the system as a whole. The investors, such as pension funds, who buy the loans are not getting accurate information. Eventually, this could make it harder for lenders to sell them and thus reduce liquidity for new loans.

Or as Miller put it: "Garbage in -- garbage out."

**LOAD-DATE:** March 18, 2007

EXHIBIT 129   85

# Exhibit 130



1 of 100 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2007, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.

The Wall Street Journal

March 21, 2007 Wednesday

**SECTION:** Pg. A19

**LENGTH:** 1397 words

**HEADLINE:** Mortgage Meltdown

**BYLINE:** By Andy Laperriere

**BODY:**

Stock markets world-wide have sold off the past few weeks over concerns the collapse of the subprime mortgage industry could prolong and deepen the housing slump and threaten the health of the U.S. economy. Federal Reserve officials and most economists believe the problems in the subprime mortgage market will remain relatively contained, but there is compelling evidence that the failure of subprime loans may be the start of a painful unwinding of a housing bubble that was fueled by easy money and loose lending practices.

Whether measured in absolute terms or time-tested metrics such as price-to-income or price-to-rent ratios, the rise in U.S. home prices during the past six years is unprecedented. What's more, not only has mortgage debt doubled during this time, but loans have been offered on imprudent terms (for instance, a no down payment, no income verification loan to a borrower with a checkered credit history).

It's no coincidence that the five-fold growth in subprime lending occurred at a time when home prices soared to nosebleed territory. As home prices kept rising, fewer loans went bad because the homeowner could almost always refinance or sell the property at a profit. (Until the past year or so, it seems the only person in California who sold his house at a loss was the convicted lobbyist who in 2003 bribed former Rep. Randy "Duke" Cunningham by buying his house at an inflated price and selling it six months later for $700,000 less.)

As the home price boom gained momentum and delinquencies dropped, lenders offered progressively easier and riskier lending terms. Common sense suggests that the boom-time mania that led banks (and investors in mortgage-backed securities) to offer dangerous loans to individuals with poor credit histories also led them to offer the same kinds of risky loans (no income verification, no down payments, high payments as a share of income, low teaser

EXHIBIT 130    86

Mortgage Meltdown The Wall Street Journal March 21, 2007 Wednesday

rates) to individuals with good credit scores.

Far from being limited to the subprime market, the data show these risky loan features have become widespread. According to Credit Suisse, the number of no or low documentation loans -- so-called "liar loans" -- has increased to 49% last year from 18% of purchase loans in 2001, a nearly three-fold increase. The investment bank also found that borrowers put up less than a 5% down payment in 46% of all home purchases last year. Inside Mortgage Finance estimates that nontraditional mortgages -- mostly interest-only and pay-option ARMs that allow the borrower to defer paying back principal or even increase the loan balance each month -- which barely existed five years ago, grew to close to a third of all mortgages last year.

The Alt-A market, a middle ground between subprime and prime, has increased seven-fold since 2001 and accounted for 20% of home-purchase loans last year. Fully 81% of Alt-A loans last year were no or low documentation loans, according to First American Loan Performance. Why have borrowers employed this kind of risky financing? Because it was the only way many of them could afford a home in some of the hottest housing markets, where prices more than doubled in five years.

It should come as no surprise that delinquencies on these unconventional loans have increased sharply. Investors were shaken last week by a Mortgage Bankers Association report which found that mortgage delinquencies hit nearly 5% at the end of last year and that prime adjustable rate loans deteriorated at a faster rate than subprime ARMs. A recent UBS report finds that the 2006 Alt-A loans are "on track to be one of the worst vintages ever." This is no subprime niche problem.

Even if bad loans are more widespread than previously expected, many housing bulls say, the impact on the housing market and the economy will be minimal because total losses due to foreclosures will be a small percentage of outstanding mortgage debt and a still smaller share of the economy. A similar argument holds that bad loans won't lead to a broader foreclosure problem because the average American has plenty of equity in his home.

Foreclosure losses as a share of the economy will be small and most homeowners have a comfortable amount of equity in their homes. In fact, about one-third of homeowners have no mortgage and own their homes outright, but they are not the reason home prices have been driven to the stratosphere. Home prices -- like all prices -- are set at the margin. It was the marginal buyer, particularly the subprime borrower and housing speculator, who drove prices higher. The easing of lending terms increased the demand for homes, and since the supply of homes is relatively fixed (or inelastic), this increase in demand quickly translated into higher prices. As the loose lending practices are inevitably reversed -- and there is a wide chasm between current lending practices and prudent lending terms -- fewer people will be able to afford to buy a house, which will reduce demand and push home prices lower.

It's not the size of foreclosure losses as a share of the economy that matters, it is the effect those losses have on the availability of credit. When banks (and investors in mortgage-backed securities) begin suffering losses, they inevitably pull back. This is why so many subprime companies have gone bankrupt virtually overnight; investors balked at buying subprime loans except at a steep discount, which produced immediate losses. In effect, their ability to profitably finance new loans was eliminated.

What's more, the bank regulators are only now beginning to tighten lending standards and will be under increasing pressure from Congress to do more. After growing by nearly 50% in the first half of 2006, nontraditional loan growth has turned negative since the bank regulators issued new guidelines last September. The CFO of Countrywide recently told an investor conference that 60% of the subprime loans the company is making won't meet proposed federal rules likely to take effect during the summer. The concern that tighter lending standards could reduce access to financing is the reason a widely watched survey of homebuilders conducted by the National Association of Homebuilders dropped earlier this week.

The report by Credit Suisse estimates mortgage originations could drop 21% during the next year or two because of

EXHIBIT 130    87

Mortgage Meltdown The Wall Street Journal March 21, 2007 Wednesday

tighter credit standards. Coupled with high inventories of unsold homes and the additional supply likely from distressed sellers, this drop in demand could produce an unprecedented nationwide decline in home prices. Merrill Lynch estimates prices could drop as much as 10% this year. A price drop of this magnitude would lead to a vicious cycle in the housing market and pose a major risk to economic growth. And, of course, it would create a raging political firestorm.

Tomorrow the Senate Banking Committee will hold a hearing featuring the bank regulators as well as top executives from a number of subprime lenders, all of whom are likely to be the subject of some tough questioning. The collapse of the subprime industry and the increase in foreclosures are serious issues and congressional oversight is important and appropriate. However, Congress should proceed with caution as legislation designed to protect the consumer from "predatory" lending could exacerbate the credit crunch just beginning in the subprime market.

The fact that Congress is now holding hearings on the fallout from the second major asset price bubble in the last decade should prompt some broader questions. For example, what role did the Fed's loose monetary policy from 2002-2004 play in fueling the housing bubble? Should the Federal Reserve reexamine its policy of ignoring asset bubbles?

Asset bubbles are harmful for the same reason high inflation is: Both create misleading price signals that lead to a misallocation of economic resources and sow the seeds for an inevitable bust. The unwinding of today's housing bubble is not merely an academic question; it is likely to inflict real hardship on millions of Americans. To reduce the risk of a similar outcome in the future, it is important that policy makers, economists, and policy analysts properly diagnose the root causes of the current housing bust, not just its symptoms.

---

Mr. Laperriere is a managing director in the Washington office of ISI Group.

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** March 22, 2007

EXHIBIT 130    88

# Exhibit 131



4 of 8 DOCUMENTS

Copyright 2007 Associated Press
All Rights Reserved
The Associated Press

April 10, 2007 Tuesday 8:58 PM GMT

**SECTION:** BUSINESS NEWS

**LENGTH:** 760 words

**HEADLINE:** Weakness spreads from subprime mortgage market to so-called Alt-A segment

**DATELINE:** NEW YORK

**BODY:**

Turmoil in the mortgage market is ensnaring more companies who lend to people with decent credit.

The spread of home lending woes beyond loans to those with weak credit threatens to reduce the availability of loans for some consumers and even threaten the existence of some lenders.

Rising delinquencies and defaults among subprime borrowers those with blemished credit histories have resulted in more than two dozen lenders going out of business, moving into bankruptcy protection or putting themselves up for sale.

Now the so-called Alternative-A mortgage sector, which loans to borrowers with better credit than subprime borrowers but not quite prime, is starting to hurt.

One Alt-A lender, American Home Mortgage Investment Corp. of Melville, N.Y., announced late last week that it was having trouble selling its mortgages into the secondary market and would have to cut its earnings forecast for the quarter and the year. At least five analysts downgraded the stock on Monday, and its shares fell more than 15 percent on the New York Stock Exchange. The shares dropped $2.37, or 11 percent, on Tuesday to close at $19.55.

Other Alt-A lenders that have taken hits in the market in recent days are First Horizon National Corp. of Memphis, Tenn., which some analysts predict may be forced to sell out to a bigger bank, and M&T Bank Corp. in Buffalo, N.Y.

Guy Cecala, publisher of Inside Mortgage Finance Publications in Bethesda, Md., said a "backlash" from the subprime market meltdown is part of the equation.

"While you're starting to see some deterioration of the quality, it's not so much that investors should be dumping (mortgage-backed securities)," he said. "But nobody wants to own a security that goes down in value, whether because of public perception or the reality of the market."

EXHIBIT 131      89

Weakness spreads from subprime mortgage market to so-called Alt-A segment The Associated Press April 10, 2007 Tuesday 8:58 PM GMT

Doug Duncan, chief economist for the Mortgage Bankers Association in Washington, D.C., said that Alt-A mortgages made up a small share of the U.S. market at about 6 percent of outstanding loans. Loans to prime customers, who are the most creditworthy, make up 74 percent; those to subprime borrowers are about 11 percent, and government-backed loans total about 9 percent.

Alt-A borrowers traditionally had credit scores as high as prime borrowers, but often provided less documentation of their finances; in recent years, however, some Alt-A borrowers have had credit scores closer to subprime borrowers and still weren't asked for full documentation.

Duncan said he expected to see some increase in delinquencies and defaults in the Alt-A market this year, but said the bigger problem was that investors appeared less willing to invest in these loans because of the deepening subprime problems.

That will be a factor in slowing mortgage origination this year to an estimated $2.2 trillion from a peak of $3.9 trillion in 2003 and $2.5 trillion last year, Duncan said.

In fact, The delinquency and default rate for Alt-A mortgages has been considerably less than for subprime mortgages, according to First American Loan Performance, a research firm based in San Francisco that looks at mortgage loans packaged into securities and sold to investors.

The First American data shows that January payments were 60 days late on 14.3 percent of subprime loans, up from 8.4 percent a year earlier. The late-payment figures for Alt-A loans was 2.6 percent in January, up from 1.3 percent a year earlier.

Still, companies that write the Alt-A mortgages are finding that investors are less willing to buy securities that are backed by mortgages or are demanding significantly higher returns.

Among the biggest Alt-A lenders in 2006 were IndyMac Bancorp Inc. of Pasadena, Calif; Countrywide Financial Corp. of Calabasas, Calif.; Residential Capital, or ResCap, of Minneapolis, a holding company for the residential mortgage operations of General Motors; EMC Mortgage Corp. in Irving, Texas, a subsidiary of The Bear Stearns Cos.; and Washington Mutual Inc. of Seattle.

Glenn Costello, a managing director with the Fitch Ratings agency in New York, said that some of the Alt-A lenders were trying to distinguish themselves from others, arguing that they were worth investors' continued attention because they had lower delinquencies and fewer problems.

"But the fact remains that for some of the riskier products they originate, there's a lack of demand for them" as investors get pickier about the market, he said. "Investors just aren't willing to pay what they used to."

On the Net:

http://www.mortgagebankers.org

http://www.loanperformance.com

http://www.imfpubs.com

http://www.fitchratings.com

**LOAD-DATE:** April 11, 2007

EXHIBIT 131      90

# Exhibit 132



1 of 1 DOCUMENT

Copyright 2007 The Washington Post
All Rights Reserved

The Washington Post

washingtonpost.com

The Washington Post

April 21, 2007 Saturday
Every Edition

**SECTION:** FINANCIAL; Pg. F01

**DISTRIBUTION:** Virginia North

**LENGTH:** 837 words

**HEADLINE:** Appraisal Inflation

**BYLINE:** Kenneth R. Harney

**BODY:**

   Have inflated appraisals helped fuel the surge in foreclosures on credit-strapped borrowers? Are such appraisals at the core of many mortgage-fraud schemes?

   The four largest trade groups representing appraisers say yes -- and they are asking federal financial regulators to crack down on lenders and loan officers who put pressure on appraisers to raise valuations to allow overpriced deals to go through.

   Led by the 22,000-member Appraisal Institute, the groups told regulators April 11 that subprime lenders experiencing high rates of foreclosures often have been guilty of "systematic inattention" to the accuracy and the sources of the valuations backing the mortgages they funded.

   Such lenders:

    Accepted loans that had zero or minimal down payments without taking hard looks at the qualifications and track records of the appraisers supplying the numbers. Yet in softening housing markets, accuracy on property valuations is essential whenever down payments are tiny and borrowers' credit histories are shaky. A zero-down mortgage made to unqualified buyers on a house worth thousands less than the appraisal in a depreciating market is a financial cluster bomb waiting to explode.

    Failed to require "firewalls" separating loan officers working on commission from the appraisers hired to value the properties to be financed. National studies repeatedly have shown that commissioned loan officers often demand that appraisers cooperate to hit whatever number is needed to push the transaction to closing -- or lose future business. Ninety percent of the appraisers in a 2006 national survey by October Research said they had experienced threats, non-payment of fees and other forms of coercion. Many said they had lost business by refusing to play the game.

EXHIBIT 132    91

Appraisal Inflation The Washington Post April 21, 2007 Saturday

Lender complacency about appraisals also has enabled con artists to bilk banks and investors of billions of dollars in home-mortgage-fraud schemes. The four appraiser groups cited FBI estimates that mortgage-fraud losses are now approaching $3 billion a year -- and many of those schemes start with intentionally inflated property valuations that lenders fail to spot.

A senior member of the Appraisal Institute provided an inside look at one type of scam that is turning up across the country. It's called "cash out at closing," and it uses overstated property valuations as the starting point.

Gary Crabtree, president of Affiliated Appraisers in Bakersfield, Calif., documented the practice recently for the FBI and state financial and real estate regulators. The basic scenario, Crabtree said, involves real estate agents who have listed houses that aren't selling. To move the properties, they entice buyers or friends to "submit an offer [for the home] that is $30,000 to $100,000 above the current list price" with the promise that they will get substantial cash at closing.

The real estate agents then amend the multiple-listing-service asking price to match the artificially inflated offer price. A house that had been sitting for months with no takers at $450,000, for example, might be relisted by the agent at $525,000.

Then, working with a cooperative appraiser who has promised to hit the number and an unscrupulous mortgage broker who simply wants the commission, they "change the [loan] documentation to reflect the [artificially inflated] sales price." The loans typically are for 100 percent of the price of the house. The seller nets the price he or she had originally listed -- $450,000 in this example -- and the buyer gets some or all of the $75,000 inflated differential as cash at closing.

The wholesale lender purchasing the loan from the broker doesn't look hard at the appraisal and funds the excessive loan amount none the wiser. Public records do not reflect the $75,000 slush in the transaction. The real estate agents and loan brokers pocket their commissions; the buyer pockets the cash from the closing proceeds and makes loan payments for a while and then stops. Within months, the property is headed to foreclosure.

"It's total fraud, of course," said Crabtree, who is documenting 32 cases of alleged appraisal hanky-panky for state regulators and the FBI. "You can throw a dart at just about any large subprime lender, and something like this [scheme] is going to stick."

Yet some lenders are in denial that they have accepted grossly inflated appraisals. Crabtree said he contacted one major East Coast lender with the documented details of a cash-back-at-closing scam that he submitted to state regulators. So far, the lender has not even returned phone calls, according to Crabtree.

To compound the problem beyond the individual foreclosures, the inflated selling prices of the homes remain in the system for use as comparable sales prices for valuations in the coming months.

That $525,000 recorded closing price on the house that wasn't selling at $450,000, in other words, might now be available on the public records as a comparable house for overvaluing upcoming sales.

Kenneth R. Harney's e-mail address is KenHarney@earthlink.net.

**LOAD-DATE:** April 21, 2007

EXHIBIT 132      92

# Exhibit 133

Westlaw.

NewsRoom

4/30/07 REUTERS 16:55:09                                                                                     Page 1

4/30/07 Reuters News 16:55:09

Loaded Date: 12/06/2008

Reuters News
Copyright 2007 Reuters

**April 30, 2007**

**Subprime lenders made record exceptions**--analysts

 MIAMI, April 30 (Reuters) - Subprime mortgage lenders created a surge in delinquencies in the past year by repeatedly breaking their own underwriting guidelines to capture business, analysts said on Monday.

So-called "exceptions" to loans were made as written standards did not change much, Michael Youngblood, a managing director and portfolio manager at FBR Investment Management Inc., said on a panel of an Information Management Network asset-backed securities conference in Miami.

 "The amount of loan exceptions made in 2006 must be historically the highest," he said.

 Youngblood said lenders have not been providing information on how many times they strayed from their own underwriting standards, even when he asked. In any event, it is clear they represented the "wholesale" relaxation of underwriting practices that sent delinquencies to a business cycle high of about 11.4 percent, he said.

 Subprime lenders -- both those that have failed and those still standing -- in the last year also paid scant attention to "soft" guidelines, such as how they analyze "FICO" credit scores for each applicant, Mark Milner, chief risk officer for PMI Mortgage Insurance Co., said on the panel.

 For instance, relying on a credit score that was generated by an applicant paying back bills to a doctor and securing a $200 credit line "is just not enough," he said.

 PMI chose not to insure many of the subprime loans outstanding, he said.

 Delinquencies and foreclosures on subprime loans have soared in the past year as lenders such as New Century Financial Corp. <NEWC.PK> increasingly "layered" risks, such as allowing first-time homebuyers to state, rather than prove, their income and to finance as much as 100 percent of the property's value. Fallout from the loosened underwriting practices occured as the U.S. housing boom came to a halt.

 The panelists conceded that 2006 may go down in history as the worst year ever for subprime credit quality, but said the worst projections for double-digit losses on bonds backed by the collateral won't materialize.

 "I don't think the problems will be as widespread as some of the forecasts out there" said Allan Berliant, a portfolio manager at Grantham, Mayo, Van Otterloo & Co.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 133      93

 Losses to subprime bondholders will probably average between 5 percent and 7 percent, Youngblood said. That compares with expectations by the top three bond rating companies for losses between 6 percent and 8 percent, he said.

 He said delinquencies on 2006 subprime loans may creep slightly higher in 2007 and post a slight decline in 2008.

 ((Reporting by Al Yoon; Editing by Chizu Nomiyama, Reuters Messaging: albert.yoon.reuters.com@reuters.net; e-mail: albert.yoon@reuters.com; Tel 917-751-4309))

 (C) Reuters 2007. All rights reserved. Republication or redistribution of Reuters content, including by caching, framing or similar means, is expressly prohibited without the prior written consent of Reuters. Reuters and the Reuters sphere logo are registered trademarks and trademarks of the Reuters group of companies around the world.

---- INDEX REFERENCES ---

COMPANY: PAYROLL MANAGEMENT INC; PMI GROUP INC (THE); CENTURY FINANCIAL CORP; PLASTICOID MANUFACTURING INC; PMI MORTGAGE INSURANCE CO; PRECISION METALSMITHS INC; POOL MEDIA INTERNATIONAL OY; PMI; FBR INVESTMENT MANAGEMENT INC

INDUSTRY: (Retail Banking Services (1RE38); Consumer Finance (1CO55); Subprime Lending (1SU05); Financial Services (1FI37); Banking (1BA20); Mortgage Banking (1MO85))

REGION: (North America (1NO39); Florida (1FL79); Americas (1AM92); USA (1US73))

Language: EN

OTHER INDEXING: (CENTURY FINANCIAL CORP; FBR INVESTMENT MANAGEMENT INC; PMI; PMI MORTGAGE INSURANCE CO; VAN OTTERLOO CO) (Al Yoon; Allan Berliant; Chizu Nomiyama; Fallout; Mark Milner; Michael Youngblood; Republication; Youngblood)

KEYWORDS: USA SUBPRIME; EXCEPTIONS

Word Count: 609
4/30/07 REUTERS 16:55:09
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 133     94

# Exhibit 134



1 of 1 DOCUMENT

Copyright 2007 The Washington Post
All Rights Reserved

**The Washington Post**

washingtonpost.com

The Washington Post

May 7, 2007 Monday
Met 2 Edition

**SECTION:** A-SECTION; Pg. A01

**DISTRIBUTION:** Virginia

**LENGTH:** 2192 words

**HEADLINE:** Pressure at Mortgage Firm Led To Mass Approval of Bad Loans

**BYLINE:** David Cho; Washington Post Staff Writer

**BODY:**

Maggie Hardiman cringed as she heard the salesmen knocking the sides of desks with a baseball bat as they walked through her office. Bang! Bang!

" 'You cut my [expletive] deal!' " she recalls one man yelling at her. " 'You can't do that.' " Bang! The bat whacked the top of her desk. As an appraiser for a company called New Century Financial, Hardiman was supposed to weed out bad mortgage applications. Most of the mortgage applications Hardiman reviewed had problems, she said.

But "you didn't want to turn away a loan because all hell would break loose," she recounted in interviews. When she did, her bosses often overruled her and found another appraiser to sign off on it.

Hardiman's account is one of several from former employees of New Century that shed fresh light on an unfolding disaster in the mortgage industry, one that could cost as many as 2 million American families their homes and threatens to spill over into the broader economy.

New Century has become the premier example of a group of companies that grew rapidly during the housing boom, selling working-class Americans with questionable credit huge numbers of "subprime" loans with "teaser" rates that typically rose after the first two years. This business transformed the once-tiny New Century into a lending powerhouse that was held up as a model of the mortgage industry's success.

But now, with home values falling and adjustable loan rates rising, record numbers of homeowners are failing to make their payments. And a detailed inquiry into the situation at New Century and other subprime lenders suggests that in the feeding frenzy for housing loans, basic quality controls were ignored in the mortgage business, while the big Wall Street investment banks that backed these firms looked the other way.

New Century, which filed for bankruptcy protection last month, has admitted that it underreported the number of bad loans it made in its financial reports for the first three quarters of 2006. Hardiman and other former employees of

EXHIBIT 134     95

Pressure at Mortgage Firm Led To Mass Approval of Bad Loans The Washington Post May 7, 2007 Monday

New Century interviewed said there was intense pressure from bosses to approve loans, even those with obviously in-flated housing appraisals or exaggerated homeowner incomes.

"The stress in that place was ungodly. It was like selling your soul," said Hardiman, who worked for New Century in 2004 and 2005. "There was instant notification to everyone as soon as you rejected a loan. And you dreaded doing it because you paid for it. Two guys would come with a bat, and they were all [ticked] off because you cut their deals."

New Century officials would not publicly respond to the ex-employees' allegations. A senior executive, who spoke on condition of anonymity because of state and federal investigations into the company, acknowledged that the atmos-phere in some branches might have been intense at times. But he said the firm had safeguards to make sure workers did not feel pressure to approve questionable loans.

Hearing what Hardiman went through, he said, was "upsetting" and "not representative of our offices."

"In an organization with this size . . . I'm not naive to think that [such behavior] didn't happen," the executive said. "But I find it highly implausible over the last 10 years that something systemic was going on and somehow it was dis-guised. . . . There were pressures, especially in a declining market, and those pressures became more robust. But we turned up our controls and our vigilance at the very same time."

As Industry Grew, Standards Loosened

Once a little-used lending tool, subprime loans made up 20 percent, or about $600 billion, of all mortgages issued in the country last year. These loans carry a high risk of default because they generally are made to home buyers with questionable credit. But because they require borrowers to pay high interest rates, they have been a gold mine for lend-ers in recent years, accounting for 30 percent of all profits made in the mortgage business, according to Mercer Oliver Wyman, a consulting firm.

Lenders also made a fortune selling subprime loans to Wall Street. Investment banks charged huge fees for packag-ing them into massive bonds called mortgage-backed securities. Investors received high returns for buying and selling these bonds.

But there is growing evidence that along this chain, the filters that were supposed to catch bad loans did not work.

Salespeople were supposed to be the "first line of defense" against fraud and bad loans, said Steve Krystofiak, president of the Mortgage Broker Association for Responsible Lending, a group that is trying to retool practices in the industry.

But salespeople worked on commission -- meaning the more loans they sold, the more bonus money they received. "That's a bad business model. It's absolutely contradictory," Krystofiak said, adding that he has witnessed salespeople tweak numbers in mortgage applications to ensure that the loans would be approved.

Automated underwriting software that searches for irregularities and possible fraud was also supposed to stop bad loans. But industry professionals say such programs were easily manipulated. Meanwhile, some appraisers and under-writers, who examine housing values and other claims made on loan applications, say they felt pressure from bosses to let questionable loans through.

New Century and other lenders sold their mortgages through auctions to investment banks. Once a bid was ac-cepted, the investment banks performed their own detailed review and could return any loans deemed questionable without paying for them.

Several investment banks, including Merrill Lynch, Morgan Stanley and Goldman Sachs said they rigorously ex-amined the subprime mortgages they had bid on. Morgan Stanley, for instance, said it reviewed every loan appraisal and the credit histories of about 25 percent of borrowers.

Traders familiar with the bidding process said competition for mortgages from New Century began to heat up in 2005. Mortgage-backed securities based on New Century loans had been performing better for investors than those from other subprime lenders, in some cases producing two or three times the return of a U.S. Treasury bond. Many banks felt they had to loosen their standards and agree to return fewer bad loans in order to win the auctions, the traders said.

The head of a large Wall Street bank's mortgage group contended that his firm regularly lost out on New Century's business because its due diligence process was stringent and it had been returning a high number of loans. New Century wanted the bank to ease its standards, and the issue became a source of friction between the companies.

EXHIBIT 134        96

Pressure at Mortgage Firm Led To Mass Approval of Bad Loans The Washington Post May 7, 2007 Monday

"The entire industry, over time, became more lax," he said, speaking on condition of anonymity because he was not authorized to talk about his company's inner workings. "The more [loans] you accepted, the better relationship and the better price you would have. The name of the game was definitely volume."

A New Century spokeswoman said negotiating with banks to reduce both their due diligence and the number of loans they returned was a "generally accepted practice" that was "always a matter of discussion."

There was little downside for banks to push paper through the pipeline, said Kevin Beyers, a forensic accountant at Parkside Associates in Atlanta who specializes in the mortgage industry. Besides returning loans, these firms could require a lender to buy back loans that had cleared the banks' reviews but later turned out to be bad.

"Loose underwriting was not a secret," Beyers said. "[Investment] banks had to have known what was going on. They just have too much information and sophistication at their fingertips. And they knew the lenders pretty well."

Firm Unravels With Market's Slump

To address the problem of bad loans, New Century said since 2000 it has been reducing the compensation of branch managers if they approved loans that were later determined to bad. Underwriters have always been paid on the quality of their work rather than the volume of loans approved. New Century said it always had monitored the performance of employees and last year implemented a statistical program that tracked whether they were approving a high number of bad loans.

A spokeswoman said these moves helped the firm reject or reduce the appraisal value of 20 percent of the loan applications it received in the Northeast last year.

The firm's comments are difficult to square with accounts from rank-and-file workers. These employees worked at five different branches that handled subprime loans all over the country. All except Hardiman spoke on condition of anonymity, citing recent e-mails from the firm telling them not to comment publicly, although the company said that is standard corporate media policy. Hardiman said she was fired for refusing to approve weak loans. Others said they left because they were pressured to pump loans through the system. A few were interviewed while they were worked at New Century but then lost their jobs after the firm filed for bankruptcy.

Although there were variations in their descriptions of the atmosphere in their offices, most said they were pushed to approve questionable loans. Several of the interviewed employees said they faced "unofficial quotas" of loans that had to be approved each day. The pressure to meet these expectations was so unrelenting that a worker in Foxboro, Mass., collapsed from stress and was taken to the hospital, two employees said. In the firm's Long Island branch, the atmosphere resembled a fraternity, largely because the average age was 23, an appraiser there said.

A veteran appraiser who worked in Pearl River, N.Y., said he joined New Century because he had heard the pay was good. That turned out to be true, but he quickly discovered that the place was a pressure cooker. He said he often was encouraged "to make loans work." His boss generally supported him when he wanted to reject a questionable loan, he said. But other office managers "were all about the numbers just so they got their bonuses."

Still, the veteran appraiser didn't blame them.

"They were pressured to make loans, that's how you do business," said the man. "They were trying to do more and more business. That's essentially what Wall Street wanted."

For years, the volume strategy worked.

Shares in the Irvine, Calif., company rose from $5 in early 2001 to $66 at the end of 2004, cementing its status as a Wall Street favorite. Last year it issued $51.6 billion in loans, more than any other specialized subprime mortgage lender.

When times were good, the company showered lavish gifts on its salespeople, treating them to vacations in Europe and Caribbean cruises hosted by sports celebrities. As recently as March, a few weeks before it filed for bankruptcy, the company had a trip to Ireland scheduled, employees said.

The boom continued for New Century until 2006, when mortgage payment default rates spiked. That happened because homeowners who bought houses last year generally saw their values drop. And, in a declining housing market, many homeowners, especially those who are poor, choose to let their mortgages fall into delinquency rather than try to keep up with the payments, analysts said.

EXHIBIT 134      97

Pressure at Mortgage Firm Led To Mass Approval of Bad Loans The Washington Post May 7, 2007 Monday

At first, it appeared the cumulative effect of these defaults would have only a moderate effect on New Century's earnings. Then, in February, the company said it would need to revise its financial results for the first three quarters of 2006. A few weeks later, it acknowledged that federal investigators had launched probes into the timing of the stock sales of some of its executives. The company declined to comment on the investigations.

The announcements rattled the markets because the firm was so well regarded. The stock price plummeted 90 percent, and the firm was delisted from the New York Stock Exchange. (Shares now trade under a dollar on an obscure exchange.)  New Century filed for bankruptcy April 2 but said current customers would be unaffected and could continue making their mortgage payments.

The appraiser in the Pearl River branch said he considered himself a loyal employee and planned to stick by the company through its struggles. But he was fired the day after the bankruptcy filing, along with 3,200 employees, or half the firm's workforce. Most of those interviewed said they were offered two weeks of pay at rates lower than their salary. A few said they did not receive any severance.

New Century announced Thursday that it is laying off 2,000 more associates. The firm is left with about 750 employees, a company spokeswoman said.

Hardiman, the former New Century appraiser, said she was not surprised by the company's downfall. Few at the company seemed to be thinking long-term when she was there. The message she heard constantly from headquarters, which was broadcast at work conferences and in e-mails, was to approve more loans.

"We were constantly told, 'If you look the other way and let an additional three to four loans in a day that would mean millions more in revenue for New Century over the course of the week,' " Hardiman said. She added that it seemed "no one, from the top levels down to the lower levels of the office, didn't want those loans to go through."

**LOAD-DATE:** May 7, 2007

EXHIBIT 134      98

# Exhibit 135



1 of 1 DOCUMENT

Copyright 2007 The New York Times Company
The New York Times

July 11, 2007 Wednesday
Late Edition - Final

**SECTION:** Section C; Column 0; Business/Financial Desk; Pg. 1

**LENGTH:** 978 words

**HEADLINE:** Rate Agencies Move Toward Downgrading Some Mortgage Bonds

**BYLINE:** By VIKAS BAJAJ

**BODY:**

The slumping housing market again rattled the bond market yesterday.

Standard & Poor's, the credit rating firm, said that it would tighten the standards it used to rate bonds backed by subprime mortgages, a tacit acknowledgment that it might have been too optimistic about the housing market.

At the same time, Standard & Poor's said that it would probably downgrade bonds totaling a relatively small $12 billion, a move that surprised investors with its tone and timing. A rival agency, Moody's Investors Service, followed suit later in the day, saying that it would downgrade 399 bonds with a face value of $5.2 billion and put another 32 bonds on watch.

Yesterday's actions are expected to draw further attention to the role of credit agencies in the  market for mortgage securities, which helped fuel the housing boom by extending credit to people who may not have otherwise qualified for loans.

Investors and policy makers are increasingly asking whether Standard & Poor's, Moody's and a third agency -- Fitch Ratings  -- were lax in their evaluations of the mortgage bonds that Wall Street banks sold to investors like pension funds, insurance companies and endowments.

Financial markets fell sharply on the news of possible downgradings. The S.& P. 500-stock index declined 1.42 percent, to 1,510.12, and the Dow Jones industrials fell 1.09 percent, or 148.27 points, to 13,501.70. Shares in Lehman Brothers, the biggest underwriter of subprime mortgage bonds, fell 5 percent, and Bear Stearns declined 4.1 percent.

In a conference call yesterday, Standard & Poor's executives spent an hour and a half answering questions from investors, some of whom suggested that the agency had taken too long to change its views and might still be too optimistic.

"Someone asked the particularly important question: What is it that you know today that the markets didn't know three months ago?" said Joshua Rosner, a managing director at the investment firm Graham Fisher, and one of the harshest critics of the ratings agencies.  "There was, in essence, no answer offered."

S.& P. executives said they decided to make the changes after realizing that the trend of rising defaults and fore-closures showed no sign of stabilizing. As the agency conducted its review, it increasingly discovered more instances of fraud and misrepresentation in loans from some mortgage companies.

EXHIBIT 135      99

Rate Agencies Move Toward Downgrading Some Mortgage Bonds The New York Times July 11, 2007 Wednesday

The ratings agency also cited a forecast by its chief economist that average home prices nationwide will be 8 percent lower in 2008 than they were in 2006.

The previous "forecast and our expectations were based on the best available information that we had at the time," said Thomas Warrack, a managing director at S.& P. "That information has increased and significantly changed what our belief is for home prices through and including 2008."

Still, the $12 billion in bonds that S.& P. said it would probably downgrade account for just 2.1 percent of the $565.3 billion in mortgage securities rated by the firm from October 2005 to the end of 2006. They are largely the lowest-rated mortgage bonds, those BBB or below, though a handful are rated AA. The firm said it was examining other securities including those backed by second mortgages and complex derivative investment pools known as collateralized debt obligations.

So far, virtually no AAA-rated mortgage bonds have been downgraded. These bonds, which make up about 80 percent of all mortgage securities, are typically protected by several layers of lower-rated bonds like the AAs and BBBs that were acted upon by S.& P.

S.& P. said that it had determined that AAA bonds would not incur losses even if home prices fell 30 percent on the East and West Coasts and 10 percent in the rest of the nation.

"I don't think this is a the-sky-is-falling story," Mark H. Adelson, a senior analyst at Nomura Securities, said. "If they had started listing AAA paper, that would be the sky falling."

Executives said that S.& P. would rate new bonds with the assumption that more subprime loans would default and bondholders would recover less from the sale of foreclosed homes. The agency said the performance on subprime loans written in the end of 2005 and 2006 was on track to be the worst ever in the relatively short history of the subprime business. The firm expects the pools of subprime mortgages that back billions of dollars in bonds, on average, to suffer losses of 11 percent to 14 percent. By contrast, executives at Moody's have recently said they expected losses of 6 percent to 8 percent.

That the credit ratings agency are moving slowly reflects the fact that the mortgage and housing markets also move slowly. Homeowners who encounter trouble making payments can stay in houses for months or years before their homes are foreclosed and they are evicted.

In addition, bond investors realize losses on loans when the loans or the house that backs them are sold. Bondholders investing in AAA-rated bonds would not incur a loss until total losses from all loans in the pool that backs the investment increase beyond 15 or 20 percent, depending on how the bonds are structured.

Moody's noted that as of May the loss rate had risen to only about 0.3 percent of the loan pools backing subprime bonds.

"We take the action that we feel we need to when we have all the information," said Nicholas Weill, chief credit officer at Moody's.

Still, analysts note that the expectations for losses have been steadily rising and if S.& P.'s worst case is realized most of the bonds below AA rating will be wiped out. A downgrading of AAA bonds could be significant because it would force large pension funds like Calpers to sell bonds.

"Nobody really knows how far this is going to go and how much it is going to feed on itself," said Christian Stracke, an analyst at CreditSights, a bond research firm.

**URL:** http://www.nytimes.com

**GRAPHIC:** Chart: "Loan Trouble Growing" Subprime loans made in 2006 are performing significantly worse than those written in 2005 and 2004. (Source: CreditSights)

**LOAD-DATE:** July 11, 2007

EXHIBIT 135      100

# Exhibit 136



8 of 8 DOCUMENTS

Copyright 2007 The Economist Newspapers Ltd.
All Rights Reserved
The Economist

February 17, 2007
U.S. Edition

**SECTION:** FINANCE & ECONOMICS

**LENGTH:** 1294 words

**HEADLINE:** Bleak houses;
American mortgages

**DATELINE:** new york

**HIGHLIGHT:**

How will America's banks cope with bad mortgages?

**BODY:**

America's riskiest mortgages are set to pop. Where will the shrapnel land?

LAST March, ResMAE, a mortgage lender catering to risky borrowers, cut the ribbon on its new headquarters in Brea, California. The sprawling, 135,000-square-foot building dwarfed the company's 458 local employees. But it fitted the firm's outsized ambitions. Less than a year later the company, rather than its ribbon, was facing the chop. This week it said it had filed for bankruptcy and was selling its assets for a diminutive $19m.

ResMAE is one of over 20 casualties among America's "subprime" mortgage lenders, which serve borrowers with spotty credit histories at higher interest rates. This end of the market took on $605 billion of new mortgages last year, more than a fifth of the total. But as interest rates have climbed, these loans have soured and the shares of bigger sub-prime lenders, such as Countrywide Financial and IndyMac, have sagged.

Does the rot run deeper? That fear ran down a few spines on February 7th, when HSBC, Europe's biggest bank, revealed that bad loans at its American subprime mortgage division were 20% higher than expected. The same week New Century, the second-biggest such lender in America, projected a big drop in loans this year because of poor market conditions.

They are not the only ones exposed to America's home-loan blues. Citigroup peddles mortgages to risky borrowers through CitiFinancial, its consumer-finance arm. Subprime lenders have also been scooped up by investment banks, including Morgan Stanley, Merrill Lynch and Deutsche Bank, in recent months. Notably absent are FannieMae and FreddieMac, America's government-sponsored mortgage giants. Both were set up for people who dreamt of homeownership, but could not afford it. They also have the best data on borrowers, including those rejected for loans in the past. Perhaps they knew something others did not.

Indeed, the woes of the subprime lender are mostly self-inflicted. After interest rates turned up in 2004, mortgagemakers could no longer count on custom from homeowners looking to switch to new mortgages at cheaper rates. Saddled with expensive lending platforms, mortgage-writers were desperate for a new source of revenues. They found two: riskier borrowers and riskier products.

They loosened their lending standards as the demand for loans started to drop in 2004. They also resorted to "alternative" products with enticing terms and off-putting names, such as "negative-amortisation" loans (which set repayments so low that the debt gets bigger) or "hybrid" adjustable-rate mortgages (with low teaser rates that jump after a few

EXHIBIT 136     101

years). About 27% of all mortgages made in 2006 were of such non-traditional kinds, according to *Inside Mortgage Finance*, a newsletter.

Not content with these two moneypots, the more eager lenders began to combine them to make a third. They offered risky products to insecure borrowers. According to the Federal Deposit Insurance Corporation (FDIC), hybrid mortgages made up three-quarters of all new subprime loans in 2004 and 2005. The FDIC reckons many firms underwrote hybrid loans assuming that borrowers would refinance them quickly, before the low introductory rates jumped. But this was a reckless assumption when interest rates were rising and house prices softening.

An over-reliance on unseasoned risk models is also partly to blame for bad underwriting. Subprime and alternative mortgages belong to "uncharted territory", says Sheila Bair, head of the FDIC, making "modelling credit performance exceptionally difficult". The chief executive of HSBC, Michael Geoghegan, admitted as much in a conference call last week: "You've got to have history for analytics...and the fact of the matter is there [isn't history] for the adjustable-mortgage rate business when you've had 17 jumps in US interest rates."

The pressure to lend did not only come from within. Even as mortgage-writers lured borrowers with soft terms, they were themselves tempted by the strong appetite of investors for riskier assets. Wall Street banks did a roaring trade packaging bunches of subprime loans into mortgage-backed securities, and selling them on to investors, greedy for yields (see chart).

The art of securitisation, as it is called, adds liquidity to the market and allows risks to be parcelled out to those most eager to bear them. Over the past few years, it has also freed up cash for more lending and earned banks pots of money. But it may have made a wobbly subprime market even wobblier. Banks are traditionally supposed to know a bit about the borrowers on their books. But in many cases, their loans did not stay on their books long enough for them to care. Mortgages were written for a fee, sold to investment banks for a fee, then packaged and floated for another fee. At each link in the chain, the fees mattered more than the quality of the loans, which could always be passed on. "This was classic market failure," says Anthony Sanders, a mortgage expert at Ohio State University's Fisher College of Business. "The private sector wanted fees and got them, and they did not much care what happened afterwards."

Some banks do get caught holding the live grenade.  FDIC reckons that depository institutions hold $3 trillion of mortgages. Much of this is higher-quality stuff, but not all. And even banks eager to securitise their loans sometimes retain the "residual"--the most risky slice where losses hit first. CreditSights, a research firm, notes that Bear Stearns holds about $6.8 billion in residuals, although only a fraction is below investment grade. Banks that write mortgages are also contractually obliged to buy back securitised loans if their underwriting is shown to be shoddy or if the loans sour too quickly. That is what felled ResMAE and is hurting Accredited Home Lenders Holding, a San Diego lender.

Diversified banks will not meet the same fate. Many big ones, notes Howard Mason of Sanford Bernstein, a research outfit, were careful not to mix risky products with risky borrowers. Wells Fargo, for instance, sells most of its alternative mortgages to "prime" customers. Citigroup sells to subprime borrowers but does not offer alternative mortgages. However, the unregulated non-bank mortgage lenders, like New Century, could suffer.

Should loan losses climb, investors in mortgage-backed securities will also get burnt, especially those holding the riskier, higher-yielding bonds. Financial engineers worked their mysterious magic with these securities, turning the junkiest mortgages into high-grade, sometimes AAA-rated, securities. They could do this only with the blessing of credit-ratings agencies, which made a profitable business out of rating these securities. But critics say the agencies got complacent, and doubt the pooled loans were sufficiently diverse, or sliced up with sufficient art truly to have dispersed risk. One possible blind spot is that the dodgiest mortgages all behave similarly in times of stress. Another is that it is hard to avoid heavy exposure to mortgages from California, the biggest market in America, where alternative products were popular.

No one quite knows in whose hands these little bombs will ultimately explode. The hope is that the risks are widely and thinly spread. The fear is that they all sit in the lap of a few big hedge funds. But the real casualties may be homeowners, who often took out risky loans they could barely afford or did not understand. The FDIC has already tightened rules on underwriting negative-amortisation loans, and the Senate has begun to hold hearings on predatory mortgage lending. With Democrats now in charge of Congress, there is a fair chance the politicians will act. The Eliot Spitzer of the housing downturn may be about to start his charge.

**LOAD-DATE:** February 15, 2007

EXHIBIT 136      102

# Exhibit 137

10794J



FOCUS - 29 of 31 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2007, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.

The Wall Street Journal

February 27, 2007 Tuesday

**SECTION:** Heard on the Street; Pg. C1

**LENGTH:** 988 words

**HEADLINE:** Subprime Game's Reckoning Day --- Risky Lending Fallout Threatens to Spread;
Uncertain ARM Strength

**BYLINE:** By Karen Richardson and Gregory Zuckerman

**BODY:**

The worst may be yet to come for mortgage lenders. And that could add to investor nervousness.

Shares of companies that specialize in lending to riskier borrowers or offer unconventional loans have tumbled because of concerns over how rapidly these mortgages are going sour.

If these so-called subprime borrowers continue to have problems paying their debts, the lenders that target them likely will have to boost how much money they set aside for bad loans, cutting into their bottom lines. That could mean even lower stock prices.

There also is a concern that if the real-estate market remains cool, some borrowers with better credit histories might also begin struggling to make payments on certain popular, but unorthodox, mortgages. These types of loans allow borrowers to skip monthly payments, carry low short-term teaser rates or don't require detailed financial documentation. If that happens, companies such as BankUnited Financial Corp. and Countrywide Financial Corp. could suffer.

When a company keeps its reserve low, it makes its earnings look better because it continues to increase its assets from loans it originates and sells off. That holds down expenses.

But when a company beefs up those reserves and the change hits its earnings, that can impair its ability to borrow the short-term funds needed to write new mortgages. Lenders need to set aside reserves to cover any possible losses when borrowers fail to make payments.

Subprime-mortgage lenders generally sell most of their loans to investors, but many keep some loans as investments. These portfolios have grown as the number of new mortgages has risen.

New Century Financial Corp. and NovaStar Financial Inc. hold billions of dollars of loans for investment. While they have been increasing their loan-loss provisions, delinquencies have been coming faster than anticipated.

NovaStar's reserves were 1.05% of its $2.1 billion in loans held for investment in the fourth quarter, up from 0.75% in the third quarter, but still ranked among the lowest in the industry, according to Zach Gast, an analyst at the Center

EXHIBIT 137     103

for Financial Research and Analysis. New Century's ratio was 1.4% as of the third quarter. CFRA doesn't assign ratings on stocks.

Scott Hartman, chief executive of NovaStar, says the lender made a "substantial increase to our loan-loss reserve" in the past quarter, and that about half of those loans "tend to be of higher quality and generally performing very well."

New Century, which has said it will restate earnings for the first three quarters of 2006 to correct accounting errors regarding repurchased loans, declined to comment.

Subprime-mortgage lenders are likely to start reporting significant shortfalls in their loss reserves "as soon as the next several quarters," predicts David Honold, an analyst at Turner Investment Partners, which manages $23 billion and has avoided shares of subprime lenders. That is partly because some of the lenders could place into their investment-loan portfolio some poorly performing mortgages that they have bought back under terms of their sale agreement. That would required them to boost loan-loss reserves.

Subprime lenders already have seen their shares tumble -- NovaStar is off 50% and New Century is down 12% in the past 10 days -- and they could fall further if their credit-lines dry up because of poor loan-loss provisioning. NovaStar shares are trading at about 12 times estimated per-share earnings, but that valuation is likely to change as analysts adjust their projections to account for the company's steep fourth-quarter loss and poor earnings outlook. New Century shares also are trading at about 12 times estimated earnings for 2007.

Some investors urge caution about lenders that cater to borrowers with better credit but focus on mortgages that may suffer if weakness in housing continues, such as option adjustable-rate mortgages, or ARMs. These loans give borrowers multiple payment options, including a minimum payment that might not cover all of the monthly interest cost. The remainder of the interest payment is tacked onto the outstanding balance, causing it to rise.

About 59% of BankUnited's approximately $11.5 billion loan portfolio is made up of these loans and the bank is making more of them as it expands.

Countrywide has been cutting back on pay-option mortgages, funding just $2.7 billion in January out of a total $37 billion in new mortgages. Still, it has "significant exposure" to these risky loans, CFRA's Mr. Gast says. Countrywide declined to comment.

BankUnited acknowledges that borrowers are paying less of their monthly interest payments as interest rates have moved higher, and about 50% of the bank's loans have been made to residents of Florida, a weak real-estate market. And since BankUnited keeps about 70% of these loans in its own portfolio, if the borrowers run into problems it could hurt the company's earnings.

BankUnited shares, which fell 83 cents, or 3.2%, to $25.06 in 4 p.m. composite trading yesterday on the Nasdaq Stock Market, are trading at almost nine times its expected per-share earnings over the next year.

Under accounting rules, BankUnited counts the unpaid interest payments as revenue, however. So if a borrower pays the contractual minimum of $500 a month, rather than the $1,000 interest-only amount, the bank can count the remaining $500 as revenue. That is because it is assumed it will be repaid down the road. This revenue is a rising slice of its earnings, according to an analysis by Keefe, Bruyette &Woods.

Humberto Lopez, BankUnited's chief financial officer, says the bank focuses on borrowers with high credit scores who generally put down at least 20% of the purchase price on a home. "Our borrowers have the financial wherewithal, and they've earned the right to have options of payments," Mr. Lopez says. "We haven't seen any weakness in their ability to pay."

EXHIBIT 137     104



License this article from Dow Jones Reprint Service

**LOAD-DATE:** August 25, 2010

EXHIBIT 137      105

# Exhibit 138



FOCUS - 3 of 4 DOCUMENTS

Copyright 2007 Los Angeles Times
All Rights Reserved
Los Angeles Times

July 25, 2007 Wednesday
Home Edition

**SECTION:** BUSINESS; Business Desk; Part C; Pg. 2

**LENGTH:** 559 words

**HEADLINE:** Even best borrowers are falling behind, lender says;
Countrywide's profit and stock price fall as more `prime' mortgage holders miss payments.

**BYLINE:** Annette Haddad, Times Staff Writer

**BODY:**

Call it the mortgage-meltdown creep.

Countrywide Financial Corp. helped trigger a Wall Street sell-off Tuesday when it said that a growing number of customers once considered to be good credit risks were having trouble making their mortgage payments.

Until recently, such problems had been almost exclusively limited to the so-called sub-prime market, for borrowers with flawed credit records and high-cost mortgages.

But Countrywide, the nation's biggest home loan company, reported Tuesday that it was seeing more of its good-credit "prime" borrowers do the same.

"The spillover into prime, I don't think, is something that should shock anybody," Angelo Mozilo, Countrywide's chief executive, said in a three-hour conference call with investors and analysts to report second-quarter earnings.

The Calabasas-based company said payments were at least 30 days late at the end of the second quarter on 3.4% of prime first mortgages, up from 2.1% a year earlier.

The delinquency rate was worse among borrowers of prime home-equity loans -- second mortgages -- who missed payments at a rate of 4.6%. That was up from 1.8% a year earlier.

Sub-prime delinquencies also worsened sharply in the quarter, Countrywide said. Payments were late on 23.7% of sub-prime mortgages, up from 15.3% in the same period in 2006.

Mozilo said many of the prime borrowers facing delinquency had used home-equity loans on top of regular first mortgages when purchasing their homes to put together enough money for a down payment and avoid the added expense of private mortgage insurance.

The spillover into prime was enough to send Countrywide shares tumbling 10%, or $3.56, to $30.50 amid a broad market sell-off spurred in large part by the company's second-quarter financial results. Countrywide reported that the corrosion of its loan portfolio cut into sales and profit.

"Probably the most disheartening thing about Countrywide's results was the extent to which its weak performance in the second quarter reflected deterioration in prime home-equity loans, rather than exclusively sub-prime credit," said Kathy Shanley, a senior investment grade analyst at Gimme Credit, a New York-based corporate bond research firm. She rated the company's bonds as "deteriorating."

EXHIBIT 138    106

Countrywide's second-quarter net income fell to $485.1 million, or 81 cents a share, from $722.2 million, or $1.15, a year earlier. The results widely missed analysts' estimates, according to Thomson Financial.

Revenue fell 15% to $2.55 billion.

The company also slashed its full-year 2007 outlook for the second time, citing an "increasingly challenging" housing market.

So far this year, Countrywide shares have fallen more than 28%. Mozilo held out little hope that the company's fortunes and mortgage business would improve soon.

"It just takes a long time to turn a battleship around," Mozilo said. "This is a huge battleship, and we're headed in the wrong direction."

He said the inventory of unsold homes had to decrease and the slide in home prices had to stop before the nation's housing market saw any signs of recovery -- a process he predicted would take another 18 months.

Calling it "a gut feeling," Mozilo said it would take until 2009 before the market started to head "into another direction."

"We expect difficult housing and mortgage market conditions to persist," Mozilo said.

--

annette.haddad@latimes.com

**LOAD-DATE:** July 25, 2007

EXHIBIT 138    107

# Exhibit 139



FOCUS - 63 of 93 DOCUMENTS

Copyright 2007 International Herald Tribune
All Rights Reserved
The International Herald Tribune

August 1, 2007 Wednesday

**SECTION:** FINANCE; Pg. 10

**LENGTH:** 905 words

**HEADLINE:** U.S. mortgage woes spread deeper;
German bank's securities freefall rattles markets in Europe

**BYLINE:** Vikas Bajaj - The New York Times Media Group

**DATELINE:** NEW YORK

**BODY:**

Carter Dougherty contributed reporting from Frankfurt.

*

Problems in the U.S. mortgage market are spreading deeper and farther afield.

Trading in the shares of a large U.S. mortgage company was suspended Monday, and the largest insurer of home loans in the United States said its stake in a business that underwrites and invests in mortgage securities may be worthless.

Earlier, a small German bank acknowledged that its investments in American loans had deteriorated.

The developments are the latest indications that the housing slump will affect a broader segment of the mortgage industry and that the problems will last longer than many officials had suggested earlier this year. Just last week, the nation's biggest home lender, Countrywide Financial, acknowledged that defaults on second mortgages to prime borrowers were rising quickly.

The New York Stock Exchange never opened trading in shares of American Home Mortgage on Monday after the company said late Friday that it would suspend its dividend and was facing "significant margin calls" from its banks.

Already down 70 percent for the year, shares in AHM had fallen 39 percent in premarket trading, to $6.39.

Later in the evening, Mortgage Guaranty Insurance said it would write down its $516 million investment in Credit-Based Asset Servicing and Securitization, or C-Bass, possibly to zero. The Radian Group, which has a $518 million stake in C-Bass, also said it might have to write off its investment completely. The rest of C-Bass is owned by its management.

Just two weeks ago, C-Bass closed a $184 million acquisition of Fieldstone Investment, which makes and invests in mortgages to homeowners with subprime credit. C-Bass also runs Litton Loan Servicing, which processes monthly payments by borrowers and deals with defaulted mortgages.

Earlier Monday, IKB Deutsche Industriebank, a bank based in Dusseldorf, Germany, that provides loans to midsize companies, said that investments in American mortgage securities that it had pronounced healthy just 10 days ago had

EXHIBIT 139    108

fallen sharply and would be taken over by a German state bank, KfW, which owns 37 percent of IKB. The bank's chief executive, Stefan Ortseifen, said he would retire.

At American Home Mortgage, lenders appear to have issued margin calls on debt that the company used to buy mortgage-backed securities that include its loans and those made by other lenders. At the end of March, the company had borrowed $6.7 billion to finance such investments and had $19.3 billion in liabilities.

The company specialized in "Alt-A" loans, which are made to people with good, but not stellar credit. The group falls in between prime and subprime borrowers and often includes investors speculating on rising home prices.

"Since the values of the securities have been hit hard in the Alt-A space, that would be a trigger for lenders to hit them with margin calls," said Zach Gast, an analyst with the Center for Financial Research and Analysis.

Officials at American Home Mortgage did not return calls for comment or issue a statement in response to the trading of its shares. Its silence helped feed speculation on Wall Street that it was facing a liquidity crisis akin to the ones that caused the demise of New Century Financial and other big mortgage companies earlier this year.

In its statement Friday, the company said it would not make the 70 cent dividend on its common stock that it had promised to pay earlier that day. It also suspended the payment of a dividend on two series of preferred shares. The company had $836 million in cash at the end of March.

As recently as late June, the company had said it expected to pay a dividend even though it would lose money in the second quarter because of rising delinquencies on its home loans and demands by investors that it buy back defaulted mortgages.

AHM caters to U.S. homeowners with high credit scores and has an extensive network of retail branches, mortgage brokers and correspondent banks.

"The whole industry has looked at them in awe over the last several years," said Steve Jacobson, president of Fairway Independent Mortgage, which has stopped selling loans to American Home Mortgage while it awaits more information about the company's financial health.

At the start of the year, American Home Mortgage seemed to defy the problems that were plaguing its industry. In the first three months, the company made $16.7 billion in home loans, up 27.2 percent from the same period in 2006.

The disclosure by IKB that its fund, Rhineland Funding, was having problems stirred credit markets in Europe. Though it is a relatively small bank, investors worried that it might be the first of many others that could find itself in similar circumstances. In recent weeks, hedge funds as far as Australia have suffered big losses because of bets on American mortgage securities.

"The question right now is whether it will be solely a crisis for financial markets or for the real economy," said Jochen Felsenheimer, head of credit strategy at UniCredit in Munich. "The challenge that we are facing is that these crises can be self-fulfilling."

But Stefan Best, a German banking analyst at Standard & Poor's, said that his agency's survey of banks in Europe, the United States and Asia in July showed little worry about subprime-related investments.

"So far the banks feel pretty comfortable," Best said. "There is a pretty high threshold before they would take a hit."

**LOAD-DATE:** August 5, 2007

EXHIBIT 139     109

# Exhibit 140



FOCUS - 1 of 3 DOCUMENTS

Copyright 2007 The Financial Times Limited
Financial Times (London, England)

September 5, 2007 Wednesday
London Edition 1

**SECTION:** LEX COLUMN; Pg. 16

**LENGTH:** 323 words

**HEADLINE:** Distressed debt relief LEX COLUMN

**BODY:**

A legal cloud has been partly lifted from the Dollars 500bn US distressed debt market at a particularly opportune time for investors hovering around the wreckage of the subprime mortgage crisis.

The issue stemmed from the plight of some investors who bought Dollars 5m of Enron debt, a fraction of a Dollars 1.75bn syndicated loan made to the failing company by Citigroup and other banks. Enron sued the investors in bankruptcy court, arguing their claims should be subordinated - in effect, rendered worthless - because Citigroup allegedly participated in Enron's fraud and the taint carried over to the debt's new owners.

When Arthur Gonzalez, the presiding bankruptcy judge, agreed with Enron in 2005, a shudder went through the bond market. Buyers grew skittish about buying debt when there was a suggestion that the creditors might not have clean hands. In particular, the bottom dropped out of the market for some Refco debt because of concerns its lenders could be implicated in improper transactions at the failed commodity trader.

Last week, Shira Scheindlin, a US district judge, stepped in. The rights of innocent purchasers must be protected, she wrote, even if doing so allowed a few bad guys to "wash" away their sins by selling claims. To rule otherwise "threatened to wreak havoc" on the distressed debt market. But Judge Scheindlin created new confusion by ruling that investors who are "assigned" debts do not have the same rights as those who buy them. Many debt transactions are not pure open market sales.

More clarity is needed. Already, the subprime crisis is spawning new sources of distressed debt. New Century Financial and two Bear Stearns hedge funds have filed for bankruptcy protection. Countrywide Financial caused jitters when it tapped lines of credit in August. With fraud allegations starting to surface in the US mortgage market, investors need to know whether the claims they are buying could prove worthless.

**LOAD-DATE:** September 4, 2007

EXHIBIT 140     110

# Exhibit 141



FOCUS - 14 of 85 DOCUMENTS

Copyright 2007 Financial Times Information
All Rights Reserved
Global News Wire - Europe Intelligence Wire
Copyright 2007 Guardian Newspapers Ltd, Source: The Financial Times Limited
The Guardian

October 27, 2007 Saturday

**ACC-NO:** A2007102719-16665-GNW

**LENGTH:** 347 words

**HEADLINE:** FINANCIAL COUNTRYWIDE UPBEAT DESPITE $1BN SUB-PRIME HIT

**BYLINE:** ANDREW CLARK

**BODY:**

America's biggest mortgage lender, Countrywide Financial, has slumped into the red for the first time in 25 years with a quarterly loss of $1.2bn due to defaults on sub-prime home loans.

In a fresh sign of the severity of America's home loans crisis, Countrywide took a $1bn one-off charge to cover its exposure to mortgage-backed securities which collapsed in value as the capital markets seized up over the summer. The firm accounts for one in seven American mortgages and it led the industry in providing high-risk loans to less affluent families. Many of these deals offered an initial period of discounted "teaser" rates which are now expiring, leaving customers unable to meet repayments.

Yet the Californian company sounded an optimistic note by forecasting a return to profits by the end of the year, sending its shares up by 15% and, with an upbeat profit forecast from Microsoft, lifting the entire Dow Jones index by almost 1%.

Chief executive, Angelo Mozilo, said the figures reflected "unprecedented disruptions in the US mortgage market and the global capital markets, as well as continued weakening in the housing market".

The aggregate value of loans originated in the quarter dropped from $118m to $96m. The company has responded by withdrawing from the sub-prime sector and internal restructuring which will cost 10,000-12,000 jobs. A quarter of Countrywide's staff have been assigned to "loss mitigation", to help cash-strapped clients to avoid repossession of their homes.

Countrywide's shares closed up 32% at $17.30 - still well below their peak in February of $45. Analysts say the firm has a better chance than its rivals of reviving its fortunes. In a research note, Caronia Waller of stockbroker Fox-Pitt Kelton said Countrywide had moved "decisively" to change its business model. "This should position it well once the mortgage market begins to recover, as it inevitably will."

Mr Mozilo is facing an inquiry into his personal sale of $130m of shares in the run-up to the crisis, though he insists this was prompted by independent advice on retirement planning.

**LOAD-DATE:** October 27, 2007

EXHIBIT 141        111

# Exhibit 142

Westlaw.

NewsRoom

12/14/07 INTLHT 14                                                                                            Page 1

12/14/07 Int'l Herald Trib. 14
2007 WLNR 24713921

International Herald Tribune
Copyright 2007 the International Herald Tribune. All Rights Reserved.

December 14, 2007

Section: Finance

Additional scrutiny for Countrywide Financial

Gretchen Morgenson

The Illinois attorney general is investigating the home loan unit of Countrywide Financial as part of the state's expanding inquiry into dubious lending practices that have trapped borrowers in high-cost mortgages they can no longer afford.

Lisa Madigan, the attorney general, has subpoenaed documents from Countrywide relating to its loan origination practices, a person briefed on the matter said. Rick Simon, a Countrywide spokesman, said the company was cooperating with the investigation but declined to comment further.

The inquiry follows an investigation by Madigan's office into One Source Mortgage, a Chicago mortgage broker that recently closed its doors. Madigan sued One Source on Nov. 27, contending that the company misled borrowers by promising low rates on mortgages without advising them that their payments would jump sharply shortly after the loans were made. Countrywide was One Source's primary lender, according to the lawsuit.

Countrywide, the nation's largest mortgage lender and loan servicer, is coming under increased scrutiny as the home loan crisis deepens. In addition to the Illinois investigation, the company is also fielding inquiries from the U.S. Securities and Exchange Commission about significant stock trades made by Angelo Mozilo, the chief executive, before Countrywide's stock plummeted this year.

The U.S. trustee, which oversees the bankruptcy court system, is investigating Countrywide's actions in two cases involving borrowers in Florida whose loans were serviced by the company. The trustee is trying to determine if the company's conduct in those cases represents abuses of the bankruptcy system.

The attorney general's lawsuit contended that One Source put borrowers into loans with terms they did not understand, especially so-called pay option adjustable-rate mortgages. These loans allow borrowers to pay only a fraction of the interest owed and none of the principal, resulting in a growing rather than a shrinking mortgage balance. Countrywide was One Source's main provider of pay option loans, documents in that case show.

"This company's conduct is a prime example of unscrupulous mortgage brokers that has led to a foreclosure crisis for many Illinois homeowners," Madigan said when she filed the suit against One Source.

Mark Belongia, a lawyer at Belongia & Shapiro in Chicago, represents One Source and its president, Charles Man-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 142      112

gold. Belongia said his client denied all of the suit's charges and expected to be vindicated in court.

Donald Wagner, a professor of Middle East studies and comparative religion at North Park University on Chicago's North Side, is a One Source client in trouble on a Countrywide pay option loan. In March 2005, he refinanced his fixed-rate mortgage to help pay for his daughter's college education. He said the One Source broker did not tell him that his low teaser rate - less than 2 percent - would jump after just one month.

"I kept asking them and checking on that," Wagner said. "Then it jumped to more than 7 percent and now it's up to 8 percent plus and it's going to jump again. I am actually paying out over 60 percent of my monthly income, and it's only so long that I can do that."

Because Wagner cannot afford to pay both the interest and principal, the amount of his Countrywide loan has risen to $307,000, from $292,000 two and a half years ago. He has had to borrow against his 401(k) and university pension to meet his payments, he said.

Making matters worse, when he tried to sell his house last summer to get out from under the mortgage, he learned that the loan carried a prepayment penalty of $12,000. Wagner has asked Countrywide to drop the prepayment penalty, but it has declined to do so.

Of the 69 borrower cases examined by the attorney general's office, 26 of the first mortgages and 4 of the second liens were made by Countrywide. Fremont Investment and Loan, a unit of Fremont General, was One Source's second-largest lender, with 20 loans.

Last March, Fremont Investment consented to a cease-and-desist order issued by the Federal Deposit Insurance Corp., which contended that the company had practiced unsound lending and had violated laws or regulations.

The Illinois suit against One Source Mortgage said that the company lured borrowers with misrepresentations about the rates on their loans. For example, one borrower was told that he would have an interest rate of less than 1 percent for the first year of his mortgage, but the rate rose to 7.5 percent after a month, according to the complaint.

One Source also used high-pressure tactics to rush borrowers through their loan closings, according to the suit. Most of the closings took less than 30 minutes, the attorney general said, with some only 10 to 15 minutes. One borrower was told that "it would take two days to explain everything," and that the closing had to take place before that.

Some borrowers told Illinois investigators that they did not know One Source brokers had inflated their incomes to get them a larger mortgage. One consumer provided pay stubs and tax returns to One Source showing her income to be $2,200 a month, the suit said. Only later did she discover that One Source had listed her monthly income as $9,000.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EXHIBIT 142      113

# Exhibit 143

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4        THE HON. MARIANA R. PFAELZER, JUDGE PRESIDING

5

6   IN RE: COUNTRYWIDE FINANCIAL    ) MDL No. 2265
    CORP. MORTGAGE-BACKED           )
7   SECURITIES LITIGATION           )
    _____)
8                                   )
    ALLSTATE INSURANCE COMPANY,     )
9   et al.,                         )
                                    )
10                     Plaintiffs,  )
                                    )
11       vs.                        ) No. CV 11-5236-MRP (MANx)
                                    )
12  COUNTRYWIDE FINANCIAL           )
    CORPORATION, et al.,            )
13                                  )
                       Defendants.  )
14  _____)

15

16         REPORTER'S TRANSCRIPT OF PROCEEDINGS

17               Los Angeles, California

18       Wednesday, September 21, 2011; 1:38 P.M.

19               MOTION(S) TO DISMISS

20

21

22

23            Wil S. Wilcox, CSR 9178
          Official U.S. District Court Reporter
24          312 North Spring Street, # 432-A
           Los Angeles, California 90012
25               Phone: (213) 290-2849

EXHIBIT 143    114

37

1          THE COURT:  I take it that what you are saying is
2    that they knew that it was tolled, that 11 was tolled?
3          MR. BROCKETT:  Yes.
4          THE COURT:  But it never occurred to them that it
5    might be a fraud claim?
6          MR. BROCKETT:  Well, it's like this, Your Honor --
7          THE COURT:  Is that right?
8          MR. BROCKETT:  Yes.  Yes.  The answer is yes.  But
9    you see that you have an 11 claim.  You believe it's tolled.
10   Why do you want to hire lawyers and spend the money to bring
11   your own case when your investments are already covered by a
12   Section 11 claim which is a much lower burden than a 10b-5
13   claim?
14         THE COURT:  Well, that's just it.  The 11 claim is
15   very easy to prove.
16         MR. BROCKETT:  Right.
17         THE COURT:  And the 10b-5 claim is very difficult
18   to prove.
19         MR. BROCKETT:  Correct, yes.  And so there was no
20   reason to file a 10b-5 claim, right, while the class was
21   pending.
22         THE COURT:  You did know that the 11 claim was
23   over there and that it covered your investment?
24         MR. BROCKETT:  That's correct.  Yes.  That's
25   correct.  Yes.  They did know that.  And I just want to

LOS ANGELES, CA.; WEDNESDAY, SEPTEMBER 21, 2011; 1:38 P.M.

EXHIBIT 143   115

38

1    point out two new decisions, the one that came down last

2    week, Justice Swain.

3            THE COURT:  Yes, I read that.

4            MR. BROCKETT:  The Morgan Stanley case.  And there

5    is also a recent decision, another recent decision in the

6    Southern District of New York that said the same thing.

7            But one point I want to make about Justice Swain's

8    decision.  She said, yes -- she noted the same potential for

9    abuse that this Court noted about a blanket application of

10   American Pipe, that a plaintiff would file a case that had

11   no standing in order to toll the statute to find a plaintiff

12   that did have standing.

13           THE COURT:  Well, and also it's an 11 claim, and

14   it specifically notes the investments that are included.  As

15   time goes by, they add investments --

16           MR. BROCKETT:  Yes.

17           THE COURT:  -- whether they have standing as to

18   those or not.

19           MR. BROCKETT:  That's correct, yes.  But what

20   Justice Swain said, and what I think is fair, is that that

21   can be dealt with on a case-by-case basis.  The point here

22   is --

23           THE COURT:  In what way?

24           MR. BROCKETT:  Well, if there is a claim that's

25   filed that's clearly abusive, the court very well may say,

LOS ANGELES, CA.; WEDNESDAY, SEPTEMBER 21, 2011; 1:38 P.M.

EXHIBIT 143    116

1   this is abusive.  We are not going to allow standing.  We

2   are not going to allow tolling.  But the point is in this

3   case, there is absolutely no evidence to suggest that <u>Luther</u>

4   or <u>Washington State</u> or any of the other plaintiffs that

5   eventually became the plaintiffs here were other than

6   legitimate bona fide investors of these securities.

7            So the potential for abuse, the court noted, did

8   not exist in this case and can be dealt with on a

9   case-by-case basis.

10           THE COURT:  I'm not sure I understand what you

11  mean.

12           MR. BROCKETT:  I mean, this --

13           THE COURT:  You mean you would -- well, this, of

14  course, was sent back to the state court, was filed in state

15  court and was sent back to state court by me.

16           MR. BROCKETT:  Right.

17           THE COURT:  Now, what you are saying is if I had

18  kept it or if the state had gotten busy on it sooner, it

19  could have been dealt with by having them file their motion

20  for class certification and it could have been sorted out.

21  They didn't do that, did they?

22           MR. BROCKETT:  Yes.  Well, that's true.  It could

23  have been sorted out.  My point is this.  Why deny the

24  benefit of tolling to investors like Allstate in a case

25  where there was no abuse of the <u>American Pipe</u> rule.  There

LOS ANGELES, CA.; WEDNESDAY, SEPTEMBER 21, 2011; 1:38 P.M.

EXHIBIT 143    117

40

1    wasn't.

2           These plaintiffs had legitimate investments.  They

3    were wrong about who they could represent, okay, but lots of

4    courts were split on that question.  So the plaintiffs'

5    lawyers who filed that case were wrong, and this Court

6    eventually ruled they could only have standing based on

7    tranches.  Okay, fine.  But why penalize Allstate?

8           THE COURT:  No, it was in two stages as to the

9    investment that you actually invested in.

10          MR. BROCKETT:  Yes.

11          THE COURT:  And the tranche you picked.

12          MR. BROCKETT:  Right.  But why penalize Allstate

13   and claim there is no tolling?

14          THE COURT:  But no one is penalizing anybody.  We

15   are talking about what actually happened on these facts.

16          MR. BROCKETT:  Right.

17          THE COURT:  It's not an attempt to penalize

18   anybody.  It is not retroactive anything.  It is simply

19   enforcing what already are the rules as to 11.

20          MR. BROCKETT:  Well, here was the final point I

21   wanted to make to Your Honor on this case, that Allstate is

22   penalized because its '33 Act claims under this Court's

23   opinion are now time-barred when it legitimately believed

24   that the statute was tolled.  It's claims are time-barred

25   under this Court's decision.

LOS ANGELES, CA.; WEDNESDAY, SEPTEMBER 21, 2011; 1:38 P.M.

EXHIBIT 143    118

```
 1          THE COURT:  Well, as I understand what you are
 2   saying is, they didn't -- when they looked at Luther, they
 3   did not think that there was any reason to believe there was
 4   a fraud claim.
 5          MR. BROCKETT:  Correct.
 6          THE COURT:  But they did think that their 11 claim
 7   was protected.
 8          MR. BROCKETT:  Correct.  That's correct.  But now
 9   they found --
10          THE COURT:  And they never had a chance to even
11   look at that problem until the state court judge dismissed
12   the case in SLUSA.  Am I right?
13          MR. BROCKETT:  No.
14          THE COURT:  Under SLUSA.
15          MR. BROCKETT:  No, they didn't really have
16   occasion to believe that their case wasn't tolled until
17   Maine State.  In Maine State in November of 2010 when
18   Your Honor ruled that they were not part of the class
19   anymore, that's when they knew that, oops, we don't have --
20          THE COURT:  They must have known something when
21   under SLUSA it was dismissed.
22          MR. BROCKETT:  No, because the plaintiffs refiled
23   the case right away, or went back to state court.  It was
24   refiled.
25          THE COURT:  So you were relying on both Luther and
```

LOS ANGELES, CA.; WEDNESDAY, SEPTEMBER 21, 2011; 1:38 P.M.

EXHIBIT 143   119

42

```
 1    the --
 2              MR. BROCKETT:  Washington State, yes.  The
 3    consolidated complaint.
 4              THE COURT:  Luther, Washington State.
 5              MR. BROCKETT:  And then Maine State.
 6              THE COURT:  And then Maine State.
 7              MR. BROCKETT:  That's correct, yes.
 8              And we showed in our papers that our investments
 9    were specific -- 22 of our investments were in those classes
10    from Luther all the way through to Maine State, but now we
11    don't have a '33 Act case.  And what I'm here to suggest to
12    the Court is that that was a sharp break from existing law.
13    Why not make it perspective?
14              THE COURT:  I don't think it is a sharp break from
15    existing law.  I will tell you why.  We must have looked at
16    100 cases, more than that.  Nearly all the cases that
17    existed.  It was not an easy decision.  I don't think you
18    can characterize it in quite the way you are.
19              MR. BROCKETT:  Okay.  Then what I would suggest to
20    the Court, that whether it's a sharp break or not, our
21    client had good reason to believe its claims were protected,
22    and then after the statute of limitations had run, they
23    found out they weren't.
24              And I'd also like to point out to the Court that
25    there is a case now pending in the Ninth Circuit.
```

LOS ANGELES, CA.; WEDNESDAY, SEPTEMBER 21, 2011; 1:38 P.M.

EXHIBIT 143    120

117

1                              --oOo--

2                           CERTIFICATE

3

4

5          I hereby certify that pursuant to Section 753,

6     Title 28, United States Code, the foregoing is a true and

7     correct transcript of the stenographically reported

8     proceedings held in the above-entitled matter and that the

9     transcript page format is in conformance with the

10    regulations of the Judicial Conference of the United States.

11

12    Date:  September 27, 2011

13

14

15                         /S/_____WIL S. WILCOX _____

16                          U.S. COURT REPORTER
                                CSR NO. 9178.
17

18

19

20

21

22

23

24

25

LOS ANGELES, CA.; WEDNESDAY, SEPTEMBER 21, 2011; 1:38 P.M.

EXHIBIT 143    121

# Exhibit 144

Maxwell M. Blecher (SBN 26202)
mblecher@blechercollins.com
Maryann R. Marzano (SBN 96867)
mmarzano@blechercollins.com
BLECHER & COLLINS, P.C.
515 South Figueroa St., Ste. 1750
Los Angeles, CA 90071
Telephone: (213) 622-4222
Facsimile: (213) 622-1656

Jay W. Eisenhofer, Esq. (*pro hac vice application pending*)
jeisenhofer@gelaw.com
Geoffrey C. Jarvis, Esq. (*pro hac vice application pending*)
gjarvis@gelaw.com
Deborah A. Elman, Esq. (*pro hac vice application pending*)
delman@gelaw.com
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

*Attorneys for United Financial Casualty Company; Progressive Specialty Insurance Company; Progressive Universal Insurance Company; and Progressive Advanced Insurance Company*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA –WESTERN DIVISION

| | |
|---|---|
| UNITED FINANCIAL CASUALTY COMPANY; PROGRESSIVE SPECIALTY INSURANCE COMPANY; PROGRESSIVE UNIVERSAL INSURANCE COMPANY; and PROGRESSIVE ADVANCED INSURANCE COMPANY<br><br>*Plaintiff*<br><br>v.<br><br>COUNTRYWIDE FINANCIAL CORPORATION; COUNTRYWIDE HOME LOANS, INC.; CWABS, INC.; COUNTRYWIDE CAPITAL MARKETS; COUNTRYWIDE SECURITIES CORPORATION; BANK OF AMERICA CORP.; NB HOLDINGS CORPORATION; ) | Case No.<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

EXHIBIT 144    122

1   ANGELO R. MOZILO; STANFORD L.    )
2   KURLAND; DAVID A. SPECTOR; ERIC   )
   P. SIERACKI; N. JOSHUA ADLER;       )
3   DAVID A. SAMBOL; THOMAS H.       )
   BOONE; THOMAS K. MCLAUGHLIN,    )
4                                   )
5                *Defendants.*    )
   _____)

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

SUMMARY OF ALLEGATIONS ........................................................ 2

JURISDICTION AND VENUE ............................................................ 6

PARTIES ........................................................................................... 7

SUBSTANTIVE ALLEGATIONS ..................................................... 12

I.      THE SECURITIZATION PROCESS GENERALLY ............................... 12

II.     THE COUNTRYWIDE SECURITIZATIONS AND
        PROGRESSIVE'S INVESTMENTS IN THE CERTIFICATES.............. 15

III.    IMPORTANT FACTORS IN THE DECISION OF INVESTORS
        SUCH AS PROGRESSIVE TO INVEST IN THE CERTIFICATES....... 18

IV.     COMMENCING IN 2003, COUNTRYWIDE KNOWINGLY
        ENGAGED IN WIDESPREAD AND SYSTEMATIC
        ABANDONMENT OF ITS UNDERWRITING GUIDELINES AND
        STANDARDS WHEN ORIGINATING MORTGAGES ......................... 21

        A.   COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY
             ADOPTING A "MATCHING" STRATEGY TO KEEP PACE WITH
             COMPETITORS .................................................................... 24

        B.   COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY
             DELIBERATELY IGNORING OR MANIPULATING THE BORROWERS'
             ABILITY AND WILLINGNESS TO REPAY THE LOAN ............................ 27

        C.   COUNTRYWIDE DEPARTED FROM ITS UNDERWRITING
             GUIDELINES BY USING FALSE METRICS TO ASSESS ITS
             BORROWERS' ABILITY TO REPAY ...................................................... 32

        D.   COUNTRYWIDE CREATED A PERMISSIVE CULTURE BY WHICH
             UNDERWRITING "EXCEPTIONS" WERE LIBERALLY ISSUED TO
             BORROWERS, FOR EXAMPLE, BY ALLOWING EMPLOYEES TO
             IGNORE AND OVERRIDE THE RECOMMENDATIONS OF
             COUNTRYWIDE'S HIGHLY TOUTED CLUES UNDERWRITING
             PROGRAM............................................................................................... 36

COMPLAINT

EXHIBIT 144     124

V. COUNTRYWIDE SYSTEMATICALLY FAILED TO OBTAIN APPRAISALS IN ACCORDANCE WITH INDUSTRY APPROVED APPRAISAL STANDARDS ...................................................................... 40

VI. THE CREDIT RATINGS ASSIGNED TO COUNTRYWIDE'S CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES............................................... 44

VII. COUNTRYWIDE FAILED TO ENSURE THAT TITLE TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED...................................................................................... 48

VIII. **COUNTRYWIDE** KNOWINGLY CHERRY-PICKED THE HIGHEST QUALITY LOANS FOR ITS OWN PORTFOLIO AND SOLD ONLY THE RISKIEST LOANS TO PLAINTIFF AND OTHER INVESTORS................................................................... 50

IX. DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS................................... 51

    A. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING COUNTRYWIDE'S UNDERWRITING GUIDELINES ............ 52

    B. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING COUNTRYWIDE'S USE OF EXCEPTIONS ........................... 55

    C. DEFENDANTS MADE UNTRUE STATEMENTS AND OMISSIONS REGARDING APPRAISALS AND LTV RATIOS ..................................... 56

    D. DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES ............ 59

    E. DEFENDANTS MATERIALLY MISREPRESENTED COUNTRYWIDE'S TRANSFER OF GOOD TITLE TO THE MORTGAGE LOANS TO THE ISSUING TRUSTS .............................................................................. 61

    F. DEFENDANTS MATERIALLY MISREPRESENTED THAT THEY DID NOT CHERRY-PICK MORTGAGE LOANS FOR INCLUSION IN COUNTRYWIDE'S SECURITIZATIONS.................................................. 62

X. DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS .... 63

---

ii

**XI.** PLAINTIFF PROGRESSIVE HAS SUFFERED LOSSES ON ITS PURCHASES OF CERTIFICATES ............................................................. 65

    **A.** CWABS ASSET-BACKED SECURITIES TRUST 2005-BC5 ...... 65

    **B.** CWABS ASSET-BASED CERTIFICATES TRUST 2005-7 ......... 65

    **C.** ASSET-BACKED CERTIFICATES SERIES 2004-06 .................. 66

**XII.** THE LIABILITY OF THE CONTROL PERSON DEFENDANTS ......... 66

    **A.** DEFENDANT CFC .............................................................. 66

    **B.** DEFENDANT CCM ............................................................ 68

    **C.** DEFENDANT MOZILO ........................................................ 69

    **D.** DEFENDANT SAMBOL ........................................................ 70

    **E.** DEFENDANT KURLAND ...................................................... 71

    **F.** DEFENDANT SIERACKI ....................................................... 72

    **G.** DEFENDANT BOONE .......................................................... 72

    **H.** DEFENDANT ADLER ........................................................... 72

    **I.** DEFENDANT MCLAUGHLIN .................................................. 72

**XIII.** THE LIABILITY OF BANK OF AMERICA AS THE SUCCESSOR-IN-INTEREST TO COUNTRYWIDE ....................................................... 73

CAUSES OF ACTION ............................................................................ 77

    FIRST CAUSE OF ACTION (VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5) .................................................... 77

    SECOND CAUSE OF ACTION (VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT) ............................................................................ 79

    THIRD CAUSE OF ACTION (COMMON-LAW FRAUD) ............................ 80

    FOURTH CAUSE OF ACTION (AIDING AND ABETTING FRAUD) ............ 81

FIFTH CAUSE OF ACTION (NEGLIGENT MISREPRESENTATION CAL. CIVIL CODE §§ 1572 ET SEQ. AND 1709 ET SEQ., AND COMMON LAW) ............................................................................................... 82

SIXTH CAUSE OF ACTION (FALSE STATEMENTS FOR THE PURPOSE OF INDUCING THE PURCHASE OR SALE OF A SECURITY CAL. CORPORATIONS CODE §§  25400(D) AND 25500) ............................. 83

SEVENTH CAUSE OF ACTION (UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES CAL. CORPORATIONS CODE §§ 25401, 25501, 25504) ......................................... 83

EIGHTH CAUSE OF ACTION (STATUTORY AIDING AND ABETTING LIABILITY CAL. CORPORATIONS CODE § 25504.1) ........................... 84

PRAYER FOR RELIEF ...................................................................... 88

DEMAND FOR JURY TRIAL .......................................................... 88

iv

COMPLAINT

EXHIBIT 144   127

## **INTRODUCTION**

Plaintiffs United Financial Casualty Company; Progressive Specialty Insurance Company; Progressive Universal Insurance Company; and Progressive Advanced Insurance ("Progressive" or "Plaintiff"), by undersigned counsel, brings this action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); the California Corporate Code; the California Civil Code; and the common law.  This action is brought against Defendants Countrywide Financial Corporation ("CFC"); Countrywide Home Loans, Inc. ("CHL"); CWABS, Inc. ("CWABS"); Bank of America Corp. ("Bank of America"); NB Holdings Corporation ("NB Holdings"); Stanford L. Kurland ("Kurland"); David A. Spector ("Spector"); Eric P. Sieracki ("Sieracki"); N. Joshua Adler ("Adler"); Thomas H. Boone ("Boone"); Thomas K. McLaughlin ("McLaughlin"); David A. Sambol ("Sambol") and Angelo R. Mozilo ("Mozilo") (collectively, the "Defendants"). Plaintiff makes the allegations in this Complaint based upon personal knowledge as to matters concerning Plaintiff and its own acts, and upon information and belief as to all other matters.  This information is derived from the investigation by Plaintiff's counsel, which has included a review and analysis of annual reports and publicly filed documents, reports of governmental investigations by the United States Securities and Exchange Commission, the Financial Crisis Inquiry Commission, the United States Department of Justice, the United States Senate Permanent Subcommittee on Investigations, and numerous investigations by other federal and state governmental units, press releases, news articles, analysts' statements, conference call transcripts and presentations, and transcripts from speeches and remarks given by Defendants.  In addition, Plaintiff's counsel conferred with counsel for other plaintiffs who have filed other complaints

1

1    against these Defendants based on the same or similar activities.  Based on the

2    foregoing, Plaintiff believes that substantial additional evidentiary support exists

3    for the allegations herein, which Plaintiff will find after a reasonable opportunity

4    for discovery.

5                        **SUMMARY OF ALLEGATIONS**

6         1.    This action arises out of Progressive's purchases of certain

7    residential mortgage-backed securities ("RMBS"), as evidenced in the form of

8    "Certificates", during the period from March 2007 through May 2008, in reliance

9    on the false and misleading statements that were made by Defendants.  Plaintiff

10   reasonably and justifiably relied on these untrue statements and omissions of

11   material information in deciding to purchase the Certificates.  The Certificates are

12   "securities" within the meaning of the California Corporations Code and the

13   Securities Exchange Act of 1934.

14        2.    As a result of these material misrepresentations and omissions,

15   Progressive purchased securities that were far riskier than represented, backed by

16   mortgages worth significantly less than represented, that had been made to

17   borrowers who were dramatically less creditworthy than had been represented.

18   As a consequence, Progressive has suffered losses of millions of dollars on its

19   purchases of Certificates.

20        3.    The securities acquired by Progressive were collateralized against

21   mortgages made by Defendant CFC and its wholly owned subsidiary, Defendant

22   CHL (collectively "Countrywide" or the "Company").   Until its collapse,

23   Countrywide was one of the largest mortgage lenders in the United States,

24   responsible for originating and/or servicing more than 18% of residential

25   mortgages nationally.  In 2005 and 2006 alone, Countrywide originated in excess

26   of $850 billion in home loans throughout the country.

27        4.    Countrywide did not, however, hold the mortgage loans that it

28   originated.   Rather, taking advantage of an unprecedented boom in the

---

2

COMPLAINT

EXHIBIT 144      129

securitization industry, Countrywide pooled many of the mortgage loans that it originated and deposited the loans into special-purpose entities or "trusts" that were created by Countrywide and its affiliates.  These pools of mortgage loans were then securitized into RMBS and sold by the trusts to investors in the form of Certificates.  Underwriters, including the Underwriter Defendants (as defined herein) named in this action, assisted the trusts in making these sales.

5.     The Certificates entitled investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the trusts.  The Certificates issued by each trust were divided into several classes (or "tranches") that had different seniority, priorities of payment, exposure to default, and interest payment provisions.  Rating agencies, such as Moody's Investors Service, Inc. ("Moody's"), Standard & Poor's Corporation ("S&P") and Fitch, Inc. ("Fitch"),[1] rated the investment quality of all tranches of Certificates based upon information provided by the Defendants about the quality of the mortgages in each mortgage pool and the seniority of the Certificate among the various Certificates issued by each trust.  These ratings, in part, determined the price at which these Certificates were offered to investors.  At the time of purchase, the Certificates acquired by Progressive were rated investment grade.

6.     In selling the Certificates, the Defendants prepared and filed with the Securities and Exchange Commission ("SEC") certain registration statements (the "Registration Statements"), prospectuses (the "Prospectuses") and prospectus supplements (the "Prospectus Supplements" and together with the Registration Statements and Prospectuses the "Offering Documents").  In these Offering Documents, Defendants repeatedly assured investors that the mortgages

---

[1] Moody's, Fitch and S&P are approved by the SEC as "Nationally Recognized Statistical Rating Organizations" and provide credit ratings that are used to distinguish the creditworthiness of different securities under the federal securities laws.

COMPLAINT

EXHIBIT 144     130

underlying the Certificates were originated in accordance with Countrywide's underwriting guidelines and standards, and assured investors of the strength of these underwriting guidelines and standards.  In addition, in the Offering Documents, Defendants repeatedly assured investors as to the soundness of the appraisals used to arrive at the value of the underlying properties and, specifically, that the real estate collateralizing the loans had been subjected to objective and independent real estate appraisals that complied with the Uniform Standards of Professional Appraisal ("USPAP").

7.     As it turns out, Defendants made false and misleading representations in the Offering Documents.  Specifically, Countrywide knowingly made false statements that it had followed its underwriting guidelines and standards when originating the mortgage loans.  In fact, as set forth below, Countrywide had engaged in a wholesale and systematic abandonment of its underwriting guidelines, thereby granting mortgage loans to borrowers whom it knew did not satisfy the eligibility criteria as described in the Offering Documents.  In addition, the mortgages underlying the Certificates had been extended based on collateral appraisals that were not performed in accordance with USPAP, so that the value of the underlying properties had been overstated, thereby exposing investors such as Progressive to additional losses in the event of foreclosure.

8.     Countrywide's practices, including the subjects of the false statements, misrepresentations and omissions in the Offering Documents, have been and continue to be the target of multiple state and federal investigations and proceedings.  In June 2009, the SEC filed a civil suit (the "SEC Action") against three former top Countrywide executives: Angelo Mozilo, former chairman of the board and chief executive officer; David Sambol, chief operating officer and president; and Eric Sieracki, chief financial officer.  *Securities and Exchange Commission v. Mozilo*, No. 2:09-cv-03994-JFW-MAN (C.D. Cal.).  According to

COMPLAINT

EXHIBIT 144     131

the SEC, these three individuals defrauded investors by falsely claiming that Countrywide underwrote low-risk mortgages at a time when the company was getting into increasingly risky parts of the lending business, including "subprime" mortgages – those made to less creditworthy borrowers.   The SEC further asserted that Mozilo engaged in insider trading of Countrywide stock.   On October 15, 2010, the SEC announced that Mozilo agreed to pay a record $22.5 million penalty, the largest ever paid by a public company's senior executive in an SEC settlement.   Mozilo also agreed to $45 million in disgorgement of ill-gotten gains to settle the SEC's disclosure violation and insider trading charges against him, for a total financial settlement of $67.5 million that will be returned to harmed investors.   Furthermore, Mozilo was permanently barred from serving as an officer or director of any publicly traded corporation.   Sambol and Sieracki agreed to pay $520,000 and $130,000 in civil penalties, respectively. Sambol was barred from serving as an officer or director of any publicly traded corporation for three years, and Sieracki was barred on practicing before the SEC for one year. The SEC has also made available Countrywide internal documents and testimony given by Countrywide's former executives in connection with the SEC Action, revealing the role that these individuals played in Countrywide's continued wholesale and systematic abandonment of its underwriting guidelines.

9.     The U.S. Attorney's Office is also investigating Countrywide for criminal violations and, according to an April 2010 article in THE WALL STREET JOURNAL, has stepped up the pace of its investigation, calling witnesses before a grand jury.   Additionally, various state attorneys general, including those from California, Connecticut, Florida, Illinois, and Indiana, have brought lawsuits and/or initiated investigations against Countrywide based on its lending, underwriting and appraisal practices for mortgage loans.   The Florida Attorney General investigated Countrywide for "unfair and deceptive trade practices", including the Company's sales and marketing tactics and its subprime loan

COMPLAINT

EXHIBIT 144      132

underwriting, and whether Countrywide put borrowers "into mortgages that in the first place they couldn't afford or loans with rates that were not what they were advertising or that were misleading."   On October 6, 2008, Countrywide announced that it had settled the fraud claims brought by 11 states, including California and Illinois, for an estimated *$8.4 billion*, which, according to the California Attorney General, is likely the largest settlement of allegations of predatory lending.

10.    Furthermore, on June 7, 2010 Countrywide agreed to pay $108 million to settle charges brought by the Federal Trade Commission (the "FTC") that it collected excessive fees from cash-strapped borrowers who were struggling to keep their homes.  According to the complaint filed by the FTC, Countrywide's loan-servicing operation deceived homeowners who were behind on their mortgage payments into paying inflated fees after many of the homeowners had taken out loans originated or funded by Countrywide's lending arm, including subprime or "nontraditional" mortgages such as payment option adjustable rate mortgages, interest-only mortgages, and loans made with little or no income or asset documentation.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; the California Corporate Securities Act; the California Civil Code and common law.

12.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337(a) and 1367.

13.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), (c) and (d).  Many of the acts and omissions charged herein, including the preparation and dissemination of

COMPLAINT

EXHIBIT 144     133

materially false and misleading statements in the Registration Statements and the Prospectus Supplements, occurred in substantial part in the Central District of California.  Additionally, Countrywide maintained its corporate headquarters and principal executive offices in this District.  Furthermore, Defendants CFC and CHL, and many of their affiliated entities, maintained their principal executive offices in this District

**PARTIES**

**Plaintiffs**

14.  Plaintiff United Financial Casualty Company is an Ohio corporation and subsidiary of Progressive Commercial Holdings, Inc., with its principal executive offices located at 6300 Wilson Mills Road, Mayfield Village, Ohio.  As a member of the Progressive group of companies, United Financial Casualty Company provides personal and commercial automobile insurance and other specialty property-casualty insurance and related services.

15.  Plaintiff Progressive Specialty Insurance Company is an Ohio corporation and subsidiary of Progressive Direct Holdings, Inc., with its principal executive offices located at 6300 Wilson Mills Road, Mayfield Village, Ohio.  As a member of the Progressive group of companies, Progressive Specialty Insurance Company provides personal and commercial automobile insurance and other specialty property-casualty insurance and related services.

16.  Plaintiff Progressive Universal Insurance Company is a Wisconsin corporation and subsidiary of Progressive Direct Holdings, Inc., with its principal executive offices located at 8040 Excelsior Drive, Suite 200, Madison, Wisconsin 53717.  As a member of the Progressive group of companies, Progressive Universal Insurance Company provides personal and commercial automobile insurance and other specialty property-casualty insurance and related services.

17.  Plaintiff Progressive Advanced Insurance Company is an Ohio corporation and a subsidiary of Progressive Direct Holdings, Inc., with its

7

COMPLAINT

EXHIBIT 144        134

principal executive offices located at 6300 Wilson Mills Road, Mayfield Village, Ohio.   As a member of the Progressive group of companies, Progressive Advanced Insurance Company provides personal and commercial automobile insurance and other specialty property-casualty insurance and related services.

**Defendants**

18.   Defendant CFC is a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California.   Until its acquisition by Bank of America, CFC was a public company listed on the New York Stock Exchange, and one of the largest mortgage lenders in the United States.   CFC is a holding company which, through its subsidiaries, is engaged in mortgage lending and other real estate finance-related businesses, including mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting.   The Company operates through five business segments: Mortgage Banking, which originates, purchases, sells and services non-commercial mortgage loans nationwide; Banking, which takes deposits and invests in mortgage loans and home equity lines of credit; Capital Markets, which operates an institutional broker-dealer that primarily specializes in trading and underwriting RMBS; Insurance, which offers property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licenses and supports technology to mortgage lenders in the United Kingdom.

19.   According to Defendant CFC's 2007 Form 10-K, Defendant CFC also "operate[s] an institutional broker-dealer that primarily specializes in trading and underwriting MBS" known as CSC.   The financial results of CSC are set forth in the Capital Markets Segment of Defendant CFC's financial statements. Defendant CFC further stated in its 2007 Form 10-K that it was "ranked fourth among Non-Agency MBS Underwriters" for 2007, but that its underwriting

EXHIBIT 144      135

activities had tapered off towards the latter half of 2007 due to issues in the market.

20. In January 2008, CFC was acquired by Defendant Bank of America for $4.1 billion.

21. Defendant CHL is a New York corporation, with its principal place of business at 4500 Park Granada, Calabasas, California, the same location as CFC, and is a direct wholly-owned subsidiary of CFC. Until the acquisition of Countrywide by Bank of America, CHL was the wholly-owned subsidiary of CFC operating in Countrywide's Mortgage Banking business division. CHL originated, purchased, sold and serviced mortgage loans. As discussed below, CHL acted as the "seller" of the mortgage loans underlying the Certificates purchased by Plaintiff Progressive.

22. Defendant CCM is a direct wholly-owned subsidiary of CFC. CCM's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC. CCM operates through its two main wholly-owned subsidiaries, Defendant CSC and Countrywide Servicing Exchange. According to Defendant CFC's Form 10-K, "Capital Markets [CCM] participates in both competitive bid and negotiated underwritings and performs underwriting services for CHL, Countrywide Bank and third parties." The financial results of CCM are set forth in the Capital Markets Segment of Defendant CFC's financial statements.

23. Defendant Bank of America is a successor to Defendant CFC, having de facto merged with CFC, as described more fully *infra*, ¶¶ 210 to 223. Also, as a result of the de facto merger, CSC, CHL and CCM likewise are now part of Bank of America.

24. Defendant NB Holdings is one of the shell entities used to effectuate the merger between Bank of America and CFC, and is a successor to Defendant

9

EXHIBIT 144 136

CHL.  On July 3, 2008, Defendant CHL completed the sale of substantially all of its assets to NB Holdings.

25.    Defendant CWABS is a Delaware corporation and a limited purpose financing subsidiary of CFC.  CWABS's principal executive offices are located at 4500 Park Granada, Calabasas, California, the same location as CFC.

26.    Defendant CSC, an affiliate of CFC, acted as an underwriter, within the meaning of the Exchange Act, 15 U.S.C. §78c(a)(20), for the Certificates identified in ¶ 52 below, and drafted and disseminated the Prospectus Supplements pursuant to which the Certificates were sold to Progressive.

27.    Defendant Kurland was, at relevant times, Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors of Defendant CWABS.  Defendant Kurland was concurrently the Executive Vice President and Chief Operating Officer ("COO") of Defendant CFC.

28.    Defendant Spector was, at relevant times, Vice President and a member of the Board of Directors of Defendant CWABS.  Defendant Spector was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC.

29.    Defendant Sieracki was, at relevant times, Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer of Defendant CWABS. Defendant Sieracki was concurrently the Executive Vice President and CFO of Defendant CFC.

30.    Defendant McLaughlin was, at relevant times, Executive Vice President, CFO and Treasurer of Defendant CWABS.

31.    Defendant Boone was, at relevant times, Executive Vice President and a member of the Board of Directors of Defendant CWABS.

32.    Defendant Adler was, at relevant times, President, CEO and a member of the Board of Directors for CWABS.

COMPLAINT

EXHIBIT 144      137

33.    Defendant Sambol was the mastermind of Countrywide's mortgage-backed securities business.  Defendant Sambol was concurrently the President and COO of Defendant CFC.

34.    Defendant Mozilo is the co-founder of CFC and served on CFC's Board of Directors from 1969 to July 1, 2008.  Mozilo also served as the Chairman of CFC's board of directors from March 1999 and in various other executive positions since CFC's inception, including President from March 2000 through December 2003, and CEO from February 1998 to July 1, 2008.  He was a member of CFC's Executive Strategy Committee, which, from its creation in 2005, was responsible for establishing and evaluating Countrywide's overall strategic direction and governing its annual planning process.  Mozilo also served on CFC's Credit Committee and Finance Committee and, as CEO and Chairman of CFC's board, directly oversaw the Ethics and Asset/Liability Committees. Mozilo resigned from all of the above positions on July 1, 2008.  Mozilo resides in Thousand Oaks, California.

35.    Defendants CWABS is referred to herein as the "Issuing Defendant."

36.    Defendants Kurland, Spector, Sieracki, Adler, McLaughlin, Boone, and Sambol are collectively referred to hereinafter as the "Individual Defendants."

37.    During the Class Period, the Individual Defendants, by virtue of their senior executive positions, were privy to confidential and proprietary information concerning Countrywide and its operations, financial condition and present and future business prospects.  They had access to such information via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them.  Among other information, the Individual Defendants had access to materially adverse non-public information concerning Countrywide's

11

EXHIBIT 144    138

loan origination and securitization procedures.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

38.     The Individual Defendants, because of their positions with the Countrywide, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts.  They were provided with copies of the Countrywide's (and affiliates) SEC filings, reports, press releases, and other statements alleged herein to be false and misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Thus, the Individual Defendants had the opportunity to prevent as well as commit the fraudulent acts alleged herein.

39.     As senior executives of a publicly traded company whose issuances of securities were governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Countrywide and its affiliates and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the RMBS at issue herein would be based upon truthful and accurate information.   The Individual Defendants' misrepresentations and omissions violated these specific requirements and obligations.

## SUBSTANTIVE ALLEGATIONS

## I.     THE SECURITIZATION PROCESS GENERALLY

40.     Traditionally, the process for extending mortgage loans to borrowers involved a lending institution (the loan originator) making a loan to a home buyer in exchange for a promise, documented in the form of a promissory note, by the home buyer to repay the principal and interest on the loan.  The loan originator obtained a lien against the home as collateral in the event the home buyer

12

COMPLAINT

EXHIBIT 144     139

defaulted on its obligation. Under this simple model, the loan originator held the promissory note until it matured, and was exposed to the risk that the borrower might fail to repay the loan. As such, the loan originator had a financial incentive to ensure that the borrower had the financial wherewithal to repay the promissory note, and that the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted.

41. Beginning in the 1990s, however, banks and other mortgage lending institutions increasingly used securitization to finance the extension of mortgage loans to borrowers. Under the securitization process, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage to a third-party financial institution. By selling the mortgage, the loan originator not only obtains fees, but receives the proceeds from the sale of the mortgage up front, and thereby has new capital to issue more mortgages. The financial institutions that purchase the mortgages then pool the mortgages together and securitize the mortgages into what are commonly referred to as residential mortgage-backed securities or RMBS. In this manner, unlike the traditional process for extending mortgage loans, the loan originator is no longer subject to the risk that the borrower may default; that risk is transferred with the mortgages to investors who purchase the RMBS.

42. The securitization of residential mortgage loans, and the creation of RMBS collateralized against these loans, typically follows the same structure and pattern in every transaction. First, a loan originator, such as a mortgage lender or bank, originates the underlying residential mortgage loan. After a loan has been made, a "sponsor" or "seller" (who either originated the loans itself or acquired the loans from other loan originators) sells the mortgage loans to a "depositor." The depositor pools these loans and deposits them into a special purpose entity or trust created by the depositor. One trust is established to hold the pool of mortgages for each proposed offering. In order to facilitate multiple offerings of

COMPLAINT

EXHIBIT 144     140

RMBS, a depositor sets up multiple trusts to hold the different pools of mortgages that are to be securitized.  In the case of each offering, in return for the pool of mortgages acquired from the depositor, the trust issues and distributes RMBS certificates to the depositor.  The depositor then works with an underwriter to price and sell the certificates to investors.  Thereafter, a servicer is appointed to service the mortgage loans held by the trust, *i.e.*, to collect the mortgage payments from the borrower in the form of principal and interest, and to remit them to the trust for administration and distribution to the RMBS investors.  The diagram below illustrates the typical structure of a securitization:



43.    In selling the certificates to investors, the depositor and underwriters disseminate to investors various disclosure or offering documents describing the certificates being sold.   The offering documents comprise: (1) a "shelf" registration statement (under SEC Rule 415, an issuer may file one registration statement covering several offerings of securities made during a period of up to three years after the filing of the registration statement); (2) a "base" prospectus; and (3) a "prospectus supplement."   Because a depositor will create multiple trusts to hold different pools of mortgages for multiple offerings of RMBS (as described above), the depositor files one shelf registration statement and one base prospectus that apply to multiple trusts that the depositor proposes to establish.

14

EXHIBIT 144    141

With respect to each specific trust, however, the depositor also files a prospectus supplement that applies only to that particular trust. Thus, for any given offering of securities, the relevant offering documents will typically be a shared registration statement and shared base prospectus, as well as an individual, trust-specific prospectus supplement.

44. Each investor who purchases an RMBS certificate is entitled to receive monthly payments of principal and interest from the trust. The order of priority of payment to each investor, the interest rate to be paid to each investor, and other payment rights accorded to each investor, including the speed of principal repayment, depend on which class or tranche of certificates the investor purchases.

45. The highest or senior tranche is the first to receive its share of the mortgage payments and is also the last to absorb any losses should mortgage borrowers become delinquent or default on their mortgages. Accordingly, these senior tranches receive the highest investment rating by the rating agencies, usually AAA. After the senior tranche, the middle tranches (referred to as mezzanine tranches) next receive their share of the proceeds. These mezzanine tranches are generally rated from AA to BB by the rating agencies. The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches, referred to as equity tranches. This process is repeated each month and all investors receive the payments owed to them so long as the mortgage borrowers are current on their mortgages.

## II. THE COUNTRYWIDE SECURITIZATIONS AND PROGRESSIVE'S INVESTMENTS IN THE CERTIFICATES

46. In the case of Countrywide's securitizations, the transactions among the originator/sponsor/seller, depositor, trusts and underwriters were not arms-length transactions, as CFC controlled nearly all the entities.

---

15

COMPLAINT

EXHIBIT 144        142

47.    CFC set up the Defendant CWABS to act as the depositor.  In its role as the depositor, CWABS then set up numerous issuing trusts for the issuance of RMBS.  In this case, the trusts established by CWABS from which Progressive purchased the Certificates in question were:

- CWABS Asset-Backed Certificates Trust 2005-BC5

- CWABS Asset-Backed Certificates Trust 2005-7

- Asset-Backed Certificates, Series 2004-6

(collectively, the "Issuing Trusts").

48.    In connection with its role as depositor, Defendant CWABS prepared and filed with the SEC numerous shelf registration statements.  This process was directed at all material times by CFC.  For purposes of this action, the Certificates purchased by Progressive are traceable to the following Registration Statements prepared and filed by Defendant CWABS:

| Registration Statement | Date Filed | Amount Registered |
|---|---|---|
| 333-109272 | October 9, 2003 | $ 59,982,636,635 |
| 333-125164 | June 10, 2005 | $46,598,657,434 |

49.    By preparing the above Registration Statements, Defendant CWABS was an "issuer" within the meaning of the Exchange Act, 15 U.S.C. §78c(a)(8), of the Certificates traceable to the above Registration Statements.

50.    At the time of filing, each Registration Statement contained an illustrative form of a prospectus supplement that would be used in the offering of the Certificates.  At the effective date of the offering of the Certificates, the offering's underwriters prepared and filed a final Prospectus Supplement with the

16

EXHIBIT 144      143

SEC containing a description of the mortgage pool underlying the Certificates and the underwriting standards by which the mortgages were originated. The underwriters then marketed and sold the Certificates pursuant to these Prospectus Supplements.

51.     Finally, after the Certificates were sold, CHL acted as the servicer of the mortgages held by the Issuing Trusts.

52.     The following chart summarizes and identifies (1) each Issuing Trust that issued and sold the Certificates purchased by Progressive, (2) the dates of the Registration Statements and Prospectus Supplements pursuant to which the Certificates were issued and sold, and (3) the identities of the depositor, the underwriters, and the sponsor/seller for each issuance.

| Amended Registration Statement Date | Issuing Trust | Prospectus Supplement Date of Filing | Depositor | Underwriter(s) | Sponsor / Seller |
|---|---|---|---|---|---|
| 6/10/2005 | CWABS Asset-Backed Certificates Trust 2005-BC5 | 12/28/2005 | CWABS | CSC Greenwich Capital Markets | CHL |
| | CWABS Asset-Backed Certificates Trust 2005-7 | 6/30/2005 | CWABS | CSC Greenwich Capital Markets Bear Stearns | CHL |
| 10/9/2003 | Asset-Backed Certificates, Series 2004-06 | 7/1/2004 | CWABS | CSC Greenwich Capital Markets Morgan Stanley | CHL |

COMPLAINT

EXHIBIT 144     144

## III.   IMPORTANT FACTORS IN THE DECISION OF INVESTORS SUCH AS PROGRESSIVE TO INVEST IN THE CERTIFICATES

53.   In purchasing the Certificates, Progressive, like other investors, attached critical importance to: (a) the underwriting standards used to originate the loans underlying the Certificates; (b) the appraisal methods used to value the properties securing the underlying mortgage loans; (c) the ratings assigned to the Certificates; and (d) the ability of the Issuing Trusts to establish legal title to the underlying loans.

54.   Sound underwriting was critically important to Progressive because the ability of Countrywide's borrowers to repay principal and interest was the fundamental basis upon which the investments in the Certificate were valued. Reflecting the importance of the underwriting standards, each of the Offering Documents contained representations concerning the standards purportedly used to underwrite the mortgages held by the Issuing Trusts.  For example, each of the Registration Statements issued by CWABS represented that: "The Seller's underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property[.]"

55.   Independent and accurate real estate appraisals were also critically important to investors such as Progressive because they ensured that the mortgage loans underlying the Certificates were not under-collateralized, thereby protecting RMBS investors in the event a borrower defaulted on a loan.  As such, by allowing RMBS investors to assess the degree to which a mortgage loan was adequately collateralized, accurate appraisals provided investors such as Progressive with a basis for assessing the price and risk of the Certificates.

56.   One measure that uses the appraisal value to assess whether mortgage loans are under-collateralized is the loan-to-value ("LTV") ratio.  The LTV ratio is a mathematical calculation that expresses the amount of a mortgage

18

EXHIBIT 144     145

as a percentage of the total value of the property, as obtained from the appraisal. For example, if a borrower seeks to borrow $900,000 to purchase a house worth $1,000,000, the LTV ratio is $900,000/$1,000,000, or 90%. If, however, the appraised value of the house is artificially increased to $1,200,000, the LTV ratio drops to just 75% ($900,000/$1,200,000).

57.    From a lender's perspective, the higher the LTV ratio, the riskier the loan, because it indicates the borrower has a lower equity stake, and a borrower with a lower equity stake in a property has less to lose if s/he defaults on the loan. Worse, particularly in an era of falling housing prices, a high LTV ratio creates the heightened risk that, should the borrower default, the amount of the outstanding loan may *exceed* the value of the property.

58.    Real estate appraisals are governed by USPAP, which are the generally accepted standards for professional appraisal practice in North America promulgated by the Appraisal Standards Board of the Appraisal Foundation, as authorized by Congress. With respect to real estate appraisals, USPAP requires the following:

> An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.
>
> In appraisal practice, an appraiser must not perform as an advocate for any party or issue.
>
> An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.
>
> * * * * *
>
> It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:
>
> 1.    the reporting of a predetermined result (e.g., opinion of value);

COMPLAINT

EXHIBIT 144        146

2.      a direction in assignment results that favors the cause of the client;

3.      the amount of a value opinion;

4.      the attainment of a stipulated result; or

5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

59.    Reflecting the importance of independent and accurate real estate appraisals to investors such as Progressive, the Offering Documents contained extensive disclosures concerning the value of the collateral underlying the mortgages pooled in the Issuing Trusts, and the appraisal methods by which such values were obtained.  Each Prospectus Supplement also reported the average LTV ratios of the mortgage loans pooled in the Issuing Trusts.

60.    The rating assigned to each of the Certificates was another important factor in Progressive's decision to purchase the Certificates.  Progressive and other investors relied on the ratings as an indicator of the safety and likelihood of default of the mortgage loans underlying a particular Certificate.  Consistent with its conservative corporate investment guidelines, Progressive purchased the Certificates because they all were rated as investment grade.

61.    Finally, in purchasing the Certificates, Progressive relied on the ability of each of the Issuing Trusts to be able to show that it in fact had legal title to the underlying mortgage loans.  Progressive would never have purchased any of the Certificates if there was any doubt as to whether the Issuing Trusts had legal title to any of the mortgage loans pooled for each offering.

COMPLAINT

EXHIBIT 144      147

2:11-cv-07166-MRP-MAN   Document 192-1   Filed 02/03/12   Page 164 of 252   Page ID
#:10911

## IV.   COMMENCING IN 2003, COUNTRYWIDE KNOWINGLY ENGAGED IN WIDESPREAD AND SYSTEMATIC ABANDONMENT OF ITS UNDERWRITING GUIDELINES AND STANDARDS WHEN ORIGINATING MORTGAGES

62.   Because its loan-origination guidelines were ostensibly designed to ensure that loans would perform over time, Countrywide knew that the rigorousness of its guidelines – and its adherence to those guidelines – would materially affect the risk of investing in the Certificates.   Throughout Countrywide's expansion, Defendant Mozilo consistently represented that Countrywide would not sacrifice its strict and disciplined underwriting standards. Indeed, in January 2004, Mozilo publicly declared during a call with analysts that the Company's objective was to double its share of the national market for all mortgage loans to 30%, without compromising loan quality, stating that Countrywide would target the safest borrowers in the market in order to maintain its commitment to quality.  According to Mozilo, "*going for 30% mortgage share here is totally unrelated to quality of loans we go after ... .  There will be no compromise in that as we grow market share.  Nor is there a necessity to do that.*"  (emphasis added).

63.   During a March 15, 2005 conference call with analysts, when questioned about Countrywide's strategy for increasing market share, Mozilo responded by assuring Countrywide's shareholders as follows:

> Your question is 30 percent, is that realistic, the 30 percent [market share] goal that we set for ourselves in 2008? . . . Is it achievable? Absolutely  .  .  .  .  But I will say this to you, that *under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share.* (emphasis added)

64.   Other senior Countrywide officers reiterated that the Company had not strayed from its underwriting standards, and would not do so in the future. For example, in an April 2005 conference call with analysts, Defendant Sieracki,

21

Countrywide's CFO, responded as follows to a question about whether Countrywide had changed its underwriting protocols: "I think [Fair Isaac Corporation ("FICO") credit scores, combined loan-to-value ratios, and debt-to-income ratios] will remain . . . consistent with the first quarter and most of what we did in 2004. We don't see any change in our protocol relative to the volume [of] loans that we're originating."

65.   In subsequent years, Countrywide continued to assure investors that the Company's underwriting procedures and credit risk management remained highly rigorous.  For example, in its 2005 10-K, filed with the SEC on February 28, 2006, and subsequent SEC filings, Countrywide represented that:

> *[Countrywide] ensure[s] . . . ongoing access to the secondary mortgage market by consistently producing quality mortgages and servicing those mortgages at levels that meet or exceed secondary mortgage market standards* . . . . [W]e have a major focus on ensuring the quality of our mortgage loan production and we make significant investments in personnel and technology in this regard. (emphasis added)

66.   As has now come to light, however, and contrary to Defendants' representations in the Offering Documents, Countrywide knowingly engaged in a systematic departure from its underwriting standards when originating the mortgages underlying the Certificates purchased by Progressive.  In order to achieve its publicly vaunted and aggressive market share goals, and in order to profit from the unprecedented housing boom at the beginning of the last decade, Countrywide entered into a deliberate and calculated scheme of originating large numbers of mortgage loans, regardless of the borrower's ability to pay, and then quickly flipping these loans at a profit on the secondary market.  Under this scheme, Countrywide intentionally and aggressively marketed mortgage loans to borrowers with poor credit histories and who were thus at a heightened risk of default.  Because such mortgage loans did not comply with Countrywide's internal underwriting guidelines, Countrywide expediently abandoned its

22

underwriting guidelines. The different ways by which Countrywide abandoned its underwriting guidelines have now been detailed extensively in numerous governmental investigations and private lawsuits.[2]

67. First, Countrywide abandoned its underwriting guidelines by internally adopting a "matching" strategy, under which Countrywide approved any mortgage product feature that was offered by a competitor. Under this matching strategy, Countrywide adopted mortgage product features offered by competitors regardless of whether those features constituted prudent underwriting. By mixing and matching the worst features of mortgage products from different competitors, Countrywide ensured a rush to the lowest common denominator, resulting in composite mortgage products that became the most aggressive within the industry, as further described below.

68. Second, Countrywide abandoned its underwriting guidelines by systematically disregarding and/or affirmatively manipulating the reported income, assets and employment status of borrowers seeking mortgage loans, in order to qualify these borrowers for mortgages. In many instances, this was accomplished by inflating borrowers' stated income, or facilitating income inflation by encouraging ineligible borrowers to resort to "no documentation loans" and "stated income loans", as described further below.

---

[2] *See, e.g., The People of the State of California v. Countrywide Financial Corporation, et al.*, No. LC081846. Similar actions have been filed in the States of Illinois and Connecticut. The allegations in these actions have been confirmed by investigations in other states such as Florida, Indiana, Washington and West Virginia, which revealed the nationwide scope of Countrywide's departures from the underwriting standards set forth in each Registration Statement and Supplemental Prospectus.

In addition, an FBI investigation of Countrywide has revealed further misconduct. *See, e.g.*, "FBI Investigates Countrywide – U.S. Scrutinizes Filings on Financial Strength, Loan Quality for Fraud" THE WALL STREET JOURNAL (March 8, 2008).

23

EXHIBIT 144     150

69.   Third, Countrywide departed from its underwriting guidelines by approving loans based on false affordability metrics, for example, the borrower's ability to make loan repayments based on low, introductory "teaser" interest rates. Countrywide deliberately omitted any assessment of the borrower's ability to make repayments once the interest rate reset to a higher rate, at the expiration of the teaser interest rate period.

70.   Fourth, Countrywide departed from its underwriting guidelines by implementing specific procedures by which employees – from the underwriter level up to regional vice presidents – were authorized to liberally make "exceptions" and issue loans even though the loans did not pass muster under Countrywide's underwriting guidelines.   Thus, Countrywide employees were specifically authorized to override any recommendation by Countrywide's "CLUES" underwriting system denying a loan, and even to change the terms of a loan suggested by CLUES.

71.   Because of the scheme described above, Countrywide was able to vastly expand the volume of its loan origination.   Between 2004 and 2006, Countrywide's total loan production increased, from $363 billion to $468 billion. In its 2006 annual report, Countrywide boasted that "[w]hile the overall residential loan production market in the United States has tripled in size since 2000, from $1.0 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going from $62 billion in loan originations in 2000 to $463 billion in 2006."

### A.   COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY ADOPTING A "MATCHING" STRATEGY TO KEEP PACE WITH COMPETITORS

72.   Countrywide's "matching strategy," also known as the "supermarket strategy," was a key driver of the Company's wholesale abandonment of its underwriting guidelines.   Under this strategy, Countrywide committed to offering

COMPLAINT

EXHIBIT 144      151

any product and/or underwriting guideline if it was available from at least one competitor, which Countrywide defined broadly to include subprime lenders. Consequently, if Countrywide did not offer a product offered by a competitor, its production division invoked the matching strategy to add the product to Countrywide's menu of product offerings.  For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce Countrywide's minimum required FICO score to 560.

73.   Internal documents and testimony provided in the SEC Action confirm that Countrywide knew its matching strategy was causing the Company to abandon prudent underwriting.  Specifically, John McMurray ("McMurray"), Countrywide's former Chief Risk Officer, gave explicit and alarming warnings to Defendants Sambol and Mozilo and other executives about the financial risks of Countrywide's origination practices, and recommended the implementation of stricter origination guidelines.

74.   In a June 2005 email to Defendant Sambol concerning guideline expansion and the company's growing credit risks, McMurray addressed the matching strategy and explained that "because the matching process includes comparisons to a variety of lenders, our [guidelines] will be a composite of the outer boundaries across multiple lenders[,]" and that because comparisons were only made to competitor guidelines where they were more aggressive and not used where they are less aggressive, Countrywide's "*composite guides [sic] are likely among the most aggressive in the industry.*"

75.   McMurray repeatedly explained his view and the risks of the matching strategy to others within Countrywide, including Defendant Sambol, but these concerns were ignored.  McMurray explained that Countrywide's matching strategy ensured that Countrywide was the most aggressive originator in the market because "if you match one lender on – on one – on certain guidelines or

COMPLAINT

EXHIBIT 144      152

for certain products and then you match a separate lender on a different product or a different set of guidelines, then in my view the composite of that – of that two-step match would be more – would be more aggressive than either one of those competitor reference points viewed in isolation."

76.    In a November 2, 2006 email that was forwarded to Defendant Sambol, McMurray further warned that, when the composite matching strategy "is done across multiple lenders, across products and across guidelines, the composite set of guidelines will be the most aggressive credit in the market."  The effect of this was that "our credit policy is ceded, on both a product-by-product as well as item-by-item basis, to the most aggressive lenders in the market." McMurray questioned whether "***we want to effectively cede our policy and is this approach 'saleable' for a risk perspective to those constituents who may worry about our risk profile***?"  Again, Sambol ignored these concerns and Countrywide continued to implement its matching strategy.

77.    McMurray later testified in the SEC Action that the matching strategy at Countrywide was a "corporate principle and practice that had a profound effect on credit policy" at Countrywide.  In his testimony, McMurray referred to his own handwritten notes from November 3, 2006, which showed that he had discussed, with Defendant Sambol, McMurray's concern that he would be blamed personally for loan products that McMurray "***never advocated and often recommended against.***"  In his notes, McMurray indicated that he discussed with Sambol concerns about the "company's risk philosophy … [and] ***'can't say no' culture, pressure from matching and no brokering policies***."

78.    Countrywide never disclosed to Plaintiff or other investors that it had a matching strategy that was causing the Company to cede its credit policy to the most aggressive lenders in the market.  Countrywide's executives knew – and kept it a secret – that the quality of loans originated by Countrywide was deteriorating, and would continue to worsen.  Countrywide's internal emails

26

confirm that the matching strategy was not disclosed to anyone outside Countrywide.  In a February 11, 2007 email to Sambol, McMurray stated that he doubted Countrywide's composite matching strategy "would play well with regulators, investors, rating agencies, etc. *To some, this approach might seem like we've simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines*."   Information that Countrywide was actually the most aggressive lender in the industry would have been extremely material to Plaintiff and other investors.  According to Christopher Brendler, an analyst for Stifel Nicholas who covered Countrywide commencing in January 2006 and was deposed in the SEC Action, disclosure of the "matching strategy" "would have been a very disturbing" because "to know that [Countrywide was] basically seeking out the most aggressive policies and underwriting guidelines of [its] competitors without consideration for other factors" meant that Countrywide was "essentially creating a worst of the worst."

## B.   COUNTRYWIDE ABANDONED ITS UNDERWRITING GUIDELINES BY DELIBERATELY IGNORING OR MANIPULATING THE BORROWERS' ABILITY AND WILLINGNESS TO REPAY THE LOAN

79.   As represented in the Offering Documents, Countrywide's underwriting guidelines were primarily intended to assess the ability and willingness of the borrower to repay the mortgage loan, apart from the adequacy of the mortgaged property as collateral for the loan.  Accordingly, Countrywide's underwriting guidelines required the consideration of, among other things, the borrower's assets, liabilities, income, employment history and credit history.  These items of information were used to calculate the borrower's debt-to-income ratio, *i.e.*, the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income.

80.   Notwithstanding these explicit requirements in its underwriting guidelines, Countrywide extended numerous loans even though the borrower's

EXHIBIT 144      154

information was not provided, or even if it was, where that information was patently false and Countrywide's underwriters knew that the borrower was misrepresenting her or his income, occupation and other information, and was engaged in outright mortgage fraud. In many cases, Countrywide's employees actively assisted in the misrepresentation of income, occupation and other information.

81.    These practices were most evident with respect to Countrywide's underwriting of the so-called stated asset, stated income ("SISA") loans, *i.e.*, a "low-doc" loan; and the no income, no assets ("NINA") loans, *i.e.*, a "no-doc" loan. Under the SISA program, the borrower's income and assets were simply stated in the loan application but not documented. Employment was verbally confirmed and income was supposed to be roughly consistent with incomes earned in the type of job claimed by the borrower. NINA loans allowed a borrower to simply state her/his income without providing any documentation or proof of this income.

82.    With respect to SISA loans, Countrywide's employees deliberately omitted to take any steps to verify income information even though the means for such verification were readily available. According to an April 6, 2008 article entitled, "A Road Not Taken by Lenders," authored by Gretchen Morgenson of the NEW YORK TIMES, even though Countrywide had the right to verify stated income on an application through the Internal Revenue Service ("IRS") (and this check took less than one day to complete), Countrywide verified income with the IRS on only 3% to 5% of all loans that Countrywide made in 2006. In other situations, if a potential borrower applying for a SISA loan provided a bank name, address and account number for asset verification, it was the practice at Countrywide not to verify the bank balance.

83.    Not only did Countrywide employees fail to verify income and other information, Countrywide employees circumvented Countrywide's guidelines by

COMPLAINT

EXHIBIT 144        155

affirmatively facilitating mortgage fraud by borrowers.  According to a lawsuit filed by the Illinois Attorney General on June 25, 2008, with respect to reduced documentation loans, the only check on fraudulent income was a "reasonableness standard" allegedly employed by Countrywide.   Early on, Countrywide employees were required only to use their judgment in deciding whether or not the stated income seemed reasonable.  Beginning in 2005, to supplement an employee's judgment as to whether or not a potential borrower's income was "reasonable", Countrywide required its employees to utilize a website, www.salary.com, in order to determine if the borrower's stated income was indeed reasonable.  The website, however, provides only a range of salaries based on the zip code and stated job title of the loan applicant.

84.   Many employees knew ahead of time the range of salaries that www.salary.com would provide for a particular job and, therefore, knew by how much they could overstate a borrower's income.  Countrywide's loan officers typically explained to potential borrowers that "with your credit score of X, for this house, and to make Y payment, Z is the income that you need to make." After such advice, the borrower would state that she or he made Z amount of income.  In this manner, Countrywide's loan officers affirmatively assisted loan applicants in submitting loan applications with *false income amounts*, so that applicants could get loans under false pretenses.  Unsurprisingly, as a result of these departures from Countrywide's underwriting guidelines, the Illinois Attorney General found that approximately 90% of all reduced documentation loans sold out of one Chicago office had inflated incomes.

85.   Because of the ease with which SISA loans could be manipulated to secure approval, as described above, Countrywide employees routinely converted full documentation loan applications into SISA loan applications.  In a May 7, 2007 letter to the Office of Thrift Supervision, Countrywide itself admitted that it engaged in a practice whereby, if Countrywide received proper income

COMPLAINT

EXHIBIT 144      156

documentation (*i.e.*, a W-2 form) demonstrating that the borrower did ***not*** qualify for a loan, the loan was submitted as a SISA loan so as to obtain approval of the loan.

86.   This practice is also detailed in a complaint filed by Mark Zachary ("Zachary"), a former Regional Vice President of Countrywide KB Homes Loans, Inc. ("CWKB"), in an action filed on January 17, 2008, styled *Zachary v. Countrywide Financial Corporation,* No. 4:08-cv-00214 (S.D. Tex.).   According to Zachary, loans were being canceled at prime regional operations centers as full documentation loans and transferred to the sub-prime operations center in Plano, Texas, as SISA or NINA loans.   Rather than denying an applicant based on the information revealed in the original mortgage application, Countrywide pretended that it did not see the disqualifying information (such as insufficient income or assets) and, instead, allowed applicants to apply for a no documentation loan and, according to Zachary, encouraged them to lie on these renewed applications.

87.   Numerous other sources confirm the extent by which Countrywide departed from its underwriting guidelines by allowing and/or facilitating misrepresentations by borrowers as to their income, occupation and other vital information.   Countrywide's Quality Control group performed an audit  ("4506 Audit") for the 10-month period ended on April 30, 2006, comparing the stated income from a borrower's loan application to the income reported by that borrower to the IRS.   The 4506 Audit revealed that ***fifty percent*** of the stated income loans audited by the bank showed a variance in income from the borrowers' IRS filings of greater than ten percent.   Of those, 69% had an income variance of ***greater than 50%***.

88.   The results of the 4506 Audit were known by Countrywide management, as they were reported to the Credit Risk Committee, Countrywide's Chief Risk Officer, and Defendant Sambol, then head of loan production. Additionally, Sambol shared the results of the audit with Mozilo, as reflected in a

30

EXHIBIT 144      157

June 1, 2006 email in which Mozilo stated "In a discussion with both Stan [Kurland] and Dave [Sambol] it came to my attention that the ***majority of pay options being originated by us both wholesale and retail are based upon stated income***. There is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records." (emphasis added)

89.   Countrywide's facilitation of mortgage fraud by borrowers is also confirmed by an arbitration commenced by the Mortgage Guaranty Insurance Corporation ("MGIC"), an insurer of mortgage lenders against borrower defaults, against Countrywide.   MGIC filed an arbitration demand against Countrywide seeking to exercise its right to refuse to pay insurance claims on stated-income loans on which the borrowers defaulted, claiming that Countrywide's representations regarding the loans were "riddled with materially false information."   To support its demand, MGIC hired investigators to find representative examples of Countrywide's fraud, which MGIC described in its complaint.   In one example ("MGIC Certificate No. 25797915"), a borrower's application listed his occupation as a dairy foreman with a monthly stated income of $10,500. With those credentials, the borrower qualified for a $350,000 primary residence mortgage loan with a reported debt-to-income ratio of 43.26%.   After the borrower defaulted and Countrywide submitted a claim to MGIC, the insurer investigated the claim and uncovered the fact that, the borrower was actually a dairy milker earning only $1,100 per month, with a debt-to-income ratio of 403.40%, nearly ten times higher than what was represented by Countrywide.   In addition, the borrower was not purchasing the home as a primary residence.

90.   Similarly, in connection with a lawsuit filed by MBIA Insurance Corporation ("MBIA") against Countrywide on September 30, 2008, MBIA commissioned an analysis of pools of loans that it alleges it had been fraudulently induced to insure. *MBIA Ins. Corp. v. Countrywide*, No. 08/602825 (N.Y. Sup.

COMPLAINT

EXHIBIT 144      158

Ct., filed Sept. 30, 2008). According to MBIA, the analysis revealed that *almost 90%* of defaulted or delinquent loans in at least one pool of Countrywide securitizations showed material discrepancies.

91.     In a June 30, 2008 NBC Nightly News report, one former Countrywide loan officer said that he had observed Countrywide supervisors stand by and watch as loan officers entered fictitious income figures into Countrywide's system until the borrower was approved for a loan. A borrower stated in the same report that a Countrywide loan officer advised her to claim she made more than twice her actual income when completing her own loan application.

C.      **COUNTRYWIDE DEPARTED FROM ITS UNDERWRITING GUIDELINES BY USING FALSE METRICS TO ASSESS ITS BORROWERS' ABILITY TO REPAY**

92.     Another widespread method by which Countrywide departed from its underwriting practices was to assess borrowers' ability to pay based on false metrics, so that the loan applications would pass muster.

93.     In an effort to increase the fees that it received, Countrywide steered borrowers to loans with the highest interest rates and the most fees, while concealing less expensive loan products that those customers could afford. Among other products, Countrywide originated and sold adjustable rate mortgages ("ARMs") with low initial or "teaser" interest rates. The "teaser" rate, typically 1%-1.25%, only applied to the loan for the first month. Once the teaser rate expired, the interest rate on the ARM reverted to a fully indexed rate.

94.     The fully indexed rate can change over time and is dependent on fluctuations in the current value of the chosen rate index, such as the 11th District Cost of Funds Index ("COFI"), the 12 Month Treasury Average Index or the London Interbank Offer Rate. The fully indexed rate is calculated by adding the current value of the rate index (which fluctuates monthly) to a margin agreed to

32

by the borrower.  The margin remains static for the life of the loan.  The margin on Countrywide loans could be as high as 4%.  Thus, if the Countrywide ARM identifies the rate index as COFI (which was at 2.8% in July 2008) and the margin as 4%, then once the cap or "teaser rate" has expired, the borrower will be subject to an interest rate equal to the fully indexed rate, or 6.8%, for that month.

95.   In the case of "option ARMs", the borrower had the option of making monthly payments as though the interest rate had not changed, thereby making only a "minimum" payment that was based on the teaser rate of 1% to 1.25% as opposed to the fully indexed rate of 6.8%.  This meant that the borrower was making payments that were less than the amount of interest accruing on the loan after the teaser rate had already expired.  The unpaid interest that accrued while the borrower was making the payment based on the teaser rate was tacked on to the principal (a process known as negative amortization).  Once the principal hit 115% of the original loan, the borrower's monthly payment immediately was raised to a level that would pay off the new balance (original principal plus the unpaid interest) of the loan.  This resulted in borrowers experiencing "payment shock" after the interest-only payment period expired.

96.   In order to ensure that mortgage products such as these ARMs and option ARMs passed muster, Countrywide engaged in the practice of approving the loans based on the borrower's ability to pay the teaser rate, as opposed to the fully indexed rate, and steered customers to "hybrid" ARMS.  Hybrid ARMS have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then an adjustable interest rate for the remaining loan term.  In the fourth quarter of 2006 alone, almost 60% of the borrowers who obtained subprime hybrid ARMs from Countrywide would not have qualified at the fully indexed rate, and 25% of the borrowers would not have qualified for any other Countrywide product, according to the Company's May 7, 2007 letter to the Office of Thrift Supervision.

33

COMPLAINT

EXHIBIT 144      160

97.     As a result of these underwriting practices, the number of ARM loans originated by Countrywide increased dramatically.   According to the January 27, 2011 Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States ("The FCIC Report"), the volume of option ARMs retained on Countrywide's balance sheet continued to increase, growing from $5 billion in 2004 to $26 billion in 2005 and peaking in 2006 at $33 billion.   Meanwhile, the FCIC Report also states that the percentage of Countrywide's option ARMs that were negatively amortizing grew from just 1% in 2004 to 53% in 2005 and then to more than 90% by 2007.

98.     At all relevant times, Defendants were well aware of this practice of approving loans based on these false affordability metrics, and of the dangers posed by these ARM products.   Defendants were acutely aware of the likely crisis when the time came for the interest rates to reset and the borrowers experienced "payment shock."

99.     On August 1, 2005, Mozilo wrote an e-mail to Defendant Kurland and another executive stating that ***"when the loan resets in five years there will be an enormous payment shock and if the borrower is not sufficiently sophisticated to truly understand this consequence then the bank will be dealing with foreclosure in potentially a deflated real estate market. This would be both a financial and reputational catastrophe."***   (emphasis added)

100. Eight months later, in an April 13, 2006 email to Defendants Sambol and Sieracki, Mozilo expressed his concern that loans had been originated "through our channels with disregard for process [and] compliance with guidelines."   Mozilo went on to write that he had ***"personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan*** [sic]."   Mozilo then noted that, ***"[i]n my conversations with Sambol***

34

EXHIBIT 144      161

*he calls the 100% sub prime seconds as the 'milk' of the business. Frankly, I consider that product line to be the poison of ours.*" (emphasis added).

101.   Two months later, Mozilo reiterated his earlier concerns regarding the likely fate of Countrywide's ARMs.  According to the SEC, on June 1, 2006, Mozilo wrote an e-mail to Defendant Sambol and other executives expressing his concern that borrowers **"are going to experience a payment shock which is going to be difficult if not impossible for them to manage."** (emphasis added) He recommended that the Company deal with these issues expeditiously, stating that **"[w]e know or can reliably predict what's going to happen in the next couple of years."**  (emphasis added)

102.   Countrywide has since admitted the degree to which it departed from prudent underwriting guidelines in originating ARMs.  In a December 13, 2007 memo that was sent to Mozilo, Countrywide's enterprise risk assessment officer noted that:

> Countrywide had reviewed limited samples of first- and second-trust-deed mortgages originated by Countrywide Bank during the fourth quarter of 2006 and the first quarter of 2007 in order to get a sense of the quality of file documentation and underwriting practices, and to assess compliance with internal policies and procedures. The review resulted in . . . the finding that **borrower repayment capacity was not adequately assessed by the bank during the underwriting process** for home equity loans. **More specifically, debt-to-income (DTI) ratios did not consider the impact of principal [negative] amortization or an increase in interest.** (emphasis in original).

103.   In a September 3, 2007 article entitled "Countrywide's Confident Tone Turned to Crisis," the LOS ANGELES TIMES reported that Countrywide tightened its lending standards in the summer of 2007 in order to ensure that borrowers could afford loans at the fully indexed rate (as opposed to just the teaser rate).  And, according to a December 28, 2007 LOS ANGELES TIMES article, "Prime Loans Seeing Rise in Defaults," Countrywide admitted that, had those guidelines been in effect during the relevant time period, "it would have rejected

89% of the option ARM loans it made in 2006, amounting to $64 billion, and $74 billion, or 83%, of those it made in 2005."

104.   In the years leading up to the financial crisis, most subprime loan purchase agreements provided that if the borrower failed to make a payment within three months of the loan's purchase, or if the loan breached certain representations and warranties, such as representations related to the loan's characteristics or documentation, the seller could be obligated to repurchase the loan.  According to the April 13, 2011 staff report of the U.S. Senate Permanent Subcommittee on Investigations, the Mortgage Department of the investment firm Goldman Sachs initiated an intensive review of the loans in its inventory in early 2007.  It found that approximately 50% of the Countrywide-originated loans that it reviewed were candidates for return to the lender.

**D.   COUNTRYWIDE CREATED A PERMISSIVE CULTURE BY WHICH UNDERWRITING "EXCEPTIONS" WERE LIBERALLY ISSUED TO BORROWERS, FOR EXAMPLE, BY ALLOWING EMPLOYEES TO IGNORE AND OVERRIDE THE RECOMMENDATIONS OF COUNTRYWIDE'S HIGHLY TOUTED CLUES UNDERWRITING PROGRAM**

105.   Countrywide departed from its underwriting guidelines by allowing "exception" loans to be made even though the exceptions were not justified under Countrywide's underwriting guidelines.  Although Countrywide's underwriting guidelines allowed for exceptions to be made, such exceptions could be made only when "compensating factors" were present.  Compensating factors were defined to include the borrower's employment stability, favorable credit history, and equity in the property.

106.   Instead of requiring employees to clearly document the process by which exceptions were made, Countrywide created a high-pressure environment that drove the origination of loans.  Furthermore, Countrywide implemented

specific procedures for bypassing the underwriting guidelines and liberally granting exceptions.

107. Countrywide's CLUES computer underwriting system generated a loan analysis report that rated the borrower's creditworthiness and indicated whether a proposed loan complied with Countrywide's underwriting standards. Based on this analysis, the CLUES report would recommend that a loan be approved, declined, or be referred for a further, manual analysis by a Countrywide underwriter. However, Countrywide employees were specifically authorized to override any recommendation by CLUES denying a loan, by obtaining the approval of a supervisor. Countrywide employees were also authorized to change the terms of loan as suggested by CLUES. As a result, Countrywide employees at every level were authorized to liberally make exceptions to Countrywide's underwriting standards.

108. If all else failed, Countrywide employees could also submit a request for an exception to Countrywide's Structured Loan Desk in Plano, Texas, a department set up specifically for the purpose of granting underwriting exceptions. Commencing in late 2004, the Structured Loan Desk employed software called the Exception Processing System or EPS in order to obtain approval for loans that should have been rejected by Countrywide's underwriting standards. The objectives of EPS were to approve virtually every borrower and loan profile, especially high risk borrowers. Consequently, as many as 15% to 20% of the loans generated each day at the Company's Structured Loan Desk were run through EPS and very few were ever rejected.

109. The orders to liberally grant underwriting exceptions came straight from senior management, as reflected in emails released in the SEC Action. These emails and other documents show that concerns about deteriorating underwriting standards were trumped by the understanding that Countrywide could off-load the risks by simply securitizing the loans in question. Thus, on

COMPLAINT

EXHIBIT 144        164

February 13, 2005 Defendant Sambol sent an e-mail which stated that the *"purpose of the [Structured Loan Desk] and our pricing philosophy"* **was that** *"we should be willing to price virtually any loan that we reasonably believe we can sell, securitize, without losing money, even if other tenders can't or won't do the deal*." (emphasis added)

110. In a July 28, 2005 email sent by Defendant Spector to Countrywide's managing directors and Secondary Markets senior executives, including Defendant Adler, Spector provided an update on Countrywide's exceptions strategy "going forward":

> As indicated in a previous note, when we first started the SLD [Structured Loan Desk], the intent was to be able to offer at least one option for borrowers who wanted exceptions to our underwriting guides. The thought was that we would offer borrower exceptions in our two major loan programs: 30-year fixed rate and 5/1 ARMs. In addition, both of these programs were set up for Alt A and as such we could price and sell under these programs. ***While this process seemed to have worked well in the past, we have been recently seeing increased demand from Production for exceptions on all products in general and Pay Option loans in particular***.
>
> *                *                *
>
> In addition, Production has been expressing frustration that we were only offering major exceptions for 5/1 ARMs and 30-year fixed rates. As such, to the ***widest extent possible***, ***we are going to start allowing exceptions on all requests, regardless of loan programs, for loans less than $3million effective immediately***. The pricing methodology we will use will be similar to that which we use for 30-year fixed rates and 5-1 Hybrids. ***We will assume securitization in all cases.*** (emphasis added)

111. Similarly, in a deposition provided in connection with the SEC Action, Defendant Adler confirmed that the Secondary Markets Structured Loan Desk did not review loans from an underwriting point of view, but reviewed them for their securitization potential only:

COMPLAINT

EXHIBIT 144      165

1    Q. Do you know whether Countrywide sometimes originated loans
2    that were considered to be exceptions to its underwriting guidelines?

3    A. We did.

4    Q. To your knowledge, was there a process by which such loans were
5    approved?

6                   *      *      *

7    THE WITNESS: There generally was, yes.

8    Q. And what is your understanding of that process?

9
10    A. Well, I was -- I was at the tail end of that process. There was -- we
had guidelines, we had kind of core guidelines, and then we had these
11   shadow guidelines, which were the kind of the second tier guideline,
if you will. And then there was this third tier which would come to
12   me. But essentially there were -- the tiering of guidelines related to the
13   kind of the exception process. And there was an underwriting, they
called it, Structured Loan Desk process in the divisions where loans
14   would get referred to the Structured Loan Desk if they were outside, I
15   believe, of kind of the core guidelines. And then if those loans were
outside of even the shadow guidelines, then they would be referred to
16   Secondary Marketing to determine if the loan could be sold given the
17   exception that was being asked for.

18                   *      *      *

19    Q. Was one of the criteria for granting exceptions at the Secondary
20   Loan Desk in Secondary Marketing whether or not the loan could be
sold into the secondary market?

21
22    A. ***That was the only criteria that we followed.***

23    112.   Other Countrywide officers knew and warned of the dangers of
24 liberally granting exceptions to Countrywide's underwriting standards where
25 there was no basis for doing so.  On May 22, 2005, John McMurray,
26 Countrywide's then-Chief Risk Officer, warned Defendant Sambol that the loans
27 originated as exceptions to Countrywide's stated origination guidelines were
28 likely to experience higher default rates. He stated that ***"exceptions are generally***

39

COMPLAINT

*done at terms more aggressive than our guidelines"* and recommended that *"[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."* (emphasis added)

113.   These practices were also troublesome to many Countrywide employees, a significant number of which made efforts to report the improper conduct to authorities.   The FCIC Final Report stated that Countrywide had approximately 5,000 internal referrals of potentially fraudulent activity in its mortgage business in 2005, 10,000 in 2006 and 20,000 in 2007, according to Francisco San Pedro, the former senior vice president of special investigations at the company.   However, it filed only 855 suspicious activity reports in 2005, 2,895 in 2006, and 2,261 in 2007.[3]

114.   Despite being aware of the fact that the persistent issuance of exception loans was likely to result in higher default rates, Countrywide continued to aggressively grant them.   In a June 28, 2005 presentation, the Corporate Credit Risk Committee revealed to senior executives, including Defendant Sieracki, that nonconforming exceptions loans accounted for an astounding **40%** of all Countrywide loan originations.

## V.   COUNTRYWIDE SYSTEMATICALLY FAILED TO OBTAIN APPRAISALS IN ACCORDANCE WITH INDUSTRY APPROVED APPRAISAL STANDARDS

115.   Not only did Countrywide systematically abandon its underwriting guidelines, Countrywide also departed from USPAP when obtaining appraisals for the properties securing the mortgages underlying the Certificates.

---

[3] Suspicious activity reports, also known as SARs, are reports filed by FDIC-insured banks and their affiliates to the Financial Crimes Enforcement Network (FinCEN), a bureau within the Treasury Department that administers money-laundering laws, working with law enforcement to combat financial crimes.

40

COMPLAINT

EXHIBIT 144      167

116.   According to Countrywide's "Subprime Appraisal Requirements", virtually every loan needed to be accompanied by at least one independent appraisal performed by an appraiser working through Countrywide's subsidiary, Landsafe Appraisals, Inc. ("Landsafe"), or a secondary appraisal from an "approved appraisal company", including eAppraiseIT.com, Lender Services Inc. and LandAmerica Lender Services.

117.   Notwithstanding   Countrywide's   "Subprime   Appraisal Requirements", the appraisals obtained by Countrywide underwriters were not independent.   For example, since at least 2005, loan officers from all of Countrywide's origination divisions were permitted to (i) hire appraisers of their own choosing, (ii) discard appraisals that did not support loan qualification, and (iii) replace appraisers when necessary to obtain a more favorable LTV so as to qualify a loan for approval.   Countrywide loan officers were allowed to lobby appraisers to assign particular values to a property in order to support the closing of a loan.   In fact, Countrywide intimidated appraisers in order to hit the appraisals that Countrywide needed to support the making of a mortgage loan. By employing these practices, Countrywide methodically and deliberately enlisted appraisers in its scheme to inflate appraisals, which resulted in the issuance of low-quality, high-risk loans.

118.   Numerous appraisers have confirmed that the inflation of appraisals was commonplace.   For example, the owner of a small residential real estate appraisal firm in Illinois – who was approved and/or utilized by CHL and other originators in approximately 200 transactions – stated that mortgage brokers would call him and say "I need this number."   This appraiser also stated that he was frequently threatened with, "either give us this home value or you will never do business for us again."

119.   An independent appraiser from Florida, who was approved by CHL and other originators, stated that she was told by brokers and/or lenders that: "WE

COMPLAINT

EXHIBIT 144        168

NEED THIS NUMBER, OR YOU WILL NEVER WORK FOR US AGAIN." In order to stay in business, she gave the valuations the broker or lender demanded, even if it required driving 20 miles away to identify a "comparable" sale that could be used to justify the appraisal. During the relevant period, this appraiser completed more than 100 appraisals for Defendant CHL and other originators that were inflated.

120.   A real estate appraiser in Las Vegas stated that when the Las Vegas market had peaked, Defendant CHL required appraisers to come up with real estate appraisals reflecting escalating values or it would blackball them. This appraiser conducted over 300 appraisals that in his opinion were inflated for CHL and other originators.   According to this appraiser, typically the appraisals demanded by CHL were 15% to 25% over the actual market.

121.   Another independent appraiser stated that CHL in-house or outside loan officers demanded inflated numbers from him in Compton and Watts, California.  The officers told him to either give them the appraisal numbers they wanted or that he would be "done" and that he would be blackballed by every lender doing business in California.  According to this appraiser, he completed over 100 inflated appraisals just for CHL and one other originator.  In some cases he was appraising houses for $100,000 more than they were worth in such dangerous neighborhoods that he never even got out of his car, but simply drove by and took pictures of the house and gave the broker or the lender the number that was demanded.

122.   Apart from these numerous accounts from appraisers, multiple lawsuits have been filed against Countrywide and its appraisal subsidiary, Landsafe, as well as several of the "approved appraisal companies", alleging that the appraisals obtained were inflated.

123.   On June 25, 2008 and July 24, 2008, shareholders of Fannie Mae and Freddie Mac, respectively, commenced derivative actions on behalf of those

COMPLAINT

EXHIBIT 144     169

companies against, among others, Countrywide, Landsafe and eAppraiseIT.com. *See Agnes v. Raines,* No. 1:08-cv-01093-RJL (D.D.C.) (Fannie Mae) and *Adams Family Trust v. Syron*, No. 1:08-cv-00773-LMB-TCB (E.D. Va.) (Freddie Mac). In both actions, the plaintiff shareholders assert that Fannie and Freddie were harmed by purchasing from Countrywide portfolios of mortgage loans that had been made to borrowers based on artificially high and unjustified appraisals for the underlying real estate.

124.   In the *Zachary* action, Zachary (a former employee of the Countrywide and KB Homes joint venture, CWKB) alleges that Landsafe – the only appraiser employed by CWKB to appraise the homes on behalf of the joint venture – was encouraged to inflate the value of appraised homes by as much as 6% in order to allow the borrower to "roll up" the closing costs of the mortgage. This practice resulted in the actual home value being less than the mortgaged amount, putting the home buyer "upside down" on the home immediately after purchasing it.  It also put RMBS investors such as Progressive at risk because they were unaware of the true value of the underlying real estate assets.  The same practice is also described in *Zaldana, et al. v. KB Home, et al.*, No. CV 08-3399 (EDL) (N.D. Ca.), a class action brought on behalf of purchasers of houses built by KB Home.  The plaintiffs in this action describe a process whereby KB Home paid Countrywide to make loans with subsidized initial payments to KB Home borrowers.  This allowed  KB Home to prop up the ostensible sales price of the houses and sell to buyers who would not otherwise be able to afford or qualify for the monthly mortgage payments.   In turn, Countrywide had its Landsafe appraisers ignore the subsidies and appraise the houses at the full stated sales price, thereby inflating the actual value of the house.

125.   In *Capitol West Appraisals, LLC v. Countrywide Financial Corp.*, No. 2:08-cv-01520 (W.D. Wash.), *Clark v. Countrywide Home Loans, Inc.*, No. 2:09-cv-00036 (W.D. Wash.) and *Johnson v. KB Home*, No. 2:09-cv-00972-FJM

43

EXHIBIT 144      170

(D. Ariz.) – putative class actions filed on behalf of real estate appraisers and homeowners nationwide – the plaintiffs allege that Countrywide engaged in widespread appraisal-related misconduct by inflating the value of properties in order to support the loans that it wished to make.  The plaintiffs in *Clark* allege that Countrywide often required the borrower to have the property appraised by its affiliates, LandSafe, Inc. and LandSafe Appraisal Services, Inc. These lawsuits allege that this conduct violated the federal law requiring an in-house or "staff appraiser" at a bank – as opposed to an independent contractor – to "be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property."

126.  In a stunning admission of its flagrant departure from proper appraisal methods, since the end of 2007, Countrywide has tightened its standards for appraisals it will accept.  For example, in a fall 2007 letter to its "Valued Business Partner[s]," Countrywide provided "additional appraisal due diligence controls" in soft markets "in an effort to make decisions based on accurate current market values and trends."

## VI.   THE CREDIT RATINGS ASSIGNED TO COUNTRYWIDE'S CERTIFICATES MATERIALLY MISREPRESENTED THE CREDIT RISK OF THE CERTIFICATES

127.  The investment grade credit ratings of the Certificates were an important factor in Plaintiff Progressive's decision to purchase the Certificates. Because Plaintiff is a conservative institutional investor, it purchased only investment grade Certificates, ranked between AA+ and A- by Standard & Poor's.

128.  Investment grade securities are understood by investors to be stable, secure and safe.  According to Standard and Poor's, the default rate on all investment grade corporate bonds (including AA, A and BBB) from 1981 to

COMPLAINT

EXHIBIT 144          171

2007, for example, averaged about .094% per year and was not higher than 0.41% in any year.

129.   The Defendants well understood (and banked on) the importance that purchasers of mortgage-backed securities attached to credit ratings.   In most cases, the purchasers were institutional investors such as Progressive who did not have the knowledge, means or wherewithal to independently analyze the mortgage pools underlying any particular offering to verify for themselves that the ratings were accurately determined.

130.   Accordingly, Defendants featured the ratings prominently in the Offering Documents and discussed at length the ratings assigned to the Certificates, and the bases for the ratings.   Each Prospectus Supplement stated that the issuance of each tranche of the Certificates was conditioned on the assignment of particular, investment-grade ratings, and listed the ratings in a chart.

131.   Unbeknownst to Progressive and other investors, at all relevant times, Defendants knew that the ratings were not reliable because those ratings were bought and paid for, and were supported by, flawed information provided by Defendants to the rating agencies.   In fact, Countrywide manipulated the rating agencies to obtain the desired ratings for the Certificates.

132.   Specifically, the ratings of the Certificates were significantly compromised by the misinformation provided by Countrywide to the rating agencies.   Among other matters, Countrywide did not disclose to the rating agencies that the Company had abandoned its underwriting standards by, among other things, adopting a "matching" policy; manipulating the assets, liabilities, income and other important information concerning a borrower; using false metrics to qualify a borrower; and aggressively using exceptions to qualify borrowers.  Countrywide did not disclose that, in obtaining appraisals to value the underlying collateral, it used inflated appraisals that departed from industry

COMPLAINT

EXHIBIT 144        172

approved standards. Countrywide did not otherwise disclose its knowledge of the pervasive fraud that affected the mortgages underlying the Certificates.

133.   Apart from supplying incomplete and false information to the rating agencies, Countrywide also manipulated its relationship with the rating agencies in order to achieve the desired ratings. The rating agencies received enormous revenues from the issuers who paid them for rating their securities. Because the desired rating of a securitized product was the starting point for any securities offering, the rating agencies were actively involved in helping Countrywide structure the products to achieve the requested rating. As a result, the rating agencies essentially worked backwards, starting with Countrywide's target rating and then working toward a structure that would yield the desired rating. Among other things, the rating agencies instructed Countrywide on how much "credit enhancement" to provide to each tranche of the Certificates, in order to secure the desired ratings.

134.   In this manner, Countrywide was able to manipulate the rating agencies to achieve the inflated ratings it desired. Through repeated communications with the rating agencies, Countrywide effectively was able to reverse engineer aspects of the ratings models and then modify the structure of an offering to improve the ratings without actually improving the underlying credit quality.

135.   In a 2008 Report entitled "Summary Report of Issues Identified in the Commission Staff's Examinations of Select Credit Rating Agencies", the SEC confirms that the issuers and the rating agencies worked together so that securities would receive the highest ratings:

> [T]ypically, if the analyst concludes that the capital structure of the RMBS does not support the desired ratings, this preliminary conclusion would be conveyed to the arranger. The arranger could accept that determination and have the trust issue the securities with the proposed capital structure and the lower rating or adjust the

46

structure to provide the requisite credit enhancement for the senior tranche to get the desired highest rating. Generally, arrangers aim for the largest possible senior tranche, i.e., to provide the least amount of credit enhancement possible, since the senior tranche -- as the highest rated tranche -- pays the lowest coupon rate of the RMBS' tranches and, therefore, costs the arranger the least to fund.

136. The rating process was further compromised by the practice of "rating shopping." Countrywide did not pay for the credit rating agencies' services until after the agencies submitted a preliminary rating. Essentially, this practice created bidding wars in which the issuers would hire the agency that was providing the highest rating for the lowest price. The credit rating agencies were only paid if they delivered the desired investment grade ratings, and only in the event that the transaction closed with those ratings. "Ratings shopping" jeopardized both the integrity and independence of the rating process.

137. As a result, the Certificates were not worthy of the investment grade ratings given to them, as evidenced most clearly by the fact that many of the Certificates – all initially awarded investment grade ratings – have now been downgraded, a vast number of the underlying loans have been foreclosed upon, and the remaining underlying loans are suffering from crippling deficiencies and face serious risks of default. The collective downgrade of investment grade-rated Certificates indicates that the ratings set forth in the Offering Documents were false, unreliable and inflated.

138. By including and endorsing the investment grade ratings contained in the Offering Documents, Defendants falsely represented that they actually believed that the ratings were an accurate reflection of the credit quality of the Certificates.

47

COMPLAINT

EXHIBIT 144      174

## VII. COUNTRYWIDE FAILED TO ENSURE THAT TITLE TO THE UNDERLYING MORTGAGE LOANS WAS EFFECTIVELY TRANSFERRED

139. A fundamental aspect of the mortgage securitization process is that the issuing trust for each offering must obtain good title to the mortgage loans comprising the pool for that offering. This is necessary in order for the holders of the RMBS to be legally entitled to enforce the mortgage loans in the event of default. Two documents relating to each mortgage loan must be validly transferred to the trust as part of the securitization process – a promissory note and a security instrument (either a mortgage or a deed of trust).

140. The rules for these transfers are governed by the law of the state where the property is located, by the terms of the pooling and servicing agreement ("PSA") for each securitization, and by the law governing the issuing trust (with respect to matters of trust law). In general, state laws and the PSAs require the promissory note and security instrument to be transferred by indorsement, in the same way that a check can be transferred by indorsement, or by sale. In addition, state laws generally require that the trustee of the issuing trust have physical possession of the original, manually signed promissory note in order for the loan to be enforceable by the trustee against the borrower in the event of a default by the borrower.

141. In order to preserve the bankruptcy-remote status of the issuing trusts in RMBS transactions, the notes and security instruments are generally not directly transferred from the mortgage loan originator to the trust. Rather, the notes and security instruments are initially transferred from the originator to the depositor, either directly or via one or more special-purpose entities. After this initial transfer to the depositor, the depositor transfers the notes and security interests to the issuing trust for the particular securitization. Each of these transfers must be valid under applicable state law in order for the trust to have good title to the mortgage loans.

48

142.   To ensure that the trust qualifies as a tax-free real estate mortgage investment conduit ("REMIC"), the PSA generally requires the transfers to the trust to be completed within a strict time limit after formation of the trust. Furthermore, the applicable trust law in each state generally requires strict compliance with the trust documents, including the PSA, so that failure to comply strictly with the timeliness, indorsement, physical delivery and other requirements of the PSA with respect to the transfers of the notes and security instruments means that the transfers would be void and the trust would not have good title to the mortgage loans.

143.   The Offering Documents for the Certificates represented in substance that the Issuing Trust for the respective offering had obtained good title to the mortgage loans comprising the pool underlying the offering.  However, in actual fact, Countrywide routinely and systematically failed to comply with the requirements of applicable state laws and the PSAs for valid transfers of the notes and security instruments.  This has come to light as a result of recent foreclosure proceedings in connection with mortgage loans securitized by Countrywide.

144.   For example, in *Kemp v. Countrywide Home Loans, Inc.*, Bkrtcy. No. 08-18700 (D.N.J.), Countrywide sought to prove that the Bank of New York, as trustee for an issuing trust that purportedly held Mr. Kemp's mortgage, was entitled to enforce the mortgage.  Countrywide presented testimony by Linda DeMartini, who had been employed by Countrywide Home Loans Servicing L.P. ("Countrywide Servicing"), a servicer of residential home mortgage loans, for almost ten years as of August 2009 and was then a supervisor and operational team leader for the Litigation Management Department of Countrywide Servicing.  Ms. DeMartini testified that, in her extensive career in the mortgage loan servicing business of Countrywide, "I had to know about everything … ."

145.   According to Ms. DeMartini, Defendant CHL originated Mr. Kemp's loan in 2006 and transferred it to the Bank of New York as trustee for the

COMPLAINT

EXHIBIT 144      176

issuing trust, but Countrywide Servicing retained the original note in its own possession and never delivered it to the Bank of New York because Countrywide Servicing was the servicer for the loan.  Ms. DeMartini further testified that an "allonge" to the promissory note, which purported to transfer the note to the trust by indorsement, was prepared only for purposes of the litigation in 2009, long after the purported transfer of the loan to the trust in 2006, and also was never delivered to the trustee.  Ms. DeMartini testified that there was no ordinary business practice of signing an allonge at the time a note was purportedly transferred.  Critically, Ms. DeMartini testified that it was standard operating procedure for the physical documents to be retained within the corporate entity, that is, Countrywide, as opposed to providing it to the relevant issuing trust.  According to Ms. DeMartini, that was "***the normal course of business [because] we are the servicer, [and] we're the ones that are doing all the servicing, and that would include retaining the documents.***"

146.   In this manner, Countrywide routinely did not transfer the original mortgage loan documents to the issuing trusts for RMBS transactions, but rather retained the original documents itself.  Consequently, Defendants failed to validly assign the promissory notes and security instruments associated with many of the mortgage loans underlying the Certificates purchased by Plaintiff Progressive.

**VIII.   COUNTRYWIDE KNOWINGLY CHERRY-PICKED THE HIGHEST QUALITY LOANS FOR ITS OWN PORTFOLIO AND SOLD ONLY THE RISKIEST LOANS TO PLAINTIFF AND OTHER INVESTORS**

147.   In the Prospectus Supplements, Countrywide stated that it would not select loans for securitization "in a manner intended to affect the interests of the certificateholders adversely."  This was a material representation as Plaintiff and other investors relied on assurances from Countrywide that the loans included in the pools for the Certificates were high-quality loans that had low credit risk.

148.   In reality, Countrywide was acting adversely to the interests of Plaintiff and other Certificate purchasers.   Countrywide protected its own

50

investment portfolio by choosing the best quality loans for retention, while selling

the riskiest loans to secondary market investors, including Plaintiff Progressive.

149.   In the SEC Action, Countrywide's former Chief Risk Officer, Clifford Rossi, testified that in general the Company attempted to cherry-pick the best loans for its own investment portfolio.  Rossi stated that "the general strategy that had been provided to me from people like Carlos Garcia [Executive Managing Director of Banking and Insurance at Countrywide] and Jim Furash [President of Countrywide Bank] and that would have been conveyed back again from -- from the parent was that -- and this is when I first started there, *was that the bank was to originate and to cherry pick the better quality assets.*" (emphasis added).

150.   Defendants were aware of the Company's practice of cherry-picking the better quality loans for its own portfolio as well as the fact that it would negatively affect the secondary market securitizations.  On August 2, 2005, Defendant Sambol expressed his concerns regarding the company's policy of "cherry-picking" the best loans for itself in an e-mail to Mozilo and Defendant Kurland and Carlos Garcia.  He stated,  "While it makes sense for us to be selective as to the loans which the Bank retains, *we need to analyze the securitization implications on what remains if the bank is only cherry-picking and what remains to be securitized/sold is overly concentrated with higher risk loans*. This concern and issue gets magnified as we put a bigger percentage of our pay option production into the Bank *because the remaining production then increasingly looks like an adversely selected pool*."  (emphasis added).

## IX.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

151.   In light of (a) the systematic abandonment by Countrywide of its underwriting guidelines; (b) the failure by Countrywide to obtain independent and accurate property appraisals; (c) the true credit risk of the underlying mortgages;

COMPLAINT

EXHIBIT 144      178

(d) the failure to properly convey legal title to the Issuing Trusts; and (e) Countrywide's policy of cherry-picking loans for securitization, all as described above, the Offering Documents disseminated by Defendants in the course of selling the Certificates contained numerous false statements and omissions, as set forth below.

### A.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING COUNTRYWIDE'S UNDERWRITING GUIDELINES

152.   Defendants issued Offering Documents that contained the following misrepresentations concerning Countrywide's underwriting guidelines and practices, using identical or substantially similar language:

> (a)   "The Mortgage Loans will have been originated in accordance with the underwriting guidelines of the Originators for credit blemished mortgage loans, which will be referred to in this prospectus supplement as the underwriting guidelines. ***Generally, under the underwriting guidelines, the Originator reviews the applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, reviews the credit history of the applicant, calculates the debt service-to-income ratio to determine the applicant's ability to repay the loan, reviews the type and use of the property being financed and reviews the property. The underwriting guidelines generally require that mortgage loans be underwritten in a standardized procedure which complies with applicable federal and state laws and regulations and requires the Originator's underwriters to be satisfied that the value of the property being financed, as indicated by an appraisal and a review of the appraisal currently supports the outstanding loan balance.***" (emphasis added)

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents: Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at S-48); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at

EXHIBIT 144      179

S-28 – S-29); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at S-47); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at S-27).

> (b)    "Each prospective borrower completes an application which includes information with respect to the applicant's assets, liabilities, income and employment history, as well as certain other personal information.  Countrywide Home Loans requires an independent credit bureau report on the credit history of each applicant in order to evaluate the applicant's prior willingness and/or ability to repay. . . .
>
> After obtaining all applicable employment, credit and property information, Countrywide Home Loans uses a debt-to-income ratio to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations. The "DEBT-TO-INCOME RATIO" is the ratio of the borrower's total monthly credit obligations to the borrower's gross monthly income. The maximum monthly debt-to-income ratio varies depending upon a borrower's credit grade and documentation level (as described below) but does not generally exceed 50%."

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at S-47); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at S-28); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at S-47); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at S-26 – S-27).

153.   The above statements of material fact were untrue when made because they failed to disclose that Countrywide had systematically abandoned its

COMPLAINT

EXHIBIT 144      180

stated underwriting standards, as well as underwriting standards imposed by state and federal law, in issuing the mortgages pooled into the Issuing Trusts. Specifically:

      (a)    In contravention of its underwriting guidelines, Countrywide systematically ignored borrowers' repayment ability and the value and adequacy of the underlying collateral.

      (b)    In contravention of Countrywide's underwriting guidelines, Countrywide employees ignored borrowers' debt-to-income ratios and instead extended loans even where income, occupation and other information was missing. If the information that was provided was patently incorrect, Countrywide intentionally ignored the deficiencies and failed to conduct verifications when the means to do so were readily available. Countrywide employees coached borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, thereby circumventing the underwriting guidelines. Countrywide employees circumvented the underwriting guidelines by converting loans requiring full documentation into low-documentation or no-documentation loans. In this way, Countrywide was able to steer applicants to NINA and SISA loans in situations where the borrowers would not otherwise have qualified for full documentation loans.

      (c)    In contravention of its underwriting guidelines, Countrywide knowingly approved loans based on false metrics, such as the borrowers' ability to repay based on introductory and one-off "teaser rates", despite Countrywide's knowledge that the borrowers would not be able to afford the "fully indexed rate" when the teaser rate expired.

COMPLAINT

**B.   DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS REGARDING COUNTRYWIDE'S USE OF EXCEPTIONS**

154.   Defendants issued Offering Documents that contained the following misrepresentations concerning Countrywide's policy with respect to underwriting exceptions:

(a)   **"**Exceptions to the sponsor's underwriting guidelines will be made **when compensating factors are present."** (emphasis added)

Language identical or substantially similar to the above misstatement was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at S-20); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at S-28); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at S-20); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at S-26).

(b)   "On a case by case basis, Countrywide Home Loans may determine that, **based upon compensating factors**, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception." (emphasis added)

Language identical or substantially similar to the above misstatement was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at S-12); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at S-28); Registration Statement filed by CWABS on Form 3/A on October 9, 2003

55

EXHIBIT 144      182

(at S-47); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at S-8).

155.   The above statements of material facts were untrue when made because they failed to disclose that, in order to generate increased loan volume for securitizations, and in contravention of Countrywide's underwriting guidelines, Countrywide allowed non-qualifying borrowers to be approved for loans under "exceptions" to Countrywide's underwriting standards, even though there were no "compensating factors" that could possibly justify such an exception. Countrywide incentivized its employees to liberally apply exceptions to Countrywide's underwriting policies, and created specific procedures and implemented software to systematically override or alter the recommendations of Countrywide's CLUES underwriting system that was meant to weed out non-qualifying loans.

C.   **DEFENDANTS MADE UNTRUE STATEMENTS AND OMISSIONS REGARDING APPRAISALS AND LTV RATIOS**

156.   The Offering Documents represented that independent appraisals were prepared for each mortgaged property and that reports were prepared to substantiate these appraisals.  For example, the Offering Documents contained, in sum or substance, the following representation:

(a)   "In determining the adequacy of the property to be used as collateral, an appraisal will generally be made of each property considered for financing.  The appraiser is generally required to inspect the property, issue a report on its condition and, if applicable, verify construction, if new, has been completed.  The appraisal is generally based on the market value of comparable homes, the estimated rental income (if considered applicable by the appraiser) and the cost of replaced the home.  ***The value of the property being financed, as indicated by the appraisal, must be such that it currently supports, and is anticipated to support in the future, the outstanding loan balance.***"  (emphasis added)

56

COMPLAINT

EXHIBIT 144        183

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at 23); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at 23); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at 23); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at 23).

(b)  "*Countrywide Home Loans' underwriting standards are applied in accordance with applicable federal and state laws and regulations and require an independent appraisal of the mortgaged property* prepared on a Uniform Residential Appraisal Report (Form 1004) or other appraisal form as applicable to the specific mortgaged property type. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home and generally is required to have been made not earlier than 180 days prior to the date of origination of the mortgage loan. Every independent appraisal is reviewed by a representative of Countrywide Home Loans before the loan is funded, and an additional review appraisal is generally performed in connection with appraisals not provided by Landsafe Appraisals, Inc., a wholly owned subsidiary of Countrywide Home Loans … Variations in maximum loan amount limits are permitted based on compensating factors." (emphasis added)

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at S-47); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at

57

S-29); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at S-47); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at S-27).

157.   The above representations were materially false and misleading in that they omitted to state that: (i) Countrywide violated its stated appraisal standards and in many instances materially inflated the values of the underlying mortgaged properties used to collateralize the Certificates; (ii) the appraisers were not independent from Countrywide, and Countrywide in fact exerted pressure on appraisers to come back with pre-determined, inflated and false appraisal values; (iii) the inflated appraisals obtained by Countrywide did not conform to USPAP and were not market data analyses of comparable homes in the area or analyses of the cost of construction of a comparable home; and (iv) the forms of credit enhancement applicable to certain tranches of the Certificates were affected by the total value of the underlying properties, and thus were inaccurate as stated. Countrywide omitted to disclose that it subordinated proper appraisals to the goal of originating and securitizing as many mortgage loans as it could.

158.   The Offering Documents also provided information regarding LTV ratios, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.  Using identical or substantially similar language, the Offering Documents stated that:

> "Countrywide Home Loans's underwriting standards permit first mortgage loans with loan-to-value ratios at origination of up to 100% and second mortgage loans with combined loan-to-value ratios at origination of up to 100% depending on the program, type and use of the property, documentation level, creditworthiness of the borrower, debt-to-income ratio and loan amount".

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at S-47 – S-48); Prospectus

COMPLAINT

EXHIBIT 144      185

Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at S-29); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at S-47 – S-48); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at S-27).

159.   Each Prospectus Supplement referenced and incorporated into each Registration Statement stated the average LTV ratio of the mortgage loans included in the Issuing Trusts and the maximum LTV ratio of mortgage loans included in the Issuing Trusts.  The prospectus Supplements described the LTV ratio of mortgages as equal to: (1) the principal balance of the mortgage loan at the date of origination, divided by; (2) the collateral value of the related mortgaged property, where the "collateral value" was the lesser of either the appraised value based on an appraisal made for Countrywide by an independent fee appraiser at the time of the origination of the related mortgage loan, or the sales price of the mortgaged property at the time of origination.

160.   All of the representations regarding LTV ratios, described above, were materially false and misleading because the underlying appraisals used to determine the LTVs were improperly performed.  The actual LTV ratios for numerous mortgage loans underlying the Certificates would have exceeded 100% if the underlying properties had been appraised by an independent appraiser according to USPAP as represented in the Offering Documents.

**D.   DEFENDANTS MATERIALLY MISREPRESENTED THE ACCURACY OF THE CREDIT RATINGS ASSIGNED TO THE CERTIFICATES**

59

EXHIBIT 144     186

161.   Defendants represented in the Offering Documents that the Certificates purchased by Plaintiff were rated as investment grade between "AA+ and A –" signifying that the risk of loss was minimal.

162.   Defendants further represented in the Offering Documents, using identical or substantially similar language, that:

> "It is a condition to the issuance of the securities of each series offered hereby and by the prospectus supplement that they shall have been rated in one of the four highest rating categories by the nationally recognized statistical rating agency or agencies (each, a "Rating Agency") specified in the related prospectus supplement.
>
> **Any such rating would be based on, among other things, the adequacy of the Trust Fund Assets and any credit enhancements with respect to such class** and will reflect such Rating Agency's assessment solely of the likelihood that holders of a class of securities of such class will receive payments to which such securityholders are entitled under the related Agreement." (emphasis added)

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at 104); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at 104); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at 103); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at 104).

163.   By touting the ratings of the Certificates, and in making the above statements in the Offering Documents, Defendants represented that they believed that the information provided to the rating agencies to support these ratings accurately reflected Countrywide's underwriting guidelines and practices, and the specific qualities of the underlying loans.  This representation was false, because

COMPLAINT

EXHIBIT 144      187

Countrywide did not disclose to the rating agencies the extent of Countrywide's improper underwriting and appraisals, and Countrywide otherwise gamed the rating agencies to ensure it obtained the highest ratings even when those ratings were not warranted.  The falsity of this representation is further evidenced by the rapid downgrades of nearly all of the Certificates within a few years of issuance.

E.   **DEFENDANTS MATERIALLY MISREPRESENTED COUNTRYWIDE'S TRANSFER OF GOOD TITLE TO THE MORTGAGE LOANS TO THE ISSUING TRUSTS**

164.   Defendants stated in each of the Offering Documents, using identical or substantially similar language, that:

> "[T]he depositor will also deliver or cause to be delivered to trustee (or to the custodian) for each single family loan, multifamily loan or home equity loan,
> The mortgage note or contact endorsed without recourse in blank or to the order of the trustee,
> The mortgage, deed of trust or similar instrument (a "Mortgage") with evidence of recording indicated thereon . . .
> An assignment of the Mortgage to the trustee, which assignment will be in recordable form in the case of a Mortgage assignment, and
> Any other security documents, including those relating to any senior interests in the Property, as may be specified in the related prospectus supplement or the related Agreement."

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at 49); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at 49); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at 48); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at 49).

61

COMPLAINT

EXHIBIT 144     188

165.   These representations were false because Defendants routinely failed to physically deliver the original promissory notes and security instruments for the mortgage loans to the issuing trusts, as required by applicable state laws and the PSAs.   These representations were also false because Defendants routinely failed to execute valid indorsements of the documents at the time of the purported transfer, as also required by applicable state laws and the PSAs.   The Issuing Trusts therefore did not possess good title to many of the mortgage loans and lacked legal authority to enforce many of the mortgage loans against the borrowers in the event of default.

## F.   DEFENDANTS MATERIALLY MISREPRESENTED THAT THEY DID NOT CHERRY-PICK MORTGAGE LOANS FOR INCLUSION IN COUNTRYWIDE'S SECURITIZATIONS

166.   The Offering Documents stated, using identical or substantially similar language, that mortgage loans added to the pool after the closing date would be:

> "selected in a manner reasonably believed not to be adverse to the interests of the certificateholders."

Language identical or substantially similar to the above misstatements was contained in the following Offering Documents:  Registration Statement filed by CWABS on Form S-3/A on June 10, 2005 (at S-46); Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-BC5 filed by CWABS on Form 424B5 on December 28, 2005; Prospectus Supplement for CWABS Asset-Based Certificates Trust 2005-7 filed by CWABS on Form 424B5 on June 30, 2005 (at S-27); Registration Statement filed by CWABS on Form 3/A on October 9, 2003 (at S-46); Prospectus Statement for Asset-Based Certificates Series 2004-06 filed by CWABS on Form 424B on July 1, 2004 (at S-25).

62

EXHIBIT 144       189

167.   The above statement was false because, in actual fact, Countrywide systematically and routinely cherry-picked the worst mortgage loans for inclusion in Countrywide's securitizations, retaining the best loans for Countrywide's own portfolio.  Countrywide thus in fact acted adversely to the interests of Plaintiff and other purchasers of Certificates.

## X.   DEFENDANTS KNEW THAT THE OFFERING DOCUMENTS CONTAINED MATERIAL MISSTATEMENTS AND OMISSIONS

168.   The allegations below are made in support of Plaintiff's claims under the Exchange Act, sections 25400(d), 25500, and 25504.1 of the California Corporations Code and common-law fraud.

169.   As set forth above, at all relevant times, Defendants knew that the Offering Documents contained material misstatements and omissions. Defendants' knowledge is evidenced by, among other things, the following:

- Countrywide intentionally abandoned its underwriting guidelines by deliberately adopting a "matching" strategy to keep pace with competitors.  Countrywide continued with this strategy even though certain officers warned of the sharp deterioration in Countrywide's underwriting standards.  *See supra* ¶¶ 72 to 78.

- Countrywide intentionally abandoned its underwriting guidelines by deliberately ignoring or manipulating the borrower's ability and willingness to repay a given loan.  Countrywide even permitted its employees to coach borrowers to misstate their income on loan applications to qualify for mortgage loans under Countrywide's underwriting standards, thereby circumventing the underwriting guidelines.  *See supra* ¶¶ 79 to 91.

- Countrywide intentionally abandoned its underwriting guidelines by deliberately using false metrics to assess borrowers' ability to repay. As set forth above, senior Countrywide executives, including Mozilo, were acutely aware of the dangers of these practices, and regularly discussed the potential crisis when the "teaser" interest rates on Countrywide's ARM products expired, resulting in "payment shock" for the borrowers.  Reflecting their intentional abandonment of underwriting guidelines, Countrywide's executives nevertheless justified continuing with their practices because Countrywide would off-load the mortgage loans into the secondary market through securitization.  *See supra* ¶¶ 92 to 104.

63

COMPLAINT

EXHIBIT 144       190

- Countrywide intentionally abandoned its underwriting guidelines by creating a sophisticated, permissive culture by which underwriting "exceptions" were liberally issued to borrowers. Employees at all levels were allowed to ignore and over-ride the recommendations of Countrywide's highly touted CLUES underwriting program. Countrywide continued these practices despite repeated warnings from Countrywide's risk officers of the likelihood of high default rates for loans originated as exceptions. *See supra* ¶¶ 105 to 114.

- Countrywide systematically and intentionally corrupted the appraisals of the property collateralizing the mortgage loans that Countrywide originated. By threatening to blackball and otherwise pressuring appraisers to inflate home values, Countrywide was methodically and deliberately enlisting appraisers in a scheme to inflate real estate appraisals in contravention of industry approved appraisal standards. *See supra* ¶¶ 115 to 126.

- Countrywide collaborated with and gamed the rating agencies in order to secure the highest ratings for Countrywide's RMBS. Countrywide did not disclose the extent of its abandonment of its underwriting guidelines or its use of improper appraisals. Countrywide collaborated with the rating agencies to structure Countrywide's offerings of securities and to obtain sufficient "credit enhancement" to obtain the highest ratings possible. Where the ratings were not to Countrywide's satisfaction, Countrywide went to another rating agency to "shop" for a higher rating. *See supra* ¶¶ 127 to 138.

- Countrywide knew that legal title to the underlying mortgages was not being properly conveyed to the Issuing Trusts, but deliberately failed to take steps to remedy this deficiency. *See supra* ¶¶ 139 to 146.

170. Additionally, Countrywide's knowledge is clearly evidenced by Countrywide's self-interested conduct in protecting its own investment portfolio by choosing the best quality loans for retention, while selling the riskiest loans to secondary market investors, including Plaintiff Progressive. This conduct was confirmed in the SEC Action, in which Countrywide's former Chief Risk Officer Clifford Rossi testified that, in general, the Company attempted to "cherry-pick" the best loans for its own investment portfolio.

171. Finally, in the SEC Action, relying on some of the evidence referenced in this Complaint, the United States District Court for the Southern District of New York has denied the motions for summary judgment filed by

64

EXHIBIT 144      191

Defendants Mozilo, Sambol and Sieracki, explicitly holding that there was evidence from which a jury could find scienter:

> Here, the SEC has presented evidence from which a reasonable jury could conclude that Defendants possessed the requisite scienter.  For example, the SEC has demonstrated that defendants were aware that Countrywide routinely ignored its underwriting guidelines and that Defendants understood the accompanying risks……The SEC has also presented evidence that Sambol was aware that Countrywide's matching strategy resulted in Countrywide's composite guidelines being the most aggressive guidelines in the industry….

> Moreover, in addition to demonstrating that Defendants were aware of the facts which made their statements misleading, the SEC has presented evidence that Sambol and Sieracki knew that Countrywide's Chief Risk Officer John McMurray firmly believed that Countrywide should include greater risk disclosure in its SEC filings… .

> ***Accordingly, the SEC's evidence is sufficient to raise a genuine issue of material fact with respect to Defendants' scienter, and summary judgment is inappropriate***.

*S.E.C. v. Mozilo*, 2010 WL 3656068, at *16-20.

## XI.   PLAINTIFF PROGRESSIVE HAS SUFFERED LOSSES ON ITS PURCHASES OF CERTIFICATES

### A.   CWABS ASSET-BACKED SECURITIES TRUST 2005-BC5

172.   On May 29, 2008 Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2005-BC5, when they were rated Aa1 by Moody's, but the Certificates have since been downgraded and are currently rated Caa1.  At the time of filing of this Complaint, the Certificates were trading at 73% of their purchase price.

### B.   CWABS ASSET-BASED CERTIFICATES TRUST 2005-7

173.   On August 9, 2007 Plaintiff purchased Certificates issued by CWABS Asset-Backed Certificates Trust 2005-7, when they were rated A3 by

COMPLAINT

EXHIBIT 144      192

Moody's, but the Certificates have since been downgraded and are currently rated C.  At the time of filing of this Complaint, the Certificates were trading at 12% of their purchase price.

### C.   ASSET-BACKED CERTIFICATES SERIES 2004-06

174.   On March 16, 2007 Plaintiff purchased Certificates issued by Asset-Backed Certificates Series 2004-06 trust, when they were rated Baa3 by Moody's, but the Certificates have since been downgraded and are currently rated Ca.  At the time of filing of this Complaint, the Certificates were trading at 2.9% of their purchase price.

## XII.   THE LIABILITY OF THE CONTROL PERSON DEFENDANTS

### A.   DEFENDANT CFC

175.   Defendant CFC was in a position to and in fact controlled each of Defendants CHL, CSC, CCM and the Issuing Defendant CWABS.

176.   Defendant CFC operated its consolidated subsidiaries (including the Issuing Defendant) as a collective enterprise, making significant strategic decisions for its subsidiaries, monitoring enterprise-wide risk, and maximizing profit for CFC's executives and shareholders.  As reported in CFC's 2003 Form 10-K, although mortgage banking remained CFC's "core business," it had expanded operations in recent years "to capitalize on meaningful opportunities to leverage our core Mortgage Banking business and to provide sources of earnings that are less cyclical than the mortgage banking business."  In other words, CFC operated an enterprise that involved ramping up mortgage loan origination and then establishing Countrywide subsidiaries to facilitate the packaging of the mortgage loans for sale as RMBS.  Throughout the relevant time period, CFC filed consolidated Form 10-Ks that provided a cumulative assessment of the operations of CFC and all of its subsidiaries including the other Countrywide entity Defendants.

66

EXHIBIT 144        193

177. Unlike arms-length securitizations where the loan originator, depositor, underwriters, and issuers are unrelated third parties, here the transactions among the loan originator (CHL), the depositors, the Issuing Defendant, the Issuing Trusts, and the primary underwriter (CSC) were not arms-length transactions at all. CFC controlled every aspect of the origination and securitization processes.

178. All of the mortgage loans underlying the Certificates were originated by CHL, a wholly-owned subsidiary of CFC, or were acquired by CHL from other lenders.

179. CFC then created CWABS, the Issuing Defendant, a Delaware corporations structured as a limited purpose wholly-owned subsidiary to acquire mortgage loans from CHL and to transfer the loans to the Issuing Trusts for sale to investors as RMBS. As the depositors, the Issuing Defendant was a shell corporation that had no assets of its own and was controlled by CFC through its appointment of CFC executives (Sieracki, Kurland, and Sambol, among others) as its directors and officers. Through these executives, CFC exercised actual day-to-day control over the Issuing Defendant. Revenues flowing from the issuance and sale of the Certificates were passed through to CFC.

180. The Issuing Defendant in turn created the Issuing Trusts. Like the Issuing Defendant, the Issuing Trusts were shell entities that were established for the sole purpose of holding the pools of mortgage loans assembled by the Issuing Defendant, and issuing Certificates collateralized against these mortgage pools to underwriters for sale to the public. Through the Issuing Defendant, CFC also exercised actual control over the Issuing Trusts.

181. CFC also participated in creating the Offering Documents and CFC executives signed the Offering Documents.

COMPLAINT

EXHIBIT 144      194

182.   In sum, CFC maintained a high level of day-to-day scrutiny and control over its subsidiaries, and controlled the entire process leading to the sale of the Certificates to Progressive.

183.   CFC culpably participated in the violations of the Issuing Defendant and CSC discussed below.   CFC controlled the guidelines for loan origination, determined which traditional or non-traditional loan products to offer, set protocols for servicing the mortgage loans it originated or purchased from other lenders and for which it had servicing rights, approved the manner in which it sold the loans it elected to securitize, and controlled the disclosures made in connection with those securitizations.   Among other misconduct, CFC oversaw the actions of its subsidiaries and allowed them, including Defendants CHL and CSC, to engage in underwriting practices that were inconsistent with the descriptions presented in the Offering Documents, and to misrepresent the mortgage loans' characteristics in the Offering Documents.

**B.   DEFENDANT CCM**

184.   Defendant CCM was in a position to and in fact controlled each of Defendants CSC and the Issuing Defendant.

185.   CCM exercised a high level of day-to-day control over its subsidiary, CSC.   Mandates from CFC passed through CCM to CSC, and CSC followed priorities and practices established by CFC and CCM.

186.   As the division of the Countrywide enterprise charged with marketing the loans originated and acquired by CHL, CCM also exercised control over the Issuing Defendant and, through the Issuing Defendant, over the Issuing Trusts.   Along with CFC, CCM determined and approved the manner in which CSC and the Issuing Trusts selected and securitized the loans as RMBS offerings, and controlled the disclosures made in connection with each securitization.

68

EXHIBIT 144      195

## C.   DEFENDANT MOZILO

187.   Defendant Mozilo was in a position to and in fact controlled each of Defendants CFC, CHL, CSC, CCM and the Issuing Defendant.

188.   Mozilo had numerous positions and roles within Countrywide that allowed Mozilo to control and influence all business operations of Defendant CFC and its subsidiaries.   Mozilo exercised his power to control and influence CFC and its subsidiaries (including CSC and the Issuing Defendant) through his involvement in the daily management of all phases of Countrywide's core operations.   This included both approving and overseeing CFC's and CHL's mortgage and loan product offerings, including the same mortgages and loans that were bundled together for the securitizations at issue in this litigation.   Mozilo was actively involved in the development, modification and implementation of CFC's guidelines for making and underwriting new loans and mortgages.   Mozilo has stated that "I participate every day in originations myself, and it keeps me apprised of what's happening."

189.   Mozilo also exercised his control and influence through meetings of senior management.   During CFC's monthly "Business Review" meetings, attended by Mozilo and other senior executives, the performance and operations of all Countrywide entities were discussed in detail.

190.   Mozilo controlled and influenced CFC and its subsidiaries via his membership of numerous CFC management committees and CFC's board of directors.   Mozilo was a member of the CFC Executive Strategy Committee, Finance Committee and Credit Committee.   Through this membership as well as his position on the board of directors, Mozilo was an integral member of Countrywide's decision-making team.   Because of Mozilo's participation in these committees, as well as his membership on the board of directors, he was up to speed on developments in the business practices of CFC and its subsidiaries and exercised control and influence over the entire business of CFC.

69

EXHIBIT 144   196

191.   In addition, through numerous statements disseminated to the public, Mozilo portrayed himself as the public face of CFC and conveyed that he was speaking on behalf of CFC and all of its subsidiaries.  Mozilo also exercised his control and influence over CFC and its subsidiaries by signing numerous materially false and misleading CFC documents filed with the SEC.

192.   Mozilo also had the power to control and influence and did control and influence CSC, a wholly-owned subsidiary of CFC.  Mozilo was a direct supervisor of Defendant Sambol, who directly supervised Ranjit Kripalani ("Kripalani"), during the time Kripalani was President, Chief Executive Officer, and Managing Director of CSC.  Kripalani regularly provided Sambol with business updates regarding CSC, which Sambol then discussed with Mozilo.

### D.   DEFENDANT SAMBOL

193.   Sambol had numerous positions and roles within Countrywide.  By virtue of his senior management positions, Sambol had the power to control and influence, and did control and influence, Defendants CFC, CHL, CSC, CCM and the Issuing Defendant.

194.   Sambol regularly exercised his authority to control and influence CFC and its subsidiaries by signing numerous materially false and misleading CFC documents filed with the SEC.  In numerous statements to the public, Sambol portrayed himself as a public face of CFC and its subsidiaries and conveyed that he was speaking on behalf of CFC, CHL and CFC's other subsidiaries (including CSC).

195.   Sambol was closely involved in the daily management of Countrywide's operations.  Sambol created, approved and oversaw CFC's mortgage and loan product offerings through its subsidiary CHL – including loans that were packaged together for the securitizations at issue in this case.  Sambol was the direct supervisor for Kripalani during Kripalani's tenure as President, CEO, and Managing Director of CSC.  Kripalani provided Sambol with regular

70

EXHIBIT 144      197

business updates regarding CSC, and Sambol provided direction to Kripalani regarding CSC's business.  Sambol had the power to control and influence, and did control and influence, CSC in his role as Kripalani's supervisor.

196.  Sambol was deeply involved in developing, modifying, and implementing guidelines for making and underwriting new loans and mortgages. Others within Countrywide routinely acknowledged that Sambol had the ultimate power to approve the relaxation of guideline requirements for issuing new loans and the implementation of any exceptions processes.   Sambol created the Exception Processing System, which was the software designed to approve exception loans routinely.  Sambol also was responsible for revising minimum FICO requirements under Countrywide's underwriting guidelines.  At Sambol's direction, CFC and CHL greatly expanded their roles in the subprime mortgage business despite warnings from employees that these loans were too risky.

197.  Sambol had the power to control and influence, and did control and influence, CFC and its subsidiaries through his membership on several CSC management and board of directors committees.  Sambol was a member of at least the following CFC committees: (1) Executive Strategy Committee; (2) Asset/Liability Committee; (3) Finance Committee; (4) Audit and Ethics Committee; and (5) Committee to Set Loan Loss Allowance. Through his membership of these committees and the Board, Sambol participated in Countrywide's decision-making team.

E.    **DEFENDANT KURLAND**

198.  Defendant Kurland was, at relevant times, Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors of Defendant CWABS.  Defendant Kurland was concurrently the Executive Vice President and Chief Operating Officer ("COO") of Defendant CFC.

EXHIBIT 144      198

199.   Kurland exercised his authority to control and influence Defendant CWABS and its subsidiaries by signing numerous materially false and misleading Registration Statements filed with the SEC.

200.   By virtue of his senior management positions, Kurland had the power to control and influence, and did control and influence, Defendant CWABS.

**F.    DEFENDANT SIERACKI**

201.   Defendant Sieracki was, at relevant times, Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer of Defendant CWABS. Defendant Sieracki was concurrently the Executive Vice President and CFO of Defendant CFC.

202.   By virtue of his senior management positions, Sieracki had the power to control and influence, and did control and influence, Defendant CWABS.

**G.    DEFENDANT BOONE**

203.   Defendant Boone was, at relevant times, Executive Vice President and a member of the Board of Directors of Defendant CWABS.

204.   By virtue of his senior management positions, Boone had the power to control and influence, and did control and influence, Defendant CWABS.

**H.    DEFENDANT ADLER**

205.   Defendant Adler was, at relevant times, President, CEO and a member of the Board of Directors of CWABS.

206.   By virtue of his senior management positions, Adler had the power to control and influence, and did control and influence, Defendant CWABS.

**I.    DEFENDANT MCLAUGHLIN**

207.   Defendant McLaughlin was, at relevant times, Executive Vice President, CFO and Treasurer of Defendant CWABS.

COMPLAINT

EXHIBIT 144      199

208.  By virtue of his senior management positions, McLaughlin had the power to control and influence, and did control and influence, Defendant CWABS.

209.  Defendant Spector was, at relevant times, Vice President and a member of the Board of Directors of Defendant CWABS.  Defendant Spector was concurrently the Senior Managing Director of Secondary Marketing of Defendant CFC.

## XIII.  THE LIABILITY OF BANK OF AMERICA AS THE SUCCESSOR-IN-INTEREST TO COUNTRYWIDE

210.  On January 11, 2008, Bank of America announced its plans to purchase CFC for $4.1 billion.  The acquisition was completed on July 1, 2008. This acquisition was a de facto merger because Bank of America intended to take over and did in fact take over CFC and its subsidiaries in their entirety and, thus, should carry the liabilities of CFC, CHL, CSC, and CCM as associative with the benefits it derived from the acquisition.

211.  In its 2008 Annual Report, Bank of America confirmed that "[o]n July 1, 2008, we acquired Countrywide," and stated that the merger "significantly improved our mortgage originating and servicing capabilities, making us a leading mortgage originator and servicer."  In the Q&A section of the same report, the question was posed: "How do the recent acquisitions of Countrywide and Merrill Lynch fit into your strategy?" Bank of America responded that, by acquiring Countrywide, it became the "No. 1 provider of both mortgage originations and servicing" and "as a combined company," it would be recognized as a "responsible lender who is committed to helping our customers become successful homeowners." (emphasis added).  The annual report further stated that "Countrywide's results of operations were included in [Bank of America's] results beginning July 1, 2008.  Similarly, in a July 1, 2008 CFC press

COMPLAINT

EXHIBIT 144      200

release, Mozilo stated that "the combination of Countrywide and Bank of America will create one of the most powerful mortgage franchises in the world."

212.   On November 7, 2008, CFC transferred substantially all of its assets to Bank of America.  Around that time, CFC ceased filing its own financial statements, and its assets and liabilities are now instead included in Bank of America's financial statements.

213.   On April 27, 2009, Bank of America rebranded CHL as "Bank of America Home Loans."  According to press reports, Bank of America Home Loans will operate out of Countrywide's offices in Calabasas, California with substantially the same employees as the former Countrywide entities.  Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand.  On Bank of America's Form 10-K filed on February 26, 2010, both CCM and CSC were listed as Bank of America subsidiaries.

214.   Additionally, CFC's former website now redirects to the Bank of America website.  Under the "Merger History" tab of Bank of America's website, Countrywide is included among the list of companies Bank of America has acquired.  Under the "Time Line" tab, the website states that Bank of America "became the largest consumer mortgage lender in the country" following its acquisition of Countrywide in 2008.  Furthermore, under the "Our Heritage" tab, the website states that the acquisition of Countrywide "resulted in the launch of Bank of America Home Loans in 2009, making the bank the nation's leading mortgage originator and servicer."  The Countrywide logo appears on the page.

215. As of September 21, 2009, former Countrywide bank deposit accounts were reportedly converted to Bank of America accounts.  Additionally, on November 9, 2009, online account services for Countrywide mortgages were reportedly transferred to Bank of America's online banking website.

74

COMPLAINT

EXHIBIT 144      201

216.   Bank of America's acquisition of Countrywide also constituted a de facto merger because it resulted in continuity of ownership.  The shareholders of CFC became shareholders of Bank of America on July 1, 2008 through an all-stock transaction involving Defendant NB Holdings, which was created for the sole purpose of facilitating the acquisition of CFC.

217.   In numerous statements and through other conduct, Bank of America has also taken responsibility for the pre-merger liabilities of CFC, CHL, CSC and CCM, including restructuring hundreds of thousands of loans created and serviced by the Defendants.  Bank of America has reached various settlement agreements in which it has directly taken responsibility for Countrywide's liabilities.  As part of a $8.4 billion settlement agreement with certain state attorneys general arising from Countrywide's predatory lending, Bank of America agreed to forgive up to 30 percent of the outstanding mortgage balances on up to 390,000 loans extended to former Countrywide customers.  These loans were made prior to Bank of America's acquisition of Countrywide.

218.   On January 13, 2010, Brian Moynihan, Bank of America's CEO and President, testified before the FCIC, stating that "our primary window into the mortgage crisis came through the acquisition of Countrywide … .  The Countrywide acquisition has positioned the bank in the mortgage business on a scale it had not previously achieved.  There have been losses, and lawsuits, from the legacy of Countrywide operations, but we are looking forward."  Addressing investor demands for refunds on faulty loans sold by Countrywide, Moynihan stated "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we'll pay for the things that Countrywide did."  And, in a NEW YORK TIMES article published in December 2010, Moynihan, speaking about Countrywide, stated that "Our company bought it and we'll stand up; we'll clean it up."

---

75

219.   Consistent with these public statements, through the third quarter of 2010, Bank of America has faced $26.7 billion in repurchase requests and has resolved, declined or rescinded $18 billion of those claims.  It has established a reserve fund against the remaining $8.7 billion in repurchase requests, which at the end of the third quarter stood at $4.4 billion.

220.   The pre-merger liabilities of CFC, CHL, CSC and CCM were in fact fully factored into Bank of America's decision to acquire Countrywide. Specifically, Bank of America acquired CFC and its subsidiaries for 27% of book value, with the discount intended to reflect the pending claims and potential claims against Countrywide.  In an interview published on February 22, 2008 in the legal publication CORPORATE COUNSEL, a Bank of America spokesperson admitted that Bank of America had taken into account Countrywide's liabilities:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country. ***Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations*. "*We bought the company and all of its assets and liabilities,*"** spokesman Scott Silvestri says. "***We are aware of the claims and potential claims against the company and have factored these into the purchase***."  (emphasis added).

221.   Similarly, in a January 23, 2009 NEW YORK TIMES article reporting on the acquisition of CFC and its subsidiaries, Kenneth D. Lewis, Bank of America's former Chairman and Chief Executive Officer, acknowledged that Bank of America was aware of the legal liabilities of CFC and its subsidiaries and impliedly accepted them as being part of the cost of the deal.

> We did extensive due diligence.  We had 60 people inside the company for almost a month. It was the most extensive due diligence we have ever done.  So we feel comfortable with the valuation.  We looked at every aspect of the deal*, **from their assets to potential lawsuits*** and we think we have a price that is a good price. (emphasis added).

COMPLAINT

EXHIBIT 144        203

222. Based on the above, Bank of America has de facto merged with CFC, consolidating and merging with CFC, CHL, CSC and CCM and acquiring substantially all of the assets of these Defendants. Bank of America is thus the successor in liability to CFC, CHL, CSC and CCM, and is jointly and severally or otherwise vicariously liable for the wrongful conduct of those Defendants as set forth *infra* under each of the Causes of Action.

223. Based on the above same facts, in *MBIA Ins. Corp. v. Countrywide Home Loans, et al.*, Index No. 602825/08, the Supreme Court of the State of New York issued a decision on April 29, 2010 holding that the plaintiff, MBIA, had sufficiently alleged a de facto merger "in which Bank of America intended to absorb and continue the operation of Countrywide."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

224. Plaintiff realleges each and every allegation above as if fully set forth herein.

225. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, against Mozilo, the Individual Defendants, and the Issuing Defendant (collectively, the "Section 10(b) Defendants"). The Section 10(b) Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Progressive, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

226. The Section 10(b) Defendants promoted and sold the Certificates purchased by Progressive pursuant to the defective Prospectuses and Prospectus Supplements. The Prospectuses and Prospectus Supplements contained untrue

COMPLAINT

EXHIBIT 144    204

statements of material facts, omitted to state other facts necessary to make the
statements made not misleading, and concealed and failed to disclose material
facts.

227.   The Section 10(b) Defendants each had actual knowledge of the
misrepresentations and omissions of material facts set forth herein, or acted with
reckless disregard for the truth by failing to ascertain and to disclose such facts
even though such facts were available to them, or deliberately refrained from
taking steps necessary to discover whether the material facts were false or
misleading.

228.   As a result of the Section 10(b) Defendants' dissemination of
materially false and misleading information and their failure to disclose material
facts, Progressive was misled into believing that the Certificates were more
creditworthy investments than they really were.

229.   Progressive purchased the Certificates without knowledge that the
Section 10(b) Defendants had misstated or omitted material facts.  In purchasing
the Certificates, Progressive relied directly or indirectly on false and misleading
statements and omissions made by the Section 10(b) Defendants.  Progressive
was damaged as a result of its reliance on the Section 10(b) Defendants' false
statements and misrepresentations and omissions of material facts.

230.   At the time of the Section 10(b) Defendants' false statements,
misrepresentations and omissions, Progressive was ignorant of their falsity and
believed them to be true.  Progressive would not have purchased or otherwise
acquired the Certificates had it known the truth about the matters discussed
above.

231.   Progressive is filing this action within two years following discovery
of the facts constituting the violation, including facts establishing scienter and
other elements of Progressive's claim, and within 5 years after the violations with
respect to Progressive's investments.

78

COMPLAINT

EXHIBIT 144      205

232.  By virtue of the foregoing, the Section 10(b) Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

233.  As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Progressive has suffered damages in connection with its purchase of the Certificates.

**SECOND CAUSE OF ACTION**
**(Violation of Section 20(a) of the Exchange Act)**

234.  Plaintiff realleges each and every allegation contained above as if fully set forth herein.

235.  This count is asserted against Defendants CFC, CCM, Mozilo and the Individual Defendants (collectively, the "Section 20(a) Defendants"), and is based upon Section 20(a) of the Exchange Act.

236.  Each of the Section 20(a) Defendants by virtue of its control, ownership, offices, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a control person of the Section 10(b) Defendants within the meaning of Section 20(a) of the Exchange Act.

237.  As a result of their control of the Section 10(b) Defendants, the Section 20(a) Defendants reviewed, or had the opportunity to review the Offering Documents for the Certificates prior to their issuance and therefore knew or should have known that those Offering Documents contained misrepresentations and omissions.  The Section 20(a) Defendants could have prevented the issuance of the Offering Documents or caused them to be corrected.  As a result, the Section 20(a) Defendants did not act in good faith.

238.  As set forth above, the Section 10(b) Defendants each violated Section 10(b) of the Exchange act and Rule 10b-5 promulgated thereunder.  By virtue of their positions as control persons, the Section 20(a) Defendants are jointly and severally liable pursuant to Section 20(a) of the Exchange Act.

79

COMPLAINT

EXHIBIT 144      206

239.   As a direct and proximate result of the Section 20(a) Defendants' wrongful conduct, Progressive suffered damages in connection with its purchase of the Certificates.

### THIRD CAUSE OF ACTION
### (Common-Law Fraud)

240.   Plaintiff realleges each and every allegation contained above as if fully set forth herein.

241.   This claim is brought against Mozilo, the Individual Defendants, and the Issuing Defendant (the "Common-Law Fraud Defendants").

242.   The Common-Law Fraud Defendants promoted and sold the Certificates purchased by Progressive pursuant to the defective Prospectuses and Prospectus Supplements.   The Prospectuses and Prospectus Supplements contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts.

243.   Each of the Common-Law Fraud Defendants knew their representations and omissions were false and/or misleading at the time they were made.   Each of the Common-Law Fraud Defendants made the misleading statements with an intent to defraud Progressive.

244.   Progressive justifiably relied on the Common-Law Fraud Defendants' false representations and misleading omissions.

245.   Had Progressive known the true facts regarding the loans underlying the Certificates, including Countrywide's abandonment of its underwriting practices, Countrywide's improper appraisal methods, the inaccuracy of the ratings assigned by the rating agencies, and the failure to convey to the Issuing Trusts legal title to the underlying mortgages, Progressive would not have purchased the Certificates.

COMPLAINT

EXHIBIT 144     207

246.   As a result of the Common-Law Fraud Defendants' false and misleading statements and omissions, Progressive has suffered damages in connection with its purchase of the Certificates.

## FOURTH CAUSE OF ACTION
### (Aiding and Abetting Fraud)

247.   Plaintiff realleges each and every allegation contained above as if fully set forth herein.

248.   This is a claim against CFC, CCM, Mozilo and the Individual Defendants (collectively, the "Aiding and Abetting Defendants").

249.   The Aiding and Abetting Defendants knew of the fraud perpetrated by the Common-Law Fraud Defendants.  As alleged in detail above, the Aiding and Abetting Defendants directed, supervised and otherwise knew of Countrywide's abandonment of its underwriting practices; Countrywide's improper appraisal methods; the inaccuracy of the ratings assigned by the rating agencies; and the failure to convey to the Issuing Trusts legal title to the underlying mortgages.

250.   The Aiding and Abetting Defendants provided the Common-Law Fraud Defendants with substantial assistance in perpetrating the fraud.   The Aiding and Abetting Defendants participated in the violations of Countrywide's mortgage loan underwriting and appraisal standards; made false public statements about Countrywide's mortgage loan underwriting and appraisal standards; provided false information about the mortgage loans underlying the Certificates to the rating agencies; provided false information for use in the Offering Documents; and participated in the failure to properly endorse and deliver the mortgage notes and security documents to the Issuing Trusts.

251.   As a direct and natural result of the fraud committed by the Common-Law Fraud Defendants, and the knowing and active participation by the

81

EXHIBIT 144     208

1  Aiding and Abetting Defendants, Plaintiff Progressive has suffered substantial
2  damages.

3                          **FIFTH CAUSE OF ACTION**
                          **(Negligent Misrepresentation**
4         **Cal. Civil Code §§ 1572 et seq. and 1709 et seq., and Common Law)**

5         252.   Plaintiff repeats and re-alleges each and every allegation contained
6  above as if fully set forth herein.

7         253.   This cause of action is brought against the Individual Defendants and
8  the Issuing Defendant.

9         254.   As alleged above, the Individual Defendants and the Issuing
10 Defendant made untrue or misleading representations, including, among others,
11 that Countrywide originated loans in compliance with its underwriting guidelines,
12 and that Countrywide originated loans in compliance with proper appraisal
13 methods.

14        255.   In making the representations referred to above, the Individual
15 Defendants and the Issuing Defendant intended to induce Plaintiff to rely on those
16 representations in making its decision to purchase the Certificates.  Defendants
17 expected that Plaintiff would rely on those representations in deciding whether to
18 purchase the Certificates.  Defendants also knew that the facts regarding
19 Countrywide's compliance with its underwriting standards were exclusively
20 within Defendants' knowledge.

21        256.   When the Defendants made these representations, they had no
22 reasonable ground for believing them to be true.

23        257.    Plaintiff reasonably and justifiably relied on the representations
24 described above in analyzing and deciding to purchase the Certificates.  Had
25 Defendants not made the false and misleading representations, Plaintiff would not
26 have purchased the Certificates.

27        258.   When it purchased the Certificates, Plaintiff did not know about the
28 untrue and misleading statements alleged herein.

---

82

COMPLAINT

EXHIBIT 144       209

259.   The Individual Defendants and the Issuing Defendant had a duty to provide Plaintiff complete, accurate, and timely information regarding the underlying mortgage loans and the securitization of these loans. Defendants breached their duty to provide such information to Plaintiff.

260.   As a direct and proximate result of the negligent misrepresentations by Defendants, Plaintiff was damaged in an amount to be proved at trial.

## SIXTH CAUSE OF ACTION
### (False Statements for the Purpose of Inducing the Purchase or Sale of a Security Cal. Corporations Code §§  25400(d) and 25500)

261.   Plaintiff realleges each and every allegation contained above as if fully set forth herein.

262.   Mozilo, the Individual Defendants and the Issuing Defendant committed a primary violation of Sections 25400(d) and 25500 of the California Corporations Code by inducing Plaintiff to purchase the Certificates.   The Individual Defendants and the Issuing Defendant made statements which were, at the time and in light of the circumstances under which they were made, false and misleading with respect to material facts, and which the Individual Defendants and the Issuing Defendant knew or had reasonable grounds to believe were false and misleading.

263.   By reason of the foregoing, the Individual Defendants and the Issuing Defendant violated section 25400(d) of the California Corporations Code and are liable to Plaintiff pursuant to Section 25500 of the California Corporations Code.

## SEVENTH CAUSE OF ACTION
### (Untrue or Misleading Statements in the Sale of Securities Cal. Corporations Code §§ 25401, 25501, 25504)

264.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

265.   The Individual Defendants (excluding Individual Defendants Kurland, Sieracki and Sambol) and the Issuing Defendant committed a primary

83

COMPLAINT

EXHIBIT 144     210

violation of Sections 25401 and 25501 of the California Corporations Code by selling the Certificates to Plaintiff by means of the Offering Documents, which contained untrue statements of material fact and/or omissions of material fact necessary in order to make the statements in the Offering Documents not misleading.

266.   Each of CFC, CSC, CCM, CHL and the Individual Defendants is liable under Section 25504 of the California Corporations Code because it directly and/or indirectly controlled the Issuing Defendant by virtue of its ownership, offices, directorship, and specific acts at the time of the wrongs alleged herein.   CFC, CSC, CCM and CHL and the Individual Defendants (excluding Individual Defendants Kurland, Sieracki and Sambol) had the power and influence and exercised the same to cause the Issuing Defendant to engage in the acts described herein in violation of Sections 25401 and 25501.

267.   Additionally, each of the Individual Defendants is liable under Section 25504 as a principal executive officer or director of the Issuing Defendants at the time of their violation of Sections 25401 and 25501.

**EIGHTH CAUSE OF ACTION**
**(Statutory Aiding and Abetting Liability**
**Cal. Corporations Code § 25504.1)**

268.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

269.   Each of CFC, CCM, CHL, the Individual Defendants, and Bank of America is liable for materially assisting CSC's violations of California Corporations Code Section 25401.

*Countrywide Financial*

270.   CFC was the parent company of all the other Countrywide Defendants.   CFC controlled and managed the entire securitization process from loan origination to sale of RMBSs.

84

271.   In this role, CFC materially assisted CSC's violations of Corporations Code Section 25401.

272.   CFC acted with intent to deceive and defraud.  CFC knew that the loans underlying the securitizations were not underwritten pursuant to Countrywide's stated underwriting guidelines.  CFC also knew that because of the pressure to get offerings available for sale quickly, the sheer number of loans that needed to be reviewed across many deals for many issuers, and the short time frames within which to complete the due diligence, the required due diligence could not be done and was not being done properly.

273.   Additionally, given the financial incentives to bring the securitizations to market quickly, CFC knew that non-compliant loans were included in the securitizations.

274.   CFC knew that the quality of the underlying mortgage loans was not as represented in the Offering Documents, and CFC knowingly failed to disclose the true risk profile of underlying loans.

*Countrywide Home Loans*

275.   CHL was, at all times herein mentioned, a wholly-owned subsidiary of CFC that originated and serviced residential home mortgage loans.

276.   At the time of the acts alleged herein, CHL materially assisted CSC's violations of California Corporations Code Section 25401.  For each of the securitizations at issue, CHL originated, or acted through external mortgage brokers or correspondent banks, the underlying secondary residential mortgages. CHL also acted as servicer for the mortgage loans in each securitization.

277.   CHL acted with intent to deceive or defraud.  CHL originated (or purchased from other lenders) the loans underlying the securitizations.  CHL knew it was not following stated underwriting guidelines and that the risky loans it was originating without income or asset verification would be pooled together, securitized and sold to unsuspecting purchasers like Progressive.

COMPLAINT

EXHIBIT 144      212

278. CHL knew that the underlying loans pooled together for the securitizations were not underwritten according to Countrywide's stated underwriting guidelines. CHL knew that CSC was selling RMBSs based on the false and misleading representation that the underlying loans were underwritten according to Countrywide's stated underwriting guidelines and, thus, to borrowers who could repay the loans.

*Countrywide Capital Markets*

279. At the times of the acts alleged herein, CCM materially assisted CSC's and the Issuing Defendant's violations of California Corporations Code Section 25401. It supervised and controlled CSC, the primary underwriter for all securitizations at issue, and thus assisted in pricing and selling RMBSs to investors, structuring and marketing the transactions, and making SEC filings.

280. CCM acted with intent to deceive or defraud. CCM knew that the loans underlying the securitizations were not underwritten pursuant to Countrywide's stated underwriting guidelines. Moreover, CCM knew that CSC was charged with overseeing third party due diligence firms, ostensibly to confirm that the underlying mortgage loans in the securitizations complied with Countrywide's stated underwriting guidelines. CCM knew or recklessly disregarded that because of the pressure to get the offerings available for sale quickly, the sheer number of loans that needed to be reviewed across many deals for many issuers, and the short time frames within which to complete the due diligence, the required due diligence could not be done and was not being done properly.

281. In addition, given the financial incentives for CSC to bring the securitizations to the market regardless of the quality of the loans included within them, CCM knowingly allowed CSC to offer and sell securitizations that contained non-complaint loans.

86

COMPLAINT

EXHIBIT 144   213

282.   CCM knew that the quality of the underlying mortgage loans was not as represented in the offering documents, and CCM knowingly failed to disclose the true risk profile of the underlying loans.

*The Individual Defendants*

283.   The Individual Defendants were all CFC executives and executives at each of the other Countrywide Defendants.   The Individual Defendants controlled and managed the entire securitization process from loan origination to the sale of the RMBSs.

284.   Each of the Individual Defendants therefore materially assisted CSC's violations of California Corporations Code Section 25401.

285.   The Individual Defendants acted with intent to deceive and defraud. The Individual Defendants knew that the loans underlying the securitizations were not underwritten pursuant to Countrywide's stated underwriting guidelines. The Individual Defendants also knew that because of the pressure to get offerings available for sale quickly, the sheer number of loans that needed to be reviewed across many deals for many issuers, and the short timeframes within which to complete the due diligence, the required due diligence could not be done and was not being done properly.

286.   In addition, given the financial incentives to bring the securitizations to the market regardless of the quality of the loans included within them, the Individual Defendants knowingly allowed non-compliant loans to be included in the securitizations.

287.   The Individual Defendants knew that the quality of the underlying mortgage loans was not as represented in the offering documents, and the Individual Defendants knowingly failed to disclose the true risk profile of the underlying loans.

*Bank of America*

COMPLAINT

EXHIBIT 144    214

288.   Bank of America, as successor-in-interest to CFC, CHL, CCM, CSC, and CWABS, is liable for the wrongdoing and damages caused by CFC, CHL, CCM, CSC, and CWABS.

289.   By reason of the foregoing, Defendants CFC, CSC, CCM, CHL, CWABS, Mozilo, the Individual Defendants, and Bank of America materially assisted the violations of California Corporations Code 25401, and are jointly and severally liable to Progressive under California Corporations Code Section 25504.1.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants, as follows:

1.      For rescission;

2.      For an award of compensatory damages against Defendants in favor of Plaintiff for damages sustained as a result of Defendants' wrongdoing;

3.      For an award to Plaintiff of its costs and disbursements in this suit, including reasonable attorneys' fees and expert fees; and

4.      For such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury.

COMPLAINT

EXHIBIT 144      215

Dated: June 3, 2011

BLECHER & COLLINS, P.C.
MAXWELL M. BLECHER
MARYANN R. MARZANO

By:     */s/ Maryann R. Marzano*
MARYANN R. MARZANO

and

GRANT & EISENHOFER P.A.
JAY W. EISENHOFER
GEOFFREY C. JARVIS
DEBORAH A. ELMAN

By:   */s/ Jay W. Eisenhofer*
JAY W. EISENHOFER

*Attorneys for United Financial Casualty
Company; Progressive Specialty Insurance
Company; Progressive Universal Insurance
Company; and Progressive Advanced
Insurance Company*

COMPLAINT

EXHIBIT 144    216

# Exhibit 145

LINK: 26, 29, 32, 35, 36

1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 CHILDREN'S HOSPITAL &<br>MEDICAL CENTER FOUNDATION<br>12 OF OMAHA, et al., | Case No. CV-11-02056-MRP-MAN<br><br>**ORDER RE MOTIONS TO DISMISS**<br>**THE COMPLAINT** |
| 13 Plaintiff, | |
| 14 v. | |
| 15 COUNTRYWIDE FINANCIAL<br>CORPORATION, et al. | |
| 16 Defendants. | |
| 17 | |

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 145     217

# I.   INTRODUCTION & BACKGROUND

This case is one of several related securities actions before this Court involving Countrywide Financial Corporation ("Countrywide"),[1] the former management of Countrywide, and its former auditor KPMG.  This particular action is one of several opt-out suits filed by members of the class in *In re Countrywide Fin. Corp. Sec. Litig.*, CV-07-05295-MRP (MANx) (the "*Pappas*" suit or the "class action") that opted out of the settlement in that case.  Familiarity with the long and complex procedural history of *Pappas* is assumed for purposes of this order.  Plaintiffs in this case ("Plaintiffs") are a group of investors who purchased Countrywide common stock between March 12, 2004 and the end of November, 2007.[2]  Plaintiffs' opt-out complaint (the "Complaint") was filed on March 10, 2011.  ECF No. 1.  The Complaint includes causes of action under §§ 10(b) and 20(a) of the Exchange Act that were present in the original *Pappas* action.  In addition, the Complaint adds a cause of action under § 18 of the Exchange Act and state law causes of action for common law fraud and negligent misrepresentation.  All defendants (collectively "Defendants") have moved to dismiss the Complaint on various grounds.   Mtns. to Dismiss, ECF Nos. 26, 30, 32, 35, 36.  The issues

---

[1] On July 1, 2008, Countrywide completed a forward triangular merger into a subsidiary of Bank of America called Red Oak Merger Corporation ("Red Oak"). In the transaction, Countrywide shareholders received shares of BofA in exchange for their Countrywide shares. Red Oak was then renamed Countrywide Financial Corporation.  Countrywide Fin. Corp., Form 10-Q (Aug. 11, 2008).  The merger postdates the class period and the allegations in the complaint.  Unless required by context, "Countrywide," as used in this Order, refers to the entity as constituted before the merger.

[2] The Plaintiffs are Children's Hospital & Medical Center Foundation of Omaha, Hastings College Foundation, Peter Kiewit Foundation, Weitz Value Fund, Weitz Partners Value Fund, Weitz Hickory Fund, Weitz Balanced Fund, Research Fund, Partners III Opportunity Fund, and Heider Weitz Partnership.

EXHIBIT 145      218

have been fully briefed and the Court heard extensive oral argument on August 8, 2011.  After careful consideration, the Court decides as follows:

The state law claims alleged in Counts III, IV, and V are time-barred under the relevant statutes of limitations.  The Court therefore **GRANTS** Defendants' motions to dismiss Counts III, IV, and V **WITH PREJUDICE**.  Plaintiffs have failed to adequately plead a § 10(b) claim against KPMG.  The Court therefore **GRANTS** KPMG's motion to dismiss **WITHOUT PREJUDICE**.  The Court otherwise **DENIES** the motions to dismiss.

## II.    MOTION TO DISMISS STANDARD

A Rule 12(b)(6) motion to dismiss should be granted when, assuming the truth of the plaintiff's allegations, the complaint fails to state a claim for which relief can be granted.  *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).  In deciding whether the plaintiff has stated a claim, the Court must assume the plaintiff's allegations are true and draw all reasonable inferences in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the Court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  A court reads the complaint as a whole, together with matters appropriate for judicial notice, rather than isolating allegations and taking them out of context.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

## III.    DISCUSSION

### A. STATE LAW CLAIMS

Plaintiffs' Complaint, filed on March 10, 2011, alleges causes of action for common law fraud and negligent misrepresentation.  Complaint at ¶¶ 564–80.  As a threshold matter the Court must decide a choice of law question.  Defendants argue that the state law claims should be analyzed under California's three-year statute of limitations for fraud and two-year statute of limitations for negligence.

EXHIBIT 145       219

The Complaint does not specify under which state's laws the common law claims are asserted. Complaint at ¶¶ 564–580. Plaintiffs' Opposition to the motions to dismiss states that, because Plaintiffs are based in Nebraska, the claims are asserted under Nebraska law and subject to its four-year statute of limitations for fraud-based claims. Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss ("Opp.") at 30, ECF No. 47.[3]

Even if Plaintiffs' claim was properly brought under Nebraska law, the California statute of limitations would apply. A federal court addressing state law claims generally "utilizes its own state's statute of limitations." *Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 613 (9th Cir. 1975). *See also* Restatement Second, Conflict of Laws § 142 (1971) ("An action will not be maintained if it is barred by the statute of limitations of the forum."). The general approach discussed in *Forsyth* is not an absolute rule, however. *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 485 (9th Cir. 1987). Rather, the Court must conduct a choice of law inquiry using the choice of law rules of the forum state. *Id.* California has adopted a two-step "governmental interest" approach to choice of law problems. Under that test, the Court must first determine whether the laws of the two jurisdictions differ. If they do, the Court must apply the law of the state whose interest would be more impaired if its law were not applied. *Offshore Rental Co. v. Continental Oil Co.*, 22 Cal.3d 157, 164-65 (1978).

A true conflict of laws exists in this case: Nebraska provides a four-year statute of limitations whereas the statute is two or three years in California. The first prong is therefore easily met. The Ninth Circuit faced a similar issue in

---

[3] The parties do not address whether the opposition brief was the appropriate filing to assert that its claims were brought under Nebraska law. Because it does not matter to the outcome, the Court assumes for the sake of argument that Plaintiffs' state law claims may properly be brought under Nebraska law and that this was properly raised in the Opposition.

EXHIBIT 145        220

*Nelson v. International Paint Co.*, 716 F.2d 640, 644 (9th Cir. 1983).  Relying on California law, the Ninth Circuit noted that, "[s]tatutes of limitation are designed to protect the enacting state's residents and courts from the burdens associated with the prosecution of stale cases."  *Id*. (quoting *Ashland Chemical Co. v. Provence*, 129 Cal. App. 3d 790, 794 (1982)).  For this reason, the forum state (California) was the only one with an interest in having its statute of limitations applied.  *Id*; *accord Asset Recovery Co. v. Jackson*, 34 Fed. App'x 594, 595 (9th Cir. 2002) (Applying California statute of limitations because "New Jersey has little interest in having its statute of limitations applied because there are no New Jersey defendants and New Jersey is not the forum.").  The same analysis applies here. The governmental interests of Nebraska would not be impaired by applying California's statute of limitations because none of the defendants are Nebraskan and the forum is in California.  Therefore, the Court will apply California's statutes of limitations for Plaintiffs' state law claims.

The statute of limitations for a fraud action in California is three years from the discovery "of the facts constituting the fraud or mistake."  Cal. Civ. Proc. § 338(d).  "The courts interpret discovery in this context to mean not when the plaintiff became aware of the specific wrong alleged, but when the plaintiff suspected or should have suspected that an injury was caused by wrongdoing. The statute of limitations begins to run when the plaintiff has information which would put a reasonable person on inquiry.  A plaintiff need not be aware of the specific facts necessary to establish a claim since they can be developed in pretrial discovery."  *Kline v. Turner*, 87 Cal. App. 4th 1369, 1374 (Cal. App. 4th Dist. 2001).  California's statute of limitations for negligent misrepresentation is two years.  Cal. Civ. Proc. § 339; *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1054 (9th Cir. 2008) ("For negligent misrepresentation, there is a two-year statute of limitations.").

EXHIBIT 145       221

Plaintiffs do not argue that their state law claims are timely under California's two- or three-year statutes of limitations, and any attempt to do so would be futile. The Complaint acknowledges that the "market learned the true financial condition of Countrywide" by November 2007. Complaint at ¶ 435. The Complaint itself lists a series of corrective disclosures and drops in stock price which constitute adequate "storm warnings" to trigger inquiry notice under California law. Complaint at ¶¶ 436–515. The Court therefore **GRANTS** Defendants' motions to dismiss Counts IV and V **WITH PREJUDICE**.

**B. SECTION 18 CLAIMS**

Plaintiffs bring a cause of action under Section 18 of the Exchange Act, which punishes misleading statements in documents required by the Exchange Act. 15 U.S.C. § 78r. Section 18 contains a one-year statute of limitations and a three-year statute of repose. *Id.* The claim is therefore time-barred unless the statutes of limitation and repose have been tolled.

Plaintiffs invoke *American Pipe & Constr. Co. v. Utah* in arguing that the *Pappas* class action tolled the statute of limitations for their Section 18 claim. 414 U.S. 538 (1974); Opp. at 27. Under *American Pipe*, class action proceedings toll the statute until a class member exercises its right to opt out. *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1488 (9th Cir. 1995). This Court previously held that *American Pipe* tolling applies to statutes of repose as well as to statutes of limitations. *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 722 F. Supp. 2d 1157, 1166 (C.D. Cal. 2010). The *Pappas* complaints, however, alleged violations of § 10(b) and Rule 10(b)(5), not § 18.

Most courts to consider the issue have held that claims need not be identical in order for *American Pipe* to apply. The inquiry is whether the claims "concern the same evidence, memories, and witnesses as the subject matter of the original class suit." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 355 (1983) (Blackmun, J., concurring); *accord Tosti*, 754 F.2d at 1489. The goal is to ensure

EXHIBIT 145          222

that the initial suit gives the defendants enough notice of the claims against them that they can adequately preserve evidence and develop their litigation strategy. Plaintiffs argue that the absence of § 18 claims in the original class action complaints is not fatal because "Countrywide and KPMG had adequate notice that Plaintiffs would seek redress for the underlying course of conduct giving rise to Plaintiffs' damages, whether that recovery was pursuant to § 18 or § 10(b)." Opp. at 30.

It is true that Plaintiffs rely on some of the same underlying conduct for their § 18 and § 10(b) claims. However, the proof required for the two claims is markedly different. Specifically, a § 18 claim requires pleading actual reliance and allows evidence of good faith as an affirmative defense. 15 U.S.C. § 78r(a). The actual reliance requirement means that courts have "almost universally declined to certify § 18 claims in class actions." *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, No. 5:02CV1105, 2003 WL 25861087, at *18 (N.D. Ohio June 4, 2003). At least three courts have considered the exact question presented here: whether a § 18 claim is similar enough to a § 10(b) claim that an earlier-filed § 10(b) class action tolls the later-filed § 18 claim. All have held that the claims are distinct and dismissed the § 18 claim.

In *Lindner Dividend Fund, Inc. v. Ernst & Young*, the court held that, "[B]ecause the 'legal standards for bringing an action under § 18 are significantly different from those for 10(b),' . . . the tolling doctrine of *American Pipe* does not apply to plaintiffs' claims." 880 F. Supp. 49, 54–55 (D. Mass. 1995) (quoting *Decker v. Massey-Ferguson, Ltd.*, 534 F. Supp. 873, 883 (S.D.N.Y. 1981)). The two later cases both cite *Linder* and reach an identical conclusion. *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, No. 10-10331-JT, 2011 WL 1226983, at *11 (D. Mass. Mar. 31, 2011) ("The legal standards for proving Section 18 and Section 10(b) claims are sufficiently distinct that filing a class action alleging a violation of Section 10(b) does not toll the statute of limitations

EXHIBIT 145     223

for a Section 18 claim."); *Wyser-Pratte Mgmt. Co.*, 2003 WL 25861087, at *18–19 (N.D. Ohio June 4, 2003) ("Given the meaningful distinctions between the . . . § 10(b) claims and those asserted . . . under § 18, the Court finds that class tolling does not apply.").

Plaintiffs try unsuccessfully to distinguish these cases. The *Able Labs* decision that Plaintiffs cite involved relation back, not class action tolling. *In re Able Labs. Sec. Litig.*, C.A. No. 05-2681, 2008 WL 1967509, at *24 (D.N.J. Mar. 24, 2008). The *Enron* case that Plaintiffs rely on considered whether a federal class action tolled related claims brought under state law (so-called "cross-jurisdictional"). *In re Enron Corp. Sec. Litig.*, 465 F. Supp. 2d 687, 718 (S.D. Tex. 2006). This Court has already rejected cross-jurisdictional tolling in the *Centaur* case. *Centaur Classic Conv. Arb. Fund Ltd. v. Countrywide Fin. Corp.,* No. 10-CV-05699 MRP (MANx), ECF No. 57, slip op. at 10 (C.D. Cal. Jan. 20, 2011).

Plaintiffs also argue that "*Linder* and *Wyser-Pratte* barred § 18 claims in subsequently filed individual actions because the original class actions alleging § 10(b) claims involved different parties." Opp. at 10. This argument is misleading and borders on bad faith. *Linder* provided alternative holdings for dismissing the § 18 claims. One was that the new claim involved a party who had been dismissed from the earlier class action. *Linder*, 880 F. Supp. at 54. The second (and relevant one for present purposes) was that a § 10(b) class action does not toll a § 18 claim in any event. *Id.* at 54–55. The relevant section of *Wyser-Pratte* involves the same defendant in the § 10(b) and § 18 claims.[4] *Wyser-Pratte*, 2003 WL 25861087, at 18.

---

[4] An earlier portion of the opinion dealt with a motion to dismiss by two other defendants. There, the court did, in fact, dismiss the claims because the earlier-filed class actions had not included them. *Wyser-Pratte*, 2003 WL 25861087, at 12.

EXHIBIT 145      224

1   The Court is persuaded by the reasoning of its brethren in Massachusetts and
2   Ohio.  Section 18's actual reliance requirement precludes class-action treatment.
3   Therefore, almost by definition, filing a § 10(b) class action does not put a
4   defendant on notice that it will be called upon to defend a § 18 claim.  Plaintiffs' §
5   18 claim was therefore not tolled by the filing of *Pappas*.  Accordingly, the Court
6   finds that Count III is time-barred under both the three-year statute of repose and
7   the one-year statute of limitations.  The Court **GRANTS** Defendants' motions to
8   dismiss Count III **WITH PREJUDICE**.

9   **C. SECTION 10(B) CLAIMS**

10  Count I of the Complaint alleges violations of § 10(b) of the Exchange Act
11  and Rule 10(b)(5) promulgated thereunder.  This claim was brought in *Pappas*, and
12  each of the Defendants was named in that action.  Plaintiffs' § 10(b) action is
13  therefore tolled by *American Pipe* and consequently timely.  The Court next turns
14  to whether the claim is well pled.  A plaintiff asserting a claim under § 10(b) must
15  plead six elements: (1) a material ["materiality"] (2) misrepresentation or omission
16  ["falsity"] (3) made with scienter ["scienter"] (4) on which plaintiff relied
17  ["reliance"], (5) suffering an economic loss ["loss"] (6) caused by the
18  misrepresentation or omission ["loss causation"].  *In re Countrywide Fin. Corp.*
19  *Sec. Litig.*, 588 F. Supp. 2d at 1184 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S.
20  336, 341-42 (2005)).  The Court will analyze each in turn.

21  *1.   Materiality*

22  Plaintiffs are required to plead materiality with particularity.  *No. 84*
23  *Employer–Teamster Joint Council Pension Trust Fund v. America West Holding*
24  *Corp.*, 320 F.3d 920, 951 (9th Cir. 2003).  It is one of the "circumstances
25  constituting fraud" not subject to Public Securities Litigation Reform Act
26  ("PSLRA") standards. Fed. R. Civ. Proc. 9(b); 15 U.S.C. § 78u–4(b). Therefore, it
27  is subject to Rule 9(b).  As in the class action litigation, the alleged representations
28  and omissions are clearly material.  Plaintiffs' core allegation is that, beginning in

EXHIBIT 145     225

2003, Countrywide abandoned its underwriting guidelines in favor of increasing market share and selling ever more loans into the secondary market. Representations regarding the quality of Countrywide's underwriting (which goes to its core business) are therefore material to investors. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1185. *See also Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) ("[A]s a mortgage lender . . . underwriting practices would be among the most important information looked to by investors.").

2.    *Falsity & Scienter*

The Court analyzes falsity and scienter together. *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005) ("[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA."). Falsity and scienter are subject to a heightened pleading standard under the PSLRA. 15 U.S.C. §§ 78u–4(b). With respect to falsity, the complaint must (1) explain why the statement is false or misleading and, (2) if alleged on information and belief, the complaint must "state with particularity all facts on which that belief is formed." 15 U.S.C. §§ 78u–4(b)(1). Regarding scienter, a pleading must allege with "particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Supreme Court defines a "strong inference" as one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). To find a strong inference, a court must determine that a scienter inference is "at least as likely as any plausible opposing inference." *Id.* at 328. This requires a "comparative evaluation" of competing inferences that can be drawn from the allegations. *Id.* at 314. However, the evaluation is still made in light of the entire complaint and judicially noticeable

EXHIBIT 145    226

facts–a court must not isolate each allegation and determine whether that allegation

meets the standard.  *Id.* at 322.

"[K]nowing or intentional conduct" satisfies the "required state of mind."

*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (internal

quotations omitted).  Every Circuit also agrees that some degree of recklessness

satisfies § 10(b)'s scienter requirement, but the Supreme Court has expressly

reserved the question.  *Tellabs*, 551 U.S. at 319 n.3.  The Ninth Circuit has one of

the most demanding recklessness standards, requiring "deliberate recklessness,"

which is recklessness that "reflects some degree of intentional or conscious

misconduct"—apparently something more than gross recklessness and less than

actual knowledge that the statement was false or misleading. *In re Silicon

Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999), *reh'g en banc denied*,

195 F.3d 521 (9th Cir. 1999); *South Ferry*, 542 F.3d at 782.

<u>Countrywide and the Officer Defendants</u>

Taken as a whole the Complaint raises the same compelling inferences of

falsity and scienter as did the consolidated class action complaint.  Plaintiffs devote

72 pages of the Complaint to purportedly false statements made by Countrywide.

Complaint at ¶¶ 247–432.  These statements appeared in SEC filings, analyst calls,

and press releases and can be broken into five main categories:

- Statements to the effect that Countrywide originated "high quality"
  mortgages through the use of rigorous underwriting guidelines.  *See, e.g.*,
  Complaint at ¶ 250.

- Sarbanes-Oxley certifications that Countrywide's financial statements
  complied with Generally Accepted Accounting Principles ("GAAP").
  *See, e.g.*, Complaint at ¶ 253.

- Statements regarding the percentage of "prime" vs. "subprime" which
  Countrywide originated and/or retained on its own books.  *See, e.g.*,
  Complaint at ¶ 253.

EXHIBIT 145        227

- Assurances that Countrywide's portfolio of pay option ARMs and HELOCs represented a predictable and safe investment whose risks were mitigated by prudent underwriting. *See, e.g.*, Complaint at ¶¶ 295, 309, 345.

- Assurances that Mozilo had not sold shares on the basis of any insider knowledge but rather only pursuant to his 10b5-1 plan. *See, e.g.*, Complaint at ¶ 355.

The Complaint alleges the dates, times, and speakers of each of these misrepresentations with particularity. The Complaint alleges that these statements were made by Countrywide and by each of the Individual Defendants. And, these statements are adequately alleged to be actionably false for the same reasons that the Court found in the original class action. *In re Countrywide Fin. Corp. Sec. Litig*, 588 F. Supp. 2d at 1144.

The Court has likewise previously addressed scienter allegations as to Countrywide, Mozilo, Sambol, and Sieracki. *Id.* at 1192–97. As a result of further proceedings in the *Pappas* case and other cases filed involving Countrywide, there is a fuller factual record than when the Court allowed the *Pappas* action to proceed in 2008. That record is not appropriate for the pleading stage, however. Based only on the pleadings, the Court concludes that, as before, an adequately strong inference of scienter can be drawn with respect to Countrywide, Mozilo, and Sambol for the entire period. *Id.* There is a similar inference of scienter for Sieracki from April of 2005. *Id*; Complaint at ¶¶ 124–25; 141; 294 (discussing April conference call and June Risk Committee meetings attended by Sieracki). These inferences of scienter are based on actual knowledge, not recklessness.

KPMG

The Complaint asserts that Countrywide's financial statements for 2004, 2005, and 2006 violated GAAP and misrepresented Countrywide's financial condition. Complaint at ¶ 192. Plaintiffs aver that noncompliance with GAAP is

EXHIBIT 145     228

probative of scienter and that the financial statements themselves were materially false and misleading. Opp. at 59; Complaint at ¶¶ 151–191. These allegations are insufficient to state a claim against KPMG in light of Rule 9(b) and the Supreme Court's recent *Janus* decision. *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S.Ct. 2296 (2011). There, the Court made clear that only the maker of a statement is liable under § 10(b) and that "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it." *Id.* at 2303. KPMG, therefore, cannot be liable for Countrywide's financial reporting generally, but only specific statements that it made. The only KPMG statements alleged in the Complaint are unqualified audit opinions. Those audit opinions are referred to only obliquely, and the complaint does not explain with any particularity which statements in the opinions were false, in what way they were false, or what specific "red flags" KPMG overlooked which would demonstrate scienter. The Court therefore **GRANTS** KPMG's Motion to Dismiss with respect to Count 1. Plaintiffs have leave to amend to cure these deficiencies.

3.    *Reliance*

The reliance element is subject to the pleading requirements of Rule 9(b) because it is one of the "circumstances constituting fraud" not subject to PSLRA standards. Fed. R. Civ. Proc. 9(b); 15 U.S.C. § 78u–4(b). Therefore, reliance must be pled with particularity to state a claim. Fed. R. Civ. Proc. 9(b). The Supreme Court has validated the proposition that an efficient market for a security establishes a rebuttable presumption of reasonable reliance. *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988). Plaintiffs have pled that Countrywide was registered with the SEC and was traded on an automated market, that it was followed by numerous analysts, and that its stock price moved quickly in response to press releases and other company-specific news. Complaint at ¶ 243. Taken in the light most favorable to plaintiffs, these facts are enough to trigger the *Basic*

EXHIBIT 145        229

presumption of reliance.  *See also In re Countrywide Fin. Corp. Sec. Litig.*, 273
F.R.D. 586, 619 (C.D. Cal. 2009) ("Plaintiffs are entitled to the *Basic* presumption
with respect to the common stock.").

Mozilo argues that the *Basic* presumption does not apply because Plaintiffs
increased their holdings of Countrywide in mid-2007, after the truth had begun to
leak out.  Mozilo reasons that, since Plaintiffs purchased more shares *after* news of
the misrepresentations was made public, Plaintiffs did not rely on the
misrepresentations.  This argument does not withstand scrutiny.

First, courts are nearly unanimous that post-disclosure purchases do not
rebut a presumption of reliance for shares purchased before the disclosure.  *In re
Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576–77 (N.D. Cal. 2009) (collecting
cases).  The fraud on the market theory holds that in an efficient market, a
security's price reflects all publicly available material information.  Therefore, if
the market is efficient, and if a security's price is inflated due to a
misrepresentation, a plaintiff relies on the misrepresentation by way of paying an
inflated price.  This inquiry has nothing to do with whether the plaintiff would
have purchased the security even without the misrepresentation.  *In re DVI Inc.
Sec. Litig.*, 249 F.R.D. 196, 203–04 (E.D. Pa. 2008) ("post-disclosure purchases
will not prevent an investor from relying on the integrity of the market for pre-
disclosure purchases").  It is possible that Plaintiffs did not rely on the integrity of
the market price in this particular instance.  But that is too particularized and fact-
dependent an inquiry to engage in at the motion to dismiss stage.

Mozilo also argues that Plaintiffs' trading pattern belies reliance for its 2007
purchases because those purchases came amidst a wave of corrective disclosures.
Mozilo Mtn. to Dismiss at 17, ECF No. 30.  Plaintiffs have pled a series of
corrective disclosures stretching into September 2007.  As in the class action, the
fact that Plaintiffs purchased after some disclosures, but before others, does not
rebut their reliance on any not-yet-disclosed misrepresentations.  If the market for

EXHIBIT 145       230

Countrywide stock remained informationally efficient during the mid-2007 (and no party has contended that it did not), then Plaintiffs are entitled to a presumption that the price reflected any not-yet-corrected misrepresentation still in the market. This establishes reliance under *Basic*.

To be sure, Plaintiffs' complicated and counterintuitive trading pattern will present a challenge in demonstrating damages and loss causation. Defendants may likewise be able to rebut individual reliance based on a more complete factual record. But those are practical problems of proof; they are not appropriate for resolution at the pleading stage.

4.      *Loss*

Plaintiffs are not required to plead their exact damages. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1199. Here, as in the class action, Plaintiffs adequately allege that they have suffered economic losses by a decline in Countrywide's stock price.

5.      *Loss Causation*

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). A plaintiff must plead loss causation in a § 10(b) case. *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 346 n.39 (S.D.N.Y. 2005) (observing that the loss causation element of § 10(b) is the "mirror image" of the defendants' burden on loss causation on § 11). Here, Plaintiffs plead a "materialization of the risk" theory of loss causation. Briefly summarized, Plaintiffs allege that Countrywide completely abandoned its underwriting guidelines in order to increase loan volume. Complaint at ¶ 433. This abandonment meant that Countrywide had a higher-than-anticipated risk of "delinquencies and defaults, reduced earnings, and an inability to access liquidity and the secondary loan market." *Id.* When these risks ultimately materialized, the

EXHIBIT 145      231

market purportedly realized that it had overvalued Countrywide and the stock price dropped precipitously.  *Id.*

As in *Centaur*, Defendants urge the Court to reject the materialization of the risk theory of loss causation based on two recent cases.  In *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010), the Ninth Circuit held that a plaintiff cannot rely on the "impact" of a fraudulent act or practice as the cause of its loss; the market must react to disclosure of the fraudulent act itself.  In *In re Nuveen Funds Sec. Litig.*, Nos. C 08–4575 SI, C 09–1437 SI, 2011 WL 1842819, at *10 (N.D. Cal. 2011), Judge Illston pointed out that the Ninth Circuit has not endorsed the theory.  But, Judge Illston declined to reach that question because she found that the *Nuveen* plaintiffs had failed to prove materialization of the risk in any event.  *Id.* at 12.

Plaintiffs style their complaint as a "materialization of the risk" theory, but it is not clear on the face of the complaint that the allegations are any different from the straightforward fraud claim in *Oracle*.  In both instances, the plaintiff alleged defects or problems with a product sold by the defendant.  In both cases, the defendant announced subsequent financial problems (an earnings miss in *Oracle*, here a series of charges against earnings, forecast revisions, and liquidity problems).  *Oracle* held that, to be compensable, a curative disclosure must relate specifically to the product defects alleged, not to the health of the company generally or to macroeconomic factors which impact the company's long-term outlook.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 392.

Under either materialization of the risk or a straightforward fraud theory, Plaintiff will be required to show an explicit causal linkage between misrepresentation and loss.  In *In re Rackable Systems, Inc. Sec. Litig.*, No. C 09–0222 CW, 2010 WL 3447857, at *12 (N.D. Cal. Aug. 27, 2010), Judge Wilken dismissed the claim because "[a]ll of Defendants' statements that allegedly reveal the 'truth' of the fraud Defendants committed upon the market disclose negative

EXHIBIT 145      232

1　news about Rackable's financial condition, its future prospects or the competition

2　in the computer server industry in general.  However, these statements do not

3　reveal the necessary causal link between the alleged fraud and the drop in

4　Rackable's stock price. Instead, they rely on a correlation between Rackable's

5　announcement of financial results and a decrease in stock price."

6　　　　The Court agrees with Judge Wilken's analysis and will enforce the same

7　requirement in this case.  Plaintiffs will ultimately bear the burden of showing that

8　declines in Countrywide's share price occurred because the market learned that

9　Countrywide had abandoned its underwriting standards or mischaracterized the

10　quality of the loans that it was issuing.  The Court is skeptical that Plaintiffs will be

11　able to meet this burden for most of the curative disclosures that they include in the

12　Complaint.  However, following *Oracle* and *Nuveen*, the Court reserves that

13　inquiry for the summary judgment stage and further factual development.  For the

14　time being the Court is satisfied that some of the disclosures are plausibly linked to

15　the alleged misrepresentations.  *See* Complaint at ¶ 442 (alleging a drop in

16　Countrywide's share price when the market learned that Countrywide had

17　characterized subprime loans as prime); Complaint at ¶ 440 (alleging a drop in

18　Countrywide's share price when the market learned that defaults and delinquencies

19　were higher than previously expected).

20　　　　As before, Defendants argue that all drops in Countrywide's stock price

21　were due to the unprecedented crisis that upended capital markets in 2007 and

22　prevented Countrywide from selling mortgages into the secondary market.

23　Countrywide Def's Mtn. to Dismiss at 28–37.  In a new twist, Defendants cite the

24　Plaintiffs' own shareholder reports, which blame their losses on market turmoil

25　rather than revelations about Countrywide's underwriting.  Countrywide Def's

26　Mtn. to Dismiss at 32–33.  Loss causation, however, depends on whether the

27　market (not the plaintiff) thinks that a curative disclosure actually corrects some

28　previous market misconception.  *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 392.

EXHIBIT 145　　　233

As a market participant, the Weitz Funds' belief that Countrywide declined because of market forces rather than poor underwriting is certainly probative. But, the Weitz funds were only one market participant, and their characterization of the market is not dispositive. Plaintiffs have pled particular disclosures and linked those disclosures to declines in Countrywide's stock price. Read in the light most favorable to Plaintiffs, the complaint adequately alleges that at least some of those disclosures corrected the market's misapprehensions about Countrywide's underwriting practices. *E.g.* Complaint at ¶¶ 441–48 (charges against earnings a result of poor underwriting standards and misclassification of loans as prime). As in the *Centaur* case, loss causation is an issue that the Court will reserve for a more complete factual record. *Centaur*, 2011 WL 2504637, at *4.

Defendants also attempt to defeat loss causation by arguing truth on the market. Those attempts fail for the same reasons explained in the class action. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d at 1201.

The Court therefore **GRANTS** Defendant KPMG's motion to dismiss Count I. Plaintiffs have leave to amend. The Complaint adequately states a claim against the remaining Defendants.

## D. SECTION 20(A) CLAIMS

Count II alleges control person claims against Mozilo, Sambol, and Sieracki under § 20(a) of the Exchange Act. Complaint at ¶ 554. Section 20(a) creates joint and several liability for control persons who aid and abet '34 Act violations. *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). The elements of § 20(a) are "(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *Id.* (internal citation and quotations omitted). There is "a good faith defense if [a defendant] can show no scienter and an effective lack of participation." *Id.* Whether a defendant is a control person is "an intensely factual question." *Id.* The element of control need

EXHIBIT 145          234

1    not be pled with particularity.  *In re LDK Solar Sec. Litig.*, 2008 WL 4369987, at
2    *12 (N.D. Cal. Sept. 24, 2008).

3         As the Court explained in the class action case, Mozilo, Sambol, and
4    Sieracki are plausible control persons of Countrywide.  *In re Countrywide Fin.*
5    *Corp. Sec. Litig.*, 588 F. Supp. 2d at 1201.  This Count is therefore adequately pled
6    for the same reasons as in the class action.  *Id.*

7                            **IV.    CONCLUSION**

8         For the reasons discussed above, the Court finds that Plaintiffs' state law and
9    Section 18 claims are time-barred.  The Court therefore **GRANTS** Defendants'
10   motions to dismiss Counts III, IV, and V with respect to **ALL DEFENDANTS**.
11   Dismissal is with prejudice.  Plaintiffs have failed to plead any false statements or
12   facts sufficient for a strong inference of scienter on behalf of KPMG.  The Court
13   therefore **GRANTS** KPMG's motion to dismiss Count I.  Plaintiffs have leave to
14   amend.  The Court **DENIES** the other Defendants' motions to dismiss Counts I
15   and II.

16        The Court **GRANTS** Plaintiffs leave to file a First Amended Complaint no
17   later than 21 days from the date of this Order.

18
19        **IT IS SO ORDERED.**
20
21   DATED:  August 22, 2011                    _Mariana R. Pfaelzer_
22                                              Hon. Mariana R. Pfaelzer
23                                              United States District Judge
24
25
26
27
28

EXHIBIT 145      235