# Exhibit 147

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PUTNAM BANK,      :   CIVIL CASE NO.
  Plaintiff,      :   3:11-cv-145 (JCH)
            :
v.            :
            :
COUNTRYWIDE FINANCIAL CORP., :   MAY 16, 2011
 ET AL.,        :
  Defendants.     :

### RULING RE:  DEFENDANTS' MOTION TO TRANSFER (DOC. NO. 9)

Between 2005 and 2007, Putnam Bank purchased mortgage backed securities

created and marketed by Countrywide Financial Corporation and its subsidiaries.

Putnam Bank filed this putative class action challenging the accuracy and adequacy of

the information disclosed in connection with the sale of these mortgage backed

securities.  The defendants include Countrywide Financial Corporation, and certain of its

subsidiaries, former employees, and successor entities.  Pursuant to 28 U.S.C.

§ 1404(a), a group of the defendants moved to transfer this action to the Central District

of California, where similar actions are pending and where Putnam Bank previously

sought to assert its claims.  All of the other defendants subsequently joined in the

Motion to Transfer.  For the following reasons, defendants' Motion is granted.

## II. BACKGROUND

Based out of Calabasas, California, Countrywide Financial was one of the

nation's largest mortgage lenders and a leader in the subprime market.  Countrywide

issued mortgages and packaged and sold the income stream from those mortgages to

investors in the form of mortgage backed securities ("MBS"). In 2007, as the housing

1

EXHIBIT 147   253

market collapsed, the performance of Countrywide's MBS was put at risk. In 2008, amidst speculation that Countrywide could be on the verge of failure, Countrywide was acquired by Bank of America.

In the wake of these events, Countrywide's MBS and other securities have been the subject of litigation in other fora. See, e.g., Footbridge Limited Trust v. Countrywide Financial Corp., --- F. Supp. 2d ---, 2011 WL 907121 (S.D.N.Y. March 16, 2011) (dismissing case with prejudice); Maine State Retirement Sys. v. Countrywide Fin. Corp., 722 F. Supp. 2d 1157 (C.D. Cal. 2010) (dismissing claims with permission to replead). Two actions claiming that Countrywide misrepresented its mortgage lending practices, and thereby misled investors in its MBS, are currently pending in the United States District Court for the Central District of California. E.g., Maine State Retirement System v. Countrywide Financial Corp., 2:10-cv-302-MRP (C.D. Cal.) (pending); Stichting Pensioenfonds ABP v. Countrywide Fin. Corp., 2:10-cv-145-MRP (C.D. Cal.) (pending). In addition, investors in other types of Countrywide securities have brought a number of cases in the Central District of California alleging very similar misrepresentations. E.g., Fresno County Employees Retirement Assoc. v. Countrywide Fin. Corp., 2:11-cv-811-MRP (C.D. Cal.) (pending); State Treasurer of the State of Michigan v. Countrywide Fin. Corp., 2:11-cv-809-MRp (MANx) (C.D. Cal.) (pending); Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp., 2:10-cv-5699-MRP (C.D. Cal.) (pending); In re Countrywide Financial Corporation Securities Litigation, 07-cv-05295-MRP (MANx) (C.D. Cal.) (closed).

Putnam Bank previously sought to assert its claims arising out of its MBS purchases in the Maine State action. In January 2010, the Maine State Retirement

2

EXHIBIT 147    254

System filed a putative class action in the Central District of California, alleging that

Countrywide and its subsidiaries, successors and employees, had violated federal

securities laws because its MBS offering documents were inaccurate and failed to

disclose risks created by Countrywide's mortgage lending practices. Putnam was not a

named plaintiff in that action. However, the Private Securities Litigation Reform Act of

1995 (PSLRA) permits any purported class member to move for appointment as the

lead plaintiff, see 15 U.S.C. § 77z-1(a)(3)(B)(i), and on April 2, 2010, Putnam so moved.

Maine State, 2:10-cv-302-MRP (C.D. Cal.), Doc. No. 77. In support of its Motion,

Putnam argued that it was a member of the plaintiff class and that it would be the most

adequate lead plaintiff for the action. Id. at 1. Putnam argued that its claims "are based

on the same legal theories and arise from the same event or practice or course of

conduct that gives rise to the claims of other class members," id. at 11 (quotation

omitted), and that it "shares substantially similar questions of law and fact with the

members of the proposed Class," id. at 12. Putnam submitted a "sworn certification

affirming [its] willingness to serve as, and assume the responsibilities of, a class

representative" in that action. Id. at 12. Putnam also argued that Scott+Scott, its law

firm both in that action and in this action, was well qualified and had ample resources to

litigate in the Central District of California. Id. at 13-15.

On May 14, 2010, the Maine State court denied Putnam's motion and instead

appointed the Iowa Public Employee' Retirement System ("IPERS") as lead plaintiff.

Maine State, 2:10-cv-302-MRP, Doc. No. 120. That decision was based primarily upon

the size of IPERS financial stake. See id. at 9, 11. At the time of this decision, the

Maine State court was aware of a potential standing issue. See id. at 8. The Maine

3

EXHIBIT 147    255

State court was aware that Countrywide had offered and sold many different MBS under different securities registration statements, and a plaintiff might have standing to sue only with respect to the particular MBS that it purchased.  Id.  Yet, the Maine State court chose to select a lead plaintiff based on the size of its financial stake in Countrywide MBS, not the breadth of its holdings across different categories of Countrywide MBS. Id.  The court explained that the problem of standing could be cured:   "even if none of the presently named plaintiffs has standing to pursue a certain claim, the lead plaintiff may seek to add new named plaintiffs in order to assert that claim."  Id. at 8.

In a subsequent Ruling, issued on November 10, 2010, the Maine State court granted a motion to dismiss all claims relating to classes of Countrywide MBS that were not purchased by the named plaintiffs.  Maine State, 722 F. Supp. 2d at 1163-64.  The court directed the plaintiffs to replead and identify the specific categories of MBS that they had purchased.  Id. at 1164-65.  The court also granted a motion to dismiss claims under the Securities Act of 1933 because the plaintiffs had failed to sufficiently allege that the limitations period had been tolled.  Id. at 1167-68.  The court permitted the plaintiffs an opportunity to replead,  id. at 1168, and an amended complaint has been filed and remains pending, Maine State, 2:10-cv-302-MRP (C.D. Cal.), Doc. No. 227 (Maine State Second Amended Complaint).

Two and a half months later, on January 26, 2011, Putnam filed this action, presenting substantially similar allegations about the Countrywide MBS that it purchased.  Putnam contends that, as a result of the November 10, 2010, Ruling in the

EXHIBIT 147    256

<u>Maine State</u> action, its claims are no longer within the scope of that action.[1]  However,

Putnam's allegations in this action are similar to the allegations in the actions pending in

California, in so far as Putnam claims that the disclosures and offering statements

issued in connection with Countrywide's MBS misrepresented or failed to disclose risks

created by Countrywide's mortgage lending practices.[2]  In addition, this action, like the

actions pending in California, asserts national class action claims based on Securities

Act of 1933.[3]  This action does differ from those pending in California, in so far as it

includes—in addition to six causes of action based on federal securities laws—a single

cause of action under Connecticut law on behalf of a Connecticut subclass.

## III.    LEGAL STANDARD

Section 1404(a) of title 28 of the United States Code provides that, "[f]or the

convenience of parties and witnesses, in the interest of justice, a district court may

transfer any civil action to any other district or division where it might have been

brought."  The objectives of section 1404(a) are "to prevent the waste of time, energy

and money and to protect litigants, witnesses and the public against unnecessary

inconvenience and expense."  <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 616 (1964) (internal

---

[1] The parties have not presented a concise list showing the specific categories of MBS at issue in each of the pending actions.  For purposes of this Ruling, the court relies on Putnam's uncontested representation that the specific categories of Countrywide MBS at issue in this action are different than the specific categories of Countrywide MBS at issue in the actions pending in the Central District of California.

[2] For example, <u>compare</u> Complaint ¶¶ 7, 12, 53, 59, 70 (alleging "systematic abandonment" of stated underwriting standards to increase loan volumes and misrepresentation of appraisal independence and loan-to-value ratios), <u>with Maine State</u> Second Amended Complaint ¶¶ 6, 16, 199 (alleging "systematic disregard" for stated underwriting standards to permit additional loans and misrepresentation of the soundness of the appraisals and the loan-to-value ratios).

[3] For example, both this action and the <u>Maine State</u> action allege separate causes of action for violations of Sections 11, 12(a)(2), and 15 of the Securities Act.  <u>See</u> Complaint ¶¶ 137-170; <u>Maine State</u> Second Amended Complaint ¶¶ 209-243.

EXHIBIT 147    257

quotations omitted).

"In determining whether transfer of venue is appropriate, district courts must engage in a two-part inquiry, asking: (1) whether the action 'might have been brought' in the proposed transferee forum and, if so, (2) whether the transfer promotes convenience and justice." Zinky Electronics, LLC v. Victoria Amplifier Co., 09-cv-26-JCH, 2009 WL 2151178, *3 (D. Conn., June 24, 2009) (citations omitted). Factors to be considered under the second step of this inquiry include: (1) the plaintiff's choice of forum; (2) the convenience of witnesses; (3) the location of relevant documents and relative ease of access to sources of proof; (4) the convenience of parties; (5) the locus of operative facts; (6) the availability of process to compel the attendance of unwilling witnesses; (7) the relative means of the parties; (8) the district court's familiarity with governing law; and (9) trial efficiency and the interest of justice. See New York Marine & Gen. Ins. Co. v. Lafarge North America, Inc., 599 F.3d 102, 112 (2d Cir. 2010) (quoting D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 106-07 (2d. Cir. 2006)); Charter Oak Fire Ins. Co. v. Broan-Nutone, L.L.C., 294 F. Supp. 2d 218, 219-20 (D. Conn. 2003).

"Section 1404(a) reposes considerable discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." Red Bull Associates v. Best Western Int'l, 862 F.2d 963, 967 (2d Cir.1988) (quotation omitted). However, the movant bears the burden of presenting clear and convincing evidence that transfer is warranted. See New York Marine & Gen. Ins. Co., 599 F.3d at 113-14.

EXHIBIT 147    258

## IV.    DISCUSSION

The first step of the section 1404(a) inquiry is not at issue here.  Putnam does not dispute that this action could have been brought in the Central District of California. Therefore, the court turns to the second step to determine whether transfer to the Central District of California would promote "convenience and justice."

### 1.    Plaintiff's Choice of Forum is Entitled to Little Weight:

"In considering a motion to transfer, a district court ordinarily affords plaintiff's choice of forum substantial weight.  However a plaintiff's choice of forum is given less weight where the case's operative facts have little connection with the chosen forum." Charter Oak, 294 F. Supp. 2d at 220 (citation and quotation omitted).  In addition, a "plaintiff's choice of forum is a less significant consideration in a (here, putative) class action than in an individual action."  In re Warrick, 70 F.3d at 741 n.7 (citing Shulof v. Westinghouse Elec. Corp., 402 F. Supp. 1262, 1263 (S.D.N.Y. 1975)).  Here, the court finds that the Putnam's choice of forum is entitled to little weight because, as discussed below, this case is much more closely connected to the Central District of California, than the District of Connecticut, and because Putnam seeks to assert claims on behalf of a nationwide class.

It is also significant that this court was not Putnam's initial choice of forum for the claims at issue here.  Putnam sought to assert substantially the same claims, arising from the same events and transactions in the Central District of California.  See Maine State, 2:10-cv-302-MRP (C.D. Cal.), Doc. No. 77, at 11.  Putnam argued that its claims should be heard there and that both itself and its counsel were well qualified to take the lead in a nationwide class action pending there.  Id. at 12-15.  Having done so, Putnam

7

EXHIBIT 147     259

cannot credibly claim that it would be inconvenienced by having its claims heard in the

Central District of California, or that it has any strong interest in having its claims heard

here.[4]  Therefore, Putnam's choice of this forum is not entitled to deference.

### 2. Trial Efficiency and Justice Strongly Favors Transfer

"There is a strong policy favoring the litigation of related claims in the same

tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous

litigation can be avoided, thereby saving time and expense for both parties and

witnesses, and inconsistent results can be avoided."  Wyndham Assocs. v. Bintliff, 398

F.2d 614,  (2d Cir. 1968); accord Berman v. Informix Corp., 30 F. Supp. 2d 653, 660

(S.D.N.Y. 1998) (where related litigation is pending in a transferee court, "[t]ransfer will

prevent duplicative litigation and avoid the risk of inconsistent results").  Courts have

frequently found this factor to be of the utmost significance in deciding whether to

transfer.  See, e.g., Goggins v. Alliance Capital Mgmt., 279 F. Supp. 2d 228, 234

(S.D.N.Y. 2003) ("The single most significant circumstance favoring transfer in this

action is the existence of the related actions in New Jersey"); Berman, 30 F. Supp. 2d at

---

[4] Defendants accuse Putnam of trying to avoid the Maine State court's holding regarding tolling of the statute of limitations.  Putnam acknowledges that it believes that holding is inconsistent with Second Circuit precedent.  Opp. at 2 n.3.  However, in Putnam's view, this indicates that it is the defendants who are forum shopping by "seek[ing] a transfer in the hopes of binding Putnam to that decision."  Id. at 2.  In an attempt to show that defendants' Motion to Transfer this action is opportunistic, Putnam cites the pendency of numerous non-transferred actions outside of California against some or all of the defendants.  Id. at 4-6.  Most of those actions are state court actions and do not involve claims under federal securities laws.  The most closely related federal action has been dismissed with prejudice. Footbridge Limited Trust v. Countrywide Fin. Corp., 1:10-cv-367-PKC (S.D.N.Y.)  The court has no basis to reach any conclusion about defendants' litigation strategy in any of these actions.  However, given the unavailability of section 1404(a) transfers in state court actions, given that the state court actions apparently do not involve claims based on federal securities law, and given that this action presents the apparently unique circumstance of having been brought by a plaintiff who previously attempted to assert the very same claims in a pending action in the proposed transferee forum, there is no reason to conclude that the defendants are engaged in improper forum shopping.  The court need not speculate about how it might rule on a statute of limitations issue that is not before it, nor about whether Putnam is engaged in improper forum shopping.

EXHIBIT 147    260

660 ("one of the most important factors considered by courts in evaluating a motion to transfer is the existence of similar litigation in the transferee district").

There are two actions asserting nearly identical claims regarding Countrywide MBS currently pending in the Central District of California, and many more actions arising out of similar alleged misrepresentations regarding the same underlying mortgage lending policies.[5]  See supra at 2, 4-5.  As a result it would be more efficient, and it would serve the interests of justice, to have these related claims tried in a single forum.  It would avoid duplicative litigation and prevent the risk of conflicting results. Therefore, the pendency of closely related actions in the proposed transferee court weighs strongly in favor of transfer.

### 3.      The Locus of the Operative Facts Favors Transfer

The claims in this action address alleged misstatements or omissions in the documents related to Countrywide's MBS offerings.  Compl. ¶ 10.  "Misrepresentations are deemed to 'occur' in the district where the misrepresentations are issued or the truth is withheld, not where the statements at issue are received."  In re Collins & Aikman Corp. Sec. Litigation, 438 F. Supp. 2d 392, 397 (S.D.N.Y. 2006) (quotation omitted)

---

[5] Putnam asserts that there are "substantive and procedural differences between this action and the California cases," Opp. at 8, but it fails to explain why any difference is significant.  Putnam notes that this action involves different, particular categories of MBS.  Id. at 9 (citing Maine State, 722 F. Supp. 2d at 1164).  However, Putnam fails to note that the actions pending in California each encompass an array of different Countrywide MBS and that the Maine State court ruled that that action could encompass all of the various categories of MBS purchased by a named plaintiff.  See  Maine State, 722 F. Supp. 2d at 1164 (directing the plaintiffs to replead and identify each category of MBS they purchased); Maine State, 2:10-cv-302-MRP, Doc. No. 120 at 8 (permitting the plaintiffs to add plaintiffs to provide coverage of additional categories of MBS).  Therefore, the fact that this action includes different MBS than the other actions pending in California does not indicate that there is a significant, substantive difference between this action and those pending in California, especially when the allegations are substantially similar.  See supra at 5, n.2.  The Maine State action could have encompassed these categories of MBS if the plaintiffs had simply added Putnam as a named plaintiff.  The only other obvious difference between this action and the California actions is that this action includes a Connecticut law claim, but it is not clear why this difference is significant.

EXHIBIT 147    261

(holding that securities litigation should be transferred to the forum where financial statements, SEC filings, and other disclosures were prepared and issued from); accord In re Nematron Corp. Sec. Litigation, 30 F. Supp. 2d 397, 404 (S.D.N.Y. 1998).  The documents were approved in and issued out of Countrywide's offices in Calabasas, California.  Therefore, the central events addressed in this action occurred within the Central District of California.

Moreover, the alleged misrepresentations concern what Putnam Bank claims was a systemic problem with Countrywide's mortgage lending practices.  Compl.  ¶¶ 57, 59.  Allegations of systemic wrongdoing by a corporate defendant clearly call into issue the conduct of corporate policy makers, who were located at corporate headquarters within the Central District of California.  See Jones v. Walgreen Co., 463 F. Supp. 2d 267, 278 (D. Conn. 2006) ("because Ms. Jones alleges systemic and pervasive discrimination by Walgreens, the locus of operative facts is principally in Illinois [at Walgreens headquarters]").

In contrast, the only connection between this action and Connecticut is the fact that Putnam—one member of a putative, nationwide class—claims to have received and acted on these materials in Connecticut.  This provides no more link to Connecticut than to any other state where any member of the nationwide class may have acted on Countrywide's disclosures.  See Nematron Corp., 30 F. Supp. 2d at 404 (citing Job Haines Home for the Aged v. Young, 936 F. Supp. 223, 230 (D.N.J. 1996)).  Putnam Bank claims that various relevant events occurred in New York, Opp. at 4, but that does not establish any connection to this District.  Therefore, the locus of the operative facts weighs strongly in favor of transfer to the Central District of California.

EXHIBIT 147    262

4.      **Convenience of Witnesses Favors Transfer**

The convenience of the witnesses weighs in favor of transfer.  In an action alleging inadequate disclosure of the risks created by Countrywide's mortgage lending practices, those responsible for preparing and approving the disclosures and those responsible for Countrywide's mortgage lending policies are surely among the most important witnesses.  The defendants have represented, and Putnam does not deny, that most of those witnesses live and work in or near the Central District of California. See Liu Decl. ¶¶ 9-10 (listing 29 potentially relevant executives); Opp. at 11 (arguing that defendants have failed to show that those witnesses would be inconvenienced by proceeding in this forum).  Given their location, and given the pendency of closely related litigation in the Central District of California, it would be more convenient for those witnesses to have this case transferred to the Central District of California.

Putnam claims that there are important third-party witnesses located in New York City.  However, beyond claiming that certain steps in the process of issuing the MBS occurred in New York, Putnam does not identify who any of the relevant witnesses might be, what they might testify about, or how important that testimony might be.  Nor does Putnam explain why it would not be more convenient for any of these non-specified witnesses to have this case proceed in the Central District of California alongside other directly-related federal class actions, rather than potentially being called to testify in both California and Connecticut.  Based upon the information presented to the court, it appears that the convenience of witnesses favors transfer.

5.      **The Remaining Factors Are Neutral or Insignificant**

Either court is competent to apply both the federal and the state law underlying

11

EXHIBIT 147   263

this action, and familiarity with the law does not weigh significantly in either direction.

On the one hand, this action does present a claim under Connecticut law. "Where a

plaintiff asserts state law claims, the forum's familiarity with governing law supports

retention of the action, but this factor is one of the least important factors in determining

a motion to transfer." Capitol Records, LLC v. Videoegg, Inc., 611 F. Supp. 2d 349, 368

(S.D.N.Y. 2009) (quotation omitted); accord Rindfleisch v. Gentiva Health Systems, Inc.,

752 F. Supp. 2d 246, 261 (E.D.N.Y. 2010) ("federal courts are deemed capable of

applying the substantive law of other states" (quotation omitted); Zinky Electronics, LLC,

09-cv-26-JCH, 2009 WL 2151178, at *8 (transferring a case including a Connecticut

Unfair Trade Practices Act claim). On the other hand, given the many cases alleging

violations of securities laws by Countrywide pending in the Central District of California,

that court presumably has particular familiarity with many of the issues presented in this

action. On balance, this factor does not weigh significantly in either direction.

The relative means of the parties is not a significant consideration. Neither party

contends that it lacks the resources to litigate this action in either forum. Putnam has

argued that its counsel has "vast resources" and that they are more than capable to

lead an action in the Central District of California. Maine State, 2:10-cv-302-MRP, Doc.

No. 77, at 15. Therefore, this factor is neutral.

The location of documents is not a significant factor. The parties contend that

many of the documents are located in California, that many are located in New York,

and that many may be located elsewhere in unspecified off-site storage locations.

Presumably, many of the documents that are not in California might have to be

produced in California in connection with the other actions. However, there has been

12

EXHIBIT 147    264

no showing that producing the documents in this forum would be a significant burden; in these days of electronic discovery, that would be difficult to show.  Therefore, the court agrees with Putnam that this factor is neutral.  Opp. at 12-13.

The availability of process to compel the attendance of witnesses is not significant in this case.  Regardless of where this action proceeds, there will be non-party witnesses who are located outside of the forum.  The court has no basis to determine which, if any, of these witnesses might need to be compelled to attend.  Moreover, if any such witnesses are beyond the reach of the trial court's subpoena power, they may be deposed.  Therefore, as Putnam contends, this factor "'has little effect on the resolution of [the] motion' to transfer venue."  Putnam Bank Opp. at 11 (quoting Ithaco, Inc. v. Billingsley Instrumentation, Inc., 98-cv-380, 1999 WL 504907, *2 (N.D.N.Y. Jan. 14, 1999)).

### 6. The "Interest of the Forum" Does Not Support Retention

Putnam claims that the court should keep this case based on the State of Connecticut's general interest in redressing harms to its citizens.  Putnam fails to cite any case law supporting consideration of the "interest of the forum."  Section 1404(a) does not indicate that this consideration is relevant.  See 28 U.S.C. § 1404(a) ("For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action . . ." (emphasis added)).  In any case, the argument is odd in light of the fact that Putnam asserts four claims on behalf of a nationwide class.  It would seem that every state has an interest in redressing wrongs done to its citizen class members.  Therefore, the single, individual state with the strongest interest in this action would appear to be California, the state where the primary defendants were

13

EXHIBIT 147     265

located and where the allegedly unlawful activities occurred.  California presumably has

a strong interest in allegations of illegal activity on the part of one of its largest financial

institutions.  Therefore, if the relative interests of the fora were a relevant factor, it would

weigh in favor of transfer.

### 7. Summary of Factors

Transfer is warranted based on the pendency of related litigation in the Central

District of California, where the alleged wrongdoing occurred.  Transfer to that forum will

promote efficiency and help avoid inconsistent results.  It will be more convenient for the

parties and the witnesses to have related actions pending in the same forum.  Because

this action seeks to assert claims on behalf of a nationwide class, because the alleged

wrongdoing occurred outside of this district, and because Putnam previously sought to

assert these claims in the Central District of California, there is no reason to defer to

Putnam's attempt to reassert its claims in this forum.  None of the other factors weigh

significantly in favor of retaining the case.

## V. CONCLUSION

For the foregoing reasons, defendants' Motion to Transfer (Doc. No. 9) is

GRANTED.  The Clerk of the Court is directed to transfer the case to the Central District

of California.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 16th day of May, 2011.


    /s/ Janet C. Hall

Janet C. Hall
United States District Judge

14

EXHIBIT 147    266

# Exhibit 148

Countrywide Financial Corp. - Analyst Forum
March 30, 2004

Speakers
Stanford Kurland, Pg 3, 17
Jeff Speaks, Pg 9
David Sambol, Pg 32
Ron Kripalani, Pg 44
Drew Kissinger, Pg 57
Keith McLaughlin, Pg 70
Nick Krsnich, Pg 85
Eric Sieracki, Pg 93
Final Question and Answer Session, Pg 98

David Bigelow:  Well, good morning, and welcome to Countrywide Financial Corporation's Spring Investor Forum.  In addition to our on-site audience, I'd like to welcome those of you who've logged in for our webcast of this event.  On behalf of Countrywide and its people, I thank you sincerely for your interest in our company.

From an IR perspective, these investor forums represent our showcase events.  They provide a chance to highlight the best feature of our company -- our deep, experienced talented management team.  You'll hear today from some of our top executives, including some new faces that you may not have seen before.

Let me go quickly through today's agenda.  Angelo Mozilo, unfortunately, will not be here today because of a scheduling conflict.  Stan Kurland, recently promoted to the position of President of Countrywide Financial, will open our program by describing our industry outlook.  He'll be followed by Jeff Speakes, our Chief Economist.

And following a short break, Stan will return to the podium to describe our corporate strategic plan and introduce some of our business line strategies, which will be described in more detail by our business segment leaders throughout the day.

The first of those will be Dave Sambol, who will follow Stan.  Dave was recently designated as President and Chief Operating Officer of Countrywide Home Loans, our primary subsidiary, and he'll discuss our mortgage banking sector, as well as our global operations.

Next, we'll have Ron Kripalani, Senior Managing Director of our Capital Markets sector, followed by Drew Gissinger, Senior Managing Director of Banking and Insurance.

Following the afternoon break will be Keith McLaughlin, our CFO, and then Nick Krsnich, Senior Managing Director and Chief Investment Officer, who will describe for you our approach to enterprise-wide risk management.

And, finally, Eric Sieracki, Senior Managing Director of Corporate Finance, will summarize the key points from today's presentations and then transition into a final Q-and-A session, which will also include Stan Kurland.

For those of you who wish, there will be a brief presentation on Countrywide's production technologies following all this, and then after that, we hope many of you will be able to join the Investor Relations team in the evening for dinner.

Before we move on, I'd like to take just one moment to thank all of our speakers in advance for their time today and also for the effort they put into preparing for this event.  And I'd especially like to recognize the Investor Relations Department -- [Lisa Riordan], [Elizabeth Moyer][ph], [Chris Oltmann][ph], [Kevin Chamberlain][ph], and [Rebecca Rupel][ph] for putting this event together.  They put a lot of work into this.

And a couple of notes about future events.

First of all, our next Investor Forum will be held on June 16 at our Plano, Texas facility, so circle that date.

EXHIBIT 148        267

David Sambol, EMD & President of CHL - Mortgage Banking Strategy Implementation

Company Representative: Okay. We'd like to ask you all to stay in your seats. And we'd like to move on to the next speaker, who is the Executive Managing Director, President and Chief Operating Officer of Countrywide Home Loans, Dave Sambol.

David Sambol: Good afternoon. Okay. I need a tutorial on how to change these slides. Is this it? Okay. Well, Stan gave you a high level view of each of Countrywide's business segments. What I intend on doing is providing you with a more detailed look at the operations and the strategies for our mortgage banking and our global segments.

By way of an agenda, I intend to cover some of the notable highlights and accomplishments for the mortgage segment in 2003. I'll discuss some of the synergies which exist among the various units and divisions within the sector. And then I'll give you an outline of our game plan for the mortgage business looking ahead.

First, on the production side of our mortgage business, the four production divisions within Countrywide Home Loans in 2003 collectively shattered, as you probably know, virtually every relevant historical record at Countrywide. Total fundings were $435b, up 73% from 2002's volume. In fact, in the fourth quarter of '03, we now reclaim the number one spot in terms of origination volume. Our origination market share grew from 9.4% in 2002 to 11.6% in '03, an increase of almost 25% in market share.

More importantly to us, our market share for purchase loans climbed almost 50% in '03 versus '02 from 8.7% to 13%. Our purchase volumes approximated $130b in '03, up from $86b the prior year. And, notably, in the last several years, we've built our home equity lending capabilities in CHL, such that today we're one of the largest originators of junior lien home equity loans in the country.

Our home equity lending business is particularly and strategically important to us, both because of the very attractive margins in HELOCs, and the counter-cyclical nature of demand for this product relative to refinance demand, particularly cash-out refinance demand. In 2003, Countrywide originated $18b in home equity fundings. And we're now in the top five in terms of market share, and moving up very quickly up that lead table.

In terms of the individual production divisions, let me give you a profile of each. And I'll start with our consumer markets division. CMD, as you might know, is our retail division, which focuses on consumers with prime mortgage credit. We organize this division into three distinct sub-units. The first is our retail branch system, which sources its loans primarily from realtors and from builders.

It has a sales force today consisting of 5,300 commissioned originators and sales support staff. And it has 480 local branches who, for the most part, perform their own processing and their own underwriting locally. The second unit in CMD is our B2C unit. This unit consists of our two very large call centers – one in California and one in Texas. And it has approximately 400 salespeople.

The B2C unit sources its loans directly from consumers. And they primarily focus on our own portfolio, and our portfolio retention and cross-sell strategies, as well as on the Internet channel. And then the third and the newest unit in CMD is what we refer to as our B2B unit. They act as a mortgage provider or outsource vendor, to other companies with mortgage customers – primarily banks – who don't want to run their own mortgage operations, but who still want to offer mortgage products to their customers.

In terms of CMD's accomplishments in 2003, it obviously starts with a fantastic year in terms of overall volume growth. CMD funded $104b in '03, up 68% from their 2002 fundings. But the primary focus for CMD over the past several years has been to grow their purchase volume and their purchase market share. And their primary strategy for doing this has been to grow the size of their sales force. On both of these counts, we can say that CMD has been tremendously successful.

In the last two years, CMD has doubled the size of its retail sales force. In the last year alone, they have added over 1,000 new loan officers. And their sales force is growing at the rate of between 100 to 150 originators per month. Today they rank as the second largest retail sales force in the U.S. mortgage industry. That's in large part due to the

EXHIBIT 148      268

sales force growth that CMD grew its purchase volume by 70% in '03 versus '02, while the overall market size for purchase loans grew somewhere between 10% and 15%.

It's not on this slide, but we estimate that our purchase market share in CMD to be approximately 3.7% today. In 2001, we averaged approximately 1.5%. CMD has also been the primary drover of our HELOC growth. They generated approximately $9b in home equity volume in '03, which is roughly one-half of Countrywide's overall home equity origination.

The second production division is our wholesale lending division, or what we refer to as WLD. WLD is organized into two sub-units – a prime organization, and a non-prime organization, which we refer to as our wholesale specialty finance unit. Now both of these units serve the needs of the mortgage broker community in the U.S. And together they source their loans from approximately 31,000 approved mortgage brokerage firms.

The prime organization today has approximately 500 salespeople. And they operate out of 51 local branches, where their fulfillment is handled for prime loans. And the specialty finance unit has its own dedicated sales force, consisting of approximately 350 salespeople, while their fulfillment functions are centralized into two very large centers – one in Plano, Texas, and the other in Orange County.

Like CMD, WLD also had a fantastic year. In fact, in 2003, they became the number one wholesale lender in the country in terms of volume, with growth in their market share year over year of 25%. They funded approximately $90b in overall volume, which is up from $67b in '02. And this included home equity volume for WLD of $4.9b, which was up 44% from '02 levels.

Most impressive, however, for WLD was the volume growth posted by their specialty finance unit. This unit grew its volume a phenomenal 212% in '03, over '02's volume, from $1.6b in 2002 to approximately $5b in 2003. And they're continuing to grow and to capture share at a very fast pace. We expect this unit to fund between $8-10b in volume this year, which is a very strategically relevant amount for us, for reasons similar to our home equity lending volume – that being that the margins in the non-prime product line are very attractive, and this business is far less interest rate sensitive than our prime volume.

Our third production division is our correspondent lending division. CLD purchases loans after they have been closed, from other financial institutions, such that their customers are other mortgage companies, banks, thrifts, credit unions, and insurance companies. And, like WLD, in 2003 CLD was the number one correspondent lender in the country.

In fact, it can be said that, after Fannie Mae and Freddie Mac, our correspondent division was the largest purchaser of single family residential mortgage loans in the world. Total production volume in CLD grew by nearly double in 2003 versus 2002, from $208b last year, to $195b in '03. Their market share growth in 2003 was 35% over what it was in 2002, and an amazing 140% in the last two years, going from a market share of 2.5% in the year 2001, to almost 6% of the total market in 2003. They captured this market share, in part, by doing a great job at exploiting consolidation, which occurred in that particular channel.

And another reason explaining their success was their resourcefulness at ramping up their capacity, as volumes soared in the industry the last couple of years. They, in fact, converted their fulfillment plans to 24x7 operations, running three shifts each day, using each desk, each computer, three times over in every 24-hour period. And, to our knowledge, they were the only correspondent lender who was able to ramp up capacity that fast, and in that way.

The last production division we have is full spectrum lending, or FSL, which is our retail operation, focusing exclusively on the non-prime and the home equity markets. FSL calls on consumers to desire to tap the equity in their homes, primarily for debt consolidation purposes. And they also act as the outsource vendor or the fulfillment platform for the non-prime loans that are sourced through our consumer markets division, our sister division.

In addition to referrals from CMD, FSL sources its loans through a variety of names. But the primary ones are through direct mail and telemarketing campaigns, through the Internet as a channel for them, and otherwise through the business development efforts of their own sales force. Like CMD, the core of FSL's market share growth

EXHIBIT 148      269

strategy has been to grow its sales force, and to grow its branch system, and to in that way expand its reach and distribution.

In the last 12 months, FSL has doubled the size of its sales force, going from approximately 1,000 account executives at the end of '02 to over 2000 salespeople today. They also added 43 new branch offices and new markets last year. And, as a result of this sales and distribution growth, funding volume for FSL more than doubled in 2003 from the previous year, to approximately $8b in production.

And, like WLD's non-prime unit, FSL is continuing to grow and gain share at a very rapid pace. In the fourth quarter of last year, their monthly volume was a little bit over $800m a month. This month, in March, and in the second quarter, we expect them to fund over $1.1b a month. And also, like WLD's non-prime unit, we expect FSL to post material year over year earnings growth, in spite of a market which conventional wisdom suggests will be significantly smaller than last year.

I think this next slide provides a clear illustration of the upward trajectory and success each of our production divisions, individually and collectively, had in growing their market share. The market share growth represented on this chart, in the aggregate, represents a compounded annual growth rate of over 30% in the last two years.

On the other side of our mortgage business, the servicing side, we also made significant strides in 2003. Our portfolio, as was mentioned by Stan, grew to $645b at year-end, up approximately $200b, or 43%, from where we were at December '02. Our servicing market share grew to 8.8%, up from 7% in '02. And our customer count broke $5m, up from $4m a year earlier.

Now our portfolio growth of approximately $200b was particularly notable, in that it was the largest amount of growth of any of the top ten servicers, in fact with the servicer which posted the next amount of growth after us, posting less than one-half of the portfolio growth that we posted. In fact, it's interesting to note that in the last year, Countrywide grew its market share by two percentage points, as I said, from 7% to almost 9%, while the other top nine servicers, as a group, collectively lost 3% market share.

On the closing services side of our mortgage banking segment, our LandSafe companies also had a banner year. LandSafe companies collectively processed over 14 million transactions in 2003, up 50% from the previous year, including 42% more credit reports, 65% more appraisals, and 37% more flood determinations. Consolidated pre-tax earnings contribution for the LandSafe companies approximated $100m last year, up 40% from 2002.

Most of the numbers I have walked you through were operational metrics. It is for the financial contribution from the mortgage banking segment, pre-tax earnings in 2003 were $2.9b, up 200% over 2002 earnings, which were record earnings themselves at the time. Production earnings obviously led the way, growing by 71% year over year, to approximately $4.1b, and materially offsetting the loss which was expected in the servicing segment, which does serve to illustrate the effectiveness of our macro hedge in one of the most stressed interest rate environments that servicing has historically seen.

It should also be pointed out that the optics relative to the way in which we are required to report production earnings and servicing could be somewhat distorted relative to the true economics of servicing. And Stan touched on this a little bit, in that much of our production earnings were enjoyed because of the portfolio.

Those earnings came from refinancings of the port, as well as various cross-sell activities, such as home equity lines of credit, which we arguably would not have had, had it not been for the port, and which, in an economic sense, maybe should be allocated to the portfolio segment. Again, this is in part what we refer to when we talk about the macro hedge, or the intrinsic value of servicing, as opposed to the accounting value, which we booked.

The other point I would make relative to earnings in 2003 is that we posted these record profits, while retaining for portfolio a substantial portion of our HELOC production, and certain ARM production, in growing our bank, and foregoing the immediate gains on sale that we otherwise could have enjoyed had we sold those assets.

This next slide is intended to highlight the depth of our management team in the mortgage business, and because we believe that superior management talent does represent one of Countrywide's key competitive advantages. And

EXHIBIT 148     270

Stan alluded earlier to the senior managing directors in my group, who average over 10 years of tenure with Countrywide, and over 20 years industry experience.  But the depth and the quality of our leadership goes much deeper than that.  At the next level down, we have 24 managing directors within the mortgaging segment, all of whom run subdivisions of major operations, or smaller subsidiaries.

Now this next slide attempts to illustrate the synergies which exist as a result of our diversification efforts, both within the mortgage banking segment and with our other business segments.  Now the pillars in this house that's depicted represent the phases in the mortgage lending process, and identify the interaction and the leverage and the cross-selling which occurs between our various entities.  On the left, at the front end of the mortgage process, a phase we call the customer acquisition phase, many of the leads that we receive are internally generated.  They come from one Countrywide entity to another.

For example, our servicing portfolio is a huge source of refinance leads for CMD.  Similarly, our consumer market division generates non-prime leads for its sister entity, FSL.  At the next stage of the process, what we call the pipeline stage, our fulfillment plans in the production divisions refer business and leads to LandSafe, our closing services company, for services such as credit, appraisal and title, and also to enter insurance services into Balboa for homeowners' insurance policies.

Our loans, as the loans are funded, Countrywide warehouse lending provides value added to CLD's customers, by giving them warehouse lines, so that they can sell more loans to Countrywide's correspondent lending division.  And Countrywide Bank provides the same customers as it does to CHL with a variety of custodial services.  And then the sale of our loans, or the mortgage-backed securities in which they are pooled, is facilitated in part by Countrywide Securities, which distributes a material portion of Countrywide's asset production.

And our Bank is also involved in the distribution side, as the portfolio home for certain products, such as our home equity lines of credit.  And then finally, on the far right, in the servicing phase, many synergies exist as well.  Of course, CHL services the loans for the bank.  Balboa and CIS provide forced place insurance to our portfolio.  And then Balboa Re participates in a very profitable mortgage insurance coverage on our servicing portfolio.  So the story here is that all of our diversification activities and businesses are characterized by or in fact explained by material synergies with our core mortgage banking business.

So that's a brief profile of the units within our mortgage banking segment, and a historical perspective on each.  What I want to cover next is our game plan for each of these units, looking ahead.  For our production divisions, there really are four key themes within each of their individual business plans.  If you were at the last investor forum, or if you are otherwise familiar with Countrywide, these themes should look very familiar to you.

The first theme, and the very core of our business plan, of all of our business plan, is continued aggressive market share growth, particularly growth in our purchase and home equity businesses.  The second theme is what we refer to as margin optimization.  I'll talk about this topic in a bit.  But I'll say that it's our focus at Countrywide on this topic, on margin optimization, that we believe has made CHL the most profitable mortgage company in the mortgage banking business in the last two years.

The third theme is productivity improvements.  By this we mean our initiatives and continuous efforts to drive down our costs to originate a loan.  And then the last theme relates to our ongoing focus in building and maintaining the best technology in the mortgage industry, a recurring theme I know that you've heard already, and will continue to hear today.

And I just want to drill down a bit on each of these four themes, starting with the topic of market share growth and our strategies to affect market share growth.  As it relates to market share growth, it all starts with Countrywide's philosophy of not being a niche player, of positioning ourselves to participate in every channel, every market, and every sub-market within the mortgage lending landscape, whether those are defined by customer profile, by geography, or by the product preference of the consumer.  It's our intent, again, as Stan said, to be ubiquitous in our presence, to be a leader in every relevant market segment, and to really seed no material segment to our competition.

The second aspect of our share growth strategy is our intent to continue to aggressively grow the size of our sales force.  Now while this primarily applies to our retail sales force in CMD and FSL, it also applies, but to a lesser

EXHIBIT 148      271

extent, to our plans for the sales force in our wholesale and correspondent channels. In the last couple of years, Countrywide has grown the aggregate size of our sales force from 2,000 salespeople to over 7,500 today. And it's our intent to double that number in the coming years, and to have the largest sales force, the largest army in the mortgage industry.

The next aspect of our share growth strategy is to maintain the broadest product line in the mortgage industry, which is a claim that we can safely make, in fact, today. It's our intent to carry every product or program for which there is reasonable demand. Our value proposition to our business partners, whether they be realtors or builders or brokers or correspondents, is that if your customer can legitimately qualify for a loan anywhere else in the U.S., they'll qualify at Countrywide. And if they have a product or a loan preference, that product will be on our menu.

Another area of strategic focus for us is the aggressive pursuit of what we refer to as the emerging market segment, which are low income families in the fast-growing minority segments in the U.S., particularly the segment represented by Hispanic Americans. Another key component of our share strategy is one that I've already touched on. And that is our initiative to build and deploy value-added technology to our customers.

Countrywide's proprietary technology clearly represents one of the primary reasons for our historical success at growing share, in every one of our channels. In looking ahead, we're building some extremely exciting and proprietary new technology that will further distance ourselves from our competitors, and will solidify and expand our customer relationships.

The next leg of the strategy relates to the topic of service. Countrywide has a mantra throughout all of our divisions that we strive to deliver what we refer to as raving fan customer service. And we, again, have many initiatives which focus on measuring and improving customer service levels. Of course, competitive pricing also remains central to share growth strategy. And pricing is another area where Countrywide is also advantaged, because of our low cost structure.

And lastly in this area, we're embarking on a national branding campaign. We recently launched a series of advertisements designed to increase consumer awareness of the Countrywide name. The theme of this ad campaign is realize your dreams. And I think we have a video clip, which I'd like to show, to give you a sense as to what our customers are seeing.

[VIDEO CLIPS]

David Sambol: Okay. I talked about our market share strategies. The next theme I want to cover with you is the theme of margin optimization or margin management. This is a theme that also resonates through every one of our business plans. Again, something I covered at the last investor's forum, which I intend to do again, Countrywide's view on pricing and related pricing margins is that there is a single price point, or related pricing margin, on each product at which our revenues and earnings will be optimized.

If we post a more aggressive price than this optimum price point, with a lower pricing margin, then the result will be dilutive to earnings, because volume will not grow sufficiently to offset the reduced margin. Conversely, if we add more margin into our rate sheet prices, and try to make more on each deal, so to speak, then the resulting drop in volume will result in earnings dilution.

So there is this single or optimum price point at which the product of volume times margin will generate the highest earnings. The problem, however, in the mortgage industry is that this optimum price is not always easy to identify. It's different on different products, and for different branches, and for different customers, and different markets. And it changes with the environment.

But it's our unique efforts at Countrywide, and the resources that we deploy to this topic, to identifying and posting the correct price each day and on all products, and for all of our markets, which is what we refer to when we talk about margin optimization strategies. Specifically, each of our production divisions has a margin management unit or theme, which exclusively focuses on this topic of price and pricing margins for their division.

# Exhibit 149

**Countrywide Financial Corporation 2006 Fixed Income Analyst Forum**
Tuesday, February 28, 2006 11:30 AM Pacific

*Presenters:*
Welcome - Vince Breitenbach, Dir. Fixed Income / IR, **pg 1**
Industry Overview - Angelo Mozilo, Chairman & CEO, **pg 3**
Financial Review & Mortgage Banking - Eric Sieracki, Executive MD and CFO, **pg 15**
Countrywide Bank - Jim Furash, CEO & President Countrywide Bank, **pg 29**
Credit Risk Management - John McMurray, Senior MD & Chief Credit Officer, **pg 41**
2006 Outlook/MSR Valuation & Hedging - Jeff Speakes, SMD & Chief Economist, **pg 53**
Liquidity & Capital Management - Jennifer Sandefur, SMD & Treasurer, **pg 64**
Capital Markets - Grant Couch, SMD & COO Countrywide Securities, **pg 71**
Q&A / Wrap-up - Eric Sieracki, Executive MD & CFO, **pg 78**

*WELCOME*

*Presentation*

**Vince Breitenbach:** Hi, good morning, everyone. Good morning, everyone here in California. Good morning to everyone who is listening to the webcast in the United States and Canada. Good afternoon to our friends in Europe. And, also, I'd like to welcome the people in Australia and Asia who will be listening to this webcast on replay tomorrow.

Welcome to Countrywide's 2006 Fixed Income Investor Financial Forum. I'm Vince Breitenbach, Director of Fixed Income Investor Relations.

Now, as my welcoming comments suggest, global markets are very important at Countrywide. Currently we fund ourselves in five different currencies, and I wouldn't be surprised if we increased the number of currencies to, by one or two over the course of this year. Currently, we fund ourselves in euros, dollars, Australian, Canada dollars, as well as sterling. We also fund ourselves domestically in the institutional and retail markets, and we also have a growing deposit base at Countrywide Bank.

As we look forward, the growth in diversity of our funding programs are largely a reflection of what we've done on the business side. Now, to help you to better understand what we are doing on our business side we've invited many of the members of Countrywide's Senior Management to give you a sense of the evolution of this business model

Today's agenda is going to begin with our Chairman and Chief Executive Officer, Angelo Mozilo. And Angelo is going to share his view of the mortgage industry from an overview perspective and, also, his outlook for 2006.

Angelo is going to be followed up by our Chief Financial Officer, Eric Sieracki. Now, Eric is going to be doing double duty today. First, he's going to give you an overview of our financial and operational performance. In addition to that, he's going to go through our mortgage bank, as well.

Now, traditionally, Stan Kurland, our Chief Operating Officer, would have done that presentation, but he's been invited to share his thoughts about the mortgage industry with [Ben Bernacki], and that's an invitation that's difficult to decline. So, Stan sends his regrets.

EXHIBIT 149      273

said is fraud in documentation.

**Angelo Mozilo:** Fraud?

Unidentified Participant: Fraud, just basically because you're getting more into a low doc loans and no doc loans, and they're finding out that, gee, lo and behold, the borrower just isn't telling the truth.

**Angelo Mozilo:** Right.

Unidentified Participant: Just what you've seen on the industry, that direction, and what you guys do to sort of sift through that and an investigation to find out beforehand what you've got going on?  And maybe how prevalent do you think it is?

**Angelo Mozilo:** Well, I can't – you know, I don't have any measures.  Fraud has always been part of the business, you know, because people, just take the, just the retail side, very often the intermediaries on the retail side will tell them, you know, you have to make so much to qualify, so tell your boss to sign the – you know, there's all kinds of stuff, always going on.

How large that is?  I don't think it's much different in the fully documented loans than it has been in the past.  There's no question that the no doc loan or stated income is, you know, there's some exaggeration going on.

But what you have to look at really is get beyond that and look at what is their FICO score, what is their past history in other mortgages, because unfortunately a lot of people hide their income, too, if you're self-employed so that your 1040 is not really a reflection of what they make.  And so it's very difficult to [gauge].

So, what we have to do is go to alternative sources, and what we do is we'll look primarily at the credit history, and we'll look at cash flows that come in through their checking account, so there's ways of getting around the first concern.

The bottom line, however, is that if you look at the low doc loans and the no doc loans, stated income loans, the performance on those loans have been extraordinary, on the good side.  So, I believe there's a lot of fraud, but I don't think it's been meaningful in terms of the quality of performance of the loans.

Where you do have problems in fraud is really in the – I mean when there is a problem in terms of loss, it's on the appraisal side.  That is the – when the appraisal, when they – and it's very easy to collude – because we have a $1 million house and $1.5 million, you have $500,000 you're screwing around with there, and you give the appraiser $20,000, $30,000, $40,000, that's a lot of money to convince them the house is worth $1.5 million instead of $1 million.

And so the appraisal side, you know, has been problematic, but not extraordinarily problematic.  I mean, again, if you look at the performance of the loans over the last five years it's been very good.  Now, no question what's covered up a lot of these sins is the increase in values.  The values keep on going up and people sort of work their way out – if they have a problem they're able to sell the house, make a few bucks, get out.  If you have value stabilizing going down I think that as somebody said a long time ago is that you don't go swimming naked till the tide goes out, and when the tide goes out or the dollar value is going lower you'll see some more problems.

Unidentified Participant: Angelo, as the yield curve inverts more what do you feel the demand will be going forward for pay option ARMs from the borrowers' perspective?  And then, also, the demand for the

# Exhibit 150



# Thomson StreetEvents℠

## Conference Call Transcript

### CFC - Countrywide Financial Equity Investor Forum

Event Date/Time: Mar. 30, 2006 / 11:00AM ET

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 150   275

FINAL TRANSCRIPT

Mar. 30. 2006 / 11:00AM ET, CFC - Countrywide Financial Equity Investor Forum

**Unidentified Audience Member**

Eric, I was intrigued by the slide on the EVA and RAROC, particularly the gap between mortgage banking being one and a half to two times the returns of the other businesses. First of all, could you talk a little bit about how that mortgage banking breaks out between production and servicing and where might that have been, either in the fourth quarter or where would you expect those returns to be in 2006 versus the rest of your businesses?

**Eric Sieracki  - Countrywide Financial - Chief Financial Officer**

Okay, well, I'm not at liberty to go into any more detail than what we showed up there in terms of the split between servicing and production or any of those other features. But the point was that you earn higher returns in mortgage banking than you do in the portfolio model. However, the Street observing the volatility and lower predictability of that cash flow stream puts a lower PE multiple on there. We were just trying to show you the earnings power of mortgage banking.

And with respect to fourth quarter versus prior, we can't get into that level of detail now. We were just trying to give you the big picture.

**Unidentified Audience Member**

During this cycle we've seen quite a bit of growth in low documentation loans, particularly stated income loans. I was wondering, is that criteria, how do you see those loans, in the prime sector in particular, performing over time and do you see a slippage in those type of income related underwriting -- ?

**Angelo Mozilo  - Countrywide Financial - Chairman and CEO**

Stated income loans? Yes, I think that depends on the FICO score. It's strictly FICO related as far as I'm concerned. That's my background, servicing and underwriting. I was raised in that. I think that it has everything to do with the quality of the credit history of that individual. Whether you get documents on them or not, it's not going to change their payment behavior.

**Unidentified Audience Member**

[inaudible - microphone inaccessible]

**Angelo Mozilo  - Countrywide Financial - Chairman and CEO**

FICO drives everything. And no amount of documentation is going to change payment behavior. And that's why you'll see that most documentation are in subprime loans and the highest delinquencies are on subprime loans. So there's a direct relationship between the number of documents and delinquencies. So I think that the fact you have stated -- now, that's on documents.

With the [inaudible] stated income I think you're talking about something a little different there. And again, FICO would play a major role there, but I think there's an increased risk on stated income because you're really, at the end of the day, really don't know really what's going on. You can run -- we run some cash flows, looking at their checking account, and do some -- try to figure out how the cash is flowing and what they really make, but I think there's an element -- I can't tell you what extent, I don't think it's severe, but I think it's a greater element of risk on stated income than there is on no-doc loans.

**Unidentified Audience Member**

Hi. I was a little surprised, going back to your slide about the EVA, to see you in the insurance underwriting business on the personal lines. And I was wondering going forward if you expect to meet your threshold in terms of return on capital considering how competitive the business is?

**Angelo Mozilo  - Countrywide Financial - Chairman and CEO**

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 150    276

# Exhibit 151

## Thomson StreetEvents℠

### CFC - Countrywide Financial Corporation Fixed Income Investor Forum

Event Date/Time: Sep. 13. 2006 / 8:30AM ET

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151      277

F I N A L   T R A N S C R I P T

**Sep. 13. 2006 / 8:30AM, CFC - Countrywide Financial Corporation Fixed Income Investor Forum**

We really see the rating agencies as kind of a proxy for what investors would feel, you know we feel the same way about our investors, we're very protective. You and all of our investors collectively have supported us for years, and so we're very sensitive to maintaining that support and maintaining that respect and that trust. Eric had also mentioned an excess capital cushion in one of his slides, this gives you a little bit more detail on the regulatory capital cushion. You see we have 3.9 billion in regulatory capital excess at June 30 and then Eric referred to the total risk based capital number of 3.5 there at the bottom.

Again we don't manage -- our capital requirements are a function of, as Eric said, economic capital observations, regulatory capital observations as well as rating agency capital requirements. And we maintain a cushion over that for unexpected events, opportunistic events and to maintain sort of a conservative profile. So even after that we're still seeing some pretty material excesses that we'll be looking at here in the near future.

As far as strategic funding plans, I think it was clear as you see the MTNs playing a lesser role. For this year we would expect to raise between 3.5 and $4.5 billion for the balance of the year. I do believe as we go forward the total issuance numbers will decline from where they are this year, but will not decline entirely. And we also are looking at building out programs at the bank, on the unsecured debt side, as well as some secured programs just to further diversify their sources of liquidity and funding.

However we're also looking at best execution and so they're competing with other lower cost forms of liability, so we're looking at I think covered bonds would be a good example of something we'll be looking at in 2007. We're also looking as I mentioned, given our excess capital position, equity position, we are looking at hybrid capital to replace some of that very costly equity and other kind of capital management tools that would be available to us. And we also are very committed to continuing to expand our geographic presence in the investor markets around the world and we'll have Vince on the road that much more as a result.

Lastly, I think let's summarize the points that I'd like to leave you with and make sure resonated with you from this presentation, Countrywide has an extraordinarily conservative and sophisticated liquidity management plan. It's very scientific, we take nothing for granted. I think we've gone a long way in the last year even on our contingent liquidity analysis and modeling. We have an optimal funding diversity, I think that -- we started our European program in 1998 and it's taken off.

We have some years where we do more than even this year and it's a little bit more of an opportunistic market. I think we've done a lot to bolster our investor relations efforts and build out that team with some highly qualified individuals. We have a substantial liquidity cushion today. We're kind of drafting some of the liquidity that we built for the boom. And our balance sheet is very high quality assets that have a quick turn through the company, very, very liquid. And that we are funding those assets and financing those assets in accordance with their liquidity profile and we look at that very conservatively. And that we are very well capitalized, lastly that we are very well capitalized from all of our regulatory and oversight constituents.

So, thank you very much.

---

**Vince Breitenbach** - *Countrywide Finance - Managing Director of Investor Relations*

Thanks, Jennifer. Last up our final formal presentation, and again we'll have Q&A after that, is John McMurray who is our Senior Credit Risk Officer.

---

**John McMurray** - *Countrywide Corporation - Senior Managing Director and Chief Risk Officer*

Good afternoon, my presentation today is going to focus primarily on residential mortgage credit risk, which seems to an item of interest to most of you. I'm going to do three things, first I'm going to share a couple macro economic factors that we think are particularly important, next I'm going to share our approach to managing this risk and then finally I'm going to show you the results of a serious delinquency study.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151      278

| Sep. 13. 2006 / 8:30AM, CFC - Countrywide Financial Corporation Fixed Income Investor Forum |
| --- |

All right. So the two macro economic variables are not surprisingly first housing prices and then employment or unemployment. So I want to start with this slight, it's an updated version of a slide that some of you should have seen in the past and let me explain how it works. If we go over to the middle left of the slide, you can see a red line that starts right at about 10% and then carries across the entire screen. That represents the national home price appreciation. It's calculated using a repeat sales approach so it doesn't look at median-to-median but it's going to look at every property that sells every month in constructing that index.

The problem with a median price is that the median home that sells in one period to the next can change and so it can give you a false read. In other words if this month it was a three bedroom house and next month it's a four bedroom house, what you have there is a change in the median house rather than a change necessarily in prices. So this removes that effect. It's done month-by-month and it measures the home price appreciation rate year-over-year, so it's an annual measure taken each month.

The tip of each of the blue bars represents the five best MSAs across the country. So there are about 330 MSAs in the United States, it's going to be a suburban or an area with at least 50,000 people. So the five best at the very tip. At the very bottom are the five worst MSAs. And then you'll see two dark blue bars on either side of the red line, that's plus/minus one standard deviation, so you're going to have just over two-thirds of the MSAs having appreciation rates that fall within sight of those dark blue bars.

At the bottom of the chart I've graphed, and this you would look to the right axis, the percentage of MSAs that are experiencing a year-over-year price decline. So a couple quick things to point out on this chart. The first is the national average is very well behaved. This slide is not inflation adjusted by the way, which is how most consumers look at their loan. And so the national average is very well behaved, it doesn't go below zero, it came close to zero it looks like in 1990. The other thing to notice is that there's a significant number of MSAs in every month that are having year-over-year price declines. The last few years have been fairly extraordinary in how few that's been so you can see that at the bottom right of the charts.

And then the last comment I'll make here is we've seen -- two last comments, the first is that we've seen a change in the composition of the very, very top part of the bar charts, so the very fast appreciating MSAs. So it's no longer places like Las Vegas, Los Angeles or some of those major metro areas, but rather second or third tier MSAs, places like Bakersfield, California, Yuma, Arizona or Fresno, California. And then finally the other thing to note is, if you look over to the far right, you can see that the red line started turning down quite a few months ago. So with this next slide I'd like to drill in a little more closely to that.

So here we're looking at the national average, but instead of measuring year-over-year we're measuring month-over-month and then annualizing that rate of appreciation. The small numbers that you see are the particular month of the year, so the first thing to notice here is there is a strong seasonal pattern. So if you're planning to buy a house you ought to buy it in the fall, if you're planning to sell a house you ought to sell it in the spring. The pattern is very pronounced and it's been very reliable. The other thing that I wanted to draw your attention to here is, if you look at the fall of 2005 and then particularly the spring of 2005, we were already seeing a substantial deterioration in the home price appreciation rate from what we had seen in the past few years. So 2000, 2001, '02 and '04, each of those successive years the appreciation rate was higher and higher, and we now see that trend broken both in the fall time frame and certainly in the spring of this year, which is on the far right. So house prices are important. The next thing that we look at are unemployment and we're going to have a closer look at this in the third section of my study, but from a high level here's how it looks. So this goes back to 1972 and we've got national unemployment graphed against national total delinquency and the two tend to track one another fairly closely.

And then finally the last macro economic slide I wanted to show you, similar to house prices, except we're looking at unemployment here. So the red line again is the national average, the tips are the five worst MSAs in terms of unemployment, the bottom of each of the green bars the best, and then we've got plus and minus one standard deviation with the dark green lines. Over at the far right you'll see it looks like three or four months that peaked up, that's actually as a result of Katrina so that would include New Orleans, Mobile, Alabama, Southern Mississippi MSAs that caused that particular spike.

All right I'd like to transition now into retained credit risk and the approach that we use to manage that and where we're keeping credit risk. On this slide I lay out our basic approach so the column at the far left are -- and at Countrywide most transactions take the form of a loan, there are a few other transactions that are not a loan but the approach is similar. So on the very left

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151   279

F I N A L   T R A N S C R I P T

**Sep. 13. 2006 / 8:30AM, CFC - Countrywide Financial Corporation Fixed Income Investor Forum**

hand column are the measures that we apply to all transactions, irrespective of whether or not we keep the credit [technical difficulty] outside of the company. The middle column are the primary credit enhancements that we use to transfer credit risk and then the last and final column on the right are the key credit risks that remain. So there's virtually no transaction that we do that allows us to get rid of the credit risk, we can get rid of it, but in most cases there is either a little bit to all of it left. And I'm going to go through the numbers on the next slide but let me just spend a minute in here just to describe some of the individual entries.

So our credit policy are simply the rules that we have governing the types of transactions that we'll do. Underwriting is the process of applying those rules to transactions. Quality control is a loan review function so we're going to come in and look at transactions that were done after the fact to make sure they were done according to policy. Surveillance is the idea of taking a very detailed look at how different parts of our portfolio, both owned and sold credit risk, are performing in terms of delinquencies, defaults, prepayments, revolving activity where the loan is a revolver. Loss mitigation is where either someone's in a delinquency status or in a default, the measures that we'll take to mitigate those risks.

And then finally with respect to diversification, we think of that in four or five different dimensions. So the first and one of the most important is geographic, we're going to see several slides on that and I hope that you can tell from looking at the very first slide why that's so important. The second is channel of distribution, so we find significant effects depending on how the loan came to us so that we think that's an important dimension of diversification. What we call amplitudinal diversification, which is having a lot of similar transactions, so on something like a mortgage loan where you have a very low expected default rate, it's good to have a lot of transactions otherwise your results are going to be lumpy. And then finally product diversification is also useful as well, we see differences in terms of performance just with respect to the particular product that a consumer or another institution takes.

All right moving to the middle column, the credit enhancements that we use. So the most basic is simply a sale of the asset. So that can take two primary forms, we can do a securitization and the securitization can be done either through the GSEs or Fannie Mae's largest securitizer and I think we're at two or three with Freddie Mac. It can be off of the Countrywide shelf, so increasingly more and more of the loans are being sold off of our shelf as opposed to the GSE shelves, or it can simply be sold as a whole loan. So that's the most common type of credit enhancement that we use.

We also use a significant amount of insurance, so that can take the form either of bond insurance or we'll use type of a [RAF] on one of our securitizations. Or we can buy private mortgage insurance that may be paid for by either the consumer or by us, and it can take the form of a loan level insurance policy or a pool level policy. We use that both in conjunction with securitizations and we also use it on whole loan portfolios. So as an example, in the bank a significant number of the 90% and higher CLTV HELOCs have a pool policy that we've got in place on those loans.

And then finally, after applying those credit enhancements to the transactions that we do, we're left with the five key credit risks that I show you over on the right. So rather than spending more time on this slide, what I'd like to do is share the numbers with you and this might be easier to see in the book than it is on the screen. So this is split into three sections, the top, the horizontal section is called the owned portfolio, these are going to be loans that are either in our inventory that we're holding for sale, so HFS stands for sale, or that we're holding as an investment. Those loans are HFI in this particular screen. The major held for investment category is going to be Countrywide Bank so you can see -- and in fact it's the major category of our own portfolio so 78 billion out of the 110 billion on this section is owned at the bank as an investment.

The middle section is called the sold portfolio, so these are loans that we've either sold as a whole loan or securitized, and then we continue to service the loans. So if I add those two subsets together, I will tie back to the total servicing portfolio so you can see the 1,196,000,000 about three quarters of the way down, and I'm on the first column of numbers, that ties out to our total servicing portfolio. And then at the very bottom we've got a -- this is all in UPV by the way, we've got a couple additional positions at Countrywide Bank.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151    280

**Sep. 13. 2006 / 8:30AM, CFC - Countrywide Financial Corporation Fixed Income Investor Forum**

There's about 2.5 billion that's serviced by others. These are all residential loans. We've got commercial real estate loans that are held for sale at about 5 billion at the time this schedule was done. And then about 4.2 in warehouse lending advances. These are commercial loans that have been given to other institutions with mortgages as collateral.

If we move to the right what I'm showing is the different types of credit risk that we're retaining on each of these different segments and subsegments. So in the second column of numbers it's HFS, HFI, and WHL which stands for warehouse lending. These are the reserves that we have accrued on these loans and so I've split it out to the different categories that those reserves apply to.

This is the classic FAS5 type reserves that you would do for a loan. Keep in mind on the held-for-sale loans the accounting on those is not just as a reserve but rather to have the mark-to-market. So what I'm showing you here is mostly the reserves rather than the market that would on those loans. The next column over is rep and warrant risks so when we sell whole loans or we do the securitization we're going to make representations and warranties. If those turn out to be subsequently breached we have risk of either buying the loan back of indemnifying the buyer of those securities or loans.

So we estimate a lifetime loss on that and then accrue a reserve so you can see that's in total about 350 that we've accrued there. Next is reinsurance so on the loan-by-loan mortgage insurance that we buy on those loans that have LTVs above 80 we sell the insurance to the mortgage insurers. So it's a mezzanine layer of risk. We've never had a loss on this reinsurance portfolio but we've selected long duration accounting. It allows us to accrue a reserve here and so we have 140 million against this particular [riskization].

The next column over is residual losses so this is the most significant position on this particular page. So what I'm showing to you here is the present value of the losses that were booked as part of the residual so you may recall that Kevin had a page where he showed you the book value of the residuals and getting to that book value what we've done is we've forecasted what the cash inflows are. We've forecasted what the cash outflows are and then present valued those back. I'm simply splitting out the present value of the default losses which are the major outflow on these securitizations.

A couple of other quick comments, they mainly come about in connection with either subprime or HELOC securitizations. That's the two primary ways that a residual gets created. And then point two on the subprime side we've lately been a very aggressive seller of those residuals and/or NIMer of those residuals. So a NIM is where we take a portion of the interest-only cash flows and sell that to an investor for cash so it allows us to cash out of our position rather than receiving it through time. And then over at the far right I just give you a total of all of the various reserve or accrued credit expenses that we've got associated with our balance sheet which as of June 30th was just under $2 billion.

All right I wanted to give you a quick look at the bank portfolios so you can see the total at the top. And we've split out three segments which are not only large but loans that we get questions on so the first is obviously pay option so it comprises almost half of our bank investment loans. You can see the original CLTVs and FICOs. One of the things that we have the capability of doing is remarketing those CLTVs and buy the way that's the combined loan to value ratio so it not only includes the indebtedness on the first but to the extent that that borrower has a second we're including that in as well. In looking at how borrowers perform obviously it's the total amount of leverage not just the leverage on the first that drives the performance.

If we remark those CLTVs they would be between 5 and 15% lower than what I've reflected here so that would take into account any negative amortization as well as any home price appreciation that has occurred by property. On the HELOCs we calculate on [line thoughts] so not against what they've drawn but what they could draw. And here's another little more close up on the pay option portfolio so what I wanted to show here is the accumulated negative amortization so across the entire portfolio as of June 30th it stood at about 88 basis points so just under 1% of accumulated NAGM.

All right on this slide what I wanted to do is to summarize the rationale of why we're putting pay option loans in the portfolio. So there's probably not a single day that doesn't go by that I talk to half a dozen people outside the company and none of them

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151   281

Sep. 13. 2006 / 8:30AM, CFC - Countrywide Financial Corporation Fixed Income Investor Forum

are excited that we're putting those loans in portfolios so we obviously have to have a good rationale for doing so and so what I wanted to do here is explain what that was.

When we look at putting any loan into an investment portfolio there are three Country area that we look at. The first is interest rate risk. The second is credit risk and the third is the expected return or the amount of profit margin on that loan. So in looking across all of the different first liens that Countrywide, the production ARM generates. In the prime sector from a credit risk perspective just looking at the product by itself we would consider pay options would probably be the riskiest loan from a credit risk perspective. So it's the least desirable in that dimension.

From an interest rate perspective it's the safest loan, the underlying accrual rate changes every month. Many of the loans also have prepaid penalties on it so from a market risk perspective it's the best choice that we have. And then finally mainly as a result of some of the increased subordination levels that took place via the rating agencies a year and a half or two years ago it also has the biggest profit margin of any loan that we could put in. So at least across the prime sector worse than one dimension at the very best and the other two dimensions so when you combine all three factors together it's the most attractive first liens that we can hold in the bank's portfolio.

What I've done with these numbers is just try to give you -- to rough out what that looks like. So in the middle of the page I show a net -- go up, like it's halfway down the page, I've got net strategy for credit costs so looking at the margin on the pay option ARM I'm comparing that to a 5/1 loan for a couple of reasons. One it's a very popular product out in the market right now and it's a choice that a lot of other institutions are making to put in their held-for-investment portfolio.

So in each case those loans are generally originated or acquired above par so there's a premium that has to be amortized. For the pay option I've included a swap cost where I wanted to swap the MTA which is what those are indexed to, back to LIBOR and so you can see a spread prior to the credit costs. Then I've put a relatively conservative credit cost per annum and then you can see the net credit spread. So still even assuming quite a bit higher credit costs for the pay option they still have a substantial spread over the 5/1 which will be another one of our alternatives.

Then at the very bottom I show the change in value that would occur from an instantaneous 200 basis point jump up in the interest rates. And so you can see the 5/1 is much more sensitive to interest rate deteriorations compared to the pay option. All right I'm going to go through these slides quickly -- they're in your book. There are four slides. Two are for the entire servicing portfolio. Two are for the bank. They're an idea to give you a rough idea of how our portfolio is distributed so it's county by county. The numerator is the number of loans that we've got in that county.

The denominator is the number of housing units in that county. So keep in mind in the rural areas of the country the financing rate tends to be lower so it's a decent proxy from seeing where relative concentrations are. We tend to -- we are in every single MSA but the urban areas the financing rate is much higher. So, two slides first and seconds on the servicing portfolio then the same calculation for the banks, first and seconds. And there are going to be slides I'm going to show you in a minute where we're going to want you to compare back.

All right the final slide I wanted to show you in the middle part of my section was some other characteristics. Now I'm back to the entire servicing portfolio. So I'm showing you combined loan to value ratios, how those are distributed. On the upper right are FICOs so one of the things to notice there is the tremendous overlap between prime and subprime so those two markets are moving. There's much more of a blurring between those two markets. They overlap more than they don't overlap so that's the change that we've seen over the past couple years.

I showed debt to income, a debt service measure that's looking at the borrower's total obligations as a percentage of income on the lower left and then finally monthly income measured in thousands of dollars per month. And for all of these charts we're looking at prime first. We've looking at VC which are subprime first. HELOCs then closed end fixed seconds. The closed end fixed seconds are a prime second lien product.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151     282

**Sep. 13. 2006 / 8:30AM, CFC - Countrywide Financial Corporation Fixed Income Investor Forum**

All right in the final section what I'd like to do is share the results of a serious delinquency study that we've done. So, one of the things that we've got at Countrywide that few if anyone else has is wonderful data. So the data is vast in terms of volume of observations. It covers a long period of time. It's unpolluted by mergers and acquisitions, and it covers a vast array of products so we're able to do some fairly interesting analyses and model building off of that data and so I wanted to share the results of that partially because we get a lot of questions on how certain things affect credit risk. So I wanted to share that with you.

So on this page I'm simply summarizing what we looked at. So the loan level attributes that we looked at are over on the far left. On the top right are time dependent covariates. All that means is that every month over the period of this study those variables are going to change so something like house prices in a MSA that's going to change by month. Unemployment in an MSA that's going to change by month so those are included in the model.

It includes about 10 million loans over the last six years or so. All right all of the next slides are going to work in terms of an odds ratio so let me explain how that works. So, on each one of the next slides I'm going to specify something as a base and call that base 1. So we're going to start with unemployment and this unemployment in the MSA where that loan is located.

So in the very middle of the chart I've called a change in unemployment of 01. So we're going to start with that as the base. So let's suppose that unemployment in that MSA increased by 5%. So if you go along the bottom of the chart from 0 over to positive 5 you can see how much, and we're measuring serious delinquency here so a 90-day delinquency, how much we would expect the 90-day delinquency rate to increase simply from that change in unemployment. So when I'm doing this I'm holding all other factors constant so I'm holding house prices constant. I'm holding all of those other loan attributes constant and showing you just the effect of unemployment.

So two themes that I'd like you to take away from this chart. The first is that the various product types don't perform the same. So you can see that the two prime loans -- well HELOCs are prime as well -- but the two prime fixed balance products are the most sensitive and we'll see that theme repeated. They tend to be the expected or the base case is the lowest but any kind of a deterioration proportionally they're going to be more sensitive to a change than either the HELOCs or the subprime. The other theme I'd like you to notice is that those lines are convex meaning that they're curved.

So look at say plus or minus 5%. Plus 5% we're getting increases in serious delinquency on the order of at least 2.5 on up to maybe a factor of 5. If I go the other way and go down by 5% we're getting a substantial improvement but it's not nearly the same magnitude so it looks like roughly about a ratio of 0.5 which you have to invert that to compare it so it's only a two times improvement rather than say a three to five times improvement. So when things get worse you get a worse deterioration than when thing improve is the point. So that's unemployment.

The next I'm showing you four slides altogether, CLTV, FICO, debt-to-income, and then monthly income. Let's start with FICO. So here we picked a base of 800 so a FICO of 800 equals 1 and then as you move to the left the FICO deteriorates and then you can see just for this one variable by itself again -- we're holding everything else constant -- the change in serious delinquency we would expect for a different FICO.

So you can see on the far top left of the chart a [inaudible] where the 500 or so FICO would be 40 times more likely to be seriously delinquent than a borrower with 800. So, FICO matters a lot. And then here again, also notice these lines are curved in a convex way as well. So, it gets steeper as you go to the left.

CLTV leverage matters. Again, it matters more with prime loans than non-prime loans, particularly first liens, but in every case it matters. Monthly income is important, generally higher. Higher income is better. We've used a base of $20,000 a month. The only exception is to the two seconds products where there's somewhat of a "U" shape to those. And then finally, debt to income matters, but it's going to be one of the least important variables that we look at. It's one of the first that I get asked about, but for this study and practically every other similar study, we can -- we have a tough time getting it to be very predictive.

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151    283

Sep. 13. 2006 / 8:30AM, CFC - Countrywide Financial Corporation Fixed Income Investor Forum

All right. A few more loan attributes, on the upper left is documentation type. So here, we've used full doc over on the far left as our base of one. And, you can see that as documentation is reduced going from left to right, the odds ratios go up significantly. So, if you go over to the far right, it's a NINA loan. That stands for no income, no asset, so the borrower's neither disclosing nor documenting income or assets. And so, that's a factor in excess of three. So, just the change by itself would triple the likelihood of that loan getting into -- or defaulting.

And then in between, we've got the intermediate doc types. SISA stands for a stated income, stated asset. That's the borrower's telling us what they're income and assets are but not documenting it. And so, you could take away from this chart that some of them may have lied. NIVA is a no income, verified asset, so they're not telling us the income that we're verifying assets, SIVA, stated income, verified assets. Preferred is a program that we as well as a lot of other institutions offer where the borrowers come in, expecting to fully document their loan. But if they pass certain criteria, they don't have to.

On the property types over on the upper right, two things to notice there. The first is no surprise. Manufactured housing is the worst. This, by the way, is simply default. It doesn't include losses. If we include losses, it would -- the picture would get even worse still. The second thing that's more of a bright spot are the condos, so especially the low-rise condos actually tend to be less risky, all else equal, than single-family homes. And so, you can see that in the middle of the page in that those bars are under one. We've mapped single-family to one.

Down in the lower left, the occupancy, we used owner occupied as a base. By owner occupied, this is somebody living in their house as a primary resident. For first lien, second homes, performed similarly, although if it's a second lien on a second home, those have an odds ratio near two, so twice as likely, all else equal, to default. And then, you can see in the middle that investor occupied properties, all else equal, are generally about a 2x compared to owner occupied. Then, the last slide on this slide, the lower right is purpose, whether the loan's done for a purchase transaction, a cash-out refinance or a rate refinance. The cash-out are generally riskier except in sub-prime when it's the exact opposite. The cash-out tend to be the safest sub-prime. But sub-prime cash-outs tend to be safer than the other two purchase -- purpose types.

All right. So this, you need to think about in terms of the other maps that I've shown you. So, what -- there are going to be four of these that I'm going to show you. So what we're looking at here are MSAs. So after adjusting for home prices, after adjusting for unemployment rates, after adjusting for all the loan attributes, we still find that geography matters. So, we used Los Angeles as a base since that's where we're from, map that to one. And, that's over in the bottom left. And then, any color that's darker than that is going to have a higher odds ratio, so statistically, a higher likelihood of default. And so one of the areas that's not surprising, given the time period that this study, is Louisiana and Mississippi.

What happened there was obvious. Katrina hit. Fannie and Freddie came in and put in a very broad forbearance program. And we count loans as delinquent, irrespective of whether they're on forbearance or not. That forbearance actually had to be matched across the board, so that's what happened there. But, there are other areas of the country that don't have as good of an explanation. So you can see for this slide, which are conventional prime first liens, that the Salt Lake area and Denver, [Ardnott], are not good. Wisconsin is particularly bad outside of Milwaukee. So, North Carolina and the Midwest are not great. Florida tends to be a higher default incidence.

One of the ways that we use this plus some of the other things that we have are in making credit enhancement decisions. So for example, in terms of what goes into the bank's portfolio, there are certain MSAs that we're not taking any loans from whatsoever. And, there are other MSAs that we'll still take loans there but not for certain property types or other characteristics. So anyhow, there's a series of four slides here, ones for prime first liens, sub-prime first liens on the next page, HELOCs and then finally, closed-end seconds.

All right. Final couple of slides I wanted to share, I've got three slides starting on page 210 that compare models or predicted versus actual results for the bank's portfolio for the 2003, 2004 and 2005 vintages. So particularly for the '03 and '04 loans have performed better than what we've expected. Although the -- you can see as you page through these three pages that the expected and the predicted are coming much more closely together, which we think is largely a result of the favorable home

© 2006 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

EXHIBIT 151        284