**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION | Case No. 2:11-ML-02265-MRP (MANx) |
| | **ORDER RE SUBSTANTIVE MOTIONS TO DISMISS** |
| WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, *et al.*, | Case No. 2:11-cv-07166-MRP (MANx) |
| Plaintiffs, | |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, *et al*. | |
| Defendants. | |

| | |
|---|---|
| NATIONAL INTEGRITY LIFE INSURANCE COMPANY, | Case No. 2:11-cv-09889-MRP (MANx) |
| Plaintiff, | |
| v. | |
| COUNTRYWIDE FINANCIAL CORPORATION, *et al*. | |
| Defendants. | |

## I.   INTRODUCTION & BACKGROUND

This Order concerns Defendants' motions to dismiss the related *Western and Southern Life Ins. Co. v. Countrywide Fin. Corp.*, 11-CV-07166-MRP (MANx) ("*Western and Southern*") and *National Integrity Life Ins. Co. v. Countrywide Fin. Corp.*, 11-CV-09889-MRP (MANx) ("*National Integrity*") actions.  *Western and Southern* and *National Integrity* are part of Multidistrict Litigation No. 2265, captioned *In Re Countrywide Financial Corp. Mortgage-Backed Securities Litigation* ("the MDL").  The plaintiffs in *Western and Southern* and *National Integrity* allege violations of the Securities Act of 1933 ("the Securities Act"), the Exchange Act of 1934 ("the Exchange Act"), and a number of state laws in connection with their purchase of residential mortgage-backed securities ("RMBS") in offerings structured and sold by several of the defendants.  Specifically, the *Western and Southern* and *National Integrity* plaintiffs ("Plaintiffs") argue that Countrywide Financial Corporation ("CFC"), its subsidiaries, and its former management misrepresented the quality of the underlying loans in the RMBS Certificates[1] that plaintiffs purchased.[2]  They also

---

[1] A Certificate is a document that shows ownership of a mortgage-backed security issued pursuant to a registration statement and prospectus supplement in a public offering.  Each Certificate represents a particular tranche within an offering.  Because "Certificate" refers to the document evidencing ownership of a specific tranche, the Court uses the terms "tranche" and "Certificate" somewhat interchangeably.  An Offering refers to the process by which the Certificates were sold to Plaintiffs.  The Offering Documents refer to the Registration Statements, Prospectuses and Prospectus Supplements, Term Sheets, and other written materials pursuant to which the Certificates were offered.

[2] The Defendants are: CWALT, Inc., CWABS, Inc., CWMBS, Inc., CWHEQ, Inc., (the "Depositors"), CFC, Countrywide Home Loans, Inc. ("CHL"), Countrywide Capital Markets, LLC ("CCM"), Countrywide Securities Corp. ("CSC") (together with the Depositor Defendants, the "Countrywide Defendants" or "Countrywide"), Bank of America Corp., Bank of America, N.A., BAC Home Loans Servicing, LP, NB Holdings Corp. ("Bank of America" or the "Bank of America Defendants"), Angelo Mozilo, David Sambol, Eric Sieracki, Ranjit Kripalani, Stanford Kurland,

allege that the defendants misrepresented that they would comply with various policies, best practices, and laws related to the transfer, servicing, and maintenance of the loans in the Offerings.  Finally, Plaintiffs allege that Bank of America and several related entities are liable as Countrywide's successor.

With the Court's approval, Defendants bifurcated the briefing of motions to dismiss in *Western and Southern* and *National Integrity*.  On March 9, 2012, the Court issued an order (the "First Round Order") dismissing many of the claims and defendants on the basis of timeliness and jurisdiction.  *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2:11-ML-02265-MRP, 2012 WL 1097244, at *16 (C.D. Cal. Mar. 9, 2012).  The claims that remain in Western and Southern are: (i) two claims under the Exchange Act of 1934 that hinge upon alleged misrepresentations regarding transfer of title and loan servicing; (ii) five claims under the Ohio Securities Act that hinge upon the same transfer-of-title and servicing allegations; (iii) claims for fraud and negligent misrepresentation that hinge upon the same transfer-of-title and servicing allegations; (iv) a claim under the Ohio Corrupt Activities Act ("OCAA") alleging that Defendants were part of a racketeering enterprise organized for the purpose of originating risky loans, packaging those loans into RMBS, selling the RMBS to investors, and then failing to service the loans properly; (v) a claim for civil conspiracy alleging that Defendants formed an association-in-fact for the same purposes; and (vi) claims that Bank of America and related entities are liable as Countrywide's successor.  The same claims remain in *National Integrity*.  In addition, *National Integrity* includes common law fraud and negligent misrepresentation claims alleging

---

David Spector, N. Joshua Adler, and Jennifer Sandefur (the "Individual Defendants").

1  misrepresentations regarding underwriting, appraisals, loan-to-value ratios, and
2  ratings.[3]

3      Defendants have moved to dismiss the remaining claims in both *Western*
4  *and Southern* and *National Integrity*.  Those issues are fully briefed, and the Court
5  heard extensive oral argument on June 13, 2012.  As set out more fully below,
6  Plaintiffs have failed to allege that any statement made by the Defendants
7  regarding transfer of title or servicing was actionably false.  Plaintiffs have also
8  failed to allege either an "enterprise" as required by the OCAA or an association-
9  in-fact as required to plead civil conspiracy.  National Integrity has also failed to
10 allege a negligent misrepresentation claim under Ohio law.  Finally, National
11 Integrity's successor liability claims are defective under Delaware law.
12 Defendants have raised a number of other grounds for dismissal; the Court finds it
13 unnecessary to address them at this time.  For the reasons set out below, *Western*
14 *and Southern* is dismissed in its entirety.  *National Integrity* is dismissed except for
15 the portion of Cause of Action Fourteen related to underwriting, appraisals, loan-
16 to-value ratios, and ratings.

17                    **II.    LEGAL STANDARDS**

18     A Rule 12(b)(6) motion to dismiss should be granted when, assuming the
19 truth of the plaintiff's allegations, the complaint fails to state a claim for which
20 relief can be granted.  *See Epstein v. Washington Energy Co.*, 83 F.3d 1136, 1140
21 (9th Cir. 1996).  In deciding whether the plaintiff has stated a claim, the Court
22 must assume the plaintiff's allegations are true and draw all reasonable inferences
23 in the plaintiff's favor.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir.
24 1987).  However, the Court is not required to accept as true "allegations that are
25 merely conclusory, unwarranted deductions of fact, or unreasonable inferences."

26

27 ────────────────

28 [3] Those claims were time-barred under the two-year statute of limitations
applicable in *Western and Southern*, but not the six-year period applicable to
*National Integrity*.  First Round Order, 2012 WL 1097244, at *16.

1  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  A court reads
2  the complaint as a whole, together with matters appropriate for judicial notice,
3  rather than isolating allegations and taking them out of context.  *Tellabs, Inc. v.*
4  *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

5         In general, the Court will apply Ninth Circuit law to federal claims and will
6  apply the state law of the transferor forum, including the transferor forum's choice-
7  of-law rules, to state law claims.  *In re Nucorp Energy Sec. Litig.*, 772 F.2d 1486,
8  1492 (9th Cir. 1985).  More detailed choice-of-law analysis is performed as
9  required for particular claims.

10                    **III.    WESTERN AND SOUTHERN**

11        Plaintiffs The Western and Southern Life Insurance Company, Western-
12  Southern Life Assurance Company, Columbus Life Insurance Company, Integrity
13  Life Insurance Company, and Fort Washington Investment Advisors, Inc.,
14  (collectively "Western and Southern") allege violations of the Exchange Act and
15  Ohio law in connection with Western and Southern's purchase of 36 Certificates.

16  **A.    WESTERN AND SOUTHERN'S TRANSFER OF TITLE ALLEGATIONS DO NOT**
17         **PLEAD FALSITY**

18        The federal,[4] OSA,[5] fraud,[6] and negligent misrepresentation[7] causes of
19  action asserted require Western and Southern to identify a misrepresentation.

---

21  [4] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008) (A
22  § 10(b) "plaintiff must prove . . . a material misrepresentation or omission by the
23  defendant . . . ."); 15 U.S.C. § 78t(a) (requiring a primary violation for liability
   under § 20(a)).
24  [5] *See* OHIO REV. CODE §§ 1707.41 (Plaintiff must plead "the falsity of any material
25  statement"); 1707.44(B)(4) ("No person shall knowingly make or cause to be made
26  any false representation concerning a material and relevant fact . . . .");
   1707.44(B)(4) (Prohibiting statements or advertisements "when the person knows
27  that the statement or advertisement is false in any material respect."); 1707.44(G)
28  (requires predicate violation of OSA); 1707.43 (requires predicate violation of
   OSA).

Because Western and Southern alleges fraud, it must plead those misstatements with particularity under Fed. R. Civ. P. 9(b).  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003) ("It is established law, in this circuit and elsewhere, that Rule 9(b)'s particularity requirement applies to state-law causes of action.").  Rule 9(b) requires plaintiffs to identify the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."  *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010).  Western and Southern must also identify the nature of the fraud through "precise allegations explaining how the alleged misstatements were misleading or untrue when made."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996).  Western and Southern's Amended Complaint (the "AC") identifies three statements with the required "time, place, content" level of specificity:

- A representation that "each loan is secured by a valid lien on, or a perfected security interest with respect to, the Property."  AC ¶ 205 (quoting CWALT 2007-16CB Prospectus Supplement at 26);

- A representation that:

  [O]n the closing date, the depositor will sell, transfer, assign, set over and otherwise convey without recourse to the trustee in trust for the benefit of the certificateholders all right, title and interest of the depositor in and to each mortgage loan and all right, title and interest in and to all other assets included in Alternative Loan Trust 2007-16CB, including all principal and interest received on or with respect to the mortgage loans, but not any principal and interest due on or before the cut-off date.

---

[6] *Burr v. Bd. of County Com'rs of Stark County*, 23 Ohio St. 3d 69, 69 (1986) (Fraud allegation requires "a representation . . . of a fact . . . made falsely.").
[7] *Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 4 (1989) (negligent misrepresentation requires the Defendant to "suppl[y] false information for the guidance of others in their business transactions.").

In connection with the transfer and assignment of a mortgage loan, the depositor will deliver or cause to be delivered to the trustee, or a custodian for the trustee, the mortgage file, which contains among other things,

- o The original mortgage note (and any modification or amendment to it) endorsed in blank without recourse, except that the depositor may deliver or cause to be delivered a lost note affidavit in lieu of any original mortgage note that has been lost;

- o The original instrument creating a first lien on the related mortgaged property with evidence of recording indicated thereon or a copy of such instrument;

- o An assignment in recordable form of the mortgage or a copy of such assignment;

- o The original or a copy of the title policy with respect to the related mortgaged property;

- o If applicable, all recorded intervening assignments of the mortgage or copies thereof and any riders or modifications to the mortgage note and mortgage or copies thereof (except for any documents not returned from the public recording office, which will be delivered to the trustee as soon as the same is available to the depositor).  AC ¶ 206 (quoting CWALT 2007-16CB Prospectus Supplement at S-39 to S-40);

- A representation that:

  For any mortgage held through the MERS® System, the mortgage is recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, as nominee for the owner of the mortgage loan, and subsequent assignments of the mortgage were, or in the future may be, at the discretion of the master servicer, registered electronically through the MERS® System. For each of these mortgage loans, MERS serves as mortgagee of record on

the mortgage solely as a nominee in an administrative capacity on behalf of the trustee, and does not have any interest in the mortgage loan.  AC ¶ 207 (quoting CWALT 2007-16CB Prospectus Supplement at S-41).

These three statements appear in the CWALT 2007-16CB Prospectus Supplement, and substantially identical statements appear in the Prospectus Supplements for each of the other Certificates.  AC ¶¶ 205–07.  It is apparent from the pleadings and from the judicially noticeable Prospectus Supplements and PSAs that none of the three statements is false.

The first statement identified by Western and Southern is a representation that "each loan is secured by a valid lien on, or a perfected security interest with respect to, the Property."  AC ¶ 205 (quoting CWALT 2007-16CB Prospectus Supplement at 26).  Nothing in the AC casts doubt on this statement.  The transfer of title allegations in paragraphs 205 through 240 say nothing about the validity of liens, the perfection of security interests, or the rather straightforward principle that loans are secured by liens.  Western and Southern attempts to match the statement to its theory of harm by ascribing to it the following meaning: "each mortgage represented a valid lien *such that the issuing trust could foreclose* upon the mortgage in the event of a borrower's default."  AC ¶ 205 (emphasis added).  Nothing about the context of the statement suggests such a reading.  On the contrary, it appears in a section of the Prospectus Supplements titled "Representations by Sellers; Repurchases."  That section begins by stating that, "[e]ach seller or, in some cases, originator, will have made representations and warranties in respect of the loans sold" and that one of those representations may be "that each loan is secured by a valid lien."  CWALT 2007-16CB Prospectus Supplement at 26.  This statement has nothing to do with whether a trustee will be able to foreclose in the event of default; read properly, it does not even relate to whether the loans are properly secured by liens.  Instead, it relates to representations that *may* be made by sellers.  Nothing in the AC indicates that

1   sellers may not have made such representations.

2          Like the first, the second statement has been quoted without reference to its

3   context.  The statement appears in a section of the Prospectus Supplement titled

4   "Assignment of the Mortgage Loans" and begins, "*[p]ursuant to the pooling and*

5   *servicing agreement*, on the closing date, the depositor will sell, transfer, assign,

6   set over and otherwise convey without recourse to the trustee in trust for the

7   benefit of the certificateholders all right, title and interest of the depositor in and to

8   each mortgage loan . . . ."  CWALT 2007-16CB Prospectus Supplement at S-39

9   (emphasis added).  In securitization, a prospectus supplement is used to market the

10  asset-backed security, while the PSA is the actual governing document for the

11  trust.  The timing of the process is such that RMBS are marketed and sold before a

12  PSA has been finalized and made available to investors.  Prospectus Supplements

13  therefore will typically summarize the PSA for investors that would not otherwise

14  have access to its terms.  An RMBS investor reading the "Assignment of the

15  Mortgage Loans" section identified by Western and Southern would understand

16  that the "pursuant to the pooling and servicing agreement" language indicates that

17  the section is meant as a description of the PSA rather than an independent

18  manifestation of present intent.  And, Western and Southern has not alleged that

19  the Prospectus Supplement states any term of the PSA inaccurately.  On the

20  contrary, each portion of the second statement matches a portion of the PSA.  *See*

21  CW RJN 34; 54.

22          Western and Southern's allegations with respect to the second statement also

23  fail to differentiate the Defendants as required by Rule 9(b).  The section states

24  that, under the PSA, the *depositor* will transfer the loan and deliver the mortgage

25  file to the trustee or the trustee's custodian.  Paragraphs 209 through 217 of the AC

26  do not mention the Depositors or indicate that the Depositors failed to take any

27  action that they were mandated to take under the PSAs.  On the contrary, this

28  section of the AC refers to "Countrywide," a defined term that includes each of the

8

Countrywide Defendants. But, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citations and quotations omitted). For the second statement to be actionable, the AC would have to explain what actions the Depositors failed to take and which specific Defendants knew or should have known that the Depositors would fail to take those actions. The AC suggests that this would be a difficult task. Its allegation is that the physical mortgage documents remained with the *servicers*, not the Depositors. AC ¶¶ 209–17. The AC does not allege that the servicers were not the "custodians" of the trustees, as contemplated by the Prospectus Supplements and PSAs. *Id.* On the face of the AC, it is therefore difficult to determine (i) which Defendants could have misrepresented the Depositors' intentions and (ii) what the Depositors could or should have done differently.

Finally, nothing in the AC indicates that the third statement was false when it was made. Western and Southern argues that "Defendants' representations in the Offering Materials that MERS would be the 'beneficial owner' of each mortgage were false." AC ¶ 242. But, the statement regarding MERS in the Prospectus Supplement does not contain the words "beneficial owner." Instead, the statement says, in effect, that the mortgages may be recorded in MERS' name but that MERS serves as mortgagee only in an administrative capacity. CWALT 2007-16CB Prospectus Supplement at S-41. Western and Southern has not identified any reason why that statement is false or misleading.

The Court's distinctions may seem pedantic, but they illustrate a fundamental problem with Western and Southern's theory. The title transfer allegations that remain in the AC allege a litany of failures. Defendants allegedly "lost, failed to timely create, or failed to timely deliver the paperwork necessary to

prove title to the mortgages and the notes under state law." AC ¶ 208.  They allegedly did not comply with various states' "strict rules governing assignment of mortgages, and transfer of promissory notes and loan files." *Id.* ¶ 209.  They then allegedly engaged in a cover-up by back-dating documents, signing fraudulent affidavits, and improperly pressuring homeowners. *Id.* ¶¶ 209–40.  These are serious allegations and the Court does not minimize them.  But if the allegations regarding assignment and servicing are true, the PSAs contain explicit provisions that allow the servicer to "put" undocumented or otherwise unsatisfactory loans back to the originators.  CWALT 2007-16CB Prospectus Supplement at S-41.  The Prospectus Supplements explicitly state that "[t]he cure, repurchase or substitution obligation constitutes the sole remedy available to certificateholders or the trustee for omission of, or a material defect in, a mortgage loan document." *Id.*

To the extent that the problems that Western and Southern identifies are actionable, it would be as claims for breach of contract or breach of fiduciary duty.  Courts must be sensitive to the distinctions between such cases and misrepresentation cases; more so when a contract provides specific mechanisms for redress as the PSAs do here.  Failure to maintain the distinctions between contract and fraud cases raises the potential for duplicative litigation and double recoveries.  As importantly, serious violence is done to the contract by failing to respect the contractual remedies that each party has agreed to.  *See Lockerby v. Sierra, 535 F.3d 1038*, 1041–42 (9th Cir. 2008) (More than intentional breach of contract necessary to commit "tortious conduct.").  For this reason, most courts to consider the issue have held that the "breach of a contractual promise of future performance typically does not constitute a misrepresentation that will support an action for fraud." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011); *see also United States v. Blankenship*, 382 F.3d 1110, 1133 (11th Cir. 2004) ("A 'promise' contained in a contract is not a certification that the promisor will actually perform the specified acts."); *Mills v. Polar Molecular Corp.*, 12 F.3d

1170, 1176 (2d Cir. 1993) ("The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract.  It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform."); *IDT Corp. v. eGlobe, Inc.*, 140 F.Supp.2d 30, 35 (D.D.C. 2001) (same).

*BP Exploration*, cited above, is on point.  There, an oil exploration trust repeatedly filed copies of a contract with the SEC as required by various regulatory requirements.  643 F.3d at 686.  The trust repeatedly filed the contract despite the fact that, at the time of each filing, the trust was allegedly in breach of one of the contract's provisions.  *Id.*  The Ninth Circuit held that "contract breach is not a sufficient predicate for securities fraud" and ordered the case dismissed.  The plaintiff had argued that the repeated filing of the contract (which had been forward-looking when originally signed) created a false impression of continuing compliance.  *Id.* at 691.  The Ninth Circuit disagreed, holding that "a reasonable investor would likely view the Trust's attachment of the [contract] to its SEC filings as a statement of the rights of the Trust and its unit holders, not as certification by [the Defendant] that all of its operations were in compliance with the [contract]."  *Id.* at 693.  This holding reflects the commonplace understanding that, "[a] 'promise' contained in a contract is not a certification that the promisor will actually perform the specified acts," it is merely an expression of the party's contractual obligation.  *Id.* at 691 (citing *Blankenship*, 382 F.3d at 1133).  Indeed, the cases cited by the Ninth Circuit made clear that the contract in *BP Exploration* was not actionable both because it was forward-looking and because a contractual obligation is not a promise to perform, but rather a promise to either perform or submit to the contractual remedy.  *Id.* at 691–94.

Western and Southern cites cases for the principle that a promise to perform a future act may be an actionable misrepresentation when the defendant has no intention of keeping the promise at the time that it makes the promise.  Opp. at 46–

47 (citing *Tibbs v. Nat'l Homes Constr. Corp.*, 52 Ohio App. 2d 281, 287 (12th Dist. 1977).  However, none of the cases cited by Western and Southern arose in the context of a "promise" to comply with contractual obligations.[8, 9]  In the absence of any such authority, the Court will follow the Ninth Circuit rule that the failure to honor a contractual obligation does not transform the original contract into a tortious misrepresentation.  Such a rule is especially appropriate when, as here, the PSA contains express provisions to redress the failures that Western and Southern complains of.  Stripped to its essentials, the AC makes the same allegation as the plaintiff in *BP Exploration*, except that the AC is one level more attenuated.  There, the plaintiff alleged that the contract itself contained a false statement.  Here, Western and Southern alleges that an accurate *description* of the contract (here the PSA) is false because the defendants did not intend to follow the PSA.  Even if the Defendants did not intend to follow the PSA,[10] their description of its contractual obligations was accurate, and any failure to meet those obligations is better addressed through other means.

For the reasons discussed above, the statements contained in Paragraphs 205 through 207 of the AC are not actionable misstatements.  Causes of Action One, Two, Three, Four, Five, Seven, Eight, Nine, and Fourteen are predicated on an

---

[8] *Burlington Ins. Co. v. Artisan Mech., Inc.*, relied upon by Western and Southern, merely stands for the proposition that a misrepresentation as to the *existence* of a contract may be actionable.  188 Ohio App. 3d 560, 566 (Ohio Ct. App. 1st Dist. 2010).

[9] The Court further notes that the AC fails to plead with specificity facts that would allow the Court to infer that, at the time the Prospectus Supplements were issued, specific defendants intended for other specific defendants to violate the transfer-of-title provisions in the PSAs.  Were this the AC's only deficiency, repleading the misrepresentation claims might be appropriate.  As discussed above, it is not.

[10] As discussed above, the Court accepts this proposition for the sake of argument but notes that Western and Southern has failed to plead subjective intent not to perform with the requisite level of specificity under Rule 9(b).

12

actionable misrepresentation.  Western and Southern has failed to plead any such misrepresentation.  Accordingly, Causes of Action One, Two, Three, Four, Five, Seven, Eight, Nine, and Fourteen are **DISMISSED WITH PREJUDICE**.

## B.   THE OCAA CLAIM DOES NOT ALLEGE AN ENTERPRISE

Cause of Action Six alleges a violation of the Ohio Corrupt Activities Act ("OCAA"), OHIO REV. CODE §§ 2923.31–36.  AC ¶¶ 418–26.  Specifically, it alleges that CFC, CHL, CCM, CSC, CWABS, CWALT, CWHEQ, CWMBS, Mozilo, Sambol, Bank of America, Bank of America, N.A., and BAC Servicing, together with non-party entities such as correspondent lenders, RMBS underwriters, appraisers, foreclosure law firms, PMI insurers, and the Bank of New York were part of a racketeering enterprise with the common purpose of originating risky loans, packaging those loans into RMBS, selling the RMBS to investors, and then failing to service the loans properly.  *Id.* ¶¶ 420–21.  To plead a violation of the OCAA, Western and Southern must allege that Defendants "participate[d] in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity."  OHIO REV. CODE § 2923.32(A)(1).  The AC does not plead an "enterprise" as required by the statute and therefore must be dismissed.

To violate the OCAA, each Defendant must have been part of an "enterprise."  "'Enterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity.  'Enterprise' includes illicit as well as licit enterprises."  OHIO REV. CODE § 2923.31(C).  The OCAA is patterned on the federal RICO statute, and Ohio courts look to federal decisions to interpret the OCAA.  *Herakovic v. Catholic Diocese of Cleveland*, 2005 WL 3007145, at *3 (Ohio Ct. App. Nov. 10, 2005) ("[F]ederal case law interpreting the federal RICO

law" should not be ignored.) (citing *Universal Coach, Inc. v. New York City Transit Auth., Inc.*, 90 Ohio App. 3d 284, 291 (1993)).[11]

The Sixth Circuit has held that an enterprise must exist separate and apart from the defendant. *Shields v. UnumProvident Corp.*, 415 F. App'x 686, 691 (6th Cir. 2011) ("[T]he 'person' charged with violating RICO [must] be a separate entity from the 'enterprise.'"). "Under this requirement, a corporation may not be liable . . . for participating in the affairs of an enterprise that consists only of its own subdivisions, agents, or members." *Id.* The Ohio courts that have considered the question have agreed. *See Herakovic*, 2005 WL 3007145, at *4 (Ohio Ct. App. Nov. 10, 2005) (dismissal appropriate because "appellants have not pled the individuals separate from the enterprise.").[12] This rule is practical and gives proper effect to the purpose of the statute. If members of a corporate family could constitute a RICO enterprise, then every act of corporate malfeasance could also be pleaded as a RICO violation, complete with its longer statute of limitations, joint

---

[11] The parties agree that the Court should look to federal law for interpretation of the OCAA. They disagree as to which Circuit's precedent is most helpful. The Court is interpreting an Ohio law. Ohio courts, though not bound by decisions from courts within the Sixth Circuit, frequently cite such decisions and would likely find them more persuasive than decisions from outside the Sixth Circuit. The Court therefore gives preference to decisions from within the Sixth Circuit in the OCAA portion of this Order.

[12] Ohio courts are split on the related question of whether a plaintiff must also plead an enterprise distinct from the alleged pattern of corrupt activity. *Compare State v. Lynch*, 2012 WL 2050862, at *4 (Ohio Ct. App. June 6, 2012) ("We will therefore herein consider whether the State indeed demonstrated a 'structure separate and apart, or distinct, from the pattern of corrupt activity' concerning appellant's heroin-dealing activities.") *with State v. Baker*, 2012 WL 707093, at *3 (Ohio Ct. App. Mar. 5, 2012) ("[T]his court has expressly rejected the notion that the state must prove that the enterprise is an entity separate and apart from the pattern of activity in which it engages."). The Court does not find it necessary to reach this question.

and several liability, and other advantages.  Each of the named OCAA defendants is a Countrywide parent, subsidiary, or agent.  Under *Shields* and *Herakovic*, the named defendants cannot, on their own, constitute an enterprise.

Western and Southern also alleges that a number of non-parties combined with the Countrywide Defendants to form an enterprise to profit from the sale, securitization, and servicing of Countrywide mortgage loans.  Opp. at 9; AC ¶ 421.  "[A]n association-in-fact enterprise must have at least three structural features:  a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).  The AC plausibly alleges that the various non-parties had longstanding business relationships with the Countrywide Defendants.  Nothing in the AC, however, creates a plausible inference that the purpose of those relationships was to "profit illegally from the sale, securitization, and servicing of Countrywide mortgage loans."  Opp. at 9.  On the contrary, from the face of the AC it appears that each of the non-parties identified by Western and Southern entered into a business relationship for their own commercial reasons.  Even if the Court credits Western and Southern's assertion that the non-parties' actions assisted Countrywide in a scheme to "profit illegally from the sale, securitization, and servicing of Countrywide mortgage loans," (Opp. at 9) the AC makes clear that the assistance was in response to each entity's own business incentives.  Parties that enter commercial relationships "for their own gain or benefit" do not constitute an "enterprise."  *City of Cleveland v. Woodhill Supply, Inc.*, 403 F. Supp. 2d 631, 635 (N.D. Ohio 2005) (citing *VanDenBroeck v. CommonPoint Mortgage Co.*, 210 F.3d 696, 699 (6th Cir. 2000) (abrogated on other grounds by *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 646 (2008))); *see also Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App. 3d 40, 60 (2009) (no enterprise when each party acts in its "contractual" role); *Robins v. Global Fitness Holdings, LLC*, 1:11 CV 1373, 2012 WL 163031, at *18 (N.D.

Ohio Jan. 18, 2012) ("routine business relationships, without more, are insufficient to establish a RICO claim"); *Javitch v. Capwill*, 284 F.Supp.2d 848, 857 (N.D. Ohio 2003) (business relationship, even one that furthers a fraud, is insufficient to plead a RICO enterprise); *Wuliger v. Liberty Bank*, No. 3:02 CV 1378, 2004 WL 3377416 (N.D. Ohio 2004) (provision of banking services, without more, does not constitute a RICO enterprise).

A recent case from the Southern District of Ohio is instructive. In *HMV Properties, LLC v. IDC Ohio Management., LLC*, plaintiffs brought a federal RICO claim against a number of defendants. 2:08-CV-895, 2011 WL 53166, at *1 (S.D. Ohio Jan. 6, 2011). The plaintiffs alleged that they bought a number of Dairy Queen franchises based on "over-inflated property appraisals, over-hyped 'triple-net' leases, and the overstated expertise of several of the [d]efendants." *Id.* They further alleged that the various appraisers, brokers, sellers, and managers of the franchises formed an enterprise with the purpose of duping the plaintiffs into purchasing over-valued assets. *Id.* The court found that the plaintiffs had failed to allege an enterprise because, "[p]laintiffs have alleged only a string of actions taken by [d]efendants either severally or in small sub-groups, and they have alleged no facts that support any allegation of "coordinated behavior" among the Defendants." *Id.* at 13. There may have been bilateral relationships between the various defendants, and various defendants may have acted improperly, but that is not the same as an allegation that the defendants acted as an ongoing and continuing organization. *Id.*[13]

---

[13] Western and Southern argues that *HMV Properties* does not apply because it involved a federal RICO claim and relied on pre-*Boyle* authority. Opp. at 17–18 n.23. To the contrary, Ohio courts look to federal RICO cases to interpret the OCAA (*supra*, n.11), and *HMV Properties* explicitly considered *Boyle* and held that allegations similar to the ones in this case were insufficient. *HMV Properties, LLC*, 2011 WL 53166 at *14 ("Plaintiffs do little more than offer conclusory

In this case, like *HMV Properties*, Western and Southern has identified a number of parties to the securitization process.  Many of the identified parties are Countrywide-owned or Countrywide agents and therefore incapable of constituting an enterprise on their own.  As to the non-Countrywide entities, the AC pleads a number of facts from which the Court *might* conclude that the parties acted improperly in response to incentives set by Countrywide or by the securitization process generally, and then attempts to bootstrap a conclusion that these thousands of diverse and disparate entities shared a common purpose and cooperated with each other in furtherance of that purpose.  The AC contains no facts indicating that the various non-Countrywide entities it identifies coordinated their behavior or combined as an enterprise.  On the contrary, a number of the AC's allegations indicate that these entities were actively competing with each other for Countrywide's business.

Western and Southern has identified a number of non-parties that were allegedly part of the enterprise.  The Court addresses each and its alleged role in the enterprise briefly:

- Correspondent lenders such as People's Choice Mortgage, Summit Mortgage LLC, Loans for Residential Homes Mortgage Corporation, Sprint Funding Corporation, Ameribanq Mortgage Group LLC, and E-Loan, Inc.  AC ¶¶ 168–88; 419–20.  The allegations in the AC, as summarized by the Western and Southern, are that the correspondent lenders would "'churn out' large numbers of loans, without regard to quality," based on the price they would fetch in the secondary market rather than the borrower's ability to repay.  Opp. at 12.  At the risk of being glib, this allegation amounts to one that "Countrywide offered to buy something, and the lenders obliged."  Western and Southern has

statements as to the existence of an association-in-fact enterprise without offering any facts in support of the *Boyle* factors: purpose, relationship, or longevity.").

17

identified exactly the type of arms-length business transaction, with each party pursuing its own independent economic interests, that does not constitute a RICO enterprise.

- Real estate appraisers controlled or influenced by Countrywide, including LandSafe, Inc. ("LandSafe").  AC ¶¶ 245–50; 420.  LandSafe was a Countrywide subsidiary and therefore cannot constitute an enterprise for the reasons set out above.[14]  The allegations respecting other appraisers are vague, but they amount to an allegation that Countrywide pressured brokers to use "acceptable" appraisers that would provide inflated valuations.  AC ¶¶ 247–250.  If true, these allegations mean that the various brokers responded to market incentives created by Countrywide and hired appraisers accordingly.  The AC does not allege that the "acceptable" appraisers had any direct relationship with Countrywide or otherwise constituted an enterprise.

- Underwriters of Countrywide RMBS, including Credit Suisse First Boston LLC and Deutsche Bank Securities, Inc.  AC ¶¶ 123; 420.  The allegations relating to the underwriters are that they ignored red flags and "waived in" to the securitizations noncompliant and risky loans.  *Id.* ¶¶

---

[14] Two recent cases have held that Countrywide and LandSafe could constitute a RICO enterprise.  *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1214–15 (S.D. Cal. 2009); *Johnson v. KB Home*, 720 F. Supp. 2d 1109, 1120–21 (D. Ariz. 2010).  Those cases did so under a doctrine called the "something more" test, which holds that a parent and its subsidiary may constitute a RICO enterprise when each plays a different role or the decision to operate through a subsidiary facilitates the activity of the enterprise in some way.  *In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d at 1214–15.  The "something more" test has not been endorsed by the Ninth Circuit, Sixth Circuit, or any Ohio court.  The Court finds no indication that an Ohio court would apply the "something more" exception, and therefore declines to address it in this case.

124–30.  The role of an underwriter is to act as a sales agent for the issuer.  Nothing in the AC indicates that the underwriters worked together to operate the affairs of an enterprise rather than their own affairs.[15]  The most damning possible inference possible from the facts in the AC is that the underwriters responded to pressure (real or perceived) from Countrywide and "waived in" loans that did not meet standards.  This is the type of bilateral conduct that does not constitute a RICO enterprise.  Every securities issue has an underwriter; if a claim of underwriter complicity were sufficient, then every securities claim could be recast as a RICO claim.

- Foreclosure law firms, including Lerner, Sampson & Rothfuss of Cincinnati, that allegedly promoted forgery, perjury, and tampering in attempting to cover up Countrywide's failure to meet Transfer of Title obligations and vest losses on bad loans in the securitization trusts.  Opp. at 10; AC ¶¶ 229–40.  For the reasons set out above, a corporation and a law firm acting as its agent are not insufficiently distinct so as to form a RICO enterprise.  *See Kelly v. Palmer, Reifler, & Associates, P.A.*, 681 F. Supp. 2d 1356, 1380 (S.D. Fla. 2010) ("The Palmer Law Firm's tactics, even if deceptive or extortionate, were not separate and apart from its

---

[15] *In re Ins. Brokerage Antitrust Litig.*, cited by Western and Southern, is instructive.  618 F.3d 300 (3d Cir. 2010).  There, the Third Circuit found that, under *Boyle*, a series of bilateral contracts between one broker and many insurers did not constitute a RICO enterprise.  *Id.* at 375.  The insurers were not connected as part of an enterprise because, "plaintiffs' factual allegations do not plausibly imply anything more than parallel conduct by the insurers." *Id.* at 374.  A bid-rigging allegation succeeded, because bid-rigging required the cooperation of the various insurers.  *Id.* at 377–78.  Nothing in the AC alleges that the underwriters coordinated or cooperated with each other.  On the contrary, the implication of the AC is that Countrywide pressured the underwriters to compete with each other by "waiving in" increasing numbers of noncompliant loans.

corporate client seeking to obtain a civil recovery from the
[p]laintiffs.").[16]

- PMI insurers that allegedly paid unlawful kickbacks to Countrywide,
  including Mortgage Guaranty Insurance Corporation, Genworth
  Mortgage Insurance Corporation, Radian Guaranty Inc., United Guaranty
  Residential Insurance Company, Triad Guaranty Insurance Company,
  and Republic Mortgage Insurance.  AC ¶¶ 262–276.  As with the
  underwriter allegations, the AC alleges that the various PMI insurers
  entered into bilateral commercial agreements with Countrywide.  The AC
  does not allege that the PMI insurers agreed or cooperated with each
  other in any way.  Moreover, if the Court credits the AC's allegations
  that the PMI insurers were forced to pay kickbacks to Countrywide under
  a pay-to-play system, then the PMI insurers are properly viewed as
  *victims*, not members of a racketeering enterprise.

- Bank of New York Mellon ("BNY"), the trustee for the RMBS trusts,
  which allegedly furthered the enterprise's goals by failing to enforce
  Countrywide's repurchase obligations.  AC ¶ 420.  The AC contains no
  factual allegation, much less one that would survive challenge under
  *Twombly*, that BNY's actions as trustee were not unilateral.

Nothing in the AC indicates that any of the groups above shared a "common
purpose" and coordinated with each other as required to plead an enterprise.  Many
of the allegations indicate the opposite, that the entities engaged in bilateral

---

[16] The Court also notes that the allegations relating to foreclosure misconduct do
not make economic sense.  The gist of Plaintiff's foreclosure misconduct
allegations is that foreclosure firms attempted to cover up deficiencies in title
transfers and foreclose on borrowers.  But it is not clear how that behavior could
have hurt noteholders.  If the foreclosure firms were successful, then the recovery
to the trusts would increase; if unsuccessful, the trusts would not be in any worse
position than before the misconduct.

1   business dealings with Countrywide but in sharp competition with each other.

2   That is the type of rimless hub-and-spoke structure that the Third Circuit

3   considered and found wanting in *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300

4   (3d Cir. 2010).  Western and Southern has cited no reason why such a structure

5   suffices to plead an enterprise in this case.

6   **C.    WESTERN AND SOUTHERN'S CIVIL CONSPIRACY CLAIM FAILS UNDER THE**

7   **INTRA-CORPORATE CONSPIRACY DOCTRINE**

8       Cause of Action Seventeen alleges that Defendants are liable for civil

9   conspiracy because they "formed an association in fact of entities that conspired to

10  underwrite and purchase fraudulently and improperly underwritten loans, to

11  package those loans for resale, and to fraudulently service such loans through use

12  of fraudulent and forged documents in foreclosures and overcharges to borrowers

13  for insurance and other services."  AC ¶ 497.  A civil conspiracy is a "malicious

14  combination of two or more persons to injure another person or property, in a way

15  not competent for one alone, resulting in actual damages."  *Kenty v. Transamerica*

16  *Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995) (citation omitted).

17      Defendants argue that the civil conspiracy claim must be dismissed under

18  the "intra-corporate conspiracy doctrine."  The intra-corporate conspiracy doctrine

19  provides that members of the same corporate family, including subsidiaries and

20  employees, cannot conspire with each because they are the same legal entity.

21  Western and Southern argues that the doctrine does not apply (or at least that it

22  does not apply to separate legal entities such as subsidiaries).  Opp. at 64–65.

23  Western and Southern apparently concedes that its civil conspiracy claim is barred

24  if the doctrine applies to legally distinct entities that are nevertheless wholly owned

25  by the same corporate parent.

26      The Ohio Supreme Court has never addressed the intra-corporate conspiracy

27  doctrine.  In 2009, however, the Sixth Circuit predicted that the Ohio Supreme

28  Court would adopt the doctrine.  *Bays v. Canty*, 330 F. App'x 594, 594 (6th Cir.

21

2009).  *Bays* drew upon a "'common sense' insight 'that a person cannot conspire with himself'" and held that, "since a corporation only acts through its officers, a group of corporate officers acting within the scope of employment cannot create a conspiracy."  *Id.*  Western and Southern cites three cases to dispute the Sixth Circuit's finding.  Opp. at 64 n.71 (citing *Ohio Bureau of Workers' Comp. v. MDL Active Duration Fund, LTD.*, 476 F. Supp. 2d 809, 825-26 (S.D. Ohio 2007); *Nilavar v. Mercy Health Sys.*, 142 F. Supp. 2d 859, 889 (S.D. Ohio 2000); *Berryhill v. Khouri*, No. 10-CV-721073, 2011 Ohio Misc. LEXIS 364, at *7 (Ohio C.P., Jan. 13, 2011)).  *Ohio Bureau of Workers' Comp.* accepted the intra-corporate conspiracy doctrine but found that it did not apply to unrelated legal entities just because those entities share an employee.  476 F. Supp. 2d at 825–26. *Nilavar* recognized the doctrine as applied to employees acting within the scope of their employment, but declined to extend it to corporate subsidiaries.  142 F. Supp. 2d at 888–89.  *Berryhill* merely clarified that the doctrine does not apply to employees acting outside the scope of their employment.  2011 Ohio Misc. LEXIS 364, at *7.

Even the cases cited by Western and Southern recognize that the intra-corporate conspiracy doctrine shields employees acting within the scope of their employment.  The Court agrees; it will follow *Bays* and the intermediate Ohio courts on this issue.  *Bays*, 330 F. App'x at 594; *Tandem Staffing v. ABC Automation Packing, Inc.*, 2000 WL 727534, at *8 (Ohio App. June 7, 2000); *Scanlon v. Gordon F. Stofer & Bro. Co.*, 1989 WL 69400, at *16 (Ohio App. June 22, 1989); *Schrock v. D & N Development, Inc.*, 1995 WL 495488, at *2 (Ohio App. June 28, 1995).

Western and Southern does not argue that any of the Individual Defendants acted outside the scope of their employment.  The remaining question is therefore whether the intra-corporate conspiracy doctrine applies to related corporate entities like the ones in this case.  *Nilavar* held that it does not.  142 F. Supp. 2d at 889.

Defendants cite two Ohio trial court cases that have held the opposite. *Hometown Health Plan v. Aultman Health Foundation*, 2009 WL 1806759 (Ohio Ct. Com. Pl. Apr. 15, 2009); *Andrew v. Power Marketing Direct Inc.*, 2010 WL 7405622 (Ohio Ct. Com. Pl. May 20, 2010). In the absence of a controlling Ohio Supreme Court decision, the Court must predict how the Ohio Supreme Court would decide the issue. *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003). It is appropriate to use "intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids." *Id.*

The Court concludes that, if faced with the question, the Ohio Supreme Court would hold that a corporation and its subsidiaries are not capable of conspiring with each other. First, while courts and states disagree, a majority appear to have adopted the intra-corporate conspiracy doctrine in the context of subsidiaries. *See Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 131 (1st Cir. 2006) ("[A] family relationship among corporations" will not support a civil conspiracy claim under Massachusetts law); *Davidson & Schaaff, Inc. v. Liberty Nat. Fire Ins. Co.*, 69 F.3d 868, 871 (8th Cir. 1995) ("[T]wo subsidiaries of the same parent cannot conspire" under Missouri law.); *Okusami v. Psychiatric Inst. of Washington, Inc.*, 959 F.2d 1062, 1066 (D.C. Cir. 1992) (Civil conspiracy not possible between a parent and its subsidiary); *Tate v. Sallie Mae, Inc.*, 3:10-CV-00386, 2011 WL 3651813, at *3 (W.D.N.C. Aug. 19, 2011) (same; North Carolina law); *Pizza Mgmt., Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154, 1166 (D. Kan. 1990) (same; Kansas law); *Bryant Heating and Air Cond. Corp. v. Carrier Corp.*, 597 F.Supp. 1045, 1054 (S.D. Fla. 1984) (same; Florida law) *Bunch v. Artec Int'l Corp.*, 559 F. Supp. 961, 970 (S.D.N.Y. 1983) (same; Oregon and Pennsylvania law); *Chrysler Credit Corp. v. Rebhan*, 66 N.C. App. 255, 259 (1984) (same; Michigan law). *But see ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 417-18 (S.D. Tex. 2008) ("[T]he most well-reasoned approach is the one that recognizes a cause of action for conspiracy between a parent and subsidiary only

when the parent acts outside its role as 100% owner of the subsidiary."); *Blades v. Countrywide Home Loans, Inc.*, CIVA1:06CV1000LG-JMR, 2007 WL 2746678 (S.D. Miss. Sept. 18, 2007) ([T]he separate nature of these subsidiaries prevents the Court from holding that CFC, the parent company, should be considered the same entity as both subsidiaries."); *Seeco, Inc. v. Hales*, 22 S.W.3d 157, 173 (Ark. 2000) (refusing to apply the doctrine to civil conspiracy claims against wholly owned subsidiaries of the same parent company); *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1044 (Del. Ch. 2006) (refusing to apply the doctrine under Delaware law). Second, the majority view better serves the purpose of conspiracy law. The bedrock of any conspiracy claim is a "malicious combination." *Kenty*, 72 Ohio St.3d at 419. *Bays* noted that it is common sense that employees of a corporation do not "combine" when they act within the scope of their employment, they merely fulfill their role as agents of the corporation. 330 Fed. App'x at 594. In many ways though, an employee is more capable of combination with an employer than is a subsidiary. An employee, at least, is a human being capable of motivations distinct from his employer. A subsidiary is capable of no such independence; it is entirely controlled by the parent company.

The Supreme Court explicitly considered this issue in the context of antitrust law:

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a

24

parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984). *Copperweld* was an antitrust case, but the Supreme Court could as easily have been discussing any conspiracy.  A conspiracy charge will not lie without multiple independent actors.   But, as explained in *Copperweld*, a parent and subsidiary have "not . . . two separate corporate consciousnesses, but one." *Id.*  The logic of *Copperweld* does not apply only to antitrust law, but rather any cause of action that requires a "combination."  Applying it here is a logical application of *Bays'* "common sense" approach to the combination requirement.  Accordingly, the Court finds that, were the Ohio Supreme Court to consider the issue, it would find that members of the same corporate family, including subsidiaries, are incapable of conspiring with each other.  Every member of the alleged conspiracy is a member of the Countrywide corporate family.  Accordingly, Cause of Action Seventeen is **DISMISSED WITH PREJUDICE**.

## IV.   NATIONAL INTEGRITY

National Integrity's complaint (the "Complaint") is identical in most respects to the Amended Complaint in *Western and Southern*.  The only significant difference is that National Integrity filed its action in the Southern District of New York.  This fact compels the Court to apply New York law, including New York choice-of-law rules.  *In re Nucorp Energy Sec. Litig.*, 772 F.2d at 1492.  In The First Round Order, the Court found that National Integrity was a New York resident, that its common law claims should therefore be evaluated under New York's statute of limitations, and that those claims were therefore timely.  First Round Order, 2012 WL 1097244, at 15–16.  The presence of those claims and the applicability of New York law require further analysis of the state law claims.

National Integrity's federal claims are identical to Western and Southern's and are **DISMISSED WITH PREJUDICE** for the same reasons set out above.

**A.    CHOICE OF LAW IS NOT APPLICABLE TO NATIONAL INTEGRITY'S OSA CLAIMS**

In the First Round Order, the Court implicitly applied Ohio law to National Integrity's OSA claims. *Id.* at *16. In a related case, the Court analyzed the potential for overlapping and/or conflicting blue sky laws. *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 2:11-ML-02265-MRP, 2012 WL 1322884, *2 (C.D. Cal. Apr. 16, 2012) ("*MassMutual*"). The Court held that conflict-of-law analysis is not necessary for Blue Sky laws because they are nonexclusive. As the Court explained in *MassMutual*:

> Blue Sky laws are designed to regulate securities transactions within (or impacting) a particular state. If a transaction touches multiple states, it follows that multiple Blue Sky laws may apply simultaneously. The Court agrees with the majority view that a plaintiff may sue under the securities laws of several states at once so long as the requirements of each state's law are met.

*Id.*[17] Nothing about the OSA requires a different result. The Court therefore adopts *MassMutual* in this case. Because Blue Sky laws may overlap, it is

---

[17] *MassMutual* was based on, among others, the following cases: *Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543, 551 (W.D. Va. 1985) ("Just as the same act can violate both federal and state law simultaneously, or a state statute as well as state common law, so too can it violate several Blue Sky laws simultaneously."); *Simms Inv. Co. v. E.F. Hutton & Co.*, 699 F. Supp. 543, 546 (M.D.N.C. 1988) ("[T]he securities laws of two or more states may be applicable to a single transaction without presenting a conflict of laws question."); *Barneby v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1536 (M.D. Fla 1989) ("[N]o reason to apply a traditional conflicts of laws analysis" when suit was brought under a state Blue Sky law.); *Chrysler Capital Corp. v. Century Power Corp.*, No. 91 Civ. 1937, 1992 WL 163006, at *2 (S.D.N.Y. June 24, 1992) ("[B]ecause application of multiple state

unnecessary to perform a conflict analysis with respect to National Integrity's OSA claims.

Only the transfer-of-title-related OSA claims survived the First Round Order.  2012 WL 1097244, at 16.  The Court considered and dismissed identical OSA transfer of title allegations in Section III.A. above.  The same law and the same analysis apply to National Integrity's OSA claims.  National Integrity's OSA claims are therefore **DISMISSED WITH PREJUDICE**.

**B.  NATIONAL INTEGRITY'S RACKETEERING AND CONSPIRACY CLAIMS MUST BE DISMISSED UNDER EITHER NEW YORK OR OHIO LAW**

Under New York law, the first step in a choice-of-law analysis is to determine whether an actual conflict exists.  *Matter of Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993).  In Section III.B above, the Court determined that identical allegations fail under the OCAA.  New York does not permit *any* private action under its racketeering law.  N.Y. Penal Law § 460.20.  Similarly, Section III.C finds identical conspiracy allegations deficient under Ohio law.  Like racketeering, "New York law does not recognize a tort action for civil conspiracy." *Vasile v. Dean Witter Reynolds Inc.*, 20 F. Supp. 2d 465, 481 (E.D.N.Y. 1998) *aff'd sub nom. Vasile v. Dean Witter Reynolds, Inc.*, 205 F.3d 1327 (2d Cir. 2000).  Plaintiffs do not dispute either point.

Ohio and New York law differ, but each would require dismissal of National Integrity's racketeering and conspiracy causes of action.  The Court therefore finds no actual conflict between them in this case.  Causes of Action Six and Fifteen are **DISMISSED WITH PREJUDICE**.

---

securities laws to a single securities transaction does not present a conflict of laws issue, [defendant]'s argument that only New York law may apply to the transaction at issue is rejected."); *United Heritage Life Ins. Co. v. First Matrix Investor Services*, No. CV 06-0496, 2009 WL 3229374, at *4 (D. Idaho Sept. 30, 2009) ("[M]ore than one state's securities laws can apply to a transaction.").

## C.   NATIONAL INTEGRITY'S NEGLIGENT MISREPRESENTATION CLAIM IS BARRED

The parties agree that Ohio law should apply to National Integrity's negligent misrepresentation claim.  Applying New York law, this Court has repeatedly dismissed negligent misrepresentation claims by RMBS investors for failure to plead a "special relationship" between the investor and Countrywide.  *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, 2:11-CV-07165-MRP, 2012 WL 1798997, at *7 (C.D. Cal. Feb. 17, 2012); *Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1192 (C.D. Cal. 2011).  Some courts have found that Ohio has a similar "special relationship" requirement.  *Doe v. SexSearch.com*, 551 F.3d 412, 418 (6th Cir. 2008) ("[A] claim for negligent misrepresentation requires 'a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction.'") (citing *Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006)); *Advantage Renovations, Inc. v. Maui Sands Resort, Co., L.L.C.*, 2012 WL 1493826, at *7 (Ohio Ct. App. Apr. 27, 2012) (Ohio law requires "special duty or relationship"); *McNabb v. Hoeppner*, 2011 WL 2571386, at *4 (Ohio Ct. App. June 22, 2011) (dismissing for lack of a "special relationship").  Other courts have eschewed the "special relationship" language in favor of a requirement that "(1) the defendant must provide false information for the guidance of the plaintiff in its business transactions and (2) the plaintiff must be the person or one of a limited group of persons for whose benefit and guidance the defendant intends to supply the information or knows that the recipient intends to supply it."  *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Products Inc.*, 2:02-CV-1288, 2007 WL 894833, at *9-11 (S.D. Ohio Mar. 22, 2007) (citing *Gutter v. Dow Jones, Inc.*, 22 Ohio St.3d 286, 288 (1986)).  In those courts' view, "special relationship" is merely convenient shorthand for the limiting (to information provided for use in business transactions

1    and to a limited group) elements of a negligent misrepresentation claim.  *In re Nat'l*

2    *Century Fin. Enters., Inc., Inv. Litig.*, 580 F. Supp. 2d 630, 647 (S.D. Ohio 2008).

3          The approach taken in *National Mulch & Seed* is persuasive.  Ohio law does

4    not impose a separate "special relationship" requirement.  Rather, the term is

5    properly viewed as shorthand for the limiting elements of the cause of action.

6    2007 WL 894833, at *9-11.  National Integrity alleges that it is part of a "limited

7    class" of purchasers because (i) it is an institutional investor, (ii) its portfolio

8    managers had face-to-face meetings with Countrywide, and (iii) Countrywide

9    provided data and helped National Integrity develop pricing models.  Opp at 62.

10   These allegations are not sufficient to state a claim for negligent misrepresentation

11   under Ohio law.

12         The general rule is that the investing public is not a sufficiently limited class.

13   *Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 855-56 (Ohio Ct.

14   App. 2000).  National Integrity has alleged that it is a sophisticated institutional

15   investor, but nothing about the Certificates or Offering Materials limited purchases

16   to such entities.  Two cases from Ohio district courts help frame the issue.  In *In re*

17   *National Century Financial Enterprises, Inc., Investment Litigation*, the court held

18   that representations made in connection with a private placement may state a claim

19   for negligent misrepresentation because participation in the private placement was

20   limited to a small group of Qualified Institutional Buyers ("QIBs").  580 F. Supp.

21   2d at 652-53 (QIB purchasers constitute a sufficiently limited group).  A more

22   recent case, *Ohio Police & Fire Pension Fund v. Standard & Poor's Fin. Services,*

23   *LLC*, held that even QIBs constitute an insufficiently limited group to state a cause

24   of action for negligent misrepresentation.  813 F. Supp. 2d 871, 881-82 (S.D. Ohio

25   2011).  The *Ohio Police* court also dismissed claims relating to non-private

26   placements because the "complaint [did] not allege that the securities . . . were

27   offered only to qualified institutional investors or only to pension funds."  *Id.* at

28   881.  The same analysis applies here.  Any investor with sufficient means was

eligible to buy the Certificates at issue in this case.  And thousands of investors from around the world bought the same or substantially the same Countrywide-issued RMBS.  That is not the type of limited class that will support a negligent misrepresentation claim.

National Integrity's allegations regarding face-to-face meetings and data provision do nothing to narrow the scope of the "class."  The data and pricing models that National Integrity discusses were publicly available to any investor on Countrywide's website.  Complaint ¶ 374.  Similarly, the face-to-face meetings that National Integrity cites to were at marketing road shows and public investor forums.  Complaint ¶ 81.  These events were open to the public.  More importantly, the alleged misrepresentations that National Integrity complains of occurred in the Offering Documents, not in the face-to-face meetings.  Those Offering Documents were available to the entire investing world.  Accordingly, an action for negligent misrepresentation is unsustainable under Ohio law.  Cause of Action Seven is **DISMISSED WITH PREJUDICE**.

**D.     THE PARTIES HAVE NOT IDENTIFIED ANY CONFLICT BETWEEN NEW YORK AND OHIO WITH RESPECT TO THE COMMON LAW FRAUD CLAIM**

National Integrity's only remaining primary claim is for common law fraud. The representations that National Integrity has identified relating to transfer of title are not false for the reasons set out in Section III.A above.  That leaves National Integrity's allegations premised on underwriting, appraisals, loan-to-value ratios, and ratings.  Applying New York law, the Court has repeatedly held that identical allegations are better addressed on a more complete factual record.  *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, 2:11-CV-07165-MRP, 2012 WL 1798997, at *5–6 (C.D. Cal. Feb. 17, 2012); A*llstate Ins. Co. v. Countrywide Fin. Corp.*, 894 F. Supp. 2d 1164, 1183–88 (C.D. Cal. 2011) ("*Allstate I*").  National Integrity argues that Ohio substantive law should apply to its common law claims (Opp. at 71), but no party has identified a material difference between the laws of

Ohio and New York with respect to common law fraud.  The Court will therefore adopt its previous rulings in *Allstate* and *Dexia* with respect to the common law fraud claim.  National Integrity's fraud allegations premised on underwriting, appraisals, loan-to-value ratios, and ratings are sufficient at the motion to dismiss stage.

**E.  DELAWARE LAW BARS NATIONAL INTEGRITY'S SUCCESSOR LIABILITY CLAIMS**

The *National Integrity* action was transferred from a district court in New York.  Accordingly, New York's choice-of-law rules apply to National Integrity's claims.  In *Allstate*, the Court applied New York's choice-of-law rules to a successor liability claim against Bank of America.  *Allstate I*, 894 F. Supp. 2d at 1171–72.  The Court found that Delaware law applies to such claims, and that the claims are barred under Delaware law.  *Id.* at 1171–74; 1192–93.  The logic of *Allstate* applies with equal force in this case.  Accordingly, Cause of Action Thirteen is **DISMISSED WITH PREJUDICE**.

**V.  CONCLUSION**

For the reasons set out above, the *Western and Southern* action is **DISMISSED WITH PREJUDICE**.  Cause of Action Fourteen in *National Integrity* may proceed based on allegations relating to underwriting, appraisals, loan-to-value ratios, and ratings.  *National Integrity* is otherwise **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

DATED:  June    29, 2012

_____

Hon. Mariana R. Pfaelzer

United States District Judge

31